# EXHIBIT A

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF GEORGIA

 3                  ATLANTA DIVISION

 4   ELSA FLORES DIAZ and        )

     EDWIN MEDRANO CACERES, for  )

 5   themselves and on behalf of )

     their minor children E.M.F.,)

 6   V.M.F., B.M.F., and H.M.F., )

                                 )

 7          Plaintiffs,          )

                                 )

 8   vs.                         ) No. 1:21-cv-03661-ELR

                                 )

 9   THE PARTNERSHIP, INC.,      )

                                 )

10          Defendant.           )

11

12

13   ************************************************

14                ORAL DEPOSITION OF

15                  BRUCE JACOBS

16                 AUGUST 11, 2022

17   ************************************************

18

19       On the 11th day of August, 2022, at 9:05 a.m.,

20   the oral deposition of the above-named witness was

21   taken at the instance of the Plaintiffs, before

22   Michelle L. Munroe, Certified Shorthand Reporter in

23   and for the State of Texas, at Regus, 825 Watters

24   Creek Boulevard, Suite 250, Allen, Texas, pursuant to

25   Notice and the agreement hereinafter set forth.
```

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 2

```
 1                  A P P E A R A N C E S
 2
    FOR THE PLAINTIFFS:
 3        Mr. Aaron K. Block (via Zoom)
          THE BLOCK FIRM LLC
 4        309 East Paces Ferry Road
          Suite 400
 5        Atlanta, Georgia  30305
          404.997.8419  telephone
 6        aaron@blockfirmllc.com
 7
 8   FOR THE DEFENDANT:
          Mr. Jeffrey W. Melcher
 9        STITES & HARBISON PLLC
          303 Peachtree Street N.E.
10        Suite 2800
          Atlanta, Georgia  30308
11        404.739.8812  telephone
          jmelcher@stites.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Bruce Jacobs                                              August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                              Page 3

1                           I N D E X

    WITNESS                                              PAGE

2

    BRUCE JACOBS

3

          Examination by Mr. Block.................   4

4

5   DEPOSITION EXHIBITS                          IDENTIFIED

6   Exhibit 1       Subpoena response...............   31

7   Exhibit 2       Handwritten notes...............   32

8   Exhibit 3       Police incident reports.........   56

9   Exhibit 4       June 27, 2022 expert report.....   63

10  Exhibit 5       Affidavit of Bruce A. Jacobs....  186

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    P R O C E E D I N G S

2                         BRUCE JACOBS,

3      having been first duly sworn, testified as follows:

4                         EXAMINATION

5      BY MR. BLOCK:

6          Q.    Good morning, Dr. Jacobs.  My name is

7      Aaron Block and I represent the plaintiffs.  And

8      unless you tell me differently, I think we can

9      dispense with the usual ground rules because you

10     have had your deposition taken a number of times.

11     Is that fair?

12         A.    Yes.

13         Q.    The one, I guess, pointer I would make

14     is -- has to do with nomenclature.  We refer to the

15     plaintiffs as the Diaz family, and I think

16     internally the defense, at least some of the time,

17     refers to them as the Caceres family.  And can we

18     just agree we're talking about the same people

19     whether it's Diaz or Caceres?

20         A.    Sure.

21         Q.    Okay.  I'll almost exclusively if not

22     exclusively say Diaz.  I just wanted to get that out

23     of the way.

24               Dr. Jacobs, the other actually pointer

25     would be sometimes on depositions, court reporters

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 5

1   tell me that I speak a little too quickly.  If I

2   speak too quickly for you or, Michelle, if I speak

3   too quickly for you, just tell me and I will try the

4   slow down.  Okay?

5        A.   Sure.

6        Q.   Could you tell me Dr. Jacobs what you did

7   to prepare for your deposition this morning?

8        A.   I just reviewed the entirety of the file

9   and reviewed my report.  That's essentially what I

10  did.

11       Q.   And could you tell me, Dr. Jacobs, a

12  little bit about your biography, your sort of

13  professional biography.  I have obviously read your

14  CV, but just if you could tell me in your own

15  English words a little bit about your professional

16  biography, that would be helpful.

17       A.   Sure.

18            I have a bachelor's degree from Duke

19  University, majored in history; got a master's

20  degree from University of Toledo, which is my

21  hometown school, in sociology with a specialization

22  in criminology; and I got a Ph.D. from the

23  University of Southern California in sociology,

24  again with a specialization in criminology.

25            In 1994, I was an assistant professor and

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc                    August 11, 2022

Page 6

1   associate professor with tenure at University of

2   Missouri, St. Louis, from, let's see, 1994 to 2003,

3   department of criminology.  I moved to University of

4   Texas at Dallas in 2003 where I have been a tenured

5   faculty member since then.

6           I have, you know, published multiple

7   peer-reviewed articles, books on street crime and

8   violence.  A lot of that is specified in my report.

9   I have done security analysis of hundreds of

10  properties around the country, retained or been --

11  retained or testified in hundreds of cases around

12  the country in the last 20 years on issues of crime

13  foreseeability, adequacy of crime prevention

14  measures, the functional limits of crime prevention,

15  deterrents, crime pattern analysis and so forth.

16          I guess that's the short and quick of it.

17      Q.    Thank you.

18          I was intrigued by your time at UMSL --

19  which, for Michelle, that's U-M-S-L, which is how

20  people in St. Louis, where I'm from, refer to the

21  University of Missouri, St. Louis.

22          And a little bit of a detour, but my

23  recollection from the late '90s when I was in high

24  school was that UMSL sort of billed itself as having

25  a really strong program in criminology and sort

Page 7

1    of -- I'm using that term kind of loosely -- but

2    criminal justice as -- you know, when they would do

3    the, like, fairs to talk about schools, that's

4    actually -- that is really what stood out about UMSL

5    is that sort of consistent with your understanding,

6    it actually is a fairly strong program at UMSL in --

7    or was, anyway, in criminology?

8         A.    Yeah, we were -- we were a top five

9    criminology department in the country.  I think

10   they're still top five.

11        Q.    Yeah.  Yeah.  That's cool.  I hadn't

12   thought about that in a long time.  But, anyway, I

13   was intrigued to see UMSL on your CV.

14             Have you, Dr. Jacobs, ever had any formal

15   employment in law enforcement?

16        A.    Not formal, no.

17        Q.    And have you ever had any formal

18   employment in providing security?

19        A.    In terms of, like, being a security guard,

20   no.

21        Q.    I think I saw in your CV that you have

22   gone on ride-alongs or otherwise sort of been

23   embedded, if you will, with law enforcement; is that

24   right?

25        A.    I have done extensive field research over

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 8

1    the years with law enforcement; drug busts, search

2    warrants, undercover buys, saturation patrol, drug

3    interdiction, gun interdiction, gang member field

4    interrogations.  So I've done all that, but I have

5    not been a cop, no.

6         Q.   Have you ever worked with any police

7    departments on crime prevention?

8         A.   How do you mean?

9         Q.   Well, it sounds like you're telling me

10   that your field work was sort of, you know, active;

11   riding along in the car, if you will, and going out

12   on operations.

13        And I'm wondering if you have ever worked

14   with law enforcement on the front end on things,

15   like, identifying patterns of crime or hot spots or

16   allocating police resources to prevent crime in the

17   first instance.

18        A.   I have done that with private properties

19   and organizations but not with police departments.

20   I have done it based on police data but not for the

21   police department.

22        Q.   And if I were to meet you socially today

23   and we were just talking and I asked you, hey, what

24   do you do for a living, how would you describe what

25   you do for a living?

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 9

1        A.    I would tell them I'm a criminologist,

2    that I teach, do research, and perform professional

3    service, and then I also provide what I would call

4    litigation support when I'm called by attorneys to

5    provide that to assess matters of negligent security

6    or allegations thereof.

7        Q.    And if you could just estimate for me

8    these days, how much time do you spend on what I

9    would think of as your academic pursuits as opposed

10   to litigation support?

11       A.    I would say on average I spend about one

12   day a week on litigation support.

13       Q.    And we'll drill down on the litigation

14   support role.

15            Could you tell me about what you do in the

16   other four days of the week in your academic

17   pursuits?

18       A.    Teaching, research, and service; that's

19   the three prongs of my job.

20       Q.    And is that -- you told me it was about

21   four days.

22            Is that a full-time position that you hold

23   with the University of Texas at Dallas?

24       A.    It -- well, it's nine months.  I don't

25   have a summer contract, but it's full-time during

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 10

 1   the nine months.

 2        Q.   And some experts I have met in other

 3   fields have -- who are associated with a university

 4   or an academic center have rules that govern whether

 5   professors can serve in an expert role and under

 6   what circumstances and have conflict policies and

 7   sometimes actually even require funding or payment

 8   for expert services to run through the university

 9   and then be dispersed to the expert.

10             That's the predicate for my question which

11   is:  Does the University of Texas at Dallas impose

12   any kind of rules or policies or restrictions on

13   your serving as an expert witness in litigation?

14        A.   Not in terms of funneling the invoices or

15   revenue through the university, but I do have formal

16   written permission from my department chair, from

17   the dean of the school of social sciences, and the

18   provost of the university to do the expert work.  I

19   have had that formal written permission, I believe,

20   since 2005.  It's called an authorization for dual

21   employment form, and so I have already taken care of

22   all that.  So they know -- they know what I'm doing.

23             And also in terms of conflict of interest

24   policies, if one of the parties was somehow related

25   to the University of Texas at Dallas or UT system,

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 11

 1   then I wouldn't take the case.  I guess that would

 2   be the answer to that part of the question.

 3       Q.   And does the university -- well, let me

 4   back up a little bit.

 5            You're obviously not here in this case to

 6   speak on behalf of the university, correct?

 7       A.   Correct.

 8       Q.   The university doesn't endorse your

 9   serving as an expert in any particular case, does

10   it?

11       A.   Endorse?  You mean -- what do you mean by

12   that?

13       Q.   Well, does the university even know that

14   you're an expert in this Diaz case?

15       A.   No, and they would have no reason to know.

16   But they know that I perform this kind of work.  And

17   it's -- so that's how I would answer that question.

18       Q.   Sure.  Sure.

19            So the -- could you tell me -- thinking

20   about the last year or two of school, could you tell

21   me what you focused on in your teaching

22   responsibilities?

23       A.   Well, I teach victimless crimes in the

24   fall.  Typically it's an undergraduate course.  I

25   teach etiology of crime and criminality, which is a

Page 12

1    Ph.D. level theory course.  I teach drugs and crime,

2    which is an undergraduate level course.  I teach

3    violent crime, which is a Ph.D. level course,

4    graduate level course.  And then obviously I have

5    multiple committee memberships, review

6    responsibilities, journal review responsibilities,

7    department committee memberships.  I do tenure

8    reviews.  I'm a journal reviewer.

9         And then obviously I -- during the course

10   of the entire year, even when I'm not on my

11   nine-month contract, I spend a lot of time working

12   on my publications, my research, and trying to get

13   my papers published.  I obviously have done a lot of

14   that this summer as well.

15        Q.   And how would you describe your research

16   focus?

17        A.   Most of it's qualitative based on

18   interviews and/or field research with active

19   offenders.  It focuses on offender decision making,

20   deterrents, rational choice.  However, I am now --

21   over the last couple years, I have been moving a

22   little bit more into some quantitative research

23   designs with -- in collaboration with some of my

24   colleagues.

25        Q.   And just so we're all clear, when you say

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 13

1    you're moving into more quantitative research, could

2    you give me a sense of what you mean by that?

3         A.   We're currently working on a paper based

4    on a survey of 70,000 respondents in 30 different

5    countries that explores crime and victimization risk

6    among different respondents based on particular sets

7    of independent variables.

8              And so now on this particular paper we're

9    working on, we're focusing on the relationship

10   between honor attitudes and crime and victimization

11   risk.

12        Q.   Interesting.

13             Are there particular types of crime that

14   your research tends to focus on?

15        A.   Yeah, I would say street crime.  Street

16   crime and violence.

17        Q.   And what do you mean by "street crime and

18   violence"?

19        A.   Drugs, carjacking, robbery, burglary,

20   motor vehicle theft, retaliatory assaults, murder,

21   shooting, stabbings, that sort of stuff.

22        Q.   And why would you group those types of

23   crimes together as street crime or violent crime?

24        A.   Because the lion's share happen in urban

25   neighborhoods high in concentrated disadvantage.

Bruce Jacobs                                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 14

1        Q.    Let's talk about your litigation support

2    work for a little while.

3              Could you tell me how you first got into

4    litigation support?

5        A.    I was referred on a case in St. Louis.  It

6    was actually a carjacking homicide at a Schnucks

7    parking lot -- S-c-h-n-u-c-k-s -- Schnucks parking

8    lot grocery store in St. Louis.  I was referred on a

9    case, and that was my first case and that's kind of

10   how I started.

11       Q.    That's a -- that's -- for those of you who

12   don't know, that's the leading -- but in my view not

13   the best -- local grocery store in St. Louis.

14   Definitely the dominant one.

15             Okay.  And then can you tell me, you know,

16   why you obviously continued with litigation support

17   over the next several decades?

18       A.    I wrote an article based on that case --

19   or actually wrote a couple articles based on that

20   case.  But one in particular ended up being featured

21   as a cover story on one of the legal magazines, and

22   I got several -- a lot of calls after that article

23   appeared in 2004, and it just kind of went from

24   there, I suppose.

25       Q.    And you told me earlier that at least

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 15

1    during the school year, it's about one day a week

2    that you spend on litigation support, but could

3    you -- and maybe that's true for the whole 12 months

4    of the year.

5              But could you ballpark for me about how

6    much of your professional time is spent on

7    litigation support as opposed to academic or other

8    pursuits?

9         A.   Probably the same answer, on average about

10   one day a week.

11        Q.   And without giving me the numbers, could

12   you give me a sense of roughly what fraction of your

13   income annually comes from litigation support as

14   opposed to academic pursuits?

15        A.   I don't track that.

16        Q.   Don't you have to track that for tax

17   purposes?

18        A.   I'm not sure what you mean.  I report it

19   all, but I don't track percentages or anything like

20   that.

21        Q.   You have no idea how much money you make

22   doing litigation support?

23        A.   I don't track percentages.  I don't -- my

24   taxes are filled out electronically with a digital

25   consent form.  They are signed and submitted by an

Page 16

1    accountant, and that's my role in it.

2         Q.    Could you ballpark it for me?

3         A.    That would be guessing.  I'm not going to

4    guess.

5         Q.    Do you testify for both plaintiffs and

6    defendants in litigation support matters?

7         A.    Yes.

8         Q.    And understanding that you have been doing

9    this a long time, I would like to focus on just the

10   last, you know, three or four years.

11             Could you estimate, if possible, the split

12   between plaintiff and defendants in litigation

13   support matters?

14        A.    I would say more defense than plaintiff,

15   but I don't know what the percentage is.

16        Q.    What -- what do you do when you're asked

17   to review a case for possible involvement?  Could

18   you walk me through any process you have that will

19   allow you to determine whether you want to take on

20   the retention?

21        A.    I first check for conflicts.  The next

22   thing I do is typically speak with the contacting

23   attorney about the facts.  And if I think that

24   there's no conflict and I would be able to be of

25   assistance in reviewing the file, then I will send

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 17

1    out some sort of engagement agreement.

2         Q.   Do you apply the same standards when

3    you're testifying for plaintiffs as when you're

4    testifying for defendants?

5         A.   Yes.

6         Q.   Do you apply the same standards -- well,

7    I'm going to make -- I'll actually ask you that in a

8    more specific way in a little bit so just strike

9    that beginning to a question.

10             I always like to know the answer to this

11   question.  Why -- and I'm not suggesting anything --

12   but why do you do litigation support?

13        A.   Why do I do it?  It's interesting, I

14   suppose.  It's an opportunity to bring criminology

15   to the courtroom.  Actually, my university

16   encourages it because on some level it enhances the

17   stature of the school when one of its faculty

18   members is testifying as an expert in court on a

19   matter of judicial relevance.  So those are, I

20   guess, the main reasons.

21        Q.   That's pretty consistent with what I hear

22   from most experts except in fields where some people

23   say they believe in sort of imposing discipline on

24   their professional peers, but that's more of a

25   malpractice setting.

Bruce Jacobs                              August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 18

1         Can you tell me how you connected first

2    with Mr. Melcher about this case, the counsel for

3    TPI, the defendant?

4         A.   He either emailed or called me about the

5    case and I believe we talked at that point.

6         Q.   Had you ever worked with Mr. Melcher

7    before?

8         A.   Yes.

9         Q.   How -- could you just estimate how often

10   you worked with him before?

11        A.   I think there was one prior case in

12   Tennessee, one prior case that I recall.

13        Q.   Had you ever worked with the defendant,

14   The Partnership, Inc., or TPI before?

15        A.   Not that I recall.

16        Q.   In response to our subpoena, you wrote us

17   a Word document in which you said that you do not

18   retain expert reports or transcripts from your

19   testimony.  Is that true?

20        A.   Yes.

21        Q.   Do you affirmatively go and delete your

22   expert reports?

23        A.   No, but I'm talking about, like, the

24   original reports that I sign and scan or that the

25   counsel has, I don't keep any of that stuff.  That's

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 19

1    all discarded with the file.

2        Q.   Do you keep electronic copies of the

3    report?

4        A.   Not the original copies.  I may have draft

5    versions of earlier copies, but I don't know to what

6    extent they're the same as the ones I have

7    submitted.

8        Q.   Let me make sure I understand what you

9    mean by "original copy."  Tell me what you delete.

10       A.   I didn't say I deleted anything.  What I

11   said was when I write a report and sign it, I

12   provide that to counsel.  I might keep a written

13   copy in that file, but when the case is over, I

14   don't keep any of that stuff.

15       Q.   Well, I need to be specific or precise

16   with you here.

17            So when you finish a report and it's

18   ready, from your expert perspective, to be submitted

19   to the attorney who has retained you, are you

20   telling me that you physically go in and sign the

21   last page or some page with a pen, like a wetting

22   signature?

23       A.   Typically, yes.

24       Q.   And then how do you get the final report

25   and your signature to the attorney who has retained

Bruce Jacobs                              August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 20

1    you?

2        A.   Well, I'll scan the signature page and

3    then I'll email the report.  But, like I said -- and

4    I'll keep copies of draft versions of that report

5    but not the original signed copy of the report.  So

6    I don't know whether to what extent the report would

7    have changed since the time I submitted it.

8        Q.   Well -- okay.  I think you just told me

9    that when you are done with a report and ready to

10   submit it to the attorney who's retained you, you

11   email that report to the attorney who's retained

12   you.

13            Is that what you're telling me?

14       A.   Typically, yes.

15       Q.   Do you go into your sent items and delete

16   those emails?

17       A.   No, but they don't stay for all that long.

18   I don't physically delete them -- well, it depends.

19   If he responds and it goes in my inbox, then, yeah,

20   I'll put it in the trash.  If it's just a sent

21   email, then it probably would stay in the email but

22   not for that long.  I don't have that much space on

23   the Gmail account.

24       Q.   Do you have -- do you pay Google for extra

25   storage space on your Gmail account?

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 21

1          A.    No.

2          Q.    So as far as you know, you have the

3    standard storage that Google provides to everybody

4    who signs up for free Gmail account?

5          A.    Correct.

6          Q.    And it would be possible for you to go

7    into your sent items in your Gmail account and see

8    if you have final reports that you have submitted to

9    the lawyers who retained you?

10         A.    For a very limited time, I suppose.  If

11   they didn't respond -- if they didn't respond that

12   they received the report, I suppose it's

13   conceivable, but I don't think it really stores it

14   for all that long even in the sent box.

15         Q.    And when you -- if an attorney were to

16   respond and confirm receipt, would you go into your

17   sent items and then delete the email in which you

18   had sent the final report to the attorney?

19         A.    No.  But the way it works is if there's a

20   response to the original email, then it goes to my

21   inbox.  When I'm done with that email, I will delete

22   it and it no longer appears in the sent box; it's in

23   the trash box.  And the trash box recycles every

24   month or two.

25         Q.    Why do you delete the emails with

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 22

1   attorneys who have retained you?

2        A.   There's no reason to keep them.  I would

3   have thousands of emails staring at me in my box, so

4   there's no reason to keep them.

5        Q.   Do you delete your professional emails,

6   your UT Dallas emails?

7        A.   Every one of them.

8        Q.   When you write a paper with colleagues and

9   publish it, do you delete copies of that paper?

10       A.   What I would do is I would wait until it's

11  published and then download the PDF from the

12  publisher.

13       Q.   And would you go in and affirmatively

14  delete the final version that you had on your

15  system?

16       A.   There might be a draft version if I wanted

17  access to some references; but no, I wouldn't delete

18  it, per se, but it's not the finalized typeset page

19  proof version.  It's different.

20       Q.   I understand.  I'm just trying to

21  understand your document management.  So I think

22  what you're telling me -- what about presentations,

23  do you give presentations in your academic work?

24       A.   I write -- I help write the papers.

25  Typically my co-author does the presentations at

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 23

1   this point.  I used to do all the presentations; now

2   he's doing them.

3        Q.   Do you ever create written materials that

4   you use to teach your students at UT Dallas?

5        A.   What do you mean?

6        Q.   Well, like slides or a handout or a, you

7   know, written document of some kind or a

8   presentation of some kind that you would create for

9   the benefit of your students at the UT Dallas?

10       A.   Well, I create new lecture slides every

11  class every semester.  Those are -- I don't keep

12  those.  I suppose they could be recovered from the

13  email system but I don't keep them.

14       Q.   Do you go in and affirmatively delete

15  them?

16       A.   I would say, yes, because I do new slides

17  and new lectures -- or new slides based on -- on the

18  lecture material for that semester each semester, so

19  I don't keep the slides and recycle them from

20  semester to semester, no.

21       Q.   Do you ever keep slides so that you don't

22  have to re-create from scratch basic concepts that

23  you're going to be teaching students year after

24  year?

25       A.   No.

Page 24

1      Q.    I may not have understood that.

2           So you don't keep -- you're telling me you

3      do not keep slides that you -- I'm sorry, I mangled

4      that question.  I'm going to ask it in a more direct

5      way.

6           Do you go in and affirmatively delete

7      lecture slides after using them for a particular

8      class?

9      A.    I don't know if I would call it

10     affirmatively deleting.  I just don't keep them

11     because every semester I develop brand-new slides

12     based on the lecture material for that semester.

13     Q.    Do you ever use similar lecture material

14     from semester to semester?

15     A.    Oh, yes, and those are my handwritten

16     notes that I use for my lectures.

17     Q.    All right.  Do you ever receive copies of

18     your deposition or trial transcripts in matters

19     where you have provided litigation support?

20     A.    Yeah, before -- if I need to do an errata

21     sheet, I'll see my deposition.  If I have a trial,

22     then I will re-read my deposition.  I don't retain

23     any of those.

24     Q.    When you say you don't retain them, do you

25     go into your inbox and delete the emails that

Page 25

1   contain your transcripts?

2        A.   No.  But when I'm done with the

3   deposition, I'll just delete the deposition.  Or if

4   it's part of my written file, I'll just discard it

5   with the file when the case is over.

6        Q.   That's a separate topic.  I'll come to

7   your file in a second, but just so I understand with

8   your transcripts, if lawyer John Doe emails you a

9   transcript and says, Bruce or Dr. Jacobs, here is

10  your transcript, could you please review for the

11  errata sheet, do you go in and delete that email

12  where the lawyer gave you the transcript?

13       A.   After I have printed the transcript, yes.

14       Q.   Why?

15       A.   Why?  Well, there's no reason to keep an

16  email like that.  If he wants me to look at the

17  deposition and correct any errors, I will print the

18  deposition or read it online.  If I don't notice any

19  errors, it will be deleted.  If I do notice errors,

20  I'll submit the errata sheet.  I don't retain any of

21  my depositions.

22       Q.   Going back to your reports, are there

23  parts of your expert reports that you use in report

24  after report after report such as your CV or your

25  list of testimony or your qualifications?

Page 26

1        A.    I would say the front matter definitely is

2    used repeatedly because it describes who I am and

3    what I do.

4        Q.    Well, when you go to start a new report,

5    where do you go get the front matter so that you can

6    copy and paste it into the new report?

7        A.    Typically from a draft of a prior report

8    or something of that nature.

9        Q.    And is that what you did in this Diaz

10   case?

11       A.    Probably.

12       Q.    All right.  In response to our subpoena

13   requesting your prior reports and testimony, did you

14   go into your Gmail and search to see whether you had

15   any responsive documents?

16       A.    I don't think I did because I don't retain

17   the original -- as I told you several times already,

18   I do not retain the original submitted report that I

19   have sent to counsel, so there would be no reason

20   for me to search my email if I know that I did not

21   retain the original submitted report to counsel.

22       Q.    So I understand your testimony a few

23   minutes ago differently.  I understood you to be

24   testifying that you submit the final report to the

25   counsel who has retained you by email and you do not

Page 27

1    go into your sent items and delete that sent email.

2            Is that what you told me a few minutes

3    ago?

4        A.    Correct.  But...

5        Q.    And so this is a related but different

6    question.  When we served a subpoena on you and

7    asked for your prior reports, did you log into your

8    Gmail, go into your sent items or otherwise search

9    in your email to see if you have any of those

10   reports that you'd submitted to the counsel who

11   retained you?

12       A.    I don't think I specifically did that, no.

13       Q.    All right.  I want to turn to some sort of

14   big picture methodology issues, and then we'll start

15   to talk in a little bit more detail about this case.

16            Do you have a methodology for reaching

17   your opinions in a litigation support matter?

18       A.    Yes.

19       Q.    And what would you -- how would you label

20   or describe that methodology?

21       A.    It's traditional social scientific

22   methodology for reviewing datasets, documents, and

23   rendering reliable, professional, scientific

24   opinions based on said review.  And those methods

25   are content analysis.  From content analysis, you

Bruce Jacobs

August 11, 2022

Diaz, Elsa Flores v. The Partnership, Inc

Page 28

1    have domain analysis.  After domain analysis, you

2    have triangulation.  After triangulation, you have

3    analytic induction.  And so I used all those methods

4    for rendering my opinions in this case.  And they're

5    all peer-reviewed.

6         Q.   We'll try --

7         A.   I'm sorry, they're all peer-reviewed,

8    reliable, widely used methods in the social sciences

9    for reviewing qualitative data such as documents,

10   depositions, police reports, discovery material, and

11   so on, and for rendering reliable and reproducible

12   opinions.

13        Q.   We'll talk -- I saw the reference in your

14   report to triangulation and content analysis and so

15   on.  We'll talk in some more detail as we go through

16   your report.  I just wanted to understand if there

17   was a different method beyond those three methods or

18   techniques.

19             Do you have a written protocol of any kind

20   that you follow when you are applying your

21   methodology to reach an opinion in a litigation

22   support matter?

23        A.   How do you mean "written protocol"?

24        Q.   Well, some scientists have a written

25   protocol that documents specific steps that they

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                        Page 29

1   follow to understand the evidence before them and

2   reach a conclusion.  And I'm wondering if you have

3   any written protocol like that?

4        A.   Well, I just described it, I think.  It's

5   also described in my report; again, content

6   analysis, domain analysis, triangulation, analytic

7   induction.

8        Q.   And so you yourself don't have a written

9   protocol or set of steps that you followed.  Is that

10  what you're telling me?  I mean -- let me back up.

11            I hear you to be telling me that there are

12  papers that describe content analysis and

13  triangulation and inductive analysis and so on, and

14  those are general methods in the social sciences.

15            And I'm wondering if whether you, in

16  particular, have any specific protocol that you

17  created or acquired somewhere that you sit down and

18  follow when you are conducting your analysis in a

19  litigation support matter?

20                 MR. MELCHER:  Objection; form.

21       A.   You mean like that I kind of created or

22  invented out of whole cloth, not based on any

23  established methodology or social science?

24       Q.   No, not exactly.  It could be something

25  that you created yourself or it could be something

Page 30

1    you acquired somewhere else.

2              Do you have anything like that that you

3    follow?

4                        MR. MELCHER:   Same objection.

5                        Go ahead.

6        A.    I'm not sure how to answer that question.

7    I think I described the methodology that I used.   I

8    mean, obviously within all those techniques,

9    there's, you know, additional things that you may do

10   within those techniques to render opinions.   But

11   they -- for example, crime pattern analysis would

12   fall under probably both content analysis and domain

13   analysis but it's more of a sub-technique.

14              And so those are -- the four techniques I

15   described are the overarching tools that I used.

16   And then within those techniques, there's always

17   room for drilling down in additional ways, but I

18   think those four techniques really cover most

19   everything.

20       Q.    We'll talk about those techniques in more

21   detail as we go through your report.   I want to ask

22   you now about the general work that you performed on

23   this case.

24              And I would actually like to drill down a

25   little bit more on your subpoena response.   I have a

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 31

1    copy of the Word document you shared with us.  I

2    understand that there is someone from Veritext on

3    the way to the deposition location to bring a laptop

4    so that you can look at it through a laptop instead

5    of your phone.

6              So I would like to ask you some questions

7    about your subpoena response, but let's try this.

8    Let's just see if we can put it up on the screen and

9    see if you can see it.  And if you can't, then we'll

10   go from there.  Okay.

11             So I'm going to put up what I'm going to

12   mark as Exhibit 1 on the screen.

13             Do you see -- and it's probably too small

14   to begin with, but do you see on your screen instead

15   of my face a Word document?

16                  (Exhibit 1 marked.)

17        A.    Yeah, I have a hard copy of it.

18        Q.    Oh, that's great.  I should have asked you

19   what you brought to the deposition today.

20             What did you bring to the deposition

21   today?

22        A.    My report, the subpoena response, all the

23   depositions, all the police reports, some additional

24   notes that I generated in the last few days.  That's

25   pretty much it.  Some correspondence, I think, from

August 11, 2022

Page 32

1    counsel.

2        Q.    The one item there that I don't recognize

3    that I have a copy of -- and I guess I don't know

4    what specific correspondence with counsel you're

5    referring to, but they produced a bunch.  So I'm

6    going to assume that they produced everything they

7    were supposed to.  Julie seems pretty careful.

8            Can you tell me about the notes that you

9    generated recently that you brought with you today?

10       A.    Yeah.  Typically a few days before the

11   deposition when I'm reviewing all the material in

12   preparation, I'll generate some handwritten notes to

13   guide me through some questions that you may have.

14           So I have -- looks like I have 12 pages of

15   handwritten notes that I have developed specifically

16   for today.  And I will obviously either have the

17   court reporter give these to you or have Mr. Melcher

18   scan and send them to you, however you want to do

19   it.

20       Q.    Thank you.

21           I'm just going to go ahead and mark your

22   12 pages of handwritten notes as Exhibit 2 to the

23   deposition.

24                   (Exhibit 2 marked.)

25                   MR. BLOCK:  And, Michelle, if you will

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 33

1    just, you know, grab a copy of those, we'll work on a

2    break to get them.  Okay?

3                    THE REPORTER:  Yes, sir.

4                    MR. BLOCK:  Thank you.

5         Q.   So if we turn back to Exhibit 1, your

6    subpoena response, the first item, we asked you for

7    all documents reflecting your, quote, site

8    inspection and area canvass, end quote, interview

9    with property manager.  And you refer first to an

10   L. Wynn, SP MGR, since 2017, 3/8/22.

11             Do you see that in your physical copy of

12   Exhibit 1?

13        A.   Yes.

14        Q.   And I'm just going to take down the

15   electronic copy of Exhibit 1 since you have a

16   physical copy.

17             Okay.  So I interpret your response to

18   mean that on March 8, 2022, you had an interview

19   with Ms. Wynn, the former manager of Seven Courts.

20   Is that fair?

21        A.   Correct.

22        Q.   And how do you conduct -- well, was that

23   interview conducted by telephone or in person or by

24   some other means?

25        A.   In person.

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 34

1          Q.    And was that during your trip to Atlanta

2     to do this site inspection, area canvass?

3          A.    Yes.

4          Q.    How long was your interview with Ms. Wynn?

5          A.    Maybe close to an hour, 45 minutes maybe.

6          Q.    And where was that interview conducted?

7          A.    In the leasing office.

8          Q.    At Seven Courts?

9          A.    Yes.

10         Q.    Did you speak to Ms. Wynn at any other

11    time?

12         A.    I don't think so.

13         Q.    Who was there with you and Ms. Wynn during

14    that conversation?

15         A.    Mr. Melcher and I think there was another

16    staff member in the office but not in -- immediately

17    in the interview room with us.

18         Q.    Did you take any notes from your interview

19    with Ms. Wynn?

20         A.    I think I took some handwritten notes, but

21    I converted them to this -- to this response so they

22    are legible and could be read and then I could use

23    them for the report that I generated.

24         Q.    What was the purpose of your interview

25    with Ms. Wynn?

Bruce Jacobs                                            August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 35

1        A.   I just wanted to get a sense of the crime

2   prevention measures that would have been in place at

3   or near the time of the incident.

4        Q.   Did you -- you discussed with Ms. Wynn

5   crime prevention measures.

6             Did you also discuss with Ms. Wynn the --

7   any prior instances of crime at Seven Courts?

8        A.   It might have come up, but I had all the

9   police reports, so that wasn't an explicit focus of

10  our discussion.

11       Q.   And did the -- I'm looking here at the

12  notes you took.

13            Did you ask Ms. Wynn to -- or anyone, for

14  that matter, affiliated with TPI and Seven Courts to

15  provide evidence of what the supposed security

16  measures were and that they were in place?

17       A.   Evidence in terms of?

18                 MR. MELCHER:  Let me just object to

19  form.

20                 Go ahead if you understand the

21  question.

22       A.   I mean, I'm not sure what you mean by

23  evidence.  This was an in-person interview.  I asked

24  her questions and these are the responses.

25       Q.   Well, let's take a few of these.  The

Page 36

1    first bullet you have is criminal background checks

2    of residents, so I'm assuming Ms. Wynn told you that

3    TPI conducted criminal background checks of

4    residents, right?

5         A.   When I asked her, yes.

6         Q.   So actually, let me back up.  Did you ask

7    her, tell me what kinds of crime prevention measures

8    you have in place at Seven Courts, and did she just

9    rattle off a list or did you have a list that you

10   were working off of?

11        A.   I have a generalist that I work off of.  I

12   mean, I have done this so many times, I can do it

13   mostly from memory.  But these are the -- when I

14   have an apartment complex case, these are the kinds

15   of things I ask them about, so the questions would

16   have come from me.

17        Q.   All right.  So if we look at some of

18   those, if we look at criminal background checks of

19   residents, is it your testimony that Ms. Wynn told

20   you TPI conducted criminal background checks of

21   residents?

22        A.   When I asked her if they did that, she

23   said, yes.  I think she talked about no prior

24   felonies, but I don't recall specifically, but

25   that's typically the rule or the guideline at an

Page 37

1   apartment complex.

2        Q.   Did you ask her to provide any

3   documentation that, in fact, TPI was conducting

4   criminal background checks of residents?

5        A.   I don't think so because that would have

6   come from the discovery that was already provided.

7   So I think the HUD guidelines capture that that were

8   in the discovery.  So no, I didn't ask, for that

9   reason.

10       Q.   I don't recall seeing HUD guidelines

11  provided in discovery in your report as something

12  that you reviewed.

13            Are you telling me that you reviewed some

14  HUD guidelines that are specific to this case?

15       A.   No.  That's my general knowledge of HUD

16  guidelines and the criminal background checks they

17  require of tenants at properties such as these.

18       Q.   What is the role of the HUD guidelines, in

19  your view, as it relates to apartment safety?

20            MR. MELCHER:  Objection; form.

21       A.   Well, depends on what kind of safety

22  you're talking about.  I mean, the HUD guidelines

23  cover everything from potholes and lead paint to

24  lighting.  And so there's a variety of things that

25  they address, so I can't really narrow it down

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 38

1    unless you give me more specifics.

2        Q.    Well, are the HUD guidelines a source that

3    you consider when you're evaluating the security

4    conditions at an apartment complex?

5        A.    As it relates to things like criminal

6    background checks and things of that nature, I would

7    say yes.

8        Q.    Are there parts of the HUD guidelines that

9    you think should not be considered in evaluating the

10   safety of an apartment complex?

11       A.    I would have to get the guidelines out and

12   really pour over them to respond to that adequately.

13       Q.    Sitting here right now, recognizing that

14   you don't have the guidelines in front of you but

15   they're something that you have testified and you

16   have in your brain from your 20 years of service as

17   a litigation support expert, are there specific

18   parts of the HUD guidelines sitting here that you

19   think you disagree with and don't apply when you're

20   evaluating the safety of an apartment complex?

21       A.    Not that I can recall as I sit here.

22       Q.    So if we look further at the list --

23   actually, let's stay with criminal background checks

24   of residents because I just want to make sure I get

25   a good answer on this.

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 39

1           Have you ever asked TPI to provide any

2    documentation to confirm that they, in fact, were

3    conducting criminal background checks of residents

4    at Seven Courts?

5           A.    I thought that was asked in the

6    interrogatories, so no, I didn't ask because I

7    believe it was asked in the interrogatories.

8           Q.    What about drug- and crime-free lease

9    provisions, did you ask for documentation to confirm

10   that TPI actually had and was enforcing drug- and

11   crime-free lease provisions?

12          A.    I think that was part of the Georgia

13   Apartment Association standard lease, so it would be

14   in there.

15          Q.    What about community rules for acceptable

16   behavior, did you ask for documentation of what

17   TPI's community rules for acceptable behavior are?

18          A.    Once again, I think that would be in the

19   GAA certified lease.

20          Q.    What about eviction of noncompliant

21   residents, did you ask for documentation that TPI

22   was actually evicting noncompliant residents?

23          A.    Well, there was sworn testimony in the

24   depositions about that conduct.  It's also specified

25   in the lease, the GAA lease, about what is grounds

Page 40

1    for eviction.  But did I ask for everyone who has

2    ever been evicted from Seven Courts in the three

3    years prior to this incident, no.

4         Q.   I'm going to skip down a little bit.  One

5    of your bullets is routine vacant unit checks for

6    squatters/drug dealing.

7              Do you see that?

8         A.   Yes.

9         Q.   Did you ask TPI to provide any evidence

10   that, in fact, they were conducting routine vacant

11   checks for squatters/drug dealing?

12        A.   Well, I asked her -- in my personal

13   interview, but I asked her for -- you say evidence,

14   I mean, I don't create my own evidence, I mean,

15   that's for you guys to do.  So I asked her do they

16   do that, and she answered affirmatively.

17        Q.   So I was going to get to this a little bit

18   later, but in your report, you have a list of

19   materials reviewed, which includes deposition

20   transcripts and the complaint and the answer and

21   some -- I'm not sure all -- of the discovery

22   responses.

23              Did you ask TPI for access to other

24   evidence that had been produced in the case?

25                   MR. MELCHER:  Objection; form, term

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 41

1    "evidence."

2                    Go ahead.

3        A.    I just asked them to produce all the

4    discovery in the matter; all the depositions, all

5    the exhibits thereto, everything that had been

6    produced as relevant to the file that I need to

7    review.

8        Q.    Did you ask TPI to produce the documents

9    that the company has produced in this case?

10       A.    I'm not sure what you mean.  Once again, I

11   asked them to produce all the discovery.

12       Q.    Sure.

13             So just as an example, TPI has produced

14   hundreds or thousands of emails and text messages

15   primarily about the security conditions at Seven

16   Courts.

17             Did you ask TPI to provide you access to

18   the documents such as emails and text messages about

19   security conditions at Seven Courts?

20       A.    I believe those were exhibits to the

21   depositions, so that's how I was -- had access to

22   them.

23       Q.    So other than documents that someone shows

24   to make an exhibit at a deposition, did you ask TPI

25   to provide you access to the other documents, such

Bruce Jacobs                          August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 42

1    as emails and text messages, about security
2    conditions at Seven Courts?
3                    MR. MELCHER:  Objection; form.
4        A.   Again, I asked for the available
5    discovery.  That's what I asked for.
6        Q.   Did you ask if there was anything more
7    than what you had been provided?
8                    MR. MELCHER:  Objection; form and
9    asked and answered.
10       A.   I'll stick with my previous answer.
11       Q.   Why did you not go and ask affirmative --
12   if I understand your testimony correctly -- let me
13   back up and make sure I understand it correctly.  I
14   understand you to be telling me that you asked TPI's
15   lawyers to give you the discovery in the case.
16           Did you take any other steps to confirm
17   that, in fact, they had given you all of the
18   discovery in the case?
19                   MR. MELCHER:  Objection; form,
20   harassing.
21       A.   I don't -- I can't ask for what I don't
22   know doesn't exist.  So I asked for all the
23   discovery.  I don't know how else to say that.
24       Q.   Would it be important to your analysis to
25   consider all of the emails and text messages about

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 43

1    security conditions that TPI has produced in the

2    case?

3                    MR. MELCHER:   Objection as far as it

4    calls for speculation.

5        A.   If it was part of the discovery, I asked

6    for it.

7        Q.   So if there's a break down in you not

8    having all of the information relevant to security

9    conditions at Seven Courts, I think you're telling

10   me that would be on TPI's lawyers, not you?

11                   MR. MELCHER:   Objection; form,

12   harassing.

13       A.   I can't answer that question.  I don't

14   know.  You're implying that they have this trench of

15   materials that was not provided to me that's somehow

16   relevant to the case.  And I have seen no evidence

17   of that.

18       Q.   Did you ask if there is any?

19                   MR. MELCHER:   Same objection.

20       A.   For the fourth time, I asked for all of

21   the available discovery to be provided to me so that

22   I could review the file and render professional

23   opinions.

24       Q.   Let's turn back to your response to our

25   subpoena, Exhibit 1.  You describe systematic

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 44

1   lighting on buildings, doors, and in common areas,

2   and routine lighting inspections and repairs.

3            Did you ask TPI for any evidence of what

4   the supposed systematic and routine lighting

5   measures were?

6       A.   Well, the -- again, I don't create my own

7   evidence.  I asked them if they did that.  I

8   triangulated her responses with deposition testimony

9   from both Hickey and Holt and Fontaine and Wynn that

10  lighting inspections were, in fact, routinely done

11  either by leasing office personnel or security

12  personnel, and if lights were out, they were

13  repaired.  So that would be the answer to the

14  question.

15      Q.   One of your bullets is routine property

16  inspections by management personnel.

17           Did you ask for any copies of documents,

18  such as inspection reports, that were created as a

19  result of those routine property inspections?

20      A.   No because you already did that in your

21  interrogatory requests, so no, I did not make a

22  secondary request.

23      Q.   Have you ever seen something that you

24  would consider a record of a routine property

25  inspection by management personnel?

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 45

1              MR. MELCHER:  Objection; form.

2              Are you talking about in this matter

3     or in general?

4              MR. BLOCK:  I think you know the

5     question is directed to this matter.

6              MR. MELCHER:  All right.  Well it

7     wasn't limited to that with respect to your question

8     itself, but since it's limited to this matter.

9              MR. BLOCK:  Okay.  Can you please stop

10    stepping over my questions?

11             MR. MELCHER:  What are you talking

12    about?

13       Q.   Dr. Jacobs --

14             MR. MELCHER:  I have the right --

15       Q.   Dr. Jacobs --

16             MR. MELCHER:  I have the right to

17    object, and I'm doing the best job I can considering

18    we're, you know, basically on, you know, the

19    Clampetts' telephone line here.

20       Q.   Dr. Jacobs, have you seen anything in this

21    matter that looks to you like a record of a routine

22    property inspection by management personnel?

23       A.   I would have to get out all of the file

24    materials to say yes or no, but again, these are

25    questions I asked Ms. Wynn, and they were verified

Page 46

1    by the deposition testimony.

2         Q.    Well, is there any deposition testimony

3    you can recall reflecting periodic -- excuse me --

4    routine property inspections by management

5    personnel?

6         A.    Well, sure.  Both Fontaine and Wynn

7    testified that they routinely walked around the

8    property.  They routinely inspected the property

9    for, you know, issues that may come up.  This was --

10   these statements were peppered throughout all the

11   depositions, including Holt and Hickey.

12            So -- now are you talking about a specific

13   official form that says property inspection, no.

14   But that's -- that's not the gist of that bullet

15   point.  The gist of the bullet point is were they --

16   were there boots on the ground at the property, were

17   they walking the property, were they identifying

18   potential hazards, and were they reporting them

19   either to security or the higher-ups if they, in

20   fact, existed, and they were.

21        Q.    Let's look at your next bullet:  Periodic

22   HUD and state inspections of property (every Feb.).

23            Have you seen any documentation associated

24   with periodic HUD and state inspections of the

25   property?

Page 47

1      A.   Whatever was provided in the file is what

2  I reviewed.  I asked her if they conducted these

3  inspections, and I know for a fact that HUD requires

4  them and I believe the State also does.  But in

5  terms of what's in the file, I relied on counsel to

6  provide that material.

7      Q.   In your experience as a longtime

8  litigation support consultant, would you expect that

9  periodic HUD and state inspections of a property

10  would result in some sort of documentation from

11  either HUD or the state inspectors about their

12  findings that they would share with the property?

13      A.   Typically you would see a form.  Yeah,

14  typically you would have that.

15      Q.   And do you have a specific recollection of

16  seeing any such forms in this case?

17      A.   Not that I recall.

18      Q.   Me neither.

19           How about periodic inspections of property

20  by Preservation Management ownership once a year, do

21  you recall seeing any documentation of the results

22  of those periodic inspections?

23      A.   Nothing other than the deposition

24  testimony and perhaps some of the emails that were

25  referenced in the depositions about -- from Rodrick

Bruce Jacobs                              August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 48

1    Harris to Wynn and back and forth and so forth.

2         Q.    What about multiple daily patrols provided

3    by the area police officers, have you seen any

4    documentation of those?

5         A.    Well, there probably wouldn't be if

6    there's no crime and there's no call for service.

7    So I asked Ms. Wynn specifically did APD

8    periodically patrol the property and the area,

9    you're on the property every day for hours of the

10   day, did you see them doing that, and she answered

11   affirmatively.

12            But in terms of an official record, if

13   there's no crime and no call for service, you

14   wouldn't see that.

15        Q.    Did you take everything that Ms. Wynn told

16   you about the security conditions at Seven Courts at

17   face value?

18        A.    Well, I compared them to the record,

19   obviously; the deposition testimony, the emails and

20   correspondence, the police reports, all the

21   available discovery.  So there was triangulation

22   there.

23        Q.    Is there anything Ms. Wynn told you about

24   security conditions at Seven Courts that you

25   disagreed with or didn't think happened?

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 49

1          A.    Not that I recall as I sit here.

2          Q.    Are you aware of allegations that Ms. Wynn

3    herself was involved in criminal activity?

4          A.    I have seen the allegations from Mr. Holt,

5    yes.

6          Q.    And did you factor that into your analysis

7    of whether to rely on Ms. Wynn's report to you?

8          A.    Yes.  Although, you know, I'm not in the

9    credibility assessment business.  Obviously there's

10   a factual dispute between Mr. Holt and Ms. Wynn

11   about who was doing what, when, and how.

12          But I will say that almost all those

13   concerns seem to have been neutralized by the

14   deposition testimony of former employee Fontaine, in

15   addition to 30-year law enforcement veteran Kenneth

16   Hickey, both of whom essentially undermine almost

17   entirely virtually everything that Mr. Holt said.

18          So once again, that's the jury's call, not

19   mine, but you asked me the question, so that's my

20   answer.

21          Q.    So I think what you're telling me is that

22   in reading the deposition testimony of various

23   witnesses, you decided to believe the version of

24   events in which Latoya Wynn is not a criminal?

25                MR. MELCHER:  Objection; form.

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 50

1      A.   That's not what I said at all, and so I'll

2  just stick with my previous answer.

3      Q.   If, in fact, Ms. Wynn was involved in

4  criminal activity, what would that mean for your

5  reliance on the interview you conducted with her?

6              MR. MELCHER:   Objection; form.

7      A.   Well, that would convert back to what

8  extent to these data points were they triangulated

9  by either the records or the testimony or my site

10  visit.   And I think all of them were.   I mean -- so

11  the only thing that -- looking at the list here, I

12  mean, my site visit and the deposition testimony and

13  the exhibits thereto triangulated, I think, just

14  about all these data points.

15      Q.   You didn't triangulate the periodic HUD

16  and state inspections of the property every

17  February, did you?

18      A.   I think Ms. Fontaine talked about them,

19  but I need to re-read her deposition to be sure.

20      Q.   You didn't triangulate multiple daily

21  patrols provided by beat area police officers, did

22  you?

23      A.   Well, unless I'm riding with the cops, I

24  don't think I could.   But Mr. Holt testified that

25  the cops were routinely at or around the property.

Bruce Jacobs                                   August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 51

1   The police reports I reviewed showed police presence

2   at the property.  I think Hickey testified to the

3   same, Fontaine as well.

4           So once again, unless there's -- that

5   particular data point, unless there's a police

6   report or a call for service, you would not be able

7   to triangulate that other than the deposition

8   testimony that I referenced.

9       Q.   Let me see if I understand something that

10  I think you're saying.  If the police is at Seven

11  Courts to respond to a crime, like let's say there's

12  a shooting and the police respond to a 911 call for

13  the shooting, is that police presence something you

14  would consider a crime prevention measure?

15      A.   Well, it potentially could be, but I'm

16  talking about more of narratives that say, you know,

17  police were patrolling the area, and while

18  patrolling the area, X, Y, or Z happened.  And so

19  that would be more of an example than responding to

20  a crime that has already been committed.

21      Q.   Your last bullet is for periodic security

22  patrol.

23           What do you mean there?

24      A.   So that would be Hickey's presence after

25  May 21 where he was patrolling the property

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 52

1    periodically, passing out fliers and so forth.

2        Q.    And do you consider -- you're referring to

3    Mr. Hickey's testimony where he would drive through

4    the property and pass out notices?

5        A.    I believe the testimony was three times a

6    week he would patrol the property, and during the

7    patrol, he would pass out these fliers or notices or

8    vice versa.  Nobody asked him how long he was at the

9    property each time, so I don't know the duration,

10   but there was a periodic security patrol based on

11   his presence.

12       Q.    His testimony was that his function was

13   mostly passing out notices.

14             Do you remember that?

15             MR. MELCHER:  Objection; form.

16       A.    Right.  But he also said while he was

17   there, he would have eyes on the property and

18   potentially -- potentially report issues that came

19   up.

20       Q.    And in your view, is that a security

21   measure?

22       A.    Oh sure.

23       Q.    Is it a strong security measure?

24       A.    I'm not sure how to define strong but it's

25   a security measure.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 53

1      Q.    Is it, in your view, an important security

2  measure?

3      A.    It depends on the violent crime pattern in

4  play at the subject property.

5      Q.    Would it have been -- let me back up so

6  that we're all clear about what we're talking about.

7           Were Mr. Hickey's May, June, July random

8  drive-throughs mostly to pass out notices, would

9  that have been an important security measure given

10  the crime conditions at Seven Courts?

11               MR. MELCHER:  Objection; form.

12      A.    I thought it was reasonable relative to

13  the violent crime risk there, yes.

14      Q.    Would it have been sufficient to deter

15  violent crime?

16               MR. MELCHER:  Objection; form.

17      A.    It would depend on the offender you're

18  trying to deter.

19      Q.    Tell me which offenders or types of

20  offenders driving through the property randomly,

21  mostly passing out notices would deter at Seven

22  Courts in the summer of 2021.

23               MR. MELCHER:  Objection; form.

24      A.    Typically offenders who are ambiguity

25  averse, so randomized patrol like that where

Page 54

1    offenders don't know when they're coming, how long

2    they're staying, when they're coming back.  An

3    ambiguity averse offender would be deterred by that

4    kind of measure.

5         Q.    What kind of offenders would not be

6    deterred by that kind of measure?

7         A.    Someone high on PCP would be an example,

8    someone drunk, somebody desperate, somebody who just

9    simply doesn't care about security, those would be

10   examples.

11        Q.    We'll talk more about some of those

12   opinions, but I want to just finish up on your

13   subpoena response.

14              On the second page, you refer to axial

15   codes and selective codes.

16              What do you mean there?

17        A.    That comes from the domain analysis

18   methodology where there's axial codes, selective

19   codes, subselective codes, which you're essentially

20   organizing the data into very specific categories,

21   and then ultimately those categories will be linked

22   through analytic induction to the scientific

23   literature, so that's what those codes refer to.

24        Q.    All right.  I'm looking now at -- I guess

25   it's the next page, the third page under number --

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

Page 55

1    you responded that you will bring the original

2    police reports with shorthand summary of each crime

3    type on the top right-hand corner of page 1 of each

4    police report to the deposition.

5            Did you do that today?

6        A.   Yes.

7        Q.   Let's mark those as Exhibit 3, and we'll

8    make a --

9            MR. BLOCK:  I don't need to see those

10   today, Michelle, I just want to make a copy of them,

11   and then we can get the --

12       Q.   You know, I assume, Dr. Jacobs, you would

13   like to have a copy with your notes at least for the

14   duration of this case, so we don't want to -- we

15   need to get those back to you somehow --

16       A.   Yes.

17       Q.   -- or a copy of them.

18           Okay.  We talked about the other things,

19   so let's set aside Exhibit 1.  And let me make a

20   note of Exhibit 3, which is your -- for the record,

21   your copies of the police reports with your

22   handwritten notes.

23           If you know, Dr. Jacobs, which years of

24   APD police reports did you consider in forming your

25   opinions in this case?

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                         Page 56

                        (Exhibit 3 marked.)

1

2       A.    I think it was 7/'18 to 7/'21.

3       Q.    You mean July '18 to July 2021?

4       A.    Yes.

5       Q.    So that's a three-year reference period?

6       A.    Yes.

7       Q.    And why did you consider APD reports over

8   a three-year reference period?

9       A.    Two to three years is a standard reference

10  period in my field.  Three years is specified in the

11  OSHA risk assessment guideline.  Two years is the

12  published criminal logical guideline for look back.

13  So I typically look at two to three years in my

14  practice.

15      Q.    And just so I understand that, so three

16  years is in the OSHA risk assessment.  And can you

17  just explain for the record why you would

18  incorporate an Occupational Safety and Health

19  Administration standard into your criminology

20  assessments?

21      A.    Because it's a federal risk guideline.

22      Q.    And then the two-year standard, where did

23  you testify that came from?

24      A.    That comes from a 1989 peer-reviewed

25  scientific article assessing foreseeability by the

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 57

```
 1   former president of the American Society of

 2   Criminology.

 3        Q.   And what is the author name of that

 4   article?

 5        A.   Lawrence Sherman.

 6        Q.   And is that something that you would have

 7   produced in your production of papers?

 8        A.   Yes, it's one of the hundred-plus PDFs

 9   that I uploaded to the ShareFile link.

10        Q.   Sure.  Let me just get that out now while

11   we -- I just want to get the title for the record.

12             So Sherman -- that's from 2017, so that's

13   not it.  Is it -- okay.  Let me look at the date.

14             Did you say 1979 or 1989?

15        A.   '89.

16        Q.   Okay.  So is the paper that you're

17   referring to Violent Stranger Crime at a Large

18   Hotel:  A Case Study in Risk Assessment Methods by

19   Lawrence W. Sherman?

20        A.   Yes.

21        Q.   Okay.  So that's the source from which

22   you're drawing the two-year reference period?

23        A.   Correct.

24        Q.   Can you explain why you would rely on the

25   Sherman paper from 1989 to derive a two-year
```

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 58

1    reference period?

2        A.    Because, once again, it's a peer-reviewed

3    scientific article.  It's published in a very

4    reputable social science journal.  It's written by

5    one of the most highly respected criminologists in

6    the world, former president of the American Society

7    of Criminology, former president of the American

8    Association of Experimental Criminology, former -- I

9    believe former president of the Academy of Criminal

10   Justice Sciences.  His work has been cited, I

11   believe, over 40,000 times in scholarly literature

12   attesting to its impact and acceptance.  So that's

13   why.

14       Q.    So what do you do -- when you're looking

15   back two years or three years, depending on whether

16   you're -- whether you're -- let me make sure I

17   understand.

18             How would -- would "reference period" be

19   the term that you use to describe the time period

20   over which you analyze crime data for a subject

21   property?

22       A.    Right.

23       Q.    And in this case, how long of a reference

24   period did you use?

25       A.    Well, I think I -- I had police reports

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 59

1    for the three years prior, so obviously I'm looking

2    at those police reports relative to the security

3    measures that were in place at or near the time of

4    the incident.

5        Q.    So did you use a three-year reference

6    period in forming your opinions in this case?

7        A.    I used a three-year reference period to

8    assess the reasonableness of the measures that were

9    in place at the time of the incident.  But obviously

10   also I'm looking for recency of violence within the

11   three-year reference period, which is also standard

12   methodology.

13       Q.    We'll come to that, but just -- maybe

14   let's ask it this way:  What types of data did you

15   consider over a three-year period in forming your

16   opinions in this case?

17       A.    I looked at all the police reports and

18   analyzed them.

19       Q.    Did you make any -- other than -- let me

20   back up.

21             The police report, I know what you're

22   talking about because I have seen the email sending

23   them to you.  And I'm actually the one who made Open

24   Records Act request for them at the beginning of the

25   case, so I know what you mean.

Bruce Jacobs                               August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 60

 1              But just for the record, when you say
 2    "police reports," you mean Atlanta Police Department
 3    police reports that counsel for TPI provided to you?
 4         A.   Yes.
 5         Q.   Did you yourself request any other crime
 6    data from the Atlanta Police Department in forming
 7    your opinions in this case?
 8         A.   I don't recall that I did, no.
 9         Q.   And did you request crime -- excuse me.
10              Did you request crime data from any other
11    source in forming your opinions in this case?
12         A.   I don't believe so.
13         Q.   All right.  I promise you we will get to
14    your report, but I'm still trying to understand how
15    you approached this case.
16              So we have seen -- I don't think we need
17    to make them an exhibit right now, but we, I think,
18    received in the last day or two a couple of invoices
19    of yours, not the one you sent us for the
20    deposition, these are invoices you sent to
21    Mr. Melcher and his team.
22              And it looks like you had one invoice from
23    March 9th for $7,516 for a total of 21 and a half
24    hours, and then you had a June 30th, 2022, invoice
25    in the amount of $2,310 for a total of 5.85 hours.

Page 61

1           So I guess as of June 30th, according to

2    your invoices, you had spent about 27 -- a little

3    over 27 hours working on this case.

4           Does that sound about right to you?

5       A.   Yes.

6       Q.   And I notice that one of your invoices --

7    your March 9 invoice refers to your Atlanta trip.

8           Did you bill for the whole time that you

9    were traveling to and in Atlanta?

10      A.   Right.  I mean, I -- travel time is

11   included, so the flight, doing analysis typically on

12   the flight of some kind, the visit, and then return

13   to Dallas.

14      Q.   Sure.  I'm not -- I mean, like, it's --

15   for lawyers, it's client by client whether they're

16   going to pay for travel time, so I understand what

17   you're saying.  I just -- and good for you if you

18   can charge the client for travel time whether you're

19   working for the client or not.

20           What I'm trying to understand is if we

21   look at your if we look at your total time as of

22   June 30, 2022, some fraction of that will be for

23   your travel time during perhaps -- during which you

24   perhaps were working on this case.

25           Is that what you're telling me?

Bruce Jacobs                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 62

1      A.    Right.  So, you know, the flight is an

2    hour and a half each way, you know, that's a real

3    quick flight, so, yeah, that would be it.  Maybe,

4    you know, my house to the airport is half an hour,

5    so -- right.

6      Q.    Did you spend the night in Atlanta?

7      A.    No.

8      Q.    How long were you in Atlanta for your site

9    visit trip?

10     A.    Maybe five hours, six.

11     Q.    So that's like, you know -- well, let me

12   ask it this way because obviously there's some type

13   at a big airport, but how long would you say you

14   were on the ground actively conducting your site

15   visit and also your area canvass on your trip to

16   Atlanta?

17     A.    Probably three to four hours maybe.

18     Q.    And roughly how much of that time was the

19   site visit to Seven Courts?

20     A.    I don't recall.  I mean, I inspected the

21   property and interviewed Ms. Wynn.  We did the area

22   inspection.  I probably -- we probably came back to

23   the property multiple times, which is what I like to

24   do in a case.  So I don't know what the breakdown

25   is.

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 63

1        Q.   We'll talk in some more detail about the

2    site visit and the area canvass when we go through

3    your report which is actually what I would like to

4    turn to now.

5                MR. BLOCK:  But before I do, does

6    anybody need to take a break, in particular the court

7    reporter who has the hardest job here.

8                THE REPORTER:  Yes, please.

9                MR. BLOCK:  Let's take a five-minute

10   break if that's enough for everybody.

11               (Recess 10:25 a.m. to 10:32 a.m.)

12       Q.   Dr. Jacobs, I'm going to mark, for the

13   record, a copy of your June 27, 2022, expert report

14   as Exhibit 4.

15               And I believe you have a copy in front of

16   you; is that right?

17               (Exhibit 4 marked.)

18       A.   Yes.

19       Q.   Very good.  Then I will not put one up on

20   your screen.

21               If I understand the emails correctly,

22   Dr. Jacobs, you were retained by TPI sometime in the

23   winter 2021.

24               Does that sound right, to you?

25       A.   I was retained by Mr. Melcher, not TPI,

Page 64

1    but I believe the date was correct.

2         Q.    Sure.

3               You were retained by Mr. Melcher on behalf

4    of TPI --

5         A.    Correct.

6         Q.    -- right?

7         A.    Correct.

8         Q.    Sometime in late 2021 is when you were

9    retained by Mr. Melcher?  Yes?

10        A.    I think so.  Either late '21 or early '22.

11        Q.    Okay.  And your report is dated June 27,

12   2022, although it was not actually disclosed to us

13   until the deadline, which was July 11, 2022.

14              Do you have any understanding of why your

15   report is dated June 27 even though it was provided

16   to us on July 11?

17        A.    That's -- June 27 is when I completed it,

18   so that's all I can say.

19        Q.    Sure.  Yeah, obviously they didn't need to

20   give it to us before the deadline; I was just

21   curious about that two-week gap.

22              So you completed your report June 27, and

23   you'd obviously then reached your opinions by

24   June 27 of 2022, correct?

25        A.    At that -- the opinions at that time,

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 65

 1    correct.

 2         Q.    Sure.  We'll get to that.

 3              But can you tell me when you reached your

 4    opinions that you put in your June 27, 2022, report?

 5         A.    The date, no, I don't know the date.

 6         Q.    Was it before or after your site visit to

 7    Atlanta -- to Seven Courts in Atlanta?

 8         A.    It would have been after the site visit.

 9         Q.    And can you tell me how you came to the --

10    I understood your methodology -- your description of

11    your methodology previously.  But can you tell me,

12    like, how you came to form the opinions that you

13    express in your June 27th report?

14         A.    It would just have been based on reviewing

15    the totality of the material in the file in addition

16    to the site inspection.

17         Q.    So you sort of alluded to something, and

18    I'll ask it directly.

19              The very first line of your report after

20    "dear Mr. Melcher," is, This is a preliminary report

21    in the Caceres/Seven Courts matter.

22              And the -- I want to make sure I get it

23    right.  I think it's paragraph 41.  At the end of

24    your report reinforces that -- it's actually

25    paragraph 46, excuse me, excuse me, also refers to

Bruce Jacobs

August 11, 2022

Diaz, Elsa Flores v. The Partnership, Inc

Page 66

1    this is a preliminary report.

2                Can you tell me what do you mean by a

3    preliminary report?

4        A.    That's standard language I use in case

5    additional facts, evidence, or discovery material

6    becomes available between the time I issue my report

7    and the time I'm deposed or the time of trial.

8        Q.    Have your opinions changed at all since

9    the time of your report?

10       A.    I don't think so.

11       Q.    Since the time of your report, June 27,

12   2022, have you reviewed any additional evidence in

13   this matter?

14       A.    There were a few depositions that were

15   taken after my report.  I think Hugh Jacobs was one

16   of them I reviewed.  I think there was a couple --

17   Rafael Lenz.  I think there was a couple family

18   members as well, but my opinions did not

19   fundamentally change.

20       Q.    Okay.  Well, sure, so we can just get out

21   the list of witnesses who were deposed after

22   June 27th of your report.  It was Hugh Jacobs, Erik

23   Zamora, Rafael Lenz, and then the two youngest Diaz

24   children.  And I think they all were deposed after

25   the date you finalized your report.

Page 67

1            And I think you're telling me that none of

2       that testimony has, in your words, fundamentally

3       changed your opinions in this case?

4            A.    That's correct.

5            Q.    Is that right?

6            A.    That is correct.

7            Q.    After -- in addition to those depositions,

8       after finalizing your report on June 27th, did you

9       review any additional evidence or discovery material

10      from this case?

11           A.    I reviewed the psychologist expert's

12      report just for my own edification and then whatever

13      exhibits were embedded in the depositions taken

14      after my report and before today.

15           Q.    Okay.  And other than those materials, did

16      you consider any other -- like, documents that were

17      produced in the litigation that -- did you review

18      anything like that after finalizing your report on

19      June 27th other than what would incidentally be in a

20      deposition transcript you were reading?

21           A.    Nothing other than the discovery material

22      that was part of the totality of the file.

23           Q.    So if we think about the language where

24      you say your report is preliminary, you also say in

25      your report that you hold these opinions to a

Bruce Jacobs                                   August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 68

1   reasonable degree of scientific probability.  That's

2   paragraph 43.

3              First tell me, what do you mean by "a

4   reasonable degree of scientific probability"?

5       A.   In the sense that would someone who

6   replicated my methodology in the field of

7   criminology reviewing the same set of materials that

8   I reviewed, would they more likely than not come to

9   the same or similar opinions, and that's what it

10  means, I believe.

11             MR. MELCHER:  I'm just going to object

12  as far as it calls for a legal conclusion.

13      Q.   So -- okay.  Explain to me the interaction

14  between having preliminary opinions and holding them

15  to a reasonable degree of scientific probability.

16      A.   In other words, based on all of the

17  material that I reviewed up to the point of writing

18  the report, these are the opinions.  These opinions

19  are reproducible and reliable.  However, if

20  additional material becomes available that I need to

21  review that may change those opinions, then I

22  reserve the right to do that.  That's all it means.

23      Q.   And do you have any staff or anyone who

24  assists you in preparing your opinions and reports

25  in a litigation support matter like this?

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 69

1        A.    No.

2        Q.    Do you write your own reports?

3        A.    Yes.

4        Q.    How long did it take you, roughly, to

5    write your report in this case?

6        A.    Well, it depends on what you count.  I

7    mean, obviously I had to review all the documents,

8    do my site visit, have consultations with

9    Mr. Melcher and so forth.  So that's all part of the

10   report even though it's not writing the report.

11           Are you talking about the physical writing

12   of the report?

13       Q.    Yes, sitting at a computer.

14       A.    I'm going to estimate three hours.

15       Q.    Had you reached your opinions that you

16   offer in this report prior to completing, let's say,

17   a draft of the report?

18       A.    Yes.

19       Q.    All right.  I want to go through your

20   report in some detail.  So you have told me about

21   paragraph 1.  Looking at paragraph 2, you say, My

22   scientific research focuses on serious criminality,

23   predatory violence, and illegal drug distribution.

24           I'm wondering if in your research

25   experience you find that there is a relationship of

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 70

1    any kind between illegal drug distribution and other

2    forms of predatory violence or serious criminality?

3        A.   There can be.  It depends on the drug.  It

4    depends on the level of the dealing hierarchy that

5    the players are involved in.  It depends on the

6    relationships between the dealers and the users.  It

7    depends on the neighborhood.  There's a lot of

8    contingencies but it's possible, sure.

9        Q.   Did you evaluate -- well, I'll just tell

10   you, I don't see any reference in your report to

11   consideration of whether there was drug activity at

12   Seven Courts.

13            Is that a fair interpretation of your

14   report?

15       A.   I considered it.  I don't know if I

16   focused on it in the report.  I focused on predatory

17   violence.

18       Q.   Sure.  I'm going to ask you to define that

19   term in a minute, but first I want to stick with

20   drugs.

21            I have the ability to just do a word

22   search, which I could do on the screen for you, but

23   when I look for the word "drug," the only time it

24   comes up other than in reference to your general

25   background or papers that you -- papers that you

Bruce Jacobs                           August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 71

1   might cite, so the only sort of case-specific

2   references to drugs are in the bullet points on

3   page 5 where you say -- echoing Ms. Wynn that TPI

4   had drug- and crime-free lease provisions and

5   routine vacant unit checks for squatters/drug

6   dealing.

7           So you can look at it too, but assume that

8   I'm right that your report doesn't have anything

9   explicit about considering whether there was illegal

10  drug activity at Seven Courts, can you tell me first

11  why your report wouldn't reflect any consideration

12  of drug activity at Seven Courts?

13      A.   Because it's not predatory violence.

14      Q.   So did you consider whether there was

15  evidence of drug activity at Seven Courts --

16      A.   Sure.

17      Q.   -- when forming your opinions in this

18  case?

19           I'm sorry.  Yes, you did?

20      A.   If it was part of the police reports, then

21  I reviewed it.  Obviously some deposition testimony

22  was given about drug activity, so, yeah, it's not

23  like I ignored it.  But, again, the analysis focuses

24  principally on predatory violence.

25      Q.   I think you told me a minute ago that

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 72

1    under some circumstances, drug activity can be

2    related to predatory violence.

3              Isn't that true in the field of

4    criminology?

5         A.    In the ways that I described earlier, yes.

6         Q.    Did you conduct any analysis specific to

7    this case to determine what types of drug activity

8    were going on at Seven Courts and whether those

9    types of drug activity were related to predatory

10   violence?

11        A.    Sure through the police reports.  If it

12   was drug involved and it led to an act of predatory

13   violence such as robbery or carjacking, I noted it.

14        Q.    Where did you note it?

15        A.    It would be on the police report itself.

16        Q.    Well, I'm asking actually a slightly

17   different question which is sort of a meta question

18   or a systemic question.

19              Did you consider in evaluating the

20   evidence and forming your opinions in this case

21   whether there was evidence of systematic drug

22   problems at Seven Courts and whether any such

23   evidence might have played a role in patterns of

24   predatory violence at Seven Courts?

25                   MR. MELCHER:  Objection; form and

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 73

1    asked and answered.

2        A.    Yeah, I have answered the question.  Yes,

3    I considered it, and I assessed whether and to what

4    extent any drug activity escalated to predatory

5    violence.

6        Q.    I'm asking a different question, so I'm

7    going to have to ask it again.  I'm not asking

8    necessarily about specific incidents and whether

9    someone was dealing drugs and then they were robbed

10   or other forms of escalation from drug activity to

11   predatory violence.

12           I'm asking you whether the presence of a

13   lot of drug activity at Seven Courts might have

14   played a role in patterns of predatory violence at

15   Seven Courts.

16           Did you sit down and conduct any formal

17   analysis of the evidence from that perspective?

18                MR. MELCHER:  Same objection.

19                Go ahead.

20       A.    I don't know how to do that other than the

21   police reports that I have analyzed, so yes, I did

22   that.  And if it was linked to predatory violence, I

23   noted it.

24       Q.    And why did you not include that in your

25   expert report?

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 74

1             MR. MELCHER:  Objection; form.

2        A.   I don't think the drug issue was a central

3    issue in this case unless -- there's no allegations

4    that your clients were drug dealers, so I don't -- I

5    don't know why it would have been central to my

6    report.

7        Q.   I want to make sure I understand what you

8    did in this case.

9             You've told me a couple of times that when

10   you were reading police reports, you would note

11   whether drugs were involved in one form or another.

12            Is that what you told me?

13       A.   When you asked me did I consider drugs in

14   my assessment, if -- the consideration would have

15   been along those lines.

16       Q.   Right.

17            Did you step back and consider whether

18   there was a pattern of drug activity at Seven Courts

19   and whether that pattern might be related to a

20   pattern of predatory violence at Seven Courts?

21       A.   If, in fact, it existed, of course.  But,

22   again, I have already answered that question.

23       Q.   Well, I don't think you have,

24   respectfully.  I think what you're telling me is

25   that as you went through the APD reports, you made a

Page 75

1  note about whether there was drug activity reflected

2  in a particular report.

3          I'm not hearing you testify that you

4  stepped back and took a broader look to examine

5  whether there are overall patterns or trends of drug

6  activity at Seven Courts and then whether those

7  overall patterns or trends could have been linked to

8  the patterns of predatory violence at Seven Courts.

9          MR. MELCHER:  Objection; form and

10  speculation.

11      A.   That's how you do it.  You analyze the

12  police reports, which is exactly what I did.  So,

13  yes, I did do that.

14      Q.   Okay.  So tell me what -- did you sit down

15  and total up all of the -- all of the APD reports

16  that reflected drug activity?

17      A.   I analyzed any reports -- I considered all

18  the police reports.  I analyzed any reports in

19  particular that were relevant to predatory violence.

20  The extent to which they're drug involved or not

21  would be reflected in the report or not.  And if

22  they were, I noted it.

23          If they weren't, I don't know how you

24  would determine that X, Y, or Z drug activity led to

25  X, Y, or Z predatory violence unless there's some

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 76

1    notation of it in the report.  Otherwise, you're

2    just speculating.

3        Q.   Would it matter to your analysis of crime

4    conditions at a property whether there were repeat

5    instances or recurrent instances over time of

6    illegal drug activity?

7        A.   It would depend on the nature of the

8    activity; who it involved; the kind of drug; again,

9    whether it was violent; whether it was predatorily

10   violent and so forth.

11       Q.   Did you conduct such an analysis of the

12   evidence in this case?

13       A.   I analyzed all the police reports for the

14   property for the three years prior.  So like I said,

15   if they were linked to predatory violence, then I

16   noted that.

17       Q.   Yeah, I'm hearing that you made notes on

18   pieces of paper.  I'm asking what you did with that

19   data.

20            Did you, in your mind or in writing or any

21   way else, sit down and look at whether there were

22   patterns of trends of recurrent drug activity at

23   Seven Courts?

24       A.   I don't think I made notes of that

25   specific issue.

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 77

1       Q.    Would it matter -- let me start that over.

2             Assume with me that the manager of a

3    property like Seven Courts is herself involved in

4    illegal drug activity, just assume that I'm right

5    about that, might that involvement of management in

6    illegal drug activity --

7                   MR. MELCHER:  Objection; form.

8       Q.    -- affect --

9                   MR. BLOCK:  I'm not done with my

10   question.

11                  MR. MELCHER:  All right.

12      Q.    -- affect the crime conditions at that

13   property?

14                  MR. MELCHER:  Objection; form and

15   calls for facts not in evidence.

16                  Go ahead.

17                  And requires speculation.

18      A.    Yeah, I mean, what you just said was

19   reflected in some quite inflammatory allegations by

20   Mr. Holt, none of which were corroborated by anybody

21   else in the file, including former employee Maggie

22   Fontaine, ex-security officer Hickey, there's a

23   30-year law enforcement veteran, and Ms. Wynn

24   herself.  So I can't really answer that question

25   because it's asking me to assume something that has

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 78

1  been contradicted by numerous deponents.

2      Q.   Well, let's remember that you're not a

3  juror so you don't get to weigh the evidence.  I'm

4  just asking you a hypothetical question because

5  that's something as an expert you can answer.

6           Assume with me for the sake of argument

7  that management was involved in illegal drug

8  activity.  Would that involvement by management in

9  illegal drug activity have any influence over the

10  crime conditions at a property like Seven Courts?

11               MR. MELCHER:  Same objection.

12      A.   Potentially.

13      Q.   What if the Atlanta Police Department had

14  threatened to seize Seven Courts for having

15  recurrent illegal drug activity?  Would that affect

16  your analysis of the drug problem and crime

17  conditions at Seven Courts?

18               MR. MELCHER:  Same objections.

19      A.   You're talking about seizing the property

20  because of drug dealing?

21      Q.   Yes.

22               MR. MELCHER:  Same objection.

23      A.   Is that a fact in evidence?  I don't think

24  I have ever seen that before.

25      Q.   Well, I think we have established that

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 79

```
 1   TPI's lawyers didn't show you all the evidence.
 2                 MR. MELCHER:  That --
 3        Q.   Just assume with me --
 4                 MR. MELCHER:  Aaron, no.
 5        Q.   Let me --
 6                 MR. MELCHER:  No.  That is
 7   objectionable, and I request that you withdraw that
 8   and restate.
 9                 MR. BLOCK:  I will withdraw my
10   editorialization.  I shouldn't be paying you back for
11   your speaking objections like that.
12                 MR. MELCHER:  I'm not making speaking
13   objections; they would be four paragraphs long.  I'm
14   simply stating grounds.  I'm doing what the federal
15   courts require.  I'm only laying out grounds.
16                 But I resent the continuing --
17        Q.   Doctor --
18                 MR. MELCHER:  -- implications that we
19   have, you know, withheld evidence either from you or
20   a witness or whatever.
21        Q.   Dr. Jacobs, assume with me for the sake of
22   argument that the Atlanta Police Department or the
23   City of Atlanta, acting through the police
24   department, had threatened to seize Seven Courts for
25   recurrent drug activity on the property.
```

Bruce Jacobs                                   August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 80

1          Would that affect your analysis of crime

2     conditions at Seven Courts?

3                    MR. MELCHER:  I'm just going to object

4     and point out that discovery is closed and there has

5     been no suggestion whatsoever to date that that was

6     even a possibility.

7                    Subject to that objection, if you

8     understand the question, you can answer.

9          A.   I don't know the answer to that question.

10    I'm not sure.

11         Q.   Why are you not sure?

12         A.   Because I'd need to see the specific

13    allegation that you're making and the substance of

14    it, the evidence behind it.  These are very

15    inflammatory allegations that you're making, so I

16    would have to really analyze that carefully if that

17    was, in fact, true.

18         Q.   And just so we're all clear, that's not

19    something you analyzed in the context of this case,

20    is it?

21                   MR. MELCHER:  Objection; form.

22         A.   I have seen no evidence that the Atlanta

23    Police Department was about to seize Seven Courts

24    for drug dealing.

25         Q.   And I think what you're telling me is that

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 81

1    if there was such evidence, that's something you

2    would want to consider and study carefully to see

3    how it affected your opinions?

4              MR. MELCHER:  Objection; form,

5    mischaracterizes testimony.

6         A.   I don't know.  I mean, again, I reviewed

7    all the available discovery provided to me.  That's

8    all I can say.

9         Q.   Let me turn back to your report.  I want

10   to look at paragraph 7.  And paragraph 7 is where

11   you describe your, quote, professional outreach with

12   numerous business and/or private individuals on

13   issues of crime analysis, security, guard duties and

14   deployment, crime prevention posturing, and/or crime

15   deterrence.

16             And then you describe those entities to

17   include a supermarket conglomerate, a hotel chain,

18   fast-food restaurants, and two private sector

19   property management and development companies that

20   oversee more than 40,000 apartment units in at least

21   20 states.

22             I just want to call your attention to

23   that, Dr. Jacobs.  You say at the end of paragraph 7

24   that you, quote, catalogued specific techniques for

25   establishing an adequate crime prevention posture as

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 82

1   well as the scientific/empirical basis for those

2   techniques.  This outreach is based on the same

3   methodology I applied in the present case.

4         Do you see that in paragraph 7 of your

5   report?

6         A.   Yes.

7         Q.   Okay.  And so what I understand you to be

8   saying in a nutshell in paragraph 7 is that the --

9   for crime identification or, really, crime

10  prevention posture framework and opinions that

11  you're offering in this case are the same as those

12  that you offer to private clients who consult you

13  outside of litigation.

14        Is that a fair read of what you're trying

15  to say in paragraph 7?

16        A.   I would say that, yeah, the same

17  methodology that I use inside these cases is the

18  same methodology and findings and studies that I

19  would convey outside of litigation, yes.

20        Q.   And do you still have -- where -- let me

21  ask you, where did you catalogue specific techniques

22  for establishing an adequate crime prevention

23  posture as well as the scientific/empirical basis

24  for those techniques?

25        A.   So that's everything in the report, like

Bruce Jacobs                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 83

1    SCP, CPTED, which is C-P-T-E-D, you know all the

2    crime pattern analysis, the camera research, the

3    lighting research, the guard research, the policing

4    research.  That's all the same.  That doesn't

5    change.

6         Q.   So I guess I read your paragraph 7 a

7    little differently.  When I read you to say that you

8    catalogue specific techniques for establishing an

9    adequate crime prevention posture, I'm understanding

10   you to be saying that you catalogued in the sense of

11   you wrote down for your consulting clients what an

12   adequate prevention posture would be.

13             Is that what you're trying to say here?

14        A.   I would say it's typically more verbal,

15   these discussions with these organizations or

16   individuals, where I describe -- typically I don't

17   provide a written document per se.  It's more of a

18   conversation dialogue with these individuals or

19   businesses.

20        Q.   So if a supermarket conglomerate with over

21   $2 billion in annual revenues or a hotel chain with

22   assets over a billion dollars wants to engage you as

23   a consultant, you're telling me that you just give

24   them security advice verbally and you don't share

25   with them any kind of written work product they can

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 84

1   use to shape their organization security prevention

2   posture?

3        A.    No.

4                 MR. MELCHER:  Objection; form.

5        A.    If that's the -- that's a different

6   question.  If they requested that, I absolutely

7   would provide it.  But typically that's not the

8   format of these consultations.  The format is

9   educating them on crime analysis, crime deterrents,

10  crime prevention, the limits of lighting, the limits

11  of gating, the limits of fencing, the limits of

12  guards, and whether or to what extent they need

13  these things based on their pattern.

14                Now, if they hire me specifically to, you

15  know, do a -- for example, a security vulnerability

16  assessment and give them specific -- specific

17  tactics that I would recommend, then I would provide

18  that in writing.  That's not typically what that

19  paragraph refers to.  These are more consultations,

20  dialogue, interactions that are separate from some

21  sort of formal written document.

22       Q.    Have you in the last few years -- let's

23  limit it to the last, you know, four years:  Have

24  you ever created written documents for some of these

25  private clients of yours to advise them on security

Bruce Jacobs                                   August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 85

1    prevention?

2        A.    In terms of a formal written document,

3    probably not.  These would be more discussions,

4    advise and counsel, as opposed to a written

5    document.  But I just can't recall if it involved

6    beyond that, at this point.

7        Q.    Are these fairly minor engagements for

8    you?

9        A.    I'm not sure what you mean about that.  I

10   mean, I wouldn't call them minor, especially to the

11   people asking me.  But this is part of my

12   professional outreach as a criminologist.  You know,

13   I consider it one of the three prongs of my job as a

14   criminologist, which is service.

15           So if they hired me separately from that

16   to do -- you know, provide them a formal written

17   document, then I certainly would consider doing

18   that.  But this is -- this is a little different

19   from that.

20       Q.    Tell me then what kind of -- tell me about

21   the form this outreach takes because the way you're

22   describing it sounds like it's fairly brief and

23   informal.

24       A.    Well, it depends.  Like, I have gotten

25   calls from entities that, you know, want to do some

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 86

1    sort of phone conference where we talk about

2    security measures, crime patterns, the relevance of

3    lighting, cameras, and guards.  There's other

4    contacts -- frankly, a lot of my contacts are

5    probably made from litigation, and then the advice

6    and counsel would extend from there.  So that's how

7    they come to know who I am.  I hope that answers

8    your question.

9         Q.   Well, let's just go specifically here.

10   Let's start with the supermarket conglomerate

11   reporting over $2 billion in annual revenues.

12             What did you do for them?

13        A.   So I met with their risk management

14   personnel, I met with their legal team, and I

15   discussed all the things that I'm describing to you

16   today and whether and to what extent they needed to

17   implement these things at their various stores.  So

18   that would be an example of what I did in that

19   particular case.

20        Q.   And did you give them any kind of written

21   description of the security measures that they

22   should consider or employ?

23        A.   I don't recall giving them a written

24   description, no; it was an in-person meeting.

25        Q.   What about that hotel chain reporting

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 87

1    assets over a billion dollars, what did you do for

2    them?

3          A.    Same thing.

4          Q.    Just an in-person meeting with no

5    substantive written documentation of your

6    recommendations?

7          A.    Well, they -- I think they wrote a bunch

8    of things down, but I didn't provide them something

9    written.

10         Q.    How about the Fortune 1000 fast-food

11   restaurant corporation --

12         A.    That was a --

13         Q.    -- that recently posted --

14                     (Simultaneous speaking.)

15         A.    Yeah, that was -- that was following a

16   homicide at a fast-food restaurant.  And I -- I

17   believe it was a telephonic meeting between the

18   legal representation and the risk management of the

19   company following that litigation.

20         Q.    And just so I understand, these

21   engagements, are these -- were you retained as a

22   litigation consultant or expert or -- like, in other

23   words, were you assisting with the defense of the

24   case or was this general business advice you were

25   providing?

Bruce Jacobs                           August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 88

1      A.    Well, like I said earlier, this would have

2   been general business advice and counsel following

3   retention.  And so it was separate from the

4   retention but that's how they got to know who I was.

5      Q.    And how about the two private sector

6   property management and development companies that

7   oversee more than 40,000 apartment units, what did

8   you do for them?

9      A.    Same thing.  So that was, again, I

10  believe -- this is a while ago, but I think that was

11  telephone conference with the risk manager and I

12  think -- I think the representative of the apartment

13  ownership group, but it has been a while, but again,

14  same kind of stuff that I have already described

15  like when do you need a guard?  How do you know you

16  need a guard?  What kind of guard do you need?

17  What -- how does the crime pattern inform you of the

18  kind of guard you need and when you need to deploy

19  them?  How do you determine if your property is a

20  hot spot?  How do you to determine if your property

21  is a hot spot only on specific burning times?  To

22  what extent should cameras be implemented at your

23  property?  To what extent do cameras have a violence

24  prevention effect?  To what extent does lighting

25  have a violence prevention effect?  To what extent

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 89

1   do you need to take specific measures at your

2   property that you're not engaging in to make your

3   property safer?

4           So these are all the things that -- and

5   many more -- that would have come up in these

6   interactions in this consultation.  So I hope that

7   answers your question.

8       Q.   Let's look at paragraph 8 where you

9   describe your multi-year term as chair of the

10  University's Safety and Security Council.  And the

11  gist of this paragraph, as I understand it, is that

12  the UT Dallas has a security plan and you were

13  involved with developing and implementing the

14  security plan.  Is that fair?

15      A.   Well, the -- so I served a multi-year term

16  as the chair.  The plan was largely in place.  At

17  the point that I came on board the council, these

18  are essentially periodic meetings to revisit

19  security-related issues that may or may not be

20  encompassed by the plan.

21          But the council itself was tasked with

22  developing, implementing, and evaluating the plan,

23  so that's what the council did.  Obviously we worked

24  in tandem with the UTD Police Department, with

25  environmental health and safety, with the emergency

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 90

1    management, with facilities planning, and so forth

2    to -- as a product of these various meetings.

3         Q.   I'm going to ask you about that plan a

4    little bit later.

5              If we turn -- actually, you've used some

6    terms in your deposition today that you use in your

7    report, and I think it would make sense for us to

8    just define them now so that I'm on the same page

9    with you when I hear you use a term.

10             So one of the terms that you use in your

11   report is "foreseeability," correct?

12        A.   Can you specify the paragraph?

13        Q.   Well, sure.  Let me put that -- yeah.  So

14   you say -- well, in paragraph 11, you say that you

15   have provided continuing legal education seminars to

16   address topics like crime foreseeability and others.

17             And in -- that actually might be the only

18   time you use the word "foreseeability" other than

19   some general references about foreseeability.  But I

20   do think that you use concepts like foreseeability

21   in your report when you say that there was -- there

22   was no -- that TPI didn't have sort of advanced

23   warning of this incident.

24             So let's do a couple things:  Do you in

25   this case have an opinion about whether any of the

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 91

1    attacks on the Diaz family was foreseeable by TPI?

2            MR. MELCHER:  Objection; form.

3        A.   I don't think I'm offering foreseeability

4    opinions in this case.  It's really -- the opinion

5    focuses on the reasonableness of the security

6    measures relative to the risk.

7        Q.   And why do you have -- why do you not have

8    a foreseeability opinion in this case?

9        A.   Probably in discussions with Mr. Melcher

10   that this was the focus of my opinions.  I think

11   that was the core issue in the case is was -- were

12   the measures -- were the security measures in place

13   at the time of the incident adequate and reasonable

14   relative to the risk.  So that's how I looked at the

15   scope of my inquiry.

16       Q.   Well, wouldn't that inquiry require you to

17   identify what the risk was?

18       A.   Right.

19            And I did, I looked at the police reports

20   to assess whether and to what extent, for example,

21   an armed security patrol, a dedicated, fixed, armed

22   security patrol was necessary at the property on

23   July 22, 2021.  And so that's part of what I did,

24   yes.

25       Q.   Yeah, I'm trying to understand here

Bruce Jacobs                                     August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 92

1  because it seems to me, like, if you're -- what I

2  hear you saying is that you're trying to measure the

3  existing security measures at TPI or at Seven Courts

4  against the risk of what happened to the Diaz

5  family.

6          And so it seems to me like -- I'm

7  wondering how you can evaluate whether measures are,

8  you know, appropriate relative to a risk without

9  having a sense of what the risk is.  So maybe you

10  can explain that for me conceptually.

11          MR. MELCHER:  Objection; form.

12      A.   Like I said earlier, I assessed the risk

13  of predatory violence.  The pattern is described in

14  my report, paragraph 24, and 25, and 26, 27, 28.  So

15  I did assess the risk.

16          And, you know, the analysis focused on

17  whether, you know, a dedicated armed security guard

18  was needed at the property on the night in question.

19  In my opinion, the pattern did not justify it.

20      Q.   And so here is what I'm trying to get at

21  is -- and we'll go through your rationale in some

22  more detail, but just at the conceptual level here,

23  I'm trying to understand how you could measure the

24  adequacy of measures against the risk without having

25  an estimate of risk.

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 93

1       A.    I think I just answered the question.  I
2   mean, I did assess the risk and it is part of the
3   opinion.
4       Q.    Okay.  So tell me then how an assessment
5   of the risk differs from an assessment of whether a
6   violent crime such as the Diaz family experienced is
7   foreseeable.
8                   MR. MELCHER:  Objection; form.
9       A.    It's a different inquiry.
10      Q.    Well -- okay.  So explain to me what's
11  different about an inquiry into whether the attack
12  was foreseeable as opposed to the risk that the
13  attack would happen.
14      A.    Well, I'm not sure how to articulate that
15  as I sit here, but like I said, my understanding is
16  that the nature of my inquiry was to assess whether
17  the security measures in place at Seven Courts were
18  adequate and reasonable relative to the risk.
19            So obviously the risk I focused on was
20  predatory violence, the extent to which property
21  crime escalated the violent crime, the extent to
22  which Seven Courts had notice that this crime was
23  going to happen.  But that's not foreseeability per
24  se; it's whether the measures that they had in place
25  were adequate and reasonable.

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 94

1      Q.   Okay.  So you have told me that you do not

2   have what you understand to be a foreseeability

3   opinion in this case.  Is that fair?

4      A.   I think that's fair.

5      Q.   But you do have an opinion about the risk

6   or likelihood of whether the Diaz family would

7   experience what actually happened to them, a violent

8   armed robbery in July 2021; is that what you're

9   telling me?

10              MR. MELCHER:  Objection; form.

11      A.   No.  No.  It's -- once again, it's were

12   the measures listed in my report adequate and

13   reasonable relative to the pattern of predatory

14   violence leading up to this incident.

15      Q.   Okay.  You mentioned notice a minute ago.

16          Do you have an opinion in this case about

17   whether TPI had notice that an attack on the Diaz --

18   well, really doesn't have to be on the Diaz family,

19   so let me back up and start that question over.

20          Do you have an opinion in this case about

21   whether TPI had notice that tenants at Seven Courts

22   in July of 2021 might be at risk from a violent or

23   predatory crime?

24      A.   Do I have evidence that they had notice?

25      Q.   I'm asking you -- well, I'm going to first

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 95

1   ask if you have an opinion about whether TPI had

2   notice.

3          A.    I don't think I have an opinion on that.

4          Q.    And why not?

5          A.    I don't think I was asked to offer that

6   opinion.

7          Q.    So if you go, Dr. Jacobs, to page 11 of

8   your report and you look at paragraph 42, which is

9   your "in closing" paragraph, the second sentence

10  reads, Seven Courts had no notice of imminence of

11  harm.

12         So I read that to be an opinion from you

13  as to whether Seven Courts had notice of imminence

14  of harm.  I'm just reading it literally.

15         A.    Imminence of harm is a criterion in

16  forensic criminology which asks whether, to what

17  extent there's clues at or near the time of the

18  incident that the property knew about, didn't react

19  to, and had they known and reacted to them, they

20  could have done something to prevent the incident.

21         So there's no evidence that, for example,

22  Latoya Wynn saw this criminal lurking on the

23  property that day, saw him casing the property, saw

24  him, you know, sizing up these -- your clients for a

25  robbery.  There's no evidence about any of that.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 96

1              And so imminence of harm gets at the

2       situational cues at or near the time of the incident

3       that would possibly have given the landlord or the

4       defendant notice that something really bad was about

5       to happen and then they did nothing to despite that

6       notice.  So there's no evidence of that.

7           Q.   And I want to understand what you mean.

8              When you offer this imminence of harm

9       opinion, are you talking about notice in the moments

10      or hours before the attack?

11          A.   Yeah, imminence of harm typically focuses

12      on the window of time close to the incident itself

13      to see if the defendant had notice that something

14      was about to happen.

15          Q.   And in this case, what kind of window are

16      you using when you offer this opinion about whether

17      TPI had notice of imminence of harm?

18          A.   Well, I mean, in this kind of case, it

19      would be, you know, in the moments at or near the

20      time of the incident.

21          Q.   And so it's what I'm hearing from you is

22      that you're not offering an opinion about whether

23      crime at Seven Courts in the days, weeks, months,

24      years prior to the July 2021 attack created notice.

25      Is that fair?

Bruce Jacobs                                     August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 97

1              MR. MELCHER:  Objection; form.

2        A.   I don't think I'm offering an opinion on

3    that issue.

4        Q.   Okay.  Just so I understand and because

5    there was an objection, do you have an opinion in

6    this case about whether crime reported at Seven

7    Courts in the three years prior to the July 2021

8    attack on the Diaz family would have put TPI on

9    notice of the risk of what actually happened to the

10   Diaz family?

11       A.   I don't think I'm offering an opinion on

12   that issue.

13       Q.   One phrase that you have used in this

14   deposition and in your report is "reasonable" and

15   you have also used the phrase "adequate."  And just

16   to keep it simple, are you sort of using

17   "reasonable" and "adequate" as more or less

18   synonyms?

19       A.   I'm not sure.  I think they mean slightly

20   different things.  I like to use them both.  But I

21   have to really think about the distinction between

22   the two.

23       Q.   Okay.  Well, why don't you define them

24   both for me.

25              What does "reasonable" mean as you use it

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 98

1    in your opinions in this case?

2         A.   "Reasonable" typically means, you know, if

3    other regular people were facing the same or similar

4    circumstances, would they have acted in the same or

5    similar manner.  That's kind of how I look at

6    "reasonable."

7              And then "adequate" is more do the

8    measures -- do the measures in place, are they

9    generally consistent with practices associated with

10   crime prevention approaches specified in the

11   peer-reviewed scientific criminology literature.

12        Q.   Okay.  So let's stick with "reasonable"

13   for a minute, and I thank you for giving me the

14   definition that you're using in this case.

15             Where do you get the definition of

16   "reasonable" that you're using in this case?

17        A.   I just gave it to you.  I don't know.

18   It's something that...

19        Q.   From where do you derive it?  That's what

20   I'm asking you.

21        A.   Just my understanding of the term.

22        Q.   Based on what?

23        A.   Just, I suppose, understanding of the

24   English language.  I mean...

25        Q.   Well, I mean, we all use the word

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 99

1    "reasonable" in different facets of our life, but

2    you're here as an expert testifying in litigation.

3    And so I'm trying to ask you how you -- how you

4    derive the definition of "reasonable" that you use

5    to frame your opinions in this case.

6         A.   It's probably from my reading and training

7    in forensic criminology.

8         Q.   Is it a legal standard that you think

9    you're using when you say "reasonable"?

10        A.   I would say it's more of a term relevant

11   to forensic criminology and the various literature

12   that examines the concept of reasonableness in the

13   context of that literature, a lot of which I

14   provided you through the ShareFile link.

15        Q.   And so is there a definition of

16   "reasonable" in the peer-reviewed literature that

17   people in your field all use and apply to mean the

18   same thing?

19        A.   I would have to point you to the

20   literature in forensic criminology.  I can't cite a

21   chapter and verse as I sit here.

22        Q.   And how do you, to form your opinions in

23   this case, evaluate whether TPI's conduct is

24   reasonable?

25        A.   From the standpoint of a criminologist and

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 100

1    whether the violent crime pattern would have

2    justified security measures that were not in place

3    at the time of the incident.

4         Q.    And how do you perform that inquiry?

5         A.    Through the methods I described earlier.

6         Q.    The triangulation and analytic induction

7    and content analysis?

8         A.    Domain analysis, crime pattern analysis,

9    and all the various sub-techniques, yes.

10        Q.    And how, then -- specifically how do you

11   arrive at a determination based on those techniques

12   whether security measures are or are not reasonable?

13        A.    Based on -- I think I just answered that

14   question.  It's based on the -- the content

15   analysis, the domain analysis, the crime pattern

16   analysis, and whether and to what extent those --

17   the data suggests that the property warranted

18   security measures that it did not have in place on

19   the night in question.

20        Q.    And I appreciate that you're giving me the

21   sort of summary answer.  I'm trying to ask you the

22   detail question.

23             How do you use these techniques you've

24   referenced to reach a specific conclusion about

25   whether security measures are reasonable?

Bruce Jacobs
August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 101

1    A.   Well, security measures in general will be

2    determined by the data points that are listed in my

3    report as they relate to whether those data points

4    are consistent with the peer-reviewed criminological

5    guidelines in crime prevention such as situational

6    crime prevention and crime prevention through

7    environmental design.  So that's a simple comparison

8    exercise that I did in my report.

9         The armed security issue is a more narrow

10   issue of, you know, was -- was the property, for

11   example, a violent crime hot spot at or near the

12   time of the incident, and if it was a violent crime

13   hot spot, would it have justified a particular

14   security deployment.

15        And so the hot spot analysis, that comes

16   directly from -- from crime pattern analysis, which

17   I have described earlier, which is also found in

18   methodology that police departments, including APD,

19   use all over the country called Compstat, which is

20   essentially you're analyzing crime by address, by

21   type of occurrence, by time of occurrence, by

22   victim-offender relationships, by motive, by weapon

23   involvement, so on and so forth to determine, you

24   know, whether a ramped-up security presence is

25   justified.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 102

1          So I did all that and, you know, my

2    report, paragraph 24, essentially describes how in

3    the 11 months leading up to the subject incident, I

4    believe there's only one nighttime act of predatory

5    violence or predatory gun crime in the 11 months

6    preceding the incident.

7              So based on a standard hot spot analysis

8    that really virtually any police department would

9    do, if they looked at a property and said this

10   property hasn't had a single nighttime predatory gun

11   crime in almost a year, would we recommend, for

12   example, a dedicated, fixed policing presence at

13   this property every night of the week, seven days a

14   week, absolutely not.  They would never do that.

15             And that's the methodology that I use is

16   the methodology used by police departments around

17   the country, security experts on hot spot analysis

18   which is based on crime pattern analysis and the

19   various variables involved therein.

20                  (Off-the-record conversation.)

21      Q.   Another term that you use in your report

22   is "standard of care."

23             What do you mean by "standard of care"?

24      A.   Can you show me the paragraph?

25      Q.   On page 6 of your report, paragraph 23,

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 103

1    you say -- this is in the fourth line down, This is

2    not the expected standard of care in the security

3    industry for a crime of this type with this fact

4    pattern.

5            So if you use it in your report, what do

6    you mean by "standard of care"?

7        A.    What paragraph again?

8        Q.    23.

9        A.    Okay.  So in other words, is there any

10   security organization, any national written standard

11   that suggests or dictates that a guard should have

12   been posted by the plaintiffs' unit at or near the

13   time of the incident.  There's no standard in the

14   country that I'm aware of that says anything close

15   to that.

16       Q.   Do you really think that our theory in

17   this case is that an armed guard should have been

18   right outside the Diaz family's unit and not moving

19   anywhere else?

20                MR. MELCHER:  Objection; form.

21       A.   I can't speak for your approach to this

22   case.

23       Q.   Come on.  Okay.  I will just tell you

24   our -- I know you don't actually think that's our

25   theory.  I'm not sure why you shot at that in your

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 104

1    report.

2              Assume that our theory is that an armed

3    guard should have been present at Seven Courts

4    during the hot summer evenings of July 2020.

5         A.    Where?  By building G?

6         Q.    So let me --

7         A.    Building D?  By the leasing office?  By

8    the pool if there is a pool?

9         Q.    Hold on.  It's not -- okay.

10             All right.  Let's just assume that we

11   don't think every unit should have its own armed

12   guard right by the door like a bank safe.  What do

13   you mean -- actually, we can even take it out of the

14   context of -- not the case but of the specifics

15   there.

16             You use a term "standard of care" in your

17   report.  What do you mean by "standard of care"?

18        A.    I already answered that question.

19        Q.    So I understand you to be saying "standard

20   of care" means published standards by professional

21   bodies or organizations or institutions such as

22   what?

23        A.    ASIS, A-S-I-S; IAPSC; American Society of

24   Criminology; Academy of Criminal Justice Scientists;

25   ANSI, A-N-S-I.  I mean, some sort of professional

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 105

1    organization that says, here is a standard and

2    here -- it's a written standard and this is what we

3    expect.  That's a standard of care.

4         Q.   And you refer in that same sentence to the

5    security industry.

6              What do you mean by "security industry"?

7         A.   So that would be one of the

8    security-related organizations such as ASIS or

9    IAPSC.

10        Q.   I want to -- I want to understand the role

11   that a written standard, as you just described it,

12   plays in you forming your opinions in this and other

13   cases where you're a litigation consultant.

14             Do you require there to be a written

15   standard by one of these professional bodies before

16   you testify that a particular security measure is

17   the standard of care?

18        A.   Do I require that, no.  But that's --

19   that's one of the points is these organizations may

20   issue guidelines or something of that nature but

21   they're not -- they're guidelines and that's it.

22             And so given that it really has to be

23   justified -- for example, an armed security presence

24   really has to be justified, you know, by a pattern

25   of predatory violence that suggests the property

Bruce Jacobs                                  August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 106

1    really absolutely needed a dedicated, fixed presence

2    on the night in question.

3        Q.    Another term that you use -- and this is

4    on page 5, footnote 6, is "customs and practices."

5    And you're referring to "customs and practices" for

6    certain security measures among similar type

7    properties in the same general area.

8            What do you mean by "customs and

9    practices"?

10       A.    I think it's pretty self-explanatory what

11   other folks or entities are doing relative to these

12   same issues.

13       Q.    And I want to go through these terms and

14   understand if these are terms that you use in your

15   academic work, whether it's research or teaching

16   students.

17           You research or teach your students about

18   the standard of care as you have defined it?

19       A.    Depends what the class is about.

20       Q.    In what class would you teach your

21   students about the standard of care?

22       A.    If we're talking about violent crime

23   prevention, that issue might come up.

24       Q.    How would it come up?

25       A.    For example, when we discuss robbery risk

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 107

1   at convenience stores, one of the issues we talk

2   about is whether, for example, two clerks is a

3   standard of care in the convenience store industry.

4   That would be one example.

5        Q.   All right.  Let's look at -- excuse me --

6   paragraph 16 of your report.

7        A.   You say 16?

8        Q.   Uh-huh, paragraph 16.  Starts at the

9   bottom of page 3.  This is where you describe the

10  materials that informed this report.  So you have

11  the complaint, the answer, TPI's responses to

12  plaintiffs' first set of discovery requests.

13           And are you referring to the actual, like,

14  written litigation document that contains TPI's

15  responses where they say objection this, that, or

16  the other thing and then the answer?

17       A.   Whatever was provided to me that's listed

18  as that file name is what I'm referring to.

19       Q.   Okay.  Then we have that in the file.

20           There's the APD reports, and the attorney

21  summary of APD reports, the 911 call, the

22  plaintiffs' responses to TPI's discovery requests,

23  some depositions, and you have testified that there

24  were additional depositions you reviewed after your

25  report.

Bruce Jacobs                                          August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 108

1          So tell me about how you reviewed the

2     depositions in this case.  What did you do?

3          A.   I read every page and absorbed the

4     material.  I'm not sure how to answer that.

5          Q.   Did you take notes?

6          A.   I took some notes in preparation for the

7     opinions today.  If that's what you mean, yes.

8          Q.   That's the notes that we have marked as

9     Exhibit 2 --

10         A.   Yes.

11         Q.   -- and that you brought today?

12         A.   Correct.

13         Q.   So your testimony is you read every page

14    of every deposition that you were provided in this

15    case?

16         A.   Correct.

17         Q.   And then you refer to your site inspection

18    and area canvass and interview with the property

19    manager.

20          So did you review -- so setting aside the

21    APD, the Atlanta Police Department, reports, did you

22    review internal incident reports generated by TPI

23    employees?

24         A.   Yes.  If they were provided in the file, I

25    reviewed them.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 109

1       Q.    And so I think what you mean by provided
2   in the file is incident reports that were attached
3   as exhibits to depositions you were provided.
4            Is that what you mean?
5       A.    Either that or Mr. Melcher's responses to
6   requests for production.
7       Q.    Well, so when I look at what was contained
8   in your file, I don't see a collection of incident
9   reports at all, frankly, other than what might be
10   referred to as an exhibit in a particular
11   deposition.
12            So what I'm asking you is did you get a
13   stack or ask for a stack or receive a stack of all
14   of the incident reports for Seven Courts, to your
15   knowledge?
16       A.    I asked for all -- to my recollection, I
17   asked for all internally generated incident reports.
18   And so whatever was provided, was provided.
19       Q.    Did you review other than what might have
20   been marked as an exhibit in deposition, did you
21   review text messages from the TPI employees and
22   security contractors when they were texting about
23   crime conditions at Seven Courts?
24       A.    I don't think anything other than the --
25   what was provided as exhibits or mentioned or

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                    Page 110

1    referenced as exhibits to the depositions.  I don't

2    recall the specific file names along those lines.

3         Q.    Would it be your typical practice to ask a

4    defendant, in particular a defendant like TPI that

5    owns and operates or manages a property, to share

6    with you all of the incident reports during the

7    reference period?

8         A.    Yes.

9         Q.    And why would you want to see those

10   incident reports?

11        A.    Well, especially as it relates to violent

12   crime, I want to see if there's anything being

13   reported internally that was not being reported to

14   the police department.

15        Q.    Because in order for you to conduct a

16   reliable analysis of crime conditions at the

17   property, you need all the data, not just what's in

18   the police department reports, correct?

19        A.    As it relates to predatory violence, I

20   would tend to agree.

21        Q.    All right.  So paragraph 18 of your report

22   is where you describe content analysis, which you

23   have testified is a technique or method you used in

24   this case, correct?

25        A.    Among several, yes.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 111

1       Q.    And what forms of evidence or information

2   do you perform content analysis on?

3       A.    All the depositions, the relevant

4   exhibits, the interrogatory answers, responses to

5   requests for production, depositions, police

6   reports, internal reports if available, the totality

7   of the file materials is what you do the analysis

8   on.

9       Q.    And how do you perform a content analysis

10  on those file materials?

11      A.    I think I specified that in my subpoena

12  response where I develop axial codes, selective

13  codes; and then ultimately before I'm deposed or

14  within the report itself, I will convert those codes

15  into themes or concepts that drive the report or my

16  deposition notes.

17      Q.    In paragraph 19, you refer to analytic

18  induction.  Can you tell me how you use the

19  technique of analytic induction to reach your

20  opinions in this case?

21      A.    Sure.  That's where you compare all the

22  data points that you have developed from the

23  discovery material to see whether and to what extent

24  they're consistent with practices and crime

25  prevention that are peer-reviewed in criminology

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 112

1    such as situational crime prevention and crime

2    prevention through environmental design.

3             You also compare the data points to other

4    relevant literatures in the field of, like, for

5    example, lighting, cameras, uniform patrol, to see,

6    again, whether and to what extent the data points --

7    how those data points line up with the peer-reviewed

8    scientific literature in criminology.

9             So analytic induction is really where

10   you're taking your data -- in this case, the data

11   come from the discovery materials -- and you're

12   trying to assess whether the data and the data

13   points are consistent with the peer-reviewed

14   findings in criminology on these relevant areas.

15        Q.   Can you point me to anywhere in your

16   report where you walk through a process of analytic

17   induction?

18        A.   25, doesn't warrant a roving, armed

19   security patrol, that's based on hot spot analysis,

20   crime pattern analysis, which is analytic induction.

21             26, 27, 28, that's all about the property

22   crime, violent crime, escalation phenomenon, that's

23   all analytic induction.  Comes right from the

24   literature that's cited.

25             The functional limits of crime prevention,

Bruce Jacobs                          August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 113

1    which is paragraphs 29 and 30, and then all the

2    supporting material, that's analytic induction.

3            The -- paragraphs 34 -- paragraph 34 about

4    gating and fencing a violent crime, that's analytic

5    induction.

6            Paragraph 40, surveillance cameras, 41,

7    lighting, that's all analytic induction as well.  So

8    it's peppered throughout the report.

9        Q.   And you refer in paragraph 20 to

10   triangulation, and you say that triangulation is a

11   technique that you could use to test or falsify a

12   factor theory in issue, right?

13       A.   Right, because you're using multiple data

14   sources to establish the -- verify a conclusion

15   about a fact in issue.  So, for example, you're not

16   just reading police reports, you're not just reading

17   depositions, you're not just reading emails and

18   correspondence, you're not just cherry-picking one

19   data source, you're looking at everything, and

20   you're determining the extent to which there's

21   alignment in the data on a particular issue.

22           When there's not alignment, then you may

23   have a factual dispute such as the one you were

24   raising earlier about Holt saying that Wynn is a

25   drug dealer and everybody saying that she's not.  So

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 114

1   that's a factual dispute.  The jury will have to

2   resolve that.

3        Q.   So on paragraph 21, you say, Based on my

4   review of all the discovery material in this matter,

5   as well as the site inspection, interview with the

6   property manager, and area canvass, and then you

7   offer your considered opinion about whether Seven

8   Courts had an adequate and reasonable crime

9   prevention posture.

10            You list as the adequate and reasonable

11   crime prevention posture all of the bullet points

12   that come straight out of your interview with Toya

13   Wynn, correct?

14       A.   Well, no, it's the interview with Toya

15   Wynn, my site inspection, the available discovery

16   material.  Everything that was part of the case is

17   part of that -- part of that paragraph.

18            But there are some things that were not --

19   like, for example, the HandyTrac system, you know, I

20   would have only known that by asking her.  I think

21   she even showed me the system.

22       Q.   Did you ask whether TPI had any formal

23   security policy for Seven Courts?

24                MR. MELCHER:  Objection; form.

25       A.   You asked in your interrogatory, so no, I

Page 115

1    did not replicate the question.

2        Q.   And the answer is no, TPI does not have a

3    formal security policy for Seven Courts, correct?

4        A.   Any what?

5        Q.   Any formal security policy for Seven

6    Courts.

7        A.   Right, there's no formal -- quote/unquote,

8    formal policy, but the data points are consistent

9    with -- the data points listed in my report that I'm

10   talking about today are entirely consistent with a

11   crime prevention posture, which is -- it may not be

12   a formal written security plan, but on some level,

13   it's a functional proxy for it.

14       Q.   Do you think that a property like Seven

15   Courts should have a formal written security plan or

16   policy?

17               MR. MELCHER:  Objection; form, term

18   "think."

19       A.   It should have a plan of some kind,

20   whether it's -- whether it's written or not, I would

21   not require that, but it should have a posture in

22   place, which is consistent with a plan, which is

23   what they're doing.

24       Q.   Should a property like Seven Courts or a

25   company like TPI operating a property like Seven

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                    Page 116

1    Courts undertake a formal analysis of crime at Seven

2    Courts and in the surrounding area?

3                    MR. MELCHER:  Objection; time and

4    scope.

5        A.   Well, I mean, I guess there's two answers

6    to that.  As a criminologist who is interested in

7    crime data, I'm an advocate of doing that, I'm all

8    for that.  Whether they're required to do that -- my

9    understanding is that there's no legal duty, I

10   guess, for any Georgia apartment complex to dig up

11   police reports for its property, inspect them on a

12   regular basis.  That's my understanding.

13                Again, having said that, I'm a

14   criminologist.  I'm all for analyzing crime data.  I

15   think it's a good thing to do.  But would I require

16   it?  I don't think I would require it but I'm an

17   advocate of that.

18       Q.   So I'm going to set aside your

19   understanding or views about what Georgia law

20   requires since we can all agree you're not an expert

21   on Georgia law, right?

22       A.   Correct.

23       Q.   So I want to ask you your opinion -- your

24   litigation support opinion.

25                Do you think that a company like TPI

Bruce Jacobs                           August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 117

1   operating a property like Seven Courts should

2   undertake a formal analysis of crime at Seven Courts

3   and in the surrounding area over a time frame of two

4   or three years?

5       A.   I'm not sure.  I think I'll stick with my

6   previous answer.  I mean, it depends on the

7   property, really.  It depends on -- you said

8   surrounding area.  It depends on the area.  You used

9   the word "formal."  I mean, I don't know.  I mean,

10  I'm not sure how to answer that question.

11      Q.   When you were interviewing Ms. Wynn, did

12  you ask her why TPI did not provide regular armed,

13  overnight security at Seven Courts in the summer

14  of 2021?

15      A.   She -- I believe she told me they were

16  moving from a regular or nightly security presence

17  to a camera system that would have interfaced with a

18  periodic patrol.  I think that's what she was

19  telling me.

20           But my question was, was there an armed

21  guard at the premises on the night in question, and

22  I believe she said they were in between -- they were

23  in this transition point where they were moving from

24  a guard present to a more technologically intensive

25  security presence with a guard interface.  That's

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 118

1    what I think she was telling me.

2          Q.   Has there ever been -- actually, let me

3    orient you.  Let me orient you actually.  So I want

4    to actually ask you about paragraph 23.  We're going

5    to come back to paragraph 22, but looking at

6    paragraph 23, which is primarily about the presence

7    of a security guard, have you ever in a litigation

8    support matter concluded that a security guard

9    should have been present at an apartment complex?

10         A.   Oh, sure.

11         Q.   And what would have led you to reach the

12   conclusion that a security guard should have been

13   present at an apartment complex?

14         A.   A very clear violent -- pattern of

15   predatory violence that justified, for example, a

16   dedicated presence.

17         Q.   And what kind of pattern of predatory

18   violence would justify an armed security guard?

19         A.   I can't invent it out of whole cloth, but

20   typically a pattern.  You know, you're looking for,

21   you know, instances of stranger-on-stranger violence

22   that would have justified some sort of dedicated,

23   fixed security presence.

24         Q.   Well, give me an example, if you would, of

25   what a pattern, in your view, would look like that

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                   Page 119

1    would justify an armed security guard.

2        A.    Well, typically you're talking about --

3    well, you look at the -- assuming that the litigated

4    incident involves predatory violence, then you look

5    at the reference period and you're asking whether

6    and to what extent there are similar, recent, and

7    frequent incidents that would have justified a fixed

8    security presence.  And so you're looking at those

9    variables.

10            You're also looking at, obviously, time of

11   occurrence, location of occurrence, you know, you're

12   trying to see if there's a clear pattern that would

13   have justified some sort of dedicated security

14   presence.

15       Q.    And I am asking you to define those

16   variables in more detail than you're doing.  So when

17   you say that you're looking to discern a pattern,

18   you're looking at incidents that are similar.  Tell

19   me what you mean.

20       A.    Well, again, assuming that the litigated

21   incident is predatory violence, you're looking at

22   incidents that involve strangers, you're looking at

23   incidents that involved serious violent crime which

24   would be murder, rape, aggravated assault, or

25   robbery.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 120

1          You're looking at incidents where there is

2     typically weapon involvement and/or serious victim

3     injury.  You're looking for incidents in which

4     there's a clear time pattern of occurrence so that

5     it's not only a hot spot but it's a burning time for

6     the hot spot.

7          You're probably looking for location

8     information.  You know, for example, I look at

9     common area occurrence versus interior of apartment

10    occurrence.  And obviously common area occurrence is

11    something that security presence can theoretically

12    do something about.  You're looking for whether the

13    crime was committed by somebody internal to the

14    property or external.

15         So, you know, I can't cite you chapter and

16    verse exactly the pattern that has to be in place to

17    justify armed security presence, but those are the

18    variables I would be looking at to help determine

19    that.

20    Q.   Would you examine crime only at the

21    subject property or would you also look at crime in

22    nearby properties or areas?

23    A.   I'm not against looking at the area

24    assuming the data are available from the police

25    department.  So -- but if the data are not

Page 121

1  available, then you want to see the extent to which

2  violent crime is either spilling over or migrating

3  from the property to the area.

4      Q.   What is your -- in your litigation support

5  role, what is your customary practice toward nearby

6  properties or areas?  Is it your customary practice

7  to investigate for crime data for nearby properties

8  and areas?

9      A.   If the data are available, I typically do

10  like to look around.  I don't think Atlanta -- I'm

11  trying to remember.  I don't think Atlanta -- I

12  can't remember.

13         But since I wasn't offering a

14  foreseeability opinion in this case, really what I'm

15  looking at is what's the pattern of predatory

16  violence at the property and does it justify

17  security measures that were not in place on the

18  night in question.

19      Q.   I think you're telling me that the

20  pattern -- when you're trying to discern the pattern

21  of predatory violence, you customarily look at the

22  subject property and you'll customarily look at the

23  pattern of predatory violence in nearby properties

24  as well at least when the data are available.

25         Is that a fair understanding of your

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 122

1    testimony?

2         A.    It depends on the scope of my duties in

3    the case, I would say that.  So in this particular

4    case, I was not asked to offer a foreseeability

5    opinion.  So I was asked to offer whether the

6    security measures that were in place were adequate

7    and reasonable relative to the risk, so it really

8    does depend on the scope of my inquiry.

9         Q.    Okay.  Let's step out of this case for a

10   minute and any limitations that may have been

11   imposed on your analysis or that you may have

12   understood to be imposed on your analysis.

13             When you are trying to evaluate the

14   pattern of violence at a piece of property or the

15   risk of violence at a piece of property, would you

16   customarily look at crime data for adjacent

17   properties or nearby properties?

18                  MR. MELCHER:  Objection; form.  The

19   retention was based on the allegations made in the

20   suit.

21        A.    Right.  It depends on the scope of my

22   inquiry.  It really does depends.  I think I have

23   answered that three times now.

24        Q.    The scope of the inquiry, you mean the

25   scope of inquiry that the lawyers who retained you

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 123

1    gave you?

2                    MR. MELCHER:  Objection; form, asked

3    and answered.

4          A.    It's the nature of the case and what the

5    allegations in the case are.  So that may come from

6    retaining counsel; it may come from you; it may come

7    from the discovery.  It depends on the case.

8          Q.    In your academic research, do you ever try

9    to evaluate the patterns of predatory violence at a

10   particular piece of property or neighborhood or

11   site?

12         A.    Perhaps through my respondents that I'm

13   interviewing, but that would be the extent of it.

14         Q.    Well, I don't know that I -- maybe I

15   didn't ask you that question the right way or I just

16   don't understand your answer.

17                I'm trying to ask whether in your academic

18   research you might ever focus on a particular site,

19   whether it be an apartment complex or a housing

20   project or a neighborhood and whether you ever try

21   to understand the patterns of predatory violence at

22   that site.

23                Is that something you ever do in your

24   academic work?

25         A.    I do it through the research literature,

Bruce Jacobs                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 124

1    but I don't -- those kind of studies -- I typically

2    do qualitative studies based on active offenders, so

3    that kind of research would be literature-based

4    research as opposed to me generating the data.

5         Q.   In your review of the literature when your

6    professional colleagues in criminology are

7    evaluating the patterns of predatory violence at a

8    site, do they typically expand their inquiry to look

9    at patterns of predatory violence in nearby sites?

10        A.   Only typically if they want to see if the

11   security measures at the specific site that were

12   analyzed caused crime to displace away from that

13   site to nearby areas.  But that's typically the main

14   reason that they would do that kind of research.

15        Q.   And then shifting back to litigation

16   support, what I think you're telling me is that you

17   would consider crime at properties near the subject

18   property if you understood that to be important to

19   the case?

20        A.   If there were significant pattern of crime

21   or violent crime spilling over or migrating from the

22   area to the property or the scope of my inquiry was

23   much broader than it is in this case where I'm

24   simply asked, Dr. Jacobs, are the security

25   measures -- were the security measures in place on

Page 125

1    the night in question adequate and reasonable

2    relative to the risk.

3           So assuming that it's not those two narrow

4    criteria, then perhaps.  But it really just depends

5    on the nature of the inquiry and the scope of my

6    inquiry.

7       Q.   So this gets back to the dilemma that we

8    had previously.  I don't understand conceptually how

9    you can evaluate whether security measures were

10   reasonable relative to a risk without knowing what

11   the risk is.

12              MR. MELCHER:  Objection; form.

13      Q.   Can you explain that for me?

14      A.   I have already told you three, four, five,

15   maybe six times.  I did assess the risk.  I did it

16   through the police reports.  I went back three

17   years, which is 1,095 days of crime data.  I

18   analyzed all the depositions, all the exhibits, all

19   the material referenced in the file itself.  That's

20   all assessment of risk, so I'm not sure what you're

21   saying.

22      Q.   Did you evaluate the risk of crime at

23   properties near Seven Courts?

24      A.   I did not collect that data, no.

25      Q.   Why not?

Bruce Jacobs                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 126

1    A.    I'm not sure how it would have informed my

2    opinions in this case where this criminal

3    essentially snuck up on the plaintiffs right outside

4    their apartment, barged in, and robbed them.  I'm

5    not sure how crime data at some other complex some

6    distance away would have affected that fact pattern.

7    Q.    So in your report, you refer to your

8    analysis of what you believe are comparable

9    properties, right?

10    A.    Well, I would say comparable to the extent

11    that there are other apartment complexes in the same

12    geographic area at around the same time.

13    Q.    Right.

14    This is what you described as your area

15    canvass?

16    A.    Yes.

17    Q.    And for your area canvass, you drove

18    around and you looked at eight properties that are

19    within roughly a mile of Seven Courts, correct?

20    A.    Roughly.  Some may have been a little

21    further out but roughly.

22    Q.    Yeah, if you look at paragraph 36 of your

23    report, you say there are eight multifamily

24    apartment complexes within approximately 1 mile of

25    Seven Courts.  And then you cite the names of them

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 127

1    in footnote 10.

2          Do you see that?

3          A.    Yes.

4          Q.    Why did you pick -- first of all, why did

5    you conduct an area canvass?

6          A.    I just want to see what the customs and

7    practices are for other properties of a similar type

8    in terms of -- not looking at convenience stores,

9    I'm not looking at gas stations, I'm not looking at

10   fast-food restaurants.  I'm looking at other

11   apartment complexes in the same area at around the

12   same time.

13         And I'm asking a very simple question:  If

14   instead of living at Seven Courts, if the plaintiff

15   lived at one of these other eight complexes, what

16   would they have -- what would the security

17   measures -- what would the apparent security

18   measures have been available to them assuming they

19   did not live at Seven Courts but lived at one of

20   these eight other complexes within a mile of Seven

21   Courts.

22         So did they have gates?  Did they have a

23   gatehouse?  Did they have indicia of fixed security

24   presence?  Did they have a fully enclosed perimeter?

25         So it's a very simple question that tries

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 128

1    to assess the customs and practices of these various

2    measures -- various security measures that I suppose

3    your side is contending should have been in place.

4                Are these customs and practices, in fact,

5    in place and do they comprise the metric in the area

6    for security for other complexes in the same area at

7    around the same time.

8        Q.   Do these customs and practices you're

9    trying to identify inform your analysis of what

10   security measures are reasonable?

11       A.   I think so.  Right.  You know, if every

12   other complex in the radius had armed guards and

13   gatehouses and, you know, 8-foot fences with barbed

14   wire at the top, I mean, that would tell me that

15   Seven Courts is maybe not doing something it needs

16   to be doing.  So, yes, it assesses my -- it informs

17   my assessment of the material.

18       Q.   Did you perform any investigation of what

19   the crime patterns are at the eight comparator

20   properties?

21       A.   No, it was a very simple inquiry.  If the

22   person lived -- instead of Seven Courts they lived

23   at some of these other properties, given that, you

24   know, theoretically, you know, an armed robbery like

25   this, I suppose, can happen to any of these other

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 129

1    tenants in any of these other properties, it's

2    theoretically possible, I suppose, what is the

3    security posture at these other places relative to

4    what is in place at Seven Courts.

5         Q.    How can you evaluate whether the security

6    posture at these comparator properties is reasonable

7    if you don't know what the crime conditions are at

8    those properties?

9         A.    I'm not doing an assessment of the other

10   properties in terms of the reasonableness of those

11   measures for those properties.  I'm assessing

12   whether the measures that Seven Courts has in place

13   were reasonable relative to the customs and

14   practices in the area.  It's a completely different

15   inquiry.

16        Q.    Well, I'm not sure that's true, but what

17   if -- what if the customs and practices at all of

18   those other properties are deficient, would that

19   make -- would it be reasonable for all of the

20   companies that operate low-income housing in this

21   part of Atlanta to just decide to have weak security

22   practices?

23             If they all agreed or independently

24   reached the conclusion that they should do that,

25   would that make their security practices reasonable?

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 130

1       A.    Absolutely not.  But, again, as I said

2   earlier, if I did my canvass and it showed that all

3   these complexes had gatehouses and armed guards and

4   8-foot fences with barbed wire and enclosed

5   perimeters, that obviously would look very badly for

6   Seven Courts, and that was part of my inquiry.

7             So it wasn't like -- the results fell

8   where they fell, and I'm reporting them.  I can't

9   speak for these other properties.  I'm just talking

10  about if I'm Seven Courts and I looked around -- if

11  I'm the plaintiff and I looked around for other

12  complexes in this radius, what would I find and

13  would Seven Courts' posture be wholly deficient in

14  light of what everybody else was doing.  It's just a

15  very simple comparative inquiry.

16      Q.    Now, I understand your report to offer the

17  opinion that as far as the variables you looked at

18  for these comparator properties, Seven Courts is

19  roughly the same in terms of, in your view, whether

20  there's a great, whether there's indicia of armed

21  guards and things like that.  Is that fair?

22            Roughly speaking, you're saying Seven

23  Courts is about where the other eight properties in

24  the 1-mile radius are?

25      A.    I would put it more that -- let's see, how

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 131

1    did I word it in my report.  I would just say like I

2    said in my report, like, more rigorous access

3    control measures than those used by Seven Courts

4    were not the custom and practice among other

5    complexes in the area.  It's very simple.

6        Q.   Would it matter to your opinion if at

7    these other eight apartment complexes there was a

8    pattern of predatory violence?

9        A.   Only if the lawsuit was at one of those

10   other properties, then I would have to do that

11   analysis.

12       Q.   Well, wouldn't that -- wouldn't knowing

13   whether the other properties that you have

14   identified as comparators -- let me start this over.

15            If you're judging -- well, let me back up.

16   Let me make sure I understand what I think you're

17   trying to do here.  I think what you're telling me

18   is that you think that you have identified the

19   custom and practice for apartment complexes in this

20   part of Atlanta, but you're not trying to testify

21   that that custom or practice is reasonable or

22   adequate to deter predatory violence, are you?

23       A.   Wrong.  No, that's not what I'm doing.

24       Q.   What are you doing?

25       A.   Again, I don't know how many times I can

Bruce Jacobs                                            August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 132

1    explain this.

2                MR. MELCHER:  Objection; form.

3         Q.   I know -- I -- let's do the part where I

4    understand what you're saying.  I understand you to

5    be saying that you think you have identified the

6    custom and practice in this part of Atlanta for

7    multifamily apartment complexes, okay, based on your

8    area canvass?

9         A.   Well, the custom and practice for, for

10   example, gates, gatehouses, perimeter enclosures,

11   and indicia of a dedicated security presence.

12        Q.   Is it your opinion that that custom and

13   practice is adequate and reasonable to deter the

14   risk of predatory violence?

15                MR. MELCHER:  Objection; form.

16        A.   No, that's not my opinion.

17        Q.   Do you know whether that custom and

18   practice is adequate and reasonable to deter the

19   risk of predatory violence?

20                MR. MELCHER:  Objection; form.

21        A.   I'm not offering that opinion.  That's

22   beyond the -- that would require me to do --

23        Q.   What would it require you to do?

24        A.   It would require me to -- well, that's a

25   different inquiry.  If it's reasonable relative to

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 133

1   the risk, then I have to get the violent crime data

2   for these other properties and do an assessment.

3   But that's -- again, that's beyond the scope of my

4   responsibilities in this case.

5           I asked a very simple question, and I have

6   said it three times now.  If I lived at Martin Manor

7   or Abby Ridge or The Commons or Harvest Oak or The

8   View or the Peaks of MLK or Columbia Commons or

9   Dogwood, if I lived at any one of those other eight

10  places in the area, what would I expect to get with

11  regard to gates, gatehouses, fences, and guards.

12  That's very simple.  That's all I did.

13      Q.   So tell me why that's important in your

14  opinion to know what the custom and practice is in

15  the surrounding area.

16      A.   Well, in my experience, one of the first

17  things that a reasonable juror might ask is what's

18  everybody else doing, what's everybody else doing

19  with perimeter enclosures, gatehouses, dedicated

20  armed security, barbed wire fences.  That's one of

21  the first questions that a reasonable juror might

22  have.  And so this is really, I suppose, to --

23  ultimately to assist them with that information.

24      Q.   And wouldn't a logical next question be to

25  ask whether those customs and practices were

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 134

1    adequate and reasonable, in your words, to deter

2    predatory violence?

3                    MR. MELCHER:  Objection; form.

4        A.    No, because the other eight complexes are

5    not being sued.

6        Q.    But if your opinion is that there's a

7    particular custom or practice, don't you want to

8    know whether it's an effective or good or safe

9    custom and practice?

10                    MR. MELCHER:  Objection; form.

11       A.    Well, that's in part covered in my report

12   where I talk about the limitations of gating as a

13   violence prevention tool, where I talk about the

14   limits of security patrol as a violence prevention

15   tool, cameras, lighting, so it's all covered in my

16   report anyway.

17       Q.    So does it matter to your opinion whether

18   the custom and practice is adequate to deter

19   predatory violence?

20                    MR. MELCHER:  Objection; form.

21                    What custom and practice?

22                    MR. BLOCK:  The one we have been

23   talking about for 15 minutes.

24       Q.    Please answer the question.

25       A.    So which custom and practice?  Gates?

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 135

1    Fencing?  Guard house?  Security patrol?  Which one?

2         Q.    In your report, Dr. Jacobs, you refer to a

3    custom and practice, which I understand to include

4    the various security measures that you refer to in

5    paragraph 37, paragraph 38, and paragraph 39,

6    parking gates, manned gatehouses, and armed

7    security.

8              Does it matter to you whether that custom

9    and practice is adequate to deter predatory

10   violence?

11              MR. MELCHER:  Same objection.

12        A.    I'm not sure how -- again, I have answered

13   that question.  Whether it's adequate to deter

14   predatory violence is covered in my report.  The

15   issue for the canvass is -- like I said, I did not

16   know when I did this canvass what the results were

17   going to be.

18              So if I came back here today and I found

19   that seven out of the eight, for example, apartment

20   complexes had a manned gatehouse, I mean, that would

21   obviously benefit you, and I would be reporting that

22   to you, and none of these questions about the crime

23   pattern of these other properties would have been

24   asked.  It would have been simply, oh, Seven Courts

25   is not doing something that seven of the other eight

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 136

1   people are doing.

2           And so that's my only -- that's the only

3   reason for the inquiry is just to show, again, if I

4   lived or your clients lived at any one of these

5   other eight properties, what would they expect to

6   get with regard to these four security measures.

7   That's it.

8       Q.   What would you think if you analyzed crime

9   data for these eight properties and found that they

10  had a pattern of predatory violence?

11          Assume with me that you did that analysis

12  and that was your finding, what would that mean for

13  your opinion?

14      A.   I would be speculating.  Depends on the

15  nature of the pattern.

16      Q.   But what -- you get where I'm going with

17  this.

18          What if you found that many of these

19  properties that you think are comparators had

20  shootings, murders, armed robberies, would that have

21  been -- just assume that's to be true.

22          Would that have any effect on your

23  evaluation of whether the custom and practice that

24  you think Seven Courts was adhering to was

25  reasonable?

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 137

1        A.    It depends on whether the offenders in

2    these alleged hypothetical other crimes are internal

3    to the property or external.  Depends whether they

4    were tenants or guests or outsiders.  It depends on

5    who they were targeting, whether they were people

6    known to them or not.  There's too many variables

7    for me out there that I don't know about for me to

8    give a reliable opinion without speculating

9    entirely.

10       Q.    And the way to conduct the analysis you

11   just described would be to, for example, pull APD

12   reports for these properties, right?

13       A.    If our doing a full-on foreseeability

14   assessment of all eight other properties, yes, but

15   I'm not doing that.

16       Q.    Well, if you wanted to evaluate whether

17   the custom and practice you have identified were

18   reasonable and adequate, you might also want to

19   evaluate crime at those properties, correct?

20       A.    I think I have already answered that

21   question four or five times.  It's --

22       Q.    And it's simple to tell me yes or no.

23            If you wanted to know if these customs and

24   practices were adequate and reasonable, wouldn't you

25   want to know what crime looks like at those

Bruce Jacobs                              August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 138

1   properties?

2                    MR. MELCHER:  Objection; asked and

3   answered repeatedly.

4                    Go ahead.

5        A.   I have already answered the question,

6   like, five times.  I mean...

7        Q.   And you can simply tell me yes or no.

8        A.   It's not amenable to a yes or no answer.

9   I have answered it.

10       Q.   Well, I understand that the outcome of

11  your analysis is not amenable because you didn't do

12  the research, but just help me understand if I'm

13  thinking about the question correctly.

14                   If I'm Dr. Jacobs and I want to know

15  whether security measures that are a custom and

16  practice in an area are adequate and reasonable, I

17  should go look at the crime data for all of the

18  properties that form the basis for my custom and

19  practice analysis; isn't that true?

20                   MR. MELCHER:  Aaron, you're just

21  arguing with him now.  I mean, you have asked him --

22                   MR. BLOCK:  Don't --

23                   MR. MELCHER:  Wait a second.

24                   -- what went into his analysis

25  repeatedly, and now you're projecting your opinions

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 139

1    on to him.  You have established that he didn't do it

2    because he didn't feel that it was appropriate.

3    There's nothing else that he can say on this.

4                    MR. BLOCK:  Then he can give me a

5    one-sentence answer --

6                    MR. MELCHER:  He just said --

7                    MR. BLOCK:  -- or one-word answer.

8                    (Simultaneous speaking.)

9                    MR. MELCHER:  I'm going to instruct

10   him not to answer yes or no if he feels he can't

11   answer it --

12                   MR. BLOCK:  Is there a privilege

13   objection you're making?

14                   MR. MELCHER:  No.  This has nothing to

15   do with privilege.

16                   MR. BLOCK:  Then you cannot give him

17   an instruction.  Then you cannot give him an

18   instruction not to answer.

19                   MR. MELCHER:  I can certainly instruct

20   him not --

21                   (Simultaneous speaking.)

22                   MR. MELCHER:  Just like you can

23   continue to badger him, I can continue to make

24   objections.

25                   MR. BLOCK:  I'm trying to

Page 140

1    understand --

2                  MR. MELCHER:  He indicated he cannot

3    answer -- the witness has indicated he cannot answer

4    the question yes or no.  Why would you then ask him

5    to answer it yes or no?  Whether it's privileged

6    objection or what, it's an inappropriate question.

7        Q.    Dr. Jacobs, if you would like to know

8    whether a custom and practice is adequate and

9    reasonable to deter crime, don't you need to know

10   what crime is going on at the properties that have

11   the custom and practice?

12       A.    I have already told you that question is

13   answered by the research literature.  That's a

14   separate question --

15       Q.    If you wanted to know whether a --

16       A.    -- which is covered in my report.

17       Q.    If you want to know whether a custom and

18   practice in Atlanta at Seven Courts and eight

19   neighboring properties is adequate and reasonable to

20   deter predatory violence, don't you need to know the

21   crime data on predatory violence at all of those

22   properties?

23       A.    No, because I'm only answering the

24   question for Seven Courts, not these other eight

25   properties.

Bruce Jacobs                                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 141

1       Q.   How can you know whether the custom and

2    practice is adequate and reasonable unless you see

3    how it's working in practice?

4       A.   It's discussed in my research report or my

5    expert report, the limits of gating, cameras,

6    lighting, and security patrol.  So that tells you

7    from the peer-reviewed criminological literature

8    whether to what extent these particular measures are

9    effective in inhibiting violence.  So that answer --

10   that question is answered.

11            The question you're trying to ask is

12   related to an inquiry that is beyond the scope of

13   what I was asked to do.  And once again, I have

14   answered the question four, five, six different

15   times already, so I'm just going to refer back to my

16   previous answer because, frankly, I'm getting a

17   little tired, and I don't want to misspeak, so I'll

18   just refer back to what I have already answered.

19      Q.   Looking at paragraph 37 of your report

20   where you describe your area canvass, I want to

21   understand what you did to observe these other

22   properties.

23            Did you drive by them?

24      A.   So I think the first thing I did was

25   before my visit, I went on Google Earth and

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                        Page 142

1    identified all the relevant properties that were

2    listed in the electronic -- on the Internet.  Then

3    once I got to the property -- or the area, I had

4    Mr. Melcher take me around to these various

5    properties.  And, in addition, as happens sometimes,

6    there are properties that I stumble upon during my

7    canvass that are not listed electronically, so those

8    would have been covered as well.

9              In terms of the actual visit, yeah, we --

10   I instructed him to drive me onto these properties,

11   to drive me into the properties, to drive me around

12   the exterior of the properties.  And I did that I

13   guess eight times over.  And that was the nature --

14   again, just a basic assessment of these very basic

15   security measures that are an issue in this case.

16   That's all I was doing.

17        Q.   Did you ever get out of the car at any of

18   these properties?

19        A.   I don't remember if I did, but the nature

20   of this particular inquiry would not have required

21   that.

22        Q.   Did you make any attempt to speak with

23   anyone associated with any of these properties?

24        A.   You mean like a leasing agent?

25        Q.   Sure.  Anybody.

Page 143

1      A.    I think at one of the properties there was

2  a policeman present, and I think I talked to him

3  briefly.  And essentially what he told me was there

4  had been some incidents in the last week or so, and

5  so he was there investigating those.  I think that's

6  what he said.

7      Q.    What time of day did you conduct this

8  exercise?

9      A.    Afternoon.

10      Q.    Was it light out?

11      A.    Yes.

12      Q.    So in paragraph 37, you say that at the

13  time of your inspection, the four complexes that had

14  a parking gate had the gate in the open position.

15           Do you know whether the gate at those

16  properties is closed at night?

17      A.    I do not know.  It would have required me

18  to know that information in July of '21, so no, I do

19  not know.

20      Q.    You don't know one way or the other?

21      A.    Right.

22      Q.    And in paragraph 39, you say, None of the

23  eight complexes had indicia of a continuous

24  uniformed and/or armed security patrol.

25           First of all, you have no information one

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 144

1    way or the other whether these properties have armed

2    guards at night, do you?

3         A.    Not based on the signage, no.

4         Q.    Not based on anything, right?

5         A.    Correct.  But --

6         Q.    And when you say that there are no indicia

7    of a continuous uniformed and/or armed security

8    patrol, what kind of indicia are you referring to?

9         A.    So I'm looking from the offender's

10   perspective, which is the purpose of our exercises,

11   are there specific signage, placards saying this

12   property is patrolled by X, Y, or Z, this property

13   is secured by X, Y, or Z.

14            That's the visibility component of

15   deterrence where you're publicizing the deterrent

16   threat to would-be offenders to essentially scare

17   them away, so that's what I'm looking at.

18            Also I'm looking at the extent to which I

19   physically witness either a security patrol on duty

20   and roving the property at the time of the incident.

21   As I mentioned, there was a police officer at one of

22   the properties, and I asked him, you know, what --

23   the extent of his duties there, and I believe he

24   said it was in response to a recent spat of

25   incidents that they were investigating.  I believe

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 145

1    that's what he said.

2        Q.   So your -- okay.  I understand what you

3    did there.

4                MR. BLOCK:  Do y'all want to take a

5    break and you can eat some lunch, Dr. Jacobs, or a

6    snack and we can set the laptop up?

7                (Off-the-record conversation.)

8                (Recess 12:29 p.m. to 1:05 p.m.)

9        Q.   Dr. Jacobs, I would like to stick with

10   your report, Exhibit 4.  I would like you to turn,

11   if you could, please, to page 6.  I want to ask you

12   primarily -- we're going to do this in segments but

13   primarily paragraphs 23, 24, and 25.

14                And I actually want to work backwards

15   because what I think you're saying in 23, 24, and 25

16   is that the pattern of predatory violence -- let me

17   tell you what I'm doing here.  I'm looking at

18   paragraph 25, and you say that pattern of predatory

19   violence would not necessarily warrant a continuous

20   roving armed security patrol at the time of the

21   incident, and then you describe that pattern in

22   paragraph 24, and then you compare that to the, you

23   know, actual incident -- or ultimate incident in

24   paragraph 23.  So I'm just trying to get you

25   oriented for where I'm looking.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 146

1          So can you tell me about your analysis in

2    paragraph 24, how you determined what the pattern of

3    predatory violence was at Seven Courts prior to

4    July 2021?

5          A.   It's based on the review of all the police

6    reports in the file for the three years prior to the

7    incident, which I have today on the desk here.

8          Q.   In your report, paragraph 24 refers to an

9    approximate 11-month period in which you say that

10   there was only one nighttime predatory gun crime.

11         So taking that in parts, why in your

12   report do you refer to an 11-month period?

13         A.   Because that was the natural -- when I

14   wrote this report, that was the apparent cutoff of

15   the last reported predatory gun crime.  But after

16   reviewing -- let's see here, after reviewing Holt's

17   deposition again, he apparently pointed out that the

18   Strawn robbery on 8/2/20 was a false report.  So I

19   would revise my finding in paragraph 24 to say that

20   there were no nighttime not just gun crimes,

21   predatory violent crimes in basically a year prior.

22   So the last -- I'm sorry there was one.  There was

23   one, the 12/12/20.  So that's correct.

24         But I would say it was one nighttime

25   predatory gun crime in basically a year prior.

Page 147

1    Because the --

2        Q.    Which is the -- go ahead.

3        A.    Because the 8/2/20 incident Holt said was

4    made up by the victim -- alleged victim.

5        Q.    And what is the -- I think you mentioned

6    December 2020.

7                What is the December 2020 incident you're

8    referring to?

9        A.    It's an armed robbery with a gun

10   December 12, 2020.  That was the only -- the only

11   predatory violent crime in essentially the 12 months

12   prior.  It's also the only -- the only violent

13   crime -- actually, the only -- yeah, the only

14   violent crime that occurred at the property after

15   Hickey took over security.  And when I looked at the

16   record of Mr. Holt, I can't say that at all.

17               So that's part of the assessment of the

18   adequacy is that not only did you have a substantial

19   dropping off of violence at the property but it

20   coincided with the hiring -- or the getting rid of

21   Holt and hiring Hickey.

22               Like I said, Holt -- Holt was let go in

23   November 2020.  Between November 2020 and July 2021,

24   you had one violent crime at the property.  And I

25   thought that was a remarkable pattern and I think a

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 148

1    prudent move on the part of Seven Courts to let Holt

2    go and hire Hickey with the 30 years' experience in

3    law enforcement.

4        Q.   Of course, Seven Courts downgraded

5    Hickey's role as of March 2021, correct?

6        A.   Well, that's not necessarily true.

7    Mr. Hickey downgraded his presence.  He couldn't

8    staff Seven Courts to the extent that he wanted to.

9    Seven Courts wanted to keep him on.  In fact, they

10   kept him on beyond the March '21 cutoff through an

11   additional month in April where they specifically

12   said, Please stay.  In May and June, he had

13   transitioned to a periodic presence as opposed to a

14   fixed presence in addition to passing out the

15   notices.

16            So I don't agree with your

17   characterization that they downgraded their

18   security.

19       Q.   Well, sure.  I think that it might be a

20   little bit of a mutual thing or in the eye of the

21   beholder.  And obviously all of this is -- you and

22   me -- subject to whatever the documents and the

23   testimony show.

24            But what I'm trying to question you on is

25   it is not the case that Mr. Hickey's services in

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 149

1    May, June, and July of 2021 were the same as his

2    services prior to May 2021, correct?

3         A.   Correct.  And that was mostly because

4    Hickey essentially changed the terms and was not

5    able to meet what Seven Courts wanted him to do.

6         Q.   Well, I think we'll let the testimony

7    speak for itself.

8              But directionally Mr. Hickey provided less

9    security service in May, June, and July 2021 than he

10   did prior to that, correct?

11        A.   I think as a function of the duration of

12   time he was there, yes.

13        Q.   So help me understand a little bit here.

14   You testified, although it's not in your report,

15   that you conducted an analysis of crime data over

16   three years at Seven Courts.  You have testified

17   several times today that you did, in fact, conduct

18   such an analysis.

19             So the first question is:  Why do you not

20   disclose that three-year analysis in your report?

21        A.   Because I'm not giving a foreseeability

22   opinion.

23        Q.   We'll come back to that.  I have heard

24   your testimony this morning.

25             But why do you -- why would you recount in

Page 150

1   your report any historical crime data such as the

2   11-month crime data in paragraph 24 if you're not

3   giving a foreseeability analysis?

4        A.   Because that's the hot spot analysis.

5   That's different than foreseeability.

6        Q.   "Hot spot" is not a word you use in your

7   report, is it?

8        A.   I would have to look but maybe not, but

9   that's what paragraph 24 and 25 capture.

10        Q.   Okay.  So what is a hot spot analysis such

11   as you performed here in your analysis in this case?

12        A.   It's a place where there's a concentration

13   of violent crime in a geographically --

14        Q.   And what --

15        A.   I'm sorry.

16             Concentration of violent crime in a

17   geographic location over a specific time parameter.

18   So in this case -- again, I'll revise the report

19   because Holt claimed --

20        Q.   No, you can't do that.  Actually, you

21   can't revise your report.

22        A.   Well, I'll revise the --

23        Q.   It's federal.

24        A.   -- conclusion in the preliminary report

25   which I labeled "preliminary" twice based on

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 151

1    Mr. Holt's testimony that the 8/2/20 robbery was

2    made up, so essentially it just changes from 11 to

3    about 12 months in terms of one violent crime in the

4    year prior.

5         Q.    Sure.

6              So I'm trying to understand what is the

7    utility of performing a hot spot analysis?

8         A.    It's exactly what the police departments

9    around the country do and exactly what we do in

10   criminology to assess whether and to what extent you

11   should deploy law enforcement assets at a particular

12   place.

13        Q.    And that's because based on the hot spot

14   analysis, you might or might not expect crime that

15   you would then want to deter with a police presence?

16        A.    Particularly violent crime, predatory

17   violence, yes.

18        Q.    How is that different from a

19   foreseeability analysis?

20        A.    The hot spot analysis is really

21   determining how to deploy your security assets.

22   Foreseeability analysis is something separate.  It's

23   whether a particular type of incident could have

24   been forecast.

25        Q.    Okay.  I understand what you're doing.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 152

1          So in your -- what was the -- what was the

2    frame of reference or duration of your hot spot

3    analysis?

4          A.   I'm not sure what you mean.  Like the --

5          Q.   Over what time period did you consider

6    crime data to determine whether there was a hot spot

7    at Seven Courts?

8          A.   Well, obviously I looked at the entire

9    three-year period just to get a basic sense of what

10   the property looked like.  But then within the

11   three-year period, I'm looking at the recency and

12   frequency and similarity of violent crime to see

13   whether and to what extent the issues that appear to

14   be emerging in, for example, 2019 and into 2020 were

15   continuing into 2021 such that a dedicated armed

16   security presence was justified.

17          So I can't justify based on this data

18   pattern a dedicated armed security presence on the

19   night in question.

20         Q.   So let me see if I understand this.

21          Is it your testimony that you did consider

22   crime at Seven Courts going back three years from

23   July 2021?

24         A.   I have already said yes.

25         Q.   In conducting -- I'm sorry.  I didn't mean

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 153

1    to -- you can finish your answer.

2         A.   I've already said I looked at three years'

3    worth of crime data.  Within the reference period,

4    you look for recency, frequency, and similarity, and

5    particularly as it relates to the time period

6    leading up to the incident to see if additional

7    security measures, such as a dedicated armed

8    security presence, were warranted on the night in

9    question as opposed to a periodic patrol presence

10   that they had in place.

11        Q.   So I'm just -- I don't need to argue with

12   you about what Mr. Hickey was actually doing.  I

13   just want to flag that I don't think we read the

14   testimony the same way, but that's not a question or

15   a statement to which you need to react.

16             I think what you're telling me is that you

17   looked back three years at crime data and -- but

18   then you zeroed in on the 12 or 11 months

19   immediately prior to July 2021 to see whether that

20   shorter period would have justified armed security.

21             Is that basically what you did?

22        A.   Right, because that's -- the recency

23   component gives you a better sense of whether a

24   dedicated armed presence was necessary on the night

25   in question.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 154

1        Q.   As you were conducting your analysis of

2    both one- and three-year periods, what kinds of

3    crimes or other instance would you have considered

4    as warranting or contributing to the need for armed

5    security overnight?

6        A.   It depends what day you're talking about.

7        Q.   What do you mean?

8        A.   Well, for example, so they had a murder at

9    the property on 4/6/19, and I think shortly

10   thereafter, they hired armed security, Holt, which I

11   think was absolutely reasonable.  You have got an

12   incident.  It's a very serious incident.  They

13   responded to it.  They hired somebody.  They

14   deployed them.

15           They had a couple of shootings in July

16   of 2020, and right after those shootings, they

17   ramped up the security presence even more, which is

18   totally correct.  I think they went to double the

19   shifts on weekends and longer shifts during the

20   week.  So that's textbook hot spot deployment.

21           And so when you have got a diminution of

22   violence, as you clearly had from July '20 to July

23   '21, then you can ramp down your measures, which is

24   exactly what they did.  It's textbook.

25       Q.   If I understand your testimony correctly,

Page 155

1    although this is not in your report, you seem to be

2    saying that Mr. Hickey, when he was performing

3    actual security guard services prior to May of 2021,

4    is responsible for at least some of the decrease in

5    crime.  In other words, switching from Holt to

6    Hickey decreased crime.

7             Is that your opinion?

8        A.   I all I can tell you is what the data say.

9    And the data say that while Holt was there, you had

10   armed robbery carjacking, strong arm robbery, armed

11   robbery, armed robbery, shooting, shooting, and then

12   strong arm robbery that was fake.  And while Hickey

13   was there, you had one armed robbery.

14       Q.   Right.

15            And I'm wondering if -- I think I know --

16   I think I know what you're trying to do.  All right.

17   So I think I understand what you're saying right

18   here.

19            So is it your opinion that TPI conducted

20   any kind of analysis of crime conditions and made a

21   considered choice to decrease the level of armed

22   security as of July 2021 because there was less

23   crime to deter?

24       A.   No, I don't think they did that, and I

25   don't think I said that.  But if I would have been

Bruce Jacobs                                           August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 156

1    advising them and I see this crime pattern, I would
2    have said that what they did forensically was
3    absolutely reasonable.  And the fact of the matter
4    is they --
5        Q.   Do you recall Mr. Hickey's testimony that
6    crime in Atlanta tends to increase in the summer?
7        A.   Well, depends on what kind of crime you're
8    talking about.  I think he's talking about, like,
9    teenagers and loitering and all kinds of other stuff
10   that's not violence.
11       Q.   Is that what he testified to, sir?
12       A.   I would have to get out his deposition,
13   but if you're talking about all crime, then that may
14   be true, certain kinds of crime do increase.  I'm
15   not sure about predatory violence.  Domestic
16   violence certainly increases in the summer.
17       Q.   Have you ever analyzed whether predatory
18   violent crime increases in the summer in Atlanta?
19       A.   In Atlanta for the entire city, no.
20       Q.   Did you analyze in this case whether Seven
21   Courts experienced more crime of any type predatory
22   violent or otherwise in summers as opposed to in the
23   cooler months?
24       A.   Well, in '19, they had none in terms of
25   predatory violence.  In '20, they obviously had --

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 157

1       Q.    Okay.  There was a murder -- you sure --
2    it's not actually summer here in April but it's hot.
3       A.    April 7th is not summer.
4       Q.    Yeah.  It's warm weather; it's not the
5    calendar.
6              MR. MELCHER:  Let's just define the
7    time period then.
8       Q.    Anyway, tell me what you did.  I don't
9    want you to speculate sitting here.  I want you to
10   tell me about the work you did before signing your
11   name to this report.
12             Did you study before signing your name to
13   this report whether there are any temporal patterns
14   in crime at Seven Courts season to season?
15      A.    I just told you I'm looking at the --
16   looking at my notes.
17      Q.    No.  Tell me whether you did analysis
18   beforehand, not what you can come up with now
19   looking at your notes.
20             MR. MELCHER:  Objection; form.
21      A.    These are my notes so it's beforehand.
22      Q.    You did this analysis beforehand or you
23   took the notes beforehand?
24      A.    Well, both; if I took the notes, I did the
25   analysis.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 158

1      Q.    What is your analysis that you did

2   beforehand?

3      A.    I just list all the acts of predatory

4   violence between, looks like, 7/'18 and 7/'21.  I

5   have them listed by date and type.  And that comes

6   right from the police reports that I told you I put

7   markings on very early on in this case that you will

8   be provided after today's deposition.

9      Q.    Speaking of materials to be provided after

10  today's deposition, are you willing to comply with

11  our subpoena and go into your sent items in your

12  email to look for reports from prior cases?

13                 MR. MELCHER:  Objection; form.

14                 Go ahead.

15     A.    Perhaps.  I mean, I don't know if that's

16  confidential work product with the attorneys I'm

17  working with.  I'm not going to disclose

18  confidential work product that might jeopardize the

19  outcome of a case, absolutely not.

20     Q.    Well, to me that's sort of a case-by-case

21  analysis that you might have to do.  My question is

22  different.  It's are you going to go do the search

23  that the subpoena asked you to do?

24     A.    So --

25                 MR. MELCHER:  Same objection.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 159

1        A.    -- search prior emails for reports sent?

2        Q.    We asked you for reports that you had

3   served in prior cases.  And I think we limited it to

4   the last four years or so.  And you told us in your

5   written response that you didn't have any.  You told

6   us in your testimony today that you don't actually

7   know because you didn't go into your sent box which

8   would reflect if you sent a final report to an

9   attorney.

10          I understand you that there could be --

11  understanding you to be saying that there could be

12  circumstances in which a report, notwithstanding

13  final from your perspective, might not have been

14  served on the other side and might still be

15  protected as work product, but that's -- that's a

16  different question.

17          The first step is just actually doing the

18  search to see what you have, which you haven't done

19  yet.  So my question for you is whether you're

20  willing to do that search.

21       A.    I'll look in my sent email box and see if

22  there are any reports that jump out, but other than

23  that -- I mean, I don't have the original signed

24  copies of these reports.  And to the extent that

25  they have changed since I issued them, I don't know.

Bruce Jacobs                                          August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 160

1    But I'll look in my sent email box if that's what

2    you want me to do.

3         Q.    Yeah, it is.  And I don't -- you keep

4    using the term "original."  I don't need the paper

5    copy with the wetting signature; I need a copy of

6    that which you've testified you would have sent to

7    the lawyers who retained you via email.  So that's

8    what we want.

9         A.    I'll look and see what shows up.

10        Q.    Thank you.

11             And then obviously if there are reasons to

12   think that particular reports are protected for one

13   reason or another, you know, it could be that they

14   weren't served so they're work product, it could

15   be -- I doubt it would be HIPAA, but it could be

16   HIPAA.  You know, we can talk about all that, but

17   the first step is to understand what we're dealing

18   with.

19             Okay.  So what -- if you were doing your

20   analysis, your -- what you call the hot spot

21   analysis, what kinds of -- what kinds of -- well,

22   let me make sure I understand.

23             What's the duration of the hot spot

24   analysis?  Is it three years or is it approximately

25   one year?

Bruce Jacobs                                           August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 161

1       A.   Well, it depends on the nature of the

2   inquiry.  I mean, obviously I looked at three years'

3   worth of data.  And then as I mentioned a few times

4   today, within the reference period, you look for

5   patterns and trends and the recency of predatory

6   violence within the reference period, so that's what

7   I did.  And then you compare those trends to the

8   security posture in place to see if additional or

9   different measures were justified.  So those would

10  be the three answers to your question.

11      Q.   And what kinds of crimes did you

12  consider -- what kinds of crimes would bear on your

13  hot spot analysis?

14      A.   Well, you're looking at whether the

15  incident -- or whether the property was a hot spot

16  for predatory violence.

17           So I look -- I considered all crimes,

18  analyzed all crimes, and then within that population

19  of crimes, I looked to see which ones were predatory

20  violence.

21      Q.   And just so we have a good definition --

22  you did testify to it earlier but a good fresh

23  definition -- what do you mean by "predatory

24  violence"?

25      A.   Typically predatory violence is stranger

Bruce Jacobs                                          August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 162

1    on stranger where there's no discernible

2    relationship of significance between the victim and

3    the offender.

4         Q.    And then I think in your paragraph 6, you

5    appear to distinguish predatory violence from crimes

6    such as -- I'm quoting you here -- burglary,

7    larceny, and motor vehicle theft, which you

8    characterize as property crimes.

9              Is that the distinction that you draw?

10        A.    Well, not only me but the Uniform Crime

11   Reporting system and 18,000 police departments

12   around the country.

13        Q.    And you say that property crimes like

14   those do not empirically forecast violent crimes,

15   right?

16        A.    Correct.

17        Q.    Have you ever offered the opinion that

18   property crimes, like motor vehicle theft, do

19   forecast violent crimes?

20        A.    In my opinion, no.  I mean, some people

21   do.

22        Q.    Have you ever used property crimes, like

23   motor vehicle theft, to evaluate whether a crime was

24   foreseeable or likely or a property with a hot spot?

25        A.    It would depend on the nature of the

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 163

1    inquiry.  So if I was analyzing the foreseeability

2    of an auto theft, then I would probably look at auto

3    theft.

4         Q.   Sure.  That's fair.  I did not ask a very

5    precise question.

6              Have you ever evaluated property crimes,

7    like auto thefts, to determine whether they might

8    forecast a violent crime?

9         A.   Well, I would look at them to see if they

10   did, in fact, escalate to violence of any kind.

11   So -- but if they didn't, then you set them aside.

12        Q.   In other words, in your view, an auto

13   theft that doesn't itself escalate to violence would

14   not predict a future violent crime at a property?

15        A.   That's what the research indicates,

16   correct.

17        Q.   Have you always had that opinion?

18        A.   I would think so.

19        Q.   How about burglary, have you ever had the

20   opinion that burglary, which did not itself lead to

21   a violent episode, could nonetheless predict the

22   occurrence of a violent episode?

23        A.   No.  Some people call it a threshold crime

24   that can escalate, but I'm not of that opinion and I

25   have the data to back that up.

Bruce Jacobs                                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 164

1          Q.    In paragraph 27 you say that burglaries
2    are not accompanied by violent crime of any kind and
3    that 99.7 percent of all reported motor vehicle
4    thefts were not accompanied by violent crime of any
5    kind.
6               What I think you're saying there is that
7    at the moment of a burglary, almost all of them do
8    not convert into a violent episode.  And at the
9    moment of an auto vehicle theft, 99.7 percent of
10   them do not convert or progress into a violent
11   episode, correct?
12         A.    They don't escalate.  They're not
13   accompanied by violence, correct.
14         Q.    "Escalate," that's the word that you used.
15              It's a different question, though, whether
16   the occurrence of burglaries and auto thefts might
17   be associated with more violent crimes at different
18   times, right?
19         A.    Right.  The literature is very clear that
20   those are not necessarily predictive violent crimes
21   at other times.  You have lots of properties with,
22   you know, burglary after burglary with no violence
23   ever recorded.  Conversely, you have lots of
24   properties with relatively few property crimes and a
25   significant number of violent crimes.  So that's why

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 165

1    you do the crime-specific analysis.

2        Q.    Do you consider -- when you're doing your

3    hot spot analysis, do you consider shootings or the

4    discharge of a firearm that does not hit somebody

5    and not result in an injury --

6        A.    Yes.

7        Q.    -- as predictive of -- I'm sorry, let me

8    finish the question.

9              -- as predictive of a predatory violence?

10       A.    If -- I include shootings if they're

11   verified and if they involve -- if they don't

12   involve some sort of domestic or relational sort of

13   attachment.

14       Q.    And can you explain for me -- what I'm

15   hearing from you is that like domestic violence or

16   crimes between people who have a significant

17   relationship, they don't seem to count in your

18   analysis of whether a property is a hot spot.

19             Is that a fair assessment of your opinion?

20       A.    In terms of a hot spot of predatory

21   violence, they don't count per se.  I mean, you're

22   talking about -- that's not just my opinion.  The

23   Department of Justice makes a distinction between

24   domestic violence and predatory violence, forensic

25   criminologists around the country make the

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 166

1    distinction, forensic criminology textbooks make the
2    distinction.
3            Domestic violence typically can't be
4    foreseen and often can't be prevented because they
5    involve incidents -- they involve incidents with
6    people who know one another often intimately that
7    have conflicts that are intrinsic to that
8    relationship that the landlord or defendant
9    typically knows little to nothing about, so there's
10   not really much you can do about it.  That's the
11   short -- the long and short of it.
12       Q.   Yeah, I understand that, but I'm wondering
13   about a slightly different question, which is
14   whether the existence of repeated instances of
15   domestic violence might nonetheless, you know,
16   characterize a location that is generally violent or
17   generally at risk of predatory violence.
18       A.   No.  There's -- the correlation -- I do
19   not know of a correlation between those two things
20   as I sit here.
21       Q.   And if you were doing -- we kind of
22   touched on this earlier, but if you were doing your
23   hot spot analysis, did you consider the presence of
24   drug crimes at Seven Courts?
25       A.   If they escalated to violence -- obviously

Bruce Jacobs                                            August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 167

1    I considered all crimes.  And then again, I looked

2    at the extent to which these other crimes were

3    either linked to or accompanied by or escalated to

4    predatory violence.

5         Q.   I want to ask you about some crime

6    reports, if you can tell me how they factor into

7    your hot spot analysis.  Okay?

8         A.   All right.

9         Q.   So let's just start with -- I want to

10   start with APD reports so bear with me here.

11             Okay.  So I have up on the screen,

12   Dr. Jacobs -- these are the APD reports that we

13   received from APD starting with 2019.  This is

14   the -- APD broke the 2019 reports into two files,

15   not necessarily in chronological order, but this is

16   2019 Police Reports, dash, 1 which I know you have.

17             So I just want to walk through crimes, and

18   you tell me what these crimes mean to you in terms

19   of your hot spot analysis.  We're not going to talk

20   about all of them.

21             The first one is for forgery of a check

22   under $10,000.  I think I know what you're going to

23   say.  So we don't need to talk about that one.

24             And we don't need to talk about stolen

25   Amazon packages necessarily unless it were, like,

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 168

1   you know, there were a lot of them.  But that's the

2   only one that I have seen.

3           Can you see this on your screen?

4       A.   Yes.

5       Q.   Okay.  So we have here -- this is a

6   10/12/2019 incident, so this is within the

7   three-year period.  And it looks like this is an

8   auto theft.  I'll flip to the substance of the

9   narrative.  So this is an auto theft around

10  8:00 p.m. on 10/11/2019, and -- I mean, it is what

11  it is; it's an auto theft.

12          What, if anything, does this auto theft

13  say to you about the risk of predatory violence at

14  Seven Courts?

15      A.   Nothing in particular.

16      Q.   And I think this is actually -- this is a

17  different one, so 11/5/2019, it's another auto

18  theft.

19          Same answer, this says nothing in

20  particular to you about the risk of predatory

21  violence at Seven Courts?

22      A.   Correct.

23      Q.   Let's see.  This is another auto theft.

24  Same answer?

25      A.   Correct.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 169

1        Q.    Now, this one, this is from May 16, 2019.

2    And this is -- I'll let you read it, of course, but

3    this is an assault, an unknown male/suspect

4    assaulted a Mr. Lorenza when he went to take out the

5    trash.

6        A.    Can you scroll down to the next page?

7        Q.    Yes.

8        A.    So this is a simple assault involving --

9    so no deadly weapon, no serious injury, so it's a

10   Part II.  It's not a Part I violent crime per the

11   FBI standard.  And he knows these individuals in

12   some capacity, so although the relationship was --

13   appeared to be not deep, the relevant criteria is

14   that it's a simple assault, no deadly weapon, no

15   serious injury, so it's not a Part I violent crime.

16       Q.    And so because it's not a Part I violent

17   crime, you just categorically take this assault out

18   of consideration in your hot spot analysis?

19       A.    I wouldn't say I take it out.  I

20   considered it but -- this was what date again?

21       Q.    It was May 2019.

22       A.    Right.  So it's 4:30 in the afternoon

23   right after school.  It's over two years old.  So I

24   considered it, but it's -- kind of set it to the

25   side because not a Part I violent crime, it lacks

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 170

1   recency, it's not at night, involves no weapon, no

2   serious injury, et cetera.

3         Q.    So you give it very little weight?

4         A.    Relative to the analysis that I did,

5   correct.

6         Q.    So the next one is -- these are not in

7   order for some reason but that's how APD gave them

8   to us.

9               So this is 11/3/2019, and this is another

10  assault apparently from one tenant to another,

11  assuming -- (audio distortion) -- who assaulted the

12  victim.

13              What do you do with an incident like this

14  in your hot spot analysis?

15        A.    Same as the other one; it's daytime

16  incident, simple assault, no deadly weapon, no

17  victim injury.  It's not a Part I violent crime.

18        Q.    So here is one from April 6, 2019.  There

19  was a shooting -- this is the murder.  So this one

20  you do take seriously.

21        A.    Of course.

22        Q.    And you know there was another murder in

23  April of 2022, right, at Seven Courts?

24        A.    I don't look after the incident.

25        Q.    Why not?

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 171

1      A.    Because post-incident crime is irrelevant

2    to my opinions in this case.

3      Q.    Might it bear on the defendant's crime

4    prevention methods and whether they're adequate to

5    deter crime?

6                   MR. MELCHER:   Objection; form.

7      A.    Once again, I don't look at post-incident

8    data.

9      Q.    I'm asking you a logic question.  Couldn't

10   post-incident data bear -- assuming the security

11   measures are the same or similar, couldn't it bear

12   on their adequacy?

13     A.    I don't -- I have no information about any

14   of that after the incident, so I don't know.

15     Q.    Not my question.  My question is whether

16   conceptually a post-incident murder could bear on

17   the adequacy of the similar crime prevention methods

18   at Seven Courts.

19     A.    Same answer.  I don't know how to answer

20   your question.  I didn't analyze anything after the

21   incident.

22     Q.    So this one -- it doesn't start there --

23   it's -- maybe we can do this.  Okay.

24          If it's -- I think you told me what you

25   feel about burglary and you have told me -- which

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

Page 172

1    this may or may not have been a near burglary, this

2    one that's up on the screen.  It's a prowler call.

3    Who knows.

4           I think you told me about assaults that

5    are, in your view, minor.  So in your hot spot

6    analysis, you're really just looking to see, I

7    guess, shots fired or a murder or, like, an injury

8    that sent someone to the hospital?

9           You're shaking your head.  Tell me what

10   matters.  Tell me what says to you this place needs

11   an armed security guard.

12       A.   So Part I predatory violent crimes;

13   murder, rape, aggravated assault, robbery of all

14   kinds, stabbings, shootings, robberies, carjackings,

15   murders, sexual assaults.

16           As long as they're predatory and as long

17   as they meet the UCR-defined classification of a

18   Part I violent crime, then I would obviously

19   consider them for assessing the security posture of

20   a venue.

21       Q.   Would it have been reasonable for Seven

22   Courts to have nighttime armed security in July

23   of 2021?

24       A.   Well, they did.  It was periodic, it

25   wasn't fixed, so they did have it.

Bruce Jacobs                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 173

1       Q.   Okay.  We will have to agree to disagree

2  about what Mr. Hickey was actually doing.

3            Let me just spot you for the sake of

4  argument that he was there in July of 2021 for as

5  long as it took him to drive through and pass out

6  notices, okay, which is what he actually testified

7  to.

8            My question is different.  Would it have

9  been reasonable to have real overnight armed

10 security at Seven Courts in July of 2021?

11            MR. MELCHER:  Objection; form, asked

12 and answered.  And if you're referring to specific

13 testimony, I would ask you to refer to that specific

14 testimony.

15            MR. BLOCK:  Thank you.

16       Q.   Please answer the question.

17       A.   Property can do anything it wants.  I'm

18 not here to say it could or couldn't.  I'm just here

19 to say what the data showed and what the data

20 justified or not.

21       Q.   Different question than what you're

22 answering.

23            Would it have been reasonable for TPI to

24 provide overnight armed security at Seven Courts in

25 July of 2021?

Bruce Jacobs                            August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 174

1              MR. MELCHER:  Objection; term

2     "reasonable."

3         A.   It could be reasonable; it could be

4     unreasonable.  I'm not sure how to answer the

5     question.

6         Q.   Do you think it would have been a waste of

7     money for TPI to pay for armed security overnight at

8     Seven Courts in July of 2021?

9              MR. MELCHER:  Objection to the term

10    "think."

11        A.   I don't know.

12        Q.   Do you think it would have been a bad idea

13    for Seven Courts to provide overnight armed security

14    in July of 2021?

15        A.   I'm agnostic; it's neither a good or bad

16    idea.  The issue is is it justified by the data.

17        Q.   Do you think it would have been

18    unjustified by the data for TPI to pay for overnight

19    armed security at Seven Courts in July of 2021?

20        A.   I think that's what my report said, that

21    the predatory violent crime pattern did not

22    warrant -- I use the word "warrant" -- a continuous

23    roving armed security patrol, so I will stick with

24    that.

25        Q.   Do you think a continuous roving arm

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 175

 1    security patrol in July 2021 would have been

 2    unjustified?

 3         A.   It was not justified by the predatory

 4    violent crime pattern, correct.

 5         Q.   In forming your opinions about what

 6    security measures were justified, did you consider

 7    the two other attempts to at least steal from the

 8    Diaz family?

 9                   MR. MELCHER:  Objection; form.

10         A.   I'm sorry, say again.

11         Q.   In forming your opinions about what

12    security measures were reasonable, did you consider

13    the two prior attempted robbery attempts on the Diaz

14    family?

15                   MR. MELCHER:  Same objection.

16         A.   Okay.  There was a prior burglary attempt,

17    I believe.  The second alleged attempt was a soccer

18    ball hitting the window, so -- and neither of those

19    were robberies.  Those were -- one was a soccer ball

20    hitting the window; the other one was apparently a

21    burglary attempt, but the guy, I guess, figured out

22    somebody was there and ran away.

23         Q.   So let's take that one.

24              Did you consider that burglary attempt in

25    forming your analysis about what security systems

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 176

1    were reasonable at Seven Courts?

2          A.    I considered all the crime, as I told you

3    before.  So the question is did that particular

4    burglary or any others escalate to violence of any

5    kind.  I looked at that.

6          Q.    And you characterize another incident as a

7    soccer ball, so I take it you're choosing to believe

8    Toya Wynn's version of events as opposed to the Diaz

9    family's at least belief about what really broke

10   their -- or damaged their window.

11              Why are you choosing to believe Toya

12   Wynn's version of events?

13              MR. MELCHER:  Objection; form.

14         A.    Because Ms. Fontaine corroborated it.  I

15   believe Harris corroborated it.  I'm not sure if

16   Hickey did, I would have to re-read his deposition,

17   but this wasn't an isolated statement.

18              And the -- I believe the internal report,

19   it was -- I think it was a broken window.  Not a

20   single thing was moved or stolen or removed or

21   anything from the apartment, so it was consistent

22   with the deposition testimony it was a soccer ball

23   hitting the window.

24         Q.    Looking at your report, I want to look at

25   page -- excuse me, paragraph 34 with you.  You say

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 177

1   that there is no reliable scientific evidence that

2   gating and fencing prevents violent crime of the

3   general type involved here.

4           By "violent crime of the general type," do

5   you mean armed robberies or other types of violent

6   crime?

7       A.   Part I predatory violent crime.

8       Q.   And is it really your testimony that there

9   is no reliable scientific evidence that gating and

10  fencing can prevent Part I violent crime?

11      A.   At apartment complexes, I have looked at

12  the -- I have canvassed the literature.  In fact,

13  some of the literature shows that the literature is

14  equivocal.  Let's put it that way.  There's some

15  literature that may suggest there's a preventative

16  effect.  There's other literature that says there's

17  not.

18           But when you focus on -- like, for

19  example, I have co-written an article on the rates

20  of robbery at gated versus ungated complexes.  And

21  the data are a bit limited in terms of what they can

22  do, but those data do not -- do not prove, I guess,

23  within the realm of scientific probability that

24  there is, in fact, a statistically significant

25  reduction in robbery at gated complexes as opposed

Bruce Jacobs                                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 178

1    to ungated complexes.  So that's all I can say.

2        Q.    So are complexes or other buildings who

3    spend the money on gates and fences just throwing

4    their money away?

5        A.    I wouldn't say that.  For some offenders

6    in some circumstances, it may deter them.  But like

7    I said, I'm looking at the broader -- the broader

8    question, you know, is there statistically

9    significant evidence that shows a reduction at

10   apartment complexes in robbery between gated and

11   ungated complexes.

12       Q.    So you say that in paragraph 40 --

13   basically your testimony is surveillance cameras

14   are, quote, an excellent forensic tool.  They have

15   minimal demonstrated scientific -- I assume

16   "evidence" or "value" is missing there -- for

17   violence prevention, particularly in the United

18   States.

19            That's what you said in your report.  I

20   read your testimony to be security cameras do not

21   prevent violent crime, at least in the United

22   States.

23            Is that the point you're trying to make?

24       A.    Well.  It's -- that's what the literature

25   shows.  I mean, again, I'm all for cameras, I like

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 179

1    cameras, the more the better, but in terms of a

2    violence prevention tool, the scientific literature

3    does not suggest there's a strong correlation

4    between camera presence and violence reduction.

5        Q.    And cameras are not a substitute for an

6    armed security guard, are they?

7        A.    Well, it would depend on the deployment of

8    the camera, how they're used, whether they're

9    monitored real-time, whether they're coupled with

10   some other security presence.

11            But, yeah, I mean, if you're just talking

12   about camera versus guard, they're very different.

13       Q.    Yeah.

14            And then for paragraph 41, you discuss

15   lighting and you say that that measure, meaning

16   lighting, has been shown too scientifically -- I

17   think this is a typo and you meant to say

18   inconclusive as a violence prevention measure.

19       A.    Yeah.

20       Q.    That's just a typo.  It has to be for that

21   sentence to make sense.

22            Your point there is that lighting doesn't

23   prevent Part I violent crime?

24       A.    Well, I think it would be broader than

25   that.  The lighting studies don't differentiate --

Bruce Jacobs                                          August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 180

1    yeah, I think that's correct actually.

2              So the lighting studies basically don't

3    show a scientifically conclusive relationship

4    between lighting levels and violence.  Some show a

5    reduction in crime; some don't.

6              The ones that show a reduction tend to

7    show it for property crime or certain forms of

8    property crime.  The ones that show reduction almost

9    never show a reduction for violence.

10             And when they do show a reduction for

11   violence or just crime in general, they can't --

12   they're not able to disentangle whether it was the

13   lighting that caused the reduction in crime or

14   whether it was some other measure that was in place

15   at the same time, like a camera or a guard or police

16   or whatever it might be.  So that's why the effect

17   is -- it's a null effect, n-u-l-l, inconclusive.

18       Q.   So I just -- I want to try and understand

19   putting all this together.  Assume that we have two

20   properties that are next to each other and identical

21   in every respect.  And let's say they're in a

22   dangerous part of town like Seven Courts is.  And

23   one of them has really good lighting and a working

24   gate and a fence, and the other one has no fence, no

25   gate, and it's pitch black at night.

Bruce Jacobs                                              August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 181

1           Do you think that those two properties are

2    going to have the same amount of violent crime?

3                   MR. MELCHER:  Objection to the term

4    "think" and form.

5        A.   I have to see the data, and I also have to

6    see whether the crimes are being committed by people

7    internal to the property or external and whether

8    the --

9        Q.   Yeah.  Just use your common sense here and

10   give me the common sense answer.  Two properties

11   that are completely the same, one of which is

12   brightly lit and gated and fenced and the other is

13   pitch black, and has no gated fence, do you really

14   think they will have the same amount of violent

15   crime?

16                   MR. MELCHER:  Objection; form.

17       A.   If it's common sense, you don't need an

18   expert to answer it.  But like I said, I need the

19   data.  All else being equal, I'm all for lights, I'm

20   all for cameras.  I'm just telling you what the data

21   shows.

22       Q.   Looking at paragraph 42, you describe this

23   incident as targeted -- or apparently targeted.  I

24   think you go as far as saying it for sure is.

25                   Tell me how you differentiate between a

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 182

1    targeted versus an opportunistic crime.

2        A.   Well, that's why I don't -- I don't know.

3    That's why I use the word, I think, "appearance."

4        Q.   Yes.

5        A.   I'm just saying, like, you have 170 units

6    at this property.  There's never -- to my

7    recollection, there's never been an armed home

8    invasion of any unit at this property prior to this

9    one.

10            Somehow, someway, this masked guy shows up

11   outside of B23, and as this family is coming back

12   from the mailbox and playground and just times it

13   perfectly right when they get back and right when

14   they open the door and rushes them in and demands

15   the money.

16            I mean, in my experience as a

17   criminologist, for that to be a coincidence is a

18   strange, almost all credulity, but like I said, I'm

19   not offering an opinion that this was a targeted

20   crime, but you know, it certainly -- I guess that's

21   all I would say.

22       Q.   Could you look at paragraph 21.  We're

23   going to start to go back up.  Actually, no, it

24   should be paragraph -- well, it's paragraph 21 and

25   22.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 183

1           So paragraph 21 contains your bullet point

2    list of all of the security measures you believe

3    that Seven Courts had, and then in paragraph 22, you

4    say that the above measures are consistent with

5    established practices in crime prevention through

6    environmental crime and situational crime

7    prevention, which you describe as peer-reviewed,

8    scientific approaches to crime prevention, right.

9           So tell me what you mean -- let's take

10   those one at a time.  Let's first start with CPTED,

11   Crime Prevention Through Environmental Design.

12          Is it your testimony that Seven Courts has

13   security measures that were consistent with the

14   standards for Crime Prevention Through Environmental

15   Design?

16       A.   Yeah, they had all the things listed in

17   those -- in the previous paragraph get to things

18   such as defensible space, order maintenance,

19   activity support, territorial reinforcement, natural

20   surveillance.  These are all concepts that are

21   embedded within CPTED, so yes.

22       Q.   Are there -- did you formally compare the

23   security measures at Seven Courts to any kind of

24   standard for Crime Prevention Through Environmental

25   Design?

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 184

1      A.    I think I just described that.  These

2   measures are consistent with defensible space,

3   activity support, natural surveillance, territorial

4   reinforcement, order maintenance, you know, the

5   variance dimensions that go into CPTED.  These are

6   all consistent with those.

7      Q.    And so that's your analysis basically is

8   you just have a -- you sort of have a sense of what

9   you think the Crime Prevention Through Environmental

10  Design security measures are and you compared them,

11  I guess, in your mind to the security measures you

12  think were in place at Seven Courts?

13              MR. MELCHER:  Objection; form.

14     A.    I'm not sure where you're getting that

15  conclusion from.  The CPTED materials embedded in

16  the 100-plus PDFs that I uploaded to the ShareFile

17  link a few weeks ago, the dimensions I just listed a

18  few minutes ago, those are standard -- standard

19  concepts within CPTED.  I teach them to my students.

20  I have taught them for 25 years.  And they were in

21  place.  I mean, they're consistent with CPTED.  I

22  mean, I don't know what else to say.

23     Q.    Do you think that TPI should have done

24  anything differently in relation to security during

25  July of 2021?

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 185

1          A.    The one thing I probably would have had

2     them do is instead of Hickey doing three random

3     patrols a week, I would have -- I would have

4     negotiated some sort of periodic in and out presence

5     that was episodic, intermittent, and random.  They

6     could probably have done that without increasing the

7     budget, and it would not have required much more in

8     the way of time on the part of Hickey's part.  It

9     would just have been a slightly different

10    deployment.  That's probably what I would have

11    recommended, just a slightly different deployment.

12         Q.    That's it?  Otherwise, you think

13    everything they did to deter the risk of violent

14    crime in July of 2021 was reasonable?

15         A.    Given that they were in the midst of

16    upgrading their surveillance system and given the

17    absence of any predatory violence -- or the virtual

18    absence of any predatory violence in the year prior,

19    I think that would have been reasonable given the

20    data points we have already talked about today.

21         Q.    Would you have felt comfortable living at

22    Seven Courts in July 2021?

23                    MR. MELCHER:  Objection; form.

24         A.    I really don't know.  I don't like

25    apartment complexes period, so that would be my

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 186

1    answer.

2         Q.    Let me ask you about something,

3    Dr. Jacobs.  Give me a minute to put something on

4    the screen.

5              Dr. Jacobs, I am going to mark as

6    Exhibit 5 something that you should see on your

7    screen that's identified Affidavit of Bruce A.

8    Jacobs, Ph.D., in the case of Kathryn Perez against

9    DNT Global Star, LLC, from Harris County District

10   Court.

11             Do you see that on your screen?

12                 (Exhibit 5 marked.)

13        A.    Yes.

14        Q.    Do you remember testifying or

15   participating as an expert in the Perez case?

16        A.    Vaguely.

17        Q.    But you are the Bruce A. Jacobs, Ph.D.,

18   who -- and I'll show you all the pages -- but whose

19   affidavit this is?

20        A.    Correct.

21        Q.    And just so you can look at the last page,

22   do you recognize that signature on the last page as

23   your signature?

24        A.    Yes.

25        Q.    Okay.  I want to ask you about some of the

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 187

1    things that you said in the Perez case.

2            Do you need to refresh yourself on what

3    the facts were in the Perez case before I ask you

4    questions about the affidavit?

5        A.    I don't think so.

6        Q.    Okay.  But just so we're on the same page,

7    it was a premises liability or negligent security

8    case involving an apartment complex and there

9    someone -- the predatory violence they experienced

10   was murder, right?

11       A.    Right.

12       Q.    And you testified for the plaintiff in

13   that case, not the defense like you're doing here,

14   right?

15       A.    Correct.

16       Q.    Okay.  So I want to look at some things

17   that you did.  If you look at page 3 of your

18   affidavit, I'm looking toward the bottom here --

19   actually, starting at "in terms of violent crime" --

20   sorry, just so you know, I'll go back to the

21   beginning.

22           The murder in this case took place at 500

23   West Crosstimbers.  Okay.  I just want to make sure

24   that we're on the same page about where the murder

25   site was, what the apartment complex address was.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 188

1    It was 500 West Crosstimbers.

2              So, actually, if we look at page 2, the

3    materials that you looked at in that case were

4    Houston police reports obtained for the one-mile

5    radius, including and surrounding 500 West

6    Crosstimbers for the 23 months prior to the murder

7    of the victim limited only to apartment complexes in

8    that vicinity, right?

9        A.    I'll take your word for it.

10       Q.    It's what you wrote in your affidavit, so

11   it's actually your word for it, sir.

12       A.    Right.  I can't read it, but like I said,

13   I'll take your word for it.

14       Q.    I can make it a little bigger if that

15   helps.

16             In the Perez case, unlike in the Diaz

17   case, you reviewed police reports not just for the

18   site where the murder or violent crime took place

19   but also all the other apartment complexes within a

20   mile.

21       A.    Right because I was doing a foreseeability

22   opinion in that case which I'm not doing here.

23       Q.    Yes, I understand what you're saying about

24   that.  I actually sort of dispute that you're -- I

25   think you are trying to give a foreseeability

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 189

```
 1   opinion and just call it something else, but I hear
 2   you on that.  I just don't want you to think that's
 3   going undetected.
 4                 MR. MELCHER:  Objection; form.  That's
 5   not a question; it's a statement.
 6                 MR. BLOCK:  It's not.  It's just a
 7   statement about your strategy.
 8                 MR. MELCHER:  Let's limit it to
 9   questions here.
10                 MR. BLOCK:  Limit your objections to,
11   you know, real objections that just say form or
12   whatever.
13                 (Simultaneous speaking.)
14                 MR. BLOCK:  Or you can let me take the
15   deposition.
16                 MR. MELCHER:  I am perfectly content
17   with my objections.  They are following the Federal
18   Rules, and they are not lengthy, and they are just
19   stating the grounds with no elaboration.
20                 MR. BLOCK:  That is not an accurate
21   statement but the record --
22                 MR. MELCHER:  That's because you're
23   not listening, Aaron.
24                 MR. BLOCK:  Okay.  We don't need to
25   argue with each other, Jeff.
```

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 190

1              MR. MELCHER:  That is correct.

2       Q.   Anyway, I heard what you said, Dr. Jacobs,

3   but the fact is your approach when you wanted to

4   understand crime where the victim was attacked in

5   the Perez case was to look at crime at the site

6   where he was attacked and also at all the other

7   apartment complexes within a mile, which is the

8   opposite of what you did in this case, correct?

9              MR. MELCHER:  Objection; form.

10      A.   Incorrect.  As I said a few minutes ago,

11  in that case, I was asked to give a foreseeability

12  opinion; in this case, I was not.

13      Q.   You have been asked in this case to give

14  an opinion about risk of violence at Seven Courts,

15  correct?

16      A.   As it relates to a hot spot designation

17  and the justification for dedicated, fixed, armed

18  security presence at the complex on the night in

19  question.

20      Q.   And so in your mind, there's a difference

21  between an analysis of risk of crime and whether

22  crime is foreseeable?

23      A.   Is that a question?

24      Q.   Yes.

25      A.   Are you talking about the general risk of

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 191

 1    any crime or are you talking about the risk of

 2    predatory violence?  What are you talking about?

 3         Q.   I'll rephrase.

 4              Is there a difference in your mind between

 5    evaluating a risk of predatory violent crime and

 6    evaluating whether predatory violent crime is

 7    foreseeable?

 8         A.   As it relates to security deployment,

 9    there could be, and that's the scope of my inquiry

10    in this case, was a dedicated armed security

11    presence justified at this property on the night in

12    question.

13         Q.   And justified by the risk of foreseeable

14    crime, violent crime, right?

15         A.   I wouldn't call it foreseeability.  I

16    would talk about the predatory violent crime pattern

17    in the months preceding the incident, just --

18         Q.   And whether that --

19         A.   It's the same thing that every police

20    department does before they decide where to send

21    their officers.

22         Q.   I know.  And what you're talking about is

23    whether the pattern of predatory violent crime in

24    the preceding time period makes it conceivable or

25    foreseeable that there will be predatory violent

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 192

1   crime during the period in which you're trying to

2   decide whether to allocate resources.

3                    MR. MELCHER:  Objection; form.

4       A.   I guess that's your opinion.  I wouldn't

5   put it that way.

6       Q.   Okay.  So do you intend to tell the jury

7   that there was a pattern of predatory violent crime

8   prior to July 2021 that conveyed information to

9   Seven Courts about whether predatory violent crime

10  might occur in July 2021 such that that prediction

11  would influence the kinds of security measures that

12  would be reasonable in July 2021?

13                   MR. MELCHER:  Objection; form.

14      A.   I'm sorry, that question was so long, I

15  lost it.

16      Q.   Let me try it again.

17           Do you plan to tell the jury that the

18  pattern of predatory violent crime prior to

19  July 2021 conveyed information to TPI about the risk

20  or chance of predatory violent crime in July 2021

21  such that TPI could use that information to evaluate

22  what kinds of security measures to deploy in

23  July 2021?

24                   MR. MELCHER:  Objection; form.

25      A.   Again, you said the same thing.  I'm not

Bruce Jacobs                                          August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                    Page 193

1    sure what you're asking.  I mean, I have already

2    answered the question.

3            You have one act of predatory violence in

4    12 months prior.  That doesn't justify an armed

5    dedicated security presence.  They had a periodic

6    security presence that was armed.  That's fine.

7    That's it.

8        Q.    Yeah.  All right.  We got on a detour.

9            So what you did here when you wanted to

10   evaluate the violent crime at the subject property

11   in the Perez case in Texas, you looked at -- let's

12   start with the incidents at that property.  You

13   have aggravated -- actually, let me get you the date

14   on this one too.

15           The date of the murder was December 9,

16   2005.  And you looked back nearly two years to

17   January of 2004 for an aggravated sexual assault and

18   aggravated robbery, a year and a half earlier for a

19   strong arm robbery, a year and a half-ish earlier

20   for another strong arm robbery, an aggravated

21   robbery and aggravated assault.  At the bottom,

22   you've got another aggravated robbery -- wait a

23   minute.  Actually, are these -- hold on.  That's

24   actually going back.  It's that aggravated assault,

25   that last one, that's what you looked at.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 194

1          So you looked, I guess, from nearly two

2    years up to about six months or five months prior

3    and you had some strong arm robberies and some

4    aggravated assault including a sexual assault one,

5    right?

6          A.   Right.  So a shorter reference period and

7    I was a plaintiff expert in that case.

8          Q.   And then at the bottom of the paragraph --

9    or, excuse me, the bottom of the page, that last

10   paragraph, you write, In terms of proximate

11   violence, the following robberies, aggravated

12   robberies, aggravated assault, and gun crimes

13   reportedly occur at apartment complexes within one

14   mile of the subject property within 23 months of the

15   subject incident.

16          Do you see that?  It's the very last

17   paragraph.

18          A.   Correct.  And the previous paragraph is

19   talking about five occurred at the property itself.

20          Q.   Yes.  Over about two years.

21          A.   Less than two years.

22          Q.   Just less than two years.

23          A.   And you're ignoring -- you're leaving out

24   all kinds of rich data in terms of the location,

25   time of occurrence, day of week.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 195

1      Q.    I'm trying to -- yeah.  We can do all of

2   that.  The point I'm making is that you -- well, you

3   get the point I'm making.

4      A.    You're cherry-picking.

5      Q.    So you then expand your lens and you look

6   at properties within a mile -- every apartment

7   complex within a mile and you found an aggravated

8   robbery; another aggravated robbery; another

9   aggravated robbery; another aggravated robbery;

10  another aggravated robbery; a strong arm robbery; a

11  gun drug offense which was just two men selling

12  drugs, one of them threw a gun away; aggravated

13  robbery.

14          And it goes on for a couple of pages

15  because you actually in the Perez case when you were

16  a plaintiffs' expert, went out and looked to see if

17  the neighborhood around the subject apartment

18  complex was dangerous.

19                  MR. MELCHER:  Objection; form.

20                  (Simultaneous speaking.)

21      A.    Perhaps you're not aware, Mr. Block, that

22  in the state of Texas, we have a watershed premises

23  case called the Timberwalk case that requires the

24  proximity dimension of foreseeability to be

25  assessed, which is precisely what I was doing in

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 196

1    that case.

2           And the second answer is that in that

3    particular case, as I have told you twice already, I

4    was asked to give a foreseeability opinion in that

5    case.  I was not asked to do that here.

6       Q.   No, you were told to call it something

7    else in this case.

8                MR. MELCHER:  Objection; form.

9       Q.   So --

10      A.   I'm not sure what that means, but if

11   you're implying that there's some sort of conspiracy

12   between me and Mr. Melcher, I think that you need to

13   reconsider that thoroughly.

14               MR. MELCHER:  Thank you.

15      Q.   I don't think it's a conspiracy in some --

16   I don't know what.  I wouldn't call it a conspiracy;

17   I would just call --

18               (Simultaneous speaking.)

19               MR. MELCHER:  Aaron, you're getting

20   way out of line here.  You're getting way out of

21   line.

22               MR. BLOCK:  Thank you, Jeff.

23               MR. MELCHER:  This is a

24   question-and-answer session, not a throw insults at

25   us exercise.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 197

1            MR. BLOCK:  It's not an insult.

2            MR. MELCHER:  We both just took it

3      that way.

4            MR. BLOCK:  Well, you know, I

5      genuinely believe you changed the label from

6      foreseeability to something else.  And maybe --

7                  (Simultaneous speaking.)

8            MR. MELCHER:  I changed the label?

9      Okay.  Well, since we're on the record, please supply

10     me with your evidence to suggest that or otherwise

11     I'm going to take you before the Court.  That is

12     implying that I have suborn perjury.

13                  Would you like to rephrase now?

14           MR. BLOCK:  No, I don't think it's

15     perjury.

16           MR. MELCHER:  Okay.

17           MR. BLOCK:  I don't think it's

18     perjury.

19           MR. MELCHER:  All right.  We're about

20     two seconds from going off the record and calling the

21     Court.

22                  Would you like to rephrase your

23     question?

24           MR. BLOCK:  Yes.

25           MR. MELCHER:  All right.  Thank you.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 198

1              MR. BLOCK:  Yeah.  I'll rephrase my

2     question.  And I'll tell you exactly what I'm getting

3     at off the record if you would like to know.

4              MR. MELCHER:  No.  On the record,

5     please --

6              MR. BLOCK:  Yeah.

7              MR. MELCHER:  We are on the record

8     here.  If you would like to tell us the thrust of

9     your suggestion here on the record, that will be

10     fine.

11              MR. BLOCK:  Sure.

12              MR. MELCHER:  Because I can tell you

13     we asked him to evaluate your allegations.  We did

14     not give him marching orders.  Perhaps you need to

15     revisit your vague allegations that are completely

16     unfounded in this case.

17              MR. BLOCK:  In the spirit of being

18     transparent --

19              MR. MELCHER:  That would be nice.

20              MR. BLOCK:  -- I hear Dr. Jacobs

21     saying emphatically that he is not giving a

22     foreseeability opinion.  Okay.  So that's the first

23     premise.  I don't think anyone can deny that he said

24     that many times today.

25              But what I see in Dr. Jacobs' report

Bruce Jacobs
August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 199

1    and what I hear in his answers today is that he is

2    using retrospective data on crime at Seven Courts to

3    make a prediction about future crime against which to

4    measure the reasonableness of security measures.

5                    THE COURT:  Wrong.

6                    MR. BLOCK:  And that to me -- hold on.

7    Let me just finish my thought, please.

8                    That, to me, sounds a lot like

9    foreseeability, just not calling it foreseeability.

10   I see that -- hold on, I'm almost done.  I'm going to

11   get to your part of the story now.  Okay.

12                   I hear Dr. Jacobs denying that.  I see

13   him shaking his head.  I hear you denying it.  And we

14   can just agree to disagree.

15                   I'm just telling you I'm not accusing

16   you of anything other than, you know, lawyers like to

17   repackage evidence to -- not in a bad way, but that's

18   just what lawyers do.  And so I just -- that's what

19   I'm detecting.  If I'm wrong, I'm wrong.  But I'm

20   just being transparent that that's what I'm

21   detecting.  But that's not a question.  There is just

22   now a long, you know, soliloquy from me.

23       A.    Here is the problem with your soliloquy.

24       Q.    I'll ask the question --

25                   MR. MELCHER:  Hang on, let the

Page 200

```
 1    witness --
 2                 MR. BLOCK:  No, let me hear the
 3    problem.  I was actually done.
 4         A.   The problem with your soliloquy is that it
 5    ignores the fact that what could I offer -- how
 6    could I offer an opinion on the adequacy of the
 7    security posture at the premises without analyzing
 8    the prior crime data.  If I did that, you would put
 9    some kind of motion to exclude me.
10         Q.   Yeah.
11         A.   So how can I -- that's exactly what I'm
12    doing.  I'm assessing the adequacy of the security
13    relative to the crime pattern.  If I didn't do that,
14    my opinion would not be empirically justified.
15         Q.   I understand what you're saying.  Yes.  It
16    would be -- yes, if you just showed up and said I
17    have no idea what this place is even like and I had
18    an opinion about what security measures they have,
19    yeah, that wouldn't make any sense.  I know that.
20                 So I'm not -- anyway, I think we
21    understand each other on this point.
22         A.   Speak for yourself.
23         Q.   So I actually think that was the useful
24    exchange even though not good forum led by me, not
25    you.
```

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 201

1          So -- all right.  If we go back to

2     Exhibit 5, the Perez affidavit, I want to -- and I

3     heard you before we went off on that detour that

4     your opinion in the Perez case was in Texas and so

5     it was informed by Texas law.  Okay.

6          But I think you were also telling me that

7     you were giving in the Perez case just like in this

8     case a scientific opinion, not a legal opinion,

9     right?

10         A.   Correct.  But obviously I have to conform

11    to Texas state law.

12         Q.   So on page 9 -- excuse me, page 8 of your

13    Perez affidavit, you write, Defendants' failure to

14    take reasonable measures to prevent foreseeable harm

15    is evidence of gross indifference if not callous

16    disregard for the security of 500 Crosstimbers'

17    tenants and invitees.

18         And then you go on to explain all of the

19    13 or 14 bullet points that in your view, reflect

20    deliberate indifference and callous disregard for

21    tenant safety in the Perez case.

22         So the first thing that you said in the

23    Perez case was defendants had a broken security gate

24    and did not fix it.

25         Okay.  Do you still believe that having a

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 202

1    broken security gate and not fixing it is evidence

2    of callous discard for tenant safety?

3        A.    You conveniently left off the sentence

4    right after that where it says, quote, Defendant's

5    policies and procedures establish common ground

6    maintenance is the highest of priorities.

7              And, in fact, they specifically -- I

8    believe the deposition testimony was when the gate

9    is broken, you fix it.  That was specifically in the

10   record.  They also had a security officer that they

11   used to deploy and then fired who would have been

12   posted at the broken gate at the time of the

13   incident at the time the assailants went through the

14   open gate.  So you're ignoring those two pieces of

15   data, but other than that, you're correct.

16       Q.    I think what might matter in terms of data

17   that's absent is the apartment complex in the Perez

18   case had a policy manual for how to keep the grounds

19   safe, and TPI does not have one for Seven Courts,

20   does it?

21       A.    As I said earlier, they did not have a

22   formal written plan, but obviously the data points

23   listed in my report are functionally equivalent or

24   analogous to a plan.

25       Q.    Okay.  So -- okay.  So you also said that

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 203

1  it showed callous disregard for tenant safety when

2  defendants' failure to have someone monitor the

3  broken gate contrary to the policies, right?

4        A.   Right, if their policy said to do that and

5  they didn't do it, then they're acting contrary to

6  their policies.

7        Q.   And so if you just don't have any policies

8  whatsoever about how to keep the property safe,

9  there's nothing for you to violate.  But that makes

10 it okay?

11             MR. MELCHER:  Objection; form.

12       A.   I didn't say that.  Are you testifying?

13       Q.   Well, I'm trying to understand the logic

14 of your opinion because -- you get what I'm saying.

15            Okay.  You also in this opinion -- it must

16 be the case that having a gate would have mattered

17 or else you wouldn't say that having a broken gate

18 exhibits callous disregard for tenant safety.

19       A.   Right.  Because the courtesy officer said

20 that he would have been posted at the gate had he

21 not been let go prior to the incident.

22       Q.   Well, hold on.  We'll get to that.  That's

23 a different bullet.  You actually just wrote, bullet

24 one, Defendants had a broken security gate and did

25 not fix it.

Page 204

1          If a gate is as meaningless for crime

2     prevention as you've been telling me all day, why

3     would it show callous disregard to have a broken

4     gate?

5          A.   Because it was in their policies not to

6     have a broken, or if it was broken, to post somebody

7     at the gate until it was fixed.

8          Q.   And TPI doesn't have that problem because

9     they just have no policies at all, right?

10               MR. MELCHER:  Objection; form, asked

11    and answered.

12         A.   It's not a gated property.

13         Q.   Right.

14              All right.  So bullet 3 is, Defendants

15    fired their courtesy officer and did not replace

16    him, which was a reduction in their own standard of

17    care.

18              That's what you wrote?

19         A.   Correct.

20         Q.   Okay.  I'll grant you it wasn't as bad as

21    firing Mr. Hickey; it was just not hiring him in a

22    robust way because they wanted to spend money on

23    security cameras that were inoperative.

24              Do you think that that shows callous

25    disregard for tenant safety at Seven Courts?

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 205

1              MR. MELCHER:  Objection; form.

2         A.    No.

3         Q.    Number 4, Defendants failed to collect any

4    crime data for the property even though the property

5    manager went to Houston Police Department PIP

6    meetings at one point had a courtesy officer who

7    could have obtained the data for free.

8              So it was your testimony in the Perez case

9    that when a property manager or an apartment complex

10   manager doesn't get crime data from the police

11   department, that is callous disregard for tenant

12   safety, right?

13        A.    I don't think that's what my affidavit

14   says.  In fact, it doesn't say that at all.

15        Q.    Well, it says they failed to collect any

16   crime data for the property.

17        A.    Right.  After going to those PIP meetings

18   which instruct them to do that.

19        Q.    It says even though they went to the PIP

20   meetings.

21        A.    Right.  And at the PIP meetings, there was

22   an instruction to get the date, and I believe the

23   courtesy officer testified that he could have gotten

24   the data for them for free.  So as I said earlier in

25   the deposition, I'm all for collecting crime data.

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 206

1    Whether it's required or not, is up to the
2    jurisdiction.  I'm all for collecting it.
3          Q.   I actually take your point to be that if
4    you can get free crime data, that's what you ought
5    to do, because if not, you're just operating in the
6    dark and you're exhibiting callous disregard for
7    tenant safety.
8          A.   The last part is not what I agree with,
9    but I do agree it's good to collect crime data.  I
10   have said that many times today.  As a
11   criminologist, I'm all for that.
12         Q.   Do you know what it costs to get crime
13   data from the Atlanta Police Department?
14         A.   Depends what you're asking.
15         Q.   Do you know how to get the police reports
16   that you base your opinions on?
17         A.   Typically through an open records request,
18   although some departments require something more.
19         Q.   So assume with me that what you have to do
20   to get crime data for a property is send an email,
21   and if it takes more than 30 minutes, you pay a very
22   low hourly rate for them to redact people's phone
23   numbers and Social Security numbers from the report.
24   So it's kind of a de minimis cost.
25              Assume with me that that's how you can get

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 207

1   crime reports.  Okay.  Do you think that failing to

2   do that by TPI exhibits callous disregard like it

3   did of the tenant or the landowner in the Perez

4   case?

5        A.    Can you...

6        Q.    Do you want me to make it bigger?

7        A.    Now I can't see what I was trying to read.

8        Q.    Do you want me to make it smaller again?

9        A.    Right.  So, again, you're taking

10  individual bullet points and saying this one alone

11  means that they were callous and indifferent when

12  clearly there's 13, 14, 15, whatever, I can't see

13  the second page, but multiple indicators of other

14  failures of this property to do what it said it was

15  going to do.

16            So, you know, you're cherry-picking one

17  item and saying that's callous indifference, and

18  that's not what the affidavit says.

19       Q.    And we'll just -- I'm -- I'm planning to

20  go through all of them, but I need to go one by one

21  because there are 14.

22       A.    Right.  But the 14 in totality that

23  explain the indifference, which is listed in the

24  previous paragraph.

25       Q.    I see.  I see.

Bruce Jacobs                                          August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 208

1          All right.  Number 5, Defendants failed to

2     implement or attempt to implement any preventative

3     patrol on the premises.

4          What did you mean there?

5          A.   They had a courtesy officer who patrolled

6     the property periodically; they fired him.  This is

7     despite the leasing agent almost being raped, I

8     think, within that two-year reference period inside

9     the leasing office.

10         Q.   Ms. Wynn was -- not sexually but Ms. Wynn

11    was assaulted once or twice in the leasing office

12    within the two-year period prior to this incident.

13         A.   Right.

14         Q.   Did you know that?

15         A.   She was punched in the mouth after she

16    tried to kick someone out of the property, and yet

17    your contention is that she was a drug dealer and

18    criminal and running a nuisance property.  That

19    doesn't make any sense.  You're kicking people out

20    and getting assaulted for it and she's running a

21    nuisance property?

22         Q.   I think you're maybe overstating some of

23    what we're saying.  I think we don't need to debate

24    that.  I don't need to get your opinions on Ms. Wynn

25    and what the evidence shows.  That's really not for

Bruce Jacobs                                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 209

1    you.

2          A.    You just asked me.

3                MR. MELCHER:  You just asked him that,

4    Aaron.

5          Q.    On that?

6          A.    Yeah, you asked me specifically about

7    Ms. Wynn and how horrible of a manager she was and

8    how she's running a criminal syndicate at Seven

9    Courts and that's --

10         Q.    Slightly different question.  I asked

11   whether you considered the allegations against her,

12   how you factored that into your analysis.  We don't

13   need to debate, you know, questions I asked you four

14   or five hours ago unless you just really want to.

15               Number 6, Defendants failed to generate

16   any internal reports about crime on its property.

17               So that TPI did.  I will spot them that.

18   Doesn't sound like you reviewed those unless they

19   were incidentally attached to a deposition, but they

20   exist.

21               Defendants provided Ms. Perez misleading

22   information when she asked whether the property was

23   safe.

24               I don't need to ask you about the

25   communications between Ms. Wynn and the Diaz family.

Bruce Jacobs                                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 210

1    That's not really for you.

2            Ms. Nunez, the property manager, testified

3    it was her responsibility to warn tenants about

4    crime and management requires her to do it, yet she

5    failed to do this.

6            Here is my question on that one:  Have you

7    seen any evidence in this case that TPI, as a matter

8    of corporate policy, required Ms. Wynn to warn

9    tenants about crime at Seven Courts?

10       A.    I have not seen that specific policy, no.

11       Q.    Then you say number 9, Ms. Nunez, the

12   property manager, said that had she known about all

13   the prior crime, she would have requested additional

14   security.  And then you say she could have gotten

15   the data.  I'm not sure that maps here or not.

16           Number 10, There were six Part I felonies

17   in the six months after defendants purchased the

18   property and took over its management.

19           I'm not exactly sure when they took over

20   the property and how that lines up with your

21   temporal analysis in this case.

22           So number 11, Defendants failed to have

23   any crime prevention survey done at the property,

24   which the Houston Police Department could have

25   conducted for free.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 211

1          Are you aware of any evidence that TPI

2    requested a crime prevention survey at Seven Courts?

3          A.    No.  But that was being provided by both

4    Holt and Hickey during the entirety of their

5    deployment there.  So they wouldn't have to request

6    one.

7          Q.    You don't think the police might have

8    broader, richer data than just Mr. Holt and

9    Mr. Hickey?

10         A.    They're boots on the ground.  They know

11   that property better than anybody and certainly

12   better than the APD does.

13         Q.    Okay.  So we should actually defer to

14   Mr. Holt and Mr. Hickey for what crime was really

15   like at Seven Courts?

16              MR. MELCHER:  Objection; form.

17         A.    In addition to the police reports that

18   were part of the file, yes, and in addition to the

19   other deponents who provided corroborating

20   information or the lack thereof on some of

21   Mr. Holt's observations.

22         Q.    Defendants failed to do any background

23   check on their tenants, and the HPD offense reports

24   establish at least one career criminal living on the

25   property.

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 212

1          And you have testified that you believe

2     that Seven Courts actually did -- or TPI actually

3     performed background checks on Seven Courts'

4     tenants.  And, you know, that's just what you

5     believe.  You know, I have to tell you we have seen

6     hide nor hair of that, but you and I can't resolve

7     that today.

8                    MR. MELCHER:  Is that a question?

9          Q.    Number 13 --

10         A.    That's not what I believe; it's what

11    Ms. Wynn informed me and it's what HUD requires.

12    So, you know, I don't know what else to say.

13         Q.    But don't you think that if Seven Courts

14    were actually doing that, when we asked for their

15    security documents, they would (audio distortion)

16    send them to us?

17         A.    I suppose that would require them to give

18    you every single lease that was taken at the

19    property, and then within those leases, every single

20    background check that was performed on every single

21    would-be tenant.  I can't speak for them, but that's

22    what it would require, I suppose.

23         Q.    There's not even one for our clients where

24    we do have the tenant file.

25                    But you didn't consider that; you just

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 213

1    took it at face value that they did it.

2            So number 13 --

3                  MR. MELCHER:  Wait.  Wait.  Wait.

4        Q.    -- Defendants failed --

5                  MR. MELCHER:  Is that a question?

6                  MR. BLOCK:  Well, sure, I can put a

7    question mark on it.

8        Q.    You didn't look at our tenant file -- the

9    tenant file for the Diaz family to confirm whether

10   there was a background check in there, did you?

11       A.    I reviewed all the available discovery

12   that was provided to me.

13       Q.    I didn't see in your list the Diaz

14   family's tenant file, so it looks like you didn't

15   consider it.

16       A.    I would not necessarily agree with that.

17   Like I said, I looked at all the available discovery

18   that was provided to me.

19       Q.    And if we wanted to know what is provided

20   to you, we would go back to your list, which doesn't

21   include the Diaz family tenant file.

22       A.    Well, unless it was listed under

23   defendant's responses to -- TPI's responses to

24   plaintiffs' second set of requests for production of

25   documents.  I'm assuming it would be embedded in

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 214

1   either that one or the first set of discovery.

2        Q.   Well, yeah, but the discovery includes --

3   actually, you know what we can do is if you want --

4   if you're going to make me do this, we can actually

5   go into the ShareFile and see if it's in there.

6             TPI's produced, as Jeff knows, thousands

7   of documents.  So you just -- you don't have those;

8   you just don't.  Other than ones that, you know,

9   were appended to something that you were given.

10            MR. MELCHER:  Again, I don't think

11   that's a question.  I just think that's a soliloquy

12   but --

13            MR. BLOCK:  Sure.  You are right.

14        Q.   Number 13, Defendants failed to reach out

15   to any nearby complexes, which its policies and

16   procedures say it should do.  Reaching out could

17   include identifying crime data and getting help with

18   a shared patrol.

19            So you don't have any evidence that TPI

20   reached out to nearby complexes for their crime

21   data, do you?

22        A.   It wasn't in any of their policies and

23   procedures or testimony that they were required to

24   do that.  It was in the Crosstimbers case.

25        Q.   Yeah.

Bruce Jacobs                                            August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 215

1          So here again, TPI doesn't have to do

2     something to detect crime because they didn't put it

3     into a policy, right?

4          A.   I guess that's your position.  It wouldn't

5     be mine, but if that's what you say.

6          Q.   Number 14, Defendants failed to develop or

7     attempt to develop a community crime watch

8     organization among their tenants which could have

9     improved levels of informal social control and had a

10    meaningful crime prevention effect.

11         Do you have any evidence that TPI

12    attempted to develop a community crime watch

13    organization among their tenants?

14         A.   No.

15         Q.   Do you think that's a problem?

16         A.   I'm generally supportive of that kind of

17    measure.  Whether it's a problem, I don't know how

18    it relates to the facts of this case, but I'm

19    generally supportive of that if the crime pattern

20    justifies it.

21         Q.   If you look at the very last paragraph,

22    you write, Access is the lifeblood of predatory

23    offending.  Cut off the access and you generally cut

24    off the opportunity for crime.

25              Was that a true statement of your opinions

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 216

1    when you testified to that effect in 2009?

2         A.    Generally speaking, that is true.

3    Generally speaking.

4         Q.    It's still true?

5         A.    Are you talking about this particular case

6    or in all cases?  I mean, the question is --

7         Q.    I'm --

8         A.    Yeah, if you can anticipate that a

9    particular act of violence is going to happen and

10   you have opportunity to cut off the access and you

11   don't, then that's probably going to be a problem.

12   But if you don't know and the crime data doesn't

13   suggest to you that access control is an issue, then

14   it's not.

15            In fact, I don't believe that statement

16   that you just read was in this report.  That was

17   part of a different plaintiff case where the

18   offender walked in through an unlocked door and

19   roamed around the building for two to three hours

20   before attacking a lady inside at a time when that

21   building was supposed to be locked.

22            So, yes, access is the lifeblood of

23   predatory offending, especially when the door is

24   supposed to be locked and it isn't.

25         Q.    That language I read is coming straight

Bruce Jacobs                                          August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 217

1    out of your affidavit from the Perez case.  I don't

2    know about this other case you're talking about

3    where the defendant came in -- or the offender was

4    wandering around in an unlocked building.

5         A.    Can you show me where it says that in this

6    affidavit?

7         Q.    Yeah, I'll make it bigger.  It says,

8    Access is the lifeblood --

9         A.    Okay.

10        Q.    -- of predatory offending.  Cut off the

11   access and you generally cut off the opportunity for

12   crime.

13        A.    Right.

14        Q.    That last paragraph.

15        A.    Again, it refers to the firing of the

16   courtesy officer who would have been positioned at

17   the gate exactly where the crime happened and the

18   courtesy officer saying that that was a dumb move.

19        Q.    Let me ask you, Dr. Jacobs, in your -- I'm

20   going to go back to your report, Exhibit 4.  You

21   have in paragraph 30 a partial list of papers, and I

22   counted 38 papers.  And you kind of briefly

23   referenced functional limits of deterrence.

24             Really your opinion about these papers

25   seems to be that they would be useful for the jury

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 218

1    to understand.

2              What do you intend to tell the jury about

3    these 38 papers?

4         A.    Well, again, that's a partial list.   What

5    I would do is educate them on the functional limits

6    of crime prevention and the theoretical reasons

7    behind those limits to help them understand why,

8    despite the presence of, for example, lighting or

9    gates or cameras or uniform law enforcement

10   presence, why violence still happens or still can

11   happen.

12             And so those studies really essentially

13   catalogue the reasons why that can still happen, and

14   the reasons are defiance, imprudence, and

15   displacement.

16             And so it's merely to educate the triers

17   of fact in an area of knowledge that is beyond their

18   normal expertise, which is exactly what an expert is

19   supposed to be doing.

20             And in this case, it helps them understand

21   why violent crime can still happen despite all these

22   security measures.   And I will walk them through the

23   overall findings of these various studies to help

24   them explain -- particularly the uniform law

25   enforcement hot spot studies where you have police

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 219

1    in a very small geographic area intensely over a

2    several week or several month long period and you do

3    a randomized control trial, which is the gold

4    standard in science, and you compare violent crime

5    rates at hot spots with police versus at hot spots

6    without police.  And there's either no statistically

7    significant reduction in the experimental group

8    relative to the control group or there is a

9    reduction but it's minor or modest at best.

10          Like, most jurors would wonder, like, why

11   in the world is that true.  Like, you have got cops

12   at a small geographic location such as an apartment

13   complex or a convenience store or a strip center,

14   and you have got no statistically significant

15   reduction in violence or maybe a small reduction

16   that's modest at best.  Like, what in the world

17   would explain that.  And the explanations based on

18   the peer-reviewed science are defiance, imprudence,

19   and displacement.

20          And I would walk them through those

21   findings and explain how they contextualize the lack

22   of a reduction that you see in violence despite the

23   presence of even sworn law enforcement officers.

24       Q.   So I interpret what you're saying to mean

25   that insofar as scientific studies can measure it,

Bruce Jacobs                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 220

1    armed guards, whether they're police officers or

2    private security guards, don't reduce crime;

3    lighting doesn't reduce crime; gating and fences

4    don't reduce crime.

5              So is that really in a nutshell what

6    you're saying about what the literature shows?

7         A.   No, not at all.  You're saying crime; I'm

8    saying violent crime.  There's a big distinction.

9         Q.   Yeah, I'm sorry.  Let me be specific about

10   this.

11             What I understand you to be saying is that

12   based on your view of the scientific literature,

13   armed guards, policemen or private security

14   officers, good lighting, gates and fences do not

15   reduce violent crime.

16        A.   What I'll say is I what I said in my

17   report and what I said earlier, that the

18   lighting/violence relationship is null.  The

19   camera/violence relationship is negligible.  The law

20   enforcement patrol/hot spot violence reduction

21   relationship, depending on the study you look, there

22   could be some reduction.  Sometimes it's

23   statistically significant; sometimes it's not.  But

24   even when you do get a statistically significant

25   reduction of violence, the reduction tends to be

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 221

1    minor or moderate.

2            So like I said, I'm not against these

3    measures; I'm just trying to tell you and the jury

4    what the science says about all this stuff and, you

5    know, does the treatment cure the patient.  Does the

6    treatment cure the disease.  And to what extent does

7    it treat and cure the disease.  And that's all I'm

8    doing is educating them on what these studies say.

9            The disease is violence, the treatment is

10   security, nothing more, nothing less.

11                   MR. MELCHER:  Can we take a short

12   break.

13                   MR. BLOCK:  Yes.

14           (Recess 2:49 p.m. to 2:58 p.m.)

15       Q.   Dr. Jacobs, I want to pick up where we

16   left off.  As a foundational point, what I

17   understand you to be saying, correct me if I'm

18   wrong, is that when you look at the scientific

19   literature, the effect of security guards, lighting,

20   fencing on reducing violent crime is, like, slim to

21   none.

22           Is that basically the gist of what you're

23   saying?

24       A.   Well, it would depend on -- it would

25   depend on the fact pattern like -- if you have more

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 222

1    information about the crime in question, uniform

2    police presence can actually be more effective than

3    if you don't have the information.  It's called

4    intelligence-based policing.

5              But in a case like this, you don't have

6    specific intelligence on the particular criminal, so

7    it would have defaulted back to what the typical

8    studies say about it in terms of the reduction,

9    which is not all that remarkable.

10             And then the other stuff, lighting,

11   gating, fencing, again, there's nothing wrong with

12   it, you know.  I'm not against it per se.  But, you

13   know, does it more likely than not reduce the

14   probability of an armed robbery and home invasion, I

15   don't think anyone can say that unless they have

16   more specific information about the fact pattern.

17       Q.    Part of what I'm wondering and you can

18   explain for me is why does everybody do it.  And

19   there's obviously a ton of money that goes into

20   designing crime prevention plans like you have been

21   affiliated with that includes things like security

22   guards and cameras and lighting and fencing and

23   gates and so on.  I mean, it is the case.  You can

24   look out and drive around and see all that stuff.

25             And so it's not unheard of, but it's

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 223

1   unusual for people -- many people to spend lots of

2   money on, you know, theatre or charades.  So help me

3   understand, like, practically speaking why is it

4   that there's a whole industry that sells that

5   service to people and has consumers for it if it

6   doesn't do any good in reducing violent crime.

7       A.    Fear is very effective.  That's the first

8   answer.  Second answer is for some offenders in some

9   circumstances, it does work.  A lot of those things

10  are undetectable because deterrence is invisible, so

11  you can't measure something that didn't happen.

12          But having said that, again, when you have

13  the best available comparison studies, the reduction

14  and violence, for example, with these various

15  measures is not great, but again, doesn't mean you

16  don't do it.  As some offenders in some

17  circumstances, it will work.  But, you know, a lot

18  of offenders simply don't care, and that's reflected

19  by the data.

20      Q.    Can you tell me then if we look at your

21  list of literature -- and I can actually put -- I

22  think I can put the folder up on the screen.  Maybe

23  not.  So let's try without it.

24          Let's just focus on security guards.

25  Which of the papers in your file that you think

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 224

1    demonstrate that security guards do not have an

2    effect on reducing crime?

3         A.    Well, it would be law enforcement more

4    generally in terms of uniform crime prevention

5    presence, not security per se although -- so it

6    would be more -- the hot spot studies are almost

7    always done on law enforcement, which is a higher

8    standard, which is I think even more probative of

9    these issues because more often than not, you're

10   talking about a sworn police presence as opposed to

11   just a random mall cop, which is a much higher

12   standard of police presence.  And yet even with a

13   sworn police presence, these comparison studies are

14   unremarkable at best.

15        Q.    So which name should I look at in papers?

16   What are the authors or the names of the papers that

17   in your view demonstrate that even armed -- excuse

18   me, even uniformed police officer presence does not

19   deter violent crime or reduce the risk of violent

20   crime?

21        A.    Again, some of the studies will show a

22   statistically significant reduction in violence.

23   What that doesn't account for is the nature of the

24   reduction.  Statistical significance means it's more

25   likely than not that we got this reduction because

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 225

1    of the cops, not some other measure or not some

2    other chance factor.  That's what statistical

3    significance means.

4            Once you get statistical significant, then

5    you see what the reduction is.  In some studies,

6    like the Sherman study, I think it was 6 to 13

7    percent was the reduction.  The Groff study, I think

8    it was higher but it depended on the crime.

9            The studies you want to look at are

10   Sherman, Groff.  Some of these are not in the report

11   but they are in the ShareFile link.  The Telep

12   study, T-e-l-e-p.

13       Q.    I'm sorry, which one was that?

14       A.    Telep.

15       Q.    Which was it?

16       A.    T-e-l-e-p.

17       Q.    I saw that.

18       A.    The Groff study.  The Rosenfeld study.

19   The Taylor study.  The Ratcliffe study.

20           And again, some of these studies do show a

21   statistically significant reduction in violence with

22   law enforcement presence, but that doesn't tell you

23   the size of the reduction.

24           And if the size of reduction is, for

25   example, 20 to 30 percent, that means 70 to

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 226

1    80 percent of the violence remains relative to the

2    control group, which is not more likely than not.

3         Q.   It matters a great deal for the 20 or

4    30 percent of victims who weren't victimized, right?

5         A.   Absolutely.  And so, yeah, at a city

6    level, you know, at 20 percent reduction, it -- you

7    know, at that level of aggregation is genuine and

8    important.  But at a specific property or set of

9    properties, it's less hard -- it's more difficult to

10   make the argument that this presence would have

11   prevented a crime like this.

12        Q.   And is that because you're measuring over

13   a much smaller area and it's hard to get a really

14   good -- it's not a controlled trial, it's even hard

15   to find a natural comp, is that -- these are some of

16   the limitations?

17        A.   No.  No.  No.  What I'm saying is the hot

18   spots -- the randomized control trials do that for

19   you.  They typically, you know, look at 20, 25

20   different hot spots throughout a city, which are

21   small geographic areas like an apartment complex or

22   a half a block or something like that.  So you do

23   get the data.

24             What I'm saying is if you can apply this

25   on a city level and get a 10 percent reduction, if

Bruce Jacobs                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 227

1  Atlanta has got 2,000 violent crimes in a year,

2  10 percent reduction is 200.  That's significant for

3  a city.

4           But for a property where you might have,

5  let's say, four violent crimes in a year or three, a

6  10 percent reduction is not even one crime reduced.

7       Q.   Small numbers?

8       A.   Right.

9       Q.   Yeah.  It's very difficult to measure

10  small numbers -- changes in small numbers, I should

11  say.  It's easy to measure small numbers; it's

12  harder to measure changes in them.

13                 MR. BLOCK:  Okay.  All right.  Those

14  are the questions I have for your, Dr. Jacobs.  Thank

15  you.

16                 THE WITNESS:  All right.

17                 MR. MELCHER:  We're going to read and

18  sign.

19                 (Deposition concluded at 3:06 p.m.)

20

21

22

23

24

25

Bruce Jacobs                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 228

1                    DEPOSITION CHANGES

2   WITNESS:  BRUCE JACOBS

3   PAGE NO.  LINE NO.    CHANGE    REASON FOR CHANGE

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Bruce Jacobs                                      August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 229

_____
(Signature of the Witness)

THE STATE OF _____

COUNTY OF _____

     Subscribed and sworn to before me by the said
witness, BRUCE JACOBS, on this the _____ day of
_____, 2022.

_____
Notary Public in and for the
State of _____
County of _____
My commission expires:  _____

Bruce Jacobs                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 230

1   STATE OF TEXAS    )

2   COUNTY OF DALLAS )

3        I, Michelle L. Munroe, Certified Shorthand

4   Reporter in and for the State of Texas, certify that

5   the foregoing deposition of BRUCE JACOBS was reported

6   stenographically by me at the time and place

7   indicated, said witness having been placed under oath

8   by me, and that the deposition is a true record of

9   the testimony given by the witness;

10        That the amount of time used by each party at

11   the deposition is as follows:

         Mr. Block -  5 hours, 9 minutes

12

13        I further certify that I am neither counsel for

14   nor related to any party in this cause and am not

15   financially interested in its outcome.

16        Given under my hand on this the 25th day

17   of August, 2022.

18

19

20

21

                 Michelle L. Munroe, CSR No. 6011

22               Commission expires 1-31-24

                 Firm Registration #571

23               VERITEXT LEGAL SOLUTIONS

                 300 Throckmorton Street, Suite 1600

24               Fort Worth, Texas  76102

                 817.336.3042  telephone

25

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[& - 3]

Page 1

| & | | | |
|---|---|---|---|
| **&**   2:9 | **12:29**   145:8 | **2003**   6:2,4 | 158:4 182:22,24 |
| **0** | **13**   201:19 207:12 | **2004**   14:23 | 183:1 |
| **03661**   1:8 | 212:9 213:2 | 193:17 | **22**   64:10 91:23 |
| **1** | 214:14 225:6 | **2005**   10:20 | 118:5 182:25 |
| **1**   3:6 31:12,16 | **14**   201:19 207:12 | 193:16 | 183:3 |
| 33:5,12,15 43:25 | 207:21,22 215:6 | **2009**   216:1 | **23**   102:25 103:8 |
| 55:3,19 69:21 | **15**   134:23 207:12 | **2017**   33:10 57:12 | 118:4,6 145:13 |
| 126:24 130:24 | **16**   107:6,7,8 | **2019**   152:14 | 145:15,24 188:6 |
| 167:16 | 169:1 | 167:13,14,16 | 194:14 |
| **1,095**   125:17 | **1600**   230:23 | 169:1,21 170:18 | **24**   92:14 102:2 |
| **1-31-24**   230:22 | **16958**   230:20 | **2020**   104:4 147:6 | 145:13,15,22 |
| **10**   127:1 210:16 | **170**   182:5 | 147:7,10,23,23 | 146:2,8,19 150:2 |
| 226:25 227:2,6 | **18**   56:2,3 110:21 | 152:14 154:16 | 150:9 |
| **10,000**   167:22 | 158:4 | **2021**   53:22 56:3 | **25**   92:14 112:18 |
| **10/11/2019** | **18,000**   162:11 | 63:23 64:8 | 145:13,15,18 |
| 168:10 | **186**   3:10 | 91:23 94:8,22 | 150:9 184:20 |
| **10/12/2019** | **19**   111:17 156:24 | 96:24 97:7 | 226:19 |
| 168:6 | **1979**   57:14 | 117:14 146:4 | **250**   1:24 |
| **100**   184:16 | **1989**   56:24 57:14 | 147:23 148:5 | **25th**   230:16 |
| **1000**   87:10 | 57:25 | 149:1,2,9 152:15 | **26**   92:14 112:21 |
| **10:25**   63:11 | **1994**   5:25 6:2 | 152:23 153:19 | **27**   3:9 61:2,3 |
| **10:32**   63:11 | **1:05**   145:8 | 155:3,22 172:23 | 63:13 64:11,15 |
| **11**   1:16 64:13,16 | **1:21**   1:8 | 173:4,10,25 | 64:17,22,24 65:4 |
| 90:14 95:7 | **2** | 174:8,14,19 | 66:11 92:14 |
| 102:3,5 146:9,12 | **2**   3:7 32:22,24 | 175:1 184:25 | 112:21 164:1 |
| 150:2 151:2 | 69:21 83:21 | 185:14,22 192:8 | **27th**   65:13 66:22 |
| 153:18 210:22 | 86:11 108:9 | 192:10,12,19,20 | 67:8,19 |
| **11/3/2019**   170:9 | 188:2 | 192:23 | **28**   92:14 112:21 |
| **11/5/2019** | **2,000**   227:1 | **2022**   1:16,19 3:9 | **2800**   2:10 |
| 168:17 | **2,310**   60:25 | 33:18 60:24 | **29**   113:1 |
| **11th**   1:19 | **20**   6:12 38:16 | 61:22 63:13 | **2:49**   221:14 |
| **12**   15:3 32:14,22 | 81:21 113:9 | 64:12,13,24 65:4 | **2:58**   221:14 |
| 147:10,11 151:3 | 154:22 156:25 | 66:12 170:23 | **3** |
| 153:18 193:4 | 225:25 226:3,6 | 229:13 230:17 | **3**   3:8 55:7,20 |
| **12/12/20**   146:23 | 226:19 | **21**   51:25 56:2 | 56:1 107:9 |
| | **200**   227:2 | 60:23 64:10 | 187:17 204:14 |
| | | 114:3 143:18 | |
| | | 148:10 154:23 | |

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[3/8/22 - activity]**

Page 2

**3/8/22**  33:10
**30**  13:4 49:15
  61:22 77:23
  113:1 148:2
  206:21 217:21
  225:25 226:4
**300**  230:23
**303**  2:9
**30305**  2:5
**30308**  2:10
**309**  2:4
**30th**  60:24 61:1
**31**  3:6
**32**  3:7
**34**  113:3,3
  176:25
**36**  126:22
**37**  135:5 141:19
  143:12
**38**  135:5 217:22
  218:3
**39**  135:5 143:22
**3:06**  227:19

**4**

**4**  3:3,9 63:14,17
  145:10 205:3
  217:20
**4/6/19**  154:9
**40**  113:6 178:12
**40,000**  58:11
  81:20 88:7
**400**  2:4
**404.739.8812**
  2:11
**404.997.8419**  2:5
**41**  65:23 113:6
  179:14

**42**  95:8 181:22
**43**  68:2
**45**  34:5
**46**  65:25
**4:30**  169:22

**5**

**5**  3:10 71:3
  106:4 186:6,12
  201:2 208:1
  230:11
**5.85**  60:25
**500**  187:22 188:1
  188:5 201:16
**56**  3:8
**571**  230:22

**6**

**6**  102:25 106:4
  145:11 162:4
  170:18 209:15
  225:6
**6011**  230:21
**63**  3:9

**7**

**7**  56:2,2 81:10,10
  81:23 82:4,8,15
  83:6 158:4,4
**7,516**  60:23
**70**  225:25
**70,000**  13:4
**76102**  230:24
**7th**  157:3

**8**

**8**  33:18 89:8
  128:13 130:4
  201:12

**8/2/20**  146:18
  147:3 151:1
**80**  226:1
**817.336.3042**
  230:24
**825**  1:23
**89**  57:15
**8:00**  168:10

**9**

**9**  61:7 193:15
  201:12 210:11
  230:11
**90s**  6:23
**911**  51:12 107:21
**99.7**  164:3,9
**9:05**  1:19
**9th**  60:23

**a**

**a.m.**  1:19 63:11
  63:11
**aaron**  2:3,6 4:7
  79:4 138:20
  189:23 196:19
  209:4
**abby**  133:7
**ability**  70:21
**able**  16:24 51:6
  149:5 180:12
**absence**  185:17
  185:18
**absent**  202:17
**absolutely**  84:6
  102:14 106:1
  130:1 154:11
  156:3 158:19
  226:5

**absorbed**  108:3
**academic**  9:9,16
  10:4 15:7,14
  22:23 106:15
  123:8,17,24
**academy**  58:9
  104:24
**acceptable**  39:15
  39:17
**acceptance**
  58:12
**access**  22:17
  40:23 41:17,21
  41:25 131:2
  215:22,23
  216:10,13,22
  217:8,11
**accompanied**
  164:2,4,13 167:3
**account**  20:23
  20:25 21:4,7
  224:23
**accountant**  16:1
**accurate**  189:20
**accusing**  199:15
**acquired**  29:17
  30:1
**act**  59:24 72:12
  102:4 193:3
  216:9
**acted**  98:4
**acting**  79:23
  203:5
**active**  8:10 12:18
  124:2
**actively**  62:14
**activity**  49:3
  50:4 70:11

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[activity - analysis]

Page 3

71:10,12,15,22
72:1,7,9 73:4,10
73:13 74:18
75:1,6,16,24
76:6,8,22 77:4,6
78:8,9,15 79:25
183:19 184:3
**acts** 158:3
**actual** 107:13
142:9 145:23
155:3
**addition** 49:15
65:15 67:7
142:5 148:14
211:17,18
**additional** 30:9
30:17 31:23
66:5,12 67:9
68:20 107:24
148:11 153:6
161:8 210:13
**address** 37:25
90:16 101:20
187:25
**adequacy** 6:13
92:24 147:18
171:12,17 200:6
200:12
**adequate** 81:25
82:22 83:9,12
91:13 93:18,25
94:12 97:15,17
98:7 114:8,10
122:6 125:1
131:22 132:13
132:18 134:1,18
135:9,13 137:18
137:24 138:16

140:8,19 141:2
171:4
**adequately**
38:12
**adhering** 136:24
**adjacent** 122:16
**administration**
56:19
**advanced** 90:22
**advice** 83:24
86:5 87:24 88:2
**advise** 84:25
85:4
**advising** 156:1
**advocate** 116:7
116:17
**affect** 77:8,12
78:15 80:1
**affidavit** 3:10
186:7,19 187:4
187:18 188:10
201:2,13 205:13
207:18 217:1,6
**affiliated** 35:14
222:21
**affirmative**
42:11
**affirmatively**
18:21 22:13
23:14 24:6,10
40:16 48:11
**afternoon** 143:9
169:22
**agent** 142:24
208:7
**aggravated**
119:24 172:13
193:13,17,18,20

193:21,22,24
194:4,11,12
195:7,8,9,9,10
195:12
**aggregation**
226:7
**agnostic** 174:15
**ago** 26:23 27:3
71:25 88:10
94:15 184:17,18
190:10 209:14
**agree** 4:18
110:20 116:20
148:16 173:1
199:14 206:8,9
213:16
**agreed** 129:23
**agreement** 1:25
17:1
**ahead** 30:5
32:21 35:20
41:2 73:19
77:16 138:4
147:2 158:14
**airport** 62:4,13
**alignment**
113:21,22
**allegation** 80:13
**allegations** 9:6
49:2,4 74:3
77:19 80:15
122:19 123:5
198:13,15
209:11
**alleged** 137:2
147:4 175:17
**allen** 1:24

**allocate** 192:2
**allocating** 8:16
**allow** 16:19
**alluded** 65:17
**alongs** 7:22
**amazon** 167:25
**ambiguity** 53:24
54:3
**amenable** 138:8
138:11
**american** 57:1
58:6,7 104:23
**amount** 60:25
181:2,14 230:10
**analogous**
202:24
**analysis** 6:9,15
27:25,25 28:1,1
28:14 29:6,6,12
29:13,18 30:11
30:12,13 42:24
49:6 54:17
61:11 71:23
72:6 73:17 76:3
76:11 78:16
80:1 81:13 83:2
84:9 92:16
100:7,8,8,15,15
100:16 101:15
101:16 102:7,17
102:18 110:16
110:22 111:2,7,9
112:19,20 116:1
117:2 122:11,12
126:8 128:9
131:11 136:11
137:10 138:11
138:19,24 146:1

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[analysis - area]**

Page 4

149:15,18,20
150:3,4,10,11
151:7,14,19,20
151:22 152:3
154:1 155:20
157:17,22,25
158:1,21 160:20
160:21,24
161:13 165:1,3
165:18 166:23
167:7,19 169:18
170:4,14 172:6
175:25 184:7
190:21 209:12
210:21
**analytic** 28:3
29:6 54:22
100:6 111:17,19
112:9,16,20,23
113:2,4,7
**analyze** 58:20
75:11 80:16
156:20 171:20
**analyzed** 59:18
73:21 75:17,18
76:13 80:19
124:12 125:18
136:8 156:17
161:18
**analyzing**
101:20 116:14
163:1 200:7
**annual** 83:21
86:11
**annually** 15:13
**ansi** 104:25
**answer** 11:2,17
15:9 17:10 30:6

38:25 40:20
42:10 43:13
44:13 49:20
50:2 77:24 78:5
80:8,9 100:21
107:11,16 108:4
115:2 117:6,10
123:16 134:24
138:8 139:5,7,10
139:11,18 140:3
140:3,5 141:9,16
153:1 168:19,24
171:19,19
173:16 174:4
181:10,18 186:1
196:2,24 223:8,8
**answered** 40:16
42:9 48:10 73:1
73:2 74:22 93:1
100:13 104:18
122:23 123:3
135:12 137:20
138:3,5,9 140:13
141:10,14,18
173:12 193:2
204:11
**answering**
140:23 173:22
**answers** 86:7
89:7 111:4
116:5 161:10
199:1
**anticipate** 216:8
**anybody** 63:6
77:20 142:25
211:11
**anyway** 7:7,12
134:16 157:8

190:2 200:20
**apartment** 36:14
37:1,19 38:4,10
38:20 39:13
81:20 88:7,12
116:10 118:9,13
120:9 123:19
126:4,11,24
127:11 131:7,19
132:7 135:19
176:21 177:11
178:10 185:25
187:8,25 188:7
188:19 190:7
194:13 195:6,17
202:17 205:9
219:12 226:21
**apd** 48:7 55:24
56:7 74:25
75:15 101:18
107:20,21
108:21 137:11
167:10,12,13,14
170:7 211:12
**apparent** 127:17
146:14
**apparently**
146:17 170:10
175:20 181:23
**appear** 152:13
162:5
**appearance**
182:3
**appeared** 14:23
169:13
**appears** 21:22
**appended** 214:9

**applied** 82:3
**apply** 17:2,6
38:19 99:17
226:24
**applying** 28:20
**appreciate**
100:20
**approach** 103:21
190:3
**approached**
60:15
**approaches**
98:10 183:8
**appropriate**
92:8 139:2
**approximate**
146:9
**approximately**
126:24 160:24
**april** 148:11
157:2,3 170:18
170:23
**area** 33:8 34:2
48:3,8 50:21
51:17,18 62:15
62:21 63:2
106:7 108:18
114:6 116:2
117:3,8,8 120:9
120:10,23 121:3
124:22 126:12
126:14,17 127:5
127:11 128:5,6
129:14 131:5
132:8 133:10,15
138:16 141:20
142:3 218:17
219:1 226:13

Bruce Jacobs                                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

**areas** 44:1
112:14 120:22
121:6,8 124:13
226:21
**argue** 153:11
189:25
**arguing** 138:21
**argument** 78:6
79:22 173:4
226:10
**arm** 155:10,12
174:25 193:19
193:20 194:3
195:10
**armed** 91:21,21
92:17 94:8
101:9 103:17
104:2,11 105:23
112:18 117:12
117:20 118:18
119:1 120:17
128:12,24 130:3
130:20 133:20
135:6 136:20
143:24 144:1,7
145:20 147:9
152:15,18 153:7
153:20,24 154:4
154:10 155:10
155:10,11,13,21
172:11,22 173:9
173:24 174:7,13
174:19,23 177:5
179:6 182:7
190:17 191:10
193:4,6 220:1,13
222:14 224:17

**arrive** 100:11
**article** 14:18,22
56:25 57:4 58:3
177:19
**articles** 6:7
14:19
**articulate** 93:14
**aside** 55:19
108:20 116:18
163:11
**asis** 104:23
105:8
**asked** 8:23 16:16
27:7 31:18 33:6
35:23 36:5,22
39:1,5,7 40:12
40:13,15 41:3,11
42:4,5,9,14,22
43:5,20 44:7
45:25 47:2 48:7
49:19 52:8 73:1
74:13 95:5
109:16,17
114:25 122:4,5
123:2 124:24
133:5 135:24
138:2,21 141:13
144:22 158:23
159:2 173:11
190:11,13 196:4
196:5 198:13
204:10 209:2,3,6
209:10,13,22
212:14
**asking** 72:16
73:6,7,12 76:18
77:25 78:4
85:11 94:25

98:20 109:12
114:20 119:5,15
127:13 171:9
193:1 206:14
**asks** 95:16
**assailants**
202:13
**assault** 119:24
169:3,8,14,17
170:10,16
172:13 193:17
193:21,24 194:4
194:4,12
**assaulted** 169:4
170:11 208:11
208:20
**assaults** 13:20
172:4,15
**assess** 9:5 59:8
91:20 92:15
93:2,16 112:12
125:15 128:1
151:10
**assessed** 73:3
92:12 195:25
**assesses** 128:16
**assessing** 56:25
129:11 172:19
200:12
**assessment** 49:9
56:11,16 57:18
74:14 84:16
93:4,5 125:20
128:17 129:9
133:2 137:14
142:14 147:17
165:19

**assessments**
56:20
**assets** 83:22 87:1
151:11,21
**assist** 133:23
**assistance** 16:25
**assistant** 5:25
**assisting** 87:23
**assists** 68:24
**associate** 6:1
**associated** 10:3
46:23 98:9
142:23 164:17
**association**
39:13 58:8
**assume** 32:6
55:12 71:7 77:2
77:4,25 78:6
79:3,21 104:2,10
136:11,21
178:15 180:19
206:19,25
**assuming** 36:2
119:3,20 120:24
125:3 127:18
170:11 171:10
213:25
**atlanta** 1:3 2:5
2:10 34:1 60:2,6
61:7,9 62:6,8,16
65:7,7 78:13
79:22,23 80:22
108:21 121:10
121:11 129:21
131:20 132:6
140:18 156:6,18
156:19 206:13
227:1

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

[attached - believe]                                                                        Page 6

**attached** 109:2
  209:19
**attachment**
  165:13
**attack** 93:11,13
  94:17 96:10,24
  97:8
**attacked** 190:4,6
**attacking** 216:20
**attacks** 91:1
**attempt** 142:22
  175:16,17,21,24
  208:2 215:7
**attempted**
  175:13 215:12
**attempts** 175:7
  175:13
**attention** 81:22
**attesting** 58:12
**attitudes** 13:10
**attorney** 16:23
  19:19,25 20:10
  20:11 21:15,18
  107:20 159:9
**attorneys** 9:4
  22:1 158:16
**audio** 170:11
  212:15
**august** 1:16,19
  230:17
**author** 22:25
  57:3
**authorization**
  10:20
**authors** 224:16
**auto** 163:2,2,7
  163:12 164:9,16
  168:8,9,11,12,17

168:23
**available** 42:4
  43:21 48:21
  66:6 68:20 81:7
  111:6 114:15
  120:24 121:1,9
  121:24 127:18
  213:11,17
  223:13
**average** 9:11
  15:9
**averse** 53:25
  54:3
**aware** 49:2
  103:14 195:21
  211:1
**axial** 54:14,18
  111:12

**b**

**b.m.f.** 1:6
**b23** 182:11
**bachelor's** 5:18
**back** 11:4 25:22
  29:10 33:5 36:6
  42:13 43:24
  48:1 50:7 53:5
  54:2 55:15
  56:12 58:15
  59:20 62:22
  74:17 75:4
  79:10 81:9
  94:19 118:5
  124:15 125:7,16
  131:15 135:18
  141:15,18
  149:23 152:22
  153:17 163:25

182:11,13,23
  187:20 193:16
  193:24 201:1
  213:20 217:20
  222:7
**background**
  36:1,3,18,20
  37:4,16 38:6,23
  39:3 70:25
  211:22 212:3,20
  213:10
**backwards**
  145:14
**bad** 96:4 174:12
  174:15 199:17
  204:20
**badger** 139:23
**badly** 130:5
**ball** 175:18,19
  176:7,22
**ballpark** 15:5
  16:2
**bank** 104:12
**barbed** 128:13
  130:4 133:20
**barged** 126:4
**base** 206:16
**based** 8:20 12:17
  13:3,6 14:18,19
  23:17 24:12
  27:24 29:22
  52:10 65:14
  68:16 82:2
  84:13 98:22
  100:11,13,14
  102:7,18 112:19
  114:3 122:19
  124:2,3 132:7

144:3,4 146:5
  150:25 151:13
  152:17 219:17
  220:12 222:4
**basic** 23:22
  142:14,14 152:9
**basically** 45:18
  146:21,25
  153:21 178:13
  180:2 184:7
  221:22
**basis** 82:1,23
  116:12 138:18
**bear** 161:12
  167:10 171:3,10
  171:11,16
**beat** 50:21
**beginning** 17:9
  59:24 187:21
**behalf** 1:5 11:6
  64:3
**behavior** 39:16
  39:17
**beholder** 148:21
**belief** 176:9
**believe** 10:19
  17:23 18:5 39:7
  41:20 47:4
  49:23 52:5 58:9
  58:11 60:12
  63:15 64:1
  68:10 87:17
  88:10 102:4
  117:15,22 126:8
  144:23,25
  175:17 176:7,11
  176:15,18 183:2
  197:5 201:25

[believe - calls]                                                    Page 7

202:8 205:22
212:1,5,10
216:15
**benefit** 23:9
135:21
**best** 14:13 45:17
219:9,16 223:13
224:14
**better** 153:23
179:1 211:11,12
**beyond** 28:17
85:6 132:22
133:3 141:12
148:10 218:17
**big** 27:14 62:13
220:8
**bigger** 188:14
207:6 217:7
**bill** 61:8
**billed** 6:24
**billion** 83:21,22
86:11 87:1
**biography** 5:12
5:13,16
**bit** 5:12,15 6:22
11:4 12:22 17:8
27:15 30:25
40:4,17 90:4
148:20 149:13
177:21
**black** 180:25
181:13
**block** 2:3,3 3:3
4:5,7 32:25 33:4
45:4,9 55:9 63:5
63:9 77:9 79:9
134:22 138:22
139:4,7,12,16,25

145:4 173:15
189:6,10,14,20
189:24 195:21
196:22 197:1,4
197:14,17,24
198:1,6,11,17,20
199:6 200:2
213:6 214:13
221:13 226:22
227:13 230:11
**blockfirmllc.c...**
2:6
**board** 89:17
**bodies** 104:21
105:15
**books** 6:7
**boots** 46:16
211:10
**bottom** 107:9
187:18 193:21
194:8,9
**boulevard** 1:24
**box** 21:14,22,23
21:23 22:3
159:7,21 160:1
**brain** 38:16
**brand** 24:11
**break** 33:2 43:7
63:6,10 145:5
221:12
**breakdown**
62:24
**brief** 85:22
**briefly** 143:3
217:22
**brightly** 181:12
**bring** 17:14 31:3
31:20 55:1

**broader** 75:4
124:23 178:7,7
179:24 211:8
**broke** 167:14
176:9
**broken** 176:19
201:23 202:1,9
202:12 203:3,17
203:24 204:3,6,6
**brought** 31:19
32:9 108:11
**bruce** 1:15 3:2
3:10 4:2 25:9
186:7,17 228:2
229:12 230:5
**budget** 185:7
**building** 104:5,7
216:19,21 217:4
**buildings** 44:1
178:2
**bullet** 36:1 46:14
46:15,21 51:21
71:2 114:11
183:1 201:19
203:23,23
204:14 207:10
**bullets** 40:5
44:15
**bunch** 32:5 87:7
**burglaries** 164:1
164:16
**burglary** 13:19
162:6 163:19,20
164:7,22,22
171:25 172:1
175:16,21,24
176:4

**burning** 88:21
120:5
**business** 49:9
81:12 87:24
88:2
**businesses** 83:19
**busts** 8:1
**buys** 8:2

**c**

**c** 2:1 4:1 14:7,7
83:1
**caceres** 1:4 4:17
4:19 65:21
**calendar** 157:5
**california** 5:23
**call** 9:3 24:9
48:6,13 49:18
51:6,12 81:22
85:10 107:21
160:20 163:23
172:2 189:1
191:15 196:6,16
196:17
**called** 9:4 10:20
18:4 101:19
195:23 222:3
**calling** 197:20
199:9
**callous** 201:15
201:20 202:2
203:1,18 204:3
204:24 205:11
206:6 207:2,11
207:17
**calls** 14:22 43:4
68:12 77:15
85:25

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[camera - cherry]

Page 8

**camera** 83:2
117:17 179:4,8
179:12 180:15
220:19
**cameras** 86:3
88:22,23 112:5
113:6 134:15
141:5 178:13,20
178:25 179:1,5
181:20 204:23
218:9 222:22
**canvass** 33:8
34:2 62:15 63:2
108:18 114:6
126:15,17 127:5
130:2 132:8
135:15,16
141:20 142:7
**canvassed**
177:12
**capacity** 169:12
**capture** 37:7
150:9
**car** 8:11 142:17
**care** 10:21 54:9
102:22,23 103:2
103:6 104:16,17
104:20 105:3,17
106:18,21 107:3
204:17 223:18
**career** 211:24
**careful** 32:7
**carefully** 80:16
81:2
**carjacking** 13:19
14:6 72:13
155:10

**carjackings**
172:14
**case** 11:1,5,9,14
14:5,9,9,18,20
16:17 18:2,5,11
18:12 19:13
25:5 26:10
27:15 28:4
30:23 36:14
37:14 40:24
41:9 42:15,18
43:2,16 47:16
55:14,25 57:18
58:23 59:6,16,25
60:7,11,15 61:3
61:24 62:24
66:4 67:3,10
69:5 71:1,18
72:7,20 74:3,8
76:12 80:19
82:3,11 86:19
87:24 90:25
91:4,8,11 94:3
94:16,20 96:15
96:18 97:6 98:1
98:14,16 99:5,23
103:17,22
104:14 108:2,15
110:24 111:20
112:10 114:16
121:14 122:3,4,9
123:4,5,7 124:19
124:23 126:2
133:4 142:15
148:25 150:11
150:18 156:20
158:7,19,20,20
171:2 186:8,15

187:1,3,8,13,22
188:3,16,17,22
190:5,8,11,12,13
191:10 193:11
194:7 195:15,23
195:23 196:1,3,5
196:7 198:16
201:4,7,8,21,23
202:18 203:16
205:8 207:4
210:7,21 214:24
215:18 216:5,17
217:1,2 218:20
222:5,23
**cases** 6:11 82:17
105:13 158:12
159:3 216:6
**casing** 95:23
**catalogue** 82:21
83:8 218:13
**catalogued**
81:24 83:10
**categorically**
169:17
**categories** 54:20
54:21
**cause** 230:14
**caused** 124:12
180:13
**center** 10:4
219:13
**central** 74:2,5
**certain** 106:6
156:14 180:7
**certainly** 85:17
139:19 156:16
182:20 211:11

**certified** 1:22
39:19 230:3
**certify** 230:4,13
**cetera** 170:2
**chain** 81:17
83:21 86:25
**chair** 10:16 89:9
89:16
**chance** 192:20
225:2
**change** 66:19
68:21 83:5
228:3,3
**changed** 20:7
66:8 67:3 149:4
159:25 197:5,8
**changes** 151:2
227:10,12 228:1
**chapter** 99:21
120:15
**characterization**
148:17
**characterize**
162:8 166:16
176:6
**charades** 223:2
**charge** 61:18
**check** 16:21
167:21 211:23
212:20 213:10
**checks** 36:1,3,18
36:20 37:4,16
38:6,23 39:3
40:5,11 71:5
212:3
**cherry** 113:18
195:4 207:16

Bruce Jacobs

August 11, 2022

Diaz, Elsa Flores v. The Partnership, Inc

**[children - component]**

Page 9

**children** 1:5
66:24
**choice** 12:20
155:21
**choosing** 176:7
176:11
**chronological**
167:15
**circumstances**
10:6 72:1 98:4
159:12 178:6
223:9,17
**cite** 71:1 99:20
120:15 126:25
**cited** 58:10
112:24
**city** 79:23
156:19 226:5,20
226:25 227:3
**claimed** 150:19
**clampetts** 45:19
**class** 23:11 24:8
106:19,20
**classification**
172:17
**clear** 12:25 53:6
80:18 118:14
119:12 120:4
164:19
**clearly** 154:22
207:12
**clerks** 107:2
**client** 61:15,15
61:18,19
**clients** 74:4
82:12 83:11
84:25 95:24
136:4 212:23

**close** 34:5 96:12
103:14
**closed** 80:4
143:16
**closing** 95:9
**cloth** 29:22
118:19
**clues** 95:17
**codes** 54:15,15
54:18,19,19,23
111:12,13,14
**coincided** 147:20
**coincidence**
182:17
**collaboration**
12:23
**colleagues** 12:24
22:8 124:6
**collect** 125:24
205:3,15 206:9
**collecting**
205:25 206:2
**collection** 109:8
**columbia** 133:8
**come** 25:6 35:8
36:16 37:6 46:9
59:13 68:8 86:7
89:5 103:23
106:23,24
112:11 114:12
118:5 123:5,6,6
149:23 157:18
**comes** 15:13
54:17 56:24
70:24 101:15
112:23 158:5
**comfortable**
185:21

**coming** 54:1,2
182:11 216:25
**commission**
229:18 230:22
**committed** 51:20
120:13 181:6
**committee** 12:5
12:7
**common** 44:1
120:9,10 181:9
181:10,17 202:5
**commons** 133:7
133:8
**communications**
209:25
**community**
39:15,17 215:7
215:12
**comp** 226:15
**companies** 81:19
88:6 129:20
**company** 41:9
87:19 115:25
116:25
**comparable**
126:8,10
**comparative**
130:15
**comparator**
128:19 129:6
130:18
**comparators**
131:14 136:19
**compare** 111:21
112:3 145:22
161:7 183:22
219:4

**compared** 48:18
184:10
**comparison**
101:7 223:13
224:13
**complaint** 40:20
107:11
**completed** 64:17
64:22
**completely**
129:14 181:11
198:15
**completing**
69:16
**complex** 36:14
37:1 38:4,10,20
116:10 118:9,13
123:19 126:5
128:12 187:8,25
190:18 195:7,18
202:17 205:9
219:13 226:21
**complexes**
126:11,24
127:11,15,20
128:6 130:3,12
131:5,7,19 132:7
134:4 135:20
143:13,23
177:11,20,25
178:1,2,10,11
185:25 188:7,19
190:7 194:13
214:15,20
**comply** 158:10
**component**
144:14 153:23

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[comprise - contributing]**                                                Page 10

comprise   128:5
compstat   101:19
computer   69:13
conceivable
21:13 191:24
concentrated
13:25
concentration
150:12,16
concept   99:12
concepts   23:22
90:20 111:15
183:20 184:19
conceptual
92:22
conceptually
92:10 125:8
171:16
concerns   49:13
concluded   118:8
227:19
conclusion   29:2
68:12 100:24
113:14 118:12
129:24 150:24
184:15
conclusive   180:3
conditions   38:4
41:15,19 42:2
43:1,9 48:16,24
53:10 76:4
77:12 78:10,17
80:2 109:23
110:16 129:7
155:20
conduct   33:22
39:24 72:6
73:16 76:11

99:23 110:15
127:5 137:10
143:7 149:17
conducted   33:23
34:6 36:3,20
47:2 50:5
149:15 155:19
210:25
conducting
29:18 37:3 39:3
40:10 62:14
152:25 154:1
conference   86:1
88:11
confidential
158:16,18
confirm   21:16
39:2,9 42:16
213:9
conflict   10:6,23
16:24
conflicts   16:21
166:7
conform   201:10
conglomerate
81:17 83:20
86:10
connected   18:1
consent   15:25
consider   38:3
42:25 44:24
51:14 52:2
55:24 56:7
59:15 67:16
71:14 72:19
74:13,17 81:2
85:13,17 86:22
124:17 152:5,21

161:12 165:2,3
166:23 172:19
175:6,12,24
212:25 213:15
consideration
70:11 71:11
74:14 169:18
considered   38:9
70:15 73:3
75:17 114:7
154:3 155:21
161:17 167:1
169:20,24 176:2
209:11
considering
45:17 71:9
consistent   7:5
17:21 98:9
101:4 111:24
112:13 115:8,10
115:22 176:21
183:4,13 184:2,6
184:21
conspiracy
196:11,15,16
consult   82:12
consultant   47:8
83:23 87:22
105:13
consultation
89:6
consultations
69:8 84:8,19
consulting   83:11
consumers   223:5
contacting   16:22
contacts   86:4,4

contain   25:1
contained   109:7
contains   107:14
183:1
contending
128:3
content   27:25,25
28:14 29:5,12
30:12 100:7,14
110:22 111:2,9
189:16
contention
208:17
context   80:19
99:13 104:14
contextualize
219:21
contingencies
70:8
continue   139:23
139:23
continued   14:16
continuing   79:16
90:15 152:15
continuous
143:23 144:7
145:19 174:22
174:25
contract   9:25
12:11
contractors
109:22
contradicted
78:1
contrary   203:3,5
contributing
154:4

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[control - courts]

Page 11

**control** 131:3
215:9 216:13
219:3,8 226:2,18
**controlled**
226:14
**convenience**
107:1,3 127:8
219:13
**conveniently**
202:3
**conversation**
34:14 83:18
102:20 145:7
**conversely**
164:23
**convert** 50:7
111:14 164:8,10
**converted** 34:21
**convey** 82:19
**conveyed** 192:8
192:19
**cool** 7:11
**cooler** 156:23
**cop** 8:5 224:11
**copies** 19:2,4,5
20:4 22:9 24:17
44:17 55:21
159:24
**cops** 50:23,25
219:11 225:1
**copy** 19:9,13
20:5 26:6 31:1
31:17 32:3 33:1
33:11,15,16
55:10,13,17
63:13,15 160:5,5
**core** 91:11

**corner** 55:3
**corporate** 210:8
**corporation**
87:11
**correct** 11:6,7
21:5 25:17 27:4
33:21 57:23
64:1,5,7,24 65:1
67:4,6 90:11
108:12,16
110:18,24
114:13 115:3
116:22 126:19
137:19 144:5
146:23 148:5
149:2,3,10
154:18 162:16
163:16 164:11
164:13 168:22
168:25 170:5
175:4 180:1
186:20 187:15
190:1,8,15
194:18 201:10
202:15 204:19
221:17
**correctly** 42:12
42:13 63:21
138:13 154:25
**correlation**
166:18,19 179:3
**correspondence**
31:25 32:4
48:20 113:18
**corroborated**
77:20 176:14,15
**corroborating**
211:19

**cost** 206:24
**costs** 206:12
**council** 89:10,17
89:21,23
**counsel** 18:2,25
19:12 26:19,21
26:25 27:10
32:1,4 47:5 60:3
85:4 86:6 88:2
123:6 230:13
**count** 69:6
165:17,21
**counted** 217:22
**countries** 13:5
**country** 6:10,12
7:9 101:19
102:17 103:14
151:9 162:12
165:25
**county** 186:9
229:9,17 230:2
**couple** 12:21
14:19 60:18
66:16,17 74:9
90:24 154:15
195:14
**coupled** 179:9
**course** 11:24
12:1,2,3,4,9
74:21 148:4
169:2 170:21
**court** 1:1 4:25
17:18 32:17
63:6 186:10
197:11,21 199:5
**courtesy** 203:19
204:15 205:6,23
208:5 217:16,18

**courtroom** 17:15
**courts** 33:19
34:8 35:7,14
36:8 39:4 40:2
41:16,19 42:2
43:9 48:16,24
51:11 53:10,22
62:19 65:7,21
70:12 71:10,12
71:15 72:8,22,24
73:13,15 74:18
74:20 75:6,8
76:23 77:3
78:10,14,17
79:15,24 80:2,23
92:3 93:17,22
94:21 95:10,13
96:23 97:7
104:3 109:14,23
114:8,23 115:3,6
115:15,24 116:1
116:2 117:1,2,13
125:23 126:19
126:25 127:14
127:19,21
128:15,22 129:4
129:12 130:6,10
130:13,18,23
131:3 135:24
136:24 140:18
140:24 146:3
148:1,4,8,9
149:5,16 152:7
152:22 156:21
157:14 166:24
168:14,21
170:23 171:18
172:22 173:10

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

173:24 174:8,13
174:19 176:1
180:22 183:3,12
183:23 184:12
185:22 190:14
192:9 199:2
202:19 204:25
209:9 210:9
211:2,15 212:2,3
212:13
**cover** 14:21
30:18 37:23
**covered** 134:11
134:15 135:14
140:16 142:8
**cpted** 83:1
183:10,21 184:5
184:15,19,21
**create** 23:3,8,10
23:22 40:14
44:6
**created** 29:17,21
29:25 44:18
84:24 96:24
**credibility** 49:9
**credulity** 182:18
**creek** 1:24
**crime** 6:7,12,13
6:14,15 8:7,15
8:16 11:25 12:1
12:3 13:5,10,13
13:15,16,17,23
13:23 30:11
35:1,5,7 36:7
39:8,11 48:6,13
51:11,14,20 53:3
53:10,13,15 55:2
57:17 58:20

60:5,9,10 71:4
76:3 77:12
78:10,16 80:1
81:13,14,14,25
82:9,9,22 83:2,9
84:9,9,10 86:2
88:17 90:16
93:6,21,21,22
94:23 96:23
97:6 98:10
100:1,8,15 101:5
101:6,6,11,12,16
101:20 102:5,11
102:18 103:3
106:22 109:23
110:12,16
111:24 112:1,1
112:20,22,22,25
113:4 114:8,11
115:11 116:1,7
116:14 117:2
119:23 120:13
120:20,21 121:2
121:7 122:16
124:12,17,20,21
125:17,22 126:5
128:19 129:7
133:1 135:22
136:8 137:19,25
138:17 140:9,10
140:21 146:10
146:15,25
147:11,13,14,24
149:15 150:1,2
150:13,16 151:3
151:14,16 152:6
152:12,22 153:3
153:17 155:5,6

155:20,23 156:1
156:6,7,13,14,18
156:21 157:14
162:10,23 163:8
163:14,23 164:2
164:4 165:1
167:5 169:10,15
169:17,25
170:17 171:1,3,5
171:17 172:18
174:21 175:4
176:2 177:2,4,6
177:7,10 178:21
179:23 180:5,7,8
180:11,13 181:2
181:15 182:1,20
183:5,6,6,8,11
183:14,24 184:9
185:14 187:19
188:18 190:4,5
190:21,22 191:1
191:5,6,14,14,16
191:23 192:1,7,9
192:18,20
193:10 199:2,3
200:8,13 204:1
205:4,10,16,25
206:4,9,12,20
207:1 209:16
210:4,9,13,23
211:2,14 214:17
214:20 215:2,7
215:10,12,19,24
216:12 217:12
217:17 218:6,21
219:4 220:2,3,4
220:7,8,15
221:20 222:1,20

223:6 224:2,4,19
224:20 225:8
226:11 227:6
**crimes** 11:23
13:23 137:2
146:20,21 154:3
161:11,12,17,18
161:19 162:5,8
162:13,14,18,19
162:22 163:6
164:17,20,24,25
165:16 166:24
167:1,2,17,18
172:12 181:6
194:12 227:1,5
**criminal** 7:2
36:1,3,18,20
37:4,16 38:5,23
39:3 49:3,24
50:4 56:12 58:9
95:22 104:24
126:2 208:18
209:8 211:24
222:6
**criminality**
11:25 69:22
70:2
**criminological**
101:4 141:7
**criminologist**
9:1 85:12,14
99:25 116:6,14
182:17 206:11
**criminologists**
58:5 165:25
**criminology**
5:22,24 6:3,25
7:7,9 17:14

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[criminology - defendant]

Page 13

56:19 57:2 58:7
58:8 68:7 72:4
95:16 98:11
99:7,11,20
104:24 111:25
112:8,14 124:6
151:10 166:1
**criteria** 125:4
169:13
**criterion** 95:15
**crosstimbers**
187:23 188:1,6
201:16 214:24
**csr** 230:21
**cues** 96:2
**cure** 221:5,6,7
**curious** 64:21
**currently** 13:3
**custom** 131:4,19
131:21 132:6,9
132:12,17
133:14 134:7,9
134:18,21,25
135:3,8 136:23
137:17 138:15
138:18 140:8,11
140:17 141:1
**customarily**
121:21,22
122:16
**customary** 121:5
121:6
**customs** 106:4,5
106:8 127:6
128:1,4,8 129:13
129:17 133:25
137:23

**cut** 215:23,23
216:10 217:10
217:11
**cutoff** 146:14
148:10
**cv** 1:8 5:14 7:13
7:21 25:24

**d**

**d** 3:1 4:1 83:1
104:7
**daily** 48:2 50:20
**dallas** 6:4 9:23
10:11,25 22:6
23:4,9 61:13
89:12 230:2
**damaged** 176:10
**dangerous**
180:22 195:18
**dark** 206:6
**dash** 167:16
**data** 8:20 28:9
50:8,14 51:5
54:20 58:20
59:14 60:6,10
76:19 100:17
101:2,3 110:17
111:22 112:3,6,7
112:10,10,12,12
113:13,19,21
115:8,9 116:7,14
120:24,25 121:7
121:9,24 122:16
124:4 125:17,24
126:5 133:1
136:9 138:17
140:21 149:15
150:1,2 152:6,17

153:3,17 155:8,9
161:3 163:25
171:8,10 173:19
173:19 174:16
174:18 177:21
177:22 181:5,19
181:20 185:20
194:24 199:2
200:8 202:15,16
202:22 205:4,7
205:10,16,24,25
206:4,9,13,20
210:15 211:8
214:17,21
216:12 223:19
226:23
**datasets** 27:22
**date** 57:13 64:1
65:5,5 66:25
80:5 158:5
169:20 193:13
193:15 205:22
**dated** 64:11,15
**day** 1:19 9:12
15:1,10 48:9,10
60:18 95:23
143:7 154:6
194:25 204:2
229:12 230:16
**days** 9:8,16,21
31:24 32:10
96:23 102:13
125:17
**daytime** 170:15
**de** 206:24
**deadline** 64:13
64:20

**deadly** 169:9,14
170:16
**deal** 226:3
**dealer** 113:25
208:17
**dealers** 70:6
74:4
**dealing** 40:6,11
70:4 71:6 73:9
78:20 80:24
160:17
**dean** 10:17
**dear** 65:20
**debate** 208:23
209:13
**decades** 14:17
**december** 147:6
147:7,10 193:15
**decide** 129:21
191:20 192:2
**decided** 49:23
**decision** 12:19
**decrease** 155:4
155:21
**decreased** 155:6
**dedicated** 91:21
92:17 102:12
106:1 118:16,22
119:13 132:11
133:19 152:15
152:18 153:7,24
190:17 191:10
193:5
**deep** 169:13
**defaulted** 222:7
**defendant** 1:10
2:8 18:3,13 96:4
96:13 110:4,4

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

166:8 217:3
**defendant's**
171:3 202:4
213:23
**defendants** 16:6
16:12 17:4
201:13,23 203:2
203:24 204:14
205:3 208:1
209:15,21
210:17,22
211:22 213:4
214:14 215:6
**defense** 4:16
16:14 87:23
187:13
**defensible**
183:18 184:2
**defer** 211:13
**defiance** 218:14
219:18
**deficient** 129:18
130:13
**define** 52:24
70:18 90:8
97:23 119:15
157:6
**defined** 106:18
172:17
**definitely** 14:14
26:1
**definition** 98:14
98:15 99:4,15
161:21,23
**degree** 5:18,20
68:1,4,15
**delete** 18:21 19:9
20:15,18 21:17

21:21,25 22:5,9
22:14,17 23:14
24:6,25 25:3,11
27:1
**deleted** 19:10
25:19
**deleting** 24:10
**deliberate**
201:20
**demands** 182:14
**demonstrate**
224:1,17
**demonstrated**
178:15
**deny** 198:23
**denying** 199:12
199:13
**department** 6:3
7:9 8:21 10:16
12:7 60:2,6
78:13 79:22,24
80:23 89:24
102:8 108:21
110:14,18
120:25 165:23
191:20 205:5,11
206:13 210:24
**departments** 8:7
8:19 101:18
102:16 151:8
162:11 206:18
**depend** 53:17
76:7 122:8
162:25 179:7
221:24,25
**depended** 225:8
**depending** 58:15
220:21

**depends** 20:18
37:21 53:3 69:6
70:3,4,5,7 85:24
106:19 117:6,7,8
122:2,21,22
123:7 125:4
136:14 137:1,3,4
154:6 156:7
161:1 206:14
**deploy** 88:18
151:11,21
192:22 202:11
**deployed** 154:14
**deployment**
81:14 101:14
154:20 179:7
185:10,11 191:8
211:5
**deponents** 78:1
211:19
**deposed** 66:7,21
66:24 111:13
**deposition** 1:14
1:20 3:5 4:10
5:7 24:18,21,22
25:3,3,17,18
31:3,19,20 32:11
32:23 40:19
41:24 44:8 46:1
46:2 47:23
48:19 49:14,22
50:12,19 51:7
55:4 60:20
67:20 71:21
90:6 97:14
108:14 109:11
109:20 111:16
146:17 156:12

158:8,10 176:16
176:22 189:15
202:8 205:25
209:19 227:19
228:1 230:5,8,11
**depositions** 4:25
25:21 28:10
31:23 39:24
41:4,21 46:11
47:25 66:14
67:7,13 107:23
107:24 108:2
109:3 110:1
111:3,5 113:17
125:18
**derive** 57:25
98:19 99:4
**describe** 8:24
12:15 27:20
29:12 43:25
58:19 81:11,16
83:16 89:9
107:9 110:22
141:20 145:21
181:22 183:7
**described** 29:4,5
30:7,15 72:5
88:14 92:13
100:5 101:17
105:11 126:14
137:11 184:1
**describes** 26:2
102:2
**describing** 85:22
86:15
**description**
65:10 86:21,24

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[design - displace]

Page 15

design 101:7
112:2 183:11,15
183:25 184:10
designation
190:16
designing
222:20
designs 12:23
desk 146:7
desperate 54:8
despite 96:5
208:7 218:8,21
219:22
detail 27:15
28:15 30:21
63:1 69:20
92:22 100:22
119:16
detect 215:2
detecting 199:19
199:21
deter 53:14,18
53:21 131:22
132:13,18 134:1
134:18 135:9,13
140:9,20 151:15
155:23 171:5
178:6 185:13
224:19
determination
100:11
determine 16:19
72:7 75:24
88:19,20 101:23
120:18 152:6
163:7
determined
101:2 146:2

determining
113:20 151:21
deterred 54:3,6
deterrence 81:15
144:15 217:23
223:10
deterrent 144:15
deterrents 6:15
12:20 84:9
detour 6:22
193:8 201:3
develop 24:11
111:12 215:6,7
215:12
developed 32:15
111:22
developing
89:13,22
development
81:19 88:6
dialogue 83:18
84:20
diaz 1:4 4:15,19
4:22 11:14 26:9
66:23 91:1 92:4
93:6 94:6,17,18
97:8,10 103:18
175:8,13 176:8
188:16 209:25
213:9,13,21
dictates 103:11
difference
190:20 191:4
different 13:4,6
22:19 27:5
28:17 72:17
73:6 84:5 85:18
93:9,11 97:20

99:1 129:14
132:25 141:14
150:5 151:18
158:22 159:16
161:9 164:15,17
166:13 168:17
173:8,21 179:12
185:9,11 203:23
209:10 216:17
226:20
differentiate
179:25 181:25
differently 4:8
26:23 83:7
184:24
differs 93:5
difficult 226:9
227:9
dig 116:10
digital 15:24
dilemma 125:7
dimension
195:24
dimensions
184:5,17
diminution
154:21
direct 24:4
directed 45:5
directionally
149:8
directly 65:18
101:16
disadvantage
13:25
disagree 38:19
173:1 199:14

disagreed 48:25
discard 25:4
202:2
discarded 19:1
discern 119:17
121:20
discernible
162:1
discharge 165:4
discipline 17:23
disclose 149:20
158:17
disclosed 64:12
discovery 28:10
37:6,8,11 40:21
41:4,11 42:5,15
42:18,23 43:5,21
48:21 66:5 67:9
67:21 80:4 81:7
107:12,22
111:23 112:11
114:4,15 123:7
213:11,17 214:1
214:2
discuss 35:6
106:25 179:14
discussed 35:4
86:15 141:4
discussion 35:10
discussions
83:15 85:3 91:9
disease 221:6,7,9
disentangle
180:12
dispense 4:9
dispersed 10:9
displace 124:12

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[displacement - earlier]**

Page 16

**displacement**
218:15 219:19
**dispute** 49:10
113:23 114:1
188:24
**disregard**
201:16,20 203:1
203:18 204:3,25
205:11 206:6
207:2
**distance** 126:6
**distinction** 97:21
162:9 165:23
166:1,2 220:8
**distinguish**
162:5
**distortion**
170:11 212:15
**distribution**
69:23 70:1
**district** 1:1,2
186:9
**division** 1:3
**dnt** 186:9
**doctor** 79:17
**document** 18:17
22:21 23:7 31:1
31:15 83:17
84:21 85:2,5,17
107:14
**documentation**
37:3 39:2,9,16
39:21 46:23
47:10,21 48:4
87:5
**documents**
26:15 27:22
28:9,25 33:7

41:8,18,23,25
44:17 67:16
69:7 84:24
148:22 212:15
213:25 214:7
**doe** 25:8
**dogwood** 133:9
**doing** 10:22
15:22 16:8 23:2
45:17 48:10
49:11 61:11
79:14 85:17
106:11 115:23
116:7 119:16
128:15,16 129:9
130:14 131:23
131:24 133:18
133:18 135:25
136:1 137:13,15
142:16 145:17
151:25 153:12
159:17 160:19
165:2 166:21,22
173:2 185:2
187:13 188:21
188:22 195:25
200:12 212:14
218:19 221:8
**dollars** 83:22
87:1
**domain** 28:1,1
29:6 30:12
54:17 100:8,15
**domestic** 156:15
165:12,15,24
166:3,15
**dominant** 14:14

**door** 104:12
182:14 216:18
216:23
**doors** 44:1
**double** 154:18
**doubt** 160:15
**downgraded**
148:4,7,17
**download** 22:11
**dr** 4:6,24 5:6,11
7:14 25:9 45:13
45:15,20 55:12
55:23 63:12,22
79:21 81:23
95:7 124:24
135:2 138:14
140:7 145:5,9
167:12 186:3,5
190:2 198:20,25
199:12 217:19
221:15 227:14
**draft** 19:4 20:4
22:16 26:7
69:17
**draw** 162:9
**drawing** 57:22
**drill** 9:13 30:24
**drilling** 30:17
**drive** 52:3 53:8
111:15 141:23
142:10,11,11
173:5 222:24
**driving** 53:20
**dropping** 147:19
**drove** 126:17
**drug** 8:1,2 39:8
39:10 40:6,11
69:23 70:1,3,11

70:23 71:4,5,10
71:12,15,22 72:1
72:7,9,12,21
73:4,10,13 74:2
74:4,18 75:1,5
75:16,20,24 76:6
76:8,22 77:4,6
78:7,9,15,16,20
79:25 80:24
113:25 166:24
195:11 208:17
**drugs** 12:1 13:19
70:20 71:2 73:9
74:11,13 195:12
**drunk** 54:8
**dual** 10:20
**duke** 5:18
**duly** 4:3
**dumb** 217:18
**duration** 52:9
55:14 149:11
152:2 160:23
**duties** 81:13
122:2 144:23
**duty** 116:9
144:19

---

**e**

**e** 2:1,1 3:1 4:1,1
83:1 225:12,12
225:16,16
**e.m.f.** 1:5
**earlier** 14:25
19:5 72:5 88:1
92:12 100:5
101:17 113:24
130:2 161:22
166:22 193:18

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[earlier - essentially]                                                      Page 17

193:19 202:21
205:24 220:17
**early** 64:10
158:7
**earth** 141:25
**east** 2:4
**easy** 227:11
**eat** 145:5
**echoing** 71:3
**edification** 67:12
**editorialization**
79:10
**educate** 218:5,16
**educating** 84:9
221:8
**education** 90:15
**edwin** 1:4
**effect** 88:24,25
136:22 177:16
180:16,17
215:10 216:1
221:19 224:2
**effective** 134:8
141:9 222:2
223:7
**eight** 126:18,23
127:15,20
128:19 130:23
131:7 133:9
134:4 135:19,25
136:5,9 137:14
140:18,24
142:13 143:23
**either** 18:4 32:16
44:11 46:19
47:11 50:9
64:10 79:19
109:5 121:2

144:19 167:3
214:1 219:6
**elaboration**
189:19
**electronic** 19:2
33:15 142:2
**electronically**
15:24 142:7
**elr** 1:8
**elsa** 1:4
**email** 20:3,11,21
20:21 21:17,20
21:21 23:13
25:11,16 26:20
26:25 27:1,9
59:22 158:12
159:21 160:1,7
206:20
**emailed** 18:4
**emails** 20:16
21:25 22:3,5,6
24:25 25:8
41:14,18 42:1,25
47:24 48:19
63:21 113:17
159:1
**embedded** 7:23
67:13 183:21
184:15 213:25
**emergency**
89:25
**emerging** 152:14
**emphatically**
198:21
**empirical** 82:1
82:23
**empirically**
162:14 200:14

**employ** 86:22
**employee** 49:14
77:21
**employees**
108:23 109:21
**employment**
7:15,18 10:21
**enclosed** 127:24
130:4
**enclosures**
132:10 133:19
**encompassed**
89:20
**encourages**
17:16
**ended** 14:20
**endorse** 11:8,11
**enforcement**
7:15,23 8:1,14
49:15 77:23
148:3 151:11
218:9,25 219:23
220:20 224:3,7
225:22
**enforcing** 39:10
**engage** 83:22
**engagement**
17:1
**engagements**
85:7 87:21
**engaging** 89:2
**english** 5:15
98:24
**enhances** 17:16
**entire** 12:10
152:8 156:19
**entirely** 49:17
115:10 137:9

**entirety** 5:8
211:4
**entities** 81:16
85:25 106:11
**environmental**
89:25 101:7
112:2 183:6,11
183:14,24 184:9
**episode** 163:21
163:22 164:8,11
**episodic** 185:5
**equal** 181:19
**equivalent**
202:23
**equivocal**
177:14
**erik** 66:22
**errata** 24:20
25:11,20
**errors** 25:17,19
25:19
**escalate** 163:10
163:13,24
164:12,14 176:4
**escalated** 73:4
93:21 166:25
167:3
**escalation** 73:10
112:22
**especially** 85:10
110:11 216:23
**essentially** 5:9
49:16 54:19
89:18 101:20
102:2 126:3
143:3 144:16
147:11 149:4
151:2 218:12

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[establish - expires]**                                                    Page 18

| | | | |
|---|---|---|---|
| **establish** 113:14 | **evidence** 29:1 | 114:19 118:15 | **exist** 42:22 |
| 202:5 211:24 | 35:15,17,23 40:9 | 118:24 120:8 | 209:20 |
| **established** | 40:13,14,24 41:1 | 132:10 135:19 | **existed** 46:20 |
| 29:23 78:25 | 43:16 44:3,7 | 137:11 152:14 | 74:21 |
| 139:1 183:5 | 66:5,12 67:9 | 154:8 177:19 | **existence** 166:14 |
| **establishing** | 71:15 72:20,21 | 218:8 223:14 | **existing** 92:3 |
| 81:25 82:22 | 72:23 73:17 | 225:25 | **expand** 124:8 |
| 83:8 | 76:12 77:15 | **examples** 54:10 | 195:5 |
| **estimate** 9:7 | 78:3,23 79:1,19 | **excellent** 178:14 | **expect** 47:8 |
| 16:11 18:9 | 80:14,22 81:1 | **exchange** 200:24 | 105:3 133:10 |
| 69:14 92:25 | 94:24 95:21,25 | **exclude** 200:9 | 136:5 151:14 |
| **et** 170:2 | 96:6 111:1 | **exclusively** 4:21 | **expected** 103:2 |
| **etiology** 11:25 | 177:1,9 178:9,16 | 4:22 | **experience** 47:7 |
| **evaluate** 70:9 | 197:10 199:17 | **excuse** 46:3 60:9 | 69:25 94:7 |
| 92:7 99:23 | 201:15 202:1 | 65:25,25 107:5 | 133:16 148:2 |
| 122:13 123:9 | 208:25 210:7 | 176:25 194:9 | 182:16 |
| 125:9,22 129:5 | 211:1 214:19 | 201:12 224:17 | **experienced** |
| 137:16,19 | 215:11 | **exercise** 101:8 | 93:6 156:21 |
| 162:23 192:21 | **ex** 77:22 | 143:8 196:25 | 187:9 |
| 193:10 198:13 | **exactly** 29:24 | **exercises** 144:10 | **experimental** |
| **evaluated** 163:6 | 75:12 120:16 | **exhibit** 3:6,7,8,9 | 58:8 219:7 |
| **evaluating** 38:3 | 151:8,9 154:24 | 3:10 31:12,16 | **expert** 3:9 10:5,8 |
| 38:9,20 72:19 | 198:2 200:11 | 32:22,24 33:5,12 | 10:9,13,18 11:9 |
| 89:22 124:7 | 210:19 217:17 | 33:15 41:24 | 11:14 17:18 |
| 191:5,6 | 218:18 | 43:25 55:7,19,20 | 18:18,22 19:18 |
| **evaluation** | **examination** 3:3 | 56:1 60:17 | 25:23 38:17 |
| 136:23 | 4:4 | 63:14,17 108:9 | 63:13 73:25 |
| **evenings** 104:4 | **examine** 75:4 | 109:10,20 | 78:5 87:22 99:2 |
| **events** 49:24 | 120:20 | 145:10 186:6,12 | 116:20 141:5 |
| 176:8,12 | **examines** 99:12 | 201:2 217:20 | 181:18 186:15 |
| **everybody** 21:3 | **example** 30:11 | **exhibiting** 206:6 | 194:7 195:16 |
| 63:10 113:25 | 41:13 51:19 | **exhibits** 3:5 41:5 | 218:18 |
| 130:14 133:18 | 54:7 84:15 | 41:20 50:13 | **expert's** 67:11 |
| 133:18 222:18 | 86:18 91:20 | 67:13 109:3,25 | **expertise** 218:18 |
| **evicted** 40:2 | 95:21 101:11 | 110:1 111:4 | **experts** 10:2 |
| **evicting** 39:22 | 102:12 105:23 | 125:18 203:18 | 17:22 102:17 |
| **eviction** 39:20 | 106:25 107:2,4 | 207:2 | **expires** 229:18 |
| 40:1 | 112:5 113:15 | | 230:22 |

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[explain - filled]

Page 19

**explain** 56:17
57:24 68:13
92:10 93:10
125:13 132:1
165:14 201:18
207:23 218:24
219:17,21
222:18
**explanations**
219:17
**explanatory**
106:10
**explicit** 35:9
71:9
**explores** 13:5
**express** 65:13
**extend** 86:6
**extensive** 7:25
**extent** 19:6 20:6
50:8 73:4 75:20
84:12 86:16
88:22,23,24,25
91:20 93:20,21
95:17 100:16
111:23 112:6
113:20 119:6
121:1 123:13
126:10 141:8
144:18,23 148:8
151:10 152:13
159:24 167:2
221:6
**exterior** 142:12
**external** 120:14
137:3 181:7
**extra** 20:24
**eye** 148:20

**eyes** 52:17

**f**

**face** 31:15 48:17
213:1
**facets** 99:1
**facilities** 90:1
**facing** 98:3
**fact** 37:3 39:2
40:10 42:17
44:10 46:20
47:3 50:3 74:21
78:23 80:17
103:3 113:15
126:6 128:4
148:9 149:17
156:3 163:10
177:12,24 190:3
200:5 202:7
205:14 216:15
218:17 221:25
222:16
**factor** 49:6
113:12 167:6
225:2
**factored** 209:12
**facts** 16:23 66:5
77:15 187:3
215:18
**factual** 49:10
113:23 114:1
**faculty** 6:5 17:17
**failed** 205:3,15
208:1 209:15
210:5,22 211:22
213:4 214:14
215:6

**failing** 207:1
**failure** 201:13
203:2
**failures** 207:14
**fair** 4:11 33:20
70:13 82:14
89:14 94:3,4
96:25 121:25
130:21 163:4
165:19
**fairly** 7:6 85:7
85:22
**fairs** 7:3
**fake** 155:12
**fall** 11:24 30:12
**false** 146:18
**falsify** 113:11
**family** 4:15,17
66:17 91:1 92:5
93:6 94:6,18
97:8,10 175:8,14
182:11 209:25
213:9,21
**family's** 103:18
176:9 213:14
**far** 21:2 43:3
68:12 130:17
181:24
**fast** 81:18 87:10
87:16 127:10
**fbi** 169:11
**fear** 223:7
**featured** 14:20
**feb** 46:22
**february** 50:17
**federal** 56:21
79:14 150:23
189:17

**feel** 139:2 171:25
**feels** 139:10
**fell** 130:7,8
**felonies** 36:24
210:16
**felt** 185:21
**fence** 180:24,24
181:13
**fenced** 181:12
**fences** 128:13
130:4 133:11,20
178:3 220:3,14
**fencing** 84:11
113:4 135:1
177:2,10 221:20
222:11,22
**ferry** 2:4
**field** 7:25 8:3,10
12:18 56:10
68:6 72:3 99:17
112:4
**fields** 10:3 17:22
**figured** 175:21
**file** 5:8 16:25
19:1,13 25:4,5,7
41:6 43:22
45:23 47:1,5
65:15 67:22
77:21 107:18,19
108:24 109:2,8
110:2 111:7,10
125:19 146:6
211:18 212:24
213:8,9,14,21
223:25
**files** 167:14
**filled** 15:24

Bruce Jacobs                                                    August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

**[final - form]**                                                  Page 20

| | | | |
|---|---|---|---|
| **final** 19:24 21:8 | 183:10 198:22 | **followed** 29:9 | 199:9,9 |
| 21:18 22:14 | 201:22 214:1 | **following** 87:15 | **foreseeable** 91:1 |
| 26:24 159:8,13 | 223:7 | 87:19 88:2 | 93:7,12 162:24 |
| **finalized** 22:18 | **five** 7:8,10 62:10 | 189:17 194:11 | 190:22 191:7,13 |
| 66:25 | 63:9 125:14 | **follows** 4:3 | 191:25 201:14 |
| **finalizing** 67:8 | 137:21 138:6 | 230:11 | **foreseen** 166:4 |
| 67:18 | 141:14 194:2,19 | **fontaine** 44:9 | **forgery** 167:21 |
| **financially** | 209:14 | 46:6 49:14 | **form** 10:21 |
| 230:15 | **fix** 201:24 202:9 | 50:18 51:3 | 15:25 29:20 |
| **find** 69:25 | 203:25 | 77:22 176:14 | 35:19 37:20 |
| 130:12 226:15 | **fixed** 91:21 | **food** 81:18 87:10 | 40:25 42:3,8,19 |
| **finding** 136:12 | 102:12 106:1 | 87:16 127:10 | 43:11 45:1 |
| 146:19 | 118:23 119:7 | **foot** 128:13 | 46:13 47:13 |
| **findings** 47:12 | 127:23 148:14 | 130:4 | 49:25 50:6 |
| 82:18 112:14 | 172:25 190:17 | **footnote** 106:4 | 52:15 53:11,16 |
| 218:23 219:21 | 204:7 | 127:1 | 53:23 65:12 |
| **fine** 193:6 | **fixing** 202:1 | **forecast** 151:24 | 72:25 74:1,11 |
| 198:10 | **flag** 153:13 | 162:14,19 163:8 | 75:9 77:7,14 |
| **finish** 19:17 | **fliers** 52:1,7 | **foregoing** 230:5 | 80:21 81:4 84:4 |
| 54:12 153:1 | **flight** 61:11,12 | **forensic** 95:16 | 85:21 91:2 |
| 165:8 199:7 | 62:1,3 | 99:7,11,20 | 92:11 93:8 |
| **firearm** 165:4 | **flip** 168:8 | 165:24 166:1 | 94:10 97:1 |
| **fired** 172:7 | **flores** 1:4 | 178:14 | 99:22 103:20 |
| 202:11 204:15 | **focus** 12:16 | **forensically** | 114:24 115:17 |
| 208:6 | 13:14 16:9 35:9 | 156:2 | 122:18 123:2 |
| **firing** 204:21 | 91:10 123:18 | **foreseeability** | 125:12 132:2,15 |
| 217:15 | 177:18 223:24 | 6:13 56:25 | 132:20 134:3,10 |
| **firm** 2:3 230:22 | **focused** 11:21 | 90:11,16,18,19 | 134:20 138:18 |
| **first** 4:3 8:17 | 70:16,16 92:16 | 90:20 91:3,8 | 157:20 158:13 |
| 14:3,9 16:21 | 93:19 | 93:23 94:2 | 171:6 173:11 |
| 18:1 33:6,9 36:1 | **focuses** 12:19 | 121:14 122:4 | 175:9 176:13 |
| 65:19 68:3 | 69:22 71:23 | 137:13 149:21 | 181:4,16 184:13 |
| 70:19 71:10 | 91:5 96:11 | 150:3,5 151:19 | 185:23 189:4,11 |
| 94:25 107:12 | **focusing** 13:9 | 151:22 163:1 | 190:9 192:3,13 |
| 127:4 133:16,21 | **folder** 223:22 | 188:21,25 | 192:24 195:19 |
| 141:24 143:25 | **folks** 106:11 | 190:11 191:15 | 196:8 203:11 |
| 149:19 159:17 | **follow** 28:20 | 195:24 196:4 | 204:10 205:1 |
| 160:17 167:21 | 29:1,18 30:3 | 197:6 198:22 | 211:16 |

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[formal - give]                                                                   Page 21

**formal** 7:14,16
7:17 10:15,19
73:16 84:21
85:2,16 114:22
115:3,5,7,8,12
115:15 116:1
117:2,9 202:22
**formally** 183:22
**format** 84:8,8
**former** 33:19
49:14 57:1 58:6
58:7,8,9 77:21
**forming** 55:24
59:6,15 60:6,11
71:17 72:20
105:12 175:5,11
175:25
**forms** 47:16 70:2
73:10 111:1
180:7
**fort** 230:24
**forth** 1:25 6:15
48:1,1 52:1 69:9
76:10 90:1
101:23
**fortune** 87:10
**forum** 200:24
**found** 101:17
135:18 136:9,18
195:7
**foundational**
221:16
**four** 9:16,21
16:10 30:14,18
62:17 79:13
84:23 125:14
136:6 137:21
141:14 143:13

159:4 209:13
227:5
**fourth** 43:20
103:1
**fraction** 15:12
61:22
**frame** 99:5
117:3 152:2
**framework**
82:10
**frankly** 86:4
109:9 141:16
**free** 21:4 39:8,11
71:4 205:7,24
206:4 210:25
**frequency**
152:12 153:4
**frequent** 119:7
**fresh** 161:22
**front** 8:14 26:1,5
38:14 63:15
**full** 9:22,25
137:13
**fully** 127:24
**function** 52:12
149:11
**functional** 6:14
112:25 115:13
217:23 218:5
**functionally**
202:23
**fundamentally**
66:19 67:2
**funding** 10:7
**funneling** 10:14
**further** 38:22
126:21 230:13

**future** 163:14
199:3

**g**

**g** 4:1 104:5
**gaa** 39:19,25
**gang** 8:3
**gap** 64:21
**gas** 127:9
**gate** 143:14,14
143:15 180:24
180:25 201:23
202:1,8,12,14
203:3,16,17,20
203:24 204:1,4,7
217:17
**gated** 177:20,25
178:10 181:12
181:13 204:12
**gatehouse**
127:23 135:20
**gatehouses**
128:13 130:3
132:10 133:11
133:19 135:6
**gates** 127:22
132:10 133:11
134:25 135:6
178:3 218:9
220:14 222:23
**gating** 84:11
113:4 134:12
141:5 177:2,9
220:3 222:11
**general** 29:14
30:22 37:15
45:3 70:24
87:24 88:2

90:19 101:1
106:7 177:3,4
180:11 190:25
**generalist** 36:11
**generally** 98:9
166:16,17
215:16,19,23
216:2,3 217:11
224:4
**generate** 32:12
209:15
**generated** 31:24
32:9 34:23
108:22 109:17
**generating** 124:4
**genuine** 226:7
**genuinely** 197:5
**geographic**
126:12 150:17
219:1,12 226:21
**geographically**
150:13
**georgia** 1:2 2:5
2:10 39:12
116:10,19,21
**getting** 141:16
147:20 184:14
196:19,20 198:2
208:20 214:17
**gist** 46:14,15
89:11 221:22
**give** 13:2 15:12
22:23 32:17
38:1 42:15
64:20 83:23
84:16 86:20
118:24 137:8
139:4,16,17

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[give - handout]

Page 22

170:3 181:10
186:3 188:25
190:11,13 196:4
198:14 212:17
**given** 42:17 53:9
71:22 96:3
105:22 128:23
185:15,16,19
214:9 230:9,16
**gives** 153:23
**giving** 15:11
86:23 98:13
100:20 149:21
150:3 198:21
201:7
**global** 186:9
**gmail** 20:23,25
21:4,7 26:14
27:8
**go** 18:21 19:20
20:15 21:6,16
22:13 23:14
24:6,25 25:11
26:4,5,14 27:1,8
28:15 30:5,21
31:10 32:21
35:20 41:2
42:11 63:2
69:19 73:19
77:16 86:9
92:21 95:7
106:13 138:4,17
147:2,22 148:2
158:11,14,22
159:7 181:24
182:23 184:5
187:20 201:1,18
203:21 207:20

207:20 213:20
214:5 217:20
**goes** 20:19 21:20
195:14 222:19
**going** 8:11 16:3
17:7 23:23 24:4
25:22 31:11,11
32:6,21 33:14
40:4,17 61:16
63:12 68:11
69:14 70:18
72:8 73:7 80:3
90:3 93:23
94:25 116:18
118:4 135:17
136:16 139:9
140:10 141:15
145:12 152:22
158:17,22
167:19,22 181:2
182:23 186:5
189:3 193:24
197:11,20
199:10 205:17
207:15 214:4
216:9,11 217:20
227:17
**gold** 219:3
**good** 4:6 38:25
61:17 63:19
116:15 134:8
161:21,22
174:15 180:23
200:24 206:9
220:14 223:6
226:14
**google** 20:24
21:3 141:25

**gotten** 85:24
205:23 210:14
**govern** 10:4
**grab** 33:1
**graduate** 12:4
**grant** 204:20
**great** 31:18
130:20 223:15
226:3
**grocery** 14:8,13
**groff** 225:7,10
225:18
**gross** 201:15
**ground** 4:9
46:16 62:14
202:5 211:10
**grounds** 39:25
79:14,15 189:19
202:18
**group** 13:22
88:13 219:7,8
226:2
**guard** 7:19
81:13 83:3
88:15,16,16,18
92:17 103:11,17
104:3,12 117:21
117:24,25 118:7
118:8,12,18
119:1 135:1
155:3 172:11
179:6,12 180:15
**guards** 84:12
86:3 128:12
130:3,21 133:11
144:2 220:1,2,13
221:19 222:22
223:24 224:1

**guess** 4:13 6:16
11:1 16:4 17:20
32:3 54:24 61:1
83:6 116:5,10
142:13 172:7
175:21 177:22
182:20 184:11
192:4 194:1
215:4
**guessing** 16:3
**guests** 137:4
**guide** 32:13
**guideline** 36:25
56:11,12,21
**guidelines** 37:7
37:10,14,16,18
37:22 38:2,8,11
38:14,18 101:5
105:20,21
**gun** 8:3 102:5,10
146:10,15,20,25
147:9 194:12
195:11,12
**guy** 175:21
182:10
**guys** 40:15

**h**

**h** 14:7
**h.m.f.** 1:6
**hair** 212:6
**half** 60:23 62:2,4
193:18,19
226:22
**hand** 55:3
230:16
**handout** 23:6

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[handwritten - hundred]**                                                                 Page 23

**handwritten** 3:7
24:15 32:12,15
32:22 34:20
55:22
**handytrac**
114:19
**hang** 199:25
**happen** 13:24
93:13,23 96:5,14
128:25 216:9
218:11,13,21
223:11
**happened** 48:25
51:18 92:4 94:7
97:9 217:17
**happens** 142:5
218:10
**harassing** 42:20
43:12
**harbison** 2:9
**hard** 31:17
226:9,13,14
**harder** 227:12
**hardest** 63:7
**harm** 95:11,14
95:15 96:1,8,11
96:17 201:14
**harris** 48:1
176:15 186:9
**harvest** 133:7
**hazards** 46:18
**head** 172:9
199:13
**health** 56:18
89:25
**hear** 17:21 29:11
90:9 92:2 189:1
198:20 199:1,12

199:13 200:2
**heard** 149:23
190:2 201:3
**hearing** 75:3
76:17 96:21
165:15
**help** 22:24
120:18 138:12
149:13 214:17
218:7,23 223:2
**helpful** 5:16
**helps** 188:15
218:20
**hereinafter** 1:25
**hey** 8:23
**hickey** 44:9
46:11 49:16
51:2 77:22
147:15,21 148:2
148:7 149:4,8
153:12 155:2,6
155:12 173:2
176:16 185:2
204:21 211:4,9
211:14
**hickey's** 51:24
52:3 53:7 148:5
148:25 156:5
185:8
**hide** 212:6
**hierarchy** 70:4
**high** 6:23 13:25
54:7
**higher** 46:19
224:7,11 225:8
**highest** 202:6
**highly** 58:5

**hipaa** 160:15,16
**hire** 84:14 148:2
**hired** 85:15
154:10,13
**hiring** 147:20,21
204:21
**historical** 150:1
**history** 5:19
**hit** 165:4
**hitting** 175:18
175:20 176:23
**hold** 9:22 67:25
104:9 193:23
199:6,10 203:22
**holding** 68:14
**holt** 44:9 46:11
49:4,10,17 50:24
77:20 113:24
147:3,16,21,22
147:22 148:1
150:19 154:10
155:5,9 211:4,8
211:14
**holt's** 146:16
151:1 211:21
**home** 182:7
222:14
**hometown** 5:21
**homicide** 14:6
87:16
**honor** 13:10
**hope** 86:7 89:6
**horrible** 209:7
**hospital** 172:8
**hot** 8:15 88:20
88:21 101:11,13
101:15 102:7,17
104:4 112:19

120:5,6 150:4,6
150:10 151:7,13
151:20 152:2,6
154:20 157:2
160:20,23
161:13,15
162:24 165:3,18
165:20 166:23
167:7,19 169:18
170:14 172:5
190:16 218:25
219:5,5 220:20
224:6 226:17,20
**hotel** 57:18
81:17 83:21
86:25
**hour** 34:5 62:2,4
**hourly** 206:22
**hours** 48:9 60:24
60:25 61:3
62:10,17 69:14
96:10 209:14
216:19 230:11
**house** 62:4 135:1
**housing** 123:19
129:20
**houston** 188:4
205:5 210:24
**hpd** 211:23
**hud** 37:7,10,14
37:15,18,22 38:2
38:8,18 46:22,24
47:3,9,11 50:15
212:11
**hugh** 66:15,22
**huh** 107:8
**hundred** 57:8

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**hundreds** 6:9,11
41:14
**hypothetical**
78:4 137:2

**i**

**iapsc** 104:23
105:9
**idea** 15:21
174:12,16
200:17
**identical** 180:20
**identification**
82:9
**identified** 3:5
131:14,18 132:5
137:17 142:1
186:7
**identify** 91:17
128:9
**identifying** 8:15
46:17 214:17
**ignored** 71:23
**ignores** 200:5
**ignoring** 194:23
202:14
**ii** 169:10
**illegal** 69:23
70:1 71:9 76:6
77:4,6 78:7,9,15
**immediately**
34:16 153:19
**imminence**
95:10,13,15 96:1
96:8,11,17
**impact** 58:12
**implement** 86:17
208:2,2

**implemented**
88:22
**implementing**
89:13,22
**implications**
79:18
**implying** 43:14
196:11 197:12
**important** 42:24
53:1,9 124:18
133:13 226:8
**impose** 10:11
**imposed** 122:11
122:12
**imposing** 17:23
**improved** 215:9
**imprudence**
218:14 219:18
**inappropriate**
140:6
**inbox** 20:19
21:21 24:25
**incident** 3:8 35:3
40:3 59:4,9
90:23 91:13
94:14 95:18,20
96:2,12,20 100:3
101:12 102:3,6
103:13 108:22
109:2,8,14,17
110:6,10 119:4
119:21 144:20
145:21,23,23
146:7 147:3,7
151:23 153:6
154:12,12
161:15 168:6
170:13,16,24

171:1,7,10,14,16
171:21 176:6
181:23 191:17
194:15 202:13
203:21 208:12
**incidentally**
67:19 209:19
**incidents** 73:8
119:7,18,22,23
120:1,3 143:4
144:25 166:5,5
193:12
**include** 73:24
81:17 135:3
165:10 213:21
214:17
**included** 61:11
**includes** 40:19
214:2 222:21
**including** 46:11
77:21 101:18
188:5 194:4
**income** 15:13
129:20
**inconclusive**
179:18 180:17
**incorporate**
56:18
**incorrect** 190:10
**increase** 156:6
156:14
**increases** 156:16
156:18
**increasing** 185:6
**independent**
13:7
**independently**
129:23

**indicated** 140:2
140:3 230:7
**indicates** 163:15
**indicators**
207:13
**indicia** 127:23
130:20 132:11
143:23 144:6,8
**indifference**
201:15,20
207:17,23
**indifferent**
207:11
**individual**
207:10
**individuals**
81:12 83:16,18
169:11
**induction** 28:3
29:7 54:22
100:6 111:18,19
112:9,17,20,23
113:2,5,7
**inductive** 29:13
**industry** 103:3
105:5,6 107:3
223:4
**inflammatory**
77:19 80:15
**influence** 78:9
192:11
**inform** 88:17
128:9
**informal** 85:23
215:9
**information**
43:8 111:1
120:8 133:23

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[information - isolated]                                                                 Page 25

143:18,25
171:13 192:8,19
192:21 209:22
211:20 222:1,3
222:16
**informed** 107:10
126:1 201:5
212:11
**informs** 128:16
**inhibiting** 141:9
**injury** 120:3
165:5 169:9,15
170:2,17 172:7
**inoperative**
204:23
**inquiry** 91:15,16
93:9,11,16 100:4
122:8,22,24,25
124:8,22 125:5,6
128:21 129:15
130:6,15 132:25
136:3 141:12
142:20 161:2
163:1 191:9
**inside** 82:17
208:8 216:20
**insofar** 219:25
**inspect** 116:11
**inspected** 46:8
62:20
**inspection** 33:8
34:2 44:18,25
45:22 46:13
62:22 65:16
108:17 114:5,15
143:13
**inspections** 44:2
44:10,16,19 46:4

46:22,24 47:3,9
47:19,22 50:16
**inspectors** 47:11
**instance** 1:21
8:17 154:3
**instances** 35:7
76:5,5 118:21
166:14
**institutions**
104:21
**instruct** 139:9
139:19 205:18
**instructed**
142:10
**instruction**
139:17,18
205:22
**insult** 197:1
**insults** 196:24
**intelligence**
222:4,6
**intend** 192:6
218:2
**intensely** 219:1
**intensive** 117:24
**interaction**
68:13
**interactions**
84:20 89:6
**interdiction** 8:3
8:3
**interest** 10:23
**interested** 116:6
230:15
**interesting** 13:12
17:13
**interface** 117:25

**interfaced**
117:17
**interior** 120:9
**intermittent**
185:5
**internal** 108:22
111:6 120:13
137:2 176:18
181:7 209:16
**internally** 4:16
109:17 110:13
**internet** 142:2
**interpret** 33:17
219:24
**interpretation**
70:13
**interrogations**
8:4
**interrogatories**
39:6,7
**interrogatory**
44:21 111:4
114:25
**interview** 33:8
33:18,23 34:4,6
34:17,18,24
35:23 40:13
50:5 108:18
114:5,12,14
**interviewed**
62:21
**interviewing**
117:11 123:13
**interviews** 12:18
**intimately** 166:6
**intrigued** 6:18
7:13

**intrinsic** 166:7
**invasion** 182:8
222:14
**invent** 118:19
**invented** 29:22
**investigate**
121:7
**investigating**
143:5 144:25
**investigation**
128:18
**invisible** 223:10
**invitees** 201:17
**invoice** 60:22,24
61:7
**invoices** 10:14
60:18,20 61:2,6
**involve** 119:22
165:11,12 166:5
166:5
**involved** 49:3
50:3 70:5 72:12
74:11 75:20
76:8 77:3 78:7
85:5 89:13
102:19 119:23
177:3
**involvement**
16:17 77:5 78:8
101:23 120:2
**involves** 119:4
170:1
**involving** 169:8
187:8
**irrelevant** 171:1
**ish** 193:19
**isolated** 176:17

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[issue - know]

Page 26

**issue** 66:6 74:2,3
76:25 91:11
97:3,12 101:9,10
105:20 106:23
113:12,15,21
135:15 142:15
174:16 216:13
**issued** 159:25
**issues** 6:12 27:14
46:9 52:18
81:13 89:19
106:12 107:1
152:13 224:9
**item** 32:2 33:6
207:17
**items** 20:15 21:7
21:17 27:1,8
158:11

**j**

**jacobs** 1:15 3:2
3:10 4:2,6,24
5:6,11 7:14 25:9
45:13,15,20
55:12,23 63:12
63:22 66:15,22
79:21 81:23
95:7 124:24
135:2 138:14
140:7 145:5,9
167:12 186:3,5,8
186:17 190:2
198:20,25
199:12 217:19
221:15 227:14
228:2 229:12
230:5

**january** 193:17
**jeff** 189:25
196:22 214:6
**jeffrey** 2:8
**jeopardize**
158:18
**jmelcher** 2:11
**job** 9:19 45:17
63:7 85:13
**john** 25:8
**journal** 12:6,8
58:4
**judging** 131:15
**judicial** 17:19
**julie** 32:7
**july** 53:7 56:3,3
64:13,16 91:23
94:8,22 96:24
97:7 104:4
143:18 146:4
147:23 149:1,9
152:23 153:19
154:15,22,22
155:22 172:22
173:4,10,25
174:8,14,19
175:1 184:25
185:14,22 192:8
192:10,12,19,20
192:23
**jump** 159:22
**june** 3:9 53:7
60:24 61:1,22
63:13 64:11,15
64:17,22,24 65:4
65:13 66:11,22
67:8,19 148:12
149:1,9

**jurisdiction**
206:2
**juror** 78:3
133:17,21
**jurors** 219:10
**jury** 114:1 192:6
192:17 217:25
218:2 221:3
**jury's** 49:18
**justice** 7:2 58:10
104:24 165:23
**justification**
190:17
**justified** 100:2
101:13,25
105:23,24
118:15,22 119:7
119:13 152:16
153:20 161:9
173:20 174:16
175:3,6 191:11
191:13 200:14
**justifies** 215:20
**justify** 92:19
118:18 119:1
120:17 121:16
152:17 193:4

**k**

**k** 2:3 14:7
**kathryn** 186:8
**keep** 18:25 19:2
19:12,14 20:4
22:2,4 23:11,13
23:19,21 24:2,3
24:10 25:15
97:16 148:9
160:3 202:18

203:8
**kenneth** 49:15
**kept** 148:10
**kick** 208:16
**kicking** 208:19
**kind** 7:1 10:12
11:16 14:9,23
23:7,8 28:19
29:21 37:21
54:4,5,6 61:12
70:1 76:8 83:25
85:20 86:20
88:14,16,18
96:15,18 98:5
115:19 118:17
124:1,3,14 144:8
155:20 156:7
163:10 164:2,5
166:21 169:24
176:5 183:23
200:9 206:24
215:16 217:22
**kinds** 36:7,14
154:2 156:9,14
160:21,21
161:11,12
172:14 192:11
192:22 194:24
**knew** 95:18
**know** 6:6 7:2
8:10 10:22,22
11:13,15,16
14:12,15 16:10
16:15 17:10
19:5 20:6 21:2
23:7 24:9 26:20
30:9 32:3 33:1
42:22,23 43:14

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[know - life]**

Page 27

45:4,18,18 46:9
47:3 49:8 51:16
52:9 54:1 55:12
55:23 59:21,25
62:1,2,4,11,24
65:5 70:15
73:20 74:5
75:23 79:19
80:9 81:6 83:1
84:15,23 85:12
85:16,25 86:7
88:4,15 92:8,16
92:17 95:24
96:19 98:2,17
101:10,24 102:1
103:24 105:24
114:19 117:9
118:20,21
119:11 120:8,15
123:14 128:11
128:13,24,24
129:7 131:25
132:3,17 133:14
134:8 135:16
137:7,23,25
138:14 140:7,9
140:15,17,20
141:1 143:15,17
143:18,19,20
144:22 145:23
155:15,16
158:15 159:7,25
160:13,16
164:22 166:6,15
166:19 167:16
167:22 168:1
170:22 171:14
171:19 174:11

178:8 182:2,20
184:4,22 185:24
187:20 189:11
191:22 196:16
197:4 198:3
199:16,22
200:19 206:12
206:15 207:16
208:14 209:13
211:10 212:4,5
212:12,12
213:19 214:3,8
215:17 216:12
217:2 221:5
222:12,13 223:2
223:17 226:6,7
226:19
**knowing** 125:10
131:12
**knowledge** 37:15
109:15 218:17
**known** 95:19
114:20 137:6
210:12
**knows** 166:9
169:11 172:3
214:6

**l**

**l** 1:22 6:19 33:10
180:17,17
225:12,16 230:3
230:21
**label** 27:19
197:5,8
**labeled** 150:25
**lack** 211:20
219:21

**lacks** 169:25
**lady** 216:20
**landlord** 96:3
166:8
**landowner**
207:3
**language** 66:4
67:23 98:24
216:25
**laptop** 31:3,4
145:6
**larceny** 162:7
**large** 57:17
**largely** 89:16
**late** 6:23 64:8,10
**latoya** 49:24
95:22
**law** 7:15,23 8:1
8:14 49:15
77:23 116:19,21
148:3 151:11
201:5,11 218:9
218:24 219:23
220:19 224:3,7
225:22
**lawrence** 57:5
57:19
**lawsuit** 131:9
**lawyer** 25:8,12
**lawyers** 21:9
42:15 43:10
61:15 79:1
122:25 160:7
199:16,18
**laying** 79:15
**lead** 37:23
163:20

**leading** 14:12
94:14 102:3
153:6
**lease** 39:8,11,13
39:19,25,25 71:4
212:18
**leases** 212:19
**leasing** 34:7
44:11 104:7
142:24 208:7,9
208:11
**leaving** 194:23
**lecture** 23:10,18
24:7,12,13
**lectures** 23:17
24:16
**led** 72:12 75:24
118:11 200:24
**left** 202:3 221:16
**legal** 14:21 68:12
86:14 87:18
90:15 99:8
116:9 201:8
230:23
**legible** 34:22
**lengthy** 189:18
**lens** 195:5
**lenz** 66:17,23
**level** 12:1,2,3,4
17:16 70:4
92:22 115:12
155:21 226:6,7
226:25
**levels** 180:4
215:9
**liability** 187:7
**life** 99:1

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[lifeblood - look]**

Page 28

**lifeblood** 215:22
  216:22 217:8
**light** 130:14
  143:10
**lighting** 37:24
  44:1,2,4,10 83:3
  84:10 86:3
  88:24 112:5
  113:7 134:15
  141:6 179:15,16
  179:22,25 180:2
  180:4,13,23
  218:8 220:3,14
  220:18 221:19
  222:10,22
**lights** 44:12
  181:19
**likelihood** 94:6
**limit** 84:23 189:8
  189:10
**limitations**
  122:10 134:12
  226:16
**limited** 21:10
  45:7,8 159:3
  177:21 188:7
**limits** 6:14 84:10
  84:10,11,11
  112:25 134:14
  141:5 217:23
  218:5,7
**line** 45:19 65:19
  103:1 112:7
  196:20,21 228:3
**lines** 74:15 110:2
  210:20
**link** 57:9 99:14
  184:17 225:11

**linked** 54:21
  73:22 75:7
  76:15 167:3
**lion's** 13:24
**list** 25:25 36:9,9
  38:22 40:18
  50:11 66:21
  114:10 158:3
  183:2 213:13,20
  217:21 218:4
  223:21
**listed** 94:12
  101:2 107:17
  115:9 142:2,7
  158:5 183:16
  184:17 202:23
  207:23 213:22
**listening** 189:23
**lit** 181:12
**literally** 95:14
**literature** 54:23
  58:11 98:11
  99:11,13,16,20
  112:8,24 123:25
  124:3,5 140:13
  141:7 164:19
  177:12,13,13,15
  177:16 178:24
  179:2 220:6,12
  221:19 223:21
**literatures** 112:4
**litigated** 119:3
  119:20
**litigation** 9:4,10
  9:12,13 10:13
  14:1,4,16 15:2,7
  15:13,22 16:6,12
  17:12 24:19

27:17 28:21
  29:19 38:17
  47:8 67:17
  68:25 82:13,19
  86:5 87:19,22
  99:2 105:13
  107:14 116:24
  118:7 121:4
  124:15
**little** 5:1,12,15
  6:22 11:4 12:22
  14:2 17:8 27:15
  30:25 40:4,17
  61:2 83:7 85:18
  90:4 126:20
  141:17 148:20
  149:13 166:9
  170:3 188:14
**live** 127:19
**lived** 127:15,19
  128:22,22 133:6
  133:9 136:4,4
**living** 8:24,25
  127:14 185:21
  211:24
**llc** 2:3 186:9
**local** 14:13
**location** 31:3
  119:11 120:7
  150:17 166:16
  194:24 219:12
**locked** 216:21,24
**log** 27:7
**logic** 171:9
  203:13
**logical** 56:12
  133:24

**loitering** 156:9
**long** 7:12 16:9
  20:17,22 21:14
  34:4 52:8 54:1
  58:23 62:8,13
  69:4 79:13
  166:11 172:16
  172:16 173:5
  192:14 199:22
  219:2
**longer** 21:22
  154:19
**longtime** 47:7
**look** 25:16 31:4
  36:17,18 38:22
  46:21 56:12,13
  57:13 61:21,21
  70:23 71:7 75:4
  76:21 81:10
  89:8 95:8 98:5
  107:5 109:7
  118:25 119:3,4
  120:8,21 121:10
  121:21,22
  122:16 124:8
  126:22 130:5
  138:17 150:8
  153:4 158:12
  159:21 160:1,9
  161:4,17 163:2,9
  170:24 171:7
  176:24 182:22
  186:21 187:16
  187:17 188:2
  190:5 195:5
  213:8 215:21
  220:21 221:18
  222:24 223:20

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[look - mean]**

Page 29

224:15 225:9
226:19
**looked** 59:17
91:14,19 102:9
126:18 130:10
130:11,17
147:15 152:8,10
153:2,17 161:2
161:19 167:1
176:5 177:11
188:3 193:11,16
193:25 194:1
195:16 213:17
**looking** 35:11
50:11 54:24
58:14 59:1,10
69:21 113:19
118:5,20 119:8
119:10,17,18,21
119:22 120:1,3,7
120:12,18,23
121:15 127:8,9,9
127:10 141:19
144:9,17,18
145:17,25
152:11 157:15
157:16,19
161:14 172:6
176:24 178:7
181:22 187:18
**looks** 32:14
45:21 60:22
137:25 158:4
168:7 213:14
**loosely** 7:1
**lorenza** 169:4
**lost** 192:15

**lot** 6:8 12:11,13
14:7,8,22 70:7
73:13 86:4
99:13 168:1
199:8 223:9,17
**lots** 164:21,23
223:1
**louis** 6:2,20,21
14:5,8,13
**low** 129:20
206:22
**lunch** 145:5
**lurking** 95:22

**m**

**m** 6:19
**magazines** 14:21
**maggie** 77:21
**mailbox** 182:12
**main** 17:20
124:13
**maintenance**
183:18 184:4
202:6
**majored** 5:19
**making** 12:19
79:12 80:13,15
139:13 195:2,3
**male** 169:3
**mall** 224:11
**malpractice**
17:25
**management**
22:21 44:16,25
45:22 46:4
47:20 77:5 78:7
78:8 81:19
86:13 87:18

88:6 90:1 210:4
210:18
**manager** 33:9,19
77:2 88:11
108:19 114:6
205:5,9,10 209:7
210:2,12
**manages** 110:5
**mangled** 24:3
**manned** 135:6
135:20
**manner** 98:5
**manor** 133:6
**manual** 202:18
**maps** 210:15
**march** 33:18
60:23 61:7
148:5,10
**marching**
198:14
**mark** 31:12
32:21 55:7
63:12 186:5
213:7
**marked** 31:16
32:24 56:1
63:17 108:8
109:20 186:12
**markings** 158:7
**martin** 133:6
**masked** 182:10
**master's** 5:19
**material** 23:18
24:12,13 28:10
32:11 47:6
65:15 66:5 67:9
67:21 68:17,20
108:4 111:23

113:2 114:4,16
125:19 128:17
**materials** 23:3
40:19 43:15
45:24 67:15
68:7 107:10
111:7,10 112:11
158:9 184:15
188:3
**matter** 17:19
26:1,5 27:17
28:22 29:19
35:14 41:4 45:2
45:5,8,21 65:21
66:13 68:25
76:3 77:1 114:4
118:8 131:6
134:17 135:8
156:3 202:16
210:7
**mattered** 203:16
**matters** 9:5 16:6
16:13 24:18
172:10 226:3
**mean** 8:8 11:11
11:11 13:2,17
15:18 19:9 23:5
28:23 29:10,21
30:8 33:18
35:22,22 36:12
37:22 40:14,14
41:10 50:4,10,12
51:23 54:16
56:3 59:25 60:2
61:10,14 62:20
66:2 68:3 69:7
77:18 81:6 85:9
85:10 93:2 96:7

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[mean - methodology]**

Page 30

96:18 97:19,25
98:24,25 99:17
102:23 103:6
104:13,17,25
105:6 106:8
108:7 109:1,4
116:5 117:6,9,9
119:19 122:24
128:14 135:20
136:12 138:6,21
142:24 152:4,25
154:7 158:15
159:23 161:2,23
162:20 165:21
167:18 168:10
177:5 178:25
179:11 182:16
183:9 184:21,22
193:1 208:4
216:6 219:24
222:23 223:15
**meaning**   179:15
**meaningful**
   215:10
**meaningless**
   204:1
**means**   33:24
   68:10,22 98:2
   104:20 196:10
   207:11 224:24
   225:3,25
**meant**   179:17
**measure**   51:14
   52:21,23,25 53:2
   53:9 54:4,6 92:2
   92:23 105:16
   179:15,18
   180:14 199:4

215:17 219:25
223:11 225:1
227:9,11,12
**measures**   6:14
   35:2,5,16 36:7
   44:5 59:3,8 86:2
   86:21 89:1 91:6
   91:12,12 92:3,7
   92:24 93:17,24
   94:12 98:8,8
   100:2,12,18,25
   101:1 106:6
   121:17 122:6
   124:11,25,25
   125:9 127:17,18
   128:2,2,10
   129:11,12 131:3
   135:4 136:6
   138:15 141:8
   142:15 153:7
   154:23 161:9
   171:11 175:6,12
   183:2,4,13,23
   184:2,10,11
   192:11,22 199:4
   200:18 201:14
   218:22 221:3
   223:15
**measuring**
   226:12
**medrano**   1:4
**meet**   8:22 149:5
   172:17
**meeting**   86:24
   87:4,17
**meetings**   89:18
   90:2 205:6,17,20
   205:21

**melcher**   2:8 18:2
18:6 29:20 30:4
32:17 34:15
35:18 37:20
40:25 42:3,8,19
43:3,11,19 45:1
45:6,11,14,16
49:25 50:6
52:15 53:11,16
53:23 60:21
63:25 64:3,9
65:20 68:11
69:9 72:25
73:18 74:1 75:9
77:7,11,14 78:11
78:18,22 79:2,4
79:6,12,18 80:3
80:21 81:4 84:4
91:2,9 92:11
93:8 94:10 97:1
103:20 114:24
115:17 116:3
122:18 123:2
125:12 132:2,15
132:20 134:3,10
134:20 135:11
138:2,20,23
139:6,9,14,19,22
140:2 142:4
157:6,20 158:13
158:25 171:6
173:11 174:1,9
175:9,15 176:13
181:3,16 184:13
185:23 189:4,8
189:16,22 190:1
190:9 192:3,13
192:24 195:19

196:8,12,14,19
196:23 197:2,8
197:16,19,25
198:4,7,12,19
199:25 203:11
204:10 205:1
209:3 211:16
212:8 213:3,5
214:10 221:11
227:17
**melcher's**   109:5
**member**   6:5 8:3
   34:16
**members**   17:18
   66:18
**memberships**
   12:5,7
**memory**   36:13
**men**   195:11
**mentioned**   94:15
   109:25 144:21
   147:5 161:3
**merely**   218:16
**messages**   41:14
   41:18 42:1,25
   109:21
**met**   10:2 86:13
   86:14
**meta**   72:17
**method**   28:17
   110:23
**methodology**
   27:14,16,20,22
   28:21 29:23
   30:7 54:18
   59:12 65:10,11
   68:6 82:3,17,18
   101:18 102:15

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[methodology - need]

Page 31

102:16
**methods** 27:24
28:3,8,17 29:14
57:18 100:5
171:4,17
**metric** 128:5
**mgr** 33:10
**michelle** 1:22
5:2 6:19 32:25
55:10 230:3,21
**midst** 185:15
**migrating** 121:2
124:21
**mile** 126:19,24
127:20 130:24
188:4,20 190:7
194:14 195:6,7
**mind** 76:20
184:11 190:20
191:4
**mine** 49:19
215:5
**minimal** 178:15
**minimis** 206:24
**minor** 1:5 85:7
85:10 172:5
219:9 221:1
**minute** 63:9
70:19 71:25
94:15 98:13
122:10 186:3
193:23
**minutes** 26:23
27:2 34:5
134:23 184:18
190:10 206:21
230:11

**mischaracterizes**
81:5
**misleading**
209:21
**missing** 178:16
**missouri** 6:2,21
**misspeak** 141:17
**mlk** 133:8
**moderate** 221:1
**modest** 219:9,16
**moment** 164:7,9
**moments** 96:9
96:19
**money** 15:21
174:7 178:3,4
182:15 204:22
222:19 223:2
**monitor** 203:2
**monitored** 179:9
**month** 12:11
21:24 146:9,12
148:11 150:2
219:2
**months** 9:24
10:1 15:3 96:23
102:3,5 147:11
151:3 153:18
156:23 188:6
191:17 193:4
194:2,2,14
210:17
**morning** 4:6 5:7
149:24
**motion** 200:9
**motive** 101:22
**motor** 13:20
162:7,18,23
164:3

**mouth** 208:15
**move** 148:1
217:18
**moved** 6:3
176:20
**moving** 12:21
13:1 103:18
117:16,23
**multi** 89:9,15
**multifamily**
126:23 132:7
**multiple** 6:6
12:5 48:2 50:20
62:23 113:13
207:13
**munroe** 1:22
230:3,21
**murder** 13:20
119:24 154:8
157:1 170:19,22
171:16 172:7,13
187:10,22,24
188:6,18 193:15
**murders** 136:20
172:15
**mutual** 148:20

**n**

**n** 2:1 3:1 4:1
14:7 104:25
180:17
**n.e.** 2:9
**name** 4:6 57:3
107:18 157:11
157:12 224:15
**named** 1:20
**names** 110:2
126:25 224:16

**narrative** 168:9
**narratives** 51:16
**narrow** 37:25
101:9 125:3
**national** 103:10
**natural** 146:13
183:19 184:3
226:15
**nature** 26:8 38:6
76:7 93:16
105:20 123:4
125:5 136:15
142:13,19 161:1
162:25 224:23
**near** 35:3 59:3
95:17 96:2,19
101:11 103:12
124:17 125:23
172:1
**nearby** 120:22
121:5,7,23
122:17 124:9,13
214:15,20
**nearly** 193:16
194:1
**necessarily** 73:8
145:19 148:6
164:20 167:15
167:25 213:16
**necessary** 91:22
153:24
**need** 19:15 24:20
41:6 50:19 55:9
55:15 60:16
63:6 64:19
68:20 80:12
84:12 88:15,16
88:16,18,18 89:1

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[need - observe]**                                                        Page 32

110:17 140:9,20
153:11,15 154:4
160:4,5 167:23
167:24 181:17
181:18 187:2
189:24 196:12
198:14 207:20
208:23,24
209:13,24
**needed**  86:16
92:18 106:1
**needs**  128:15
172:10
**negligent**  9:5
187:7
**negligible**
220:19
**negotiated**  185:4
**neighborhood**
70:7 123:10,20
195:17
**neighborhoods**
13:25
**neighboring**
140:19
**neither**  47:18
174:15 175:18
230:13
**neutralized**
49:13
**never**  102:14
180:9 182:6,7
**new**  23:10,16,17
23:17 24:11
26:4,6
**nice**  198:19
**night**  62:6 92:18
100:19 102:13

106:2 117:21
121:18 125:1
143:16 144:2
152:19 153:8,24
170:1 180:25
190:18 191:11
**nightly**  117:16
**nighttime**  102:4
102:10 146:10
146:20,24
172:22
**nine**  9:24 10:1
12:11
**nomenclature**
4:14
**noncompliant**
39:20,22
**normal**  218:18
**northern**  1:2
**notary**  229:16
**notation**  76:1
**note**  55:20 72:14
74:10 75:1
**noted**  72:13
73:23 75:22
76:16
**notes**  3:7 24:16
31:24 32:8,12,15
32:22 34:18,20
35:12 55:13,22
76:17,24 108:5,6
108:8 111:16
157:16,19,21,23
157:24
**notice**  1:25
25:18,19 61:6
93:22 94:15,17
94:21,24 95:2,10

95:13 96:4,6,9
96:13,17,24 97:9
**notices**  52:4,7,13
53:8,21 148:15
173:6
**notwithstanding**
159:12
**november**
147:23,23
**nuisance**  208:18
208:21
**null**  180:17
220:18
**number**  4:10
54:25 164:25
205:3 208:1
209:15 210:11
210:16,22 212:9
213:2 214:14
215:6
**numbers**  15:11
206:23,23 227:7
227:10,10,11
**numerous**  78:1
81:12
**nunez**  210:2,11
**nutshell**  82:8
220:5

**o**

**o**  4:1
**oak**  133:7
**oath**  230:7
**object**  35:18
45:17 68:11
80:3
**objection**  29:20
30:4 37:20

40:25 42:3,8,19
43:3,11,19 45:1
49:25 50:6
52:15 53:11,16
53:23 72:25
73:18 74:1 75:9
77:7,14 78:11,22
80:7,21 81:4
84:4 91:2 92:11
93:8 94:10 97:1
97:5 103:20
107:15 114:24
115:17 116:3
122:18 123:2
125:12 132:2,15
132:20 134:3,10
134:20 135:11
138:2 139:13
140:6 157:20
158:13,25 171:6
173:11 174:1,9
175:9,15 176:13
181:3,16 184:13
185:23 189:4
190:9 192:3,13
192:24 195:19
196:8 203:11
204:10 205:1
211:16
**objectionable**
79:7
**objections**  78:18
79:11,13 139:24
189:10,11,17
**observations**
211:21
**observe**  141:21

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[obtained - opinions]**

Page 33

**obtained** 188:4
205:7
**obviously** 5:13
11:5 12:4,9,13
14:16 30:8
32:16 48:19
49:9 59:1,9
62:12 64:19,23
69:7 71:21
89:23 93:19
119:10 120:10
130:5 135:21
148:21 152:8
156:25 160:11
161:2 166:25
172:18 201:10
202:22 222:19
**occupational**
56:18
**occur** 192:10
194:13
**occurred** 147:14
194:19
**occurrence**
101:21,21
119:11,11 120:4
120:9,10,10
163:22 164:16
194:25
**offender** 12:19
53:17 54:3
101:22 162:3
216:18 217:3
**offender's** 144:9
**offenders** 12:19
53:19,20,24 54:1
54:5 124:2
137:1 144:16

178:5 223:8,16
223:18
**offending** 215:23
216:23 217:10
**offense** 195:11
211:23
**offer** 69:16
82:12 95:5 96:8
96:16 114:7
122:4,5 130:16
200:5,6
**offered** 162:17
**offering** 82:11
91:3 96:22 97:2
97:11 121:13
132:21 182:19
**office** 34:7,16
44:11 104:7
208:9,11
**officer** 77:22
144:21 202:10
203:19 204:15
205:6,23 208:5
217:16,18
224:18
**officers** 48:3
50:21 191:21
219:23 220:1,14
**official** 46:13
48:12
**oh** 24:15 31:18
52:22 118:10
135:24
**okay** 4:21 5:4
14:15 20:8
31:10 33:2,17
45:9 55:18
57:13,16,21

64:11 66:20
67:15 68:13
75:14 82:7 93:4
93:10 94:1,15
97:4,23 98:12
103:9,23 104:9
107:19 122:9
132:7 145:2
150:10 151:25
157:1 160:19
167:7,11 168:5
171:23 173:1,6
175:16 186:25
187:6,16,23
189:24 192:6
197:9,16 198:22
199:11 201:5,25
202:25,25
203:10,15
204:20 207:1
211:13 217:9
227:13
**old** 169:23
**once** 39:18 41:10
47:20 49:18
51:4 58:2 94:11
141:13 142:3
171:7 208:11
225:4
**ones** 19:6 161:19
180:6,8 214:8
**online** 25:18
**open** 59:23
143:14 182:14
202:14 206:17
**operate** 129:20
**operates** 110:5

**operating**
115:25 117:1
206:5
**operations** 8:12
**opinion** 28:21
90:25 91:4,8
92:19 93:3 94:3
94:5,16,20 95:1
95:3,6,12 96:9
96:16,22 97:2,5
97:11 114:7
116:23,24
121:14 122:5
130:17 131:6
132:12,16,21
133:14 134:6,17
136:13 137:8
149:22 155:7,19
162:17,20
163:17,20,24
165:19,22
182:19 188:22
189:1 190:12,14
192:4 196:4
198:22 200:6,14
200:18 201:4,8,8
203:14,15
217:24
**opinions** 27:17
27:24 28:4,12
30:10 43:23
54:12 55:25
59:6,16 60:7,11
64:23,25 65:4,12
66:8,18 67:3,25
68:9,14,18,18,21
68:24 69:15
71:17 72:20

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[opinions - partial]                                                      Page 34

81:3 82:10 91:4
91:10 98:1 99:5
99:22 105:12
108:7 111:20
126:2 138:25
171:2 175:5,11
206:16 208:24
215:25
**opportunistic**
182:1
**opportunity**
17:14 215:24
216:10 217:11
**opposed** 9:9 15:7
15:14 85:4
93:12 124:4
148:13 153:9
156:22 176:8
177:25 224:10
**opposite** 190:8
**oral** 1:14,20
**order** 110:15
167:15 170:7
183:18 184:4
**orders** 198:14
**organization**
84:1 103:10
105:1 215:8,13
**organizations**
8:19 83:15
104:21 105:8,19
**organizing**
54:20
**orient** 118:3,3
**oriented** 145:25
**original** 18:24
19:4,9 20:5
21:20 26:17,18

26:21 55:1
159:23 160:4
**osha** 56:11,16
**ought** 206:4
**outcome** 138:10
158:19 230:15
**outreach** 81:11
82:2 85:12,21
**outside** 82:13,19
103:18 126:3
182:11
**outsiders** 137:4
**overall** 75:5,7
218:23
**overarching**
30:15
**overnight**
117:13 154:5
173:9,24 174:7
174:13,18
**oversee** 81:20
88:7
**overstating**
208:22
**ownership** 47:20
88:13
**owns** 110:5

| **p** |

**p** 2:1,1 4:1 83:1
225:12,16
**p.m.** 145:8,8
168:10 221:14
221:14 227:19
**paces** 2:4
**packages** 167:25
**page** 3:1 19:21
19:21 20:2

22:18 54:14,25
54:25 55:3 71:3
90:8 95:7
102:25 106:4
107:9 108:3,13
145:11 169:6
176:25 186:21
186:22 187:6,17
187:24 188:2
194:9 201:12,12
207:13 228:3
**pages** 32:14,22
186:18 195:14
**paint** 37:23
**paper** 13:3,8
22:8,9 57:16,25
76:18 160:4
**papers** 12:13
22:24 29:12
57:7 70:25,25
217:21,22,24
218:3 223:25
224:15,16
**paragraph** 65:23
65:25 68:2
69:21,21 81:10
81:10,23 82:4,8
82:15 83:6
84:19 89:8,11
90:12,14 92:14
95:8,9 102:2,24
102:25 103:7
107:6,8 110:21
111:17 113:3,6,9
114:3,17 118:4,5
118:6 126:22
135:5,5,5 141:19
143:12,22

145:18,22,24
146:2,8,19 150:2
150:9 162:4
164:1 176:25
178:12 179:14
181:22 182:22
182:24,24 183:1
183:3,17 194:8
194:10,17,18
207:24 215:21
217:14,21
**paragraphs**
79:13 113:1,3
145:13
**parameter**
150:17
**parking** 14:7,7
135:6 143:14
**part** 11:2 25:4
39:12 43:5
67:22 69:9
71:20 85:11
91:23 93:2
114:16,17,17
129:21 130:6
131:20 132:3,6
134:11 147:17
148:1 169:10,10
169:15,16,25
170:17 172:12
172:18 177:7,10
179:23 180:22
185:8,8 199:11
206:8 210:16
211:18 216:17
222:17
**partial** 217:21
218:4

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[participating - periodic]**

Page 35

**participating**
186:15
**particular** 11:9
13:6,8,13 14:20
24:7 29:16 51:5
63:6 75:2,19
86:19 101:13
105:16 109:10
110:4 113:21
122:3 123:10,18
134:7 141:8
142:20 151:11
151:23 160:12
168:15,20 176:3
196:3 216:5,9
222:6
**particularly**
151:16 153:5
178:17 218:24
**parties** 10:24
**partnership** 1:9
18:14
**parts** 25:23 38:8
38:18 146:11
**party** 230:10,14
**pass** 52:4,7 53:8
173:5
**passing** 52:1,13
53:21 148:14
**paste** 26:6
**patient** 221:5
**patrol** 8:2 48:8
51:22 52:6,7,10
53:25 91:21,22
112:5,19 117:18
134:14 135:1
141:6 143:24
144:8,19 145:20

153:9 174:23
175:1 208:3
214:18 220:20
**patrolled** 144:12
208:5
**patrolling** 51:17
51:18,25
**patrols** 48:2
50:21 185:3
**pattern** 6:15
30:11 53:3
74:18,19,20 83:2
84:13 88:17
92:13,19 94:13
100:1,8,15
101:16 102:18
103:4 105:24
112:20 118:14
118:17,20,25
119:12,17 120:4
120:16 121:15
121:20,20,23
122:14 124:20
126:6 131:8
135:23 136:10
136:15 145:16
145:18,21 146:2
147:25 152:18
156:1 174:21
175:4 191:16,23
192:7,18 200:13
215:19 221:25
222:16
**patterns** 8:15
72:23 73:14
75:5,7,8 76:22
86:2 123:9,21
124:7,9 128:19

157:13 161:5
**pay** 20:24 61:16
174:7,18 206:21
**paying** 79:10
**payment** 10:7
**pcp** 54:7
**pdf** 22:11
**pdfs** 57:8 184:16
**peachtree** 2:9
**peaks** 133:8
**peer** 6:7 28:5,7
56:24 58:2
98:11 99:16
101:4 111:25
112:7,13 141:7
183:7 219:18
**peers** 17:24
**pen** 19:21
**people** 4:18 6:20
17:22 85:11
98:3 99:17
136:1 137:5
162:20 163:23
165:16 166:6
181:6 208:19
223:1,1,5
**people's** 206:22
**peppered** 46:10
113:8
**percent** 164:3,9
225:7,25 226:1,4
226:6,25 227:2,6
**percentage**
16:15
**percentages**
15:19,23
**perez** 186:8,15
187:1,3 188:16

190:5 193:11
195:15 201:2,4,7
201:13,21,23
202:17 205:8
207:3 209:21
217:1
**perfectly** 182:13
189:16
**perform** 9:2
11:16 100:4
111:2,9 128:18
**performed** 30:22
150:11 212:3,20
**performing**
151:7 155:2
**perimeter**
127:24 132:10
133:19
**perimeters**
130:5
**period** 56:5,8,10
57:22 58:1,18,19
58:24 59:6,7,11
59:15 110:7
119:5 146:9,12
152:5,9,11 153:3
153:5,20 157:7
161:4,6 168:7
185:25 191:24
192:1 194:6
208:8,12 219:2
**periodic** 46:3,21
46:24 47:9,19,22
50:15 51:21
52:10 89:18
117:18 148:13
153:9 172:24
185:4 193:5

Bruce Jacobs                                                August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

[periodically - policy]                                              Page 36

**periodically**
48:8 52:1 208:6
**periods** 154:2
**perjury** 197:12
197:15,18
**permission**
10:16,19
**person** 33:23,25
35:23 86:24
87:4 128:22
**personal** 40:12
**personnel** 44:11
44:12,16,25
45:22 46:5
86:14
**perspective**
19:18 73:17
144:10 159:13
**ph.d.** 5:22 12:1,3
186:8,17
**phenomenon**
112:22
**phone** 31:5 86:1
206:22
**phrase** 97:13,15
**physical** 33:11
33:16 69:11
**physically** 19:20
20:18 144:19
**pick** 127:4
221:15
**picking** 113:18
195:4 207:16
**picture** 27:14
**piece** 122:14,15
123:10
**pieces** 76:18
202:14

**pip** 205:5,17,19
205:21
**pitch** 180:25
181:13
**placards** 144:11
**place** 35:2,16
36:8 59:3,9
89:16 91:12
93:17,24 98:8
100:2,18 115:22
120:16 121:17
122:6 124:25
128:3,5 129:4,12
150:12 151:12
153:10 161:8
172:10 180:14
184:12,21
187:22 188:18
200:17 230:6
**placed** 230:7
**places** 129:3
133:10
**plaintiff** 16:12
16:14 127:14
130:11 187:12
194:7 216:17
**plaintiffs** 1:7,21
2:2 4:7,15 16:5
17:3 103:12
107:12,22 126:3
195:16 213:24
**plan** 89:12,14,16
89:20,22 90:3
115:12,15,19,22
192:17 202:22
202:24
**planning** 90:1
207:19

**plans** 222:20
**play** 53:4
**played** 72:23
73:14
**players** 70:5
**playground**
182:12
**plays** 105:12
**please** 25:10
45:9 63:8
134:24 145:11
148:12 173:16
197:9 198:5
199:7
**pllc** 2:9
**plus** 57:8 184:16
**point** 18:5 23:1
46:15,15 51:5
68:17 80:4 85:6
89:17 99:19
112:15 117:23
178:23 179:22
183:1 195:2,3
200:21 205:6
206:3 221:16
**pointed** 146:17
**pointer** 4:13,24
**points** 50:8,14
71:2 101:2,3
105:19 111:22
112:3,6,7,13
114:11 115:8,9
185:20 201:19
202:22 207:10
**police** 3:8 8:6,16
8:19,20,21 28:10
31:23 35:9 48:3
48:20 50:21

51:1,1,5,10,12
51:13,17 55:2,4
55:21,24 58:25
59:2,17,21 60:2
60:2,3,6 71:20
72:11,15 73:21
74:10 75:12,18
76:13 78:13
79:22,23 80:23
89:24 91:19
101:18 102:8,16
108:21 110:14
110:18 111:5
113:16 116:11
120:24 125:16
144:21 146:5
151:8,15 158:6
162:11 167:16
180:15 188:4,17
191:19 205:5,10
206:13,15
210:24 211:7,17
218:25 219:5,6
220:1 222:2
224:10,12,13,18
**policeman** 143:2
**policemen**
220:13
**policies** 10:6,12
10:24 202:5
203:3,6,7 204:5
204:9 214:15,22
**policing** 83:3
102:12 222:4
**policy** 114:23
115:3,5,8,16
202:18 203:4
210:8,10 215:3

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[pool - prevention]                                                                                    Page 37

pool 104:8,8
population
  161:18
position 9:22
  143:14 215:4
positioned
  217:16
possibility 80:6
possible 16:11
  16:17 21:6 70:8
  129:2
possibly 96:3
post 171:1,7,10
  171:16 204:6
posted 87:13
  103:12 202:12
  203:20
posture 81:25
  82:10,23 83:9,12
  84:2 114:9,11
  115:11,21 129:3
  129:6 130:13
  161:8 172:19
  200:7
posturing 81:14
potential 46:18
potentially
  51:15 52:18,18
  78:12
potholes 37:23
pour 38:12
practically
  223:3
practice 56:14
  110:3 121:5,6
  131:4,19,21
  132:6,9,13,18
  133:14 134:7,9

134:18,21,25
135:3,9 136:23
137:17 138:16
138:19 140:8,11
140:18 141:2,3
practices 98:9
  106:4,5,9 111:24
  127:7 128:1,4,8
  129:14,17,22,25
  133:25 137:24
  183:5
preceding 102:6
  191:17,24
precise 19:15
  163:5
precisely 195:25
predatorily 76:9
predatory 69:23
  70:2,16 71:13,24
  72:2,9,12,24
  73:4,11,14,22
  74:20 75:8,19,25
  76:15 92:13
  93:20 94:13,23
  102:4,5,10
  105:25 110:19
  118:15,17 119:4
  119:21 121:15
  121:21,23 123:9
  123:21 124:7,9
  131:8,22 132:14
  132:19 134:2,19
  135:9,14 136:10
  140:20,21
  145:16,18 146:3
  146:10,15,21,25
  147:11 151:16
  156:15,17,21,25

158:3 161:5,16
161:19,23,25
162:5 165:9,20
165:24 166:17
167:4 168:13,20
172:12,16
174:21 175:3
177:7 185:17,18
187:9 191:2,5,6
191:16,23,25
192:7,9,18,20
193:3 215:22
216:23 217:10
predicate 10:10
predict 163:14
  163:21
prediction
  192:10 199:3
predictive
  164:20 165:7,9
preliminary
  65:20 66:1,3
  67:24 68:14
  150:24,25
premise 198:23
premises 117:21
  187:7 195:22
  200:7 208:3
preparation
  32:12 108:6
prepare 5:7
preparing 68:24
presence 51:1,13
  51:24 52:11
  73:12 101:24
  102:12 105:23
  106:1 117:16,25
  118:6,16,23

119:8,14 120:11
120:17 127:24
132:11 148:7,13
148:14 151:15
152:16,18 153:8
153:9,24 154:17
166:23 179:4,10
185:4 190:18
191:11 193:5,6
218:8,10 219:23
222:2 224:5,10
224:12,13,18
225:22 226:10
present 82:3
  104:3 117:24
  118:9,13 143:2
presentation
  23:8
presentations
  22:22,23,25 23:1
preservation
  47:20
president 57:1
  58:6,7,9
pretty 17:21
  31:25 32:7
  106:10
prevent 8:16
  95:20 177:10
  178:21 179:23
  201:14
preventative
  177:15 208:2
prevented 166:4
  226:11
prevention 6:13
  6:14 8:7 35:2,5
  36:7 51:14

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[prevention - property]**

Page 38

81:14,25 82:10
82:22 83:9,12
84:1,10 85:1
88:24,25 98:10
101:5,6,6 106:23
111:25 112:1,2
112:25 114:9,11
115:11 134:13
134:14 171:4,17
178:17 179:2,18
183:5,7,8,11,14
183:24 184:9
204:2 210:23
211:2 215:10
218:6 222:20
224:4
**prevents** 177:2
**previous** 42:10
50:2 117:6
141:16 183:17
194:18 207:24
**previously** 65:11
125:8
**primarily** 41:15
118:6 145:12,13
**principally**
71:24
**print** 25:17
**printed** 25:13
**prior** 18:11,12
26:7,13 27:7
35:7 36:23 40:3
59:1 69:16
76:14 96:24
97:7 146:3,6,21
146:25 147:12
149:2,10 151:4
153:19 155:3

158:12 159:1,3
175:13,16 182:8
185:18 188:6
192:8,18 193:4
194:2 200:8
203:21 208:12
210:13
**priorities** 202:6
**private** 8:18
81:12,18 82:12
84:25 88:5
220:2,13
**privilege** 139:12
139:15
**privileged** 140:5
**probability** 68:1
68:4,15 177:23
222:14
**probably** 15:9
20:21 26:11
30:12 31:13
48:5 62:17,22,22
85:3 86:5 91:9
99:6 120:7
163:2 185:1,6,10
216:11
**probative** 224:8
**problem** 78:16
199:23 200:3,4
204:8 215:15,17
216:11
**problems** 72:22
**procedures**
202:5 214:16,23
**process** 16:18
112:16
**produce** 41:3,8
41:11

**produced** 32:5,6
40:24 41:6,9,13
43:1 57:7 67:17
214:6
**product** 83:25
90:2 158:16,18
159:15 160:14
**production** 57:7
109:6 111:5
213:24
**professional**
5:13,15 9:2 15:6
17:24 22:5
27:23 43:22
81:11 85:12
104:20,25
105:15 124:6
**professor** 5:25
6:1
**professors** 10:5
**program** 6:25
7:6
**progress** 164:10
**project** 123:20
**projecting**
138:25
**promise** 60:13
**prongs** 9:19
85:13
**proof** 22:19
**properties** 6:10
8:18 37:17
106:7 120:22
121:6,7,23
122:17,17
124:17 125:23
126:9,18 127:7
128:20,23 129:1

129:6,8,10,11,18
130:9,18,23
131:10,13 133:2
135:23 136:5,9
136:19 137:12
137:14,19 138:1
138:18 140:10
140:19,22,25
141:22 142:1,5,6
142:10,11,12,18
142:23 143:1,16
144:1,22 164:21
164:24 180:20
181:1,10 195:6
226:9
**property** 33:9
44:15,19,24
45:22 46:4,8,8
46:13,16,17,22
46:25 47:9,12,19
48:8,9 50:16,25
51:2,25 52:4,6,9
52:17 53:4,20
58:21 62:21,23
76:4,14 77:3,13
78:10,19 79:25
81:19 88:6,19,20
88:23 89:2,3
91:22 92:18
93:20 95:18,23
95:23 100:17
101:10 102:9,10
102:13 105:25
108:18 110:5,17
112:21 114:6
115:14,24,25
116:11 117:1,7
120:14,21 121:3

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[property - questions]

Page 39

121:16,22
122:14,15
123:10 124:18
124:22 137:3
142:3 144:12,12
144:20 147:14
147:19,24
152:10 154:9
161:15 162:8,13
162:18,22,24
163:6,14 164:24
165:18 173:17
180:7,8 181:7
182:6,8 191:11
193:10,12
194:14,19 203:8
204:12 205:4,4,9
205:16 206:20
207:14 208:6,16
208:18,21
209:16,22 210:2
210:12,18,20,23
211:11,25
212:19 226:8
227:4
**protected** 159:15
160:12
**protocol** 28:19
28:23,25 29:3,9
29:16
**prove** 177:22
**provide** 9:3,5
19:12 35:15
37:2 39:1 40:9
41:17,25 47:6
83:17 84:7,17
85:16 87:8
117:12 173:24

174:13
**provided** 24:19
37:6,11 42:7
43:15,21 47:1
48:2 50:21 60:3
64:15 81:7
90:15 99:14
107:17 108:14
108:24 109:1,3
109:18,18,25
149:8 158:8,9
209:21 211:3,19
213:12,18,19
**provides** 21:3
**providing** 7:18
87:25
**provisions** 39:9
39:11 71:4
**provost** 10:18
**prowler** 172:2
**proximate**
194:10
**proximity**
195:24
**proxy** 115:13
**prudent** 148:1
**psychologist**
67:11
**public** 229:16
**publications**
12:12
**publicizing**
144:15
**publish** 22:9
**published** 6:6
12:13 22:11
56:12 58:3
104:20

**publisher** 22:12
**pull** 137:11
**punched** 208:15
**purchased**
210:17
**purpose** 34:24
144:10
**purposes** 15:17
**pursuant** 1:24
**pursuits** 9:9,17
15:8,14
**put** 20:20 31:8
31:11 63:19
65:4 90:13 97:8
130:25 158:6
177:14 186:3
192:5 200:8
213:6 215:2
223:21,22
**putting** 180:19

q

**qualifications**
25:25
**qualitative**
12:17 28:9
124:2
**quantitative**
12:22 13:1
**question** 10:10
11:2,17 17:9,11
24:4 27:6 30:6
35:21 43:13
44:14 45:5,7
49:19 72:17,17
72:18 73:2,6
74:22 77:10,24
78:4 80:8,9 84:6

86:8 89:7 92:18
93:1 94:19
100:14,19,22
104:18 106:2
115:1 117:10,20
117:21 121:18
123:15 125:1
127:13,25 133:5
133:24 134:24
135:13 137:21
138:5,13 140:4,6
140:12,14,24
141:10,11,14
148:24 149:19
152:19 153:9,14
153:25 158:21
159:16,19
161:10 163:5
164:15 165:8
166:13 171:9,15
171:15,20 173:8
173:16,21 174:5
176:3 178:8
189:5 190:19,23
191:12 192:14
193:2 196:24
197:23 198:2
199:21,24
209:10 210:6
212:8 213:5,7
214:11 216:6
222:1
**questions** 31:6
32:13 35:24
36:15 45:10,25
133:21 135:22
187:4 189:9
209:13 227:14

Bruce Jacobs

August 11, 2022

Diaz, Elsa Flores v. The Partnership, Inc

[quick - record]                                                    Page 40

| | | | |
|---|---|---|---|
| **quick**  6:16 62:3 | **reached**  64:23 | 177:8 180:23 | **reasons**  17:20 |
| **quickly**  5:1,2,3 | 65:3 69:15 | 181:13 185:24 | 160:11 218:6,13 |
| **quite**  77:19 | 129:24 214:20 | 208:25 209:14 | 218:14 |
| **quote**  33:7,8 | **reaching**  27:16 | 210:1 211:14 | **recall**  18:12,15 |
| 81:11,24 115:7 | 214:16 | 217:24 218:12 | 36:24 37:10 |
| 178:14 202:4 | **react**  95:18 | 220:5 226:13 | 38:21 46:3 |
| **quoting**  162:6 | 153:15 | **realm**  177:23 | 47:17,21 49:1 |
| | **reacted**  95:19 | **reason**  11:15 | 60:8 62:20 85:5 |
| **r** | **read**  5:13 24:22 | 22:2,4 25:15 | 86:23 110:2 |
| **r**  2:1 4:1 | 25:18 34:22 | 26:19 37:9 | 156:5 |
| **radius**  128:12 | 50:19 82:14 | 124:14 136:3 | **receipt**  21:16 |
| 130:12,24 188:5 | 83:6,7 95:12 | 160:13 170:7 | **receive**  24:17 |
| **rafael**  66:17,23 | 108:3,13 153:13 | 228:3 | 109:13 |
| **raising**  113:24 | 169:2 176:16 | **reasonable** | **received**  21:12 |
| **ramp**  154:23 | 178:20 188:12 | 53:12 68:1,4,15 | 60:18 167:13 |
| **ramped**  101:24 | 207:7 216:16,25 | 91:13 93:18,25 | **recency**  59:10 |
| 154:17 | 227:17 | 94:13 97:14,17 | 152:11 153:4,22 |
| **ran**  175:22 | **reading**  49:22 | 97:25 98:2,6,12 | 161:5 170:1 |
| **random**  53:7 | 67:20 74:10 | 98:16 99:1,4,9 | **recess**  63:11 |
| 185:2,5 224:11 | 95:14 99:6 | 99:16,24 100:12 | 145:8 221:14 |
| **randomized** | 113:16,16,17 | 100:25 114:8,10 | **recognize**  32:2 |
| 53:25 219:3 | **reads**  95:10 | 122:7 125:1,10 | 186:22 |
| 226:18 | **ready**  19:18 20:9 | 128:10 129:6,13 | **recognizing** |
| **randomly**  53:20 | **real**  62:2 173:9 | 129:19,25 | 38:13 |
| **rape**  119:24 | 179:9 189:11 | 131:21 132:13 | **recollection**  6:23 |
| 172:13 | **really**  6:25 7:4 | 132:18,25 | 47:15 109:16 |
| **raped**  208:7 | 21:13 30:18 | 133:17,21 134:1 | 182:7 |
| **ratcliffe**  225:19 | 37:25 38:12 | 136:25 137:18 | **recommend** |
| **rate**  206:22 | 77:24 80:16 | 137:24 138:16 | 84:17 102:11 |
| **rates**  177:19 | 82:9 91:4 94:18 | 140:9,19 141:2 | **recommendati...** |
| 219:5 | 96:4 97:21 | 154:11 156:3 | 87:6 |
| **rational**  12:20 | 102:8 103:16 | 172:21 173:9,23 | **recommended** |
| **rationale**  92:21 | 105:22,24 106:1 | 174:2,3 175:12 | 185:11 |
| **rattle**  36:9 | 112:9 117:7 | 176:1 185:14,19 | **reconsider** |
| **reach**  28:21 29:2 | 121:14 122:7,22 | 192:12 201:14 | 196:13 |
| 100:24 111:19 | 125:4 133:22 | **reasonableness** | **record**  44:24 |
| 118:11 214:14 | 151:20 166:10 | 59:8 91:5 99:12 | 45:21 48:12,18 |
| | 172:6 176:9 | 129:10 199:4 | 55:20 56:17 |

Bruce Jacobs                                                        August 11, 2022
Diaz, Elsa Flores v. The Partnership, Inc

**[record - replace]**                                                    Page 41

57:11 60:1
63:13 102:20
145:7 147:16
189:21 197:9,20
198:3,4,7,9
202:10 230:8
**recorded** 164:23
**records** 50:9
59:24 206:17
**recount** 149:25
**recovered** 23:12
**recurrent** 76:5
76:22 78:15
79:25
**recycle** 23:19
**recycles** 21:23
**redact** 206:22
**reduce** 220:2,3,4
220:15 222:13
224:19
**reduced** 227:6
**reducing** 221:20
223:6 224:2
**reduction**
177:25 178:9
179:4 180:5,6,8
180:9,10,13
204:16 219:7,9
219:15,15,22
220:20,22,25,25
222:8 223:13
224:22,24,25
225:5,7,21,23,24
226:6,25 227:2,6
**refer** 4:14 6:20
33:9 54:14,23
105:4 108:17
111:17 113:9

126:7 135:2,4
141:15,18
146:12 173:13
**reference** 28:13
56:5,8,9 57:22
58:1,18,23 59:5
59:7,11 70:10,24
110:7 119:5
152:2 153:3
161:4,6 194:6
208:8
**referenced** 47:25
51:8 100:24
110:1 125:19
217:23
**references** 22:17
71:2 90:19
**referred** 14:5,8
109:10
**referring** 32:5
52:2 57:17
106:5 107:13,18
144:8 147:8
173:12
**refers** 4:17 61:7
65:25 84:19
146:8 217:15
**reflect** 71:11
159:8 201:19
**reflected** 75:1,16
75:21 77:19
223:18
**reflecting** 33:7
46:3
**refresh** 187:2
**regard** 133:11
136:6

**registration**
230:22
**regular** 98:3
116:12 117:12
117:16
**regus** 1:23
**reinforcement**
183:19 184:4
**reinforces** 65:24
**relate** 101:3
**related** 10:24
27:5 72:2,9
74:19 89:19
105:8 141:12
230:14
**relates** 37:19
38:5 110:11,19
153:5 190:16
191:8 215:18
**relation** 184:24
**relational**
165:12
**relationship**
13:9 69:25
162:2 165:17
166:8 169:12
180:3 220:18,19
220:21
**relationships**
70:6 101:22
**relative** 53:12
59:2 91:6,14
92:8 93:18
94:13 106:11
122:7 125:2,10
129:3,13 132:25
170:4 200:13
219:8 226:1

**relatively** 164:24
**relevance** 17:19
86:2
**relevant** 41:6
43:8,16 75:19
99:10 111:3
112:4,14 142:1
169:13
**reliable** 27:23
28:8,11 68:19
110:16 137:8
177:1,9
**reliance** 50:5
**relied** 47:5
**rely** 49:7 57:24
**remains** 226:1
**remarkable**
147:25 222:9
**remember** 52:14
78:2 121:11,12
142:19 186:14
**removed** 176:20
**render** 30:10
43:22
**rendering** 27:23
28:4,11
**repackage**
199:17
**repaired** 44:13
**repairs** 44:2
**repeat** 76:4
**repeated** 166:14
**repeatedly** 26:2
138:3,25
**rephrase** 191:3
197:13,22 198:1
**replace** 204:15

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[replicate - respond]**

Page 42

| | | | |
|---|---|---|---|
| **replicate**  115:1 | 131:1,2 134:11 | 73:21 74:10,25 | 115:21 116:15 |
| **replicated**  68:6 | 134:16 135:2,14 | 75:12,15,17,18 | 116:16 132:22 |
| **report**  3:9 5:9 | 140:16 141:4,5 | 75:18 76:13 | 132:23,24 |
| 6:8 15:18 19:3 | 141:19 145:10 | 91:19 107:20,21 | 206:18 212:17 |
| 19:11,17,24 20:3 | 146:8,12,14,18 | 108:21,22 109:2 | 212:22 |
| 20:4,5,6,9,11 | 149:14,20 150:1 | 109:9,14,17 | **required**  116:8 |
| 21:12,18 25:23 | 150:7,18,21,24 | 110:6,10,18 | 142:20 143:17 |
| 25:24,24 26:4,6 | 155:1 157:11,13 | 111:6,6 113:16 | 185:7 206:1 |
| 26:7,18,21,24 | 159:8,12 174:20 | 116:11 125:16 | 210:8 214:23 |
| 28:14,16 29:5 | 176:18,24 | 137:12 146:6 | **requires**  47:3 |
| 30:21 31:22 | 178:19 198:25 | 158:6,12 159:1,2 | 77:17 116:20 |
| 34:23 37:11 | 202:23 206:23 | 159:22,24 | 195:23 210:4 |
| 40:18 49:7 51:6 | 216:16 217:20 | 160:12 167:6,10 | 212:11 |
| 52:18 55:4 | 220:17 225:10 | 167:12,14,16 | **research**  7:25 |
| 59:21 60:14 | **reported**  97:6 | 188:4,17 206:15 | 9:2,18 12:12,15 |
| 63:3,13 64:11,15 | 110:13,13 | 207:1 209:16 | 12:18,22 13:1,14 |
| 64:22 65:4,13,19 | 146:15 164:3 | 211:17,23 | 69:22,24 83:2,3 |
| 65:20,24 66:1,3 | 230:5 | **represent**  4:7 | 83:3,4 106:15,17 |
| 66:6,9,11,15,22 | **reportedly** | **representation** | 123:8,18,25 |
| 66:25 67:8,12,14 | 194:13 | 87:18 | 124:3,4,14 |
| 67:18,24,25 | **reporter**  1:22 | **representative** | 138:12 140:13 |
| 68:18 69:5,10,10 | 32:17 33:3 63:7 | 88:12 | 141:4 163:15 |
| 69:12,16,17,20 | 63:8 230:4 | **reproducible** | **resent**  79:16 |
| 70:10,14,16 71:8 | **reporters**  4:25 | 28:11 68:19 | **reserve**  68:22 |
| 71:11 72:15 | **reporting**  46:18 | **reputable**  58:4 | **residents**  36:2,4 |
| 73:25 74:6 75:2 | 86:11,25 130:8 | **request**  44:22 | 36:19,21 37:4 |
| 75:21 76:1 81:9 | 135:21 162:11 | 59:24 60:5,9,10 | 38:24 39:3,21,22 |
| 82:5,25 90:7,11 | **reports**  3:8 | 79:7 206:17 | **resolve**  114:2 |
| 90:21 92:14 | 18:18,22,24 21:8 | 211:5 | 212:6 |
| 94:12 95:8 | 25:22,23 26:13 | **requested**  84:6 | **resources**  8:16 |
| 97:14 101:3,8 | 27:7,10 28:10 | 210:13 211:2 | 192:2 |
| 102:2,21,25 | 31:23 35:9 | **requesting**  26:13 | **respect**  45:7 |
| 103:5 104:1,17 | 44:18 48:20 | **requests**  44:21 | 180:21 |
| 107:6,10,25 | 51:1 55:2,21,24 | 107:12,22 109:6 | **respected**  58:5 |
| 110:21 111:14 | 56:7 58:25 59:2 | 111:5 213:24 | **respectfully** |
| 111:15 112:16 | 59:17 60:2,3 | **require**  10:7 | 74:24 |
| 113:8 115:9 | 68:24 69:2 | 37:17 79:15 | **respond**  21:11 |
| 126:7,23 130:16 | 71:20 72:11 | 91:16 105:14,18 | 21:11,16 38:12 |

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[respond - risk]**                                                                                   Page 43

51:11,12

**responded** 55:1
154:13

**respondents**
13:4,6 123:12

**responding**
51:19

**responds** 20:19

**response** 3:6
18:16 21:20
26:12 30:25
31:7,22 33:6,17
34:21 43:24
54:13 111:12
144:24 159:5

**responses** 35:24
40:22 44:8
107:11,15,22
109:5 111:4
213:23,23

**responsibilities**
11:22 12:6,6
133:4

**responsibility**
210:3

**responsible**
155:4

**responsive** 26:15

**restate** 79:8

**restaurant** 87:11
87:16

**restaurants**
81:18 127:10

**restrictions**
10:12

**result** 44:19
47:10 165:5

**results** 47:21
130:7 135:16

**retain** 18:18
24:22,24 25:20
26:16,18,21

**retained** 6:10,11
19:19,25 20:10
20:11 21:9 22:1
26:25 27:11
63:22,25 64:3,9
87:21 122:25
160:7

**retaining** 123:6

**retaliatory**
13:20

**retention** 16:20
88:3,4 122:19

**retrospective**
199:2

**return** 61:12

**revenue** 10:15

**revenues** 83:21
86:11

**review** 12:5,6
16:17 25:10
27:24 41:7
43:22 67:9,17
68:21 69:7
108:20,22
109:19,21 114:4
124:5 146:5

**reviewed** 5:8,9
6:7 28:5,7 37:12
37:13 40:19
47:2 51:1 56:24
58:2 66:12,16
67:11 68:8,17
71:21 81:6

98:11 99:16
101:4 107:24
108:1,25 111:25
112:7,13 141:7
183:7 188:17
209:18 213:11
219:18

**reviewer** 12:8

**reviewing** 16:25
27:22 28:9
32:11 65:14
68:7 146:16,16

**reviews** 12:8

**revise** 146:19
150:18,21,22

**revisit** 89:18
198:15

**rich** 194:24

**richer** 211:8

**rid** 147:20

**ride** 7:22

**ridge** 133:7

**riding** 8:11
50:23

**right** 7:24 24:17
26:12 27:13
36:4,17 38:13
45:6,14,16 52:16
54:24 55:3
58:22 60:13,17
61:4,10 62:1,5
63:16,24 64:6
65:23 67:5
68:22 69:19
71:8 74:16 77:4
77:11 91:18
103:18 104:10
104:12 107:5

110:21 112:23
113:12,13 115:7
116:21 122:21
123:15 126:3,9
126:13 128:11
137:12 143:21
144:4 153:22
154:16 155:14
155:16,17 158:6
162:15 164:18
164:19 167:8
169:22,23
170:23 182:13
182:13 183:8
187:10,11,14
188:8,12,21
191:14 193:8
194:5,6 197:19
197:25 201:1,9
202:4 203:3,4,19
204:9,13,14
205:12,17,21
207:9,22 208:1
208:13 214:13
215:3 217:13
226:4 227:8,13
227:16

**rigorous** 131:2

**risk** 13:5,11
53:13 56:11,16
56:21 57:18
86:13 87:18
88:11 91:6,14,17
92:4,8,9,12,15
92:24,25 93:2,5
93:12,18,19 94:5
94:22 97:9
106:25 122:7,15

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

[risk - scroll]                                                              Page 44

125:2,10,11,15
125:20,22
132:14,19 133:1
166:17 168:13
168:20 185:13
190:14,21,25
191:1,5,13
192:19 224:19
**road** 2:4
**roamed** 216:19
**robbed** 73:9
126:4
**robberies** 136:20
172:14 175:19
177:5 194:3,11
194:12
**robbery** 13:19
72:13 94:8
95:25 106:25
119:25 128:24
146:18 147:9
151:1 155:10,10
155:11,11,12,13
172:13 175:13
177:20,25
178:10 193:18
193:19,20,21,22
195:8,8,9,9,10
195:10,13
222:14
**robust** 204:22
**rodrick** 47:25
**role** 9:14 10:5
16:1 37:18
72:23 73:14
105:10 121:5
148:5

**room** 30:17
34:17
**rosenfeld** 225:18
**roughly** 15:12
62:18 69:4
126:19,20,21
130:19,22
**routine** 40:5,10
44:2,4,15,19,24
45:21 46:4 71:5
**routinely** 44:10
46:7,8 50:25
**roving** 112:18
144:20 145:20
174:23,25
**rule** 36:25
**rules** 4:9 10:4,12
39:15,17 189:18
**run** 10:8
**running** 208:18
208:20 209:8
**rushes** 182:14

**s**

**s** 2:1 4:1 6:19
14:7,7 104:23,23
104:25
**safe** 104:12
134:8 202:19
203:8 209:23
**safer** 89:3
**safety** 37:19,21
38:10,20 56:18
89:10,25 201:21
202:2 203:1,18
204:25 205:12
206:7

**sake** 78:6 79:21
173:3
**saturation** 8:2
**saw** 7:21 28:13
95:22,23,23
225:17
**saying** 51:10
61:17 82:8
83:10 92:2
104:19 113:24
113:25 125:21
130:22 132:4,5
144:11 145:15
155:2,17 159:11
164:6 181:24
182:5 188:23
198:21 200:15
203:14 207:10
207:17 208:23
217:18 219:24
220:6,7,8,11
221:17,23
226:17,24
**says** 25:9 46:13
103:14 105:1
168:19 172:10
177:16 202:4
205:14,15,19
207:18 217:5,7
221:4
**scan** 18:24 20:2
32:18
**scare** 144:16
**schnucks** 14:6,7
**scholarly** 58:11
**school** 5:21 6:24
10:17 11:20
15:1 17:17

169:23
**schools** 7:3
**science** 29:23
58:4 219:4,18
221:4
**sciences** 10:17
28:8 29:14
58:10
**scientific** 27:21
27:23 54:22
56:25 58:3 68:1
68:4,15 69:22
82:1,23 98:11
112:8 177:1,9,23
178:15 179:2
183:8 201:8
219:25 220:12
221:18
**scientifically**
179:16 180:3
**scientists** 28:24
104:24
**scope** 91:15
116:4 122:2,8,21
122:24,25
124:22 125:5
133:3 141:12
191:9
**scp** 83:1
**scratch** 23:22
**screen** 31:8,12
31:14 63:20
70:22 167:11
168:3 172:2
186:4,7,11
223:22
**scroll** 169:6

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[se - separate]**                                                    Page 45

| | | | |
|---|---|---|---|
| **se** 22:18 83:17 | 115:3,5,12,15 | 212:15 218:22 | 210:7,10 212:5 |
| 93:24 165:21 | 117:13,16,25 | 220:2,13 221:10 | **segments** 145:12 |
| 222:12 224:5 | 118:7,8,12,18,23 | 221:19 222:21 | **seize** 78:14 79:24 |
| **search** 8:1 26:14 | 119:1,8,13 | 223:24 224:1,5 | 80:23 |
| 26:20 27:8 | 120:11,17 | **see** 6:2 7:13 21:7 | **seizing** 78:19 |
| 70:22 158:22 | 121:17 122:6 | 24:21 26:14 | **selective** 54:15 |
| 159:1,18,20 | 124:11,24,25 | 27:9 31:8,9,9,13 | 54:18 111:12 |
| **season** 157:14,14 | 125:9 127:16,17 | 31:14 33:11 | **self** 106:10 |
| **second** 25:7 | 127:23 128:2,6 | 40:7 47:13 | **selling** 195:11 |
| 54:14 95:9 | 128:10 129:3,5 | 48:10,14 51:9 | **sells** 223:4 |
| 138:23 175:17 | 129:21,25 | 55:9 70:10 | **semester** 23:11 |
| 196:2 207:13 | 132:11 133:20 | 80:12 81:2 82:4 | 23:18,18,20,20 |
| 213:24 223:8 | 134:14 135:1,4,7 | 96:13 109:8 | 24:11,12,14,14 |
| **secondary** 44:22 | 136:6 138:15 | 110:9,12 111:23 | **seminars** 90:15 |
| **seconds** 197:20 | 141:6 142:15 | 112:5 119:12 | **send** 16:25 32:18 |
| **sector** 81:18 | 143:24 144:7,19 | 121:1 124:10 | 191:20 206:20 |
| 88:5 | 145:20 147:15 | 127:2,6 130:25 | 212:16 |
| **secured** 144:13 | 148:18 149:9 | 141:2 146:16 | **sending** 59:22 |
| **security** 6:9 7:18 | 151:21 152:16 | 152:12,20 153:6 | **sense** 13:2 15:12 |
| 7:19 9:5 35:15 | 152:18 153:7,8 | 153:19 156:1 | 35:1 68:5 83:10 |
| 38:3 41:15,19 | 153:20 154:5,10 | 159:18,21 160:9 | 90:7 92:9 152:9 |
| 42:1 43:1,8 | 154:17 155:3,22 | 161:8,19 163:9 | 153:23 179:21 |
| 44:11 46:19 | 161:8 171:10 | 168:3,23 172:6 | 181:9,10,17 |
| 48:16,24 51:21 | 172:11,19,22 | 181:5,6 186:6,11 | 184:8 200:19 |
| 52:10,20,23,25 | 173:10,24 174:7 | 194:16 195:16 | 208:19 |
| 53:1,9 54:9 59:2 | 174:13,19,23 | 198:25 199:10 | **sent** 20:15,20 |
| 77:22 81:13 | 175:1,6,12,25 | 199:12 207:7,12 | 21:7,14,17,18,22 |
| 83:24 84:1,15,25 | 178:20 179:6,10 | 207:25,25 | 26:19 27:1,1,8 |
| 86:2,21 89:10,12 | 183:2,13,23 | 213:13 214:5 | 60:19,20 158:11 |
| 89:14,19 91:5,12 | 184:10,11,24 | 219:22 222:24 | 159:1,7,8,21 |
| 91:21,22 92:3,17 | 187:7 190:18 | 225:5 | 160:1,6 172:8 |
| 93:17 100:2,12 | 191:8,10 192:11 | **seeing** 37:10 | **sentence** 95:9 |
| 100:18,25 101:1 | 192:22 193:5,6 | 47:16,21 | 105:4 139:5 |
| 101:9,14,24 | 199:4 200:7,12 | **seen** 43:16 44:23 | 179:21 202:3 |
| 102:17 103:2,10 | 200:18 201:16 | 45:20 46:23 | **separate** 25:6 |
| 105:5,6,8,16,23 | 201:23 202:1,10 | 48:3 49:4 59:22 | 84:20 88:3 |
| 106:6 109:22 | 203:24 204:23 | 60:16 78:24 | 140:14 151:22 |
| 112:19 114:23 | 206:23 210:14 | 80:22 168:2 | |

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[separately - significant]**

Page 46

| | | | |
|---|---|---|---|
| **separately** 85:15 | 73:15 74:18,20 | **sexual** 172:15 | **show** 79:1 |
| **serious** 69:22 | 75:6,8 76:23 | 193:17 194:4 | 102:24 136:3 |
| 70:2 119:23 | 77:3 78:10,14,17 | **sexually** 208:10 | 148:23 180:3,4,6 |
| 120:2 154:12 | 79:24 80:2,23 | **shaking** 172:9 | 180:7,8,9,10 |
| 169:9,15 170:2 | 92:3 93:17,22 | 199:13 | 186:18 204:3 |
| **seriously** 170:20 | 94:21 95:10,13 | **shape** 84:1 | 217:5 224:21 |
| **serve** 10:5 | 96:23 97:6 | **share** 13:24 | 225:20 |
| **served** 27:6 | 102:13 104:3 | 47:12 83:24 | **showed** 51:1 |
| 89:15 159:3,14 | 109:14,23 114:7 | 110:5 | 114:21 130:2 |
| 160:14 | 114:23 115:3,5 | **shared** 31:1 | 173:19 200:16 |
| **service** 9:3,18 | 115:14,24,25 | 214:18 | 203:1 |
| 38:16 48:6,13 | 116:1 117:1,2,13 | **sharefile** 57:9 | **shown** 179:16 |
| 51:6 85:14 | 125:23 126:19 | 99:14 184:16 | **shows** 41:23 |
| 149:9 223:5 | 126:25 127:14 | 214:5 225:11 | 160:9 177:13 |
| **services** 10:8 | 127:19,20 | **sheet** 24:21 | 178:9,25 181:21 |
| 148:25 149:2 | 128:15,22 129:4 | 25:11,20 | 182:10 204:24 |
| 155:3 | 129:12 130:6,10 | **sherman** 57:5,12 | 208:25 220:6 |
| **serving** 10:13 | 130:13,18,22 | 57:19,25 225:6 | **side** 128:3 |
| 11:9 | 131:3 135:19,24 | 225:10 | 159:14 169:25 |
| **session** 196:24 | 135:25 136:24 | **shifting** 124:15 | **sign** 18:24 19:11 |
| **set** 1:25 29:9 | 140:18,24 146:3 | **shifts** 154:19,19 | 19:20 227:18 |
| 55:19 68:7 | 148:1,4,8,9 | **shooting** 13:21 | **signage** 144:3,11 |
| 107:12 116:18 | 149:5,16 152:7 | 51:12,13 155:11 | **signature** 19:22 |
| 145:6 163:11 | 152:22 156:20 | 155:11 170:19 | 19:25 20:2 |
| 169:24 213:24 | 157:14 166:24 | **shootings** 136:20 | 160:5 186:22,23 |
| 214:1 226:8 | 168:14,21 | 154:15,16 165:3 | 229:4 230:20 |
| **sets** 13:6 | 170:23 171:18 | 165:10 172:14 | **signed** 15:25 |
| **setting** 17:25 | 172:21 173:10 | **short** 6:16 | 20:5 159:23 |
| 108:20 | 173:24 174:8,13 | 166:11,11 | **significance** |
| **seven** 33:19 34:8 | 174:19 176:1 | 221:11 | 162:2 224:24 |
| 35:7,14 36:8 | 180:22 183:3,12 | **shorter** 153:20 | 225:3 |
| 39:4 40:2 41:15 | 183:23 184:12 | 194:6 | **significant** |
| 41:19 42:2 43:9 | 185:22 190:14 | **shorthand** 1:22 | 124:20 164:25 |
| 48:16,24 51:10 | 192:9 199:2 | 55:2 230:3 | 165:16 177:24 |
| 53:10,21 62:19 | 202:19 204:25 | **shortly** 154:9 | 178:9 219:7,14 |
| 65:7,21 70:12 | 209:8 210:9 | **shot** 103:25 | 220:23,24 |
| 71:10,12,15 72:8 | 211:2,15 212:2,3 | **shots** 172:7 | 224:22 225:4,21 |
| 72:22,24 73:13 | 212:13 | | 227:2 |

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[signing - specific]

Page 47

signing 157:10
157:12
signs 21:4
similar 24:13
68:9 98:3,5
106:6 119:6,18
127:7 171:11,17
similarity
152:12 153:4
simple 97:16
101:7 127:13,25
128:21 130:15
131:5 133:5,12
137:22 169:8,14
170:16
simply 54:9
79:14 124:24
135:24 138:7
223:18
simultaneous
87:14 139:8,21
189:13 195:20
196:18 197:7
single 102:10
176:20 212:18
212:19,20
sir 33:3 156:11
188:11
sit 29:17 38:21
49:1 73:16
75:14 76:21
93:15 99:21
166:20
site 33:7 34:2
50:9,12 62:8,14
62:19 63:2 65:6
65:8,16 69:8
108:17 114:5,15

123:11,18,22
124:8,11,13
187:25 188:18
190:5
sites 124:9
sitting 38:13,18
69:13 157:9
situational 96:2
101:5 112:1
183:6
six 62:10 125:15
141:14 194:2
210:16,17
size 225:23,24
sizing 95:24
skip 40:4
slides 23:6,10,16
23:17,19,21 24:3
24:7,11
slightly 72:16
97:19 166:13
185:9,11 209:10
slim 221:20
slow 5:4
small 31:13
219:1,12,15
226:21 227:7,10
227:10,11
smaller 207:8
226:13
snack 145:6
snuck 126:3
soccer 175:17,19
176:7,22
social 10:17
27:21 28:8
29:14,23 58:4
206:23 215:9

socially 8:22
society 57:1 58:6
104:23
sociology 5:21
5:23
soliloquy 199:22
199:23 200:4
214:11
solutions 230:23
somebody 54:8,8
120:13 154:13
165:4 175:22
204:6
someway 182:10
sorry 24:3 28:7
71:19 146:22
150:15 152:25
165:7 175:10
187:20 192:14
220:9 225:13
sort 5:12 6:24,25
7:5,22 8:10
13:21 17:1,23
27:13 47:10
65:17 71:1
72:17 84:21
86:1 90:22
97:16 100:21
104:25 118:22
119:13 158:20
165:12,12 184:8
185:4 188:24
196:11
sound 61:4
63:24 209:18
sounds 8:9 85:22
199:8

source 38:2
57:21 60:11
113:19
sources 113:14
southern 5:23
sp 33:10
space 20:22,25
183:18 184:2
spat 144:24
speak 5:1,2,2
11:6 16:22
34:10 103:21
130:9 142:22
149:7 200:22
212:21
speaking 79:11
79:12 87:14
130:22 139:8,21
158:9 189:13
195:20 196:18
197:7 216:2,3
223:3
specialization
5:21,24
specific 17:8
19:15 28:25
29:16 32:4
37:14 38:17
46:12 47:15
54:20 71:1 72:6
73:8 76:25
80:12 81:24
82:21 83:8
84:16,16 88:21
89:1 100:24
110:2 124:11
144:11 150:17
165:1 173:12,13

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[specific - street]                                                                    Page 48

210:10 220:9
222:6,16 226:8
**specifically**
27:12 32:15
36:24 48:7
84:14 86:9
100:10 148:11
202:7,9 209:6
**specifics** 38:1
104:14
**specified** 6:8
39:24 56:10
98:10 111:11
**specify** 90:12
**speculate** 157:9
**speculating** 76:2
136:14 137:8
**speculation** 43:4
75:10 77:17
**spend** 9:8,11
12:11 15:2 62:6
178:3 204:22
223:1
**spent** 15:6 61:2
**spilling** 121:2
124:21
**spirit** 198:17
**split** 16:11
**spot** 88:20,21
101:11,13,15
102:7,17 112:19
120:5,6 150:4,6
150:10 151:7,13
151:20 152:2,6
154:20 160:20
160:23 161:13
161:15 162:24
165:3,18,20

166:23 167:7,19
169:18 170:14
172:5 173:3
190:16 209:17
218:25 220:20
224:6
**spots** 8:15 219:5
219:5 226:18,20
**squatters** 40:6
40:11 71:5
**st** 6:2,20,21 14:5
14:8,13
**stabbings** 13:21
172:14
**stack** 109:13,13
109:13
**staff** 34:16 68:23
148:8
**standard** 21:3
39:13 56:9,19,22
59:11 66:4 99:8
102:7,22,23
103:2,6,10,13
104:16,17,19
105:1,2,3,11,15
105:17 106:18
106:21 107:3
169:11 183:24
184:18,18
204:16 219:4
224:8,12
**standards** 17:2,6
104:20 183:14
**standpoint** 99:25
**star** 186:9
**staring** 22:3
**start** 26:4 27:14
77:1 86:10

94:19 131:14
167:9,10 171:22
182:23 183:10
193:12
**started** 14:10
**starting** 167:13
187:19
**starts** 107:8
**state** 1:23 46:22
46:24 47:4,9,11
50:16 195:22
201:11 229:8,16
230:1,4
**statement**
153:15 176:17
189:5,7,21
215:25 216:15
**statements** 46:10
**states** 1:1 81:21
178:18,22
**stating** 79:14
189:19
**stations** 127:9
**statistical**
224:24 225:2,4
**statistically**
177:24 178:8
219:6,14 220:23
220:24 224:22
225:21
**stature** 17:17
**stay** 20:17,21
38:23 148:12
**staying** 54:2
**steal** 175:7
**stenographically**
230:6

**step** 74:17 122:9
159:17 160:17
**stepped** 75:4
**stepping** 45:10
**steps** 28:25 29:9
42:16
**stick** 42:10 50:2
70:19 98:12
117:5 145:9
174:23
**stites** 2:9
**stites.com** 2:11
**stolen** 167:24
176:20
**stood** 7:4
**stop** 45:9
**storage** 20:25
21:3
**store** 14:8,13
107:3 219:13
**stores** 21:13
86:17 107:1
127:8
**story** 14:21
199:11
**straight** 114:12
216:25
**strange** 182:18
**stranger** 57:17
118:21,21
161:25 162:1
**strangers** 119:22
**strategy** 189:7
**strawn** 146:18
**street** 2:9 6:7
13:15,15,17,23
230:23

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[strike - switching]**

Page 49

**strike** 17:8
**strip** 219:13
**strong** 6:25 7:6
52:23,24 155:10
155:12 179:3
193:19,20 194:3
195:10
**students** 23:4,9
23:23 106:16,17
106:21 184:19
**studies** 82:18
124:1,2 179:25
180:2 218:12,23
218:25 219:25
221:8 222:8
223:13 224:6,13
224:21 225:5,9
225:20
**study** 57:18 81:2
157:12 220:21
225:6,7,12,18,18
225:19,19
**stuff** 13:21 18:25
19:14 88:14
156:9 221:4
222:10,24
**stumble** 142:6
**sub** 30:13 100:9
**subject** 53:4
58:20 80:7
102:3 120:21
121:22 124:17
148:22 193:10
194:14,15
195:17
**submit** 20:10
25:20 26:24

**submitted** 15:25
19:7,18 20:7
21:8 26:18,21
27:10
**suborn** 197:12
**subpoena** 3:6
18:16 26:12
27:6 30:25 31:7
31:22 33:6
43:25 54:13
111:11 158:11
158:23
**subscribed**
229:11
**subselective**
54:19
**substance** 80:13
168:8
**substantial**
147:18
**substantive** 87:5
**substitute** 179:5
**sued** 134:5
**sufficient** 53:14
**suggest** 177:15
179:3 197:10
216:13
**suggesting** 17:11
**suggestion** 80:5
198:9
**suggests** 100:17
103:11 105:25
**suit** 122:20
**suite** 1:24 2:4,10
230:23
**summary** 55:2
100:21 107:21

**summer** 9:25
12:14 53:22
104:4 117:13
156:6,16,18
157:2,3
**summers** 156:22
**supermarket**
81:17 83:20
86:10
**supply** 197:9
**support** 9:4,10
9:12,14 14:1,4
14:16 15:2,7,13
15:22 16:6,13
17:12 24:19
27:17 28:22
29:19 38:17
47:8 68:25
116:24 118:8
121:4 124:16
183:19 184:3
**supporting**
113:2
**supportive**
215:16,19
**suppose** 14:24
17:14 21:10,12
23:12 98:23
128:2,25 129:2
133:22 212:17
212:22
**supposed** 32:7
35:15 44:4
216:21,24
218:19
**sure** 4:20 5:5,17
11:18,18 15:18
19:8 30:6 35:22

38:24 40:21
41:10,12 42:13
46:6 50:19
52:22,24 57:10
58:16 61:14
64:2,19 65:2,22
66:20 70:8,18
71:16 72:11
74:7 80:10,11
85:9 90:13
93:14 97:19
103:25 108:4
111:21 117:5,10
118:10 125:20
126:1,5 129:16
131:16 135:12
142:25 148:19
151:5 152:4
156:15 157:1
160:22 163:4
174:4 176:15
181:24 184:14
187:23 193:1
196:10 198:11
210:15,19 213:6
214:13
**surrounding**
116:2 117:3,8
133:15 188:5
**surveillance**
113:6 178:13
183:20 184:3
185:16
**survey** 13:4
210:23 211:2
**suspect** 169:3
**switching** 155:5

**[sworn - tenure]**                                                    Page 50

**sworn**  4:3 39:23
  219:23 224:10
  224:13 229:11
**syndicate**  209:8
**synonyms**  97:18
**system**  10:25
  22:15 23:13
  114:19,21
  117:17 162:11
  185:16
**systematic**  43:25
  44:4 72:21
**systemic**  72:18
**systems**  175:25

**t**

**t**  83:1 225:12,16
**tactics**  84:17
**take**  11:1 16:19
  33:14 34:18
  35:25 42:16
  48:15 63:6,9
  69:4 89:1
  104:13 108:5
  142:4 145:4
  169:4,17,19
  170:20 175:23
  176:7 183:9
  188:9,13 189:14
  197:11 201:14
  206:3 221:11
**taken**  1:21 4:10
  10:21 66:15
  67:13 212:18
**takes**  85:21
  206:21
**talk**  7:3 14:1
  27:15 28:13,15

30:20 54:11
  63:1 86:1 107:1
  134:12,13
  160:16 167:19
  167:23,24
  191:16
**talked**  18:5
  36:23 50:18
  55:18 143:2
  185:20
**talking**  4:18 8:23
  18:23 37:22
  45:2,11 46:12
  51:16 53:6
  59:22 69:11
  78:19 96:9
  106:22 115:10
  119:2 130:9
  134:23 154:6
  156:8,8,13
  165:22 179:11
  190:25 191:1,2
  191:22 194:19
  216:5 217:2
  224:10
**tandem**  89:24
**targeted**  181:23
  181:23 182:1,19
**targeting**  137:5
**tasked**  89:21
**taught**  184:20
**tax**  15:16
**taxes**  15:24
**taylor**  225:19
**teach**  9:2 11:23
  11:25 12:1,2
  23:4 106:17,20
  184:19

**teaching**  9:18
  11:21 23:23
  106:15
**team**  60:21
  86:14
**technique**  30:13
  110:23 111:19
  113:11
**techniques**  28:18
  30:8,10,14,16,18
  30:20 81:24
  82:2,21,24 83:8
  100:9,11,23
**technologically**
  117:24
**teenagers**  156:9
**telep**  225:11,14
**telephone**  2:5,11
  33:23 45:19
  88:11 230:24
**telephonic**  87:17
**tell**  4:8 5:1,3,6
  5:11,14 9:1,15
  11:19,20 14:3,15
  18:1 19:9 32:8
  36:7 53:19 65:3
  65:9,11 66:2
  68:3 70:9 71:10
  75:14 85:20,20
  93:4 103:23
  108:1 111:18
  119:18 128:14
  133:13 137:22
  138:7 145:17
  146:1 155:8
  157:8,10,17
  167:6,18 172:9
  172:10 181:25

183:9 192:6,17
  198:2,8,12 212:5
  218:2 221:3
  223:20 225:22
**telling**  8:9 19:20
  20:13 22:22
  24:2 29:10,11
  37:13 42:14
  43:9 49:21
  61:25 67:1
  74:24 80:25
  83:23 94:9
  117:19 118:1
  121:19 124:16
  131:17 153:16
  181:20 199:15
  201:6 204:2
**tells**  141:6
**temporal**  157:13
  210:21
**tenant**  170:10
  201:21 202:2
  203:1,18 204:25
  205:11 206:7
  207:3 212:21,24
  213:8,9,14,21
**tenants**  37:17
  94:21 129:1
  137:4 201:17
  210:3,9 211:23
  212:4 215:8,13
**tend**  110:20
  180:6
**tends**  13:14
  156:6 220:25
**tennessee**  18:12
**tenure**  6:1 12:7

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[tenured - think]

Page 51

tenured  6:4

term  7:1 40:25
  58:19 70:19
  89:9,15 90:9
  98:21 99:10
  102:21 104:16
  106:3 115:17
  160:4 174:1,9
  181:3

terms  7:19 10:14
  10:23 35:17
  47:5 48:12 85:2
  90:6,10 106:13
  106:14 127:8
  129:10 130:19
  142:9 149:4
  151:3 156:24
  165:20 167:18
  177:21 179:1
  187:19 194:10
  194:24 202:16
  222:8 224:4

territorial
  183:19 184:3

test  113:11

testified  4:3 6:11
  38:15 46:7
  50:24 51:2
  107:23 110:23
  149:14,16
  156:11 160:6
  173:6 187:12
  205:23 210:2
  212:1 216:1

testify  16:5
  56:23 75:3
  105:16 131:20
  161:22

testifying  17:3,4
  17:18 26:24
  99:2 186:14
  203:12

testimony  18:19
  25:25 26:13,22
  36:19 39:23
  42:12 44:8 46:1
  46:2 47:24
  48:19 49:14,22
  50:9,12 51:8
  52:3,5,12 67:2
  71:21 81:5
  108:13 122:1
  148:23 149:6,24
  151:1 152:21
  153:14 154:25
  156:5 159:6
  173:13,14
  176:22 177:8
  178:13,20
  183:12 202:8
  205:8 214:23
  230:9

texas  1:23,24 6:4
  9:23 10:11,25
  193:11 195:22
  201:4,5,11 230:1
  230:4,24

text  41:14,18
  42:1,25 109:21

textbook  154:20
  154:24

textbooks  166:1

texting  109:22

thank  6:17 32:20
  33:4 98:13
  160:10 173:15

196:14,22
  197:25 227:14

theatre  223:2

theft  13:20 162:7
  162:18,23 163:2
  163:3,13 164:9
  168:8,9,11,12,18
  168:23

thefts  163:7
  164:4,16

themes  111:15

theoretical  218:6

theoretically
  120:11 128:24
  129:2

theory  12:1
  103:16,25 104:2
  113:12

thereof  9:6
  211:20

thereto  41:5
  50:13

thing  16:22
  50:11 87:3 88:9
  99:18 107:16
  116:15 141:24
  148:20 176:20
  185:1 191:19
  192:25 201:22

things  8:14 30:9
  36:15 37:24
  38:5,6 55:18
  84:13 86:15,17
  87:8 89:4 90:24
  97:20 114:18
  130:21 133:17
  166:19 183:16
  183:17 187:1,16

222:21 223:9

think  4:8,15 7:9
  7:21 9:9 16:23
  18:11 20:8
  21:13 22:21
  26:16 27:12
  29:4 30:7,18
  31:25 34:12,15
  34:20 36:23
  37:5,7 38:9,19
  39:12,18 43:9
  45:4 48:25
  49:21 50:10,13
  50:18,24 51:2,10
  56:2 58:25
  60:16,17 64:10
  65:23 66:10,15
  66:16,17,24 67:1
  67:23 71:25
  74:2,23,24 76:24
  78:23,25 80:25
  87:7 88:10,12,12
  90:7,20 91:3,10
  93:1 94:4 95:3,5
  97:2,11,19,21
  99:8 100:13
  103:16,24
  104:11 106:10
  109:1,24 111:11
  114:20 115:14
  115:18 116:15
  116:16,25 117:5
  117:18 118:1
  121:10,11,19
  122:22 124:16
  128:11 131:16
  131:17,18 132:5
  136:8,19,24

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[think - totality]**

Page 52

137:20 141:24
143:1,2,5 145:15
147:5,25 148:19
149:6,11 153:13
153:16 154:9,11
154:18 155:15
155:16,17,24,25
156:8 159:3
160:12 162:4
163:18 164:6
167:22 168:16
171:24 172:4
174:6,10,12,17
174:20,25
176:19 179:17
179:24 180:1
181:1,4,14,24
182:3 184:1,9,12
184:23 185:12
185:19 187:5
188:25 189:2
196:12,15
197:14,17
198:23 200:20
200:23 201:6
202:16 204:24
205:13 207:1
208:8,22,23
211:7 212:13
214:10,11
215:15 222:15
223:22,25 224:8
225:6,7
**thinking**   11:19
138:13
**third**   54:25
**thoroughly**
196:13

**thought**   7:12
39:5 53:12
147:25 199:7
**thousands**   22:3
41:14 214:6
**threat**   144:16
**threatened**
78:14 79:24
**three**   9:19 16:10
28:17 40:2 52:5
56:5,8,9,10,13
56:15 58:15
59:1,5,7,11,15
62:17 69:14
76:14 85:13
97:7 117:4
122:23 125:14
125:16 133:6
146:6 149:16,20
152:9,11,22
153:2,17 154:2
160:24 161:2,10
168:7 185:2
216:19 227:5
**threshold**   163:23
**threw**   195:12
**throckmorton**
230:23
**throughs**   53:8
**throw**   196:24
**throwing**   178:3
**thrust**   198:8
**timberwalk**
195:23
**time**   4:16 6:18
7:12 9:8,22,25
12:11 15:6 16:9
20:7 21:10

34:11 35:3
43:20 52:9
58:19 59:3,9
61:8,10,16,18,21
61:23 62:18
64:25 66:6,7,7,9
66:11 70:23
76:5 90:18
91:13 95:17
96:2,12,20 100:3
101:12,21
103:13 116:3
117:3 119:10
120:4,5 126:12
127:12 128:7
143:7,13 144:20
145:20 149:12
150:17 152:5
153:5 157:7
179:9 180:15
183:10 185:8
191:24 194:25
202:12,13
216:20 230:6,10
**times**   4:10 26:17
36:12 52:5
58:11 62:23
74:9 88:21
122:23 125:15
131:25 133:6
137:21 138:6
141:15 142:13
149:17 161:3
164:18,21
182:12 198:24
206:10
**tired**   141:17

**title**   57:11
**today**   8:22 31:19
31:21 32:9,16
55:5,10 67:14
86:16 90:6
108:7,11 115:10
135:18 146:7
149:17 159:6
161:4 185:20
198:24 199:1
206:10 212:7
**today's**   158:8,10
**told**   9:20 14:25
20:8 26:17 27:2
36:2,19 48:15,23
69:20 71:25
74:9,12 94:1
117:15 125:14
140:12 143:3
157:15 158:6
159:4,5 171:24
171:25 172:4
176:2 196:3,6
**toledo**   5:20
**ton**   222:19
**tool**   134:13,15
178:14 179:2
**tools**   30:15
**top**   7:8,10 55:3
128:14
**topic**   25:6
**topics**   90:16
**total**   60:23,25
61:21 75:15
**totality**   65:15
67:22 111:6
207:22

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[totally - typo]

Page 53

totally 154:18
touched 166:22
town 180:22
toya 114:12,14
  176:8,11
tpi 18:3,14 35:14
  36:3,20 37:3
  39:1,10,21 40:9
  40:23 41:8,13,17
  41:24 43:1 44:3
  60:3 63:22,25
  64:4 71:3 90:22
  91:1 92:3 94:17
  94:21 95:1
  96:17 97:8
  108:22 109:21
  110:4 114:22
  115:2,25 116:25
  117:12 155:19
  173:23 174:7,18
  184:23 192:19
  192:21 202:19
  204:8 207:2
  209:17 210:7
  211:1 212:2
  214:19 215:1,11
tpi's 39:17 42:14
  43:10 79:1
  99:23 107:11,14
  107:22 213:23
  214:6
track 15:15,16
  15:19,23
traditional
  27:21
training 99:6
transcript 25:9
  25:10,12,13

67:20
transcripts
  18:18 24:18
  25:1,8 40:20
transition
  117:23
transitioned
  148:13
transparent
  198:18 199:20
trash 20:20
  21:23,23 169:5
travel 61:10,16
  61:18,23
traveling 61:9
treat 221:7
treatment 221:5
  221:6,9
trench 43:14
trends 75:5,7
  76:22 161:5,7
trial 24:18,21
  66:7 219:3
  226:14
trials 226:18
triangulate
  50:15,20 51:7
triangulated
  44:8 50:8,13
triangulation
  28:2,2,14 29:6
  29:13 48:21
  100:6 113:10,10
tried 208:16
triers 218:16
tries 127:25
trip 34:1 61:7
  62:9,15

true 15:3 18:19
  72:3 80:17
  129:16 136:21
  138:19 148:6
  156:14 215:25
  216:2,4 219:11
  230:8
try 5:3 28:6 31:7
  123:8,20 180:18
  192:16 223:23
trying 12:12
  22:20 53:18
  60:14 61:20
  82:14 83:13
  91:25 92:2,20,23
  99:3 100:21
  112:12 119:12
  121:11,20
  122:13 123:17
  128:9 131:17,20
  139:25 141:11
  145:24 148:24
  151:6 155:16
  178:23 188:25
  192:1 195:1
  203:13 207:7
  221:3
turn 27:13 33:5
  43:24 63:4 81:9
  90:5 145:10
twice 150:25
  196:3 208:11
two 11:20 21:24
  56:9,11,13,22
  57:22,25 58:15
  60:18 64:21
  66:23 81:18
  88:5 97:22

107:2 116:5
  117:3 125:3
  166:19 167:14
  169:23 175:7,13
  180:19 181:1,10
  193:16 194:1,20
  194:21,22
  195:11 197:20
  202:14 208:8,12
  216:19
type 55:3 62:12
  101:21 103:3
  106:6 127:7
  151:23 156:21
  158:5 177:3,4
types 13:13,22
  53:19 59:14
  72:7,9 177:5
typeset 22:18
typical 110:3
  222:7
typically 11:24
  16:22 19:23
  20:14 22:25
  26:7 32:10
  36:25 47:13,14
  53:24 56:13
  61:11 83:14,16
  84:7,18 96:11
  98:2 118:20
  119:2 120:2
  121:9 124:1,8,10
  124:13 161:25
  166:3,9 206:17
  226:19
typo 179:17,20

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[u - verified]

Page 54

| u | | | |
|---|---|---|---|

**u**  6:19 14:7
180:17
**ucr**  172:17
**uh**  107:8
**ultimate**  145:23
**ultimately**  54:21
111:13 133:23
**umsl**  6:18,24 7:4
7:6,13
**undercover**  8:2
**undergraduate**
11:24 12:2
**undermine**
49:16
**understand**  19:8
22:20,21 25:7
26:22 28:16
29:1 31:2 35:20
42:12,13,14 51:9
56:15 58:17
60:14 61:16,20
63:21 74:7 80:8
82:7 87:20
89:11 91:25
92:23 94:2 96:7
97:4 104:19
105:10 106:14
123:16,21 125:8
130:16 131:16
132:4,4 135:3
138:10,12 140:1
141:21 145:2
149:13 151:6,25
152:20 154:25
155:17 159:10
160:17,22
166:12 180:18

188:23 190:4
200:15,21
203:13 218:1,7
218:20 220:11
221:17 223:3
**understanding**
7:5 16:8 64:14
83:9 93:15
98:21,23 116:9
116:12,19
121:25 159:11
**understood**  24:1
26:23 65:10
122:12 124:18
**undertake**  116:1
117:2
**undetectable**
223:10
**undetected**
189:3
**unfounded**
198:16
**ungated**  177:20
178:1,11
**unheard**  222:25
**uniform**  112:5
162:10 218:9,24
222:1 224:4
**uniformed**
143:24 144:7
224:18
**unit**  40:5 71:5
103:12,18
104:11 182:8
**united**  1:1
178:17,21
**units**  81:20 88:7
182:5

**university**  5:19
5:20,23 6:1,3,21
9:23 10:3,8,11
10:15,18,25 11:3
11:6,8,13 17:15
**university's**
89:10
**unjustified**
174:18 175:2
**unknown**  169:3
**unlocked**  216:18
217:4
**unquote**  115:7
**unreasonable**
174:4
**unremarkable**
224:14
**unusual**  223:1
**upgrading**
185:16
**uploaded**  57:9
184:16
**ups**  46:19
**urban**  13:24
**use**  23:4 24:13
24:16 25:23
34:22 58:19,24
59:5 66:4 82:17
84:1 90:6,9,10
90:18,20 97:20
97:25 98:25
99:4,17 100:23
101:19 102:15
102:21 103:5
104:16 106:3,14
111:18 113:11
150:6 174:22
181:9 182:3

192:21
**useful**  200:23
217:25
**users**  70:6
**usual**  4:9
**ut**  10:25 22:6
23:4,9 89:12
**utd**  89:24
**utility**  151:7

| v | | | |
|---|---|---|---|

**v.m.f.**  1:6
**vacant**  40:5,10
71:5
**vague**  198:15
**vaguely**  186:16
**value**  48:17
178:16 213:1
**variables**  13:7
102:19 119:9,16
120:18 130:17
137:6
**variance**  184:5
**variety**  37:24
**various**  49:22
86:17 90:2
99:11 100:9
102:19 128:1,2
135:4 142:4
218:23 223:14
**vehicle**  13:20
162:7,18,23
164:3,9
**venue**  172:20
**verbal**  83:14
**verbally**  83:24
**verified**  45:25
165:11

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

[verify - want]

Page 55

| | | | |
|---|---|---|---|
| **verify** 113:14 | 71:13,24 72:2,10 | 220:18,19,20,25 | **virtual** 185:17 |
| **veritext** 31:2 | 72:13,24 73:5,11 | 221:9 223:14 | **virtually** 49:17 |
| 230:23 | 73:14,22 74:20 | 224:22 225:21 | 102:8 |
| **versa** 52:8 | 75:8,19,25 76:15 | 226:1 | **visibility** 144:14 |
| **verse** 99:21 | 88:23,25 92:13 | **violent** 12:3 | **visit** 50:10,12 |
| 120:16 | 93:20 94:14 | 13:23 53:3,13,15 | 61:12 62:9,15,19 |
| **version** 22:14,16 | 102:5 105:25 | 57:17 76:9,10 | 63:2 65:6,8 69:8 |
| 22:19 49:23 | 110:19 118:15 | 93:6,21 94:7,22 | 141:25 142:9 |
| 176:8,12 | 118:18,21 119:4 | 100:1 101:11,12 | **vs** 1:8 |
| **versions** 19:5 | 119:21 121:16 | 106:22 110:11 | **vulnerability** |
| 20:4 | 121:21,23 | 112:22 113:4 | 84:15 |
| **versus** 120:9 | 122:14,15 123:9 | 118:14 119:23 | |
| 177:20 179:12 | 123:21 124:7,9 | 121:2 124:21 | **w** |
| 182:1 219:5 | 131:8,22 132:14 | 133:1 146:21 | **w** 2:8 57:19 |
| **veteran** 49:15 | 132:19 134:2,13 | 147:11,12,14,24 | **wait** 22:10 |
| 77:23 | 134:14,19 | 150:13,16 151:3 | 138:23 193:22 |
| **vice** 52:8 | 135:10,14 | 151:16 152:12 | 213:3,3,3 |
| **vicinity** 188:8 | 136:10 140:20 | 156:18,22 | **walk** 16:18 |
| **victim** 101:22 | 140:21 141:9 | 162:14,19 163:8 | 112:16 167:17 |
| 120:2 147:4,4 | 145:16,19 146:3 | 163:14,21,22 | 218:22 219:20 |
| 162:2 170:12,17 | 147:19 151:17 | 164:2,4,8,10,17 | **walked** 46:7 |
| 188:7 190:4 | 154:22 156:10 | 164:20,25 | 216:18 |
| **victimization** | 156:15,16,25 | 166:16 169:10 | **walking** 46:17 |
| 13:5,10 | 158:4 161:6,16 | 169:15,16,25 | **wandering** |
| **victimized** 226:4 | 161:20,24,25 | 170:17 172:12 | 217:4 |
| **victimless** 11:23 | 162:5 163:10,13 | 172:18 174:21 | **want** 16:19 |
| **victims** 226:4 | 164:13,22 165:9 | 175:4 177:2,4,5 | 27:13 30:21 |
| **view** 14:12 37:19 | 165:15,21,24,24 | 177:7,10 178:21 | 32:18 38:24 |
| 52:20 53:1 | 166:3,15,17,25 | 179:23 181:2,14 | 54:12 55:10,14 |
| 118:25 130:19 | 167:4 168:13,21 | 185:13 187:19 | 57:11 65:22 |
| 133:8 163:12 | 176:4 178:17 | 188:18 191:5,6 | 69:19 70:19 |
| 172:5 201:19 | 179:2,4,18 180:4 | 191:14,16,23,25 | 74:7 81:2,9,22 |
| 220:12 224:17 | 180:9,11 185:17 | 192:7,9,18,20 | 85:25 96:7 |
| **views** 116:19 | 185:18 187:9 | 193:10 218:21 | 105:10,10 |
| **violate** 203:9 | 190:14 191:2 | 219:4 220:8,15 | 106:13 110:9,12 |
| **violence** 6:8 | 193:3 194:11 | 221:20 223:6 | 116:23 118:3 |
| 13:16,18 59:10 | 216:9 218:10 | 224:19,19 227:1 | 121:1 124:10 |
| 69:23 70:2,17 | 219:15,22 | 227:5 | 127:6 134:7 |

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[want - written]**

Page 56

137:18,25
138:14 140:17
141:17,20 145:4
145:11,14
151:15 153:13
157:9,9 160:2,8
167:5,9,17
176:24 180:18
186:25 187:16
187:23 189:2
201:2 207:6,8
209:14 214:3
221:15 225:9
**wanted** 4:22
22:16 28:16
35:1 137:16,23
140:15 148:8,9
149:5 190:3
193:9 204:22
213:19
**wants** 25:16
83:22 173:17
**warm** 157:4
**warn** 210:3,8
**warning** 90:23
**warrant** 112:18
145:19 174:22
174:22
**warranted**
100:17 153:8
**warranting**
154:4
**warrants** 8:2
**waste** 174:6
**watch** 215:7,12
**watershed**
195:22

**watters** 1:23
**way** 4:23 17:8
21:19 24:5 31:3
59:14 62:2,12
76:21 85:21
123:15 137:10
143:20 144:1
153:14 177:14
185:8 192:5
196:20,20 197:3
199:17 204:22
**ways** 30:17 72:5
**weak** 129:21
**weapon** 101:22
120:2 169:9,14
170:1,16
**weather** 157:4
**week** 9:12,16
15:1,10 52:6
64:21 102:13,14
143:4 154:20
185:3 194:25
219:2
**weekends**
154:19
**weeks** 96:23
184:17
**weigh** 78:3
**weight** 170:3
**went** 14:23
74:25 125:16
138:24 141:25
154:18 169:4
195:16 201:3
202:13 205:5,19
**west** 187:23
188:1,5

**wetting** 19:21
160:5
**whatsoever** 80:5
203:8
**wholly** 130:13
**widely** 28:8
**willing** 158:10
159:20
**window** 96:12
96:15 175:18,20
176:10,19,23
**winter** 63:23
**wire** 128:14
130:4 133:20
**withdraw** 79:7,9
**withheld** 79:19
**witness** 1:20 3:1
10:13 79:20
140:3 144:19
200:1 227:16
228:2 229:4,12
230:7,9
**witnesses** 49:23
66:21
**wonder** 219:10
**wondering** 8:13
29:2,15 69:24
92:7 155:15
166:12 222:17
**word** 18:17 31:1
31:15 70:21,23
90:18 98:25
117:9 131:1
139:7 150:6
164:14 174:22
182:3 188:9,11
188:13

**words** 5:15 67:2
68:16 87:23
103:9 134:1
155:5 163:12
**work** 8:10 10:18
11:16 14:2
22:23 30:22
33:1 36:11
58:10 83:25
106:15 123:24
145:14 157:10
158:16,18
159:15 160:14
223:9,17
**worked** 8:6,13
18:6,10,13 89:23
**working** 12:11
13:3,9 36:10
61:3,19,24 141:3
158:17 180:23
**works** 21:19
**world** 58:6
219:11,16
**worth** 153:3
161:3 230:24
**write** 19:11 22:8
22:24,24 69:2,5
194:10 201:13
215:22
**writing** 68:17
69:10,11 76:20
84:18
**written** 10:16,19
19:12 23:3,7
25:4 28:19,23,24
29:3,8 58:4
83:17,25 84:21
84:24 85:2,4,16

Bruce Jacobs
Diaz, Elsa Flores v. The Partnership, Inc

August 11, 2022

**[written - zoom]**

Page 57

86:20,23 87:5,9
103:10 105:2,11
105:14 107:14
115:12,15,20
159:5 177:19
202:22
**wrong**   131:23
199:5,19,19
221:18 222:11
**wrote**   14:18,19
18:16 83:11
87:7 146:14
188:10 203:23
204:18
**wynn**   33:10,19
34:4,10,13,19,25
35:4,6,13 36:2
36:19 44:9
45:25 46:6 48:1
48:7,15,23 49:2
49:10,24 50:3
62:21 71:3
77:23 95:22
113:24 114:13
114:15 117:11
208:10,10,24
209:7,25 210:8
212:11
**wynn's**   49:7
176:8,12

**x**

**x**   3:1 51:18
75:24,25 144:12
144:13

**y**

**y**   51:18 75:24,25
144:12,13
**y'all**   145:4
**yeah**   7:8,11,11
13:15 20:19
24:20 31:17
32:10 47:13
62:3 64:19
71:22 73:2
76:17 77:18
82:16 87:15
90:13 91:25
96:11 126:22
142:9 147:13
157:4 160:3
166:12 179:11
179:13,19 180:1
181:9 183:16
193:8 195:1
198:1,6 200:10
200:19 209:6
214:2,25 216:8
217:7 220:9
226:5 227:9
**year**   11:20 12:10
15:1,4 23:23,24
47:20 49:15
56:5,8,22 57:22
57:25 59:5,7,11
59:15 77:23
89:9,15 102:11
146:21,25
149:20 151:4
152:9,11 154:2
160:25 168:7
185:18 193:18
193:19 208:8,12

227:1,5
**years**   6:12 8:1
12:21 16:10
38:16 40:3
55:23 56:9,10,11
56:13,16 58:15
58:15 59:1
76:14 84:22,23
96:24 97:7
117:4 125:17
146:6 148:2
149:16 152:22
153:2,17 159:4
160:24 161:2
169:23 184:20
193:16 194:2,20
194:21,22
**youngest**   66:23

**z**

**z**   51:18 75:24,25
144:12,13
**zamora**   66:23
**zeroed**   153:18
**zoom**   2:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.