# EXHIBIT B

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION
3
    ELSA FLORES DIAZ and           )
4   EDWIN MEDRANO CACERES,         )
    for themselves and on behalf   )
5   of their minor children        )
    E.M.F., V.M.F., B.M.F., and    )
6   H.M.F.,                        )  No. 1:21-cv-03661-ELR
                                   )
7        Plaintiffs,               )
                                   )
8    vs.                           )
                                   )
9   THE PARTNERSHIP, INC.,         )
                                   )
10       Defendant.                )
11
12
13                     DEPOSITION OF
14                      LATOYA WYNN
15                    June 2, 2022
16                      10 a.m.
17                 Zoom Videoconference
18
19
20
21          Diondre' Thomas, RPR, CCR-B-2433
22
23
24
25

Latoya Wynn                                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 2

1    APPEARANCES OF COUNSEL:

2

         On Behalf of the Plaintiff:

3

             AARON BLOCK, ESQ.
4            MAX MARKS, ESQ.
             ALLISON BAILEY, ESQ.
5            PRISCILA BARRVCHEIA, ESQ.
             The Block Law Firm LLC
6            309 East Paces Ferry Road, Suite 400
             (404) 997-8419
7            aaron@blockfirmllc.com

8

         On Behalf of the Defendant:

9

             JEFFREY MELCHER, ESQ.
10           Stites & Harbison
             303 Peachtree Street, #2800
11           Atlanta, GA 30308
             (404) 739-8800
12           jmelcher@stites.com

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                    INDEX OF EXAMINATIONS
2    BY MR. BLOCK..........................4
3                  DESCRIPTION OF EXHIBITS
4

     PLAINTIFF
5    EXHIBIT NO.              DESCRIPTION              PAGE
6    Exhibit 1               TPI 00009 - 10           22
7    Exhibit 2               TPI 00014 - 19           24
8    Exhibit 3               TPI 00003 - 8            27
9    Exhibit 4               TPI 00060 - 62           32
10   Exhibit 5               TPI 003939               46
11   Exhibit 6               TPI 004148               49
12   Exhibit 7               TPI 004172               62
13   Exhibit 8               TPI 004185               81
14   Exhibit 9               TPI 002615 - 2626        96
15   Exhibit 10              Eye Q Statement of Work  105
16   Exhibit 11              The Partnership Inc.      118
                             First Amended Answers to
17                           Plaintiff First Set of
                             Interrogatories
18
     Exhibit 12              TPI 000575 - 581          140
19
     Exhibit 13              Diaz 00056 - 63           142
20
     Exhibit 14              TPI 000460 - 461          144
21
     Exhibit 15              TPI 000474                147
22
     Exhibit 16              TPI 002513                151
23

24

25

Page 4

```
 1                P R O C E E D I N G S
 2                    LATOYA WYNN,
 3   having been first duly sworn, was examined and
 4   testified as follows:
 5                    EXAMINATION
 6   BY MR. BLOCK:
 7        Q. Good morning, Ms. Wynn.  My name is Aaron
 8   Block and I represent the Diaz family who are the
 9   plaintiffs in this case and I'm going to be asking
10   you most if not all of the questions today.  Okay?
11        A.  Okay.
12        Q.  Before we get into questions and substance
13   I'm going to go over some ground rules and things
14   like that just to make sure you and I are on the same
15   page about how to do what we are doing today.
16        A.  Okay.
17        Q.  So that I understand, have you ever had your
18   deposition taken before?
19        A.  Yes.
20        Q.  Okay.  So you have a general sense of what
21   we are doing in terms of I ask you questions, you
22   give verbal answers, and the court reporter writes
23   everything down?
24        A.  Yes.
25        Q.  Very good.  Probably the most important
```

Page 5

1    thing for us is -- it's always important not to talk

2    over each, but especially since the court reporter is

3    appearing by phone.  We need to give her every chance

4    to catch all the words we're saying.  So I'll try not

5    to talk over you and you can do that for me too.

6    Okay?

7        A.  Okay.

8        Q.  Very good.  Can you tell me since you have

9    been deposed before about the circumstances under

10   which you were deposed before?

11       A.  I was working at an apartment in Etheridge

12   (phonetic) and the tenants had broken into the FedEx

13   truck.  I wanted to make sure I said the right

14   company.  Yeah, they broke in the FedEx truck and

15   held him hostage.

16       Q.  Oh my.

17       A.  Yeah.

18       Q.  So you were just a witness to --

19       A.  I just happened to be the assistant manager

20   there so we had to do a deposition on it, but I

21   really wasn't aware.

22       Q.  Okay.  Have you ever been deposed any other

23   times?

24       A.  No.

25       Q.  Have you ever testified in a courtroom?

Page 6

1        A.  Yes.

2        Q.  Okay.  Could you tell me about that?

3        A.  Yes.  It was a [unintelligible] something

4    with a traffic -- it was a traffic violation.  It was

5    an accident.  That's all I can remember.

6        Q.  Okay.

7        A.  I can't really recall.  That's it.  But I

8    know I had to do this, so that's all I'm saying.

9        Q.  Very good.  And by "do this" you mean raise

10   your right hand?

11       A.  Yes, and sworn.  And the clerk actually

12   inside the courtroom did the swearing.

13       Q.  Sure.

14       A.  That was it.

15       Q.  So the clerk swore you in.  Okay.  Very

16   good.  Well, let's do this before we turn to the

17   case.

18            Can you tell me what you did to prepare for

19   your deposition today without telling me about the

20   substance of any conversations you had with

21   Mr. Melcher or any other attorney?

22       A.  I'm not sure.

23       Q.  Well, did you have any meetings -- again

24   don't tell me about the substance.

25            Did you have any meetings with Mr. Melcher

Page 7

1   to prepare for your deposition?

2        A.   Yeah.   Yeah, by phone but not in person.

3   Okay.   That's what I want to make sure I'm getting

4   the question right.

5        Q.   Yeah.   If I ever ask you a question today

6   and it doesn't make sense or you don't understand --

7        A.   That's why I just wanted -- [overtalk]

8        Q.   We don't want anyone to guess or speculate.

9        A.   Okay.

10       Q.   And I'll assume and the record will sort of

11  read as if you understood my question if you answer

12  it, but just make sure you do understand it.

13            Okay?

14       A.   Yes.

15       Q.   Very good.   So it sounds like you had a --

16  was it just one telephone conference or meeting with

17  Mr. Melcher?

18       A.   In terms of calls I know one, but I don't

19  think it was too much more.

20       Q.   Did you meet or have any discussions with

21  anyone else who works at Seven Court or for TPI?

22       A.   Yes.

23       Q.   And who was that that you can recall?

24       A.   My boss.

25       Q.   Being Mr. Harris?

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 8

1      A.   Yep.

2      Q.   And when was that?

3      A.   We talked last week, last Friday.

4      Q.   Okay.  And that was to prepare for your

5 deposition?

6      A.   Oh, no.  I'm thinking you're asking me -- so

7 you were asking me about the deposition.  Okay.  Yes.

8 Just in general the lawyers have us talking not

9 anything else.  It's too much work.

10      Q.   Okay.  You're probably short staffed like

11 everybody else.

12      A.   So I do apologize.  That question I was

13 thinking when was the last time I talked with my

14 supervisor so I was a little off on that.

15      Q.   Okay.  But just so I understand, it sounds

16 like you did speak with your supervisor Mr. Harris

17 last week?

18      A.   Yes.

19      Q.   Was that about this case?

20      A.   Yes, about me coming to this deposition.

21 Yeah.

22      Q.   Okay.  What did you and Mr. Harris talk

23 about specifically?

24      A.   Well, all of us talked.

25      Q.   Oh, Mr. Melcher was part of that as well?

Latoya Wynn                                      June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                          Page 9

```
 1        A.  Yes.

 2        Q.  I understand.  Okay.

 3        A.  Yes.

 4        Q.  All right.  Did you review any documents or

 5   e-mails or?

 6        A.  No.

 7        Q.  Very good.  Did you meet or discuss your

 8   deposition or this case within the last few weeks

 9   with anybody else?

10        A.  I guess Maggie.

11        Q.  And that's Ms. Fontaine?

12        A.  Yes.

13        Q.  Sure.  And when did you discuss the

14   deposition of this case with Ms. Fontaine recently I

15   mean.  Obviously I know you would have talked about

16   it before.

17        A.  Yeah, that's what I'm asking.  We -- I can't

18   recall the date.  Like I don't know if you want

19   specific dates and times or -- I'm not sure.

20        Q.  We will come back to some of those.

21        A.  Okay.

22        Q.  For instance, there are times we may know.

23   We have some not all of the e-mails and texts.  So we

24   know when you all were e-mailing about the case.

25        A.  Yes.
```

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 10

1     Q.   And so if I want to ask you about that --

2     A.   Yes.

3     Q.   -- I'll just ask you about that rather than

4   asking you to tell me:  Now it was September 29th --

5     A.   Correct.

6     Q.   -- at 2:00 in the afternoon.  So that

7   wouldn't be fair to you?

8     A.   No problem.

9     Q.   All right.  Well, can you -- I'll try to

10   give you an outline of where we are going or an

11   agenda.  And so the first thing we're going to do is

12   just talk about your job --

13     A.   Okay.

14     Q.   -- what you do at work, who you work for,

15   things like that.  And then we'll go into more of the

16   specifics of the case.  But first we just want to

17   know about you, kind of your biography.

18     A.   Okay.

19     Q.   So starting with high school, can you tell

20   me about your education and work history up to the

21   present day?

22     A.   Yes.  I went to Frederick Douglas High

23   School.  I graduated in 1998.  After that I started

24   working in property management.  I started out at

25   Lane Company, and I worked for -- I worked for

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 11

1    different companies.  So I normally stay four to five

2    years.  I don't really try to move around.  And

3    that's about it.  And I go to school.

4         Q.   You currently go to school?

5         A.   Yes.

6         Q.   Where do you go to school?

7         A.   I go to Strayer.

8         Q.   What are you studying?

9         A.   Business management.

10        Q.   Oh, that's great.  Do you plan to -- what do

11   you plan to do with that degree when you get it?

12        A.   I'll see.

13        Q.   See what the economy looks like when you get

14   your degree.  Fair enough.  Fair enough.  All right

15   very good.  I'm going to ask you questions today and

16   you'll think:  Surely he knows the answer to that.

17   But sometimes I have to ask these things on the

18   record.

19        A.   Okay.

20        Q.   Can you tell me where you work today?

21        A.   Yes.  I work at Seven Courts Apartments.

22        Q.   What is your job at Seven Courts Apartments?

23        A.   I'm the property manager.

24        Q.   Okay.  And what are your job duties as the

25   property manager at Seven Courts?

Page 12

1      A.   I oversee everything, train, motivate,

2   teach, supervise, hire vendors, do inspections.  I'm

3   kind of like the overseer of everything to make sure

4   that the day-to-day operations run properly.

5      Q.   And who is beneath you or who is below you?

6      A.   Okay.  You've got the maintenance

7   supervisor, you have the assistant manager, the

8   department maintenance, the maintenance tech and the

9   grounds position.

10      Q.   And then who is above you?

11      A.   Rodrick Harris, Cindy Jacob and John Porter

12   (phonetics).

13      Q.   And when did you start working at Seven

14   Courts?

15      A.   At Seven Courts I started working in 2017.

16      Q.   And what was your job when you started in

17   2017?

18      A.   Property manager.

19      Q.   And you have had the same job since 2017?

20      A.   Yes.

21      Q.   All right.  And have you had different

22   supervisors over the time that you have been at Seven

23   Courts?

24      A.   Yes.

25      Q.   Who did you have before Mr. Harris?

Latoya Wynn
June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 13

1       A.   I had Bonnie Gayner.

2       Q.   When was Gayner your supervisor?

3       A.   She was my supervisor from the time I

4    started until -- I really just don't recall when to

5    end, but she was my supervisor from the time I

6    started until Rodrick became into the full role

7    because he had to leave.

8       Q.   I see.  Just so I have the definitions

9    correctly, you're a property manager?

10      A.   Uh-huh.

11      Q.   And then the person who is above you what is

12   his or her title, Mr. Harris's title?

13      A.   Regional manager.

14      Q.   Okay.

15      A.   Now.

16      Q.   Okay.

17      A.   Because at first when Bonnie Gayner was

18   overseeing he was the area manager.

19      Q.   Okay.

20      A.   And then once Bonnie stopped being my

21   supervisor, he became the regional manager.

22      Q.   Okay.  So if we think it up on a pyramid,

23   it's property manager at Seven Courts?

24      A.   Uh-huh.

25      Q.   Is the next person up an area manager?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 14

1      A.   Yes.

2      Q.   And over an area manager is a regional

3  manager?

4      A.   That's correct.

5      Q.   Okay.  Can you tell me, if you know, what's

6  the difference between a regional manager and area

7  manager?

8      A.   I would say area would be more than likely

9  Atlanta, Georgia; and then regional would be Georgia,

10 Florida, North Carolina, South Carolina like regions.

11     Q.   Okay.  And am I right that Gayner worked at

12 TPI until fairly recently?

13     A.   Yes.

14     Q.   Do you recall roughly when she left?

15     A.   No, I don't.

16     Q.   Do you know where she is working now?

17     A.   No, I do not.

18     Q.   Do you know why she left?

19     A.   No, I do not.

20     Q.   Okay.  All right.  So sticking with your job

21 duties as a property manager at Seven Courts for a

22 little bit.

23          You obviously use e-mail for work?

24     A.   Yes.

25     Q.   We've seen that.  Do you use a cell phone

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 15

1    for work?

2        A.  Yes.

3        Q.  Which cell phone do you use?  Like is it a

4    personal cell phone of yours or a company cell phone?

5        A.  No, they don't have that kind of stuff for

6    managers; but I have my own just work phone so I can

7    cut it off.

8        Q.  Oh, you have a separate.  Okay.

9        A.  Yeah.

10       Q.  And I'll have to ask you these just so the

11   record is clear.

12           You have a personal cell phone?

13       A.  Uh-huh.

14       Q.  Which could be for friends, family, what

15   have you?

16       A.  That's correct.

17       Q.  You also have a work cell phone?

18       A.  That's correct.

19       Q.  A different device?

20       A.  That's correct.

21       Q.  All right.  And then do you also in addition

22   have a Google voice number or anything like that?

23       A.  Now I might have one that I created because

24   I know the job.  The residents are going to call my

25   cell phone number.  I might have one, but don't

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 16

1    actively use it so I don't know the number.  So I

2    probably have an account.

3        Q.  Okay.  It's not one that you actively use?

4        A.  That's correct.

5        Q.  Very good.  Very good.  And then do you ever

6    use your personal cell phone to -- or historically

7    have you to text with any of your coworkers?

8        A.  My personal?

9        Q.  Uh-huh.

10       A.  Yes.

11       Q.  And I assume you use your work telephone to

12   text with coworkers, too?

13       A.  Yes.

14       Q.  Okay.  And do you know -- I'll get the

15   numbers here.  Look, let's do this.

16           Can you just give me the last four digits of

17   the personal cell phone number?

18       A.  Let me just give you both of them --

19       Q.  If it's easier.

20       A.  -- so I can make sure.  1527, that is my

21   work number.  And then my personal number is 4107.

22       Q.  And what kind of -- what brand of devices

23   are those?

24       A.  iPhone.

25       Q.  And so you're using the Apple message app --

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 17

```
 1        A.   That's correct.
 2        Q.   -- for texting that you do with coworkers?
 3        A.   No.   Apple messages I don't understand.
 4   Like the iMessage. [overtalk].
 5        Q.   I'll just show you mine.
 6             COURT REPORTER:  Excuse me.  Excuse me.  Can
 7        you guys hear me?
 8             MR. BLOCK:  Yep.
 9             COURT REPORTER:  So we are going to have to
10        go back a little bit.  I need you to stop
11        talking over each other because for me I'm
12        actually on Zoom so it cuts you out.  It doesn't
13        just talk over you.
14             MR. BLOCK:  I see.
15             COURT REPORTER:  As you're talking and you
16        know, you're saying uh-huh and you're kind of
17        interrupting, it's kind of canceling out as
18        you're going on.
19             MR. BLOCK:  Okay.
20             COURT REPORTER:  So the last thing I have
21        is:  "for texting that you do with coworkers"
22        and you said Apple and you were going back and
23        forth kind of quickly.  So maybe the witness can
24        kind of pause after you ask the question and
25        then answer.
```

Page 18

```
 1              THE WITNESS:  Okay.

 2              COURT REPORTER:  Thank you.

 3              MR. BLOCK:  I'll re-ask those questions.

 4         Thank you.  And again, please jump in if you

 5         need.

 6              I'll ask you those questions again just to

 7         make sure we get a good, clean transcript on

 8         that.

 9              COURT REPORTER:  Thank you.

10    BY MR. BLOCK:

11         Q.  So I think what you just told me Ms. Wynn is

12    that you have a personal cell phone that's an Apple

13    and you have a work cell phone that's an Apple.  And

14    you use both of those cell phones to text with your

15    coworkers at various times.

16              Is that what you're telling me?

17         A.  Yes.

18         Q.  Very good.  Thank you.  And do you recall

19    whether the lawyers for TPI asked you to look for

20    text messages on your cell phone that might relate to

21    this case or to document requests that we made?

22         A.  Yes.

23         Q.  And which cell phone or cell phones did you

24    search?

25         A.  Both.
```

Latoya Wynn                                      June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 19

1      Q.   And did you give text messages from both to
2  the lawyers for TPI?
3      A.   Yes.
4      Q.   Thank you.  And thank you for doing that.
5  So I want to ask you a funny question.
6           What company do you work for?
7      A.   TMI, LLC.
8      Q.   And does TMI, LLC stand for TPI -- well, let
9  me back up.
10          Is it TMI, LLC or TPI Management Services,
11 LLC?
12     A.   Correct.  And you're correct.  It is TPI
13 Management Services, LLC.
14     Q.   Okay.  And when to your knowledge did you
15 start working for TPI Management Services, LLC?
16     A.   I'm not sure how to answer that question.
17 I'm not sure how to answer that.
18          MR. MELCHER:  If you can't answer then
19      that's your answer.
20          THE WITNESS:  Okay.  I don't know the
21      answer.
22 BY MR. BLOCK:
23     Q.   And can you explain why you don't know the
24 answer of when you started working for your employer?
25     A.   Because it was TPI at first and now they've

Latoya Wynn                                   June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 20

1    changed and I don't want to give you the incorrect

2    date of when they changed to that name.  TPI

3    Management Services, LLC, I don't know the correct

4    date and I don't want to give you the incorrect date.

5         Q.  I understand, and I appreciate that you

6    don't want to speculate.  We don't want that either.

7    We've seen some emails --

8         A.  Yes.

9         Q.  -- where you had TPI, The Partnership

10   Inc. --

11        A.  Yes.

12        Q.  -- on your e-mail until the fall of last

13   year 2021.

14        A.  Okay.

15        Q.  And then at some point in the fall probably

16   in October or November or maybe December of last year

17   2021, your e-mail signature changed to TPI Management

18   Services, LLC?

19        A.  Okay.

20        Q.  Do you think that is about when your

21   employer changed from TPI to TPI Management Services,

22   LLC?

23        A.  Once again, I'm not sure.  I don't handle

24   that type of thing, so I can't recall either.

25        Q.  Can you tell me how you learned that your

Latoya Wynn                                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 21

1    employer had changed from TPI to TPI Management

2    Services, LLC?

3         A.   They e-mailed us and told us to change our

4    signature block and it was by e-mail.

5         Q.   Do you think that was this calendar year

6    2022?

7         A.   I think -- I don't recall.

8         Q.   Here is something I think we can all do.

9              Was it before COVID or after COVID, before

10   lock down or after lock down?

11        A.   After COVID.

12        Q.   Okay.  That's one of the --

13        A.   Do you have a document that I can review?

14        Q.   We'll ask for those.

15        A.   Okay.

16        Q.   I have heard about this e-mail.

17        A.   Okay.  I just want to make sure right now

18   for the question.

19        Q.   I appreciate that.  I don't have it today.

20   Okay.  So let me show you -- I'm going to -- you

21   probably know I'm going to show you exhibits and

22   things like that.  So I'm going to do the first one.

23             And Madam Court Reporter, in terms of the

24   exhibits, I actually didn't bring stickers

25   unfortunately, but I can just hand write the number

Page 22

1    for the exhibits, and then we will scan that in and

2    get them sent to you.  Does that work?

3              COURT REPORTER:  Yes.

4              (Exhibit 1 was marked for identification.)

5    BY MR. BLOCK:

6         Q.  So I'm going to mark as Exhibit 1, Ms. Wynn,

7    a document that has the Bates label -- and you may

8    know what a Bates label is but I will just show you.

9    A Bates label is just these numbers down here at the

10   bottom that say TPI and then some numbers.  And that

11   means it's a document that TPI produced to us in this

12   case.

13        A.  Okay.

14        Q.  And they put the numbers so that we all know

15   what we're talking about when they produce multiple

16   documents.  We do the same thing.  So Exhibit 1 is

17   going to be a document entitled, TPI -- or excuse me

18   not entitled but with the Bates stamp TPI 00009

19   through 10.

20              And I will ask you, Ms. Wynn, if you can

21   look at that Exhibit 1 and tell us what it is if you

22   recognize it.

23        A.  This is my application.

24        Q.  You may need to speak up a little bit.

25        A.  Oh, this is my application for employment.

Latoya Wynn                          June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                    Page 23

1          Q.  And something I've wondered about, I believe

2     you go by Ms. Latoya Wynn today?

3          A.  Yes.

4          Q.  But I think I've also seen where you go by

5     Ms. McLester?

6          A.  No.

7          Q.  No?

8          A.  Not anymore

9          Q.  Not anymore.  But this is your application?

10         A.  That is correct.

11         Q.  And how would you -- I don't want to

12    mispronounce your first name.

13         A.  It's Tacharmne.

14         Q.  Tacharmne.  Okay.  Tacharmne McLester who

15    filled out the job application for TPI is you Ms.

16    Latoya Wynn?

17         A.  That's correct.

18         Q.  Okay.  That's what I thought.  I just wanted

19    to make sure.

20         A.  I had a name change.

21         Q.  I understand.

22         A.  Okay.

23         Q.  I didn't know that, but I understand what

24    you're saying.  Okay.

25              If you flip to the second page of this, it

Page 24

1    looks like your job application was dated and signed

2    on November 30, 2015?

3          A.   That is correct.

4          Q.   And the top of the application say:   TPI,

5    The Partnership, Inc. Committed to Excellence in

6    Affordable Housing.   Right?

7          A.   That's correct.

8          Q.   Did you ever fill out a job application for

9    TPI Management Services, LLC?

10         A.   No, sir.

11         Q.   You can actually set Exhibit 1 to the side.

12   Probably just make a little pile.

13         A.   Okay.

14              (Exhibit 2 was marked for identification.)

15   BY MR. BLOCK:

16         Q.   And some we will go back to and some we

17   won't.   So I'm going to mark for the record Exhibit 2

18   a document with the Bates label TPI 00014 through 19.

19   This appears to be a job description or a couple of

20   job descriptions, but I'd like you to read it -- and

21   you don't need to read every word.

22              But take a look at that, Ms. Wynn, and see

23   if you recognize that document.

24         A.   Okay.

25         Q.   On the first page, Ms. Wynn, Exhibit 2

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 25

1    appears to be a TPI, The Partnership, Inc. job

2    description for the job of property manager, correct?

3          A.  That's correct.

4          Q.  And it looks like you wrote your name at the

5    top?

6          A.  That's correct.

7          Q.  If you flip to the very next page, it looks

8    like you signed it and dated it on June 27, 2018?

9          A.  That's correct.

10         Q.  Okay.  And if you go to the next page there

11   is another TPI, The Partnership Inc. job description

12   for property manager that says revised 12/2019 at the

13   top.  And if you go to the last page it looks like

14   you signed it 7/24/2020.

15              Do you see that?

16         A.  Yes.

17         Q.  Did you ever receive a job description for

18   the job of property manager from TPI Management

19   Services, LLC?

20         A.  Not that I can recall.

21         Q.  So as far as you're aware, your only job

22   description for the job you have right now is the job

23   description that TPI gave you and you signed?

24         A.  I don't recall that.  I do think I might

25   have signed a new one this year.  I do think, but I

Page 26

1    don't recall.  So I can't say yes or no if I have not

2    did one with the new management.

3         Q.  And if you have signed one with the new

4    management you think it would be this year 2022?

5         A.  I don't recall.

6         Q.  But if you did you think it probably went

7    into a personnel file or something like that?

8         A.  That is correct.

9         Q.  What is your understanding, if any, of the

10   relationship between TPI Management Services, LLC and

11   TPI?

12         MR. MELCHER:  If you know.

13   BY MR. BLOCK:

14         Q.  Yeah, if you know.

15         A.  Same company, but I don't know.

16         Q.  To your knowledge, who does Q. Jacobs

17   (phonetic) work for?

18         A.  TPI Management Services, LLC.

19         Q.  And why do you think Mr. Jacobs work for TPI

20   Management Services, LLC?

21         MR. MELCHER:  Object to the form.  Go ahead.

22         THE WITNESS:  Because he is my supervisor.

23   BY MR. BLOCK:

24         Q.  So you just assume that because he is your

25   supervisor he works for the same company?

Latoya Wynn                                      June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 27

1        A.   That's correct.

2        Q.   But you don't actually know which company he

3    works for?

4        A.   From his e-mail I would just say he works

5    for the same company I work for.

6             (Exhibit 3 was marked for identification.)

7    BY MR. BLOCK:

8        Q.   Let me show you what I'm going to mark as

9    Exhibit 3.

10       A.   Okay.

11       Q.   And this is going to be a document with a

12   Bates label TPI 00003 through 8.  I will give you a

13   copy of that.

14            Ms. Wynn, looking at Exhibit 3, do you

15   recognize this as a General Handbook Acknowledgment,

16   an employee handbook acknowledgment for The

17   Partnership Inc.?

18       A.   Can you repeat your question?

19       Q.   Sure.  My question was:  Looking at the

20   first page of Exhibit 3, do you recognize this as a

21   General Handbook Acknowledgment that -- actually at

22   the beginning it reads:  This Employee Handbook is an

23   important document intended to help you become

24   acquainted with The Partnership Inc.

25            Do you see that?

Latoya Wynn                                   June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 28

1      A.  Yes.

2      Q.  It looks like you signed this on December 3,

3  2015?

4      A.  Yes.

5      Q.  And on the bottom right it says:  The

6  Partnership Inc. 36 of 38 August 2014.  Correct?

7      A.  Yes.

8      Q.  And so in all likelihood, you were signing

9  an acknowledgment as part of an employee handbook

10  that was about 38 pages?

11      A.  Yes.

12      Q.  And if you flip to the next page there is a

13  document entitled, Receipt of Sexual Harassment

14  Policy.

15           And you signed again on December 3, 2015 and

16  this is now page 37 of 38, correct?

17      A.  Yes.

18      Q.  And so the next page is the Receipt of

19  Non-Harassment Policy.  Again, you signed it on

20  December 3rd of 2015.

21           And it's now page 38 of 38 of The

22  Partnership Inc. employee handbook, correct, bottom

23  right corner?

24      A.  Oh, yes.

25      Q.  And if you keep going it looks like the next

Page 29

1    page, TPI 00006, is a General Handbook

2    Acknowledgment.  And if you look at this one it looks

3    like you signed it on December 20, 2017.

4            Do you see that?

5       A.  Yes.

6       Q.  And here at the very bottom it says:  The

7    Partnership Inc. Employee Handbook 2017.  Correct?

8       A.  Yes.

9       Q.  And the next page of this document is again

10   a Receipt of Sexual Harassment Policy, and then the

11   last page is a Receipt of Non-Harassment Policy from

12   the 2017 The Partnership Inc. Employee Handbook.

13           Do you see that?

14      A.  Yes.

15      Q.  I'm going to ask you some questions about

16   these, but do you know if you were ever given an

17   employee handbook for TPI Management Services, LLC?

18      A.  I don't recall.

19      Q.  All right.  I want to ask you about the

20   Non-Harassment policy and I'm reading from the last

21   page.  I think that's in front of you.  And it

22   says -- I'm quoting here: "It is TPI's policy to

23   prohibit intentional and unintentional harassment of

24   any individual by another person on the basis of any

25   protected classification including, but not limited

Latoya Wynn                                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 30

1    to, race, color, national origin, disability,

2    religion, marital status, veteran status, sexual

3    orientation or age."

4           Do you see that?

5        A.  Yes.

6        Q.  And is that your understanding of TPI's

7    Non-Harassment policy?

8        A.  With everything that is written there, yes.

9        Q.  And do you know whether TPI Management

10   Services LLC even has a Non-Harassment policy?

11       A.  I don't recall.

12       Q.  You've never been given one?

13       A.  I could have, I just don't recall.  If you

14   have a document that I can review, I can see if

15   that's my signature.  I just don't recall.

16       Q.  I sure don't have one.

17       A.  Okay.

18       Q.  I don't think there is one?

19       A.  Okay.

20       Q.  So let me ask you, do you know what the Fair

21   Housing Act is?

22       A.  Yes.

23       Q.  Can you tell me what your understanding of

24   the Fair Housing Act is?

25       A.  Do you have something I can look at to make

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 31

1    me know?

2        Q.   I don't.  But I will tell you, I'm not

3    asking you for a lawyerly definition that gets all of

4    the details exactly right.

5             Can you give me -- you're an experienced

6    property manager?

7        A.   Treat everyone fairly.

8             MR. MELCHER:  Good.

9    BY MR. BLOCK:

10       Q.   Sure.  Sure.  Is it your understanding of

11   the Fair Housing Act that it is illegal under federal

12   law to discriminate against rental tenants on the

13   basis of race, national origin and characteristics

14   like that?

15       A.   That's correct.

16       Q.   Okay.  And do you know whether TPI or TPI

17   Management Services, LLC has ever made you sign a

18   written policy saying that the company complies with

19   the Fair Housing Act?

20            MR. MELCHER:  Object to the form.  Go ahead.

21            THE WITNESS:  I don't recall.

22   BY MR. BLOCK:

23       Q.   I understand.  Where did you -- and I

24   recognize you've been in this industry, by which I

25   mean the property management industry for a long

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 32

1  time, but can you tell me if you remember how you

2  came to understand what the Fair Housing Act forbids?

3       A.  Different trainings on Grace Hill.

4       Q.  Anywhere else?

5       A.  Different training in Grace Hill.

6       Q.  And those are trainings that the Grace Hill

7  Company sells and your employer buys and shows you?

8       A.  It's a class we have to take annually.

9       Q.  Sure.  Sure.  And Grace Hill is the company

10  that makes the class?

11       A.  The software.  Yeah.

12       Q.  The software.  Yeah, I've seen online you

13  can go buy Grace Hill classes if you want to.  I'm

14  just trying to define for the record what Grace Hill

15  is.

16       A.  Yeah.

17       Q.  It's like a third-party vendor.  It's not a

18  TPI company is all I'm saying?

19       A.  That is correct.  I have used it on other

20  management companies, that's what I was saying, not

21  just TPI or management services.  I have been in

22  property management 20 years and I have been using

23  Grace Hill on and off for years.

24            (Exhibit 4 was marked for identification.)

25  BY MR. BLOCK:

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 33

1         Q.  I'm going to show you what I will mark

2     Exhibit 4 and it's TPI 00060 through 62.  I will give

3     you a minute to look at that.

4              Ms. Wynn, do you see at the top where

5     Exhibit 4 says:  Transcript for Ms. Wynn?

6         A.  That's correct.

7         Q.  Have you ever seen this before, this

8     document?

9         A.  Yes.  This was like Grace Hill.  I have to

10    do it for my employer.

11        Q.  Very good.  I wanted to make sure that we

12    both knew what we were looking at.

13        A.  Yes.

14        Q.  I understand it to be the transcript of

15    Grace Hill classes you have taken.

16              Is that your understanding?

17        A.  Yes.

18        Q.  It looks to me like, if you go down about a

19    third of the way on the first page, you took a class

20    entitled, Fair Housing 2, on January 19, 2021 and got

21    a score of 87 percent.

22              Do you see that?

23        A.  Yes.

24        Q.  And if we go down again toward the bottom

25    there is a class entitled, Fair Housing and Social

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 34

1    Media, that you took on March 25, 2020 and a class

2    entitled, Fair Housing 2, that you took on March 4,

3    2020.

4            Do you see those?

5       A.  Yes.

6       Q.  And if you flip the page -- and a lot of

7    these classes are about things like stress

8    management, sexual harassment, defeating the mold

9    monster.  I'm looking at the second page here.

10           This is sort of many of the issues that you

11   might confront in property management, correct?

12      A.  Yes.

13      Q.  If we keep going down on that second page

14   again about a third of the way down it looks like you

15   took Fair Housing 2 again on looks like February 8,

16   2019 and got an 80 percent?

17      A.  Oh, okay.  I'm down at the bottom.

18      Q.  Down at the bottom.  You took that

19   12/22/2017 and you got a hundred percent.  And on the

20   last page you took Fair Housing 2 and Fair Housing

21   (TDHDA) in January of 2017.

22           Do you see that?

23      A.  Yes.

24      Q.  So it looks to me like you have been taking

25   a Fair Housing class or two from Grace Hill it looks

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 35

1   like roughly once a year since 2017.

2           Is that fair?

3       A.  Correct.

4       Q.  In addition to those call them annual Fair

5   Housing classes, do you do any other kind of Fair

6   Housing compliance training at Seven Courts?

7       A.  Other than Grace Hill, no, sir.

8       Q.  Do any of your bosses ever meet with you to

9   ensure you're complying with the Fair Housing Act and

10  making sure you understand what the Fair Housing

11  requires of you?

12      A.  I don't recall.

13      Q.  And do you know whether Seven Courts --

14  whether there has ever been an investigation of

15  whether you all who work at Seven Courts are

16  complying with the Fair Housing Act?

17      A.  Yes.

18      Q.  Can you tell me about those investigations?

19      A.  If you have the documents in front of you I

20  can.

21      Q.  I don't.  I would love to see them, but I

22  don't have them.

23          What do you remember?

24      A.  I don't recall everything.

25      Q.  Let's start with things you might remember.

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 36

1    Do you remember when it was roughly?

2         A.   No.

3         Q.   Was it before COVID or after COVID?

4         A.   I want to say during COVID, but I can't

5    recall it, that's why I'm asking you to give me

6    documentation.  I can't recall it.

7         Q.   Just so you know, I have to ask TPI for

8    documents and it takes a bit to get them sometimes.

9    So if there are things I don't have it's not because

10   I don't want them or because I want to keep them from

11   you.  It's just because I don't have them.  So I'm a

12   little bit in the dark too.  So I'll ask for that.

13   I'm looking at Jeff now and we'll definitely follow

14   up on them.  The reason I'm asking you about the

15   specific document in hand is because I don't have it

16   that I know of.

17        A.   Okay.

18        Q.   So it sounds like you think -- and again,

19   we're going with the best of your recollection, but

20   you think during COVID so during 2020 or maybe 2021?

21        A.   Uh-huh.

22        Q.   I think we felt like we were still doing

23   COVID in 2021.  Maybe we're still doing it, I don't

24   know.  I think it depends on who you ask and where

25   you are in the country.

Page 37

1          At some point in the last two years you

2     think there was a Fair Housing Act investigation?

3               MR. MELCHER:  If you can remember, sure.  If

4          you don't, you don't.

5               THE WITNESS:  I can't remember.  That's the

6          problem.

7     BY MR. BLOCK:

8          Q.  Well, do you remember what the gist of the

9     investigation was about?

10              MR. MELCHER:  Yeah, if you know.

11              THE WITNESS:  It was a resident that had

12         moved out said that she was -- I just can't

13         remember what the claim was.  That's what I'm

14         saying.  I just know that -- I just can't

15         remember the claim, but it had to do with that.

16         And of course, we won.

17    BY MR. BLOCK:

18         Q.  When you say "you won," do you think this

19    was a lawsuit?

20         A.  Yes.

21         Q.  I don't think you were deposed as part of

22    the lawsuit because you told me your only deposition

23    had to do with --

24         A.  Yes.  So no, we didn't have to go that far.

25    Correct.

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 38

1      Q.   Okay.  Do you think -- okay.  So it was a

2   lawsuit.  And it was a female tenant?

3      A.   That's correct.

4      Q.   Do you recall whether she alleged she had

5   been discriminated against on the basis of her sex?

6      A.   I don't recall.

7      Q.   And again, we are just asking what you

8   recall, but it'll help us all understand what it is

9   we are looking for here.

10          Do you recall whether she alleged that she

11   was discriminated against based on her race or

12   national origin?

13      A.   No.

14      Q.   You seem pretty confident about that.  Why

15   are you --

16      A.   That's just --

17      Q.   Just her allegation?

18      A.   We haven't had those type of allegations.

19   That's what I'm saying.  It wasn't that.

20      Q.   Was she an older person maybe or a disabled

21   person?

22      A.   I can't recall.  Okay.

23      Q.   We will just have to go look.  I'm sure

24   there is a way to find the answer.  Okay.

25          Other than that investigation or lawsuit

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 39

1  maybe an investigation of the claims in the lawsuit,

2  do you know whether TPI has done anything to ensure

3  that you and the people who work underneath you at

4  Seven Courts are complying with the Fair Housing Act?

5      A.  Yes.  They make sure we have the Grace Hill

6  training.

7      Q.  And beyond the Grace Hill training is thre

8  anything?

9      A.  No, sir.

10      Q.  Do you understand that in this case or do

11  you understand that in this case one of the claims is

12  that TPI and specifically you as a TPI employee

13  engaged in discrimination that is alleged to violate

14  the Fair Housing Act?

15          MR. MELCHER:  Objection.

16  BY MR. BLOCK:

17      Q.  I'm asking if you understand that's an

18  allegation in the case, not that you agree with it?

19      A.  Okay.  Yes.

20      Q.  I'm just trying to lay a foundation for

21  these questions.

22      A.  Yes.

23      Q.  So other than any meetings or discussion

24  that you might have had with Mr. Melcher or the

25  attorneys working with him, do you know whether TPI

Page 40

1  did anything to investigate whether, in fact, you and

2  other people at Seven Courts were discriminating on

3  the basis of race or national origin as alleged in

4  this case?

5       A.  Not that I recall.

6       Q.  Just so I understand, other than -- well,

7  there wasn't an investigation in this case, and you

8  told me about the investigation or lawsuit involving

9  the woman whose a tenant that moved out.

10          Other than those two, are you aware of any

11  other time that TPI has investigated to determine

12  whether there is Fair Housing Act discrimination

13  going on at Seven Courts?

14      A.  No.

15      Q.  All right.  You know I think I forgot to ask

16  you this.  I'm going to turn now to Seven Courts.

17          We obviously know something about Seven

18  Courts but can you just describe Seven Courts for us

19  for the record, in terms of like where is it, what is

20  it, you know how many people live there and things

21  like that.  If you met someone at a party and they

22  said, Oh you work at Seven Courts.

23          What is Seven Courts?  Can you just give us

24  that description?

25      A.  Seven Courts we have 170 units.  It's 100

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 41

1    percent tax credit.  We have 30 units that are from

2    Atlanta Housing Authority and those tenants come from

3    down there.  We do not do a waiting list for those

4    tenants on site.  They are sent to us by Gateway and

5    they are based on income and they have some type of

6    or may have some special needs, such as mental or

7    physical disability is what the requirement is for

8    the housing based on their income limits.

9         Q.  So if I understand you correctly, I think

10   you're telling me that Seven Courts has some sort of

11   relationship with Atlanta Housing to place people who

12   needs housing?

13        A.  That's correct.

14        Q.  Atlanta Housing is a government agency

15   helping to place them?

16        A.  That's correct.

17        Q.  And that may explain it.  If I have one it's

18   in this box and I'd have to dig it out, but I have

19   seen reports that I think you submit to Atlanta

20   Housing every so often.

21             Would that be why you're submitting reports?

22        A.  That's correct.

23        Q.  I see.  So maybe in a general sense, Atlanta

24   Housing is just trying to keep tabs on what you're

25   doing with the Atlanta Housing tenants?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 42

1      A.  They require it of all the properties

2   monthly, and that is how we request the payment

3   application for the money that we need.

4      Q.  Very good.  So I have heard different

5   definitions, but can you give me a sense of the

6   demographic of the tenants at Seven Courts?

7      A.  All different.  There is not no specific

8   demographic.  We have African American, we have

9   Hispanic and we also have white and I think now

10  Indian.  We have a mixture.  I can't just you know do

11  a breakdown.

12     Q.  Sure.  Is it mostly one or two call it

13  background types?

14     A.  I would say probably more half and half

15  bilingual tenants and African American tenants.  I

16  mean I could be wrong, don't quote me, but that is

17  just my opinion.  I'm not giving you numbers because

18  we don't do that.

19     Q.  I understand.  I'm just asking for a rough

20  estimate not a precise mathematical estimate.

21         And by bilingual you mean Hispanic?

22     A.  That's correct.

23     Q.  And those two languages presumably are

24  English and Spanish?

25     A.  That's correct.

June 2, 2022

Page 43

1      Q.   So it's roughly 50/50 African American and

2  bilingual Hispanic?

3      A.   That's correct.

4      Q.   How would you describe your relationship

5  with tenants?

6      A.   Overall I'm the manager, I'm tough, they

7  don't like me.

8      Q.   You have a job to do?

9      A.   That's correct.

10     Q.   And maybe some people don't want you to do

11 the job the way you're doing the job?

12     A.   No.  They don't like nobody telling them

13 when they're breaking the rules.  The ones that don't

14 break rules they have no problem.

15     Q.   Who sets the rules at Seven Courts?

16     A.   Well, the company does and we also do GAA

17 leases.  I think that's a state level too, and we

18 comply with their rules and regulations.

19     Q.   When you say "the company sets the rules,"

20 you mean TPI?

21     A.   Because we use GA Community rules and

22 regulations, and then we have a TPI Seven Courts

23 apartment rules and regulations and it has TPI logo

24 on that.

25     Q.   Right.  I have seen that.  I have a copy of

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 44

1   that.  It's actually an addendum to the lease that

2   you make tenants sign, correct?

3        A.  That's correct.

4        Q.  Yes.  We have a copy of that.  I have to ask

5   you some of these questions.

6            You probably are not going to be too

7   surprised but, do you ever yell at tenants or raise

8   your voice at tenants?

9        A.  No.  I do talk loud, but no.

10       Q.  You don't yell at tenants?

11       A.  No.

12       Q.  Would that be appropriate?

13       A.  No.  I mean, no, I'm not yelling at tenants.

14   I don't, no.

15       Q.  Have you ever had a physical altercation

16   with any tenant?

17       A.  Yes.  I have been attacked four times at

18   this property.

19       Q.  And I have seen one or two of the police

20   reports on that?

21       A.  Yes.

22       Q.  I won't make you recount those, but is it

23   your testimony that the tenant was the aggressor in

24   those instances?

25       A.  Yes.

Latoya Wynn

June 2, 2022

Diaz, Elsa Flores v. The Partnership, Inc

Page 45

1          Q.  I have seen one or two police reports to

2    that effect?

3          A.  I have an open case right now.

4          Q.  It's like a criminal case?

5          A.  No.  A lady, she attacked me.  I have a case

6    open, civil, right now.

7          Q.  You have a civil case against the lady who

8    attacked you?

9          A.  No.  The court -- the police wouldn't -- and

10   I have a case open right now and because of COVID

11   they are pushing it back.  At first it was just one

12   charge.  They actually dropped to another charge now

13   that is going to be where she probably has to do time

14   because she made me bleed.  I think the first one was

15   just disorderly conduct, and then they moved it from

16   disorderly conduct to something else.

17         Q.  I'm going to show you something in a second,

18   but I have to ask you, have you ever had any family

19   member who lived at Seven Courts?

20         A.  Yes.

21         Q.  Which one?

22         A.  My sister Tasharah Wright.

23         Q.  Have you ever had any other family members

24   who lived at Seven Courts?

25         A.  No.

Page 46

1      Q.   Does your sister still live at Seven Courts?

2      A.   Yes.

3      Q.   You don't live at Seven Courts?

4      A.   No.

5      Q.   Why do you say no that way?

6      A.   I haven't lived on site in 20 years.  Living

7   on site is.

8      Q.   You're never away from your job?

9      A.   Yes.  That's why I said that.

10          (Exhibit 5 was marked for identification.)

11   BY MR. BLOCK:

12      Q.   Let me show you what I'll mark as Exhibit 5

13   and it's TPI 003939.  Ms. Wynn, Exhibit 5 appears to

14   be an e-mail from Horace Holt to your boss Rodrick

15   Harris from July 2, 2020 with the subject family

16   member.

17          I will ask you first, have you ever seen

18   this family member before?

19      A.   No, sir.

20      Q.   I'm going to ask you to read it and then I

21   will ask you about the circumstances.

22      A.   Okay.

23      Q.   So I'll give you a second.  Well, actually I

24   will just read it for the record so there is not

25   guesswork.  It reads -- this is from Mr. Holt to Mr.

Page 47

1   Harris:  "This resident reach out to me today.  She

2   live in D-29 and it Toya sister that live in D-30 she

3   cannot sleep for the last three to four night cause

4   they always up there party.  When she report it to

5   the office they told her to leave.  You can hear the

6   music in the background."

7          Do you see that?

8       A.  Yeah.

9       Q.  There is a picture of a wall and then there

10  was a music attached with some music coming through a

11  wall.  I didn't bring a copy of the movie.

12         I just want to ask you, do you remember what

13  Mr. Holt is describing here where a tenant who lived

14  next to your sister complained about loud music if

15  you remember?

16      A.  Okay.  I have never seen this e-mail.

17      Q.  Sure.

18      A.  But when you elaborated about the picture --

19  the picture and the video was sent to my phone, but I

20  have never seen this e-mail.  That's why I wanted to

21  be correct.

22      Q.  I understand.

23      A.  She actually lived downstairs and yes I do

24  recall.  I talked to the resident and she let me know

25  that that was not the case.  The resident still lives

Page 48

1   there now.

2        Q.  I want to make sure I understand.  First,

3   how did you get a copy of the picture and the video?

4        A.  Mr. Holt sent it to me.

5        Q.  Mr. Holt okay.  And then you went and talked

6   to the resident from D-29?

7        A.  No.  I actually had Maggie call because I

8   did not want them to think because someone was my

9   sister that I wouldn't enforce the rules because that

10  was my job.  After talking to both of them, they were

11  actually friends.  They had a love triangle.

12       Q.  Could you explain?

13       A.  A love triangle.

14       Q.  They were upset about a man I guess?

15       A.  No.  I wouldn't say a man would be involved.

16  A love triangle.

17       Q.  All right.  Triangle is three people, right?

18       A.  Yeah.

19       Q.  So we've got your sister and the resident

20  from D-29.

21            Who was the other point in the triangle?

22       A.  It would be another woman.

23       Q.  Okay.  All right.  I understand.  So the

24  resident of D-29 was upset with your sister because

25  of this love triangle?

Page 49

1        A.    That's correct.

2        Q.    So when Mr. Holt said that he thought when

3    she reported it to the office they told her to leave.

4              Did that happen?

5        A.    She never came to the office and she had

6    reported it to Rodrick.

7        Q.    Do you think Mr. Harris investigated this

8    allegation?

9        A.    Most likely she did.  But the lady in the

10   D-29 she still lives there.

11             (Exhibit 6 was marked for identification.)

12   BY MR. BLOCK:

13       Q.    You can put that aside.  Let me show you

14   what I'll mark as Exhibit 6.  This is for the record

15   TPI 004148.  Describe this for the record.  I will

16   give you a minute to read while I describe it.

17             This is an e-mail thread between Mr. Holt

18   again and your boss Mr. Harris from April, 2020.  I'm

19   going to ask you the same kind of questions, have you

20   seen this and do you know about this incident.  So

21   just read it.

22             The main thing I want to start with is at

23   the bottom.  And just for the record this reads from

24   Mr. Holt to Mr. Harris:  "I text Toya and let her

25   know that I got a complaint about her daughter making

Latoya Wynn

June 2, 2022

Diaz, Elsa Flores v. The Partnership, Inc

Page 50

1    other fight and trying to force the other girl to

2    have sex with other guys.  Instead of Toya texting

3    back she called back went up to C-18 and got her

4    daughter.  C-18 have been in jail for over three in

5    half months.  But her rent still get paid.  C-18 has

6    been having a lot of under age people in there.  It

7    has now been secured when I brought it to her

8    attention."

9           I will pause there.  Ms. Wynn, have you ever

10   seen this e-mail before?

11       A.  No.

12       Q.  Are you familiar with this incident?

13       A.  He texted me a lot.

14       Q.  He being Mr. Holt?

15       A.  Yes.

16       Q.  Do you remember Mr. Holt texting you about

17   the allegation that your daughter was making other

18   people fight and trying to force the other girl to

19   have sex with other guys?

20       A.  I don't recall that, and I did give y'all

21   permission to get my text messages from him.  I don't

22   recall that.  He texted me that.  I think he sent me

23   a separate text.  I don't recall this text about my

24   daughter.

25       Q.  Well, whether you learned about it by text

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 51

1    or some other means, do you remember the allegation

2    that your daughter --

3        A.  No.  That's what I'm telling you.  My

4    daughter wasn't apart of the allegation.

5        Q.  So without your daughter in it, do you

6    remember this allegation about --

7        A.  Yes.

8        Q.  -- sex issues in C-18?

9        A.  That is correct.  Yes.

10       Q.  Tell me about the sex issues in C-18?

11       A.  That is his allegations that he wrote it up

12   and put it -- sent it to us.  Those was his

13   allegations.  When we investigated it was found out

14   to not be true.

15       Q.  What investigation did you do?

16       A.  We sent the infraction.

17       Q.  So you sent a written infraction?

18       A.  And asked the parent to come to the office.

19       Q.  I guess the parents who lived in C-18?

20       A.  That's correct.

21       Q.  What happened?  When the parents came to the

22   office what happened?

23       A.  That was -- she was furious of the

24   allegations.

25       Q.  And so what did you do?

Latoya Wynn                                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 52

1       A.   Nothing.

2       Q.   I mean what would you have said to the

3  parent?

4       A.   Well, once we sent the infraction and she

5  said that her daughter was not having intercourse and

6  this was untrue and it's harassing her, then, you

7  know, we just -- but like I said, when he texted me,

8  Mr. Holt, he did not text my daughter.

9       Q.   He wasn't texting about your daughter?

10      A.   He texted and said, if you look at this text

11 I can't recall it, but this e-mail is not the wording

12 that he used when he texted me.  That's what saying.

13      Q.   And do you think you still have the text

14 that he sent you?

15      A.   I'm not sure because I have an iPhone and

16 the numbers -- this is from 2020.  I'm not sure.

17      Q.   Have you had the same cell phone numbers

18 since 2019?

19      A.   No, I have not.

20      Q.   Oh, okay.  I should have asked you that

21 before.  So tell me how your cell phone numbers have

22 changed?

23      A.   I have yet to give that information.  I'll

24 give you this number too.

25           Do you want to go on record for this number?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 53

1      Q.  Sure.

2      A.  (404) 599-8035. That was the number that I

3  had.

4      Q.  When?

5      A.  When I started -- no, that wasn't.  That was

6  the number that I got.  I also had another number

7  when I started.

8      Q.  I'll keep it a little bit -- I'll try to

9  keep it simple.  So let's just start in 2019.

10      A.  Well, Mr. Holt has had all of those numbers.

11      Q.  Sure.  So let's do it this way.  In 2019,

12  what were your cell phone numbers?

13      A.  2019, I can't recall.  I will have to look

14  at my cell phone bill to tell you.

15      Q.  At some point in 2019, 2021 or '22, you

16  changed your cell phone number?

17      A.  The beginning of '21 I did.

18      Q.  Why did you change your cell phone number?

19      A.  Personal stuff for instance.

20      Q.  Was that your personal cell phone number

21  that you changed?

22      A.  Yes, I only had one phone for a long time.

23  As I have learned that's not good, so I decided to

24  purchase me another phone.  That's why I have two

25  phones for work so I can -- on the weekends I can

Latoya Wynn                                            June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 54

1    re-program and reset and not just look at the phone.

2        Q.   Sure.   When did you get that work phone?

3        A.   I can't recall, but I can log in.   I can't

4    recall that date.

5        Q.   Do you use the Apple iCloud to back up your

6    phone?

7        A.   No.

8        Q.   Do you have an iCloud account?

9        A.   No.

10       Q.   Wow.

11       A.   I use G-mail.   My e-mail is

12   latoyawynn22@gmail.com.   My kids do.   They know how

13   to do all of that stuff.   I usually it really for the

14   Facetime.

15       Q.   How do you get apps on your iPhone?

16       A.   Because when you log into Apple, you can use

17   your personal e-mail.   I don't have an iCloud e-mail.

18       Q.   I see what you're saying.   So you log in

19   with your G-mail account.   That's how you log into

20   Apple?

21       A.   That's correct.

22       Q.   And that allows you to back up what's on

23   your phone like your photographs?

24       A.   I would say for storage, yes.

25       Q.   Because one of the things depending on your

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 55

1   settings you can actually back up your text messages

2   to iCloud, and then you have them as far as the

3   back-up?

4        A.  I'm not a tech person.

5        Q.  I'm gathering that.

6            MR. MELCHER:  We can answer all of those

7        questions separately.

8   BY MR. BLOCK:

9        Q.  All right.  So let's stick with Exhibit 6.

10  One of the other things that Mr. Holt reported to

11  Mr. Harris in April 2020 was -- this is at the very

12  bottom: "On Thursday at A build I sent report.  Toya

13  gave the guy a parking pass and he don't even live on

14  the property and he was damage the property by

15  burning rubber.  He walked out the office and said I

16  don't run nothing.  I post pic of the 911 call in the

17  report Thursday."

18           Okay.  So you told me you have a Tennessee

19  number.  Do you remember the allegation by Mr. Holt

20  that you had given a parking pass to someone who was

21  not a resident and who was damaging the property by

22  burning rubber?

23       A.  I don't recall that at all.

24       Q.  Do you recall whether Mr. Harris asked you

25  about that incident?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 56

1      A.   No.  I don't recall that at all.

2      Q.   You can put that one aside.  We will talk

3   about Mr. Holt in greater detail later.  We will come

4   back to the Holt e-mails.  I want to sort of stick

5   with Seven Courts.

6           Ms. Wynn, have you ever owned any businesses

7   that provides goods or services at Seven Courts?

8      A.   Yes.

9      Q.   Can you tell me about that?

10      A.   A paint and cleaning service, janitorial.

11      Q.   What was the name?

12      A.   Five Star Contractors, and I also helped out

13   Mr. Owens A&T Contractors.

14      Q.   What was the name?

15      A.   Mr. Anthony Owens, I helped him out.

16      Q.   And what was the name of his business?

17      A.   A&T.  It's no longer around.

18      Q.   A&T?

19      A.   Uh-huh.

20      Q.   And what did A&T do?

21      A.   They're both janitorial companies that were

22   painting and cleaning companies.

23      Q.   So for example, if you needed to clean an

24   apartment in between tenants Five Star or A&T would

25   do that work?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 57

1      A.   No, they never was -- they wasn't as one.

2  So we have different business.  We have Rent Ready

3  that paint and clean.  We have C&K.  So it was just

4  another painting and cleaning company that I had as a

5  back-up.

6      Q.   So when did Five Star -- or excuse me.  So

7  who owns Five Star Contractors?

8      A.   I do.

9      Q.   And do you have any other co-owners?

10      A.   No.

11      Q.   When did Five Star Contractors provide

12  services for Seven Courts?

13      A.   I started last year actually.  We were

14  having a problem with people.  They have a little

15  thing now with the I9 that they -- I mean, not the I9

16  -- the COI.  Particular insurance used to just only

17  require general liability.  They started wanting

18  workers' comp.  And we have a lot of vendors that

19  actually have the skills and the knowledge and the

20  work to do it, but they don't have -- we pay by

21  check.  We don't pay through Cash App and through

22  Zelle.  So I seen a need and I just tried to help the

23  company to get people because it was hard during

24  COVID.  We couldn't find nobody.

25      Q.   So you actually perform the work for Five

Latoya Wynn                                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 58

1    Star Contractors?

2         A.  Oh, I contract it out to different vendors.

3         Q.  And did TPI know that you owned Five Star

4    Contractors while Five Star was performing work at

5    Seven Courts?

6         A.  I mean, they knew of the vendor and they

7    approved of it; but no, I don't think that they knew

8    I was the owner of it.  No.

9         Q.  And did TPI at some point learn that you

10   were the owner?

11        A.  Yes, they have.

12        Q.  How did they learn?

13        A.  Thanks to Mr. Holt.

14        Q.  Tell me about that.

15        A.  That's it.  That's all I have to say, thanks

16   to him.

17        Q.  And what happened?

18        A.  I ceased my business.

19        Q.  Were you disciplined?

20        A.  Yeah.

21        Q.  Can you tell me about that?

22        A.  Just a write-up.

23        Q.  Who wrote you up?

24        A.  Rodrick at work.

25        Q.  Who is Laurie?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 59

1      A.  Laurie is the human resource.  They always

2  have a witness when someone is either being fired or

3  terminated.  There's always a witness.

4      Q.  What is Laurie's last name?

5      A.  Laurie Connor (phonetic) I want to say, but

6  I'm not putting that on the record.

7      Q.  I understand.  I think I've seen Laurie

8  Connor in a few emails?

9      A.  Okay.

10      Q.  Does she work in Florida, Laurie Connor?

11      A.  Yes.

12      Q.  And did she come to Atlanta to discipline

13  you?

14      A.  No.

15      Q.  Then how did she witness?

16      A.  It was on the phone.

17      Q.  All right.  So I think you told me a second

18  ago that Five Star Contractors were approved as a

19  vendor?

20      A.  Yes.

21      Q.  And who approved Five Star Contractors?

22      A.  It's not -- I'm going to explain to you the

23  process.  It's just making sure like I said the COI,

24  they have a general and the workers' comp, and then

25  they need the W9.  So it's not like a check that you

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 60

1   -- no background check or nothing like that.

2        Q.  So in terms of like -- walk me through how a

3   vendor in this case Five Star Contractors actually

4   gets approved to start performing work for Seven

5   Courts?

6        A.  We send it to accounts payable and they

7   submit back and let us know here's the new vendor ID,

8   so we can start sending their invoices in.

9        Q.  And is that accounts payable at TPI?

10       A.  That's correct.  Well, I don't understand.

11       Q.  Explain to me what you don't understand.

12       A.  Okay.  I don't understand because you're

13  saying TPI and you asked me about TMI and so I don't

14  want to say yes.  It seems like you're tricking me

15  with the TPI.

16       Q.  Well, I'm not the one playing tricks?

17       A.  Oh, okay.  That's fine.  I just didn't want

18  to say yes.  So I'm just going to say my corporate

19  office for Seven Courts.

20       Q.  That's the corporate office in Florida?

21       A.  That's correct.

22       Q.  And at least it used to be called TPI?

23       A.  That's correct.

24       Q.  And at some point somebody told you it's not

25  really TPI?

Latoya Wynn
June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 61

1      A.   It's changed that's correct.  It's TMI

2    Management Services LLC.

3      Q.   Excellent.  Did any of your relatives ever

4    have a company that provided services at Seven

5    Courts?

6      A.   No.

7      Q.   Did you ever have any family members who did

8    painting at Seven Courts?

9      A.   No.  Friends, I mean associates.  I went to

10   friends that was high school.  They say don't give

11   you no information but I am going to let you -- that

12   five minutes away.  I am very active in my community.

13   I mean, it's networking.  It's nothing wrong with

14   that.  So yes, classmates.  They're not my family

15   members, they are friends.

16     Q.   And do your friends ever share with you any

17   of the revenue that they generate when they perform

18   services for Seven Courts?

19     A.   Sometimes, yes, and I actually help people

20   do their books.

21     Q.   And does anyone -- I will call it corporate.

22     A.   Okay.

23     Q.   Does anyone at corporate know that sometimes

24   your friends who provide services share the revenue

25   with you?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc
June 2, 2022

Page 62

1      A.   No.  Let's go back on record.  No friend

2  shares revenue with me.  No friend shares revenue I'm

3  on record.

4      Q.   Okay.  Explain to me what's going on.

5      A.   Because you're confusing me.  Okay.  So we

6  might have a parking company.  We have a plumbing

7  company.  We have a roofing company.  All of those

8  companies, that's just people that I might know of or

9  work with and we built a relationships.  I don't get

10  any kick back or anything from them.  That's why I'm

11  going on record because you're kind of confusing me

12  with that.

13      Q.   Are you telling me that you sometimes

14  perform like bookkeeping or accounting services for

15  those companies?

16      A.   That's correct.

17      Q.   And you're compensated for those services?

18      A.   No.

19      Q.   You just do it for free?

20      A.   That's correct.

21           (Exhibit 7 was marked for identification.)

22  BY MR. BLOCK:

23      Q.   Let me show you what I'm marking Exhibit 7,

24  which is TPI 004172.

25           And to describe this for the record,

Page 63

1    Ms. Wynn, this is another e-mail from Mr. Holt to

2    your boss Mr. Harris.  This one is from March 10,

3    2020 with the subject line report.  And the gist of

4    this one appears to be that a resident was moving in

5    and the unit was not ready to be moved in.

6            Do you see that in all caps on the second

7    line?

8        A.  That's correct.

9        Q.  And the tenant it sounds like was

10   understandably upset.  I want to ask you about what

11   Mr. Holt said to your boss:  "Didn't report it to

12   Toya because the residents are afraid of her already

13   and don't want to be retaliated against."

14           So my question for you is:  Did Mr. Harris

15   ever discuss this allegation with you?

16       A.  No.

17       Q.  Did Mr. Harris ever discuss with you any

18   allegations that the tenants were afraid of you?

19       A.  No.

20       Q.  Did Mr. Harris ever discuss with you any

21   allegations that the tenants were afraid you might

22   retaliate against them if they complained?

23       A.  No.

24       Q.  Do you think any of the residents have been

25   afraid of you?

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 64

1        A.   No.
2        Q.   Have you ever retaliated against a tenant
3   for complaining?
4        A.   No.
5        Q.   Why would Mr. Holt say this about you?
6        A.   Clearly he does not like me.
7        Q.   Why not?  What is your sense of why Mr. Holt
8   doesn't like you?
9        A.   From my research I guess he -- I mean,
10   that's why I asked for him to be removed.  He likes
11   me, sir.
12        Q.   What do you mean likes you?
13        A.   Likes me.
14        Q.   In a romantic or sexual way?
15        A.   I guess so.  And I don't like him at all.
16        Q.   So you asked for him to be removed
17   because --
18        A.   That's correct.  He was harassing me and
19   Maggie.
20        Q.   And when was that?
21        A.   That's when he was first let go.
22        Q.   And then he came back?
23        A.   Yes.
24        Q.   All right.  So who did you tell, if anyone,
25   that Mr. Holt was harassing you and Maggie?

Latoya Wynn                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 65

1        A.  My regional and my area manager.

2        Q.  And their names are?

3        A.  Bonnie Gayner and Rodrick Harris.

4        Q.  What did they say?

5        A.  Bonnie asked me to give him a 30-day notice

6    and I did.

7        Q.  And Ms. Gayner said that was because

8    Mr. Holt was sexually harassing you --

9        A.  No.  It was on multiple things, not sexual

10   harassment.  He was harassing me at the time.  I just

11   didn't know what his motive was.

12       Q.  Explain that harassment to me.

13       A.  Okay.  He would text all of the time, all

14   kind of things that was not related to the job.

15       Q.  Such as?

16       A.  It's a bus up the street.  When are you

17   going?  Are you going down the protest?  Different

18   things, and that is what made him think I was mean.

19   Like I put on record, I don't with a vendor.  I

20   don't.

21       Q.  We've asked and we don't have all of your

22   texts with Mr. Holt.

23       A.  That's fine.

24       Q.  We will get them.  It sounds like you're

25   telling me he was texting you about irrelevant

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 66

1   topics, but the texts were not sexual in nature?

2       A.   That's correct.  But the things he did was

3   on that nature.

4       Q.   Can you tell me what those are?

5       A.   Looking at me was on that nature.

6       Q.   He would look at you in a way that you felt

7   was sexual?

8       A.   That's correct.

9       Q.   Did he say anything that was sexual?

10      A.   Not that I could hear or a witness could

11  hear.

12      Q.   What do you mean by he would look at you in

13  a sexual way?

14      A.   When he first started he would do that so I

15  kind of pushed him off on my assistant because I

16  didn't want that type of conflict and because he had

17  been referred by Atlanta Housing Authority.  To my

18  understanding, he was held on a level.  So I just

19  didn't want any confusion or conflict with him, so I

20  just kind of pushed him on Maggie.

21          Maggie reported the same thing, that he was

22  calling and texting after work.  She actually had a

23  boyfriend.  And I then got our communication back and

24  had him communicate with me only, which he still

25  refused.

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

Page 67

1    Q.   What other problems did you have with

2   Mr. Holt?  The first time he worked there, what other

3   problems did you have?

4    A.   Falsifying, not being at work, not doing

5   things to help management, he was always

6   argumentative with me after the situation, that's

7   about it.

8    Q.   What did he falsify?

9    A.   He falsified that people would be selling

10   drugs out there.  He would make up stories and

11   have me -- that's the only reason why I got attacked

12   was from his report that he sent in.  And he actually

13   sent in that an old lady was a drug dealer.  Her

14   whole family came up there because I, of course,

15   entered the infraction based off of his allegations

16   which were false and they were able to prove that he

17   was actually picking on them.  So he had

18   relationships with people out there.

19    Q.   What do you mean by relationships?

20    A.   Like a relationship.

21    Q.   Like a sexual relationships?

22    A.   Yes.  I actually seen him with a lady and

23   once I seen him I think he thought I was onto him.  I

24   was actually really just doing like a walk through of

25   the property.  I didn't understand why he was there

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 68

1    during the day, and I mentioned that to Roger.

2        Q.  You told me those are your complaints about

3    Mr. Holt the first time.

4            Do you think that he was not doing a good

5    job providing security at Seven Courts?

6        A.  Yes.  I think he was not doing a good job at

7    all.

8        Q.  And why not?

9        A.  So Bonnie Gayner -- that was one of the

10   things.  It's required by TPI to do a lighting report

11   and to do a daily activity report.  Those are things

12   like this -- not just this specifically but anything

13   that occur we can refer back to it.  And we have an

14   incident report, you know, things like that.  He just

15   wouldn't do it.  He just would not do it.

16           And so one e-mail Bonnie asked isn't his

17   reports just getting non-detailed.  Like the quality

18   of his service and work had went down tremendously,

19   and my supervisor had seen it.

20       Q.  So then what happened to Mr. Holt?

21       A.  We gave him a 30-day notice.

22       Q.  And you know Mr. Holt continued working for

23   TPI at a different TPI property, right?

24       A.  That's correct.  Because he's working up

25   under the area manager.  At the time Bonnie Gayner

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 69

1    was the regional.

2         Q.   And so what were your views about the fact

3    that TPI kept Mr. Holt?

4         A.   It was fine.  I'm kind of like -- like I

5    said, I don't --

6         Q.   He wasn't at your property anymore?

7         A.   Yeah.

8         Q.   And Mr. Holt came back to Seven Courts

9    later, right?

10        A.   Unfortunately yes.

11        Q.   Tell me what you thought about that.

12        A.   That was not my decision.  I had three other

13   security companies and at that time Mr. Hickey

14   (phonetic) was leaving.  It was told to me that he

15   was coming, so that was not my decision to bring him

16   back.  But because I'm not a confrontational person

17   and I am working with myself.  I love myself.

18             Challenges like that -- I felt like it was

19   just a challenge and I accepted it, because I didn't

20   have an issue with him.  And maybe this time he would

21   do his job and we wouldn't have a problem, but that

22   still didn't happen.

23        Q.   What were your complaints about --

24        A.   He refused to do the reports, he refused to

25   do the lighting reports, which was required by TPI.

Latoya Wynn

June 2, 2022

Diaz, Elsa Flores v. The Partnership, Inc

Page 70

1   He just wouldn't do -- but he would do fresh

2   investigations all the time.  And he would tell me,

3   "I'm at the police station right now, I can't talk to

4   you" or it may be simple questions I just need the

5   answer.

6        Q.   Do you know or did you know someone named

7   John Habies (phonetic) who went by Lee Brown

8   (phonetic)?

9        A.   That's correct.  I did.  He was a tenant

10   there.  He was one of the AHA tenants that I was

11   telling you about with the mental and physical

12   disability.  He actually has a mental disability.

13        Q.   And AHA is the Atlanta Housing Authority?

14        A.   That's correct.  Did I say "AHA," I'm sorry?

15   AH.

16        Q.   AH.

17        A.   It used to be AHA, so I do apologize.

18        Q.   Atlanta Housing whatever?

19        A.   They dropped the A.

20        Q.   Very good.  Did you have a romantic

21   relationship with him?

22        A.   No.

23        Q.   Can you think of why anyone might see you

24   two as having a romantic relationship?

25        A.   Okay.  I've been working at that property a

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc
June 2, 2022

Page 71

1  long time like I told.  When I first got to Seven

2  Courts, Mr. John A aka Mr. Brown did not like me.

3  Okay.  Because I enforced the rules.  He wanted to

4  sit out.

5          But working with them, the supportive

6  housing team, and learning so much more, like I said,

7  they -- those residents if you rode through there

8  they look and act normal at times, but then they can

9  just spiral out.  There could be different things

10  that trigger it, and so I had to learn about that.

11          So instead of making people be my enemy or

12  they not liking me, I decided to pull him up under my

13  wing and give him little things to do, as in keeping

14  the building clean for us.  He actually works with

15  Rainbow Services as a volunteer.  And the residents

16  didn't know that because we don't have to share that.

17  He got a -- what is the company called?  AARP, he

18  worked with AARP.  Okay.  And the residents didn't

19  know that, so they assumed that he was my uncle or

20  that he was my boyfriend.  He really was getting

21  paid.  But like I said, that's how they are, they

22  talk.

23      Q.   These are the residents?

24      A.   This is the residents.

25      Q.   Let's go back to Seven Courts.  What kinds

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 72

1    of crimes tend to occur at Seven Courts?

2         A.  Do you have a crime report I can look at and

3    tell you.

4         Q.  We've got a bunch.

5         A.  Okay.

6         Q.  But from your memory, what kind of crimes do

7    you tend to see there?

8         A.  Sometimes we use the incident, that explains

9    it to me.  So had a BMW that he claimed that was

10   stolen.  This is on record.  Just about three months

11   prior to that we had another resident that said the

12   same thing.  On both occasions the cars were repoed.

13   So stealing of cars is not something that goes on out

14   there.  That's what I'm trying to explain to you.

15   But I mean the typical things that I have seen are

16   property management, and it's no more than nowhere

17   else.

18        Q.  What kinds of things?  What kind of crimes

19   do you see at Seven Courts?

20        A.  Loitering, disturbance, I have witnessed --

21   I wasn't there but I have been there, we had a

22   murder.

23        Q.  You had two murders, right?

24        A.  Yes now.  I thought we were just talking

25   about --

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 73

1    Q.  Yeah.  So there was a murder in April of
2    2019?
3        A.  Yes.
4        Q.  And there was a murder within the last 60
5    days?
6        A.  That's correct.  Yes.
7        Q.  And there are robberies, armed robberies at
8    Seven Courts, right?
9        A.  The armed robberies, I'm not -- I might know
10   a little something, but they haven't been confirmed.
11   That's all I'm saying.
12       Q.  How would you confirm an armed robbery?
13       A.  I mean where the police witness it, they got
14   cameras.  We've got actual -- yes, they were robbed
15   or armed robbed.  We have people --- people say
16   anything.
17       Q.  There are allegations of robbery?
18       A.  Yes.
19       Q.  Now cameras are funny, right, because y'all
20   didn't have working cameras for the longest time,
21   right?
22           MR. MELCHER:  Objection to the form.
23   BY MR. BLOCK:
24       Q.  That was a yes, right?
25       A.  No, I didn't answer.

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 74

1      Q.  You did not have working cameras at Seven

2   Courts until the end of 2021, correct?

3      A.  I don't recall.

4      Q.  So other than a camera catching an armed

5   robbery, what would it take to make an armed robbery

6   verified or confirmed in your mind?

7          MR. MELCHER:  Objection to the form.  If you

8      know.

9          THE WITNESS:  Like I said, it would have to

10     -- to where the police or detective came back

11     and verified to me that it was an armed robbery.

12  BY MR. BLOCK:

13     Q.  So if the police come out on a 911 call and

14  someone reports an armed robbery, that is not

15  verified to you?

16     A.  No.

17     Q.  Why not?

18     A.  Because the residents, they will falsify a

19  lot of things.  Like I just gave you an example of

20  two people calling me, saying that someone stole

21  their car and within one day the police called me

22  back and said, hey, you were right, they were repoed.

23          I explained to them that when they outsource

24  the repo company, the paperwork don't always go

25  through right then.  So sometimes when they are

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 75

1    calling the actual company that did the repo, they

2    are saying no we didn't repo it, but they're not

3    knowing that like individuals have these things on

4    their car and if they ride through they go ahead and

5    pick it up.

6          So that's what I'm saying.  The residents

7    have been known out there to falsify things.

8          MR. MELCHER:  Can we take a short break?

9          MR. BLOCK:  Yes.  Off the record.

10         (A short break was taken.)

11   BY MR. BLOCK:

12        Q.  We are going to go back on the record.

13   Ms. Wynn, I want to keep talking about crime at Seven

14   Courts.

15        A.  Okay.

16        Q.  Is there drug crime at Seven Courts?

17        A.  Yes.  Well, it had been.  I mean, I can't

18   say now, but yeah.

19        Q.  When was there drug crime at Seven Courts?

20        A.  I can't give you a date, but I can give you

21   an incident when we did have a drug bust.

22        Q.  So roughly when was that?

23        A.  I can't give you the date.

24        Q.  But are you telling me that now there are

25   not drug crimes at Seven Courts?

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 76

1        A.  I can't tell you.  I don't recall or know of

2   anything.

3        Q.  Are there guns?  Whether anyone is injured

4   are guns fired with any regularity at Seven Courts?

5        A.  Not that I recall.  So you have to remember

6   that property is 24 hours.  I'm only there 8 hours.

7        Q.  So as the property manager isn't it your job

8   to know whether there is crime at Seven Courts even

9   if it's during the hours that you're not there?

10        A.  If they report it.  But if I'm not given the

11   report, it's not my job to get the crime report.  I

12   don't do that.

13        Q.  Do you think that knowing what kind of crime

14   -- and you work regular business hour 9:00 to

15   5:00-ish Monday through Friday?

16        A.  Correct.

17        Q.  And a lot of dangerous crime happens at

18   night when it's dark outside, right?

19            MR. MELCHER:  Objection to the form.

20            THE WITNESS:  I don't know.

21   BY MR. BLOCK:

22        Q.  You don't know whether more crime happens at

23   night or during the day?

24        A.  No.  I don't recall.  I'm not a police or a

25   detective.  I don't know that answer.

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 77

1        Q.   And you don't think it's your job to find

2    out so that you can keep the property safe?

3              MR. MELCHER:  Objection form, argumentative.

4              MR. BLOCK:  There's no form problem there.

5              MR. MELCHER:  It's already noted as --

6              MR. BLOCK:  I can do that during

7         cross-examination, Jeff.

8              MR. MELCHER:  Okay.  Well --

9              MR. BLOCK:  I'm going to ask you not to make

10        form objections unless there is a technical

11        problem with the form of the question.

12             MR. MELCHER:  I will make the objections as

13        I see fit.

14             MR. BLOCK:  If it's compound or something

15        like that make a form objection otherwise don't

16        obstruct.

17             MR. MELCHER:  You want to get the judge on

18        the phone, because I'm going to make my

19        objections.

20             MR. BLOCK:  To teach you how to make a

21        proper objection?

22             MR. MELCHER:  Okay.  Let's take a break.

23             MR. BLOCK:  Madame Court Reporter, we will

24        take a short break.

25             (A short break was taken.)

Latoya Wynn                                           June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 78

1    BY MR. BLOCK:

2        Q.  Back on the record.

3            Ms. Fontaine -- excuse me.  I'm looking at

4    an e-mail from Ms. Fontaine.  You're Ms. Wynn.

5            Ms. Wynn, during your time as property

6    manager at Seven Courts have you ever done anything

7    or been instructed by TPI to do anything to make sure

8    that the company is aware of crime that is happening

9    at Seven Courts outside of business hours?

10       A.  No, sir.

11       Q.  Do you think that TPI should have such a

12   policy?

13       A.  I don't have an answer to that.

14       Q.  Is there gang activity at Seven Courts?

15       A.  I don't recall.

16       Q.  Are there break-ins at Seven Courts?

17       A.  I think there have been -- some people

18   called in, but it hasn't been proven.

19       Q.  So you think there are mistaken or

20   fictitious allegations of break-ins at Seven Courts?

21       A.  That's correct.

22       Q.  Your answer was yes, that's correct?

23       A.  Yes, that's correct.

24       Q.  I just wanted to make sure that the court

25   reporter could hear you.  I'm going to ask you about

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 79

1   your own safety but there is a big exception here

2   because you were attacked four time by tenants.  So I

3   assume that made you feel unsafe on some level?

4        A.  No, sir.

5        Q.  No?

6        A.  No, sir.

7        Q.  You didn't feel unsafe when the four tenants

8   attacked you?

9        A.  No, sir.

10       Q.  Why not?

11       A.  Because I was property management and this

12   is the type of property that I worked.  I have been

13   doing this for 20 years, sir.  I have been attacked

14   at all of the properties I worked at.  When people

15   don't get their answer, they get aggressive.  And a

16   lot of the residents out there are aggressive because

17   they're -- for whatever reason.  I'm not sure --

18   following medications, prescribed or not prescribed.

19   I don't know.  No, I do not not feel safe out there.

20       Q.  So other than the tenants attacking you, are

21   there ever times when you have felt unsafe at Seven

22   Courts?

23       A.  Not that I can recall.

24       Q.  Do you ever take any precautions for your

25   own safety at Seven Courts?

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 80

1        A.   I don't understand the question.

2        Q.   Well, do you -- I don't know, as an example,

3    maybe if it's dark outside and you want to park

4    closer to where you're going or you want to be on the

5    cell phone with somebody or you want to carry a

6    weapon, you know, like you can do under Georgia law.

7             Do you ever do anything like that to keep

8    yourself safe at Seven Courts?

9        A.   No.  No.

10       Q.   Do you own a firearm of your own?

11       A.   Yes, I do.

12       Q.   Do you take it with you to work?

13       A.   I do not understand that question still.

14       Q.   We can talk about your motivation but, do

15   you take your firearm to work with you?

16       A.   Yes.  My firearm is in my car.

17       Q.   Does it stay in your car while you're in the

18   office?

19       A.   That is the policy.

20       Q.   What policy?

21       A.   TMI Management Services LLC.

22       Q.   Was it TPI's policy before that?

23       A.   No.  It was a policy that changed.

24       Q.   Tell me about the policy change.

25       A.   I think the policy said we could not have it

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 81

1   at all, and then they changed it that we can have it

2   in the car.  It cannot go in any apartment or any

3   common area, like in the office.

4        Q.  You can't wear your weapon on your hip?

5        A.  That's correct.

6        Q.  Okay.  When did that policy change so you

7   could at least bring your weapon to the premises in

8   your car?

9        A.  I don't recall.  I just know it was a change

10  because it was more of the maintenance guys at

11  another property, not my property.

12       Q.  They were allowed to have a weapon?

13       A.  Yeah.  So like I said, it was a TPI policy.

14  It wasn't Seven Courts, so I don't recall it.

15       Q.  Did we talk about Laurie earlier?  You

16  mentioned Laurie.

17       A.  Yes.

18       Q.  Is her last name Light, L-I-G-H-T?

19       A.  I don't -- that's why I said earlier, I

20  don't recall.  The e-mail now I think it's Connor.

21  So that's why I'm saying I don't recall.

22            (Exhibit 8 was marked for identification.)

23  BY MR. BLOCK:

24       Q.  That's easy enough to answer.  I appreciate

25  that.  Let me ask you about the next exhibit which

Page 82

1    will be Exhibit 8.  Exhibit 8 for the record will be

2    TPI 004185.  There you go.  Exhibit 8, Ms. Wynn, is

3    an e-mail thread between Robert Harris, Bonnie Gayner

4    and you.  And it appears that the start of this

5    thread is actually an from Horace Holt to the e-mail

6    address sevencourt@gotip.org with a subject line

7    report, and then it appears that you and Mr. Harris

8    and Ms. Gayner were e-mailing about Mr. Holt's

9    report.

10            Do you see that?

11        A.  Yes.

12        Q.  And do you remember receiving this e-mail?

13        A.  It says I received it, yes.

14        Q.  Do you have any memory of receiving it?

15        A.  No, I don't recall it.

16        Q.  But I want to ask you --

17    sevencourt@gotip.org is an email address that we have

18    seen.

19            What is your understanding of what that

20    e-mail address is for?

21        A.  This is my work e-mail.

22        Q.  The sevencourt@gotip.org?

23        A.  Oh, no, that's the property's e-mail I'm

24    sorry.

25        Q.  And what is the property's e-mail

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 83

1    sevencourt@gotip.org used for?

2        A.   That actually goes to everybody.  It fills

3    to me, the assistant, the regional, corporate.  I'm

4    not sure who but it's an e-mail that fills to

5    everybody.

6        Q.   And if you look, Mr. Holt in March of 2020

7    sent an e-mail from his report apparently from that

8    day about when he was on duty and what we observed,

9    including rats and possums and a foul smell.  And he

10   was there for it looks like three or four hours.  And

11   then Gayner wrote back or not back but wrote to you

12   and Mr. Harris to say, "Do we need them more than

13   three hours a night?  Thanks."

14           Do you see that at the top?

15       A.   Uh-huh.

16       Q.   And Mr. Harris wrote back: I think so.

17           Do you see that?

18       A.   Yes.

19       Q.   Do you know whether you responded to this

20   e-mail?

21       A.   Not if you have it --

22       Q.   This is all that I have.  My question for

23   you is:  Did you agree with Mr. Harris that you all

24   needed Mr. Holt or some armed security more than just

25   3 hours a night?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 84

1       A.   I don't have an answer to that question.

2       Q.   And why not?

3       A.   Because that's personal.  I just go by what

4    corporate wants and needs.  I don't object to what

5    they want us to have.

6       Q.   Help me understand.  How do decisions get

7    made about what security measures should be in place

8    at Seven Courts?

9       A.   Okay.  Can you re-ask the question, please?

10      Q.   Sure.  I want to understand if you can help

11   me how are decisions made about what kind of security

12   measures will be in place at Seven Courts?

13      A.   So I can just tell you how the process

14   works.  If we are looking for security me or someone

15   in the office will call three or four vendors, we

16   will get security bids and then we will submit them

17   in.  Me, Rodrick or whoever the regional or area

18   manager decides, okay, what company we will go with,

19   and then they start.  I hope I answered the question.

20      Q.   I understand how you might select a vendor.

21      A.   Okay.

22      Q.   I think that's what you just described to

23   me.

24      A.   Yes.

25      Q.   How does someone or who decides whether

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 85

1    you're going to have let's say armed security in the

2    first place?

3        A.   I would say that would be on a corporate

4    level.

5        Q.   And who decides how much armed security, in

6    other words, how many hours a day the security

7    officer will be on site?

8        A.   Once again, that's corporate.  That is a

9    step in processing the budget.

10       Q.   And who decides how much money is going to

11   be spent on security for Seven Courts?

12       A.   I don't know that answer.

13       Q.   It's not you?  Sorry I think I talked over

14   you.

15           Is it you, the property manager, who decides

16   how much money will be spent on security at Seven

17   Courts?

18       A.   No, sir.

19       Q.   In your understanding as the property

20   manager for Seven Courts, who does make the decision

21   about how much money is going to be spent on

22   security?

23       A.   Once again it's done at corporate and it's

24   part of budgeting.

25       Q.   And by corporate do you mean TPI?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 86

1        A.   I mean, the management company that manages

2   Seven Courts.

3        Q.   So whoever manages Seven Courts is going to

4   make the decision about how much money to spend on

5   security?

6        A.   That's correct.

7        Q.   And to your understanding, it's happening

8   above your level somewhere?

9        A.   That's correct.

10       Q.   Somewhere in Florida?

11       A.   I'm not sure.

12       Q.   It seems like most of the corporate people,

13   if not all, work in Florida and that's why I said

14   that.  I don't need you to weigh in on geography.

15       A.   Would you like to number this one?

16       Q.   Oh, thank you.  This is 8.  All right.  I

17   want to walk through security guards, a sort of

18   chronology of security guards.

19            Mr. Holt started in 2019 after the April of

20   2019 murder?

21       A.   Incorrect.

22       Q.   No.  What's wrong?

23       A.   That's not when he came.

24       Q.   When did he come?

25       A.   He came after we had the drug bust.

Page 87

1        Q.   When was that?

2        A.   That was after the murder.

3        Q.   But he started in 2019?

4        A.   That's correct.  That's why I wanted to make

5    sure that I didn't answer the question incorrectly.

6    I know you're tricking me.

7        Q.   Okay.  I'm not trying to trick you.  I

8    actually thought you e-mailed that he was hired

9    because maybe even the former security guard was

10   somehow involved with the murder, but I don't know.

11       A.   No, that is not what happened.

12       Q.   There was a body, but I don't know who shot

13   them?

14       A.   The security guard they was there.

15       Q.   That's right.  They were there and obviously

16   not enough to stop the shooting, but they weren't

17   involved actively?

18       A.   That's correct.

19       Q.   I knew there was some issue with the

20   security guard.  Okay.  So they're out clearly.

21            You get Mr. Holt in 2019?

22       A.   That's correct.

23       Q.   When did Mr. Holt leave to your recollection

24   Seven Courts the first time?

25       A.   When my supervisor Bonnie Gayner instructed

Latoya Wynn                                              June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 88

1   me, asked me to give him 30-day notice.  I don't know

2   the date and time exactly.

3        Q.  We have that from the notice so that's fine.

4        A.  Okay.

5        Q.  Did you have a security guard after that?

6        A.  That's correct.

7        Q.  Who was that?

8        A.  Mr. Hickey.

9        Q.  And how long was Mr. Hickey the security

10  guard at Seven Courts?

11       A.  I don't know the exact time, so I'm just --

12  I'm not giving a direct date, but I would say

13  probably roughly a year.

14       Q.  And we could just look at I guess the

15  records for when Mr. Hickey worked there rather than

16  asking you to remember?

17       A.  That's correct.

18       Q.  We can do that.  Do you remember whether any

19  type of security -- let me strike that.  It's not

20  fair necessarily asking you questions and you just

21  told me you don't remember something.  I will come

22  back to that one.

23           Speaking generally, did you think that Seven

24  Courts needed an armed security guard?

25       A.  All of the properties I ever worked at had

Latoya Wynn                                      June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 89

1    armed security guards.

2         Q.   And you think that's important?

3         A.   I don't think unarmed is even necessary.

4         Q.   Can you explain what you mean there?

5         A.   If you're unarmed to me I work there and I'm

6    unarmed.  Why would we need security if they are

7    unarmed.

8         Q.   Okay.  So I misunderstood.  I think what

9    you're telling me is if you're going to have security

10   for them to be effective they need to be armed?

11        A.   That's correct.

12        Q.   What do you think about not having armed

13   security at all, is that appropriate?

14        A.   That would be made up to the corporate

15   office.  I don't make those decisions.

16        Q.   You're the property manager?

17        A.   That's correct.

18        Q.   So what would your recommendation be armed

19   security or no armed security?

20        A.   Armed.

21        Q.   And you would vote against not having armed

22   security?

23        A.   Correct.

24        Q.   Why?

25        A.   They wouldn't be doing -- because if I want

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc
June 2, 2022

Page 90

1    unarmed security I can go and get something and say,

2    hey, I want to be armed [sic] security.  I don't have

3    any training, I don't have no background or nothing.

4    Unarmed can be anyone.  That's what I think of.

5    Okay.

6        Q.  So you're saying that to be an armed

7    security guard you have to be more professional and

8    get certified --

9        A.  Yes, that's correct.

10       Q.  -- or trained or licensed in some way?

11       A.  That's correct.

12       Q.  I see.  And I guess also the fact that

13   you're armed might help you deter or stop crime?

14       A.  I wouldn't say that because the law stops a

15   lot of that from being able to happen.

16       Q.  Okay.  What would your views be about not

17   having security armed or unarmed at all would that

18   be appropriate?

19       A.  I don't give my opinion.  I work for a

20   company and I do what they want me to do, sir.

21       Q.  If you had a vote, what would you vote on

22   that?

23       A.  I wouldn't vote.

24       Q.  You wouldn't vote?

25       A.  No.

Latoya Wynn   June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 91

1      Q.  You would just abstain?

2      A.  Yes, sir.

3      Q.  Why?

4      A.  I don't think -- I don't understand the

5   question as to why.

6      Q.  Well, to me it seems like you're telling --

7   you're the property manager?

8      A.  That's correct.

9      Q.  And you're the top person on the ground?

10     A.  That's correct.

11     Q.  And am I right, you know what's going on at

12  Seven Courts better than anybody above you on the org

13  chart, right?

14     A.  That's correct.

15     Q.  Because you're there every day?

16     A.  That's correct.

17     Q.  And I understand the company may not give

18  you a vote, but I'm asking you not your vote, your

19  opinion.

20          How would you feel about not having any

21  security armed or unarmed at Seven Courts?

22     A.  And I'm not giving an opinion.  I'm only

23  going to state facts.

24     Q.  I am going to ask you some questions about

25  finances --

Page 92

1      A.  Okay.

2      Q.  -- and just tell me what you know and don't

3   know.  Okay?

4      A.  All right.

5      Q.  Obviously Seven Courts is a business --

6      A.  Uh-huh.

7      Q.  -- that charge money for rent and you spend

8   money on goods and services, right?

9      A.  Yes.

10      Q.  What is your role in how many gets collected

11   and spent at Seven Courts?

12      A.  Kind of the middleman, the overseer.  I try

13   to make sure we stay in line with budget as much as

14   possible.  That is part of my role to see that we're

15   staying in line with budget.

16      Q.  And where does that budget that you stay in

17   line come from?

18      A.  Different things have different budgeting.

19   I'm just going to break them down.  You have general

20   office stuff that would be a category, then you have

21   maintenance stuff that's a category.  Of course, you

22   have office payroll, maintenance payroll which is a

23   category on budgeting.  And then you have capital

24   items which is another area on the budgeting.  All of

25   that is done at a corporate level.

Page 93

1        Q.  So are you telling me corporate sets the

2    budget for Seven Courts and you're responsible for

3    trying to stay within the budget?

4        A.  That is correct.

5        Q.  Are you allowed to influence how much the

6    budget should be for certain items?

7        A.  No, sir.

8        Q.  And how do you fit physically in your role

9    as property manager to try to make sure you stay

10   within the budget you've been given by corporate?

11       A.  We have numerous things.  We have like

12   invoice tracker.  We have when we put in the bill

13   it'll alert you, hey, you're over budget.  For

14   example, right now AC units -- can I give an example?

15       Q.  Sure.

16       A.  AC units -- the property is a little older

17   so we have Trane units.  In newer homes you don't

18   have that.  But to purchase one of those units it's

19   now $3,400.  That is not in the budget.

20       Q.  For a window unit?

21       A.  No.  It's for the inside/outside compressor

22   and the inside air handler.

23       Q.  Okay.

24       A.  But you have to get both of them because the

25   freon that used to work both of them now has been

Case 1:21-cv-03661-ELR   Document 52-2   Filed 10/06/22   Page 95 of 188
Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 94

1   discontinued.  So you have to change both of them.
2   So for example, something like that is not in the
3   budget, but it is needed.  So if things like that
4   occur and I know I'm over budget -- most of the time,
5   they already know Toya get it done, so I get it done.
6        Q.  Who at corporate do you work with on budget
7   issues?  What is the name of the human being that
8   tells you what the budget is for the year?
9        A.  Actually we have an accounting department,
10  and I'm not sure how they do it at corporate.  That
11  would be a Rodrick Harris we question.  I'm not in on
12  that, so I can't even elaborate or tell you how that
13  is done.  But on my day-to-day basis, we do the
14  accounts payable.  We send account payable e-mails.
15  Jamaile (phonetic) is one of the accountants, and
16  Eric is the accountant now.
17       Q.  Is that Eric Zamora (phonetic)?
18       A.  That's correct.
19       Q.  What is your understanding of Mr. Zamora's
20  role in the budget?
21       A.  He's the account payroll manager.  He is
22  over all of the money we get in and the money we send
23  out.
24       Q.  All right.  So if spent too much or went
25  over budget on some item for Seven Courts you hear

Page 95

1    about it from Mr. Zamora?

2         A.   No.  It would be -- like I said on the

3    corporate level Rodrick is who I -- so they -- he

4    probably knows I can call him and talk with Rodrick.

5    And then Rodrick will say, oh, yeah, I already gave

6    her the okay and she know about it.  We do a monthly

7    finance report, a variance report every month, so I'm

8    able to see things.  But normally that is not an

9    issue at that property.

10        Q.   Tell me about the variance report.  What are

11   those?

12        A.   They do a whole package that's monthly that

13   they create.  We use the variance report and the

14   balance statement and the income statement because I

15   actually have to upload it on the AHA portal.

16        Q.   The Atlanta Housing portal?

17        A.   That's correct.

18        Q.   Oh, you have to show Atlanta Housing?

19        A.   The finances, that's correct.

20        Q.   Because Atlanta Housing has some Atlanta

21   Housing tenants in your property?

22        A.   That's correct.

23        Q.   What do you as the property manager do with

24   the variance report?

25        A.   I just answer questions, such as we met

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 96

1    budget, why we might have been over budget or we were

2    in line with budget.

3        Q.  Are you allowed to -- I think you answered

4    this, but I'm going to ask it again to make sure I

5    understand.

6            Are you as the property manager allowed to

7    decide what the budget should be on various items?

8        A.  No, sir.

9        Q.  That's corporate?

10       A.  That's correct.

11       Q.  I'm going to ask you about cameras.

12       A.  Okay.

13       Q.  I'm going to ask you about Eye Q.

14           What can you tell me about Eye Q while I get

15   my next exhibit?

16       A.  We were getting cameras.  I asked Maggie to

17   look into the booklet that we use to get vendors out

18   sometimes if we don't go on Yellow Pages.  It's the

19   apartment association book.  They have like a vendor

20   book that they send out.  So she looked in there and

21   she located some camera people, they came out and

22   Mr. Eye Q, their rep, he sold me and Rodrick, and so

23   that was about it.

24           (Exhibit 9 marked for identification.)

25   BY MR. BLOCK:

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 97

1      Q.  Let me show you Exhibit 9 which is TPI

2   002615 through 2626.

3      A.  Okay.

4      Q.  That Exhibit 9 appears to be an e-mail from

5   -- the top of the e-mail is from you to Mr. Harris

6   from April 14, 2021 and you're forwarding the Seven

7   Courts's proposal from Bobby Keith at Eye Q.

8          I guess Mr. Keith is the sales director for

9   Eye Q you were telling us about?

10     A.  Yes, sir.

11     Q.  And if we look at the date Mr. Keith sent

12  you the e-mail with the proposal on April 4, 2021,

13  right?

14     A.  That's correct.

15     Q.  And so am I right in understanding in April

16  of 2021 at Seven Courts you're looking for a vendor

17  to come install security cameras?

18     A.  That's correct.

19     Q.  Why were you looking for a vendor to come

20  install security cameras at Seven Courts in April of

21  2021?

22     A.  I'm not sure of that question.  Can you just

23  repeat the question for me?

24     Q.  Why were you in the market for security

25  cameras at Seven Courts in April of 2021?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 98

1      A.  To get new ones.  To get more.  To get new

2   ones.  We had four and we wanted to get more.

3      Q.  Where were the four cameras that you had

4   before you purchased anything from Eye Q?

5      A.  They were just on the -- let me answer this

6   correctly.  Three of them were located on the office:

7   one facing the pool, one facing the mailbox, one kind

8   of sit near my window that actually captures the

9   doorway when you're walking down to the A building.

10  So those three were attached to the office, and then

11  there was one attached to the A building for when

12  people come in they would have to use their swiper

13  and call the key box.

14     Q.  The monitor for those cameras was in the

15  office, correct?

16     A.  Yes.

17     Q.  And if I understand correctly from

18  Ms. Fontaine, the monitor for those cameras was in a

19  locked part of the office not where you sat or

20  Ms. Fontaine sat?

21     A.  That is correct.

22     Q.  And it was not your practice to watch those

23  cameras in realtime, was it?

24     A.  No, not at this location.

25     Q.  Okay.  I just want to understand like the

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 99

1  decision-making to get cameras.

2         Based on your prior testimony it sounds like

3  somebody above you would have said, Ms. Wynn, go get

4  bids for cameras?

5      A.  No.  I just think it was that we had four

6  and we wanted more.  And the company that installed

7  those four, they were not in business anymore.  So we

8  just got a new company to get new cameras.

9      Q.  I'm trying to figure out, how did you-all

10 get the idea you should get new cameras?

11     A.  I don't recall that.

12     Q.  Was it your idea?

13     A.  I don't recall.  I don't recall.  Unless you

14 can show me something in an e-mail, I don't recall

15 how that came about.

16     Q.  At some point you and Ms. Fontaine had the

17 job to get vendors or bids?

18     A.  That's what we did.

19     Q.  And Eye Q was the winning bid, if you will?

20     A.  Yes.

21     Q.  And was there a formal bid process or Eye Q

22 just seemed like the best vendor?

23     A.  We had other vendors, but I think he was the

24 only one that was very visual.  He came to the

25 property.

Page 100

1      Q.  All right.  If you look through this -- we

2    will go to where they're located later.  I forgot to

3    ask you something before.  You said you felt safe at

4    Seven Courts.

5          Would you feel safe going to the mailboxes

6    at 9:30 p.m. on a summer evening at Seven Courts?

7      A.  Yes.  I've even worked until nine o'clock

8    sometimes.  The mailboxes sit right there at the

9    office and that's where one of the cameras was.  That

10   camera is still there.  They uploaded the technology

11   on the camera, but the same location where the four

12   was.  That camera has always been there.

13     Q.  The old cameras, the old four --

14     A.  That's correct.

15     Q.  -- did they like record?

16     A.  Yeah.

17     Q.  So there would be a recording of what those

18   cameras showed?

19     A.  Yes.  Like when you say "record," I can play

20   back.

21     Q.  Yeah.

22     A.  Oh, okay.  I just want to make sure I am

23   answering the question right.  It didn't play back a

24   long time, days.  And with them we got what we could

25   get almost 30 days but I can't -- I'm not sure.

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 101

1        Q.  How long to your recollection could you go

2    back with the old cameras?

3        A.  I don't want to state this is factual.  I'm

4    just giving a rough, around two weeks.

5        Q.  So in other words, with the old cameras if

6    you came into work at 9:00 in the morning, you should

7    have been able to pull up tape from what happened at

8    9 p.m. the preceding night?

9        A.  That's correct.

10       Q.  About 12 hours ago?

11       A.  That's correct.

12       Q.  All right.  So I want to ask you about if

13   you flip to page 2623 of Exhibit 9.  The page numbers

14   are in the upper right corner?

15       A.  You said 23.

16       Q.  Yeah 2623.  It says, Property needs analysis

17   at the top?

18       A.  Yes.

19       Q.  And I think you told me you met with the

20   representative from the Eye Q to scope out the

21   project?

22       A.  That's correct.

23       Q.  You kind of told him what you need and he

24   told you what he could sale?

25       A.  That's correct.

Latoya Wynn                                        June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                        Page 102

1        Q.   And who was in that meeting with the Eye Q
2    representative?
3        A.   I don't really recall that day, but I'm
4    going to believe it was me and my assistant Maggie
5    that contacted him.
6        Q.   Okay.  And if you look at page 2623 under
7    Property needs analysis Eye Q wrote: Based on
8    discussions with on site manager?
9        A.   I'm sorry which one?
10       Q.   It's 2623.  It says, Property needs analysis
11   at the top?
12       A.   Okay.  The same one.  I thought we went to
13   another page.
14       Q.   Do you have that in front of you now?
15       A.   Yes, I do.
16       Q.   So under Property needs analysis IQ wrote:
17   "Based on discussions with onsite management," which
18   I take it means you Ms. Wynn?
19       A.   Okay.
20       Q.   The following areas are vulnerable to
21   intruder/vandalism.  Parking lot vulnerable to
22   intruder/vandalism.  Pool vulnerable to after hour
23   intruder.  Trash compactor/dumpster security.
24   High-rise floor intruder vulnerability.  Elevator
25   intruding vulnerability.  Laundry room security.

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 103

1   Leasing office security.

2          Do you see that?

3      A.   That's correct.

4      Q.   And does that accurately reflect what you

5   would have told Eye Q when you met with them in April

6   2021?

7      A.   This might not be word for word what I told

8   him.  He might have just got some more from

9   observations from him being on site, but yes.

10  Overall the laundry room, the leasing office, I was

11  just basically going off the previous cameras that we

12  already had and those like as -- this summary that

13  would show the four cameras that we had.  Those were

14  in the location, so that's the reason why it was

15  probably mentioned that way.

16     Q.   And is it fair to say that you would have

17  told Eye Q that places like the parking lot and the

18  pool and the high-rise and elevators were vulnerable

19  to intruders?

20     A.   Not intruders.  In the high-rise there is

21  smoking and they are peeing in the elevator, so not

22  intruders.  That was his word.

23     Q.   So they are residents?

24     A.   Yes.

25     Q.   Not intruders?

Latoya Wynn                                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 104

1        A.   That's right.  I need to give lease

2    violations and every time they are saying it's not

3    me, that person is telling on me, they are lying.

4    That's why I said that was his word that he added.

5        Q.   Okay.  That's for the elevator.  But it

6    looks like he has got three or four different places?

7        A.   The laundry room.  So the elevator only sits

8    in the high-rise.  We only have one elevator.

9        Q.   I just want to ask you is it fair to say

10   that in April of 2021 various places were vulnerable

11   to intruders?

12       A.   I can't recall that.  I really don't

13   understand the question.

14       Q.   Do you think any places at Seven Courts were

15   vulnerable to intruders in April 2021?

16       A.   Like I said, I'm not giving -- I don't have

17   an opinion on that.  I just told you on record that I

18   felt safe there.  I've work there until 9 o'clock.

19   We have a policy now that we can't -- this been

20   happened that we really can't come before our

21   scheduled work time or the corporate office.

22       Q.   Do you understand my question?  Okay.  All

23   right.  Ultimately you accepted Eye Q proposal to

24   install security cameras, correct?

25       A.   That's correct.

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 105

1        Q.  And you never told Eye Q they were wrong

2    about the intruder vulnerability did you?

3        A.  This was just the scope of Keith, who is the

4    sales person.  We get people that put things in their

5    term all the time.  So no we never address the

6    wording of intruder, vandalism.  No.  No, sir.

7        Q.  You didn't tell him that he was wrong and

8    you did not have intruder vulnerability at Seven

9    Courts?

10       A.  I never mentioned that to him.  That was his

11   wording on this paperwork.

12           (Exhibit 10 was marked for identification.)

13   BY MR. BLOCK:

14       Q.  Let me show you Exhibit 10, which is a

15   document that we received from Eye Q --

16       A.  Okay.

17       Q.  -- via subpoena and it has been provided to

18   TPI's lawyers.  For the record, Exhibit 10 is an Eye

19   Q Monitoring Statement of Work dated 4/15/2021.

20           Do you see that?

21       A.  Yes.

22       Q.  If you look at the third page it looks like

23   you as the customer signed it, Toya Wynn, Property

24   Manager.  Do you see that?

25       A.  That's correct.  This is an e-Document.

Page 106

1        Q.  Yeah, it's like a docu-sign.

2        A.  Yeah, so it was an e-mail.  So Mr. Rodrick

3    had already reviewed it and he gave me the okay to

4    sign.

5        Q.  Right.  And if you look at the top it's a

6    Statement of Work you signed.  This is on the first

7    page.  It's actually the very beginning of the

8    document.  It says: This Statement of Work, SOW,

9    dated 4/15/2021 is between The Partnership Inc.,

10   customer, and National Video Monitoring Company LLC,

11   dba Eye Q Monitoring, the company -- so on and so

12   forth.

13           Right?

14       A.  Yes, I see that.

15       Q.  So the contract you signed, you're signing

16   for TPI, The Partnership Inc. with Eye Q, right?

17       A.  That's correct.

18       Q.  And if you look at I guess let me count

19   pages with you here one, two, three, four page in

20   under Schedule 1 where it has -- it lists the service

21   and equipment and cites his installation?

22       A.  Okay.

23       Q.  Do you see where it says:  Parent company

24   named The Partnership Inc.

25       A.  Yes, I do.

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 107

1      Q.   Location name Seven Courts Apartments?

2      A.   That's correct.

3      Q.   And then at the bottom of that section site

4   contact e-mail, your e-mail twynn@gotpi.org, right?

5      A.   No.

6      Q.   No.  Whose email address is that?

7      A.   Not mine.

8      Q.   Is it a typo?

9      A.   Yes, it is.

10     Q.   What was your actual e-mail address?

11     A.   It's twynn@gotpi.org.

12     Q.   Okay.  So it looks like there was a typo

13   with your contact e-mail.

14          There was an attempt to include Toya Wynn's

15   e-mail address and somebody dropped an N?

16     A.   Okay.

17     Q.   I want to ask you, if you go forward a

18   couple of pages there is a map.  I think it's not

19   even a map.  It's an image of Seven Courts.

20          Do you see that?

21     A.   Does it have at the ID of 48FOE958 at the

22   top of it?

23     Q.   Yes.

24     A.   Okay.

25     Q.   I actually would really like it if you can

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 108

1   help orient me.  I haven't seen too many overhead

2   images of Seven Courts.  I mean Google Earth of

3   course, which may be what this is.

4           On your copy of the exhibit can you just

5   draw an X where the front entrance is, like where you

6   would enter off of MLK?

7       A.  Once again did you say the front entrance?

8       Q.  The front address is on MLK, right?

9       A.  The front entrance, yes.

10      Q.  Can you just draw an X for the front

11  entrance, please?

12      A.  [Witnes complies].

13      Q.  It's there at the top of the page.

14      A.  Yes.

15      Q.  And then where is the office?

16          MR. MELCHER:  What do you want her to mark

17      that as?

18          MR. BLOCK:  Maybe an O for office.

19  BY MR. BLOCK:

20      Q.  Is it in the center of what looks to be a

21  pool?

22      A.  The pool is in front of it, yes.

23      Q.  So the front door of the office would face

24  the pool?

25      A.  No.

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 109

1       Q.   Where would the front door of the office be?

2       A.   Facing the parking lot and the mailboxes.

3       Q.   Going off to the right.  I see.  And where

4    are the mailboxes?

5       A.   Right here by where I put the circle at the

6    front door.

7       Q.   Can you draw an M for mailboxes.

8       A.   [Witness complies].

9       Q.   Where is the B building, B, as in bravo?

10      A.   I'm going to put a B right here because it's

11   both.

12      Q.   Both of those.  And those are off to the

13   right as we are looking at it?

14      A.   That's correct.

15      Q.   We have not talked a lot about the Diaz

16   family today but where would their unit B-23 have

17   been?  And maybe just write B-23 on the map.  So for

18   the record they are at the bottom right of the B

19   building?

20      A.   That's correct.

21      Q.   And then the high-rise is that the structure

22   down at the very bottom?  You don't need to mark

23   anything I'm just trying to get oriented.  So looking

24   at this map, what are the other buildings?  We have B

25   building, the high-rise, and what are the others?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

Page 110

1        A.   You have coming into the entrance over here

2   you have the D building, to the right is the E

3   building, then you have B building, the office, C

4   building and A building the high-rise in the back.

5        Q.   Where is the playground?

6        A.   The playground will be in this area.

7        Q.   Down at the bottom where it looks like there

8   is some dirt?

9        A.   No.  Off from the high-rise.

10        Q.   Okay.  So if I look at the map across from

11   the high-rise there is sort of a greenish rectangle

12   with brownish almost like baseball infield color?

13        A.   That's the playground.

14        Q.   Okay.  And then it looks like there is a

15   little parking lot.  Is that right?

16        A.   That's correct.

17        Q.   Looking at this map where are children

18   allowed to play?

19        A.   At the playground only.

20        Q.   Why at the playground only?

21        A.   TPI that's in their rules and regulations.

22        Q.   Why?

23        A.   I'm not sure, sir.  I don't make those

24   decisions.

25        Q.   Did you enforce that rule?

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 111

```
 1        A.  That's correct.

 2        Q.  How would you enforce that rule?

 3        A.  Send an infraction.

 4        Q.  Would you physically go up to children who

 5   were playing outside the playground and tell them

 6   they had to go play elsewhere?  Never?

 7        A.  No, sir.  I don't recall doing that at all.

 8        Q.  Were the playgrounds at Seven Courts closed

 9   at any point for COVID?

10        A.  Yes, sir.

11        Q.  When roughly were they closed?

12        A.  I don't recall.  I just know that Holt

13   delivered the fliers.  don't recall the date.

14        Q.  Who is Hope?

15        A.  Holt, Horace Holt.

16        Q.  Okay.  Holt delivered the flyers.  Okay.  So

17   probably in March or April of 2020.

18            It wouldn't have been before then that you

19   closed the playground for COVID, right?

20        A.  I don't recall.

21        Q.  Do you remember how long the playgrounds

22   were closed?

23        A.  No, I don't recall that.

24        Q.  How did you notify residents that the

25   playground was open again?
```

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 112

1      A.   Once we opened back up the office at the

2    beginning of this year.

3      Q.   So the playgrounds were closed from the

4    beginning of COVID until 2022?

5      A.   Yes, sir.  We had notice sent out and had it

6    taped off, but they decided to take the tape off.

7    And unfortunately, they just -- I don't have any

8    other answer to that.

9      Q.   Okay.  Let's do a few things.  Where were

10   children supposed to play if not on the playground?

11     A.   In the TPI Management Service community

12   rules and regulations that we talked about earlier it

13   said they must entertain all guests inside their home

14   only.

15     Q.   I'm asking a different question.  You

16   actually told me before that it was TPI's policy not

17   the new company.

18          But where if not on the playground where are

19   little kids supposed to play at Seven Courts?

20          MR. MELCHER:  Objection, time frame, when.

21   BY MR. BLOCK:

22     Q.   While the playground was closed from the

23   beginning of COVID-ish until 2022, where were the

24   children supposed to play?

25     A.   We didn't have an area.  There was no area

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 113

1    to play.

2          Q.   You said the office was closed.  The office

3    was closed until this year 2022?

4          A.   No.  We sent a letter out saying the office

5    was closed for them just walking up.  They had to

6    have appointments only.

7          Q.   So you actually were in Atlanta office?

8          A.   That's correct.

9          Q.   Except maybe there was a time you were out

10   because everybody was doing 15 days for COVID and

11   that went for a little bit?

12         A.   No, sir.  We worked every day.

13         Q.   Oh, you didn't.  Good for you.  So there was

14   a human being, namely you in the office during much

15   or all of COVID, but residents were not allowed to

16   just walk into the office?

17         A.   That's correct.  They had to do appointments

18   only.

19         Q.   How would they make appointments?

20         A.   Call the phone.

21         Q.   What if you were not there?

22         A.   They would leave a message and we contact

23   them back through e-mail.  We also have on the door

24   that they can go on the Web site and they can pay

25   their rent and to do a work order.

                                                    Page 114

1          Q.   What if someone walks up and knocks on the

2     door during this period the office was technically

3     closed -- could someone knock on the door and speak

4     to you about an issue?

5          A.   No.   They did it often though.

6          Q.   What would you do if someone -- let's say

7     middle of 2021, summer, someone had a problem with

8     something at Seven Courts could they just walk up and

9     knock on the door and speak to you about it?

10         A.   No, sir.

11         Q.   Why not?

12         A.   Because the rules are the rules.   We did not

13    take walk-ups, they had to call.

14         Q.   How would you communicate to someone who

15    walked up that they couldn't speak to you?

16         A.   We had a sign that said we were closed.   We

17    have a glass door, we had blinds that we pulled down,

18    and they would still just bang on the door.

19         Q.   Give me an example of someone that walks up,

20    knocks on the door, summer of 2021, someone has a

21    problem and they're knocking on the door and let's

22    say they make eye contact with you, what would you

23    do?

24         A.   Nothing.   I'm mainly staying in my office

25    because we have a lot of work to do.

Latoya Wynn                      June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 115

1      Q.  If you made eye contact with this person

2  would you --

3      A.  No, sir.

4      Q.  -- gesture?

5      A.  Sometimes yeah, we're closed.  That's it.

6      Q.  You wouldn't step outside and help them with

7  their problem?

8      A.  Now sometimes like I said they have glass

9  and if they are banging on the glass hard enough yes

10 I will come because I didn't want the glass to be

11 shattered.  So yes, and I would ask what's going on,

12 and then I would most likely point to the sign that's

13 also on the glass saying they can go to Seven Courts,

14 they can put in a work order or they can pay their

15 rent.  And they're just at the door and still at the

16 door a long time though.  You can go to

17 sevencourtapartments.com and you're able to pay your

18 rent and do a work order where they don't have to

19 come to the door.

20     Q.  Did you -- do you now or at any point as a

21 property manager, what was the system you would use

22 to keep track of tenant complaints or concerns?

23     A.  That also is on there.

24     Q.  On the Web site?

25     A.  That's correct.

Latoya Wynn                              June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 116

1      Q.  If someone wanted to say, hey, my toilet is
2  not working, they'd use the Web site?
3      A.  They use the Web site or they'd call us or
4  they would e-mail at sevencourt@gotpi or twynn@gotpi
5  or Maggie Fontaine, you know, they'd get our e-mail.
6  Sometimes when people come -- like I said, we were
7  still open.  So they know if they wanted something
8  they would call, they would say I'm going to come
9  down.  It could be 11 o'clock and say, hey, I want to
10  pay my rent.  I'll be there at 2 o'clock.  Okay.
11  When they'd come at 2 o'clock, they would say
12  whatever they had, if they had a work order issue or
13  any concerns and we would write it down and put it in
14  their file.
15          COURT REPORTER:  When you have a breaking
16      point, can I have a break?
17          (A discussion ensued off the record.)
18  BY MR. BLOCK:
19      Q.  Back on the record.  So Ms. Wynn, can you go
20  back to Exhibit 10.  The first page of Exhibit 10.
21  In the middle of the first page it says:  Estimated
22  installation start date, estimated four to six weeks
23  from contract execution once deposit and first month
24  lease payment received.
25          Do you see that?

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 117

1          A.   That's correct.

2          Q.   And then estimated installation completion

3     date under that is approximately 2 to 3 weeks once

4     installation begins, right?

5          A.   That's correct.

6          Q.   And then estimated monitoring services start

7     date is within 24 hours of installation completion,

8     right?  Is it fair to understand that at least when

9     you signed the Statement of Work on April 15, 2021,

10    the assumption was that assuming you all signed and

11    paid right away that you would have the cameras from

12    Eye Q up and running in about two months?

13         A.   I don't -- from what this paper is saying

14    that's what it says.  Yes, sir.

15         Q.   It looks like once you sign and pay it's

16    four to six weeks before installation, and then two

17    to three weeks of installation work and 24 hours to

18    turn on the cameras.  So call it six to nine weeks

19    from signing and payment to going live with the

20    cameras, right?

21         A.   Compared to this document I'm looking at,

22    yes.

23         Q.   Yes, I'm just asking you about this.  That's

24    not what happened is it?

25         A.   No.

Latoya Wynn                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 118

1        Q.  Can you tell me why?

2        A.  I don't recall.

3        Q.  We have some interrogatory responses.  It's

4    a legal document that we ask questions to TPI and TPI

5    gives answers under oath as the company?

6        A.  Okay.

7            (Exhibit 11 was marked for identification.)

8    BY MR. BLOCK:

9        Q.  And those say that -- I can mark them, but

10   those say -- let me just mark these for the record so

11   we have it all clear.  These will be Exhibit 11.

12   Just on the front it says, The Partnership Inc. First

13   Amended Answers to Plaintiff First Set of

14   Interrogatories.  I really want to ask you about

15   something that is on the bottom of page 5 onto 6.  I

16   will give you a copy of course.  I'm just trying to

17   show you.

18            What TPI told us in these amended

19   interrogatory responses is that security cameras are

20   now live.  Partial security camera utilization was

21   put in place on October 1, 2021 and the remaining

22   cameras went live on November 1, 2021.  And I think

23   that's in reference to the Eye Q cameras?

24       A.  Okay.

25       Q.  And so you don't have any reason to disagree

Latoya Wynn                                   June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 119

1    with the company's testimony in interrogatories that

2    the Eye Q cameras weren't live until October,

3    November 2021?

4          A.  No, sir.

5          Q.  And I think you just told me, you can't

6    recall sitting here today why it took from April 2021

7    when you can signed the Statement of Work until

8    October, November of 2021 for the Eye Q security

9    cameras to go live?

10         A.  That is correct.

11         Q.  What, if anything, did you do to fill in the

12   gap for that seven-month period by way of security

13   measures?

14         A.  I don't recall.

15         Q.  If you go back to Exhibit 10, which is the

16   Eye Q Statement of Work, in the middle under customer

17   information it says, Hours monitored 7 p.m. to 4 a.m.

18   daily.  Do you see that?  It's in the middle right in

19   here I'm pointing.

20         A.  I see -- okay 7 a.m. to 4 a.m. daily.

21         Q.  Whose decision was it to have the cameras be

22   monitored 7 p.m. to 4 a.m. daily?

23         A.  Me and Mr. Rodrick.

24         Q.  Why did you and Mr. Harris choose 7 p.m. to

25   4 a.m. daily?

Latoya Wynn                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 120

1        A.  Because that is after the office is closed

2    and this is basically talking about the monitoring

3    for people dumping trash and stuff and the loitering

4    that's going on in the A building where the elevator

5    is.  That was why, but I don't recall what made us

6    specifically pick 7 p.m. to 4 a.m.

7        Q.  I have heard about this from several people.

8    Tell me about the situation with trash dumping that

9    was bothering you all at Seven Courts.  What is that

10   situation?

11       A.  I actually had court on January 20th.  Yes.

12       Q.  For what?

13       A.  This code enforcement.  We sit on Martin

14   Luther King and we don't have gate.  So they come up

15   and down the street.  We have a hotel that sits on

16   the left of us and we have a hair salon that sits on

17   the right, and then we have the dumpster.  They dump

18   all kind of things from tires to furniture.  So yes,

19   that was a lot.  And we also had got the video so

20   they can try to deter contractors that come on the

21   property and dump their trash, such as tires because

22   you have to dispose of them.  And we have to pay

23   extra to get them disposed.

24       Q.  So it sounds like illegal dumping is a major

25   problem for you all at Seven Courts?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

Page 121

1      A.  Not really.  But we don't have a gate so it
2   happens.
3      Q.  Well, it's significant enough that you pay
4   to put security cameras on the dumpsters, right?
5      A.  Yes, to try to deter them.  We actually have
6   it where they can talk to them at the certain
7   location.
8      Q.  Oh, the person who's watching the monitor?
9      A.  That's what I'm trying to explain.  That's
10  why I'm thinking that that monitoring from 7 p.m. to
11  4 a.m. was.  It's not the cameras just during that
12  time, but for them to talk and tell the residents in
13  the A building not to be loitering in the hallway,
14  not to urinate, not to smoke, not to hold the
15  elevator.  They'll try to hold the elevator.  So it
16  was a lot going on with that building.  And it just
17  so happens that the maintenance shop is also hooked
18  up to that building and outside of that is where the
19  trash compactor is.
20          MR. BLOCK:  Why don't we take our break
21      here.
22          (A short break was taken.)
23  BY MR. BLOCK:
24      Q.  Back on the record.
25          Ms. Wynn, let me go back to earlier to your

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

Page 122

1    testimony about how friends of yours have companies

2    that may have performed services for Seven Courts.

3            Can you give us a list of those companies?

4        A.  No, I wouldn't -- I don't have a list.

5        Q.  You don't remember the names?

6        A.  They work there like doing AC things,

7    plumbing.  Pete the plumber works there now.

8        Q.  And is Pete the plumber a friend of yours?

9        A.  Yeah.  He has worked with me on all the

10   properties basically I've worked at.  That's how we

11   got this relationship.

12       Q.  Are there any other companies or vendors

13   that you remember right now where you say you have a

14   friendship outside of --

15       A.  Not -- I know Pete the plumber.  The pool

16   man, he does the pool.  Yeah.

17       Q.  The pool man is a friend of your outside of

18   Seven Courts?

19       A.  Yes.

20       Q.  And the name of the company is the pool man?

21       A.  It's Dominique Water Boy.

22       Q.  I have seen Water Boy on the invoice?

23       A.  Like I said, I just try to help them, like

24   doing the invoice.  They have paperwork and stuff,

25   they take forever to submit the invoices.  And we

Latoya Wynn                              June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 123

1    work off an accrual basis.  So sometimes they are not

2    doing their job holds me up.  So that's why I said, I

3    don't get any money from them.  I just want them to

4    send me the invoice so Eric can stop asking me for

5    the invoice.  That's it.  But nothing -- I don't get

6    any money from them.

7        Q.  If we think about relatives of yours who

8    have lived at Seven Courts could you give me their

9    names?

10       A.  Yes, I gave you one.  That's the only

11   relative I have Tasharah Wright.

12       Q.  One reason we are asking these questions is

13   TPI redacted a bunch of the names in the reports, so

14   we don't know who the people involved in the incident

15   were.  Your daughter she didn't live at Seven Courts

16   but she was there sometime.  What is her name?

17       A.  I don't know why I would have to answer

18   that.

19           MR. MELCHER:  Her sister's name is that what

20       you're asking?

21           MR. BLOCK:  Her daughter.

22           THE WITNESS:  I gave him my sister's name

23       and she's on the lease.  My daughter is not.

24   BY MR. BLOCK:

25       Q.  I will explain why because I understand it

Latoya Wynn                                              June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 124

1    might make you uncomfortable but there is a large

2    number of incidents reports.  You know incident

3    reports are like when there is a reported incident of

4    some kind at Seven Courts.  There are also plenty of

5    e-mails from Mr. Holt, some from Mr. Hickey

6    describing misconduct at various times or alleged

7    misconduct at various times at Seven Courts.  And we

8    not knowing who the redacted people are and not

9    knowing your daughter's name, we can't tell if it was

10   your relatives who were involved in the misconduct.

11   And I have to tell you whether it's true or not, it's

12   something that people have said and it's something we

13   have to explore.  So that's why we want to know her

14   name, not because we want to go any further than

15   that.

16           THE WITNESS:  Can I talk to you about this?

17           MR. MELCHER:  There is a question on the

18       table.  But let me just advise you that there is

19       a confidentiality agreement as well and I don't

20       think it's leaving this room in terms of what

21       your daughter's name is.

22           THE WITNESS:  Okay.

23           MR. MELCHER:  So I don't think that you have

24       anything to fear from the people sitting here.

25           THE WITNESS:  But I need to speak with you.

Latoya Wynn

Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 125

1          MR. MELCHER:  Okay.  Is that okay?

2          MR. BLOCK:  Yeah.  You need to go off the

3      record?

4          THE WITNESS:  Yeah.

5          MR. BLOCK:  Madame Court Reporter, we're

6      going to go off the record.

7          (A short break was taken.)

8          THE WITNESS:  My daughter name is N-Kiya.

9  BY MR. BLOCK:

10     Q.  Thank you.  And I'm sorry I asked you that.

11     A.  And the reason why is because she had ran

12  away.  That's why I didn't know and that's the thing.

13     Q.  Well, I'm really sorry to hear that.  I hope

14  she comes back safely.

15     A.  No, she's back, but during this time she ran

16  away.  Yes.  And I don't have custody.  Okay.

17     Q.  All right.  We will move well away from that

18  and thank you.  I want to ask you about the

19  circumstances of this case and the Diaz family.  And

20  I don't know how you knew them but their proceeding

21  is the Diaz family, which is why I said the Diaz

22  family.  Of course, you can also call them Medrano or

23  Caceres.  I think in the lease maybe it was Medrano

24  or Caceres.  You know who I'm talking about?

25     A.  Yes, sir.

Latoya Wynn                        June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 126

1      Q.  Okay.  What can you tell me about the Diaz
2   family in general?
3      A.  They were residents.  They didn't really
4   follow the rules that much, but that's it.  They had
5   some financial difficulty.  People had told I think
6   Maggie that they were having a bible study.  I really
7   didn't interact with them that long.  I had been
8   helping Rodrick on other properties, so I really
9   wasn't at Seven Courts full-time during the pandemic.
10  I had been helping him with the other properties.
11  Some of the properties that Mr. Holt would work.
12     Q.  Whispering Pine?
13     A.  Well, Whispering Pine -- a lot of the
14  properties were in Griffin.
15     Q.  Griffin, Georgia?
16     A.  Yes.  I want to say along Gainesville,
17  Greenville.  I can't think of the other.
18     Q.  Is that Georgia?
19     A.  Yeah.  I know it's near Newnan.  I just
20  can't remember right now.  I'm kind of thrown off
21  from the previous question.
22     Q.  What are the rules that you believe the Diaz
23  family did not follow?
24     A.  Loitering, standing, working on their car
25  outside in the parking lot, the children not playing

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 127

1  at the playground, playing with -- I think they had a

2  [unintelligible] and then they had a basketball and

3  that's it.  But working on the car.  I know they

4  worked on the car and the children were not

5  supervised.  And also the things we have on the

6  infractions.

7       Q.  I'm sorry.

8       A.  That's okay.

9       Q.  Where would you rank working on your car in

10  the parking lot and having kids, you know, kind of

11  unfortunate at that time playing unsupervised as you

12  stated.

13       Where does that rank on the scale of

14  misconduct that you see at Seven Courts?

15       A.  Just the ones that don't follow direction.

16  I'm sorry I'm not sure of the question.

17       Q.  That's fine.  What else do you remember

18  about the Diaz family?

19       A.  That's basically it.  They had rent help and

20  they had bible study.  I don't remember too much on

21  the Diaz family.

22       (Exhibit 11A was marked for identification.)

23  BY MR. BLOCK:

24       Q.  I intended to ask you about the rules and

25  regulation before, so let's do that now.  I am going

Page 128

1  to mark as Exhibit 11 TPI 000492 through 496.  I will

2  hand you your copy and your counsel his copy.  This

3  document is entitled TPI Seven Courts Apartments

4  Community Rules and Regulations, right?

5       A.  That's correct.

6       Q.  And if you look at the very last page it

7  says:  This addendum is hereby made a part of the

8  executed lease by Edwin Medrano Caceres and Elsa

9  Flores on October 15, 2020 for apartment hom B-23.

10 And it looks like they signed it.

11          Somebody signed it under management

12 signature.  Do you recognize that signature?

13      A.  Yes.

14      Q.  Is that Ms. Fontaine's?

15      A.  That's correct.

16      Q.  That does look like a MF to me.  Okay.  When

17 you talked about the rules and regulations is this

18 what you're referring to Exhibit 11?

19      A.  And also the GAA Community Rules and

20 Regulations.

21      Q.  GAA Community Rules and Regulations?

22      A.  And this was the TPI one I referred to

23 earlier.  And if you look at number -- go up under

24 number 11.

25      Q.  Okay.

Latoya Wynn                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 129

1          A.   That's what we were talking about earlier

2     when you asked me where they should be and that's

3     what it says.

4          Q.   okay.  What it says under Common Areas is:

5     The use of the clubhouse, fitness center, computer

6     lab, swimming pool and all other amenities are for

7     exclusive use by community residents and their

8     authorized agent.  Okay.  That doesn't say kids can't

9     play in the front area or limited to playground, does

10    it?

11         A.   11 on Loitering.

12         Q.   Oh, not common areas.  Okay.  11 Loitering:

13    Management will not allow residents or their visitors

14    to congregate on steps or breezeways or other common

15    areas at any time.  Please entertain guests inside

16    the apartment home only.

17              Is that what you're referring to?

18         A.   Yes.

19         Q.   Tell me how you interpret number 11 the

20    Anti-Loitering policy?

21         A.   From their cars to go into the apartment.

22    They shouldn't be outside.

23         Q.   Okay.  So if you saw a tenant outside what

24    would you do?

25         A.   An infraction.

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                              Page 130

1        Q.  A written infraction?

2        A.  If they are outside working on their cars,

3   they get an infraction.  If they are outside just

4   congregating, they get an infraction.  If you're

5   outside trying to bring your car to the door and

6   you're taking groceries in, you're moving.  So that's

7   why it's up under loitering because you're standing,

8   not just standing there congregating.

9        Q.  What was the problem for you with little

10  children playing outside not at the playground?

11       A.  Not at the playground.

12       Q.  Yeah.  Why was that a problem?

13       A.  I'm not sure they put these rules in place.

14       Q.  TPI?

15       A.  Yes.

16       Q.  If you came across residents who were

17  outside in your view loitering, you told me you'd

18  send an infraction notice, but that means you go back

19  to your office and generate a piece of paper that

20  someone delivers to them in their mailbox, right?

21       A.  Yes.

22       Q.  Would you also sometimes go up to the tenant

23  or speak to them and tell them you're loitering, you

24  have to go inside, something to that effect?

25       A.  So if I'm outside just like I told you I

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 131

1    seen Mr. Holt.  Sometimes I'm walking the property
2    because we have to get out.  The way the building,
3    the structure is you can see that, the outside
4    perimeter.   You can't see the inside perimeter where
5    they put trash and stuff on the back porch.  So if
6    I'm outside and they're out there, then yes, I will
7    tell them.  But if the kids are in the back of the
8    courtyard -- and that's what I have tried to tell
9    them to go in the back and not in the front -- then I
10   don't really say anything to them.
11         Yes, if I walk by and see them working on a
12   car -- me and Maggie have approached, we're going to
13   tell them you can't do that.  If they are outside
14   loitering by the trash can, which they like to do, we
15   will tell them; but normally that's secure.  It
16   really doesn't happen until in the evening time when
17   they don't want to follow the rules.
18         Q.  How are infraction notices delivered?
19         A.  By security.
20         Q.  Not by you?
21         A.  No, not by me.  Sometimes if security is not
22   there we will have the maintenance do it or the
23   grounds person.
24         Q.  Why is it that security typically would do
25   it?

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 132

1        A.   Because it helps us to be able to pinpoint

2    what they sent out because they put it in the report.

3    Hey, we put this notice out.  What Holt would do at

4    first he would take a picture of the door, so we

5    would know like late payments just to have proof in

6    court that we actually sent the notice.

7        Q.   So let's go back to the Diaz family.  What

8    else do you remember about the Diaz family?

9        A.   I don't remember much.  They wouldn't really

10   communicate with me.

11       Q.   Do you know whether -- you obviously know

12   about the July 2021 armed robbery?

13       A.   Yes.

14       Q.   Prior to that, did it ever come to your

15   attention that the Diaz family -- did they ever

16   report that they had been the potential victims of

17   other potential crimes?

18       A.   No.

19       Q.   Specifically did it ever come to your

20   attention that the Diaz family had reported that a

21   man broke down their door during bible study?

22       A.   No.

23       Q.   Did it ever come to your attention that the

24   Diaz family reported that someone tried to break in

25   the window of their apartment?

Latoya Wynn                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 133

1        A.   I don't recall.

2        Q.   What would you have done if you had heard

3   about either of those incidents?

4        A.   I don't know.  Like I said before, I don't

5   go off of -- okay, I'm going to just give you facts.

6   When I did hear something happened to them, me and

7   Maggie went down there that day.  Once we opened I

8   went down there, just like I do with everybody else.

9   If something comes to my desk I try to talk to them,

10  you know, a resolution.

11           I actually had told them, they can go and

12  purchase a ring camera and I would take it off their

13  rent.  The children were in there at the same time

14  that when we talked at the door.  They really didn't

15  communicate too well so the daughter came.

16           Yeah.  I just went there just to find out.

17  I wanted to get details to see if they knew somebody.

18  If they had seen stuff.  Because from what Mr. Hickey

19  said, he wasn't there, and I just didn't know if they

20  knew the person.

21           I thought maybe if a familiar face, me and

22  Maggie going over there, if they would feel

23  comfortable talking to Maggie maybe they could say,

24  hey, we seen this person.  That was it.  But they

25  both told me that they didn't know.  I also referred

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 134

1    them to Rainbow Housing -- because I knew in previous

2    times they had had financial difficulty -- to help

3    them pay their rent because they said they got robbed

4    of $3,000.

5         Q.  Did you believe them?

6         A.  I don't recall that day if I did or not.

7         Q.  Sitting here today do you believe them?

8         A.  No.

9         Q.  Why not?

10        A.  Because I don't know who would keep that

11   type of money on them during this time and because

12   they always needed rent help.

13        Q.  So you think they are lying about being

14   robbed of $3,000?

15        A.  Yes.

16        Q.  Do you think they are lying about being

17   robbed?

18        A.  I think they were lying about being robbed

19   for $3,000.

20        Q.  So I want to understand.  Do you think they

21   were robbed at gunpoint ?

22             MR. MELCHER:  Her personal opinion?

23             MR. BLOCK:  Yeah, give me your personal

24        opinion please.

25             THE WITNESS:  No.  I don't think they were

Latoya Wynn                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 135

1     robbed.  I don't.  But I never showed them that.

2     That's why I was saying on that day I never

3     showed that.  I showed caring and I was very

4     helpful, supportive, telling them to get the

5     ring camera.  Because if you're having bible

6     study then, you know, take precautions of

7     certain things -- a camera inside.  I don't

8     know.  I don't know.  But no, I don't think so.

9     I don't think they were robbed.

10   BY MR. BLOCK:

11        Q.  You think those little kids are lying?

12        A.  I mean, I don't know if the little kids are

13   even saying it at this point.

14        Q.  When you spoke to the Diaz family the night

15   after they were robbed, did you tell Mr. Senor

16   Caceres that he should get a gun?

17        A.  No, sir.  No, sir.

18        Q.  Now your tone just changed with me.

19        A.  Because that is like ridiculous.  I told him

20   to get a ring.  Like I told you, they don't

21   understand, so no.

22        Q.  The little kids speak English just fine.

23        A.  Why would I tell someone to get a gun?

24        Q.  Well, you have a gun.

25        A.  I know.  I have a gun for personal reasons.

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

Page 136

1      Q.   To keep you safe, right?

2      A.   No.

3      Q.   Well, what do you intend to do with it?

4      A.   My personal reasons.

5      Q.   We don't need to debate.  What do you mean

6   there?

7      A.   Because I have a vehicle, and I have been

8   attacked in my vehicle.  I have a Dodge Challenger.

9   It's been robbed, I have been shot at, so there you

10  go.  That's why.  They're personal reasons, sir.

11     Q.   Did you tell the Diaz family they should

12  move for their safety?

13     A.   No, sir.

14     Q.   Do you think they would have been safe if

15  they remained at Seven Courts?

16     A.   Yes, sir.

17     Q.   Do you have any hypothesis about who robbed

18  the family?

19     A.   No, sir.  That's why I tried to go and talk

20  to them to try to figure out if they knew.  You know

21  if you go talk to people they sometimes slip up and

22  say things.  And that's what he did.  He was like,

23  you know -- that's how I learned about the bible

24  study other than the residents telling me.  He

25  actually mentioned it.

Latoya Wynn                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                    Page 137

1        Q.   Who is he?

2        A.   The father.

3        Q.   He mentioned the bible study?

4        A.   Yes.  And he was showing me where his

5   computer was and where he did everything.  He was

6   talking about Facebook.  And I was telling him that,

7   you know, you have to be mindful.  You can't have

8   those things.  I said, and if you're going to do the

9   Facebook, let them see the camera.  Let them see

10  that.  But no, never no gun.  No, sir.

11       Q.   So a tenant has never moved out for safety?

12       A.   No, sir.

13       Q.   So do you think that there is a hypothesis

14  here that somebody from the bible study or he saw a

15  bible study online decided to go rob them?

16       A.   Uh-huh.  I think they made themselves a

17  target, if they did get robbed.  I don't think it was

18  like a random thing, if they were robbed.

19       Q.   Before we turn to rent, did you ever say

20  anything racist or discriminatory to the Diaz

21  children?

22       A.   No.

23       Q.   Did you ever tell them, the kids, the Diaz

24  children that they couldn't play on the playground

25  because the playground was not for Hispanics it was

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 138

1    only for Americans?

2         A.   No.

3         Q.   Did you ever tell the Diaz children that

4    they, who are Hispanic, that they had to go inside

5    and leave the playground while letting African

6    American kids stay on the playground?

7         A.   No, sir.  Like I told you before, I try to

8    put it in writing and the infractions are the same.

9    They have several infractions in their file for

10   working on cars, playing.  So that could be why they

11   are saying things but not literally verbally.  They

12   are talking about paperwork.

13        Q.   Have you ever threaten to call immigration

14   on any tenant at Seven Courts?

15        A.   No.  No.

16        Q.   Have you ever uttered the word immigration

17   at Seven Courts?

18        A.   No.  No, sir.  Actually the company that I

19   have right now those are my friends.  No, sir.

20        Q.   Why would people say those things about you?

21        A.   This is my first time ever hearing these

22   things.  I have never heard these things before.

23        Q.   Why would the Diaz family say that you said

24   racist things about them?

25        A.   I'm not sure.  Why would they say they got

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

Page 139

1    thing robbed?  I'm not sure.

2        Q.  Why would Mr. Holt say he saw you threaten

3    to call immigration on this family?

4        A.  Because Mr. Holt clearly does not like me.

5        Q.  And that's why he chose to say it because he

6    doesn't like you?

7        A.  Exactly.

8        Q.  Who is in charge of -- at Seven Courts who

9    is in charge of determining how much a tenant is

10   going to pay in rent?

11       A.  That is based off the home rent approval

12   sheet.  So AHA has to approve it, and then DCA

13   approves it.

14       Q.  Who is DCA?

15       A.  Department of Community Affairs I believe.

16   Don't quote me on that.

17       Q.  A Georgia state agency or a local agency?

18       A.  Yes, Georgia Department of Community

19   Affairs.

20       Q.  A government agency of some kind?

21       A.  Yes.

22       Q.  It's not HUD?

23       A.  That's correct.  No, I think they are a part

24   of -- I know it's the financial, but I'm not going to

25   say it's not HUD.  I'm not going to say that.

Latoya Wynn                                        June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 140

1           (Exhibit 12 was marked for identification.)

2    BY MR. BLOCK:

3        Q.   That's okay.   It's a complicated structure.

4           Let me show you Exhibit 12, which is TPI

5    000575 through 581.   For the record Exhibit 12 is a

6    mid month checklist for Seven Courts dated 5/17/21.

7    Do you see that?

8        A.   Yes.

9        Q.   We discussed this document with Ms. Fontaine

10   and she initialed this or all of these items on this.

11          Are you familiar with a mid month checklist

12   for Seven Courts?

13       A.   That's correct.

14       Q.   What are these?

15       A.   It's basically getting us prepared for the

16   end of the month, but like in the middle of the month

17   we want to check to make sure we didn't miss to move

18   anybody in, we didn't miss moving nobody out, we

19   haven't not charged people that needed late fees.

20   It's just like an overview to make sure in the middle

21   of the month that we are on task.

22       Q.   If you keep going a couple of pages in you

23   see a spreadsheet entitled Gross Potential Rent and

24   it lists all of the units and the market rent,

25   potential rent and the actual rent charge.   Do you

Latoya Wynn                              June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 141

1   see that?

2        A.   That's correct.

3        Q.   All of these names are redacted except for

4   one which is B-23 Edwin Medrano Caceres.  It should

5   be on -- it's on TPI 578.  Do you see that?  It's

6   page 2 of that spreadsheet.

7        A.   Okay B-23.

8        Q.   That's Senor Caceres, father in the Diaz

9   family.  And if you look under the actual rent charge

10  their rent -- and this was for 2021 was $1,200 a

11  month, correct?

12       A.   Yes.  That's correct.

13       Q.   And I recognize that you have different

14  sized units at Seven Courts.  If you scan the market

15  rent column, do you see for the Diaz family their

16  market rent was 1,265 a month and on that page alone

17  there were three other units that were market rent

18  for 1265 a month.  And you can find others throughout

19  the spreadsheet.  If you look at the Caceres one for

20  their actual rent they were paying $1,200 a month.

21  Do you see that?

22       A.   Uh-huh.

23       Q.   And you can look, you're not going to find

24  anyone else who was paying $1,200 a month in 2021.

25  And I will give you a minute to do that, but I'd like

Page 142

1    you to tell me why was the Diaz family being charged

2    more than anybody else at Seven Courts?

3         A.   They probably were the last four bedroom

4    that came in up under this 60 percent.

5         Q.   Explain what you mean.

6         A.   So we have 30 percent, 50 percent and 60

7    percent.  I'm just going to give an example.  These

8    prices won't be the correct prices because I'm giving

9    an example.  So for a four bedroom, you can have have

10   $200 for 30 percent.  But if you're a one person

11   household with one person, you can only make 13,000

12   and be able to get a four bedroom for 200.  If you're

13   50 percent, you can be a one person household and you

14   can make up to 30,000 and your rent will be 500.  If

15   you're at 60 percent, you can make a maximum of

16   40,000 and your rent will be 700.

17              The rents are changed every year in April,

18   and then they are approved in October.  So they must

19   have came in after we got the home rent approval and

20   that's the reason they were probably paying more.

21   But I can tell you now there are a lot of people

22   paying more than that now.

23              (Exhibit 13 was marked for identification.)

24   BY MR. BLOCK:

25         Q.   Let me show you Exhibit 13.  It's actually a

Latoya Wynn                                      June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 143

1    document we produced.  You all have not given a copy

2    of this.  It's Diaz 00056 through 63.  And it is a

3    copy of the apartment lease contract between the Diaz

4    family and Seven Courts from November 1, 2019.  So

5    this was their first year?

6        A.  What was this one?

7        Q.  That's 2021, so you can set that aside.

8        A.  Okay.  So we went to a different year now.

9        Q.  Yes.  This is when they first moved in 2019.

10   If you look on the first page under paragraph 6, Rent

11   and Charges, the rent is $1,100 a month?

12       A.  Yes, sir.

13       Q.  And if you flip to the last page, who signed

14   it?  I believe that's your signature on 11/1/2019?

15       A.  Yes.  I don't sign when they're there.  The

16   manager is the only person responsible.  So I didn't

17   do this with them.  I probably wasn't there and then

18   the next day I signed it and she gave them a copy.

19   But I didn't move them in.  That's what I'm trying to

20   say.

21       Q.  That is your signature?

22       A.  That is correct.

23       Q.  And for the record, if you look at paragraph

24   44, the name and address of the company or party

25   authorized to manage the apartment community is The

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 144

1    Partnership Inc., right?

2         A.   That is what it says.

3         Q.   And below that the name and address of the

4    company or party authorized to receive notice or

5    lawsuits is The Partnership Inc., correct?

6         A.   That's correct.

7         Q.   So going back to the rent.  It's $1,100 a

8    month according to the rent.  And is that what they

9    paid for rent in their first tenancy year beginning

10   late 2019?

11        A.   I'm not sure.  Do you have any documentation

12   that I can look and verify for you?

13            (Exhibit 14 was marked for identification.)

14   BY MR. BLOCK:

15        Q.   I will show you Exhibit 14, which is TPI

16   000460 through 461.  This document Exhibit 14 is

17   entitled, Resident Ledger, and it's dated 10/19/2021,

18   which it looks like when you all pulled it after

19   after we filed suit.  If you look at the date and the

20   charges for that first tenancy year beginning

21   November 1, 2019 the rent is actually listed as

22   $1150.  Do you see that?

23        A.   Yes.

24        Q.   And if you look at the charges going on down

25   the line for the rest of that first year the charges

Latoya Wynn                        June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 145

1    are $1,150 never the $1,100 that is on the rental
2    agreement you both signed?
3         A.   This must be one rental agreement.  They
4    probably had another one.  Like I said, this is in
5    November.  We get the approved rent, she probably
6    printed off the wrong one, and then had them get the
7    correct one.
8         Q.   So you think that --
9         A.   This is just another one.
10        Q.   When do you get your approved rent?
11        A.   October.
12        Q.   If you look back at Exhibit 13 it's dated
13   November 1, 2019?
14        A.   That's what I'm explaining.
15        Q.   It says $1,100.  So you're telling me the
16   rent should have gone up in October?
17        A.   I'm telling you we use -- what's it called?
18   -- Blue Moon.  We use the Blue Moon system to do the
19   leases off this National Apartment Association.  We
20   just put the information in, so it probably printed
21   out wrong because they had the old information in
22   there, and then she re-typed up the new lease.  They
23   most likely have another lease stating the 1,150.
24   I'm pretty sure because they got rent help.
25        Q.   They had what?

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

Page 146

1      A.   Rental help.  Yeah.  They had rental

2  assistance.

3      Q.   I will tell you, I don't think we've seen

4  it.  We've seen a lease for that second year?

5      A.   Gotcha.

6      Q.   Starting in late 2020 through 2021 at

7  $1,200.  We have not seen a lease for 1,150?

8      A.   That's what I'm saying, they probably don't

9  have it.  They probably lost it, I'm not sure.  This

10 is more than what the lease is and they were paying

11 it and they knew about it.

12     Q.   Well, I'm saying your company was charging

13 them more than what is in the Lease Agreement?

14     A.   No.  They knew what they were paying.

15 That's why I'm telling you this.  This is all put in

16 a system.  So if she put it in -- we're people.  We

17 are humans.  So we put it in and she probably

18 overlooked it.  Like I told you, the prices go up.

19 She probably entered the wrong price, they probably

20 had this and then she fixed it because they were

21 paying it.  As you can see, they never paid 1,100.

22 They paid what they were supposed to pay.  So it must

23 have been an error and they don't have the correct

24 lease.

25     Q.   Do you think there is a lease somewhere that

Latoya Wynn                                                June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 147

1    TPI would have that would show --

2         A.   1150, correct.

3         Q.   And we just have not been given a copy of

4    that in the litigation?

5         A.   That's what I'm saying.

6         Q.   Obviously if you don't have a lease you

7    can't charge people more than what is on the lease?

8         A.   I got you.

9              MR. MELCHER:   Objection to form.   Go ahead.

10             THE WITNESS:   I got you.   I understand what

11        you're saying.

12             (Exhibit 15 was marked for identification.)

13   BY MR. BLOCK:

14        Q.   So you mentioned this before.   This is going

15   to be Exhibit 15, which is TPI 000474.   This for the

16   record is -- I believe this is the cancellation

17   notice that you sent to Mr. Holt the first time that

18   you all let Mr. Holt go, right?

19        A.   Yes, sir.

20        Q.   And it's dated October 1, 2020?

21        A.   Uh-huh.

22        Q.   It's on TPI letterhead, right?

23        A.   That's correct.

24        Q.   You list your title as Latoya Wynn, Property

25   Manager, Seven Courts Apartments, The Partnership,

Latoya Wynn                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 148

1    Inc., right?

2         A.   That's correct.

3         Q.   Not TPI Management Services LLC, right?

4         A.   That's what this paper says.  Correct.

5         Q.   Yeah.  Why wouldn't you have sent that on

6    TPI Management Services LLC letterhead?

7         A.   I don't understand the question.

8         Q.   We will leave that for a little later.

9    Going back to the incident, the robbery, the July

10   2020 robbery.  Were you surprised the Diaz family

11   were robbed?

12            MR. MELCHER:  Objection to form.

13            THE WITNESS:  I don't recall that.  Like I

14       said, I don't have any reason to.

15   BY MR. BLOCK:

16        Q.   I apologize for jumping around a little bit.

17   When Mr. Holt came back to Seven Courts the second

18   time I think you testified that you were not thrilled

19   with that idea?

20        A.   No.  I said I did not approve that.  I

21   didn't say I wasn't thrilled.  I was told he was

22   coming back and I accepted the challenge.

23        Q.   Fair enough.  That is what you said you

24   accepted the challenge.

25            Did there ever come a point in time where

Latoya Wynn                                            June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 149

1    you had instructions or Mr. Holt had instructions not

2    to speak with tenants?

3         A.  I don't understand your question.  Can you

4    repeat it again?

5         Q.  Yes.  Let me try this again.  Do you recall

6    if there was ever a time that someone instructed

7    Mr. Holt not to speak with tenants?

8         A.  No.  I don't recall that at all.

9         Q.  Were you ever under instructions not to

10   speak with Mr. Holt?

11           MR. MELCHER:  I believe that's the situation

12       with me.

13           THE WITNESS:  Okay.  Yes.

14   BY MR. BLOCK:

15        Q.  Let me ask it this way.  I think I

16   understand what happened there.

17           Talk to me about the CDC eviction

18   moratorium.  How did that affect Seven Courts?

19        A.  Can you show me what the CDC moratorium said

20   so that way I can know?

21        Q.  Do you remember when the federal government

22   said that you can't evict tenants for non-payment of

23   rent because of COVID?

24        A.  Well, that's why I'm asking.  It was a lot.

25   That is why I wanted to look at it and see what

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 150

1    you're saying.  Yeah, it was like 38 or 40 pages of

2    the moratorium.  Sorry that's why I didn't want to

3    answer it.

4         Q.  I understand.  You're aware for a period of

5    time there was federal restrictions on removing

6    tenants for non-payment of rent due to COVID?

7         A.  That's correct.

8         Q.  And obviously the Supreme Court said that

9    was not constitutional and so you could evict tenants

10   again.

11            How did that period or that moratorium

12   affect you all at Seven Courts?

13        A.  Well, the people got to stay there and

14   eviction people didn't come, so they were just living

15   there.  It really didn't affect them.  Everybody got

16   affected because they were not paying rent.  That's

17   what I recall.  I don't think nothing else.  We have

18   affordable housing and we help everybody pay their

19   rent.  So whoever want help, we help.

20        Q.  What is a reverse write off?

21        A.  A reverse write off could be a double

22   charge.  Okay.  No reverse write off.  That's when a

23   person moves out and when they move out we do a

24   deposit accounting and it curates charges and we

25   write it off so we can close out the month.

Latoya Wynn                        June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 151

1      Q.  So if I show you -- I just want you to

2  explain this to me.  I will show you Exhibit 16?

3      A.  Okay.

4          (Exhibit 16 was marked for identification.)

5  BY MR. BLOCK:

6      Q.  Which is TPI 002513?

7      A.  Can I ask you a question do you want me to

8  still --

9      Q.  You can move that.  So TPI 2513 Exhibit 16.

10  This is an e-mail thread between you and Eric Zamora

11  and Mr. Harris about B-22 the first write-off which

12  is from August 2021.  Do you see that?

13     A.  Yes.

14     Q.  I have seen a few e-mails that refer to

15  this.  Actually if you flip to the next page you

16  started this thread by saying:  Hello, can you

17  reverse the write off for rent?  This was down before

18  the deposit accounting in error?

19          What happened here?

20     A.  I was teaching Maggie how do do write-offs

21  and she missed a step.  She did the write-off before

22  she did the accounting.  So it was looking like they

23  still owed a balance.  You're supposed to do it the

24  other way around.  You're supposed to do the deposit

25  accounting first, and then do the write-off.  So it

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 152

1    was looking like they owed money.

2        Q.   And they didn't?

3        A.   Well, we were -- I wouldn't even -- let me

4    look and see.  Yes.  Okay.  When she was writing them

5    off instead of making it a positive, she gave them a

6    credit.  So it looked like amounts to be refunded was

7    $1,145.16 which actually it was not supposed to be a

8    credit.  It was supposed to be billed.  That's what

9    it was.  They had damages charges.  As you can see

10   they did not remove their sofa and they did not pay

11   their rent.  So those days until we moved them out of

12   the system they were charged for that.

13       Q.   So that's why you said please don't cut

14   check?

15       A.   That's correct.  And you can see it right

16   here in parentheses where she gives the credit.

17           MR. BLOCK:  Let's take a break here.  I want

18       to figure out the last few things I need to ask

19       you.  Let's go off the record.

20           (A short break was taken.)

21           MR. BLOCK:  I don't have any further

22       questions.

23           COURT REPORTER:  Who was that speaking that

24       said they wanted a copy of the transcript?

25           MR. BLOCK:  Both attorneys want a copy.

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                            Page 153

1          COURT REPORTER:  Thank you.  That's it.

2          (Proceeding concluded at 2:21 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Latoya Wynn                                          June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 154

1        The following reporter and firm disclosures
2     were presented by me at this proceeding for review by
3     counsel:.
4                  REPORTER DISCLOSURES
5     The following representations and disclosures are
      made in compliance with Georgia Law, more
6     specifically:
          Article 10 (B) of the Rules and Regulations of
7     the Board Of Court Reporting (disclosure forms) OCGA
      Section 9-11-28 (c) (disqualification of reporter for
8     financial interest)OCGA Sections 15-14-37 (a) and (b)
      (prohibitions against contracts except on a
9     case-by-case basis).
      - I am a certified reporter in the State of Georgia.
10    - I am an employee or independent contractor of
      Veritext Legal Solutions Reporting and Video
11    ("Veritext Legal Solutions").
      - I have been assigned to make a complete and
12    accurate record of these proceedings.
      - I have no relationship of interest in the matter on
13    which I am about to report which would  disqualify me
      from making a verbatim record or maintaining my
14    obligation of impartiality in compliance with the
      Code of Professional Ethics.
15    - I have no direct contract with any party in this
      action, and my compensation is determined solely by
16    the terms of my agreement with Veritext Legal
      Solutions.
17
             VERITEXT LEGAL SOLUTIONS REPORTING & VIDEO
18                      FIRM DISCLOSURES
19    - Veritext Legal Solutions Reporting & Video was
      contacted to provide reporting services by the
20    noticing or taking attorney in this matter.
      - There is no agreement in place between Veritext
21    Legal Solutions and any party or attorney in this
      litigation that is prohibited by OCGA 15-14-37 (a)
22    and (b).  Any case-specific discounts are
      automatically applied to all parties, at such time as
23    any party receives a discount.
      - Transcripts:  The transcript of this proceeding as
24    produced by Veritext Legal Solutions will be a true,
      correct, and complete record of the colloquies,
25    questions, and answers as submitted by the certified
      court reporter.

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 155

1    - Exhibits:  No changes will be made to the exhibits

     as submitted by the reporter, attorneys, or

2    witnesses.

     - Password-Protected Access:  Transcripts and

3    exhibits relating to this proceeding will be uploaded

     to a password-protected repository, to which all

4    ordering parties will have access.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Latoya Wynn                                    June 2, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 156

1                        CERTIFICATE

2    STATE OF GEORGIA:

3    COUNTY OF FULTON:

4         I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the

6    colloquies, questions and answers were reduced to

7    typewriting under my direction; that the transcript

8    is a true and correct record of the evidence given.

9         I further certify that I am not a relative or

10   employee or attorney of any party, nor am I

11   financially interested in the outcome of the action.

12        Disclosure pursuant to OCGA 15-14-37 (a)&(b):

13   The party taking this deposition will receive the

14   original and one copy based on our standard and

15   customary per page charges.  Copies to other parties

16   will likewise be furnished at our standard and

17   customary charges.  A financial discount will not be

18   given to any party to this litigation.

19        This the 17th day of June, 2021.

20

21

22

23   _____

24        DIONDRE C. THOMAS, RPR, CCR-B-2433

25

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

[& - 36]

Page 1

## &

**&**   2:10 154:17,19
156:12

## 0

**00003**   3:8 27:12
**00006**   29:1
**00009**   3:6 22:18
**00014**   3:7 24:18
**000460**   3:20
144:16
**000474**   3:21
147:15
**000492**   128:1
**00056**   3:19 143:2
**000575**   3:18 140:5
**00060**   3:9 33:2
**002513**   3:22 151:6
**002615**   3:14 97:2
**003939**   3:10 46:13
**004148**   3:11 49:15
**004172**   3:12 62:24
**004185**   3:13 82:2
**03661**   1:6

## 1

**1**   3:6 22:4,6,16,21
24:11 106:20
118:21,22 143:4
144:21 145:13
147:20
**1,100**   143:11 144:7
145:1,15 146:21
**1,145.16**   152:7
**1,150**   145:1,23
146:7
**1,200**   141:10,20,24
146:7
**1,265**   141:16
**10**   1:16 3:6,15
22:19 63:2 105:12
105:14,18 116:20

116:20 119:15
154:6
**10/19/2021**   144:17
**100**   40:25
**105**   3:15
**11**   3:16 116:9
118:7,11 128:1,18
128:24 129:11,12
129:19
**11/1/2019**   143:14
**1150**   144:22 147:2
**118**   3:16
**11a**   127:22
**12**   3:18 101:10
140:1,4,5
**12/2019**   25:12
**12/22/2017**   34:19
**1265**   141:18
**13**   3:19 142:23,25
145:12
**13,000**   142:11
**13631**   156:22
**14**   3:20 97:6
144:13,15,16
**140**   3:18
**142**   3:19
**144**   3:20
**147**   3:21
**15**   3:21 113:10
117:9 128:9
147:12,15
**15-14-37**   154:8,21
156:12
**151**   3:22
**1527**   16:20
**16**   3:22 151:2,4,9
**170**   40:25
**17th**   156:19
**18**   50:3,4,5 51:8,10
51:19

**19**   3:7 24:18 33:20
**1998**   10:23
**1:21**   1:6

## 2

**2**   1:15 3:7 24:14
24:17,25 33:20
34:2,15,20 46:15
116:10,11 117:3
141:6
**20**   29:3 32:22 46:6
79:13
**200**   142:10,12
**2014**   28:6
**2015**   24:2 28:3,15
28:20
**2017**   12:15,17,19
29:3,7,12 34:21
35:1
**2018**   25:8
**2019**   34:16 52:18
53:9,11,13,15 73:2
86:19,20 87:3,21
143:4,9 144:10,21
145:13
**2020**   34:1,3 36:20
46:15 49:18 52:16
55:11 63:3 83:6
111:17 128:9
146:6 147:20
148:10
**2021**   20:13,17
33:20 36:20,23
53:15 74:2 97:6
97:12,16,21,25
103:6 104:10,15
114:7,20 117:9
118:21,22 119:3,6
119:8 132:12
141:10,24 143:7
146:6 151:12
156:19

**2022**   1:15 21:6
26:4 112:4,23
113:3
**20th**   120:11
**21**   53:17
**22**   3:6 53:15
151:11
**23**   101:15 109:16
109:17 128:9
141:4,7
**24**   3:7 76:6 117:7
117:17
**2433**   1:21 156:24
**25**   34:1
**2513**   151:9
**2623**   101:13,16
102:6,10
**2626**   3:14 97:2
**27**   3:8 25:8
**2800**   2:10
**29**   47:2 48:6,20,24
49:10
**29th**   10:4
**2:00**   10:6
**2:21**   153:2

## 3

**3**   3:8 27:6,9,14,20
28:2,15 83:25
117:3
**3,000**   134:4,14,19
**3,400**   93:19
**30**   24:2 41:1 47:2
65:5 68:21 88:1
100:25 142:6,10
**30,000**   142:14
**303**   2:10
**30308**   2:11
**309**   2:6
**32**   3:9
**36**   28:6

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

**[37 - allegations]**

Page 2

**37**  28:16
**38**  28:6,10,16,21
28:21 150:1
**3rd**  28:20

**4**

**4**  3:2,9 32:24 33:2
33:5 34:2 97:12
119:17,20,22,25
120:6 121:11
**4/15/2021**  105:19
106:9
**40**  150:1
**40,000**  142:16
**400**  2:6
**404**  2:6,11 53:2
**4107**  16:21
**44**  143:24
**46**  3:10
**461**  3:20 144:16
**48foe958**  107:21
**49**  3:11
**496**  128:1

**5**

**5**  3:10 46:10,12,13
118:15
**5/17/21**  140:6
**50**  142:6,13
**50/50**  43:1
**500**  142:14
**578**  141:5
**581**  3:18 140:5
**599-8035**  53:2
**5:00**  76:15

**6**

**6**  3:11 49:11,14
55:9 118:15
143:10
**60**  73:4 142:4,6,15
**62**  3:9,12 33:2

**63**  3:19 143:2

**7**

**7**  3:12 62:21,23
119:17,20,22,24
120:6 121:10
**7/24/2020**  25:14
**700**  142:16
**739-8800**  2:11

**8**

**8**  3:8,13 27:12
34:15 76:6 81:22
82:1,1,2 86:16
**80**  34:16
**81**  3:13
**87**  33:21

**9**

**9**  3:14 96:24 97:1
97:4 101:8,13
104:18
**9-11-28**  154:7
**911**  55:16 74:13
**96**  3:14
**997-8419**  2:6
**9:00**  76:14 101:6
**9:30**  100:6

**a**

**a&t**  56:13,17,18
56:20,24
**a.m.**  1:16 119:17
119:20,20,22,25
120:6 121:11
**aaron**  2:3,7 4:7
**aarp**  71:17,18
**able**  67:16 90:15
95:8 101:7 115:17
132:1 142:12
**abstain**  91:1
**ac**  93:14,16 122:6

**accepted**  69:19
104:23 148:22,24
**access**  155:2,4
**accident**  6:5
**account**  16:2 54:8
54:19 94:14,21
**accountant**  94:16
**accountants**  94:15
**accounting**  62:14
94:9 150:24
151:18,22,25
**accounts**  60:6,9
94:14
**accrual**  123:1
**accurate**  154:12
**accurately**  103:4
**acknowledgment**
27:15,16,21 28:9
29:2
**acquainted**  27:24
**act**  30:21,24 31:11
31:19 32:2 35:9
35:16 37:2 39:4
39:14 40:12 71:8
**action**  154:15
156:11
**active**  61:12
**actively**  16:1,3
87:17
**activity**  68:11
78:14
**actual**  73:14 75:1
107:10 140:25
141:9,20
**added**  104:4
**addendum**  44:1
128:7
**addition**  15:21
35:4
**address**  82:6,17,20
105:5 107:6,10,15

**108:8 143:24**
144:3
**advise**  124:18
**affairs**  139:15,19
**affect**  149:18
150:12,15
**affordable**  24:6
150:18
**afraid**  63:12,18,21
63:25
**african**  42:8,15
43:1 138:5
**afternoon**  10:6
**age**  30:3 50:6
**agency**  41:14
139:17,17,20
**agenda**  10:11
**agent**  129:8
**aggressive**  79:15
79:16
**aggressor**  44:23
**ago**  59:18 101:10
**agree**  39:18 83:23
**agreement**  124:19
145:2,3 146:13
154:16,20
**ah**  70:15,16
**aha**  70:10,13,14
70:17 95:15
139:12
**ahead**  26:21 31:20
75:4 147:9
**air**  93:22
**aka**  71:2
**alert**  93:13
**allegation**  38:17
39:18 49:8 50:17
51:1,4,6 55:19
63:15
**allegations**  38:18
51:11,13,24 63:18

**[allegations - authorized]**

Page 3

63:21 67:15 73:17
78:20
**alleged** 38:4,10
39:13 40:3 124:6
**allison** 2:4
**allow** 129:13
**allowed** 81:12
93:5 96:3,6
110:18 113:15
**allows** 54:22
**altercation** 44:15
**amended** 3:16
118:13,18
**amenities** 129:6
**american** 42:8,15
43:1 138:6
**americans** 138:1
**amounts** 152:6
**analysis** 101:16
102:7,10,16
**annual** 35:4
**annually** 32:8
**answer** 7:11 11:16
17:25 19:16,17,18
19:19,21,24 38:24
55:6 70:5 73:25
76:25 78:13,22
79:15 81:24 84:1
85:12 87:5 95:25
98:5 112:8 123:17
150:3
**answered** 84:19
96:3
**answering** 100:23
**answers** 3:16 4:22
118:5,13 154:25
156:6
**anthony** 56:15
**anti** 129:20
**anybody** 9:9 91:12
140:18 142:2

**anymore** 23:8,9
69:6 99:7
**apart** 51:4
**apartment** 5:11
43:23 56:24 81:2
96:19 128:9
129:16,21 132:25
143:3,25 145:19
**apartments** 11:21
11:22 107:1 128:3
147:25
**apologize** 8:12
70:17 148:16
**app** 16:25 57:21
**apparently** 83:7
**appearances** 2:1
**appearing** 5:3
**appears** 24:19
25:1 46:13 63:4
82:4,7 97:4
**apple** 16:25 17:3
17:22 18:12,13
54:5,16,20
**application** 22:23
22:25 23:9,15
24:1,4,8 42:3
**applied** 154:22
**appointments**
113:6,17,19
**appreciate** 20:5
21:19 81:24
**approached**
131:12
**appropriate** 44:12
89:13 90:18
**approval** 139:11
142:19
**approve** 139:12
148:20
**approved** 58:7
59:18,21 60:4

142:18 145:5,10
**approves** 139:13
**approximately**
117:3
**apps** 54:15
**april** 49:18 55:11
73:1 86:19 97:6
97:12,15,20,25
103:5 104:10,15
111:17 117:9
119:6 142:17
**area** 13:18,25 14:2
14:6,8 65:1 68:25
81:3 84:17 92:24
110:6 112:25,25
129:9
**areas** 102:20
129:4,12,15
**argumentative**
67:6 77:3
**armed** 73:7,9,12
73:15 74:4,5,11,14
83:24 85:1,5
88:24 89:1,10,12
89:18,19,20,21
90:2,6,13,17 91:21
132:12
**article** 154:6
**aside** 49:13 56:2
143:7
**asked** 18:19 51:18
52:20 55:24 60:13
64:10,16 65:5,21
68:16 88:1 96:16
125:10 129:2
**asking** 4:9 8:6,7
9:17 10:4 31:3
36:5,14 38:7
39:17 42:19 88:16
88:20 91:18
112:15 117:23

123:4,12,20
149:24
**assigned** 154:11
**assistance** 146:2
**assistant** 5:19 12:7
66:15 83:3 102:4
**associates** 61:9
**association** 96:19
145:19
**assume** 7:10 16:11
26:24 79:3
**assumed** 71:19
**assuming** 117:10
**assumption**
117:10
**atlanta** 1:2 2:11
14:9 41:2,11,14,19
41:23,25 59:12
66:17 70:13,18
95:16,18,20,20
113:7
**attached** 47:10
98:10,11
**attacked** 44:17
45:5,8 67:11 79:2
79:8,13 136:8
**attacking** 79:20
**attempt** 107:14
**attention** 50:8
132:15,20,23
**attorney** 6:21
154:20,21 156:10
**attorneys** 39:25
152:25 155:1
**august** 28:6
151:12
**authority** 41:2
66:17 70:13
**authorized** 129:8
143:25 144:4

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

[automatically - budgeting]                                                                 Page 4

**automatically**
154:22
**aware** 5:21 25:21
40:10 78:8 150:4

**b**

**b** 1:21 109:9,9,10
109:16,17,18,24
110:3 128:9 141:4
141:7 151:11
154:6,8,22 156:12
156:24
**b.m.f.** 1:5
**back** 9:20 17:10
17:22 19:9 24:16
45:11 50:3,3 54:5
54:22 55:1,3 56:4
57:5 60:7 62:1,10
64:22 66:23 68:13
69:8,16 71:25
74:10,22 75:12
78:2 83:11,11,16
88:22 100:20,23
101:2 110:4 112:1
113:23 116:19,20
119:15 121:24,25
125:14,15 130:18
131:5,7,9 132:7
144:7 145:12
148:9,17,22
**background** 42:13
47:6 60:1 90:3
**bailey** 2:4
**balance** 95:14
151:23
**bang** 114:18
**banging** 115:9
**barrvcheia** 2:5
**baseball** 110:12
**based** 38:11 41:5,8
67:15 99:2 102:7
102:17 139:11

**156:14**
**basically** 103:11
120:2 122:10
127:19 140:15
**basis** 29:24 31:13
38:5 40:3 94:13
123:1 154:9
**basketball** 127:2
**bates** 22:7,8,9,18
24:18 27:12
**bedroom** 142:3,9
142:12
**beginning** 27:22
53:17 106:7 112:2
112:4,23 144:9,20
**begins** 117:4
**behalf** 1:4 2:2,8
**believe** 23:1 102:4
126:22 134:5,7
139:15 143:14
147:16 149:11
**beneath** 12:5
**best** 36:19 99:22
**better** 91:12
**beyond** 39:7
**bible** 126:6 127:20
132:21 135:5
136:23 137:3,14
137:15
**bid** 99:19,21
**bids** 84:16 99:4,17
**big** 79:1
**bilingual** 42:15,21
43:2
**bill** 53:14 93:12
**billed** 152:8
**biography** 10:17
**bit** 14:22 17:10
22:24 36:8,12
53:8 113:11
148:16

**bleed** 45:14
**blinds** 114:17
**block** 2:3,5 3:2 4:6
4:8 17:8,14,19
18:3,10 19:22
21:4 22:5 24:15
26:13,23 27:7
31:9,22 32:25
37:7,17 39:16
46:11 49:12 55:8
62:22 73:23 74:12
75:9,11 76:21
77:4,6,9,14,20,23
78:1 81:23 96:25
105:13 108:18,19
112:21 116:18
118:8 121:20,23
123:21,24 125:2,5
125:9 127:23
134:23 135:10
140:2 142:24
144:14 147:13
148:15 149:14
151:5 152:17,21
152:25
**blockfirmllc.com**
2:7
**blue** 145:18,18
**bmw** 72:9
**board** 154:7
**bobby** 97:7
**body** 87:12
**bonnie** 13:1,17,20
65:3,5 68:9,16,25
82:3 87:25
**book** 96:19,20
**bookkeeping**
62:14
**booklet** 96:17
**books** 61:20

**boss** 7:24 46:14
49:18 63:2,11
**bosses** 35:8
**bothering** 120:9
**bottom** 22:10 28:5
28:22 29:6 33:24
34:17,18 49:23
55:12 107:3
109:18,22 110:7
118:15
**box** 41:18 98:13
**boy** 122:21,22
**boyfriend** 66:23
71:20
**brand** 16:22
**bravo** 109:9
**break** 43:14 75:8
75:10 77:22,24,25
78:16,20 92:19
116:16 121:20,22
125:7 132:24
152:17,20
**breakdown** 42:11
**breaking** 43:13
116:15
**breezeways**
129:14
**bring** 21:24 47:11
69:15 81:17 130:5
**broke** 5:14 132:21
**broken** 5:12
**brought** 50:7
**brown** 70:7 71:2
**brownish** 110:12
**budget** 85:9 92:13
92:15,16 93:2,3,6
93:10,13,19 94:3,4
94:6,8,20,25 96:1
96:1,2,7
**budgeting** 85:24
92:18,23,24

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

**[build - clean]**

Page 5

**build**  55:12
**building**  71:14
  98:9,11 109:9,19
  109:25 110:2,3,3,4
  110:4 120:4
  121:13,16,18
  131:2
**buildings**  109:24
**built**  62:9
**bunch**  72:4 123:13
**burning**  55:15,22
**bus**  65:16
**business**  11:9
  56:16 57:2 58:18
  76:14 78:9 92:5
  99:7
**businesses**  56:6
**bust**  75:21 86:25
**buy**  32:13
**buys**  32:7

**c**

**c**  4:1 50:3,4,5 51:8
  51:10,19 110:3
  154:7 156:24
**c&k**  57:3
**caceres**  1:4 125:23
  125:24 128:8
  135:16 141:4,8,19
**calendar**  21:5
**call**  15:24 35:4
  42:12 48:7 55:16
  61:21 74:13 84:15
  95:4 98:13 113:20
  114:13 116:3,8
  117:18 125:22
  138:13 139:3
**called**  50:3 60:22
  71:17 74:21 78:18
  145:17
**calling**  66:22
  74:20 75:1

**calls**  7:18
**camera**  74:4 96:21
  100:10,11,12
  118:20 133:12
  135:5,7 137:9
**cameras**  73:14,19
  73:20 74:1 96:11
  96:16 97:17,20,25
  98:3,14,18,23 99:1
  99:4,8,10 100:9,13
  100:18 101:2,5
  103:11,13 104:24
  117:11,18,20
  118:19,22,23
  119:2,9,21 121:4
  121:11
**canceling**  17:17
**cancellation**
  147:16
**capital**  92:23
**caps**  63:6
**caption**  156:5
**captures**  98:8
**car**  74:21 75:4
  80:16,17 81:2,8
  126:24 127:3,4,9
  130:5 131:12
**caring**  135:3
**carolina**  14:10,10
**carry**  80:5
**cars**  72:12,13
  129:21 130:2
  138:10
**case**  4:9 6:17 8:19
  9:8,14,24 10:16
  18:21 22:12 39:10
  39:11,18 40:4,7
  45:3,4,5,7,10
  47:25 60:3 125:19
  154:9,9,22

**cash**  57:21
**catch**  5:4
**catching**  74:4
**category**  92:20,21
  92:23
**cause**  47:3
**ccr**  1:21 156:24
**cdc**  149:17,19
**ceased**  58:18
**cell**  14:25 15:3,4,4
  15:12,17,25 16:6
  16:17 18:12,13,14
  18:20,23,23 52:17
  52:21 53:12,14,16
  53:18,20 80:5
**center**  108:20
  129:5
**certain**  93:6 121:6
  135:7
**certificate**  156:1
**certified**  90:8
  154:9,25
**certify**  156:4,9
**challenge**  69:19
  148:22,24
**challenger**  136:8
**challenges**  69:18
**chance**  5:3
**change**  21:3 23:20
  53:18 80:24 81:6
  81:9 94:1
**changed**  20:1,2,17
  20:21 21:1 52:22
  53:16,21 61:1
  80:23 81:1 135:18
  142:17
**changes**  155:1
**characteristics**
  31:13
**charge**  45:12,12
  92:7 139:8,9

140:25 141:9
  147:7 150:22
**charged**  140:19
  142:1 152:12
**charges**  143:11
  144:20,24,25
  150:24 152:9
  156:15,17
**charging**  146:12
**chart**  91:13
**check**  57:21 59:25
  60:1 140:17
  152:14
**checklist**  140:6,11
**children**  1:5
  110:17 111:4
  112:10,24 126:25
  127:4 130:10
  133:13 137:21,24
  138:3
**choose**  119:24
**chose**  139:5
**chronology**  86:18
**cindy**  12:11
**circle**  109:5
**circumstances**  5:9
  46:21 125:19
**cites**  106:21
**civil**  45:6,7
**claim**  37:13,15
**claimed**  72:9
**claims**  39:1,11
**class**  32:8,10 33:19
  33:25 34:1,25
**classes**  32:13
  33:15 34:7 35:5
**classification**
  29:25
**classmates**  61:14
**clean**  18:7 56:23
  57:3 71:14

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

**[cleaning - correct]**

Page 6

**cleaning** 56:10,22
57:4
**clear** 15:11 118:11
**clearly** 64:6 87:20
139:4
**clerk** 6:11,15
**close** 150:25
**closed** 111:8,11,19
111:22 112:3,22
113:2,3,5 114:3,16
115:5 120:1
**closer** 80:4
**clubhouse** 129:5
**code** 120:13
154:14
**coi** 57:16 59:23
**collected** 92:10
**colloquies** 154:24
156:6
**color** 30:1 110:12
**column** 141:15
**come** 9:20 41:2
51:18 56:3 59:12
74:13 86:24 88:21
92:17 97:17,19
98:12 104:20
115:10,19 116:6,8
116:11 120:14,20
132:14,19,23
148:25 150:14
**comes** 125:14
133:9
**comfortable**
133:23
**coming** 8:20 47:10
69:15 110:1
148:22
**committed** 24:5
**common** 81:3
129:4,12,14

**communicate**
66:24 114:14
132:10 133:15
**communication**
66:23
**community** 43:21
61:12 112:11
128:4,19,21 129:7
139:15,18 143:25
**comp** 57:18 59:24
**compactor** 102:23
121:19
**companies** 11:1
32:20 56:21,22
62:8,15 69:13
122:1,3,12
**company** 5:14
10:25 15:4 19:6
26:15,25 27:2,5
31:18 32:7,9,18
43:16,19 57:4,23
61:4 62:6,7,7
71:17 74:24 75:1
78:8 84:18 86:1
90:20 91:17 99:6
99:8 106:10,11,23
112:17 118:5
122:20 138:18
143:24 144:4
146:12
**company's** 119:1
**compared** 117:21
**compensated**
62:17
**compensation**
154:15
**complained** 47:14
63:22
**complaining** 64:3
**complaint** 49:25

**complaints** 68:2
69:23 115:22
**complete** 154:11
154:24
**completion** 117:2
117:7
**compliance** 35:6
154:5,14
**complicated** 140:3
**complies** 31:18
108:12 109:8
**comply** 43:18
**complying** 35:9,16
39:4
**compound** 77:14
**compressor** 93:21
**computer** 129:5
137:5
**concerns** 115:22
116:13
**concluded** 153:2
**conduct** 45:15,16
**conference** 7:16
**confident** 38:14
**confidentiality**
124:19
**confirm** 73:12
**confirmed** 73:10
74:6
**conflict** 66:16,19
**confront** 34:11
**confrontational**
69:16
**confusing** 62:5,11
**confusion** 66:19
**congregate** 129:14
**congregating**
130:4,8
**connor** 59:5,8,10
81:20

**constitutional**
150:9
**contact** 107:4,13
113:22 114:22
115:1
**contacted** 102:5
154:19
**continued** 68:22
**contract** 58:2
106:15 116:23
143:3 154:15
**contractor** 154:10
**contractors** 56:12
56:13 57:7,11
58:1,4 59:18,21
60:3 120:20
**contracts** 154:8
**conversations**
6:20
**copies** 156:15
**copy** 27:13 43:25
44:4 47:11 48:3
108:4 118:16
128:2,2 143:1,3,18
147:3 152:24,25
156:14
**corner** 28:23
101:14
**corporate** 60:18
60:20 61:21,23
83:3 84:4 85:3,8
85:23,25 86:12
89:14 92:25 93:1
93:10 94:6,10
95:3 96:9 104:21
**correct** 10:5 14:4
15:16,18,20 16:4
17:1 19:12,12
20:3 23:10,17
24:3,7 25:2,3,6,9
26:8 27:1 28:6,16

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

**[correct - day]**

Page 7

28:22 29:7 31:15
32:19 33:6 34:11
35:3 37:25 38:3
41:13,16,22 42:22
42:25 43:3,9 44:2
44:3 47:21 49:1
51:9,20 54:21
60:10,21,23 61:1
62:16,20 63:8
64:18 66:2,8
68:24 70:9,14
73:6 74:2 76:16
78:21,22,23 81:5
86:6,9 87:4,18,22
88:6,17 89:11,17
89:23 90:9,11
91:8,10,14,16 93:4
94:18 95:17,19,22
96:10 97:14,18
98:15,21 100:14
101:9,11,22,25
103:3 104:24,25
105:25 106:17
107:2 109:14,20
110:16 111:1
113:8,17 115:25
117:1,5 119:10
128:5,15 139:23
140:13 141:2,11
141:12 142:8
143:22 144:5,6
145:7 146:23
147:2,23 148:2,4
150:7 152:15
154:24 156:8
**correctly** 13:9
41:9 98:6,17
**counsel** 2:1 128:2
154:3
**count** 106:18

**country** 36:25
**county** 156:3
**couple** 24:19
107:18 140:22
**course** 37:16
67:14 92:21 108:3
118:16 125:22
**court** 1:1 4:22 5:2
7:21 17:6,9,15,20
18:2,9 21:23 22:3
45:9 77:23 78:24
116:15 120:11
125:5 132:6 150:8
152:23 153:1
154:7,25
**courtroom** 5:25
6:12
**courts** 11:21,22,25
12:14,15,23 13:23
14:21 35:6,13,15
39:4 40:2,13,16,18
40:18,22,23,25
41:10 42:6 43:15
43:22 45:19,24
46:1,3 56:5,7
57:12 58:5 60:5
60:19 61:5,8,18
68:5 69:8 71:2,25
72:1,19 73:8 74:2
75:14,16,19,25
76:4,8 78:6,9,14
78:16,20 79:22,25
80:8 81:14 84:8
84:12 85:11,17,20
86:2,3 87:24
88:10,24 91:12,21
92:5,11 93:2
94:25 97:16,20,25
100:4,6 104:14
105:9 107:1,19
108:2 111:8

112:19 114:8
115:13 120:9,25
122:2,18 123:8,15
124:4,7 126:9
127:14 128:3
136:15 138:14,17
139:8 140:6,12
141:14 142:2
143:4 147:25
148:17 149:18
150:12
**courts's** 97:7
**courtyard** 131:8
**covid** 21:9,9,11
36:3,3,4,20,23
45:10 57:24 111:9
111:19 112:4,23
113:10,15 149:23
150:6
**coworkers** 16:7,12
17:2,21 18:15
**create** 95:13
**created** 15:23
**credit** 41:1 152:6,8
152:16
**crime** 72:2 75:13
75:16,19 76:8,11
76:13,17,22 78:8
90:13
**crimes** 72:1,6,18
75:25 132:17
**criminal** 45:4
**cross** 77:7
**curates** 150:24
**currently** 11:4
**custody** 125:16
**customary** 156:15
156:17
**customer** 105:23
106:10 119:16

**cut** 15:7 152:13
**cuts** 17:12
**cv** 1:6

**d**

**d** 4:1 47:2,2 48:6
48:20,24 49:10
110:2
**daily** 68:11 119:18
119:20,22,25
**damage** 55:14
**damages** 152:9
**damaging** 55:21
**dangerous** 76:17
**dark** 36:12 76:18
80:3
**date** 9:18 20:2,4,4
54:4 75:20,23
88:2,12 97:11
111:13 116:22
117:3,7 144:19
**dated** 24:1 25:8
105:19 106:9
140:6 144:17
145:12 147:20
**dates** 9:19
**daughter** 49:25
50:4,17,24 51:2,4
51:5 52:5,8,9
123:15,21,23
125:8 133:15
**daughter's** 124:9
124:21
**day** 10:21 12:4,4
65:5 68:1,21
74:21 76:23 83:8
85:6 88:1 91:15
94:13,13 102:3
113:12 133:7
134:6 135:2
143:18 156:19

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

**[days - doing]**

Page 8

**days** 73:5 100:24
100:25 113:10
152:11
**dba** 106:11
**dca** 139:12,14
**dealer** 67:13
**debate** 136:5
**december** 20:16
28:2,15,20 29:3
**decide** 96:7
**decided** 53:23
71:12 112:6
137:15
**decides** 84:18,25
85:5,10,15
**decision** 69:12,15
85:20 86:4 99:1
119:21
**decisions** 84:6,11
89:15 110:24
**defeating** 34:8
**defendant** 1:10
2:8
**define** 32:14
**definitely** 36:13
**definition** 31:3
**definitions** 13:8
42:5
**degree** 11:11,14
**delivered** 111:13
111:16 131:18
**delivers** 130:20
**demographic** 42:6
42:8
**department** 12:8
94:9 139:15,18
**depending** 54:25
**depends** 36:24
**deposed** 5:9,10,22
37:21

**deposit** 116:23
150:24 151:18,24
**deposition** 1:13
4:18 5:20 6:19 7:1
8:5,7,20 9:8,14
37:22 156:13
**describe** 40:18
43:4 49:15,16
62:25
**described** 84:22
**describing** 47:13
124:6
**description** 3:3,5
24:19 25:2,11,17
25:22,23 40:24
**descriptions** 24:20
**desk** 133:9
**detail** 56:3
**detailed** 68:17
**details** 31:4
133:17
**detective** 74:10
76:25
**deter** 90:13 120:20
121:5
**determine** 40:11
**determined**
154:15
**determining** 139:9
**device** 15:19
**devices** 16:22
**diaz** 1:3 3:19 4:8
109:15 125:19,21
125:21 126:1,22
127:18,21 132:7,8
132:15,20,24
135:14 136:11
137:20,23 138:3
138:23 141:8,15
142:1 143:2,3
148:10

**difference** 14:6
**different** 11:1
12:21 15:19 32:3
32:5 42:4,7 57:2
58:2 65:17 68:23
71:9 92:18,18
104:6 112:15
141:13 143:8
**difficulty** 126:5
134:2
**dig** 41:18
**digits** 16:16
**diondre** 1:21
156:24
**direct** 88:12
154:15
**direction** 127:15
156:7
**director** 97:8
**dirt** 110:8
**disability** 30:1
41:7 70:12,12
**disabled** 38:20
**disagree** 118:25
**discipline** 59:12
**disciplined** 58:19
**disclosure** 154:7
156:12
**disclosures** 154:1
154:4,5,18
**discontinued** 94:1
**discount** 154:23
156:17
**discounts** 154:22
**discriminate**
31:12
**discriminated**
38:5,11
**discriminating**
40:2

**discrimination**
39:13 40:12
**discriminatory**
137:20
**discuss** 9:7,13
63:15,17,20
**discussed** 140:9
**discussion** 39:23
116:17
**discussions** 7:20
102:8,17
**disorderly** 45:15
45:16
**dispose** 120:22
**disposed** 120:23
**disqualification**
154:7
**disqualify** 154:13
**district** 1:1,1
**disturbance** 72:20
**division** 1:2
**docu** 106:1
**document** 18:21
21:13 22:7,11,17
24:18,23 27:11,23
28:13 29:9 30:14
33:8 36:15 105:15
105:25 106:8
117:21 118:4
128:3 140:9 143:1
144:16
**documentation**
36:6 144:11
**documents** 9:4
22:16 35:19 36:8
**dodge** 136:8
**doing** 4:15,21 19:4
36:22,23 41:25
43:11 67:4,24
68:4,6 79:13
89:25 111:7

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

[doing - exhibit]

113:10 122:6,24
123:2
**dominique** 122:21
**door** 108:23 109:1
109:6 113:23
114:2,3,9,17,18,20
114:21 115:15,16
115:19 130:5
132:4,21 133:14
**doorway** 98:9
**double** 150:21
**douglas** 10:22
**downstairs** 47:23
**draw** 108:5,10
109:7
**dropped** 45:12
70:19 107:15
**drug** 67:13 75:16
75:19,21,25 86:25
**drugs** 67:10
**due** 150:6
**duly** 4:3
**dump** 120:17,21
**dumping** 120:3,8
120:24
**dumpster** 102:23
120:17
**dumpsters** 121:4
**duties** 11:24 14:21
**duty** 83:8

**e**

**e** 4:1,1 9:5,23,24
14:23 20:12,17
21:3,4,16 27:4
46:14 47:16,20
49:17 50:10 52:11
54:11,17,17 56:4
63:1 68:16 78:4
81:20 82:3,5,8,12
82:20,21,23,25
83:4,7,20 87:8

94:14 97:4,5,12
99:14 105:25
106:2 107:4,4,10
107:13,15 110:2
113:23 116:4,5
124:5 151:10,14
**e.m.f.** 1:5
**earlier** 81:15,19
112:12 121:25
128:23 129:1
**earth** 108:2
**easier** 16:19
**east** 2:6
**easy** 81:24
**economy** 11:13
**education** 10:20
**edwin** 1:4 128:8
141:4
**effect** 45:2 130:24
**effective** 89:10
**either** 20:6,24 59:2
133:3
**elaborate** 94:12
**elaborated** 47:18
**elevator** 102:24
103:21 104:5,7,8
120:4 121:15,15
**elevators** 103:18
**elr** 1:6
**elsa** 1:3 128:8
**email** 82:17 107:6
**emails** 20:7 59:8
**employee** 27:16,22
28:9,22 29:7,12,17
39:12 154:10
156:10
**employer** 19:24
20:21 21:1 32:7
33:10
**employment** 22:25

**enemy** 71:11
**enforce** 48:9
110:25 111:2
**enforced** 71:3
**enforcement**
120:13
**engaged** 39:13
**english** 42:24
135:22
**ensued** 116:17
**ensure** 35:9 39:2
**enter** 108:6
**entered** 67:15
146:19
**entertain** 112:13
129:15
**entitled** 22:17,18
28:13 33:20,25
34:2 128:3 140:23
144:17
**entrance** 108:5,7,9
108:11 110:1
**equipment** 106:21
**eric** 94:16,17
123:4 151:10
**error** 146:23
151:18
**especially** 5:2
**esq** 2:3,4,4,5,9
**estimate** 42:20,20
**estimated** 116:21
116:22 117:2,6
**etheridge** 5:11
**ethics** 154:14
**evening** 100:6
131:16
**everybody** 8:11
83:2,5 113:10
133:8 150:15,18
**evict** 149:22 150:9

**eviction** 149:17
150:14
**evidence** 156:8
**exact** 88:11
**exactly** 31:4 88:2
139:7
**examination** 4:5
77:7
**examinations** 3:1
**examined** 4:3
**example** 56:23
74:19 80:2 93:14
93:14 94:2 114:19
142:7,9
**excellence** 24:5
**excellent** 61:3
**exception** 79:1
**exclusive** 129:7
**excuse** 17:6,6
22:17 57:6 78:3
**executed** 128:8
**execution** 116:23
**exhibit** 3:5,6,7,8,9
3:10,11,12,13,14
3:15,16,18,19,20
3:21,22 22:4,6,16
22:21 24:11,14,17
24:25 27:6,9,14,20
32:24 33:2,5
46:10,12,13 49:11
49:14 55:9 62:21
62:23 81:22,25
82:1,1,2 96:15,24
97:1,4 101:13
105:12,14,18
108:4 116:20,20
118:7,11 119:15
127:22 128:1,18
140:1,4,5 142:23
142:25 144:13,15
144:16 145:12

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

[exhibit - forth]

Page 10

147:12,15 151:2,4
151:9
**exhibits** 3:3 21:21
21:24 22:1 155:1
155:1,3
**experienced** 31:5
**explain** 19:23
41:17 48:12 59:22
60:11 62:4 65:12
72:14 89:4 121:9
123:25 142:5
151:2
**explained** 74:23
**explaining** 145:14
**explains** 72:8
**explore** 124:13
**extra** 120:23
**eye** 3:15 96:13,14
96:22 97:7,9 98:4
99:19,21 101:20
102:1,7 103:5,17
104:23 105:1,15
105:18 106:11,16
114:22 115:1
117:12 118:23
119:2,8,16

**f**

**face** 108:23 133:21
**facebook** 137:6,9
**facetime** 54:14
**facing** 98:7,7
109:2
**fact** 40:1 69:2
90:12
**facts** 91:23 133:5
**factual** 101:3
**fair** 10:7 11:14,14
30:20,24 31:11,19
32:2 33:20,25
34:2,15,20,20,25
35:2,4,5,9,10,16

37:2 39:4,14
40:12 88:20
103:16 104:9
117:8 148:23
**fairly** 14:12 31:7
**fall** 20:12,15
**false** 67:16
**falsified** 67:9
**falsify** 67:8 74:18
75:7
**falsifying** 67:4
**familiar** 50:12
133:21 140:11
**family** 4:8 15:14
45:18,23 46:15,18
61:7,14 67:14
109:16 125:19,21
125:22 126:2,23
127:18,21 132:7,8
132:15,20,24
135:14 136:11,18
138:23 139:3
141:9,15 142:1
143:4 148:10
**far** 25:21 37:24
55:2
**father** 137:2 141:8
**fear** 124:24
**february** 34:15
**federal** 31:11
149:21 150:5
**fedex** 5:12,14
**feel** 79:3,7,19
91:20 100:5
133:22
**fees** 140:19
**felt** 36:22 66:6
69:18 79:21 100:3
104:18
**female** 38:2

**ferry** 2:6
**fictitious** 78:20
**fight** 50:1,18
**figure** 99:9 136:20
152:18
**file** 26:7 116:14
138:9
**filed** 144:19
**fill** 24:8 119:11
**filled** 23:15
**fills** 83:2,4
**finance** 95:7
**finances** 91:25
95:19
**financial** 126:5
134:2 139:24
154:8 156:17
**financially** 156:11
**find** 38:24 57:24
77:1 133:16
141:18,23
**fine** 60:17 65:23
69:4 88:3 127:17
135:22
**firearm** 80:10,15
80:16
**fired** 59:2 76:4
**firm** 2:5 154:1,18
**first** 3:16,17 4:3
10:11,16 13:17
19:25 21:22 23:12
24:25 27:20 33:19
45:11,14 46:17
48:2 64:21 66:14
67:2 68:3 71:1
85:2 87:24 106:6
116:20,21,23
118:12,13 132:4
138:21 143:5,9,10
144:9,20,25
147:17 151:11,25

**fit** 77:13 93:8
**fitness** 129:5
**five** 11:1 56:12,24
57:6,7,11,25 58:3
58:4 59:18,21
60:3 61:12
**fixed** 146:20
**fliers** 111:13
**flip** 23:25 25:7
28:12 34:6 101:13
143:13 151:15
**floor** 102:24
**flores** 1:3 128:9
**florida** 14:10
59:10 60:20 86:10
86:13
**flyers** 111:16
**follow** 36:13 126:4
126:23 127:15
131:17
**following** 79:18
102:20 154:1,5
**follows** 4:4
**fontaine** 9:11,14
78:3,4 98:18,20
99:16 116:5 140:9
**fontaine's** 128:14
**forbids** 32:2
**force** 50:1,18
**foregoing** 156:4
**forever** 122:25
**forgot** 40:15 100:2
**form** 26:21 31:20
73:22 74:7 76:19
77:3,4,10,11,15
147:9 148:12
**formal** 99:21
**former** 87:9
**forms** 154:7
**forth** 17:23 106:12

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

**forward** 107:17
**forwarding** 97:6
**foul** 83:9
**found** 51:13
**foundation** 39:20
**four** 11:1 16:16
  44:17 47:3 79:2,7
  83:10 84:15 98:2
  98:3 99:5,7
  100:11,13 103:13
  104:6 106:19
  116:22 117:16
  142:3,9,12
**frame** 112:20
**frederick** 10:22
**free** 62:19
**freon** 93:25
**fresh** 70:1
**friday** 8:3 76:15
**friend** 62:1,2
  122:8,17
**friends** 15:14
  48:11 61:9,10,15
  61:16,24 122:1
  138:19
**friendship** 122:14
**front** 29:21 35:19
  102:14 108:5,7,8,9
  108:10,22,23
  109:1,6 118:12
  129:9 131:9
**full** 13:6 126:9
**fulton** 156:3
**funny** 19:5 73:19
**furious** 51:23
**furnished** 156:16
**furniture** 120:18
**further** 124:14
  152:21 156:9

**g**

**g** 4:1 54:11,19
  81:18
**ga** 2:11 43:21
**gaa** 43:16 128:19
  128:21
**gainesville** 126:16
**gang** 78:14
**gap** 119:12
**gate** 120:14 121:1
**gateway** 41:4
**gathering** 55:5
**gayner** 13:1,2,17
  14:11 65:3,7 68:9
  68:25 82:3,8
  83:11 87:25
**general** 4:20 8:8
  27:15,21 29:1
  41:23 57:17 59:24
  92:19 126:2
**generally** 88:23
**generate** 61:17
  130:19
**geography** 86:14
**georgia** 1:1 14:9,9
  80:6 126:15,18
  139:17,18 154:5,9
  156:2
**gesture** 115:4
**getting** 7:3 68:17
  71:20 96:16
  140:15
**girl** 50:1,18
**gist** 37:8 63:3
**give** 4:22 5:3 10:10
  16:16,18 19:1
  20:1,4 27:12 31:5
  33:2 36:5 40:23
  42:5 46:23 49:16
  50:20 52:23,24
  61:10 65:5 71:13

75:20,20,23 88:1
90:19 91:17 93:14
104:1 114:19
118:16 122:3
123:8 133:5
134:23 141:25
142:7
**given** 29:16 30:12
  55:20 76:10 93:10
  143:1 147:3 156:8
  156:18
**gives** 118:5 152:16
**giving** 42:17 88:12
  91:22 101:4
  104:16 142:8
**glass** 114:17 115:8
  115:9,10,13
**gmail.com.** 54:12
**go** 4:13 10:15 11:3
  11:4,6,7 17:10
  23:2,4 24:16
  25:10,13 26:21
  31:20 32:13 33:18
  33:24 37:24 38:23
  52:25 62:1 64:21
  71:25 74:24 75:4
  75:12 81:2 82:2
  84:3,18 90:1
  96:18 99:3 100:2
  101:1 107:17
  111:4,6 113:24
  115:13,16 116:19
  119:9,15 121:25
  124:14 125:2,6
  128:23 129:21
  130:18,22,24
  131:9 132:7 133:5
  133:11 136:10,19
  136:21 137:15
  138:4 146:18
  147:9,18 152:19

**goes** 72:13 83:2
**going** 4:9,13 10:10
  10:11 11:15 15:24
  17:9,18,22 21:20
  21:21,22 22:6,17
  24:17 27:8,11
  28:25 29:15 33:1
  34:13 36:19 40:13
  40:16 44:6 45:13
  45:17 46:20 49:19
  59:22 60:18 61:11
  62:4,11 65:17,17
  75:12 77:9,18
  78:25 80:4 85:11
  85:10,21 86:3
  89:9 91:11,23,24
  92:19 96:4,11,13
  100:5 102:4
  103:11 109:3,10
  115:11 116:8
  117:19 120:4
  121:16 125:6
  127:25 131:12
  133:5,22 137:8
  139:10,24,25
  140:22 141:23
  142:7 144:7,24
  147:14 148:9
**good** 4:7,25 5:8
  6:9,16 7:15 9:7
  11:15 16:5,5 18:7
  18:18 31:8 33:11
  42:4 53:23 68:4,6
  70:20 113:13
**goods** 56:7 92:8
**google** 15:22 108:2
**gotcha** 146:5
**gotip.org** 82:6,17
  82:22 83:1
**gotpi** 116:4,4

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

**[gotpi.org - hours]**

Page 12

gotpi.org   107:4
gotpi.org.   107:11
government   41:14
    139:20 149:21
grace   32:3,5,6,9
    32:13,14,23 33:9
    33:15 34:25 35:7
    39:5,7
graduated   10:23
great   11:10
greater   56:3
greenish   110:11
greenville   126:17
griffin   126:14,15
groceries   130:6
gross   140:23
ground   4:13 91:9
grounds   12:9
    131:23
guard   87:9,14,20
    88:5,10,24 90:7
guards   86:17,18
    89:1
guess   7:8 9:10
    48:14 51:19 64:9
    64:15 88:14 90:12
    97:8 106:18
guesswork   46:25
guests   112:13
    129:15
gun   135:16,23,24
    135:25 137:10
gunpoint   134:21
guns   76:3,4
guy   55:13
guys   17:7 50:2,19
    81:10

**h**

h   81:18
h.m.f.   1:6

habies   70:7
hair   120:16
half   42:14,14 50:5
hallway   121:13
hand   6:10 21:25
    36:15 128:2
handbook   27:15
    27:16,21,22 28:9
    28:22 29:1,7,12,17
handle   20:23
handler   93:22
happen   49:4 69:22
    90:15 131:16
happened   5:19
    51:21,22 58:17
    68:20 87:11 101:7
    104:20 117:24
    133:6 149:16
    151:19
happening   78:8
    86:7
happens   76:17,22
    121:2,17
harassing   52:6
    64:18,25 65:8,10
harassment   28:13
    28:19 29:10,11,20
    29:23 30:7,10
    34:8 65:10,12
harbison   2:10
hard   57:23 115:9
harris   7:25 8:16
    8:22 12:11,25
    46:15 47:1 49:7
    49:18,24 55:11,24
    63:2,14,17,20 65:3
    82:3,7 83:12,16,23
    94:11 97:5 119:24
    151:11
harris's   13:12

hear   17:7 47:5
    66:10,11 78:25
    94:25 125:13
    133:6
heard   21:16 42:4
    120:7 133:2
    138:22
hearing   138:21
held   5:15 66:18
hello   151:16
help   27:23 38:8
    57:22 61:19 67:5
    84:6,10 90:13
    108:1 115:6
    122:23 127:19
    134:2,12 145:24
    146:1 150:18,19
    150:19
helped   56:12,15
helpful   135:4
helping   41:15
    126:8,10
helps   132:1
hey   74:22 90:2
    93:13 116:1,9
    132:3 133:24
hickey   69:13 88:8
    88:9,15 124:5
    133:18
high   10:19,22
    61:10 102:24
    103:18,20 104:8
    109:21,25 110:4,9
    110:11
hill   32:3,5,6,9,13
    32:14,23 33:9,15
    34:25 35:7 39:5,7
hip   81:4
hire   12:2
hired   87:8

hispanic   42:9,21
    43:2 138:4
hispanics   137:25
historically   16:6
history   10:20
hold   121:14,15
holds   123:2
holt   46:14,25
    47:13 48:4,5 49:2
    49:17,24 50:14,16
    52:8 53:10 55:10
    55:19 56:3,4
    58:13 63:1,11
    64:5,7,25 65:8,22
    67:2 68:3,20,22
    69:3,8 82:5 83:6
    83:24 86:19 87:21
    87:23 111:12,15
    111:15,16 124:5
    126:11 131:1
    132:3 139:2,4
    147:17,18 148:17
    149:1,7,10
holt's   82:8
hom   128:9
home   112:13
    129:16 139:11
    142:19
homes   93:17
hooked   121:17
hope   84:19 111:14
    125:13
horace   46:14 82:5
    111:15
hostage   5:15
hotel   120:15
hour   76:14 102:22
hours   76:6,6,9
    78:9 83:10,13,25
    85:6 101:10 117:7
    117:17 119:17

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

[household - jamaile]

Page 13

household 142:11
  142:13
housing 24:6
  30:21,24 31:11,19
  32:2 33:20,25
  34:2,15,20,20,25
  35:5,6,9,10,16
  37:2 39:4,14
  40:12 41:2,8,11,12
  41:14,20,24,25
  66:17 70:13,18
  71:6 95:16,18,20
  95:21 134:1
  150:18
hud 139:22,25
huh 13:10,24
  15:13 16:9 17:16
  36:21 56:19 83:15
  92:6 137:16
  141:22 147:21
human 59:1 94:7
  113:14
humans 146:17
hundred 34:19
hypothesis 136:17
  137:13

i

i9 57:15,15
icloud 54:5,8,17
  55:2
idea 99:10,12
  148:19
identification 22:4
  24:14 27:6 32:24
  46:10 49:11 62:21
  81:22 96:24
  105:12 118:7
  127:22 140:1
  142:23 144:13
  147:12 151:4

illegal 31:11
  120:24
image 107:19
images 108:2
imessage 17:4
immigration
  138:13,16 139:3
impartiality
  154:14
important 4:25
  5:1 27:23 89:2
incident 49:20
  50:12 55:25 68:14
  72:8 75:21 123:14
  124:2,3 148:9
incidents 124:2
  133:3
include 107:14
including 29:25
  83:9
income 41:5,8
  95:14
incorrect 20:1,4
  86:21
incorrectly 87:5
independent
  154:10
index 3:1
indian 42:10
individual 29:24
individuals 75:3
industry 31:24,25
infield 110:12
influence 93:5
information 52:23
  61:11 119:17
  145:20,21
infraction 51:16
  51:17 52:4 67:15
  111:3 129:25
  130:1,3,4,18

131:18
infractions 127:6
  138:8,9
initialed 140:10
injured 76:3
ins 78:16,20
inside 6:12 93:21
  93:22 112:13
  129:15 130:24
  131:4 135:7 138:4
inspections 12:2
install 97:17,20
  104:24
installation 106:21
  116:22 117:2,4,7
  117:16,17
installed 99:6
instance 9:22
  53:19
instances 44:24
instructed 78:7
  87:25 149:6
instructions 149:1
  149:1,9
insurance 57:16
intend 136:3
intended 27:23
  127:24
intentional 29:23
interact 126:7
intercourse 52:5
interest 154:8,12
interested 156:11
interpret 129:19
interrogatories
  3:17 118:14 119:1
interrogatory
  118:3,19
interrupting 17:17
intruder 102:21
  102:22,23,24

105:2,6,8
intruders 103:19
  103:20,22,25
  104:11,15
intruding 102:25
investigate 40:1
investigated 40:11
  49:7 51:13
investigation
  35:14 37:2,9
  38:25 39:1 40:7,8
  51:15
investigations
  35:18 70:2
invoice 93:12
  122:22,24 123:4,5
invoices 60:8
  122:25
involved 48:15
  87:10,17 123:14
  124:10
involving 40:8
iphone 16:24
  52:15 54:15
iq 102:16
irrelevant 65:25
ish 76:15 112:23
issue 69:20 87:19
  95:9 114:4 116:12
issues 34:10 51:8
  51:10 94:7
it'll 38:8 93:13
item 94:25
items 92:24 93:6
  96:7 140:10

j

jacob 12:11
jacobs 26:16,19
jail 50:4
jamaile 94:15

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

[janitorial - letterhead]                                                Page 14

janitorial  56:10,21
january  33:20
    34:21 120:11
jeff  36:13 77:7
jeffrey  2:9
jmelcher  2:12
job  10:12 11:22,24
    12:16,19 14:20
    15:24 23:15 24:1
    24:8,19,20 25:1,2
    25:11,17,18,21,22
    25:22 43:8,11,11
    46:8 48:10 65:14
    68:5,6 69:21 76:7
    76:11 77:1 99:17
    123:2
john  12:11 70:7
    71:2
judge  77:17
july  46:15 132:12
    148:9
jump  18:4
jumping  148:16
june  1:15 25:8
    156:19

k

keep  28:25 34:13
    36:10 41:24 53:8
    53:9 75:13 77:2
    80:7 115:22
    134:10 136:1
    140:22
keeping  71:13
keith  97:7,8,11
    105:3
kept  69:3
key  98:13
kick  62:10
kids  54:12 112:19
    127:10 129:8
    131:7 135:11,12

    135:22 137:23
    138:6
kind  10:17 12:3
    15:5 16:22 17:16
    17:17,23,24 35:5
    49:19 62:11 65:14
    66:15,20 69:4
    72:6,18 76:13
    84:11 92:12 98:7
    101:23 120:18
    124:4 126:20
    127:10 139:20
kinds  71:25 72:18
king  120:14
kiya  125:8
knew  33:12 58:6,7
    87:19 125:20
    133:17,20 134:1
    136:20 146:11,14
knock  114:3,9
knocking  114:21
knocks  114:1,20
know  6:8 7:18
    9:15,18,22,24
    10:17 14:5,16,18
    15:24 16:1,14
    17:16 19:20,23
    20:3 21:21 22:8
    22:14 23:23 26:12
    26:14,15 27:2
    29:16 30:9,20
    31:1,16 35:13
    36:7,16,24 37:10
    37:14 39:2,25
    40:15,17,20 42:10
    47:24 49:20,25
    52:7 54:12 58:3
    60:7 61:23 62:8
    65:11 68:14,22
    70:6,6 71:16,19
    73:9 74:8 76:1,8

    76:20,22,25 79:19
    80:2,6 81:9 83:19
    85:12 87:6,10,12
    88:1,11 91:11
    92:2,3 94:4,5 95:6
    111:12 116:5,7
    122:15 123:14,17
    124:2,13 125:12
    125:20,24 126:19
    127:3,10 132:5,11
    132:11 133:4,10
    133:19,25 134:10
    135:6,8,8,12,25
    136:20,23 137:7
    139:24 149:20
knowing  75:3
    76:13 124:8,9
knowledge  19:14
    26:16 57:19
known  75:7
knows  11:16 95:4

l

l  81:18
lab  129:6
label  22:7,8,9
    24:18 27:12
lady  45:5,7 49:9
    67:13,22
lane  10:25
languages  42:23
large  124:1
late  132:5 140:19
    144:10 146:6
latoya  1:14 4:2
    23:2,16 147:24
latoyawynn22
    54:12
laundry  102:25
    103:10 104:7
laurie  58:25 59:1,5
    59:7,10 81:15,16

laurie's  59:4
law  2:5 31:12 80:6
    90:14 154:5
lawsuit  37:19,22
    38:2,25 39:1 40:8
lawsuits  144:5
lawyerly  31:3
lawyers  8:8 18:19
    19:2 105:18
lay  39:20
learn  58:9,12
    71:10
learned  20:25
    50:25 53:23
    136:23
learning  71:6
lease  44:1 104:1
    116:24 123:23
    125:23 128:8
    143:3 145:22,23
    146:4,7,10,13,24
    146:25 147:6,7
leases  43:17
    145:19
leasing  103:1,10
leave  13:7 47:5
    49:3 87:23 113:22
    138:5 148:8
leaving  69:14
    124:20
ledger  144:17
lee  70:7
left  14:14,18
    120:16
legal  118:4 154:10
    154:11,16,17,19
    154:21,24
letter  113:4
letterhead  147:22
    148:6

Veritext Legal Solutions

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

**[letting - making]**

Page 15

letting  138:5
level  43:17 66:18
  79:3 85:4 86:8
  92:25 95:3
liability  57:17
licensed  90:10
light  81:18
lighting  68:10
  69:25
likelihood  28:8
likes  64:10,12,13
likewise  156:16
liking  71:12
limited  29:25
  129:9
limits  41:8
line  63:3,7 82:6
  92:13,15,17 96:2
  144:25
list  41:3 122:3,4
  147:24
listed  144:21
lists  106:20 140:24
literally  138:11
litigation  147:4
  154:21 156:18
little  8:14 14:22
  17:10 22:24 24:12
  36:12 53:8 57:14
  71:13 73:10 93:16
  110:15 112:19
  113:11 130:9
  135:11,12,22
  148:8,16
live  40:20 46:1,3
  47:2,2 55:13
  117:19 118:20,22
  119:2,9 123:15
lived  45:19,24
  46:6 47:13,23
  51:19 123:8

lives  47:25 49:10
living  46:6 150:14
llc  2:5 19:7,8,10,11
  19:13,15 20:3,18
  20:22 21:2 24:9
  25:19 26:10,18,20
  29:17 30:10 31:17
  61:2 80:21 106:10
  148:3,6
local  139:17
located  96:21 98:6
  100:2
location  98:24
  100:11 103:14
  107:1 121:7
lock  21:10,10
locked  98:19
log  54:3,16,18,19
logo  43:23
loitering  72:20
  120:3 121:13
  126:24 129:11,12
  129:20 130:7,17
  130:23 131:14
long  31:25 53:22
  71:1 88:9 100:24
  101:1 111:21
  115:19 126:7
longer  56:17
longest  73:20
look  16:15 18:19
  22:21 24:22 29:2
  30:25 33:3 38:23
  52:10 53:13 54:1
  66:6,12 71:8 72:2
  83:6 88:14 96:17
  97:11 100:1 102:6
  105:22 106:5,18
  110:10 128:6,16
  128:23 141:9,19
  141:23 143:10,23

144:12,19,24
  145:12 149:25
  152:4
looked  96:20
  152:6
looking  27:14,19
  33:12 34:9 36:13
  38:9 66:5 78:3
  84:14 97:16,19
  109:13,23 110:17
  117:21 151:22
  152:1
looks  11:13 24:1
  25:4,7,13 28:2,25
  29:2 33:18 34:14
  34:15,24,25 83:10
  104:6 105:22
  107:12 108:20
  110:7,14 117:15
  128:10 144:18
lost  146:9
lot  34:6 50:6,13
  57:18 74:19 76:17
  79:16 90:15
  102:21 103:17
  109:2,15 110:15
  114:25 120:19
  121:16 126:13,25
  127:10 142:21
  149:24
loud  44:9 47:14
love  35:21 48:11
  48:13,16,25 69:17
luther  120:14
lying  104:3 134:13
  134:16,18 135:11

**m**

m  109:7
madam  21:23
madame  77:23
  125:5

maggie  9:10 48:7
  64:19,25 66:20,21
  96:16 102:4 116:5
  126:6 131:12
  133:7,22,23
  151:20
mail  14:23 20:12
  20:17 21:4,16
  27:4 46:14 47:16
  47:20 49:17 50:10
  52:11 54:11,11,17
  54:17,19 63:1
  68:16 78:4 81:20
  82:3,5,12,20,21,23
  82:25 83:4,7,20
  97:4,5,12 99:14
  106:2 107:4,4,10
  107:13,15 113:23
  116:4,5 151:10
mailbox  98:7
  130:20
mailboxes  100:5,8
  109:2,4,7
mailed  21:3 87:8
mailing  9:24 82:8
mails  9:5,23 56:4
  94:14 124:5
  151:14
main  49:22
maintaining
  154:13
maintenance  12:6
  12:8,8 81:10
  92:21,22 121:17
  131:22
major  120:24
making  35:10
  49:25 50:17 59:23
  71:11 99:1 152:5
  154:13

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

**[man - monthly]**

Page 16

**man** 48:14,15
122:16,17,20
132:21
**manage** 143:25
**management**
10:24 11:9 19:10
19:13,15 20:3,17
20:21 21:1 24:9
25:18 26:2,4,10,18
26:20 29:17 30:9
31:17,25 32:20,21
32:22 34:8,11
61:2 67:5 72:16
79:11 80:21 86:1
102:17 112:11
128:11 129:13
148:3,6
**manager** 5:19
11:23,25 12:7,18
13:9,13,18,21,23
13:25 14:2,3,6,7
14:21 25:2,12,18
31:6 43:6 65:1
68:25 76:7 78:6
84:18 85:15,20
89:16 91:7 93:9
94:21 95:23 96:6
102:8 105:24
115:21 143:16
147:25
**managers** 15:6
**manages** 86:1,3
**map** 107:18,19
109:17,24 110:10
110:17
**march** 34:1,2 63:2
83:6 111:17
**marital** 30:2
**mark** 22:6 24:17
27:8 33:1 46:12
49:14 108:16

109:22 118:9,10
128:1
**marked** 22:4
24:14 27:6 32:24
46:10 49:11 62:21
81:22 96:24
105:12 118:7
127:22 140:1
142:23 144:13
147:12 151:4
**market** 97:24
140:24 141:14,16
141:17
**marking** 62:23
**marks** 2:4
**martin** 120:13
**mathematical**
42:20
**matter** 154:12,20
**max** 2:4
**maximum** 142:15
**mclester** 23:5,14
**mean** 6:9 9:15
31:25 42:16,21
43:20 44:13 52:2
57:15 58:6 61:9
61:13 64:9,12
65:18 66:12 67:19
72:15 73:13 75:17
85:25 86:1 89:4
108:2 135:12
136:5 142:5
**means** 22:11 51:1
102:18 130:18
**measures** 84:7,12
119:13
**media** 34:1
**medications** 79:18
**medrano** 1:4
125:22,23 128:8
141:4

**meet** 7:20 9:7 35:8
**meeting** 7:16
102:1
**meetings** 6:23,25
39:23
**melcher** 2:9 6:21
6:25 7:17 8:25
19:18 26:12,21
31:8,20 37:3,10
39:15,24 55:6
73:22 74:7 75:8
76:19 77:3,5,8,12
77:17,22 108:16
112:20 123:19
124:17,23 125:1
134:22 147:9
148:12 149:11
**member** 45:19
46:16,18
**members** 45:23
61:7,15
**memory** 72:6
82:14
**mental** 41:6 70:11
70:12
**mentioned** 68:1
81:16 103:15
105:10 136:25
137:3 147:14
**message** 16:25
113:22
**messages** 17:3
18:20 19:1 50:21
55:1
**met** 40:21 95:25
101:19 103:5
**mf** 128:16
**mid** 140:6,11
**middle** 114:7
116:21 119:16,18
140:16,20

**middleman** 92:12
**mind** 74:6
**mindful** 137:7
**mine** 17:5 107:7
**minor** 1:5
**minute** 33:3 49:16
141:25
**minutes** 61:12
**misconduct** 124:6
124:7,10 127:14
**mispronounce**
23:12
**missed** 151:21
**mistaken** 78:19
**misunderstood**
89:8
**mixture** 42:10
**mlk** 108:6,8
**mold** 34:8
**monday** 76:15
**money** 42:3 85:10
85:16,21 86:4
92:7,8 94:22,22
123:3,6 134:11
152:1
**monitor** 98:14,18
121:8
**monitored** 119:17
119:22
**monitoring** 105:19
106:10,11 117:6
120:2 121:10
**monster** 34:9
**month** 95:7
116:23 119:12
140:6,11,16,16,21
141:11,16,18,20
141:24 143:11
144:8 150:25
**monthly** 42:2 95:6
95:12

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

**[months - oh]**                                                                 Page 17

**months** 50:5 72:10
117:12
**moon** 145:18,18
**moratorium**
149:18,19 150:2
150:11
**morning** 4:7 101:6
**motivate** 12:1
**motivation** 80:14
**motive** 65:11
**move** 11:2 125:17
136:12 140:17
143:19 150:23
151:9
**moved** 37:12 40:9
45:15 63:5 137:11
143:9 152:11
**moves** 150:23
**movie** 47:11
**moving** 63:4 130:6
140:18
**multiple** 22:15
65:9
**murder** 72:22
73:1,4 86:20 87:2
87:10
**murders** 72:23
**music** 47:6,10,10
47:14

**n**

**n** 4:1 107:15 125:8
**name** 4:7 20:2
23:12,20 25:4
56:11,14,16 59:4
81:18 94:7 107:1
122:20 123:16,19
123:22 124:9,14
124:21 125:8
143:24 144:3
**named** 70:6
106:24

**names** 65:2 122:5
123:9,13 141:3
**national** 30:1
31:13 38:12 40:3
106:10 145:19
**nature** 66:1,3,5
**near** 98:8 126:19
**necessarily** 88:20
**necessary** 89:3
**need** 5:3 17:10
18:5 22:24 24:21
42:3 57:22 59:25
70:4 83:12 86:14
89:6,10 101:23
104:1 109:22
124:25 125:2
136:5 152:18
**needed** 56:23
83:24 88:24 94:3
134:12 140:19
**needs** 41:6,12 84:4
101:16 102:7,10
102:16
**networking** 61:13
**never** 30:12 46:8
47:16,20 49:5
57:1 105:1,5,10
111:6 135:1,2
137:10,11 138:22
145:1 146:21
**new** 25:25 26:2,3
60:7 98:1,1 99:8,8
99:10 112:17
145:22
**newer** 93:17
**newnan** 126:19
**night** 47:3 76:18
76:23 83:13,25
101:8 135:14
**nine** 100:7 117:18

**non** 28:19 29:11
29:20 30:7,10
68:17 149:22
150:6
**normal** 71:8
**normally** 11:1
95:8 131:15
**north** 14:10
**northern** 1:1
**noted** 77:5
**notice** 65:5 68:21
88:1,3 112:5
130:18 132:3,6
144:4 147:17
**notices** 131:18
**noticing** 154:20
**notify** 111:24
**november** 20:16
24:2 118:22 119:3
119:8 143:4
144:21 145:5,13
**number** 15:22,25
16:1,17,21,21
21:25 52:24,25
53:2,6,6,16,18,20
55:19 86:15 124:2
128:23,24 129:19
**numbers** 16:15
22:9,10,14 42:17
52:16,17,21 53:10
53:12 101:13
**numerous** 93:11

**o**

**o** 4:1 108:18
**o'clock** 100:7
104:18 116:9,10
116:11
**oath** 118:5
**object** 26:21 31:20
84:4

**objection** 39:15
73:22 74:7 76:19
77:3,15,21 112:20
147:9 148:12
**objections** 77:10
77:12,19
**obligation** 154:14
**observations**
103:9
**observed** 83:8
**obstruct** 77:16
**obviously** 9:15
14:23 40:17 87:15
92:5 132:11 147:6
150:8
**occasions** 72:12
**occur** 68:13 72:1
94:4
**ocga** 154:7,8,21
156:12
**october** 20:16
118:21 119:2,8
128:9 142:18
145:11,16 147:20
**office** 47:5 49:3,5
51:18,22 55:15
60:19,20 80:18
81:3 84:15 89:15
92:20,22 98:6,10
98:15,19 100:9
103:1,10 104:21
108:15,18,23
109:1 110:3 112:1
113:2,2,4,7,14,16
114:2,24 120:1
130:19
**officer** 85:7
**offs** 151:20
**oh** 5:16 8:6,25
11:10 15:8 22:25
28:24 34:17 40:22

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

[oh - parties]

Page 18

52:20 58:2 60:17
82:23 86:16 95:5
95:18 100:22
113:13 121:8
129:12
**okay** 4:10,11,16
4:20 5:6,7,22 6:2
6:6,15 7:3,9,13
8:4,7,10,15,22 9:2
9:21 10:13,18
11:19,24 12:6
13:14,16,19,22
14:5,11,20 15:8
16:3,14 17:19
18:1 19:14,20
20:14,19 21:12,15
21:17,20 22:13
23:14,18,22,24
24:13,24 25:10
27:10 30:17,19
31:16 34:17 36:17
38:1,1,22,24 39:19
46:22 47:16 48:5
48:23 52:20 55:18
59:9 60:12,17
61:22 62:4,5
65:13 70:25 71:3
71:18 72:5 75:15
77:8,22 81:6 84:9
84:18,21 87:7,20
88:4 89:8 90:5,16
92:1,3 93:23 95:6
96:12 97:3 98:25
100:22 102:6,12
102:19 104:5,22
105:16 106:3,22
107:12,16,24
110:10,14 111:16
111:16 112:9
116:10 118:6,24
119:20 124:22

125:1,1,16 126:1
127:8 128:16,25
129:4,8,12,23
133:5 140:3 141:7
143:8 149:13
150:22 151:3
152:4
**old** 67:13 100:13
100:13 101:2,5
145:21
**older** 38:20 93:16
**once** 13:20 20:23
35:1 52:4 67:23
85:8,23 108:7
112:1 116:23
117:3,15 133:7
**ones** 43:13 98:1,2
127:15
**online** 32:12
137:15
**onsite** 102:17
**open** 45:3,6,10
111:25 116:7
**opened** 112:1
133:7
**operations** 12:4
**opinion** 42:17
90:19 91:19,22
104:17 134:22,24
**order** 113:25
115:14,18 116:12
**ordering** 155:4
**org** 91:12
**orient** 108:1
**orientation** 30:3
**oriented** 109:23
**origin** 30:1 31:13
38:12 40:3
**original** 156:14
**outcome** 156:11

**outline** 10:10
**outside** 76:18 78:9
80:3 93:21 111:5
115:6 121:18
122:14,17 126:25
129:22,23 130:2,3
130:5,10,17,25
131:3,6,13
**outsource** 74:23
**overall** 43:6
103:10
**overhead** 108:1
**overlooked** 146:18
**oversee** 12:1
**overseeing** 13:18
**overseer** 12:3
92:12
**overtalk** 7:7 17:4
**overview** 140:20
**owed** 151:23 152:1
**owens** 56:13,15
**owned** 56:6 58:3
**owner** 58:8,10
**owners** 57:9
**owns** 57:7

**p**

**p** 4:1
**p.m.** 100:6 101:8
119:17,22,24
120:6 121:10
153:2
**paces** 2:6
**package** 95:12
**page** 3:5 4:15
23:25 24:25 25:7
25:10,13 27:20
28:12,16,18,21
29:1,9,11,21 33:19
34:6,9,13,20
101:13,13 102:6
102:13 105:22

106:7,19 108:13
116:20,21 118:15
128:6 141:6,16
143:10,13 151:15
156:15
**pages** 28:10 96:18
106:19 107:18
140:22 150:1
**paid** 50:5 71:21
117:11 144:9
146:21,22
**paint** 56:10 57:3
**painting** 56:22
57:4 61:8
**pandemic** 126:9
**paper** 117:13
130:19 148:4
**paperwork** 74:24
105:11 122:24
138:12
**paragraph** 143:10
143:23
**parent** 51:18 52:3
106:23
**parentheses**
152:16
**parents** 51:19,21
**park** 80:3
**parking** 55:13,20
62:6 102:21
103:17 109:2
110:15 126:25
127:10
**part** 8:25 28:9
37:21 85:24 92:14
98:19 128:7
139:23
**partial** 118:20
**particular** 57:16
**parties** 154:22
155:4 156:15

[partnership - pool]                                                        Page 19

**partnership** 1:9
  3:16 20:9 24:5
  25:1,11 27:17,24
  28:6,22 29:7,12
  106:9,16,24
  118:12 144:1,5
  147:25
**party** 32:17 40:21
  47:4 143:24 144:4
  154:15,21,23
  156:10,13,18
**pass** 55:13,20
**password** 155:2,3
**pause** 17:24 50:9
**pay** 57:20,21
  113:24 115:14,17
  116:10 117:15
  120:22 121:3
  134:3 139:10
  146:22 150:18
  152:10
**payable** 60:6,9
  94:14,14
**paying** 141:20,24
  142:20,22 146:10
  146:14,21 150:16
**payment** 42:2
  116:24 117:19
  149:22 150:6
**payments** 132:5
**payroll** 92:22,22
  94:21
**peachtree** 2:10
**peeing** 103:21
**people** 39:3 40:2
  40:20 41:11 43:10
  48:17 50:6,18
  57:14,23 61:19
  62:8 67:9,18
  71:11 73:15,15
  74:20 78:17 79:14

86:12 96:21 98:12
  105:4 116:6 120:3
  120:7 123:14
  124:8,12,24 126:5
  136:21 138:20
  140:19 142:21
  146:16 147:7
  150:13,14
**percent** 33:21
  34:16,19 41:1
  142:4,6,6,7,10,13
  142:15
**perform** 57:25
  61:17 62:14
**performed** 122:2
**performing** 58:4
  60:4
**perimeter** 131:4,4
**period** 114:2
  119:12 150:4,11
**permission** 50:21
**person** 7:2 13:11
  13:25 29:24 38:20
  38:21 55:4 69:16
  91:9 104:3 105:4
  115:1 121:8
  131:23 133:20,24
  142:10,11,13
  143:16 150:23
**personal** 15:4,12
  16:6,8,17,21 18:12
  53:19,20 54:17
  84:3 134:22,23
  135:25 136:4,10
**personnel** 26:7
**pete** 122:7,8,15
**phone** 5:3 7:2
  14:25 15:3,4,4,6
  15:12,17,25 16:6
  16:17 18:12,13,20
  18:23 47:19 52:17

52:21 53:12,14,16
  53:18,20,22,24
  54:1,2,6,23 59:16
  77:18 80:5 113:20
**phones** 18:14,23
  53:25
**phonetic** 5:12
  26:17 59:5 69:14
  70:7,8 94:15,17
**phonetics** 12:12
**photographs**
  54:23
**physical** 41:7
  44:15 70:11
**physically** 93:8
  111:4
**pic** 55:16
**pick** 75:5 120:6
**picking** 67:17
**picture** 47:9,18,19
  48:3 132:4
**piece** 130:19
**pile** 24:12
**pine** 126:12,13
**pinpoint** 132:1
**place** 41:11,15
  84:7,12 85:2
  118:21 130:13
  154:20
**places** 103:17
  104:6,10,14
**plaintiff** 2:2 3:4,17
  118:13
**plaintiffs** 1:7 4:9
**plan** 11:10,11
**play** 100:19,23
  110:18 111:6
  112:10,19,24
  113:1 129:9
  137:24

**playground** 110:5
  110:6,13,19,20
  111:5,19,25
  112:10,18,22
  127:1 129:9
  130:10,11 137:24
  137:25 138:5,6
**playgrounds**
  111:8,21 112:3
**playing** 60:16
  111:5 126:25
  127:1,11 130:10
  138:10
**please** 18:4 84:9
  108:11 129:15
  134:24 152:13
**plenty** 124:4
**plumber** 122:7,8
  122:15
**plumbing** 62:6
  122:7
**point** 20:15 37:1
  48:21 53:15 58:9
  60:24 99:16 111:9
  115:12,20 116:16
  135:13 148:25
**pointing** 119:19
**police** 44:19 45:1,9
  70:3 73:13 74:10
  74:13,21 76:24
**policy** 28:14,19
  29:10,11,20,22
  30:7,10 31:18
  78:12 80:19,20,22
  80:23,24,25 81:6
  81:13 104:19
  112:16 129:20
**pool** 98:7 102:22
  103:18 108:21,22
  108:24 122:15,16
  122:17,20 129:6

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

**[porch - ran]**

Page 20

porch   131:5
portal   95:15,16
porter   12:11
position   12:9
positive   152:5
possible   92:14
possums   83:9
post   55:16
potential   132:16
   132:17 140:23,25
practice   98:22
precautions   79:24
   135:6
preceding   101:8
precise   42:20
premises   81:7
prepare   6:18 7:1
   8:4
prepared   140:15
prescribed   79:18
   79:18
present   10:21
presented   154:2
presumably   42:23
pretty   38:14
   145:24
previous   103:11
   126:21 134:1
price   146:19
prices   142:8,8
   146:18
printed   145:6,20
prior   72:11 99:2
   132:14
priscila   2:5
probably   4:25
   8:10 16:2 20:15
   21:21 24:12 26:6
   42:14 44:6 45:13
   88:13 95:4 103:15
   111:17 142:3,20

143:17 145:4,5,20
146:8,9,17,19,19
problem   10:8 37:6
   43:14 57:14 69:21
   77:4,11 114:7,21
   115:7 120:25
   130:9,12
problems   67:1,3
proceeding   125:20
   153:2 154:2,23
   155:3
proceedings
   154:12
process   59:23
   84:13 99:21
processing   85:9
produce   22:15
produced   22:11
   143:1 154:24
professional   90:7
   154:14
program   54:1
prohibit   29:23
prohibited   154:21
prohibitions   154:8
project   101:21
proof   132:5
proper   77:21
properly   12:4
properties   42:1
   79:14 88:25
   122:10 126:8,10
   126:11,14
property   10:24
   11:23,25 12:18
   13:9,23 14:21
   25:2,12,18 31:6,25
   32:22 34:11 44:18
   55:14,14,21 67:25
   68:23 69:6 70:25
   72:16 76:6,7 77:2

78:5 79:11,12
81:11,11 85:15,19
89:16 91:7 93:9
93:16 95:9,21,23
96:6 99:25 101:16
102:7,10,16
105:23 115:21
120:21 131:1
147:24
property's   82:23
   82:25
proposal   97:7,12
   104:23
protected   29:25
   155:2,3
protest   65:17
prove   67:16
proven   78:18
provide   57:11
   61:24 154:19
provided   61:4
   105:17
provides   56:7
providing   68:5
pull   71:12 101:7
pulled   114:17
   144:18
purchase   53:24
   93:18 133:12
purchased   98:4
pursuant   156:12
pushed   66:15,20
pushing   45:11
put   22:14 49:13
   51:12 56:2 65:19
   93:12 105:4 109:5
   109:10 115:14
   116:13 118:21
   121:4 130:13
   131:5 132:2,3
   138:8 145:20

146:15,16,17
putting   59:6
pyramid   13:22

**q**

quality   68:17
question   7:4,5,11
   8:12 17:24 19:5
   19:16 21:18 27:18
   27:19 63:14 77:11
   80:1,13 83:22
   84:1,9,19 87:5
   91:5 94:11 97:22
   97:23 100:23
   104:13,22 112:15
   124:17 126:21
   127:16 148:7
   149:3 151:7
questions   4:10,12
   4:21 11:15 18:3,6
   29:15 39:21 44:5
   49:19 55:7 70:4
   88:20 91:24 95:25
   118:4 123:12
   152:22 154:25
   156:6
quickly   17:23
quote   42:16
   139:16
quoting   29:22

**r**

r   4:1
race   30:1 31:13
   38:11 40:3
racist   137:20
   138:24
rainbow   71:15
   134:1
raise   6:9 44:7
ran   125:11,15

Veritext Legal Solutions

800.808.4958                                          770.343.9696

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

**[random - report]**

Page 21

random 137:18
rank 127:9,13
rats 83:9
reach 47:1
read 7:11 24:20,21
  46:20,24 49:16,21
reading 29:20
reads 27:22 46:25
  49:23
ready 57:2 63:5
really 5:21 6:7
  11:2 13:4 54:13
  60:25 67:24 71:20
  102:3 104:12,20
  107:25 118:14
  121:1 125:13
  126:3,6,8 131:10
  131:16 132:9
  133:14 150:15
realtime 98:23
reason 36:14
  67:11 79:17
  103:14 118:25
  123:12 125:11
  142:20 148:14
reasons 135:25
  136:4,10
recall 6:7 7:23
  9:18 13:4 14:14
  18:18 20:24 21:7
  25:20,24 26:1,5
  29:18 30:11,13,15
  31:21 35:12,24
  36:5,6 38:4,6,8,10
  38:22 40:5 47:24
  50:20,22,23 52:11
  53:13 54:3,4
  55:23,24 56:1
  74:3 76:1,5,24
  78:15 79:23 81:9
  81:14,20,21 82:15

99:11,13,13,14
  102:3 104:12
  111:7,12,13,20,23
  118:2 119:6,14
  120:5 133:1 134:6
  148:13 149:5,8
  150:17
receipt 28:13,18
  29:10,11
receive 25:17
  144:4 156:13
received 82:13
  105:15 116:24
receives 154:23
receiving 82:12,14
recognize 22:22
  24:23 27:15,20
  31:24 128:12
  141:13
recollection 36:19
  87:23 101:1
recommendation
  89:18
record 7:10 11:18
  15:11 24:17 32:14
  40:19 46:24 49:14
  49:15,23 52:25
  59:6 62:1,3,11,25
  65:19 72:10 75:9
  75:12 78:2 82:1
  100:15,19 104:17
  105:18 109:18
  116:17,19 118:10
  121:24 125:3,6
  140:5 143:23
  147:16 152:19
  154:12,13,24
  156:8
recording 100:17
records 88:15

recount 44:22
rectangle 110:11
redacted 123:13
  124:8 141:3
reduced 156:6
refer 68:13 151:14
reference 118:23
referred 66:17
  128:22 133:25
referring 128:18
  129:17
reflect 103:4
refunded 152:6
refused 66:25
  69:24,24
regional 13:13,21
  14:2,6,9 65:1 69:1
  83:3 84:17
regions 14:10
regular 76:14
regularity 76:4
regulation 127:25
regulations 43:18
  43:22,23 110:21
  112:12 128:4,17
  128:20,21 154:6
relate 18:20
related 65:14
relating 155:3
relationship 26:10
  41:11 43:4 67:20
  70:21,24 122:11
  154:12
relationships 62:9
  67:18,19,21
relative 123:11
  156:9
relatives 61:3
  123:7 124:10
religion 30:2

remained 136:15
remaining 118:21
remember 6:5
  32:1 35:23,25
  36:1 37:3,5,8,13
  37:15 47:12,15
  50:16 51:1,6
  55:19 76:5 82:12
  88:16,18,21
  111:21 122:5,13
  126:20 127:17,20
  132:8,9 149:21
remove 152:10
removed 64:10,16
removing 150:5
rent 50:5 57:2
  92:7 113:25
  115:15,18 116:10
  127:19 133:13
  134:3,12 137:19
  139:10,11 140:23
  140:24,25,25
  141:9,10,15,16,17
  141:20 142:14,16
  142:19 143:10,11
  144:7,8,9,21 145:5
  145:10,16,24
  149:23 150:6,16
  150:19 151:17
  152:11
rental 31:12 145:1
  145:3 146:1,1
rents 142:17
rep 96:22
repeat 27:18 97:23
  149:4
repo 74:24 75:1,2
repoed 72:12
  74:22
report 47:4 55:12
  55:17 63:3,11

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

**[report - sale]**                                                                 Page 22

67:12 68:10,11,14
72:2 76:10,11,11
82:7,9 83:7 95:7,7
95:10,13,24 132:2
132:16 154:13
**reported**   49:3,6
55:10 66:21 124:3
132:20,24
**reporter**   4:22 5:2
17:6,9,15,20 18:2
18:9 21:23 22:3
77:23 78:25
116:15 125:5
152:23 153:1
154:1,4,7,9,25
155:1
**reporting**   154:7
154:10,17,19,19
**reports**   41:19,21
44:20 45:1 68:17
69:24,25 74:14
123:13 124:2,3
**repository**   155:3
**represent**   4:8
**representations**
154:5
**representative**
101:20 102:2
**request**   42:2
**requests**   18:21
**require**   42:1 57:17
**required**   68:10
69:25
**requirement**   41:7
**requires**   35:11
**research**   64:9
**reset**   54:1
**resident**   37:11
47:1,24,25 48:6,19
48:24 55:21 63:4
72:11 144:17

**residents**   15:24
63:12,24 71:7,15
71:18,23,24 74:18
75:6 79:16 103:23
111:24 113:15
121:12 126:3
129:7,13 130:16
136:24
**resolution**   133:10
**resource**   59:1
**responded**   83:19
**responses**   118:3
118:19
**responsible**   93:2
143:16
**rest**   144:25
**restrictions**   150:5
**retaliate**   63:22
**retaliated**   63:13
64:2
**revenue**   61:17,24
62:2,2
**reverse**   150:20,21
150:22 151:17
**review**   9:4 21:13
30:14 154:2
**reviewed**   106:3
**revised**   25:12
**ride**   75:4
**ridiculous**   135:19
**right**   5:13 6:10 7:4
9:4 10:9 11:14
12:21 14:11,20
15:21 21:17 24:6
25:22 28:5,23
29:19 31:4 40:15
43:25 45:3,6,10
48:17,17,23 55:9
59:17 64:24 68:23
69:9 70:3 72:23
73:8,19,21,24

74:22,25 76:18
86:16 87:15 91:11
91:13 92:4,8
93:14 94:24 97:13
97:15 100:1,8,23
101:12,14 104:1
104:23 106:5,13
106:16 107:4
108:8 109:3,5,10
109:13,18 110:2
110:15 111:19
117:4,8,11,20
119:18 120:17
121:4 122:13
125:17 126:20
128:4 130:20
136:1 138:19
144:1 147:18,22
148:1,3 152:15
**ring**   133:12 135:5
135:20
**rise**   102:24 103:18
103:20 104:8
109:21,25 110:4,9
110:11
**road**   2:6
**rob**   137:15
**robbed**   73:14,15
134:3,14,17,18,21
135:1,9,15 136:9
136:17 137:17,18
139:1 148:11
**robberies**   73:7,7,9
**robbery**   73:12,17
74:5,5,11,14
132:12 148:9,10
**robert**   82:3
**rode**   71:7
**rodrick**   12:11 13:6
46:14 49:6 58:24
65:3 84:17 94:11

95:3,4,5 96:22
106:2 119:23
126:8
**roger**   68:1
**role**   13:6 92:10,14
93:8 94:20
**romantic**   64:14
70:20,24
**roofing**   62:7
**room**   102:25
103:10 104:7
124:20
**rough**   42:19 101:4
**roughly**   14:14
35:1 36:1 43:1
75:22 88:13
111:11
**rpr**   1:21 156:24
**rubber**   55:15,22
**rule**   110:25 111:2
**rules**   4:13 43:13
43:14,15,18,19,21
43:23 48:9 71:3
110:21 112:12
114:12,12 126:4
126:22 127:24
128:4,17,19,21
130:13 131:17
154:6
**run**   12:4 55:16
**running**   117:12

**s**

**s**   4:1
**safe**   77:2 79:19
80:8 100:3,5
104:18 136:1,14
**safely**   125:14
**safety**   79:1,25
136:12 137:11
**sale**   101:24

**sales** 97:8 105:4
**salon** 120:16
**sat** 98:19,20
**saw** 129:23 137:14
  139:2
**saying** 5:4 6:8
  17:16 23:24 31:18
  32:18,20 37:14
  38:19 52:12 54:18
  60:13 73:11 74:20
  75:2,6 81:21 90:6
  104:2 113:4
  115:13 117:13
  135:2,13 138:11
  146:8,12 147:5,11
  150:1 151:16
**says** 25:12 28:5
  29:6,22 33:5
  82:13 101:16
  102:10 106:8,23
  116:21 117:14
  118:12 119:17
  128:7 129:3,4
  144:2 145:15
  148:4
**scale** 127:13
**scan** 22:1 141:14
**schedule** 106:20
**scheduled** 104:21
**school** 10:19,23
  11:3,4,6 61:10
**scope** 101:20
  105:3
**score** 33:21
**search** 18:24
**second** 23:25 34:9
  34:13 45:17 46:23
  59:17 63:6 146:4
  148:17
**section** 107:3
  154:7

**sections** 154:8
**secure** 131:15
**secured** 50:7
**security** 68:5
  69:13 83:24 84:7
  84:11,14,16 85:1,5
  85:6,11,16,22 86:5
  86:17,18 87:9,14
  87:20 88:5,9,19,24
  89:1,6,9,13,19,19
  89:22 90:1,2,7,17
  91:21 97:17,20,24
  102:23,25 103:1
  104:24 118:19,20
  119:8,12 121:4
  131:19,21,24
**see** 11:12,13 13:8
  17:14 24:22 25:15
  27:25 29:4,13
  30:4,14 33:4,22
  34:4,22 35:21
  41:23 47:7 54:18
  63:6 70:23 72:7
  72:19 77:13 82:10
  83:14,17 90:12
  92:14 95:8 103:2
  105:20,24 106:14
  106:23 107:20
  109:3 116:25
  119:18,20 127:14
  131:3,4,11 133:17
  137:9,9 140:7,23
  141:1,5,15,21
  144:22 146:21
  149:25 151:12
  152:4,9,15
**seen** 14:25 20:7
  23:4 32:12 33:7
  41:19 43:25 44:19
  45:1 46:17 47:16
  47:20 49:20 50:10

  57:22 59:7 67:22
  67:23 68:19 72:15
  82:18 108:1
  122:22 131:1
  133:18,24 146:3,4
  146:7 151:14
**select** 84:20
**selling** 67:9
**sells** 32:7
**send** 60:6 94:14,22
  96:20 111:3 123:4
  130:18
**sending** 60:8
**senor** 135:15
  141:8
**sense** 4:20 7:6
  41:23 42:5 64:7
**sent** 22:2 41:4
  47:19 48:4 50:22
  51:12,16,17 52:4
  52:14 55:12 67:12
  67:13 83:7 97:11
  112:5 113:4 132:2
  132:6 147:17
  148:5
**separate** 15:8
  50:23
**separately** 55:7
**september** 10:4
**service** 56:10
  68:18 106:20
  112:11
**services** 19:10,13
  19:15 20:3,18,21
  21:2 24:9 25:19
  26:10,18,20 29:17
  30:10 31:17 32:21
  56:7 57:12 61:2,4
  61:18,24 62:14,17
  71:15 80:21 92:8
  117:6 122:2 148:3

  148:6 154:19
**set** 3:17 24:11
  118:13 143:7
**sets** 43:15,19 93:1
**settings** 55:1
**seven** 7:21 11:21
  11:22,25 12:13,15
  12:22 13:23 14:21
  35:6,13,15 39:4
  40:2,13,16,17,18
  40:22,23,25 41:10
  42:6 43:15,22
  45:19,24 46:1,3
  56:5,7 57:12 58:5
  60:4,19 61:4,8,18
  68:5 69:8 71:1,25
  72:1,19 73:8 74:1
  75:13,16,19,25
  76:4,8 78:6,9,14
  78:16,20 79:21,25
  80:8 81:14 84:8
  84:12 85:11,16,20
  86:2,3 87:24
  88:10,23 91:12,21
  92:5,11 93:2
  94:25 97:6,16,20
  97:25 100:4,6
  104:14 105:8
  107:1,19 108:2
  111:8 112:19
  114:8 115:13
  119:12 120:9,25
  122:2,18 123:8,15
  124:4,7 126:9
  127:14 128:3
  136:15 138:14,17
  139:8 140:6,12
  141:14 142:2
  143:4 147:25
  148:17 149:18
  150:12

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

**sevencourt** 82:6
  82:17,22 83:1
  116:4
**sevencourtapart...**
  115:17
**sex** 38:5 50:2,19
  51:8,10
**sexual** 28:13 29:10
  30:2 34:8 64:14
  65:9 66:1,7,9,13
  67:21
**sexually** 65:8
**share** 61:16,24
  71:16
**shares** 62:2,2
**shattered** 115:11
**sheet** 139:12
**shooting** 87:16
**shop** 121:17
**short** 8:10 75:8,10
  77:24,25 121:22
  125:7 152:20
**shot** 87:12 136:9
**show** 17:5 21:20
  21:21 22:8 27:8
  33:1 45:17 46:12
  49:13 62:23 95:18
  97:1 99:14 103:13
  105:14 118:17
  140:4 142:25
  144:15 147:1
  149:19 151:1,2
**showed** 100:18
  135:1,3,3
**showing** 137:4
**shows** 32:7
**sic** 90:2
**side** 24:11
**sign** 31:17 44:2
  106:1,4 114:16
  115:12 117:15

143:15
**signature** 20:17
  21:4 30:15 128:12
  128:12 143:14,21
  156:22
**signed** 24:1 25:8
  25:14,23,25 26:3
  28:2,15,19 29:3
  105:23 106:6,15
  117:9,10 119:7
  128:10,11 143:13
  143:18 145:2
**significant** 121:3
**signing** 28:8
  106:15 117:19
**simple** 53:9 70:4
**sir** 24:10 35:7 39:9
  46:19 64:11 78:10
  79:4,6,9,13 85:18
  90:20 91:2 93:7
  96:8 97:10 105:6
  110:23 111:7,10
  112:5 113:12
  114:10 115:3
  117:14 119:4
  125:25 135:17,17
  136:10,13,16,19
  137:10,12 138:7
  138:18,19 143:12
  147:19
**sister** 45:22 46:1
  47:2,14 48:9,19,24
**sister's** 123:19,22
**sit** 71:4 98:8 100:8
  120:13
**site** 41:4 46:6,7
  85:7 102:8 103:9
  107:3 113:24
  115:24 116:2,3
**sits** 104:7 120:15
  120:16

**sitting** 119:6
  124:24 134:7
**situation** 67:6
  120:8,10 149:11
**six** 116:22 117:16
  117:18
**sized** 141:14
**skills** 57:19
**sleep** 47:3
**slip** 136:21
**smell** 83:9
**smoke** 121:14
**smoking** 103:21
**social** 33:25
**sofa** 152:10
**software** 32:11,12
**sold** 96:22
**solely** 154:15
**solutions** 154:10
  154:11,16,17,19
  154:21,24
**somebody** 60:24
  80:5 99:3 107:15
  128:11 133:17
  137:14
**sorry** 70:14 82:24
  85:13 102:9
  125:10,13 127:7
  127:16 150:2
**sort** 7:10 34:10
  41:10 56:4 86:17
  110:11
**sounds** 7:15 8:15
  36:18 63:9 65:24
  99:2 120:24
**south** 14:10
**sow** 106:8
**spanish** 42:24
**speak** 8:16 22:24
  114:3,9,15 124:25
  130:23 135:22

149:2,7,10
**speaking** 88:23
  152:23
**special** 41:6
**specific** 9:19 36:15
  42:7 154:22
**specifically** 8:23
  39:12 68:12 120:6
  132:19 154:6
**specifics** 10:16
**speculate** 7:8 20:6
**spend** 86:4 92:7
**spent** 85:11,16,21
  92:11 94:24
**spiral** 71:9
**spoke** 135:14
**spreadsheet**
  140:23 141:6,19
**staffed** 8:10
**stamp** 22:18
**stand** 19:8
**standard** 156:14
  156:16
**standing** 126:24
  130:7,8
**star** 56:12,24 57:6
  57:7,11 58:1,3,4
  59:18,21 60:3
**start** 12:13 19:15
  35:25 49:22 53:9
  60:4,8 82:4 84:19
  116:22 117:6
**started** 10:23,24
  12:15,16 13:4,6
  19:24 53:5,7
  57:13,17 66:14
  86:19 87:3 151:16
**starting** 10:19
  146:6
**state** 43:17 91:23
  101:3 139:17

154:9 156:2
stated   127:12
  156:5
statement   3:15
  95:14,14 105:19
  106:6,8 117:9
  119:7,16
states   1:1
stating   145:23
station   70:3
status   30:2,2
stay   11:1 80:17
  92:13,16 93:3,9
  138:6 150:13
staying   92:15
  114:24
stealing   72:13
step   85:9 115:6
  151:21
steps   129:14
stick   55:9 56:4
stickers   21:24
sticking   14:20
stites   2:10
stites.com   2:12
stole   74:20
stolen   72:10
stop   17:10 87:16
  90:13 123:4
stopped   13:20
stops   90:14
storage   54:24
stories   67:10
strayer   11:7
street   2:10 65:16
  120:15
stress   34:7
strike   88:19
structure   109:21
  131:3 140:3

study   126:6
  127:20 132:21
  135:6 136:24
  137:3,14,15
studying   11:8
stuff   15:5 53:19
  54:13 92:20,21
  120:3 122:24
  131:5 133:18
subject   46:15 63:3
  82:6
submit   41:19 60:7
  84:16 122:25
submitted   154:25
  155:1
submitting   41:21
subpoena   105:17
substance   4:12
  6:20,24
suit   144:19
suite   2:6
summary   103:12
summer   100:6
  114:7,20
supervise   12:2
supervised   127:5
supervisor   8:14,16
  12:7 13:2,3,5,21
  26:22,25 68:19
  87:25
supervisors   12:22
supportive   71:5
  135:4
supposed   112:10
  112:19,24 146:22
  151:23,24 152:7,8
supreme   150:8
sure   4:14 5:13
  6:13,22 7:3,12
  9:13,19 12:3
  16:20 18:7 19:16

19:17 20:23 21:17
  23:19 27:19 30:16
  31:10,10 32:9,9
  33:11 35:10 37:3
  38:23 39:5 42:12
  47:17 48:2 52:15
  52:16 53:1,11
  54:2 59:23 78:7
  78:24 79:17 83:4
  84:10 86:11 87:5
  92:13 93:9,15
  94:10 96:4 97:22
  100:22,25 110:23
  127:16 130:13
  138:25 139:1
  140:17,20 144:11
  145:24 146:9
surely   11:16
surprised   44:7
  148:10
swearing   6:12
swimming   129:6
swiper   98:12
swore   6:15
sworn   4:3 6:11
system   115:21
  145:18 146:16
  152:12

        t

t   81:18
table   124:18
tabs   41:24
tacharmne   23:13
  23:14,14
take   24:22 32:8
  74:5 75:8 77:22
  77:24 79:24 80:12
  80:15 102:18
  112:6 114:13
  121:20 122:25
  132:4 133:12

135:6 152:17
taken   4:18 33:15
  75:10 77:25
  121:22 125:7
  152:20 156:5
takes   36:8
talk   5:1,5 8:22
  10:12 17:13 44:9
  56:2 70:3 71:22
  80:14 81:15 95:4
  121:6,12 124:16
  133:9 136:19,21
  149:17
talked   8:3,13,24
  9:15 47:24 48:5
  85:13 109:15
  112:12 128:17
  133:14
talking   8:8 17:11
  17:15 22:15 48:10
  72:24 75:13 120:2
  125:24 129:1
  133:23 137:6
  138:12
tape   101:7 112:6
taped   112:6
target   137:17
tasharah   45:22
  123:11
task   140:21
tax   41:1
tdhda   34:21
teach   12:2 77:20
teaching   151:20
team   71:6
tech   12:8 55:4
technical   77:10
technically   114:2
technology   100:10
telephone   7:16
  16:11

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

[tell - time]

Page 26

**tell** 5:8 6:2,18,24
10:4,19 11:20
14:5 20:25 22:21
30:23 31:2 32:1
35:18 51:10 52:21
53:14 56:9 58:14
58:21 64:24 66:4
69:11 70:2 72:3
76:1 80:24 84:13
92:2 94:12 95:10
96:14 105:7 111:5
118:1 120:8
121:12 124:9,11
126:1 129:19
130:23 131:7,8,13
131:15 135:15,23
136:11 137:23
138:3 142:1,21
146:3

**telling** 6:19 18:16
41:10 43:12 51:3
62:13 65:25 70:11
75:24 89:9 91:6
93:1 97:9 104:3
135:4 136:24
137:6 145:15,17
146:15

**tells** 94:8

**tenancy** 144:9,20

**tenant** 38:2 40:9
44:16,23 47:13
63:9 64:2 70:9
115:22 129:23
130:22 137:11
138:14 139:9

**tenants** 5:12 31:12
41:2,4,25 42:6,15
42:15 43:5 44:2,7
44:8,10,13 56:24
63:18,21 70:10
79:2,7,20 95:21

149:2,7,22 150:6,9

**tend** 72:1,7

**tennessee** 55:18

**term** 105:5

**terminated** 59:3

**terms** 4:21 7:18
21:23 40:19 60:2
124:20 154:16

**testified** 4:4 5:25
148:18

**testimony** 44:23
99:2 119:1 122:1

**text** 16:7,12 18:14
18:20 19:1 49:24
50:21,23,23,25
52:8,10,13 55:1
65:13

**texted** 50:13,22
52:7,10,12

**texting** 17:2,21
50:2,16 52:9
65:25 66:22

**texts** 9:23 65:22
66:1

**thank** 18:2,4,9,18
19:4,4 86:16
125:10,18 153:1

**thanks** 58:13,15
83:13

**thing** 5:1 10:11
17:20 20:24 22:16
49:22 57:15 66:21
72:12 125:12
137:18 139:1

**things** 4:13 10:15
11:17 21:22 34:7
35:25 36:9 40:20
54:25 55:10 65:9
65:14,18 66:2
67:5 68:10,11,14
71:9,13 72:15,18

74:19 75:3,7
92:18 93:11 94:3
95:8 105:4 112:9
120:18 122:6
127:5 135:7
136:22 137:8
138:11,20,22,22
138:24 152:18

**think** 7:19 11:16
13:22 18:11 20:20
21:5,7,8 23:4
25:24,25 26:4,6,19
29:21 30:18 36:18
36:20,22,24 37:2
37:18,21 38:1
40:15 41:9,19
42:9 43:17 45:14
48:8 49:7 50:22
52:13 58:7 59:7
59:17 63:24 65:18
67:23 68:4,6
70:23 76:13 77:1
78:11,17,19 80:25
81:20 83:16 84:22
85:13 88:23 89:2
89:3,8,12 90:4
91:4 96:3 99:5,23
101:19 104:14
107:18 118:22
119:5 123:7
124:20,23 125:23
126:5,17 127:1
134:13,16,18,20
134:25 135:8,9,11
136:14 137:13,16
137:17 139:23
145:8 146:3,25
148:18 149:15
150:17

**thinking** 8:6,13
121:10

**third** 32:17 33:19
34:14 105:22

**thomas** 1:21
156:24

**thought** 23:18
49:2 67:23 69:11
72:24 87:8 102:12
133:21

**thre** 39:7

**thread** 49:17 82:3
82:5 151:10,16

**threaten** 138:13
139:2

**three** 47:3 48:17
50:4 69:12 72:10
83:10,13 84:15
98:6,10 104:6
106:19 117:17
141:17

**thrilled** 148:18,21

**thrown** 126:20

**thursday** 55:12,17

**time** 8:13 12:22
13:3,5 32:1 40:11
45:13 53:22 65:10
65:13 67:2 68:3
68:25 69:13,20
70:2 71:1 73:20
78:5 79:2 87:24
88:2,11 94:4
100:24 104:2,21
105:5 112:20
113:9 115:16
121:12 125:15
126:9 127:11
129:15 131:16
133:13 134:11
138:21 147:17
148:18,25 149:6
150:5 154:22

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

June 2, 2022

**[times - understand]**

Page 27

**times** 5:23 9:19,22
18:15 44:17 71:8
79:21 124:6,7
134:2
**tires** 120:18,21
**title** 13:12,12
147:24
**tmi** 19:7,8,10
60:13 61:1 80:21
**today** 4:10,15 6:19
7:5 11:15,20
21:19 23:2 47:1
109:16 119:6
134:7
**toilet** 116:1
**told** 18:11 21:3
37:22 40:8 47:5
49:3 55:18 59:17
60:24 68:2 69:14
71:1 88:21 101:19
101:23,24 103:5,7
103:17 104:17
105:1 112:16
118:18 119:5
126:5 130:17,25
133:11,25 135:19
135:20 138:7
146:18 148:21
**tone** 135:18
**top** 24:4 25:5,13
33:4 83:14 91:9
97:5 101:17
102:11 106:5
107:22 108:13
**topics** 66:1
**tough** 43:6
**toya** 47:2 49:24
50:2 55:12 63:12
94:5 105:23
107:14

**tpi** 3:6,7,8,9,10,11
3:12,13,14,18,20
3:21,22 7:21
14:12 18:19 19:2
19:8,10,12,15,25
20:2,9,17,21,21
21:1,1 22:10,11,17
22:18 23:15 24:4
24:9,18 25:1,11,18
25:23 26:10,11,18
26:19 27:12 29:1
29:17 30:9 31:16
31:16 32:18,21
33:2 36:7 39:2,12
39:12,25 40:11
43:20,22,23 46:13
49:15 58:3,9 60:9
60:13,15,22,25
62:24 68:10,23,23
69:3,25 78:7,11
81:13 82:2 85:25
97:1 106:16
110:21 112:11
118:4,4,18 123:13
128:1,3,22 130:14
140:4 141:5
144:15 147:1,15
147:22 148:3,6
151:6,9
**tpi's** 29:22 30:6
80:22 105:18
112:16
**track** 115:22
**tracker** 93:12
**traffic** 6:4,4
**train** 12:1
**trained** 90:10
**training** 32:5 35:6
39:6,7 90:3
**trainings** 32:3,6

**trane** 93:17
**transcript** 18:7
33:5,14 152:24
154:23 156:4,7
**transcripts** 154:23
155:2
**trash** 102:23 120:3
120:8,21 121:19
131:5,14
**treat** 31:7
**tremendously**
68:18
**triangle** 48:11,13
48:16,17,21,25
**trick** 87:7
**tricking** 60:14
87:6
**tricks** 60:16
**tried** 57:22 131:8
132:24 136:19
**trigger** 71:10
**truck** 5:13,14
**true** 51:14 124:11
154:24 156:8
**try** 5:4 10:9 11:2
53:8 92:12 93:9
120:20 121:5,15
122:23 133:9
136:20 138:7
149:5
**trying** 32:14 39:20
41:24 50:1,18
72:14 87:7 93:3
99:9 109:23
118:16 121:9
130:5 143:19
**turn** 6:16 40:16
117:18 137:19
**two** 34:25 37:1
40:10 42:12,23
44:19 45:1 53:24

70:24 72:23 74:20
101:4 106:19
117:12,16
**twynn** 107:4,11
116:4
**type** 20:24 38:18
41:5 66:16 79:12
88:19 134:11
**typed** 145:22
**types** 42:13
**typewriting** 156:7
**typical** 72:15
**typically** 131:24
**typo** 107:8,12

**u**

**uh** 13:10,24 15:13
16:9 17:16 36:21
56:19 83:15 92:6
137:16 141:22
147:21
**ultimately** 104:23
**unarmed** 89:3,5,6
89:7 90:1,4,17
91:21
**uncle** 71:19
**uncomfortable**
124:1
**underneath** 39:3
**understand** 4:17
7:6,12 8:15 9:2
17:3 20:5 23:21
23:23 31:23 32:2
33:14 35:10 38:8
39:10,11,17 40:6
41:9 42:19 47:22
48:2,23 59:7
60:10,11,12 67:25
80:1,13 84:6,10,20
91:4,17 96:5
98:17,25 104:13
104:22 117:8

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

**[understand - weeks]**

123:25 134:20
135:21 147:10
148:7 149:3,16
150:4
**understandably**
63:10
**understanding**
26:9 30:6,23
31:10 33:16 66:18
82:19 85:19 86:7
94:19 97:15
**understood** 7:11
**unfortunate**
127:11
**unfortunately**
21:25 69:10 112:7
**unintelligible** 6:3
127:2
**unintentional**
29:23
**unit** 63:5 93:20
109:16
**united** 1:1
**units** 40:25 41:1
93:14,16,17,18
140:24 141:14,17
**unsafe** 79:3,7,21
**unsupervised**
127:11
**untrue** 52:6
**upload** 95:15
**uploaded** 100:10
155:3
**upper** 101:14
**ups** 114:13
**upset** 48:14,24
63:10
**urinate** 121:14
**use** 14:23,25 15:3
16:1,3,6,11 18:14
43:21 54:5,11,16

72:8 95:13 96:17
98:12 115:21
116:2,3 129:5,7
145:17,18
**usually** 54:13
**utilization** 118:20
**uttered** 138:16

**v**

**v.m.f.** 1:5
**vandalism** 102:21
102:22 105:6
**variance** 95:7,10
95:13,24
**various** 18:15 96:7
104:10 124:6,7
**vehicle** 136:7,8
**vendor** 32:17 58:6
59:19 60:3,7
65:19 84:20 96:19
97:16,19 99:22
**vendors** 12:2
57:18 58:2 84:15
96:17 99:17,23
122:12
**verbal** 4:22
**verbally** 138:11
**verbatim** 154:13
**verified** 74:6,11,15
**verify** 144:12
**veritext** 154:10,11
154:16,17,19,20
154:24
**veteran** 30:2
**victims** 132:16
**video** 47:19 48:3
106:10 120:19
154:10,17,19
**videoconference**
1:17
**view** 130:17

**views** 69:2 90:16
**violate** 39:13
**violation** 6:4
**violations** 104:2
**visitors** 129:13
**visual** 99:24
**voice** 15:22 44:8
**volunteer** 71:15
**vote** 89:21 90:21
90:21,23,24 91:18
91:18
**vs** 1:8
**vulnerability**
102:24,25 105:2,8
**vulnerable** 102:20
102:21,22 103:18
104:10,15

**w**

**w9** 59:25
**waiting** 41:3
**walk** 60:2 67:24
86:17 113:16
114:8,13 131:11
**walked** 55:15
114:15
**walking** 98:9
113:5 131:1
**walks** 114:1,19
**wall** 47:9,11
**want** 7:3,8 9:18
10:1,16 19:5 20:1
20:4,6,6 21:17
23:11 29:19 32:13
36:4,10,10 43:10
47:12 48:2,8
49:22 52:25 56:4
59:5 60:14,17
63:10,13 66:16,19
75:13 77:17 80:3
80:4,5 82:16 84:5
84:10 86:17 89:25

90:2,20 98:25
100:22 101:3,12
104:9 107:17
108:16 115:10
116:9 118:14
123:3 124:13,14
125:18 126:16
131:17 134:20
140:17 150:2,19
151:1,7 152:17,25
**wanted** 5:13 7:7
23:18 33:11 47:20
71:3 78:24 87:4
98:2 99:6 116:1,7
133:17 149:25
152:24
**wanting** 57:17
**wants** 84:4
**watch** 98:22
**watching** 121:8
**water** 122:21,22
**way** 33:19 34:14
38:24 43:11 46:5
53:11 64:14 66:6
66:13 90:10
103:15 119:12
131:2 149:15,20
151:24
**we've** 14:25 20:7
48:19 65:21 72:4
73:14 146:3,4
**weapon** 80:6 81:4
81:7,12
**wear** 81:4
**web** 113:24 115:24
116:2,3
**week** 8:3,17
**weekends** 53:25
**weeks** 9:8 101:4
116:22 117:3,16
117:17,18

Latoya Wynn
Diaz, Elsa Flores v. The Partnership, Inc

**[weigh - zoom]**                                                                 Page 29

**weigh**  86:14
**went**  10:22 26:6
  48:5 50:3 61:9
  68:18 70:7 94:24
  102:12 113:11
  118:22 133:7,8,16
  143:8
**whispering**  126:12
  126:13
**white**  42:9
**window**  93:20
  98:8 132:25
**wing**  71:13
**winning**  99:19
**witnes**  108:12
**witness**  5:18 17:23
  18:1 19:20 26:22
  31:21 37:5,11
  59:2,3,15 66:10
  73:13 74:9 76:20
  109:8 123:22
  124:16,22,25
  125:4,8 134:25
  147:10 148:13
  149:13
**witnessed**  72:20
**witnesses**  155:2
**woman**  40:9 48:22
**won**  37:16,18
**wondered**  23:1
**word**  24:21 103:7
  103:7,22 104:4
  138:16
**wording**  52:11
  105:6,11
**words**  5:4 85:6
  101:5
**work**  3:15 8:9
  10:14,14,20 11:20
  11:21 14:23 15:1
  15:6,17 16:11,21

18:13 19:6 22:2
  26:17,19 27:5
  35:15 39:3 40:22
  53:25 54:2 56:25
  57:20,25 58:4,24
  59:10 60:4 62:9
  66:22 67:4 68:18
  76:14 80:12,15
  82:21 86:13 89:5
  90:19 93:25 94:6
  101:6 104:18,21
  105:19 106:6,8
  113:25 114:25
  115:14,18 116:12
  117:9,17 119:7,16
  122:6 123:1
  126:11
**worked**  10:25,25
  14:11 67:2 71:18
  79:12,14 88:15,25
  100:7 113:12
  122:9,10 127:4
**workers**  57:18
  59:24
**working**  5:11
  10:24 12:13,15
  14:16 19:15,24
  39:25 68:22,24
  69:17 70:25 71:5
  73:20 74:1 116:2
  126:24 127:3,9
  130:2 131:11
  138:10
**works**  7:21 26:25
  27:3,4 71:14
  84:14 122:7
**wow**  54:10
**wright**  45:22
  123:11
**write**  21:25 58:22
  109:17 116:13

150:20,21,22,25
  151:11,17,20,21
  151:25
**writes**  4:22
**writing**  138:8
  152:4
**written**  30:8 31:18
  51:17 130:1
**wrong**  42:16 61:13
  86:22 105:1,7
  145:6,21 146:19
**wrote**  25:4 51:11
  58:23 83:11,11,16
  102:7,16
**wynn**  1:14 4:2,7
  18:11 22:6,20
  23:2,16 24:22,25
  27:14 33:4,5
  46:13 50:9 56:6
  63:1 75:13 78:4,5
  82:2 99:3 102:18
  105:23 116:19
  121:25 147:24
**wynn's**  107:14

**x**

**x**  108:5,10

**y**

**y'all**  50:20 73:19
**yeah**  5:14,17 7:2,2
  7:5 8:21 9:17 15:9
  26:14 32:11,12,16
  37:10 47:8 48:18
  58:20 69:7 73:1
  75:18 81:13 95:5
  100:16,21 101:16
  106:1,2 115:5
  122:9,16 125:2,4
  126:19 130:12
  133:16 134:23
  146:1 148:5 150:1

**year**  20:13,16 21:5
  25:25 26:4 35:1
  57:13 88:13 94:8
  112:2 113:3
  142:17 143:5,8
  144:9,20,25 146:4
**years**  11:2 32:22
  32:23 37:1 46:6
  79:13
**yell**  44:7,10
**yelling**  44:13
**yellow**  96:18
**yep**  8:1 17:8

**z**

**zamora**  94:17 95:1
  151:10
**zamora's**  94:19
**zelle**  57:22
**zoom**  1:17 17:12

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.