# EXHIBIT C

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                       ATLANTA DIVISION

4    _____

5    ELSA FLORES DIAZ AND EDWIN

6    MEDRANO CACERES, FOR THEMSELVES

7    AND ON BEHALF OF THEIR MINOR

8    CHILDREN E.M.F., V.M.F., B.M.F.,

9    AND H.M.F.,

10            Plaintiffs,

11        v.                          Case No.

12   THE PARTNERSHIP, INC.,          1:21-cv-03661-ELR

13            Defendant.

14   _____

15                   DEPOSITION OF

16              KENNETH H. HICKEY, SR.

17   DATE:        Tuesday, May 17, 2022

18   TIME:        10:03 a.m.

19   LOCATION:    309 East Paces Ferry Road, Suite 400

20                Atlanta, GA 30305

21   REPORTED BY:  Ariel Dallas, Notary Public

22   JOB NO.:     5203299

23

24

25

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 2

1                    A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFFS ELSA FLORES DIAZ AND EDWIN

3    CACERES MEDRANO, FOR THEMSELVES AND ON BEHALF OF THEIR

4    MINOR CHILDREN E.M.F., V.M.F., B.M.F., AND H.M.F.:

5         MAX MARKS, ESQUIRE

6         The Block Firm, LLC.

7         309 East Paces Ferry Road, Suite 400

8         Atlanta, GA 30305

9         max.marks@blockfirmllc.com

10

11        AARON BLOCK, ESQUIRE

12        The Block Firm, LLC.

13        309 East Paces Ferry Road, Suite 400

14        Atlanta, GA 30305

15        aaron@blockfirmllc.com

16

17        ALLISON BAILEY, ESQUIRE

18        The Block Firm, LLC.

19        309 East Paces Ferry Road, Suite 400

20        Atlanta, GA 30305

21

22

23

24

25

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 3

1              A P P E A R A N C E S (Cont'd)

2    ON BEHALF OF DEFENDANTS THE PARTNERSHIP, INC.:

3          JEFFREY W. MELCHER, ESQUIRE

4          Stites & Harbison, PLLC.

5          303 Peachtree Street Northeast, Suite 2800,

6          SunTrust Plaza

7          Atlanta, GA 30308

8          jmelcher@stites.com

9

10   ALSO PRESENT:

11         Ellie Oglesby, Paralegal

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                         I N D E X

2    EXAMINATION:                                        PAGE

3          By Mr. Marks                                  8

4          By Mr. Melcher                                136

5

6                       E X H I B I T S

7    NO.              DESCRIPTION                        PAGE

8    Exhibit 1        Seven Court Security Proposal      21

9    Exhibit 2        Security Contract E-mail           29

10   Exhibit 3        HSI Daily Log 11/4/20              30

11   Exhibit 4        HSI Incident Report 11/5/20        38

12   Exhibit 5        Hours Changed E-mail               42

13   Exhibit 6        Jan-Mar 2021 Schedules             44

14   Exhibit 7        Reports E-mail to Seven Courts     47

15   Exhibit 8        1/1/21-3/20/21 Daily Reports       49

16   Exhibit 9        Crime Map E-mail Exchange          71

17   Exhibit 10       Contract Termination E-mail        73

18   Exhibit 11       HSI Incident Report 3/30/21        79

19   Exhibit 12       4/13/21 Security Management

20                    Proposal E-mail                    84

21   Exhibit 13       Invoices E-mail 5/24/21            91

22   Exhibit 14       E-mail Exchange with Aaron Black   99

23   Exhibit 15       Email Exchange with Ellie Oglesby

24                    1/5/22                             100

25

Kenneth H. Hickey , Sr.                     May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 5

1                  E X H I B I T S (Cont'd)

2    NO.             DESCRIPTION                    PAGE

3    Exhibit 16     Email Exchange with Ellie Oglesby

4                   12/13/21-12/20/21              102

5    Exhibit 17     Text messages between Latoya Wynn

6                   and Kenneth Hickey             122

7                      (Exhibits attached.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

Page 6

```
 1                    P R O C E E D I N G S
 2              THE REPORTER:  Good morning.  My name
 3    is Ariel Dallas; and I'm the reporter assigned by
 4    Veritext to take the record of this proceeding.  We
 5    are now on the record at 10:03 a.m.
 6                   This is the deposition of Kenneth
 7    Hickey taken in the matter of Elsa Flores Diaz and
 8    Edwin Medrano Caceres for -- sorry, this is a long one
 9    -- for themselves and on behalf of their minor
10    children E.M.F., V.M.F., B.F.M., AND H.M.F. vs. The
11    Partnership, Inc., on Tuesday, May 17, 2022, at 309
12    East Paces Ferry Road, Suite 400, Atlanta, Georgia
13    30305.
14                   I am a notary authorized to take
15    acknowledgements and administer oaths in Georgia.
16                   Absent an objection on the record
17    before the witness is sworn, all parties and the
18    witness understand and agree that any certified
19    transcript produced from the recording of this
20    proceeding:
21                        - is intended for all uses permitted
22                        under applicable procedural and
23                        evidentiary rules and laws in the same
24                        manner as a deposition recorded by
25                        stenographic means; and
```

Page 7

1                    - shall constitute written stipulation

2                    of such.

3                    At this time will everyone in

4    attendance please identify yourself for the record,

5    beginning from my left.

6                         MR. MARKS:  I'm Max marks with the

7    Block Firm for the plaintiffs.

8                         MR. BLOCK:  Aaron Block on behalf of

9    the plaintiffs.

10                        MS. BAILEY:  Allison Bailey on behalf

11   of the plaintiffs.

12                        MS. OGLESBY:  Ellie Oglesby on behalf

13   of the plaintiffs.

14                        MR. MELCHER:  Jeff Melcher for the

15   defendants.

16                        MR. HICKEY:  And Kenneth Hickey.  I'm

17   here for the deposition.

18                        THE REPORTER:  Thank you.  Perfect.

19   And hearing no objection, I'll now swear in the

20   witness.

21                        Mr. Hickey, please raise your right

22   hand.

23   //

24   //

25   //

                                                    Page 8

1    WHEREUPON,

2                        KENNETH H. HICKEY, SR.,

3    called as a witness, and having been first duly sworn

4    to tell the truth, the whole truth, and nothing but

5    the truth, was examined and testified as follows:

6                        THE REPORTER:  Thank you, sir.

7                        And please begin.

8                            EXAMINATION

9    BY MR. MARKS:

10        Q    Good morning, Mr. Hickey.  Can you please

11   state your full name for the record?

12        A    It's Kenneth Horace Hickey, Senior.

13        Q    Have you had your deposition taken before,

14   Mr. Hickey?

15        A    This?  I've had one before.  Yes.  I have.

16        Q    Under what circumstances did you have your

17   deposition taken before?

18        A    As a state police sergeant with the Georgia

19   World Congress Center.  I had a deposition I had to

20   take for once.

21        Q    So you're -- how long ago was that?

22        A    '95, '96.

23        Q    So you're generally familiar with the

24   process, but it's been a minute.

25        A    Yes.

Kenneth H. Hickey , Sr.                        May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                      Page 9

1        Q     Let me just briefly go over the rules about

2    the format and what to expect from me and from the

3    process and also what we expect from you to make the

4    process go smoother.  So this is a deposition.  As you

5    heard a moment ago, you're under oath the same way as

6    if you're in front of a jury or in front of a court.

7              We have a court reporter here who's taking

8    down everything we say so all of my questions and all

9    of your answers.  And to help her make a clean written

10   record, it's important for us to answer audibly rather

11   than "mmhmm," "uh-huh," you know, as we would in a

12   normal conversation.  Okay?

13       A     Yes.

14       Q     Another thing is it's -- in a regular

15   conversation, you kind of talk over a little bit.  You

16   know where a question is going, you'll start to answer

17   it.  It really helps in this process if we each try to

18   wait for the other person to finish talking and kind

19   of pause for a second and then go on just to avoid

20   talking over each other and to make it a little bit

21   easier for the court reporter.  Okay?

22       A     Yes.

23       Q     So the goal here today is to find out the

24   truth about what happened.  I'm not going to try to

25   trick you or to trip you up or anything.  I am

Page 10

1   genuinely curious.

2          I have some documents to discuss, and I want

3   to find out, you know, everything you have to say, you

4   know, that relates to our client's situation.  And I

5   want to get it in as much detail and as accurately as

6   you remember it sitting here today.  And so that's how

7   we'll proceed.

8          Are you familiar, sitting here right now,

9   with who our clients are and what this case is about?

10     A    Yes.

11     Q    What is your understanding of what this case

12  is about?

13     A    I read a letter stating that your client was

14  filing a lawsuit based upon, I guess, some actions or

15  statement made by the property manager or the people

16  that work with a particular organization; and I'm here

17  to be questioned about it.

18     Q    Okay.  And you're right, our client has

19  brought a lawsuit against The Partnership, Inc.,

20  related to the time that they lived at Seven Courts

21  Apartment.  And much of what I'm going to ask you

22  about today will be about the period of time during

23  which you provided security services of some kind or

24  another to Seven Courts.

25          I'd like to start out this morning though

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 11

1    just to learn a little bit more about who you are and

2    your background and really to kind of walk through

3    your life from, you know, at a high level from birth

4    through your start at Seven Courts and just to get

5    your history.  So where are you from, Mr. Hickey?

6         A    I'm originally from here, Atlanta.  I was

7    born and raised here.  I served four years over in

8    Germany, so those were four years that I did not live

9    here in the state of Georgia.

10        Q    And when did you serve in Germany?

11        A    '87 to '90 -- '91 -- '90.

12        Q    What did you serve with?

13        A    United States Army Military Police Corps.

14        Q    Did you serve in the United States Army

15   Military Police Corps directly after high school?

16        A    Yes.

17        Q    How many years overall were you with that

18   organization?

19        A    About four years.

20        Q    So basically the whole four years you were

21   stationed over in Germany?

22        A    Yes.

23        Q    What did you do after your tour of duty

24   ended?

25        A    When I left the military, I joined -- well,

Kenneth H. Hickey , Sr.                                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 12

1    didn't join.  I got hired by Northlake Mall Security.

2    And then I became a -- I left there and got on with

3    the Georgia World Congress Center where I became a

4    police sergeant there or a police officer, then a

5    police sergeant when I promoted.

6            I am a -- I got 30 years of law

7    enforcement/security experience.  I'm a former DeKalb

8    County police officer as well as I'm currently a staff

9    sergeant with the Carver Police Department currently

10   as well as I'm the owner of Hickey Security &

11   Investigation.

12       Q    When did you work for the DeKalb Police

13   Department?

14       A    DeKalb County was '93 to '99; and then I

15   worked at the Georgia World Congress Center originally

16   at -- from, like, '90 -- '90 to '93.  Briefly with

17   Marta Police.  That was a short stent.  I didn't like

18   working there.

19            Then I went back to the Georgia World

20   Congress Center to where I was there until about 2001,

21   after 9/11.  And then I retired from law enforcement

22   briefly where I was running my own business and got

23   back into the workforce where I was with Grady Public

24   Safety where I was a captain there.

25       Q    What were you doing when you got out of law

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 13

1    enforcement for a period?

2        A    Security.  I had my own security company.  I

3    was doing security -- security consultant, Army

4    instructor with the Georgia Board of Private

5    Detectives and Security Agency.  I'm also a police

6    instructor.  I teach Georgia criminal law for one of

7    -- for departments and agencies.  I also -- I have an

8    extensive background in law enforcement and just about

9    everything that deal with that.  So yes.

10       Q    When did you start Hickey Security?

11       A    That I started back in about 2015, '16.

12       Q    Had you started a different security company

13   before Hickey Security?

14       A    Yes, I did.  My first company was K-2

15   Protective Service.  When I originally did that, on

16   one side, I decided to go back into the workforce, I

17   think, around about 2005.  That's when I started doing

18   consultant work mostly and training.

19       Q    So you started the K-2 company in 2005

20   roundabouts and were doing consulting?

21       A    No.  I started K-2 Protective Service around

22   about '96, '97.

23       Q    Okay.

24       A    And then I went back in law enforcement

25   briefly, back to the Georgia World Congress Center

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 14

1    after I left DeKalb.  And at that time I got out it

2    completely.

3            It was one of those things where I used to

4    get shot at a lot, so I decided to get out altogether.

5    That was my epiphany, I guess, to say, "Hey.  You

6    might want to do something else."  And once I got out

7    of it, I found out, you know what, "I'm kind of good

8    at what I did, so let me go back into it."  So that's

9    why.

10       Q    Yeah.  What were you doing for that little

11   stretch where you decided you didn't want to get shot

12   at for a bit.

13       A    Consultant work.  Basically training.

14       Q    So still security, consulting.  Just, like,

15   not putting yourself out there.

16       A    Yeah, yeah.  True.  That's it.

17       Q    Okay.  Where does that bring us up to?  When

18   did you get back into law enforcement?

19       A    About three or four years ago with Carver --

20   Carver College.  It's a reserve unit.  It's a biblical

21   college where we -- we maintain police off of Cascade

22   Road.  It's a real small college.  So that's where I

23   am working there.  Actually, about Friday's my last

24   day.

25       Q    When you started Hickey Security, was that

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 15

1    while you were still out there, like, putting yourself

2    forward?  Was it during this period when you were

3    doing more consulting?  Where does your starting of

4    Hickey Security fit in to --

5        A    After -- I'm sorry.  After I left Grady

6    Health System I started my own company.  That was one

7    of the reason why I left.  I started -- I been doing

8    training for since 2001 is when I was certified -- no

9    -- 2007 when I was certified as a Class 1 firearm

10   instructor with the board.

11            But I became a police instructor in 2001.

12   So those -- those opportunity come where I get to

13   train people for a fee and stuff; and I do speaking

14   engagement on safety, workplace violence, active

15   shooting, a whole slew of things.  So that's why I was

16   able to maintain an income.

17            And then once I decided to get back into the

18   workforce, I started with Grady, worked there for a

19   little while.  Then they had a new CEO come in and

20   they laid me off.  So then I started doing mostly

21   consulting work, training still -- training mostly.

22   And then that's when they called me back.  And so they

23   asked me to come back and gave me, you know, three

24   jobs and one salary.  So that's pretty much what I

25   did.

Kenneth H. Hickey , Sr.                     May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 16

1      Q     So that was at Grady still?

2      A     Yes.   Grady Public Sector.

3      Q     When is the first time you worked for an

4   apartment complex with Hickey Security?

5      A     The Decatur Reserve, they had a fire watch;

6   but I'd done apartment security since 1995 as an off-

7   duty police officer.  That's when I -- that's when I

8   started doing when I was with DeKalb Police.

9           The apartment complex was Spanish Trace

10  East.  They've changed the name since then.  They had

11  a slew of robberies and break-ins and stuff that was

12  going on; and I just happened to be working with a

13  senior officer in that territory, responding to the

14  apartment.  And the owner of the property was there,

15  and he was like, "We have too many problems."

16          So at a particular time, they had about --

17  in a week time they had, like, three rapes, four

18  robberies in a day and it was terrible.  It was a real

19  bad place.  So we ended up -- I ended up bringing,

20  like, eight off-duty police officers with me; and we

21  patrolled that property.  And we -- of course they had

22  no more problems; but, you know, the cost was very,

23  you know, at that time --

24                    THE REPORTER:  Pardon this

25  interruption.  You said Spanish Trace?

Page 17

1              THE WITNESS:   Spanish Trace East

2      Apartments.   It's in DeKalb County off Panthersville

3      Road.

4      BY MR. MARKS:

5          Q     You said that was back in the 90s?

6          A     Yeah, '95 -- yeah, '95, '96.

7          Q     So I want to bring us up to Hickey Security.

8      So your current company.

9          A     Okay.

10         Q     When and why did you start this current

11     company?

12         A     I started the company back because I wanted

13     to -- my experience, my knowledge.  A lot of clients

14     that I had before were asking me, "Hey.  Are you back

15     into the business?"  They were having different issues

16     and problems and stuff, so I decided to -- to get back

17     into it.

18         Q     And when was this?

19         A     About 2015.

20         Q     Okay.  What were you doing immediately

21     before you started back with Hickey Security?

22         A     I was with Grady Health System.

23         Q     Okay.  So you were doing both at the same

24     time?

25         A     Yes.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 18

1        Q    Hickey Security and Grady?

2        A    No.  Once I left Grady, that's when I got my

3    company license.  So Grady was -- was -- and then when

4    I left Grady, I started Hickey Security &

5    Investigations.

6        Q    Okay.  I'm with you.

7        A    Yeah.

8        Q    With Hickey Security & Investigations, about

9    how much of your work is for apartment complexes?

10       A    Not that much.  It's -- I have -- at the

11   time, I think I only had one contract at when I was

12   doing that.

13       Q    How big is Hickey Security & Investigations?

14   I mean, there's you and who?

15       A    There's me and about -- now we have about

16   six officers.  And I do off-duty stuff for, you know,

17   subcontract work for whatever company might need off-

18   duty police officer.  I'll utilize people from

19   different agencies.  I've done traffic control.

20            We've done -- we're really pushing now

21   investigation.  We do a lot more investigation now.

22   We're actually getting ready to launch here a major

23   thing on that.  So that would be what most thing I

24   concentrate on.

25            We don't do a lot of apartment complex in --

Kenneth H. Hickey , Sr.

Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

Page 19

1    in the sense that, well, they don't pay on time.  So

2    that was the biggest issue.  But it just got to the

3    point where you deal with a lot of stuff that go on

4    different apartment complexes.  To -- to me it made me

5    feel like I was back policing; and just, you know, I

6    didn't want to do it.

7         Q    When you say it makes you feel like you're

8    back policing, what do you mean by that?

9         A    It's a lot of stuff going -- you deal with a

10   lot of personality, individuals, their problems.  You

11   know, when you're in law enforcement and security,

12   you're a social worker, a doctor, a nurse, a

13   psychiatrist, psychologist, everything.  People need

14   you to assist them in different ways.  They feel that

15   we are maintenance.  They feel that we are the leasing

16   agent, you know.  It's a lot you deal with.  And so

17   sometimes it can become overcoming.

18        Q    So you're dealing with a lot of stuff that

19   you feel like is not necessarily security?

20        A    Yeah.  Yes.

21        Q    How did you first find out about Seven

22   Courts Apartments?

23        A    We did a major marketing thing where I sent

24   out e-mails and fliers and stuff, and we mailed out

25   packages to different apartment complexes -- or

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 20

1    actually to the management companies.  So we -- we --

2    I was member of the Atlanta Apartment Association, so

3    that gave me direct contact with a lot of the

4    apartment complexes, the management companies, other

5    different companies.

6           So by being a member of that, I was able to

7    reach out to different complexes.  And then some of

8    them just called me.  I think Seven Court actually

9    called me because I was in the Apartment Association

10   at the time.

11       Q    Do you recall if you sent any marketing

12   materials to -- would it have been The Partnership,

13   Inc., or Seven Courts?  Who would you have sent that

14   to?

15       A    It would probably be everybody.  We sent out

16   to everybody.

17       Q    So you think that they called you first.

18   Right?

19       A    Yes.

20       Q    What do you remember about that call?

21       A    They said, "We're looking for security

22   here," and put in a proposal.

23       Q    Did they say anything about the existing

24   security that they had there?

25       A    No.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 21

1      Q     I'm going to introduce the first exhibit.

2   All right.  I've handed you what has been marked

3   Exhibit 1.  This is an August 24, 2020, e-mail from, I

4   believe this is you to Toya Wynn, Maggie Fontaine at

5   Seven Courts Apartment, titled "HSI Security Patrol

6   Proposal."  Do you have that in front of you?

7                     (Exhibit 1 was marked for

8                      identification.)

9      A     Yes.

10      Q     So in this document, you send a proposal to

11   Seven Courts managers, and you refer to a meeting that

12   you had the prior Wednesday.  Correct?

13      A     Yes.

14      Q     Do you recall that meeting?

15      A     It was just a regular, routine introductory

16   meeting where I went and spoke to them about what

17   service we can offer and asked them what would they

18   expect from us.  That's -- that's a general --

19      Q     Yeah.  Who did you meet with?

20      A     It might have been Maggie.  I'm not quite

21   sure, but I think it was Maggie.  I don't think the

22   manager was there at the time.

23      Q     How long after the call you had referred to

24   earlier would you have had this meeting?

25      A     I don't know.  I can't recall the -- I can't

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 22

1    recall how long ago that was.

2        Q    Okay.  And then if you continue turning

3    through this exhibit, this is the proposal that you

4    sent to Seven Courts.  Correct?

5        A    Yes.

6        Q    So if you look at page 4 of that proposal,

7    and that's a document.  In the bottom right, there's a

8    label, TPI001261; and so that's something called a

9    Bates number, that TPI, when they sent us this

10   document, they put that on to keep track.

11       A    Okay.

12       Q    But this page has the details of the service

13   that you would provide.  Right?

14       A    Yes.

15       Q    So 36 hours weekly for armed security

16   officer coverage at $35 an hour.  Right?

17       A    Yes.

18       Q    And that is what you were hired to do at

19   Seven Courts.  Correct?

20       A    Yes.

21       Q    Now if you look at page 5 and 6 of this

22   document, which is, you know, the pages that end 1262

23   and 1263, you list different divisions of your

24   company.

25       A    Yes.

Kenneth H. Hickey , Sr.

Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

Page 23

1       Q     Could you explain what these divisions are

2    and how they're different?

3       A     The division, which is changed now, but at

4    that particular time what I was offering was different

5    services based upon the division.  So that meant that

6    we market specifically at individuals that needed

7    service within what the division is.  That's who would

8    -- a representative will contact them based upon that.

9              So it's just different services specific.

10   Like, investigation does not cover security patrol.

11   And it's also based upon the state.

12             As a private security company, investigation

13   company, we have a different list of service we can

14   offer.  So if I was not an investigation company, I

15   couldn't have an investigation division.  I couldn't

16   do surveillance.  I couldn't do private investigation

17   and criminal stuff.  I had to have that particular

18   license.

19             So it's just letting our clients know we

20   offer more than what normal security companies offer.

21   They don't have the background, nor do they have the

22   level of training or skills that we have because we

23   offer everything.  We're able to do that.  So that's

24   why.

25       Q     And I see that armed security officer is

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 24

1    listed under the security division on this document.

2         A    Yes.

3         Q    What is the security division?

4         A    The security division is when you get an

5    individual that will either work in a plain clothes or

6    in a uniform.  They provide the services that are

7    similar to that of, say, a police officer but on a

8    private level.  And that's all we do.  That's --

9    that's part of that.

10             Those are -- these are the requirement the

11   state tell us that we can offer basically based upon

12   that, you know, security -- security company.  And

13   then, like, I say, the investigation division offers

14   service that what a private, you know, CID or criminal

15   investigation division or private investigation

16   company can offer.  Those are the -- those are the

17   things that the state allow us to do.

18        Q    Yeah.  If we look at the next page, there's

19   a heading for a security consultant division.

20   Correct?

21        A    Yes.

22        Q    What is that?

23        A    It's just us providing, like, at the end of

24   the contract.  We don't provide the complete services

25   that we offer.  We will, like -- I do property

Kenneth H. Hickey , Sr.                          May 17, 2022

Diaz, Elsa Flores v. The Partnership, Inc

Page 25

1    investment -- not property investment but property

2    investment inspections for security safety.  So, like,

3    apartment complex.  You going to buy an apartment

4    complex, we'll actually go out, do a security

5    assessment for it.

6          We'll pull the crime stats.  We'll actually

7    do a brief little surveillance to see what activity

8    going in during different hours and stuff like that.

9    So that's why we used to do that.  We -- I put all

10   that up under the investigation division so that we

11   can simplify it.

12        Q    So I see that there is not either armed or

13   unarmed security officers listed under the security

14   consultant division.  Correct?

15        A    Yes.

16        Q    Because that's consulting.  That's not an

17   actual physical work that you're going to be doing, so

18   that's not part of that division.

19        A    So if you go back to the first page of this

20   exhibit, the e-mail, you say that you were waiting on

21   the City of Atlanta crime statistics.  Explain what

22   you meant by that.

23        Q    I was waiting on the Atlanta crime stats

24   that would tell you what type of incidence you have on

25   the property.  It'll give you the listing of the

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 26

1   severity of crimes that they have, the different types

2   if crime, if there's Incident Report, what apartment

3   it respond -- I do this on every property that I have.

4   Unfortunately, City of Atlanta is kind of

5   lackadaisical in their return response time to doing

6   something; so that's why it was a delay on that.  But

7   now their system is on the internet, so you can pretty

8   much go online and pull up property stats on -- in a

9   general area too, what type of crime they have.

10      Q    Did you receive these crime statistics for

11  Seven Courts?

12      A    No.  I didn't.  I actually ended up going

13  online, and I saw some of the stuff that I was looking

14  at online.

15      Q    What did you observe about crime on the

16  property?

17      A    They had a lot of it.

18      Q    Any particular kinds of crimes that you

19  observed?

20      A    I was told later on -- I think that a

21  security officer was shot or killed before the

22  previous company or something like that.  They had

23  drug issues.  One of the big problems they had on

24  there were drug dealers that lived on the property.

25  That was one of the problems that they had over there.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 27

1      Q     Does drug dealers living on the property

2   relate to the property's safety at all in your

3   opinion?

4      A     Yes, yes.

5      Q     In what way?

6      A     They bring undesirables.  They had a lot of

7   -- one of the issues we had was individuals that would

8   come on the property, try to break into an apartment,

9   live in it or the laundry room or different areas,

10  vehicles.  They were soliciting.  They had -- that

11  particular area had a lot of prostitution that's going

12  on in the area, and they would try to come on the

13  property.  But when we was there, of course, they

14  didn't come.

15     Q     What do you mean by that?

16     A     That when we was on the property --

17     Q     Of course they didn't come?

18     A     Yeah.  They saw -- visibility is the key

19  thing in security patrol.  So while we were visible,

20  you know, they -- they wouldn't come on the property.

21     Q     So it's your observation that people would

22  know when you're there and when you're not there?

23     A     I can't speculate on that 'cause I don't

24  know, you know, what they would think.

25     Q     But you know that they weren't there when

Page 28

1   you were there, but they were there other times.

2        A    Oh, they -- yeah.  They would come.  I mean,

3   some would be brazen enough to just come on, you know,

4   to buy their drugs.  They -- you know, until they

5   walked up on them.

6        Q    But being there, like, an armed security

7   guard presence has, in your view, a deterrent effect

8   on crime?

9        A    Yes.

10             MR. MELCHER:  Objection.  Form.

11             Go ahead.

12   BY MR. MARKS:

13        Q    So after you made this proposal, what is the

14   next contact with Seven Courts management?  Let me

15   rephrase that.  What's the next contact you can recall

16   with anyone about Seven Courts after you sent the

17   proposal?

18        A    After I sent the proposal, I met with

19   Maggie, I think, one time; and then the next time, I

20   met with the manager.  Unless it was both of them.  I

21   just know -- I remember us all having a conversation,

22   they saying, "Okay.  We want to move forward with you.

23   When can you start?"  And that was the process.

24             It's not -- it's not a major process to

25   start a contract.  It's not where we're going through

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 29

1   some elaborate discussion and stuff.  It's -- you

2   know, I'm already known.  A lot of people know about

3   my service that I offer; and, you know, this is just

4   what -- what we do.

5        Q    When you said that you met with the manager,

6   were you referring to Ms. Wynn?

7        A    Yes.

8        Q    All right.  So I have marked what is Exhibit

9   2.  I'm passing to you now.  Exhibit 2 is a November

10  6, 2020, e-mail from Ms. Wynn to Rodrick Harris with

11  the subject "Security Contract."  Attaching Security

12  Contract Hickey.pdf.  Do you have that in front of

13  you?

14                  (Exhibit 2 was marked for

15                   identification.)

16       A    Yes, I do.

17       Q    Now, obviously you are not copied on this

18  e-mail itself.

19       A    No.

20       Q    If you look to the attachment, does this

21  represent the contract between you and Seven Courts

22  Apartment related to the initial services you

23  provided?

24       A    Yes.  This is it.

25       Q    If you look at Section 2, Payment of

Kenneth H. Hickey , Sr.                      May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 30

1    Services, as we just discussed, it is for 36 hours

2    weekly at $35 an hour, which was the armed guard rate.

3    Correct?

4        A    Yes.

5        Q    And this contract reflects that it has a

6    November 1, 2020, start date on the first page.

7        A    Yes.

8        Q    Is this the typical form of contract that

9    you use with all your clients?

10       A    Yes.  It -- it has changed over the time,

11   you know.  I've gotten a little bit better at it and

12   added different stuff.  So.  It's -- but it's a

13   general --

14       Q    All right.  I am marking Exhibit 3.  And

15   this is a document with the heading HSI Daily Log and

16   a date of November 4, 2020.  Do you have that in front

17   of you?

18                    (Exhibit 3 was marked for

19                    identification.)

20       A    Yes.

21       Q    What is this document?

22       A    Just Daily Log that we -- we kept that we

23   would fill out while we were on a property.  Mostly --

24   most of the time it was me that was on a property, so

25   this is what I completed.

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 31

1      Q     Okay.  Where it says "property inspection,"
2   what does this section of the report represent?
3      A     Basically, in security, we check doors, make
4   sure specific areas are secure.  Like, the laundry
5   room, the maintenance office, the office itself, any
6   -- any area, even some abandoned apartments.  If we
7   know which ones are abandoned, we'll check those and
8   make sure they're secure, no one's living in them.  So
9   this is just basically one of the things that we do.
10      Q     If we look at that property inspection
11   section, it has a place for playground areas where you
12   put, "Light traffic around the playground area, mostly
13   kids playing, short timeframes."  When you first
14   started, do you recall the playground area being
15   opened?
16      A     Yes, it was -- no.  Because that was during
17   pandemic time.  They actually -- I think they closed
18   it off or they was in the process of closing off.  It
19   might have been opened, but I know they end up closing
20   it off.  I just can't remember exactly when.  But it
21   was open, I think, briefly.
22      Q     Yeah.  At least for this very first report
23   that we have.
24      A     Yeah.
25      Q     The November 4th you refer to kids playing

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 32

1    on it.

2         A    Yes.

3         Q    Where it says, "Lights out, no," why is

4    lights out a part of this form?

5         A    The lights out is what we do to -- for

6    hazardous conditions so -- and security-wise because

7    if you have lights that are blacked out in certain

8    areas, people can't see and it's just a safety issue.

9    So what we do, like, most properties have Georgia

10   Power or whatever company they have that work on their

11   lights, they'll just send over a report.

12             They'll say, "This light is out."  I'll give

13   them the number to pole and say, "Hey.  This pole

14   light was out," or the exact location of building; and

15   that's all we do.

16        Q    Why, in your view, are lights being out a

17   safety issue?

18        A    Because you can't see if someone attacking

19   you.

20        Q    And you write on this report, "No lights

21   out, but some areas need better lighting."  Correct?

22        A    Yes.

23        Q    Is that your opinion about the lighting

24   conditions just overall for the time that you were

25   working out there?

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 33

1        A    Well, no.  Her -- she actually did a great

2   job with improving the lights in the area.  If I

3   brought up an issue or concern, that is just my

4   personal opinion that if I saw here, "Well, you might

5   need more light over here," or something like that.

6   But once I told her about it, she did an excellent

7   job.  She -- you know, it was well lit, the property.

8            The only way you would have blackouts is

9   that some companies will put these timers on their

10  lights so they won't burn out; and a lot of companies

11  don't know that -- a lot of apartment managers don't

12  know this, that Georgia Power don't tell you that the

13  lights will stay on and once they reach a certain

14  temperature, they'll cut off.  They'll make us think

15  that we got, you know, bad lighting; and then next

16  thing you know, about 30 minutes to an hour later, the

17  lights come back on.  So that's -- but she did an

18  excellent job on that.  The property was well lit.

19       Q    And when you -- going down too, you have

20  blackout areas where you wrote, "No blackout, but

21  additional lighting could be placed on the property."

22  Correct?

23       A    Yes, yes.

24       Q    So at this time, you didn't put the property

25  was well lit.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 34

1          MR. MELCHER:  Objection.  Form.

2          THE WITNESS:  I -- I -- what I do is

3  when I do my patrol service, if I notice something

4  that could improve the quality or safety, I'll add it

5  to it.  So if I put -- when I put, like, "No blackout

6  areas," that doesn't mean that, in my opinion, there

7  could be better lighting.  And that's all that is.  So

8  -- but like I said, she did an excellent job on that.

9  Whenever -- we didn't have a problem with lights.

10  BY MR. MARKS:

11     Q    Now, if you look down to the report, there

12  is a place called "comments."  I'm going to read part

13  of this into the record.

14          "At around 1915 hours, I was in position at

15  the office of A building when I heard a male voice

16  being loud and yelling at someone.  This incident was

17  at the main entrance area between D and G buildings.

18  While in route, Toya Wynn, property manager, called;

19  and it was determined the individual was yelling at

20  her.

21          Upon arrival, I spoke to a nonresident,

22  black male, name unknown.  He stated he was walking

23  across the parking lot, and Ms. Wynn almost hit him.

24  Upon speaking with a resident, name unknown at this

25  time, he stated the individual walked out in front of

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 35

1    Ms. Wynn.  He also stated to me he informed the

2    individual who Ms. Wynn was, and that is when the

3    individual became verbally abusive and using

4    profanity.

5              I did not hear the profanity while

6    responding, but this was due to the distance.  The

7    resident stated, "I wished I would not have told him

8    who Ms. Wynn was because that is when he became upset

9    and became verbally abusive."  Did I read to that

10   point correctly?

11        A    Yes.

12        Q    What do you recall about this incident?

13        A    This guy was a nonresident and probably

14   Ms. Wynn had -- individual who was living on the

15   property who was not on the lease, which is a leasing

16   violation.  And because she probably sent them a

17   notice to the person he was staying with, he was

18   upset.  That's why he was mad.

19              So that was an individual -- one of the

20   individuals who she -- she kicked out of the property.

21   We had individuals who didn't belong on the property.

22   If individuals were not doing what they were supposed

23   to do, she would evict them, send them a notice.  But,

24   you know, because of COVID, you really couldn't really

25   kick somebody out because they had a moratorium going

Kenneth H. Hickey , Sr.                           May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 36

1    on at the time.  So what we did, if they were not a

2    resident of a property, we would issue them a criminal

3    trespass warning.

4        Q    Were you told anything that this person said

5    about Ms. Wynn specifically?

6        A    Only what the gentleman that was there while

7    I was patrolling.  You know, at that particular time,

8    a lot of the residents were happy to see us on the

9    property, even for the short amount of time that we

10   was on the property.  But that was -- they just

11   informed me.  He was just telling me what was going

12   on.

13           It was -- and I actually spoke to the

14   individual.  He was very obnoxious.  He didn't -- he

15   didn't want to -- and he was upset about the fact that

16   they received notices and stuff.  So.  But he wasn't a

17   resident there, and he just decided to just walk

18   across the street and create an issue.

19       Q    You said a moment ago that folks at the

20   apartment complex were happy to see you on the

21   property for the short time that you were on the

22   property?

23       A    Yes.

24       Q    Tell me more about that.

25       A    They were happy to see us while we was on

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 37

1    the property.  We was only there for, like, four hours

2    a day, Monday through Friday.  I think on the weekend,

3    we were there for eight, but we broke it up to four-

4    hour shift.

5         Q    Why were they happy to see you while you

6    were there?

7         A    We're reducing crime.  The -- you know, the

8    visibility, the safety.

9         Q    You recall any particular comments that

10   folks made to you?

11        A    Yeah.  "Thank you for being here.  We

12   appreciate you."

13        Q    Any comments that people made to you about

14   what it's like out there when y'all aren't there?

15        A    Yeah.  They had told us they wish we could

16   be there more often, but that was the contract.  I

17   never elaborate with anybody about the contract.  That

18   was -- that's not the place for -- we don't do that.

19   That's proprietary information anyway.  Plus, for

20   safety reason, we never discussed the hours we were

21   going to be there; so they didn't know.

22        Q    How did you respond when people would tell

23   you that they wished you could be there more often?

24        A    I said, "Go talk to management and

25   ownership."

Kenneth H. Hickey , Sr.                              May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 38

1        Q    I'm going to do another exhibit, and I

2    believe this is the update about the individual from

3    the last report that you just referenced.  All right.

4    I'm handing you what's been tagged as Exhibit 4.  And

5    this is the document captioned, Hickey Security &

6    Investigation Incident Report.  It was dated November

7    5, 2020.  Do you have this in front of you?

8                    (Exhibit 4 was marked for

9                     identification.)

10       A    Yes.

11       Q    So this document, the Incident Report, is a

12   little bit of a different format than the Daily Log in

13   the prior exhibit.  Right?

14       A    Yes.

15       Q    What is the different between these two

16   types of documents?

17       A    The Daily Log provides you with the activity

18   that the officers have when they're patrolling a

19   property or things they might see that the client

20   might need to be aware of.  Our Incident Report deals

21   with us actually having to address mostly -- it could

22   be an apartment rule violation or it could be a

23   criminal violation.  It just depends on what it is.

24            But if it warrants us to write a report --

25   this was done because under Georgia Code 16-7-21,

Page 39

1    Criminal Trespass, I issued this individual that

2    warning; and as an authorized representative of the

3    apartment, this is why this report was done.  So if

4    the City of Atlanta would have to be called for him,

5    we would have documentation explaining why he should

6    not be on the property and why that he should be

7    arrested for criminal trespass.

8        Q    And so towards the end of this Incident

9    Report, if you turn to the second page, there at the

10   very end of the narrative there's a portion that

11   begins, "I met with Ms. Wynn to inform her of the

12   suspect comments, and I issued him a criminal trespass

13   warning.  At this time, the subject stated he would be

14   petty and contact the ownership of the property to

15   file a complaint against Ms. Wynn.  He stated that he

16   would get her fired from her job as a petty gesture.

17   Nothing to follow."  Did I read that correctly?

18       A    Yes.

19       Q    What do you remember about this?

20       A    Him being petty.

21       Q    Did he actually tell you, "I'm going to be

22   petty and contact the ownership"?

23       A    Oh, yeah.  He was -- he hounded the whole

24   situation.  We had a little -- little -- nice little

25   brief conversation.  But as I instructed him, I was

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 40

1    like, "You know, you're not a legal resident here.  If

2    I was not someone who was on a lease and I had a copy

3    of the lease, then I would not be cursing out and, you

4    know, being verbally abusive towards the property

5    manager, especially when she does, you know, keep the

6    property pretty good, you know?"

7              The property was clean.  It -- especially in

8    that area that -- that I worked at.  And I went to

9    other properties too around that area trying to

10   solicit businesses, and they -- they was not clean.

11   It was not at all.  So he was -- and like I said, he

12   was upset by his girlfriend or whoever he was staying

13   with receiving letters and stuff; and that's, you know

14   -- and I deliver some of the letters there, so he knew

15   who I was when I -- when I approached him.  So.

16      Q    Did any other residents while you were

17   working at Seven Courts approach you regarding a

18   dispute or a complaint about Ms. Wynn or other people

19   in management?

20      A    They were always complaining about

21   something.  I mean, that's one of the things we deal

22   with.  They -- the elevator broke down, but they got

23   upset about that.  They would complain to us.  They

24   would come to us and tell us their complaints, and I

25   have to just direct them to the office.

Page 41

1          A lot of the stuff that they complained

2     about was minor stuff, you know.  But some -- you

3     know, we were dealing with COVID.  A lot of people was

4     out of work or, you know, they couldn't get people

5     there in time or they subcontract out some of the

6     maintenance work.  And they would have to come and

7     perform their duties; so, you know, it might have took

8     a day or two.  But most people want stuff right then

9     and there.  So that's -- that was most of the

10    complaints that we got.

11         Q    Other than this individual in the report, do

12    you remember any specific instances in which someone

13    complained to you about Ms. Wynn specifically?

14         A    They always said management.  They didn't

15    ever say her name.  They would say the property

16    management, the owners of the building.  They'll say,

17    "Hey.  You know, my -- we got bed bugs."

18              I remember one complaint a lady had bedbugs;

19    and she didn't tell us until we walked into the

20    apartment, which that was kind of messed up.  So, you

21    know, we all, like, taking -- going home, we got to go

22    change our clothes.  But it wasn't anything on a

23    personal level.  Mostly it was just dealing with

24    maintenance issues and stuff like that.

25         Q    Anyone that you recall make security-related

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 42

1    complaints to you?

2        A    Probably that -- only security complaint I

3    ever had they wanted us out there more.  So nothing

4    where you shouldn't be doing your job.

5        Q    Did management ever communicate with you in

6    such a way that you felt like they were preventing you

7    from doing your job?

8        A    No.

9        Q    All right.  I'm handing you what has been

10   marked Exhibit 5.  So this is an e-mail -- well, at

11   the top of the document is an e-mail from Ms. Wynn to

12   Rodrick Harris dated December 17, 2020, where she

13   forwards an e-mail from you titled, "Hours changed."

14   Correct?

15                  (Exhibit 5 was marked for

16                  identification.)

17       A    Yes.

18       Q    And you say in your e-mail to Ms. Wynn, "I

19   would like to change the Saturday hours from 7 p.m. to

20   3 a.m. due to the incident where a resident was

21   robbed.  Please advise if this is okay with you."  Did

22   I read that correctly?

23       A    Yes.

24       Q    What incident is this referring to?

25       A    Someone said they were robbed, but I don't

Kenneth H. Hickey , Sr.

May 17, 2022

Diaz, Elsa Flores v. The Partnership, Inc

Page 43

1   think it was right there on the property.  I think it

2   was right there at the entrance, if I remember

3   correctly.  So it wasn't -- I don't think it was

4   directly on the property.  They was about to come onto

5   the property.

6            And I just asked, "Can we adjust the hours?"

7   because the hours we had were -- and that was the

8   purpose of -- once we do the crime stats on any

9   property that I have, if they have an incident, we try

10  to, you know, address the issue.  We -- we are very

11  proactive on how we address stuff, so if there's an

12  incident -- like I said, we were not there 24/7; so

13  there could be an incident there where we didn't know

14  about.  There were incidents that we didn't know about

15  until later on but 'cause we were not on the property.

16           So we just wanted to be more active and

17  address the issue and concern.  Plus, I think that was

18  the time where during that time people were going out

19  and the holidays and stuff like that; so that's --

20  that's always an increased time during the time where

21  a lot of crime is -- starts, especially close to

22  Christmastime.

23       Q    Do you recall if this change in hours was

24  approved?

25       A    I think it was.  We've had -- we had the

Page 44

1    ability to adjust hours where we want.  We just have

2    to make sure we notify her.

3        Q    I will represent to you that I have not seen

4    a schedule for November or December 2020.  I'm about

5    to show you schedules for January, February, and March

6    in 2021.  And this will be Exhibit 6.

7                    (Exhibit 6 was marked for

8                    identification.)

9                    MR. MELCHER:  Can we take a short

10   break?  I've got someone calling me on a car problem.

11   I had a flat tire.

12                   MR. MARKS:  Yes.

13                   MR. MELCHER:  All right.  Thank you.

14                   THE REPORTER:  Okay.  We are off the

15   record at 10:49 a.m.

16                   (Off the record.)

17                   THE REPORTER:  We are back on the

18   record at 10:52 a.m.

19   BY MR. MARKS:

20       Q    Mr. Hickey, I am handing you what I have

21   marked as Exhibit 6.  This is three different e-mails.

22   The first is an e-mail from you to Seven Courts

23   apartment, subject "January 2021 schedule."  The

24   second is an e-mail from you with February's schedule,

25   and the third is an e-mail from you with March's

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 45

1    schedule for Seven Courts Apartments.  Each of those

2    three e-mails includes the attached schedule.  Do you

3    have those in front of you?

4         A    Yes.

5         Q    And are these the schedule that you, in

6    fact, had in place at Seven Courts for these three

7    months?

8         A    Yes.

9         Q    All right.  So if you look at the January

10   schedule, I will just say as a high-level

11   characterization that your hours at the apartment

12   typically included night and early morning hours.

13        A    Yes.  But we had the -- the schedule -- all

14   schedules are tentative.  These are not written in

15   stone; so some of these schedules, the days change

16   based upon our needs and the needs of the property.

17   So this was just something I would give them.

18             So this was what we project the schedule to

19   be; however, it can change.  And all I would do is e-

20   mail her or text her, "Hey.  We're going to be working

21   these hours right here."  So it just -- but this is

22   the tentative schedule.

23        Q    Why is it that you would set your hours, you

24   know, for instance 9 p.m. to 1 a.m. instead of, you

25   know, 9 a.m. to 1 p.m.?

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 46

1        A     The -- one, when management is on property,

2   we have less issues 'cause people already know she --

3   she was very active going out, walking the property,

4   making sure things are going right.  But once, you

5   know, management leave -- and that's on majority of

6   the apartment's complex that I've ever provide

7   services for.  Once management is gone, that's when

8   the criminals start coming out, people start

9   loitering, doing stuff they normally don't do.

10                 MR. MELCHER:  Can I ask you to identify

11  for the record who you meant by "she"?

12                 THE WITNESS:  I'm sorry.  Ms. Wynn.

13                 MR. MELCHER:  All right.  Thank you,

14  sir.

15  BY MR. MARKS:

16       Q     And understanding that this schedule can

17  change, it was generally your goal to be out there at

18  night basically?

19       A     Yes, yes.

20       Q     And when you did have a schedule change, was

21  it your practice, like the prior exhibit we discussed,

22  to let management know?

23       A     Yes.

24       Q     All right.  Handing you what has been marked

25  as Exhibit 7.  This is an e-mail dated December 18,

Page 47

1    2020, from you to Seven Courts at gotpi.org e-mail

2    address, titled "Reports."  And this is just the cover

3    e-mail.  It does not include the reports.  Correct?

4                    (Exhibit 7 was marked for

5                     identification.)

6         A    Yes.

7         Q    You see in this cover e-mail, you tell Seven

8    Courts management in the second sentence, "APD advised

9    my officer of their staffing shortage and there will

10   be a delay on any responses in Zone 4.  Just FYI

11   information for you."  Did I read that correctly?

12        A    Yes.

13        Q    What do you recall about that?

14        A    Atlanta Police were short-staffed.  They had

15   a real bad COVID outbreak during that time.  A lot of

16   officers was out or called in.  I forgot what zone it

17   is, but the actual zone that was -- Seven Court is

18   positioned on the zoning line for APD, so I think it's

19   either Zone 1 or whatever other zone, it's across the

20   bridge or the railroad tracks.  They would have to

21   sometimes come and respond to their property because

22   of their shortage.  So they had a real short-staffing

23   problem as they currently do now.

24        Q    How long, while you were working at Seven

25   Courts, do you recall this short-staffing problem

1    lasting with the APD?

2        A    That -- that problem had last for the past

3    ten years, so that's not nothing new.  And I have

4    direct contact with City of Atlanta, so I'm aware of

5    their -- their staffing issues.

6        Q    Does that mean that residents couldn't

7    necessarily rely on the APD to get out there fast?

8        A    No.  Not at all.  No.

9        Q    When you had an armed guard on the property,

10   would residents have any way to flag them or to get

11   their attention?

12       A    Yes.

13       Q    So do you believe that when you had an armed

14   guard out there, you would have a faster response time

15   than if somebody had to call the police?

16       A    Yes.

17       Q    Okay.  Mr. Hickey, do you recall providing

18   documents to our office in response to a subpoena that

19   you received?

20       A    Yes.

21       Q    And you provided reports from your time at

22   Seven Courts Apartments to Ellie.  Correct?

23       A    Yes.

24       Q    I am handing you a compilation exhibit that

25   I have tagged Exhibit 8.  And I will represent to you

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 49

1    that these are all of the reports that you provided to

2    our office pursuant to that subpoena; and they run

3    from January 1, 2021, through March 20, 2021.  And I

4    know you will not be able to say whether anything is

5    missing in here; but generally speaking, does that

6    appear accurate to you?

7                    (Exhibit 8 was marked for

8                    identification.)

9        A    Yes.

10       Q    And these are, in fact, the Daily Reports

11   that you would provide to apartment management, you

12   know, on or around the date that they were created.

13   Right?

14       A    Yes.

15       Q    Let me just ask you about that for a moment.

16   When did you or your officers create each Daily

17   Report?

18       A    We normally did it that night or that -- the

19   very next day.  I -- I have a laptop so -- with me,

20   while I'm at the site, I'll type it, you know, or I

21   have my notepad and I'll write in it and then once I

22   get home or, you know, in the office before I get

23   ready to leave, we would type them up then.

24       Q    Okay.  So management was getting these

25   reports pretty soon after, you know, you were making

Page 50

1   these observations.  Correct?

2       A    Yes.  Mostly.  Majority of the time they

3   did.  Sometime there might be a delay.  I switched out

4   computers, laptops.  I normally buy a different laptop

5   every two years, and so I lost some reports that I

6   tried to give you guys because they was on the other

7   laptop that fried.  So --

8       Q    Would that be reports basically before

9   January 1st?

10      A    Before and also I ended up having to take my

11  laptop to Best Buy to the Geek Squad, which I'll never

12  do that again.  But they -- they didn't fix my laptop

13  properly, so I ended up losing stuff over after that.

14  So.

15           But most of this is what all that

16  transpired; and if anything that was major happened, I

17  would call her directly or also text her.  So.  We --

18  we had great communication.  There was never no, you

19  know, issue with that.

20                MR. MELCHER:  Just when you get a

21  chance, I'd like to take a short restroom break.

22                MR. MARKS:  Now's fine.

23                MR. MELCHER:  Okay.  All right.  Thank

24  you.

25                THE REPORTER:  Okay.  We are off the

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 51

1    record at 11:02 a.m.

2                   (Off the record.)

3                   THE REPORTER:  All right.  So we are

4    back on the record at 11:09 a.m.

5    BY MR. MARKS:

6        Q    All right, Mr. Holt [sic].  Before we took a

7    break, we just introduced Exhibit 8, which is a

8    compilation of your Daily Logs from January 1, 2021,

9    through March 20, 2021.  Correct?

10       A    Yes.

11       Q    I'd like to go through a few of these

12   entries and ask you questions about particular days,

13   starting with page 1.  So on this very first page of

14   Exhibit 8 on the lights out, Officer Supervisor Ricky

15   Green noted lights out on fence side of B building.

16   Correct?

17       A    Yes.

18       Q    Now, if you look over the next few days,

19   basically the same report on January 2nd, January 3rd,

20   and January 4th and January 5th.  Right?

21       A    Yes.

22       Q    And then you get to January 6th, and it says

23   lights are working properly at B through G building.

24   Correct?

25       A    Yes.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 52

1      Q    So you reported the lights being out at

2  least five days in a row, and then they were fixed

3  after that.  Right?

4      A    Yes.

5                MR. MELCHER:  Objection.  Form.

6  BY MR. MARKS:

7      Q    And we don't have those reports -- excuse

8  me.  We haven't looked at those reports immediately

9  before January 1, 2021.  Correct?

10     A    Yes.

11     Q    And it's your testimony that you couldn't

12 find those.  Right?

13     A    Yes.

14     Q    So the lights may have been out on those

15 buildings for some days before that.  Correct?

16     A    No.  I think this -- this building, the one

17 I had told you earlier about how the lights cut off

18 and they cut on, I think that's -- this area right

19 here is one of those areas where the lights were

20 working but once they stay on for a minute they cut

21 off and then they come back on.  So I think this is

22 the same area.

23     Q    Now, you reported five days in a row though,

24 lights out.  Right?

25     A    Yes.

Kenneth H. Hickey , Sr.                                           May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 53

1       Q    Not lights on and off, flickering.

2       A    Well, what I just -- what I just said is

3  that when an officer or myself there that we've had

4  lights in those areas that once they heat up, they'll

5  cut off.  So you might go through there and they'll be

6  off, and then you'll come back and they'll be back on.

7  So that's probably why he put lights out.

8            I'm just saying that's the general area

9  where I remember those are some of the lights in that

10  area that I explained to -- when I said earlier that

11  once they heat up, a lot of managers don't know

12  this -- or property owners -- that they'll shut

13  themselves off so they won't burn out.

14            And it depends upon what type of lights they

15  are; but, I think, most of them are those hydrogen

16  lights where once they heat to a certain temperature,

17  they'll cut off.  So that could have been the case in

18  that particular time, especially if we were working

19  the same nighttime hours and stuff.  So it could have

20  been that could be the case.  So I'm just -- that's --

21  that's what I recall for that area right there.

22       Q    Sitting here right now, you don't know why

23  those lights were out on January 1st through January

24  5th.  Right?

25                 MR. MELCHER:  Objection.  Form.

Page 54

1           THE WITNESS:  No.

2    BY MR. MARKS:

3        Q    You don't know what you would have reported

4    in terms of lights the days before January 1st?

5        A    If they was out, I would have report they're

6    out.  If they were working properly, I would have

7    report they working properly.

8        Q    But as of January 6th, the lights are

9    working again.  Right?

10              MR. MELCHER:  Objection.  Form.

11              THE WITNESS:  Yes.

12   BY MR. MARKS:

13       Q    And then you look forward, and it continues

14   to say lights are working properly in bold for some

15   number of days.  Right?

16       A    Yes.

17       Q    You had testified earlier that when you

18   reported problems with lighting, management would

19   address them.  Right?

20       A    Yes.

21       Q    And you don't think that this is an example

22   of that occurring?

23       A    It could be.

24              MR. MELCHER:  Objection.  Form.  I'm

25   sorry, what was the answer?

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 55

1                    THE WITNESS:  I said it could be.

2                    MR. MELCHER:  Okay.

3        BY MR. MARKS:

4            Q    Let's look at the January 12, 2021, report.

5        On the January 12, 2021, report, on the lights out

6        section of the property inspection, you have, "All

7        lights are working properly."  Correct?

8            A    Yes.

9            Q    If you look down at the comment though,

10       there is a discussion of a situation where some units

11       are without power.  Right?

12           A    Yes.

13           Q    Why would that not be reported in the

14       lighting report?

15           A    I think this was the -- that was inside the

16       apartment.  That's not -- that was inside the

17       apartments.  That was not outside, so that's

18       completely different.

19           Q    Would this be an example then of a non-

20       security situation that you kind of got roped into as

21       a security guard?

22           A    Yes, it is.  It's a maintenance issue that I

23       explained.  Yeah.  So that's what that was.

24           Q    So this is not about the outdoor lighting to

25       the best of your recollection?

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 56

1      A      No.   This -- those actually was the

2   apartments that the power went out.   We originally

3   thought because of nonpayment, but there was an issue

4   they had.   And that's why Georgia Power -- I had noted

5   that too.

6      Q      You turn to the February 7th report?   Are

7   you there?

8      A      Yes.

9      Q      So this report under "suspicious activity"

10  describes a situation in which a resident reports a

11  burglary.   Correct?

12     A      Yes.

13     Q      What do you recall about this situation?

14     A      This was a woman who had somebody living in

15  her apartment who wasn't even on the lease.   She

16  normally don't live on the property.   To be honest, I

17  thought this was a false report.

18     Q      Why did you think that?

19     A      I -- in my initial investigation, I

20  conducted a search of the property.   I did a search of

21  the window and stuff, and there was no sign of forced

22  entry.   My years of experience as a police officer and

23  as a detective -- a sergeant of a detective, this was

24  no way a burglary.   It was somebody gaining access --

25  and we also later found out she had a gentleman who

Kenneth H. Hickey , Sr.

May 17, 2022

Diaz, Elsa Flores v. The Partnership, Inc

Page 57

1    was living in her apartment who wasn't on the lease.

2            She also very seldom stayed at the property.

3    She lived somewhere else.  So she just had that

4    property where she was living at, and then she had

5    another place she was staying at.  And this from her

6    words.

7            I spoke to her because I stopped putting

8    notices on her door because they were left on the

9    door.  So.  And we would have an accumulation of

10   notices and stuff.  So we -- I stopped putting on her

11   door.  I try to slide it in as much as possible.

12       Q    Is that so that people wouldn't know that

13   there's an apartment without somebody coming there

14   every day.

15       A    Yes, yes.  That's it.

16       Q    Okay.  Can you turn to the February 16th

17   report?

18       A    I'm here.

19       Q    Look down at the very bottom of this report,

20   and you're welcome to look at the rest of it to

21   refresh your recollection.  You have a "special note."

22   Right?

23       A    Yes.

24       Q    So your special note reads, quote, "There

25   are affordable cameras that can be placed in the

Kenneth H. Hickey , Sr.                              May 17, 2022

Diaz, Elsa Flores v. The Partnership, Inc

Page 58

1    stairways.  Also, the doors can be set to lock; and

2    resident can only go to the bottom floor to exit.

3    This will stop them from using the stairway to go from

4    floor to floor."  Did I read that correctly?

5         A    Yes.

6         Q    Why did you make this comment about

7    affordable cameras?

8         A    That's -- I think that's A building, and

9    that was a building where we had a drug dealer that

10   City of Atlanta was looking for too.  But he was -- he

11   was frequenting the place.  So.  And you had homeless

12   folks that were coming up to the property, sleeping in

13   the stairwell.  So that's -- that's one reason why I

14   did that.

15        Q    Who is the drug dealer in A building that

16   the Atlanta police were interested in?

17        A    I forgot his name; but they -- if I'm not

18   mistaken, they ended up arresting him.  So.  And plus,

19   he was put out.  So.

20        Q    While you were working at Seven Courts, were

21   there any cameras on the property that you were able

22   to access footage from?

23        A    I was not able to, but they did have

24   cameras.  They did have cameras on the -- on the

25   property.

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 59

1      Q     How, in your view, do cameras fit in to the

2   security situation on a property?

3      A     I think it's a waste of time.  All the

4   camera going to do is be a witness.  It's not going to

5   stop somebody from assaulting you.  It'll help you

6   prosecute if they have good resolution.  They're

7   effective.  But camera -- only thing camera do is say,

8   "Hey.  That person just robbed me."

9      Q     So is it your view then that cameras don't

10  really deter crime, but they can make it where someone

11  who commits the crime can be caught on the back end?

12     A     No.  It could deter crime if you got

13  cameras.  I just don't feel they effective, but it can

14  deter.  I -- Georgia criminals won't commit a crime if

15  they fear for being caught.

16     Q     So cameras can deter, but it's not your view

17  that they're the most effective means to deter?

18     A     Yes.

19     Q     What, in your view, is a more effective

20  means to deter?

21     A     Twenty-four/seven Hickey Security Patrol

22  Service.  That would be the most effective way to do

23  it.

24     Q     So an actual human being in a uniform there

25  on the property that people know are looking out?

Kenneth H. Hickey , Sr.                              May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 60

1          A     Yes.

2          Q     You can turn to February 24, 2021, report.

3          A     There.

4          Q     So on this report, under "suspicious

5     activity," your officer, Carl Glisson, writes, "Gun

6     fire was heard from the apartment's southeast corner

7     of the property.  I did not hear or see the suspect or

8     suspects.  Also, I did not see Atlanta Police

9     Department respond."  Did I read that correctly?

10         A     Yes.

11         Q     What do you recall about this situation?

12         A     That is actually an apartment complex that

13    is adjacent to it to the southeast.  They have some

14    serious issues over there.  So the gunfire that the

15    officer heard, actually was coming from them.  It

16    wasn't coming on -- on their property.

17         Q     What is that apartment complex's name?

18         A     I don't know quite offhand.  But if I could

19    Google it, I could tell you the name of it.

20         Q     Please.

21                    THE REPORTER:  Would you mind to spell

22    Carl's last name for me, Counselor?

23                    MR. MARKS:  G-L-I-S-S-O-N.

24                    THE REPORTER:  Thank you.  And Carl

25    with a K?

Page 61

1              MR. MARKS:  With a C.

2              THE REPORTER:  Thank you.

3              THE WITNESS:  I don't see the name, but

4    it's on Peyton Place Southwest.  That's the property.

5              THE REPORTER:  Is Peyton with an E or

6    an A?

7              THE WITNESS:  P-E-Y-T-O-N.

8              THE REPORTER:  Thank you, sir.

9              THE WITNESS:  But it's southeast of it.

10   BY MR. MARKS:

11       Q    Could you get Exhibit 8 back out?  And I'd

12   like you to turn to the January 2nd report, so going

13   back in time about a month and a half.

14       A    Mmhmm.

15       Q    The January 2nd report on suspicious

16   activity; and this is Supervisor Ricky Green wrote,

17   "At 1900 hours, several juveniles gathered in front of

18   the A building.  More juveniles came from near the C

19   and D building.  I recognized a few of them from D-36.

20   I knew them from incidents with the dogs.  The same

21   dogs was not on a leash during the time I seen them in

22   the middle of this dispute.

23              An argument broke out between the juveniles

24   and as they was arguing, a grey Chevy Impala drove by

25   very fast and someone fired two shots from the back

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 62

1    seat.  The juveniles scattered.  I repositioned to a

2    safe location and called 911.

3           An APD officer didn't come to the scene.

4    They called me on the phone to give a statement.  The

5    officer stated that it had been some beef between the

6    juveniles here and another set of juveniles living a

7    few blocks away."  Did I read that correctly?

8        A    Yes.

9        Q    Is this the same general dispute, as far as

10   you understand, as the February shots fired incident?

11       A    No.

12       Q    No.  Tell me what you remember about this

13   January 2021 shooting incident.

14       A    APD didn't respond, so I'm not even sure if

15   it was an actual gun that was fired at them.  they

16   didn't even come.  Crime scene didn't respond to the

17   location.  No one was here.

18           Some of those kids, they -- unfortunately

19   they have toys now that they like to carry.  And so --

20   'cause normally on something like this, if there was a

21   shooting, especially with kids involved, you would

22   have had the police will respond.  They'll have a

23   crime scene.  The whole nine yards.

24           So this could have been a situation where

25   later on we determined that it was some knucklehead

Page 63

1    playing with a cap gun and stuff like that.  They were

2    known to do stuff like that.  They -- they just --

3    they're youth; and the kids that they were talking

4    about, it's a little field right there.  So they would

5    play soccer.  They would play football at that little

6    grassy area right there in front of A building, so

7    that's probably why they got in an argument.

8            But I don't remember it being a major issue,

9    even though they got in an argument.  But I don't

10   remember City of Atlanta responding 'cause, I mean,

11   you just don't get to shoot at kids and the police

12   don't come out.  But then again, that is APD.  So.

13           But I -- I recall it not being a major

14   issue.  There were just some kids arguing and stuff.

15   I don't remember they shot at the kids and, you know,

16   or hit one of the kids and they got injured.  So I'm

17   not sure what it could have been, but I'm just

18   thinking that it could be one of the incidents where

19   some kids got into an argument.

20           They got into a lot of arguments.  An

21   apartment complex in the southeast of it, they always

22   had some type of, you know, "beef," as they say, with

23   one another.  Based upon their little -- we call it

24   "loose knit social groups" that think they want to be,

25   you know, something more than what they are.

Case 1:21-cv-03661-ELR    Document 52-3    Filed 10/06/22    Page 65 of 176
Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 64

1          But we didn't -- I don't recall this being,

2     you know, anything other than, you know, these kids

3     was arguing with each other.  I don't even think it

4     was actual gunfire at that particular time.  That's

5     just what I'm trying to recall.  It happened a while

6     ago.

7          Q    Now, you weren't here for this incident.

8     Correct?

9          A    No, I wasn't.  He actually -- I remember

10    Ricky called me -- Green -- Officer Green called me;

11    and he was like, "APD hasn't showed up."  And I was

12    like, "What are they doing?"  And that's why I say, I

13    don't think it was actual shooting.  I think he ended

14    up changing it to something else.

15          I just can't -- I can't recall.  But I do

16    remember we had an incident something like that.  I

17    don't know if it's this specific incident; but I just

18    remember that it turned out to be something less than

19    what it was.

20          Q    Let's look at what Supervisor Ricky Green

21    put in the report.  But first of all, how long has

22    Supervisor Ricky Green been working for Hickey

23    security?

24          A    He wasn't with me that long.  He was maybe

25    there a couple of weeks.  I'd have to look at my

Page 65

1    record, but he ended up being terminated.

2         Q    You recall what his background was?

3         A    He actually used to work for me at Grady

4    Health System.  He'd been in security.  He does clubs,

5    apartments, other stuff too.

6         Q    And so he wrote, "A grey Chevy Impala drove

7    by very fast, and someone fired two shots from the

8    backseat."  Right?

9         A    Yes.

10        Q    All right.  He wrote that he was the one who

11   repositioned to a safe location and called 911.

12   Correct?

13        A    Yes.

14        Q    And an APD officer didn't come to the scene.

15   Right?

16        A    Yes.

17        Q    So he is reporting this as two shots fired

18   from the back of a Chevy Impala.  Right?

19        A    Yes.

20                  MR. MELCHER:  Objection.  Form.

21                  THE WITNESS:  Yes.

22   BY MR. MARKS:

23        Q    Seven Courts is an apartment complex where

24   there had been shootings.

25        A    Yes.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 66

1      Q    And you testified earlier that there's drug

2   activity on the property.

3      A    Yes.

4      Q    Your testimony a moment ago about this being

5   a cap gun.  There was no basis for that.  Right?

6                  MR. MELCHER:  Objection.  Form.

7                  THE WITNESS:  What I said was that I

8   don't think -- I remember -- if this the incident, I

9   remember that it turned out to be something less than

10  what it was after later on.  At that particular time I

11  spoke to him, and that's why I'm confused about this

12  because if there wasn't an Incident Report done with

13  it -- we normally would do an Incident Report.

14                 Also, the police would have responded.

15  We'll have a case number.  We would have a

16  supervisor -- APD supervisor would have come out, and

17  normally news media would probably have been out.  So

18  doing -- that's why I don't think this -- this is one

19  of those incident that turned out to be something less

20  than what it initially was because it could have been

21  something.

22                 I don't know if it was a cap gun or

23  not, but I said I don't think it was any of an actual

24  firearm because those are some of the things those

25  kids have.  I've had them carry them.  They've showed

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 67

1    me cap guns that they had that looked like real guns.

2    They had BB guns.

3                    I actually just ordered two online that

4    are from Amazon that look like a Glock 19 and also a

5    .357 Magnum, and they were BB guns.  I actually do

6    firearm training, so that's one of the things --

7    that's why I bought them to show people and then also

8    for police training as a police instructor, to show

9    them this is what's out there.

10                   So I just -- this right here is so

11   vague that, for me, there's no way that I would think

12   that it was a major incident because, one, the police

13   didn't respond out.  He probably could have -- I just

14   don't -- I just recall we had an incident that turned

15   out to be something less than what it was.  And

16   that's -- that's happened at many of the apartment

17   complexes I've worked at before, even as a police

18   officer.

19                   We respond and next thing you know --

20   "Oh somebody got shot," and next thing you know, no.

21   It wasn't a shot.  It was pellets.  It was

22   firecrackers.  It was people just, you know, being --

23   you know, doing stuff that wasn't even a gun.  So

24   that's -- I just can't recall that.

25                   It would be -- it would have been an

Kenneth H. Hickey , Sr.

Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

Page 68

1  Incident Report if it was something major.  One of the

2  kids got, you know -- to be honest, if we thought it

3  was something major, we would have done an Incident

4  Report.  APD would have done their Incident Report.

5  BY MR. MARKS:

6      Q    You're speculating about what APD would have

7  done.  Right?

8               MR. MELCHER:  Objection.  Form.

9               THE WITNESS:  Well, me being a police

10  officer, I know what the law requires to do.  So

11  that's my experience.  So.  And I'm just saying this

12  is -- this is -- when we have a major -- when we have

13  an incident of this nature, you just don't brush this

14  off.  That's why I was surprised that reading that

15  they call.  APD called him and didn't do that, you

16  know.  I just -- that's not the normal procedure.

17  BY MR. MARKS:

18      Q    What you're saying is that it's not the

19  normal procedure for the APD to not do an Incident

20  Report.  Do you, sitting here right now, think that

21  Supervisor Ricky Green was lying when he made any part

22  of this report?

23      A    No.  I don't think he was lying.

24      Q    Then you think it's true that he heard two

25  shots come out of a Chevy Impala towards those kids?

Page 69

```
 1                MR. MELCHER:  Objection.  Form and
 2      asked and answered.
 3                THE WITNESS: I think he heard what he
 4      probably -- he speculated could be firearms at that
 5      time.
 6      BY MR. MARKS:
 7           Q    That he reported to the police was two
 8      shots.
 9           A    Yes.  And that -- and it could have turned
10      out to be something else.  I -- I just don't recall
11      the incident.  I just recall we had an incident there
12      that turned out -- we had a couple of incident there
13      that we thought was something.  Turned out to be --
14      not to be exactly what it was.
15                You know, just like the burglary.  We
16      thought -- this lady said, "We got a burglary that
17      occurred."  Come to find out, there was not a
18      burglary.  There was no forced entry or anything, you
19      know.
20                People make false reports so, you know.  I
21      don't think he would make this up.  I don't know why
22      he would do that.
23           Q    Supervisor Ricky Green has no reason to make
24      up a false report about two shots coming out of a
25      Chevy Impala.  Right?
```

Page 70

1        A    Yeah.

2               MR. MELCHER:  Objection.  Form.

3               THE WITNESS:  But this is the deal.  If

4    he said that he saw a gun, a muzzle flash, if he said

5    he saw something like that, in my -- in my opinion,

6    but if he said he heard a distinctive sound from a gun

7    coming out of a vehicle -- could be a lot of things.

8    It could have been -- it could have been anything.  It

9    could have been a gun.  I'm just saying that this

10   particular incident would merit more than just an APD

11   officer not responding and just calling him on the

12   phone.

13   BY MR. MARKS:

14       Q    Did you talk to Mr. Green about why he

15   didn't write an Incident Report?

16       A    That's why I'm thinking that it was

17   something less than what it was because normally we

18   would have done it.  That's why -- that's why I'm

19   saying I'm confused by this because normally, if it

20   was something major, we would have an Incident Report.

21   But also, again too, if APD didn't come out, then we

22   would not initiate one of our Incident Report because,

23   you know, or we'll just put it in the Daily Log.

24       Q    I guess I have kind of the same reaction as

25   you, Mr. Hickey, that I kind of feel like two shots

Page 71

1    should have been taken more seriously by someone.

2         A    I agree with you.

3         Q    But you don't specifically, sitting here

4    right now, know how this resolved?

5         A    No.

6         Q    Mr. Hickey, I'm handing you what has been

7    marked as Exhibit 9.  This is an e-mail exchange

8    between you and Maggie Fontaine.  The subject line

9    "Community crime map."  And in this, she had -- and

10   this is not including attachment in her initial e-mail

11   to you.

12              She had attached a community crime map and

13   asked you, "Is it possible for you to supply one

14   weekly?"  And you responded, "I will get with APD and

15   see if this is possible."  Correct?

16                   (Exhibit 9 was marked for

17                   identification.)

18        A    Yes.

19        Q    What do you recall about this?

20        A    You know, there are incidents that might

21   occur on a property that they're not aware of,

22   especially after hours.  So just like I always do is

23   try to attain my crime stats.  Once I do, like,

24   security assessments, it allowed me to look at

25   incidents.  Like, you know, domestic violence,

Page 72

1    especially during COVID, increased tremendously.

2              And so what we end up doing is that we would

3    have incidents that the management didn't know about.

4    Even though that property is not that large, you can

5    have police respond and they not know or after hours

6    or on the weekends.  So what we end up doing is they

7    wanted to get a weekly on the property because once it

8    come time to renew the lease, then they will not renew

9    the lease, especially if I get an Incident Report --

10   excuse me -- an Incident Report says, "Hey.  We had a

11   domestic fight over here."

12             They had a situation that, I think, it was

13   the last rape turned out it wasn't that, you know.  So

14   it's, you know -- we -- we pull the stats for that.

15   So that's what she wanted that for.

16        Q    Did you talk with APD about this?

17        A    They have -- I called them on the phone.

18   APD is not -- their return time on stuff is not that

19   great, but a lot of stuff I did go online.  It's

20   called LexisNexis.  You can pull up community stats

21   and stuff.  So that's what I did.

22             I pulled up different things it had on it.

23   If it was something that was major, depending on,

24   like, it's an aggravated assault, armed robbery, rape,

25   or anything like that, we'll pull the report.  You

Kenneth H. Hickey , Sr.                              May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 73

1   know, go down there and get a copy of the report.  You

2   could do that or; I think, they got it now where

3   actually you could do stuff online now.  So.

4          Technology has changed even over just these

5   past few years, especially with COVID because they

6   didn't want people coming in and out.  So they are

7   able to relinquish a few of the things through the

8   internet.

9       Q    Okay.  So basically just a way to keep track

10  of the crime that's going on when nobody's around.

11      A    Yes.

12      Q    All right.  I'm handing you what has been

13  marked Exhibit 10.

14              (Exhibit 10 was marked for

15              identification.)

16      A    Thanks.

17      Q    This is a March 1, 2021, e-mail from

18  Ms. Wynn to Mr. Harris forwarding an e-mail from you

19  subject to contractual agreement termination and an

20  attachment.  Do you have that in front of you?

21      A    Yes.

22      Q    What is this e-mail and attachment?

23      A    At the time, we were terminating the service

24  over there.  The amount of hours that we were -- we

25  wanted more hours; and, you know, their budget wasn't

Page 74

1    able to accommodate that.

2         Q    Tell me about any conversations you had

3    leading up to this termination.  When did you first

4    discuss the possibility of terminating services at

5    Seven Courts with someone at Seven Courts?

6         A    I didn't.

7         Q    What was your, I guess, discussion prior to

8    sending the termination letter?

9         A    I didn't have a discussion about terminating

10   the contract.  When I decided myself to terminate the

11   contract, I sent the e-mail, at which time she asked

12   me could I stay on a little longer; and I offered a

13   different type of service.  And she said, "Can we do

14   that?"

15             That's when I did the -- the security

16   consultant portion of the contract, which covered a

17   brief patrol monitoring with the APD any incidents and

18   stuff that go on to the property because, I think, at

19   the time, they was getting ready to add more cameras

20   anyway.  They were going to upgrade the cameras or get

21   more cameras on the property.  So that's -- that's how

22   that -- that took place.

23        Q    I believe a moment ago you said that before

24   you sent the termination letter, you wanted more

25   hours.  Correct?

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 75

1        A     Yes.

2        Q     Did you talk with management about that?

3        A     Yeah.  They budget wouldn't allow it to

4   happen.

5        Q     When did you talk to them about that?

6        A     I can't remember the exact time.  I can't

7   recall.

8        Q     Would it have been more than one

9   conversation or just one time?

10       A     Probably one time.  I don't remember more

11  than one.  We were probably sitting around, talking,

12  just in general conversation.  And I was like, "You

13  know, we probably should increase the hours and

14  stuff."

15       Q     Why did you think you should increase the

16  hours?

17       A     We wanted more money.  That's -- I do that

18  all -- every contract.  If we get more hours, I'll say

19  -- especially if I think there's a need for it.  I

20  mean, they did a good job with the amount of hours --

21  we did an excellent job for the amount of hours; but

22  if we had more hours, we could do a better job, you

23  know?  But --

24       Q     Did you think there was a need for it in

25  this situation?

Kenneth H. Hickey , Sr.                           May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 76

1       A    I'm always going to tell somebody to

2   increase the hours.  I'll never tell somebody decrease

3   the hours.  I mean, that's not good business practice.

4       Q    Yeah.  But you -- right here, right now, was

5   there a need for it?

6       A    I think it probably was.  Yes.

7       Q    Why do you think that?

8       A    Because even, you know, the weather starting

9   to change.  When the -- as weather get warmer, more

10  activities start on any -- any property.  But I can

11  just honestly say, I mean, she did -- she did the best

12  job she can do.  I think she did an excellent job.

13          One of the things that we did is that we

14  were proactive.  So to me, it was like being

15  proactive, let's increase the hours.  The weather

16  starting to get warm, activity increases.  That's just

17  part of the nature of the beast, you know?  When you

18  are in security, you in law enforcement, you know,

19  when the weather change and people able to be out

20  more, then the crime rate go up.  It just --

21      Q    Yeah.  It makes sense.

22      A    It's anywhere.  Yes.

23      Q    All right.  But she said no or said the

24  budget's not there for more hours?

25      A    Yes, yes.

Page 77

1      Q    Why did you decide that instead of

2  continuing with your existing hours you would

3  terminate the contract?

4      A    More hours and then it's the staffing.  it

5  becomes a staffing issue, especially when you deal

6  with armed officers.  You know, you -- we -- when we

7  have armed officers, they cost more.  Like, the rate

8  that I'm charging now is not even close to the rate we

9  charge now -- I mean, the charge I charge then is not

10  close to the rate we charge now.  Everything can go

11  up.

12        So I have to look at the viability of

13  maintaining a staff member there at that location and

14  would it be worth it.  So that's how I look at it.  So

15  there are plenty of contracts I've had in the past

16  where I say, "Hey, look, you know, we're not -- we're

17  not meeting the budget that we have for this

18  particular property.  Either we need to increase more

19  time or you have another property.  We can lump them

20  in together."  And that's how I operate on that end.

21  We make money through volume, not just one or two

22  contracts.

23      Q    And you were also getting paid late this

24  time.  Right?

25                MR. MELCHER:  Objection.  Form.

Page 78

1                THE WITNESS:  No.  Actually no.  Not --

2    I said most apartment complex, but we were -- the

3    first initial payments that we had it was because of

4    the mail.  They actually mailed the check out.  So it

5    took a little while to get it; but when we got it, we

6    never had any issue after.

7                You know, once COVID and the staff and,

8    I guess, for the postal service got better, then we

9    started getting our check on time.  So we didn't have

10   an issue on that.  It was just our first, initial

11   couple of checks and then that was it.

12   BY MR. MARKS:

13       Q    So this termination wasn't about timeliness

14   of payments.  It was wanting more hours and dealing

15   with staffing issues.

16       A    Yes, yes.

17       Q    And so you write in the letter that you're

18   terminating the contractual agreement on March 31,

19   2021.  Right?

20       A    Yes.

21       Q    So this would be terminating the armed

22   services contract.

23       A    It would be terminating -- yeah -- that

24   service, that particular contract.  Yes.

25       Q    Okay.  Mr. Hickey, I just handed you a

Page 79

1    document marked Exhibit 11.  This is titled "Hickey

2    Security & Investigation Incident Report," dated March

3    30, 2021.  You have that in front of you?

4                    (Exhibit 11 was marked for

5                    identification.)

6        A    Yes.

7        Q    What do you recall about this incident?

8        A    I almost shot this woman who was about to

9    try to hit me with a sledgehammer and also a -- she

10   threw something else at me.  She came running towards

11   me.  She had mental issues.

12            This is also an incident where the City of

13   Atlanta Police failed to do they job.  They initially

14   made contact with this individual about an hour before

15   I came on duty, and they failed to do their job.  And

16   she was having a mental issue, drug issue; and she was

17   also talking about she was dealing with a gentleman in

18   A building who knew her.  They were having some type

19   of sexual relationship, but she wanted drugs.

20            She came out; and as she was sitting there,

21   I just said, "Hey.  How you doing?"  She started

22   screaming at me.  Not knowing that City of Atlanta

23   Police were just there maybe -- I'm sorry -- less than

24   an hour before I go there and did nothing to assist

25   this lady.  She was having -- she also has some mental

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 80

1    issues.

2           And so she charged me with a sledgehammer.

3    That's what it was, the sledgehammer.  She charged me

4    with a sledgehammer and was about to hit me with it.

5    And so -- but she saw -- she saw a Glock 22, and she

6    changed her mind.

7           Q    You said you almost shot her?

8           A    Yeah.  I was about to shoot her.  If she had

9    proceeded towards me, I would have shot her.  Getting

10   hit with a sledgehammer is not conducive to, you know,

11   surviving.

12          Q    That's a scary situation.

13          A    Yeah.  it's part of the job.  But we ended

14   up 10-13-ing her and taking her to jail.  I mean,

15   taking her to Grady.  I didn't press charges on her

16   because Grady EMS came, and they was familiar with

17   her.  And their -- their mental crisis response team

18   also came.

19          And being the fact I used to work at Grady,

20   they -- I don't know if they recognized me but I spoke

21   to them and -- in depth and then they told me, you

22   know, "Yeah.  She's -- she's not taking her

23   medication."  So that was one of the other reasons.

24          Q    Now, you mentioned a moment ago the APD not

25   doing their job in your opinion.  Right?

Kenneth H. Hickey , Sr.                              May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 81

1        A     Yes.

2        Q     Could you get Exhibit 8 back out.  It's the

3   big one.  And turn to the March 2, 2021, report in

4   that document.

5        A     You said March?

6        Q     Yeah.  March 2nd.

7        A     I'm there.

8        Q     So the March 2nd report in Exhibit 8 has a

9   suspicious activity section that, I believe, you

10  wrote.  Correct?

11       A     Yes.

12       Q     So this says, "APD responded to a domestic

13  call in A building.  Upon speaking with the officer,

14  he was extremely uncooperative.  He barely provided me

15  with any information.  I was waited to turn in the

16  reports to see if he had an Incident Report.

17            The officer changed the call to a

18  disturbance and failed to complete report.  This is a

19  clear violation of state and federal law concerning

20  domestic violence.  I will speaking with his upper

21  leadership concerning their lack of cooperation with

22  security."  Did I read that correctly?

23       A     Yes.

24       Q     What do you recall about this incident?

25       A     The officer responded to the call.  I -- I

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 82

1    just happened to be there, and I was asking him what

2    was the nature of the call.  And unfortunately, some

3    officers look down upon security and don't -- don't

4    really consider them to be part -- he did not know my

5    background or know that I was a police officer at the

6    time, a sergeant.  And he was being very belligerent.

7          He was just -- wasn't cooperative.  I don't

8    know why.  It's open record.  He has to give me

9    information.  I -- I think I did speak to his

10   supervisor about that, but he changed the call.

11         So you know if it's a domestic violence, you

12   must do an Incident Report.  And that's one of the

13   things they would do is change the call to a

14   disturbance, which does not require them to have a --

15   do a report.  So he just being lazy.

16     Q    All right.  This is a couple of situations

17   now where you think the APD should have done an

18   Incident Report that they didn't do.

19     A    Yes.  But also, I have to say now, to -- to

20   their defense, that there were mandates on arrests

21   that you made during the COVID time.  So a lot of

22   stuff they tried to handle without making an arrest

23   because of COVID.  So the jail was very reluctant to

24   take someone if they -- if they didn't have to.

25     Q    You said that you -- excuse me.  What was

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 83

1    your testimony about whether or not you spoke with his

2    upper leadership about the lack of cooperation?

3        A    I think I spoke to somebody.  I remember

4    speaking to somebody.  I don't know if it was his

5    direct leadership, but I remember speaking to someone

6    within APD.

7        Q    And who do you recall speaking to?

8        A    You know, my sister work Atlanta 911; so I

9    have access to a lot of stuff.  So I'm quite sure I

10   spoke through her or she had somebody call me and I

11   spoke to them.  I just don't recall exactly how.  But

12   I have family members work Atlanta 911.  They are

13   familiar with me from working the state and that my

14   sister work there.  So I do a little -- I'm a little

15   privy to a lot more stuff than most people.

16       Q    But you don't recall the name of the

17   officer, sitting here today?

18       A    Yeah.  No, I don't.  No, I don't.  I don't

19   remember the name.

20       Q    Okay.  I've handed you what has been marked

21   Exhibit 12.  This is an April 13, 2021, e-mail from

22   you to Ms. Wynn, titled "Security Management Proposal"

23   and it includes the attachment Seven Courts

24   Apartment's 04122021.pdf.  Do you have that in front

25   of you?

Page 84

1              (Exhibit 12 was marked for

2              identification.)

3     A    Yes.

4     Q    What is this proposal?

5     A    Our security management service, what it

6  does is for properties -- like, not a property that

7  I'm negotiating with -- that can't afford 24/7 patrol

8  service, that cannot afford even eight hours patrol

9  service, what they -- we do is we do a random patrol.

10           We'll go check the property.  If local law

11 enforcement is called, we'll respond with them, you

12 know, after they get there.  We're not going to go

13 there and handle the call.  We'll respond if it's

14 something major so if there's, like, a robbery so they

15 can have a representative there for their best

16 interest.  And that's what part of the service is.

17           And we do, do, like, security checks for,

18 like, at nighttime to make sure the lights are working

19 properly, during the daytime to see if they violate

20 any zoning or stuff like that, leasing agreement.

21 We'll walk the property to see stuff -- see if they

22 have anything and then -- but that's not done on a

23 regular basis.  That's done, like, random.

24           One of the things we did -- I did for her,

25 which I normally don't do is that they would call me

Page 85

1    and have me pass out notices.  So -- and I think that

2    was the one that the young lady that had the -- I

3    think I was passing out notices during that time, and

4    so I was just finishing up.  So yeah.

5              Normally I'd go around and A building would

6    be the last building I would go to, and that's where

7    she was at.  So that's when I saw her.  So yeah.

8    That's what we were doing for them during that time.

9         Q    You said that something you were doing for

10   her that you don't normally do is pass out notices.

11   When you said "her" there, were you referring to

12   Ms. Wynn?

13        A    Ms. Wynn.  Yes.

14        Q    Why don't you normally pass out notices?

15        A    On the security management we don't.  On the

16   regular patrol thing we do.  But on that particular we

17   normally don't 'cause it takes a longer time period;

18   and they're not, you know, they're not privy to all

19   the hours that we normally give.  But if it's like two

20   or three or four, something like that then we'll -- we

21   don't have no problem with that.

22             So it just depends upon how many.  If it's a

23   large number, I tell them, you know, "You need to get

24   your staff to do that."  But if it's a small amount,

25   we don't -- you know, good customer service.  We try

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 86

1  to extend.

2       Q    So how many times a week would you come on

3  the property and pass out notices?  You or one of your

4  officers?

5       A    They only -- it's probably only about two or

6  three times a month that we would have to go pass out

7  notices.

8       Q    Now, turning back to the Exhibit 12, if you

9  look at the third page of the exhibit that ends with

10  590 in the bottom right, that is a letter from you to

11  Seven Courts Apartment where you describe your

12  security management proposal as saying, quote, "This

13  program allows apartment communities to have some form

14  of security and safety measures in place."  What did

15  you mean by "some form of security and safety measures

16  in place"?

17       A    It's -- it's what I said earlier.  It's --

18  it's a -- instead of the full service, it's broken

19  down to where we give them some form of -- where we

20  don't -- we do -- instead of doing patrol 24/7, we

21  might patrol the property two or three times a week

22  for, like, an hour or less than an hour.  We'll just

23  drive through, check up.  We'll work with the local

24  police department to see what type of crime stats,

25  we'll obtain crime stats, we'll create a crime chart

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 87

1   for the property.  But like I said, with them, it was

2   mostly dealing with us having to do -- passing out

3   notices and then checking the area and stuff.  I have

4   to take a break real quick --

5                    MR. MARKS:  Let's go off the record.

6                    THE REPORTER:  We are off the record at

7   11:55.

8                    (Off the record.)

9                    THE REPORTER:  And we are back on the

10  record at 12:05 p.m.

11  BY MR. MARKS:

12     Q    When we left off, Mr. Hickey, we were

13  discussing your Security Management Proposal, Exhibit

14  12.  Correct?

15     A    Yes.

16     Q    Now, if you look at page 2 of your proposal,

17  which is TPI000591, does this page describe the

18  services you were providing Seven Courts under your

19  Security Management Proposal?

20     A    Yes.

21     Q    So that would be safety checks three times a

22  week.  Correct?

23     A    Yes.

24                    THE REPORTER:  Pardon the interruption.

25  Your microphone is falling.

Page 88

1          MR. MARKS:  I did not put it --

2          THE REPORTER:  There you go.  Perfect.

3    Perfect.

4    BY MR. MARKS:

5      Q    Is there anything listed on this page that

6    you did not do at Seven Courts Apartment when you were

7    providing security management services?

8      A    It's -- this is just some of the services

9    that I can offer.  I don't -- you know, we might not

10   need it to do -- to do anything.  So I didn't assist

11   management in review of criminal background

12   investigation 'cause they didn't -- they didn't ask me

13   to.  APD didn't notify me of any violent -- or crimes,

14   so I didn't -- I didn't do that.

15     Q    So you had mentioned passing out notices as

16   one specific thing that management asked you to do

17   under this contract.  Correct?

18     A    Yes.

19     Q    Were there other specific things that they

20   asked you to do under this contract?

21     A    Patrol the property.

22     Q    Three times a week randomly as set out here?

23     A    Yes.

24     Q    I will represent to you, Mr. Hickey, that

25   the last formal report that we have received that has

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 89

1    been written by your company is Exhibit 11, which is

2    the March 30, 2021, Incident Report involving the

3    woman with the sledgehammer.  Did you write any Daily

4    Reports or Incident Reports after March 30, 2021?

5        A    No.  Not -- not on this form right here.

6    Most of the forms that I -- most of the forms that I

7    did or contact I made with Ms. -- Ms. Wynn or anybody

8    on the property, I would do it in a text because we

9    were there at random.  We wasn't there, like, four

10   hours for the thing.  So if something happened, if I

11   saw something or she wanted me to pass out notices --

12   like I said, that's the biggest thing that we did for

13   them during that time was just passing out the notices

14   and stuff like that.

15            During the random check, we just driving

16   through and coming out.  We didn't see anything, we

17   didn't say anything, you know.  Was nothing for us to

18   say -- so to report.  So that I think during those

19   times I just did a text, "Hey.  Everything is clear.

20   We was here."

21            And that was it.  And that was it on that

22   right there.  It was -- this -- with her was very

23   limited what we needed to do for the property at the

24   time.

25       Q    So for her it was very limited what you

1    needed to do for the property at the time.  Being

2    mainly pass out notices?

3        A    Mostly pass out notices and just drive

4    through to make sure, check on the property, any

5    lights out.  The minimum.  But that's what the

6    management-proposed services is.  You don't get a

7    full-fledged, like, this right here, the reports, the

8    staying on the property for several hours or, you

9    know, some properties you might be at eight.  Some

10   property might be there 12.  Just depends upon what

11   the contract of agreement is.  So this is what we did

12   for her on that.

13       Q    And I understand entirely.  You're not doing

14   work that you're not paid to do.  Right?

15       A    Yes.  True.

16       Q    And this is a very limited contract with

17   limited services.

18       A    Yes.

19       Q    The month of -- let me put an exhibit in

20   first.  Like I said, I'm not going to try to trick

21   you.  Let me put a document in front of you that we

22   can talk about.

23            All right, Mr. Hickey.  I'm passing you what

24   has been marked Exhibit 13.  And this is an e-mail

25   from you to Seven Courts Apartment, subject

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 91

1    "Invoices," dated May 24, 2021.  Do you have that in

2    front of you?

3                   (Exhibit 13 was marked for

4                   identification.)

5         A    Yes.

6         Q    And you write here in this e-mail, "Here are

7    the invoices.  Also, the monthly invoice for the

8    security management services."  If you look through

9    the invoices, you have weekly invoices for armed

10   security officer services for the four weeks in April

11   from April 4th through May 1st.  And then you have

12   security management invoice for the month of May.

13   Correct?

14        A    Yes.

15        Q    We had discussed your termination letter

16   earlier that said you were terminating the armed

17   security officer services on March 31st.  Correct?

18        A    Yes.

19        Q    How did you end up providing armed security

20   services for the month of April?

21        A    Well, she sent me an e-mail and asked me to

22   -- she called me too and said that she wanted me to

23   stay on a little bit longer, could I do it?  I sent

24   her an addendum or -- to this.  I don't see that, but

25   there was an addendum for the -- and I also sent her

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 92

1    the -- the security management service proposal.  So

2    that's -- that was the agreement.  So we just

3    continued the service.  That's all we did.

4         Q    And so it's your testimony that you sent

5    Ms. Wynn an addendum to cover the month of April for

6    the armed security services?

7         A    No, no.  For the security management

8    service.  So once -- you just showed me the -- the --

9    for the armed services for the month of April.

10        Q    Yes.

11        A    So on May the 1st, that's when the security

12   management services started.  So when our agreement

13   that we had -- I'm quite sure there was some type of

14   documentation.  I'm just -- I don't remember exactly

15   where it's at now.  But this is the weekly service

16   that I always sent in to her for -- for payment; and

17   once we decided to start May the 1st to do the monthly

18   things, then that's when I sent her the invoice for

19   that.  So that's -- that's when we started it.

20        Q    Okay.  I'm just representing to you that I

21   have not seen documents that cover that April Armed

22   Services Contract.  I'm just asking, do you think that

23   an e-mail or a contract or anything exists where, you

24   know --

25        A    Well, the contract didn't terminate with the

Kenneth H. Hickey , Sr.                           May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 93

1    letter that I sent to them.  We didn't terminate on

2    that particular date.  We kept it until --

3         Q     The end of April.

4         A     Yeah.  So that's -- we end up doing that.

5    So that e-mail was an old e-mail that we ended up

6    changing, you know, the agreement.  So that's why I'm

7    like, I'm quite sure I sent an addendum 'cause we

8    would had to, to change over to what we were doing.

9    That's probably why I sent the proposal to her.  Say,

10   "Hey.  This is the service I'm going to start, and

11   we'll do it this way."

12        Q     Yeah.  So May was the first month of the

13   security management services.

14        A     Yes.

15        Q     For the month of April, I have not seen the

16   same kind of Daily Reports that you had sent through

17   January, February, and March that are in Exhibit 8.

18   Why is that?

19        A     Remember I told you my computer, I went to

20   Best Buy to Geek Squad.  So they had my -- I had to

21   get my computer fixed, and I lost a lot of the stuff.

22   So that was during the time where I didn't have -- and

23   I tried to go back and look for it.  That's why I

24   told -- I think it might have been you -- the young

25   lady here, that I lost some stuff that was dealing

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 94

1    with my laptop.

2              So I could not -- I couldn't find it.  So we

3    normally store it within the Cloud system but I don't

4    know why but the Geek Squad had to erase my -- I

5    thought they had did the backup on the computer.

6    That's what they normally do for you.  They didn't do

7    that, and I lost some -- some reports.  And that was

8    during the time that that happened.

9              So I could probably try to, you know --

10   well, I tried before to try to recoup that stuff.  I

11   just couldn't do it.  I'm not -- I'm okay with

12   computers, but I'm not that computer savvy.

13       Q    And so you think that reports from the end

14   of March and through April were lost thanks to the

15   Geek Squad?

16       A    Yeah.

17       Q    Is it your testimony that you were, in fact,

18   sending Daily Reports throughout the month of April?

19       A    We had a gap of time where sometimes I

20   didn't send right away.  I might have or might not or

21   I probably held them up for a day.  I'm sure I did.

22   But also, the e-mail address that I -- that you have

23   on here is my old e-mail address.  I no longer use

24   that e-mail address.  So --

25       Q    What is your new e-mail address?

Kenneth H. Hickey , Sr.                     May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 95

1        A     It's K-H -- it's khickeysr@hickeysi.com.

2                    THE REPORTER:   Is senior written out or

3    is it just --

4                    THE WITNESS:   It's S-R.

5                    THE REPORTER:   Thank you, sir.

6    BY MR. MARKS:

7        Q     And that was @ what?

8        A     Hickeysi, H-I-C-K-E-Y-S-I .com.  And so the

9    website is hickeysi.com -- www.

10       Q     So whether you sent them late, this or that,

11   do you think that for the month of April, out there

12   somewhere, Daily Reports exist?

13       A     Yes.  And I think what probably happened is

14   that they -- during the switch over of my e-mail

15   address, that that probably could have -- 'cause I had

16   to go back into the -- the e-mail that you have right

17   here with the Hickey -- the khickey, I had to go back

18   in there and to find all the e-mails and stuff.

19                  So that probably could have been the reason

20   too why I lost that much 'cause I switched the

21   website.  I went from -- I -- I use Network Solutions

22   now, but it was -- I was doing Wicked or -- I -- I

23   can't recall the exact company name.  But it took me a

24   minute to get everything switched over.

25                  So I did lose a lot of stuff on that end.

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 96

1  That probably could have been why I didn't have as

2  much at that time, and we were probably just -- I was

3  texting her or letting her know whatever happened

4  during that time.

5          But we weren't doing the major patrols like

6  we were doing on that one because you could tell that

7  was a more thorough and detail.  But I'm quite sure

8  that's why I didn't have it because I couldn't recover

9  it too.  Plus, like I said, the Geek Squad --

10 they -- my computer with my laptop.

11     Q    Yeah.  And I understand you've done what you

12 can to try to get us documents.

13     A    Yeah, yeah.

14     Q    Just for your own context, we're also trying

15 to get documents from folks at TPI.  And so I'm just

16 trying to ask you right now to understand, like, out

17 there.  Not for you to go get them again but, like,

18 what does or doesn't exist that we can ask them to

19 get.  Just to be candid with you.

20     A    Oh, and also, I ended up -- when I switched

21 my e-mail address -- so they could have sent stuff to

22 the other e-mail address and didn't go through 'cause

23 I did get -- you know, that could have happened.  I've

24 had a client -- just recently, one of my clients was

25 sent into the old e-mail address; and I had to let

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 97

1    them know.

2        Q    Yeah.  So for the month of April, when you

3    were still providing the armed security services, what

4    e-mail address would you have sent the Daily Logs to?

5        A    E-mail who I sent it to them?  Well, I sent

6    it to the -- I would send it to the one that they

7    provided me, the Seven Courts Apartments.

8        Q    Okay.

9        A    That's where they would go to.

10       Q    So to the extent that you sent any Daily

11   Logs covering April, it would have been to the Seven

12   Courts at gotpi.org address?

13       A    Yes.  Yes, that's correct.

14       Q    Okay.  Did you ever e-mail with Ms. Wynn on

15   any e-mail address other than her gotpi.org e-mail

16   address?

17       A    She has her own -- she has her e-mail

18   address for her office and then a Seven Courts is

19   where everybody get to see it so the other people --

20   so, I guess, it's like a group e-mail, everybody can

21   see it.  So she does have her own one, but I -- I --

22       Q    But also a gotpi.org?

23       A    Yeah.  Yes.

24       Q    Have you ever, for instance, e-mailed her at

25   toyawynn@gmail.com, some personal address?

Kenneth H. Hickey , Sr.                              May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 98

1        A     No.   No.   She never gave me that.

2        Q     Okay.   Is there anybody at Seven Courts that

3   you e-mailed at anything other than a TPI e-mail

4   address?

5        A     No.

6        Q     Did you know Rodrick Harris?

7        A     I don't recall that name unless he's a

8   maintenance man, but I really didn't interact with --

9   that's one of the things we don't do with our company.

10  We don't fraternize or try to befriend staff because

11  it -- it becomes a conflict at times.  Unfortunately,

12  in my years of doing this, I've had to arrest managers

13  and maintenance supervisors and different people from

14  everything.  From selling drugs to, you know, doing,

15  buying drugs.  So we -- it's just always been a policy

16  of ours.

17       Q     Do you know who Ms. Wynn's boss is?

18       A     No.

19       Q     Okay.  So you never had any interaction with

20  anyone.  She was, like, the top dog as far as Seven

21  Courts goes.

22       A     Yes.  If he relayed something, it was

23  through her to me.  I never spoke directly to him.

24       Q     And you testified a moment ago, I think,

25  that after you switched to security management

Page 99

1    services, you would not have been providing Daily

2    Logs.

3         A    No.  Would not have.

4         Q    And at that point -- so from May forward,

5    your communications would primarily be via text

6    message.

7         A    Text or they'll call me.  Like, they'll call

8    me and say, "Hey.  We got some notices that need to go

9    out.  Can you come drop them off?"  Okay.

10        Q    All right.  I'm handing you what has been

11   marked Exhibit 14.  This is an e-mail chain dated

12   November 23, 2021, between you and Aaron Block at our

13   office, sitting right to my left.  Do you have this in

14   front of you?

15                    (Exhibit 14 was marked for

16                    identification.)

17        A    Yes.

18        Q    Do you recall communicating with our office

19   a little bit after receiving a subpoena?

20        A    Yes.

21        Q    And these are, in fact, e-mails that you

22   exchanged with our office.  Correct?

23        A    Yes.

24        Q    So if you look at that, your first e-mail at

25   the top of the chain, you say there, "We were

Kenneth H. Hickey , Sr.                May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 100

1    providing security management services.  This is where

2    we check the property randomly, and mostly I was

3    passing out late notices."  Did I read that correct?

4         A    Yes.

5         Q    And that's what you just testified to a

6    moment ago in some detail.  Correct?

7         A    Yes.

8         Q    Okay.  All right.  I'm handing you what has

9    been marked as Exhibit 15.  This is another e-mail

10   thread between you and our office, this time with

11   Ellie Oglesby; and the top e-mail here is dated

12   January 5, 2022.  Do you have this in front of you?

13                   (Exhibit 15 was marked for

14                    identification.)

15        A    This one says Monday, November the 20th --

16   21.  It says December and --

17        Q    Here.  Can I switch that tag onto a

18   different document?

19                   MR. MELCHER:  So this is not going to

20   be 15?

21                   MR. MARKS:  That's correct.

22                   MR. MELCHER:  Okay.

23                   MR. MARKS:  So I am changing the

24   exhibit from the document I just passed to you and

25   putting it onto the one that I described for the

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 101

1   record.

2   BY MR. MARKS:

3        Q     Okay.  Now do you have in front of you an

4   e-mail chain with Ellie Oglesby at our office with the

5   top e-mail dated January 5, 2022?

6        A     Yes.

7        Q     Okay.  And if you look down at your top

8   e-mail in this chain, dated January 4, 2022, you told

9   Ellie -- and this is about reports after March 2021.

10  "I do not have any reports during this time.  As I

11  stated, I was working as a consultant; and my duties

12  were merely passing out notices and driving through

13  the property periodically."  Did I read that

14  correctly?

15       A     Yes.

16       Q     And you testified a moment ago that you

17  believe there may be reports somewhere for the month

18  of April.  Correct?

19       A     Yes.

20       Q     Other than that, your statement here is

21  accurate.  Correct?

22       A     Yes.

23       Q     And consistent with the testimony you gave a

24  moment ago.  Right?

25       A     Yes.

Kenneth H. Hickey , Sr.                May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 102

1      Q    Okay.  All right.  Now I'm going to tag the

2   document that you had a moment ago that I took away

3   from you as Exhibit 16.  So Exhibit 16 that I just

4   handed to you is an e-mail chain between you and

5   Ms. Oglesby that begins on December 13, 2021, and ends

6   on December 20, 2021.  Correct?

7                  (Exhibit 16 was marked for

8                  identification.)

9      A    This says Monday, December the 20th, 2021,

10  and it has December 12, 2021.

11     Q    And the very first e-mail on the chain at

12  the bottom is December 13th.

13     A    No.  It's --

14     Q    The next page.

15     A    Oh, it's the next page.  Yeah.  So.

16     Q    So the chain starts with December 13, 2021,

17  and runs through December 20th.  Correct?

18     A    Yes.

19     Q    Okay.  So in your first e-mail in this chain

20  to Ellie, you describe the situation with your old

21  laptop and then you go on, "Also, on the date of the

22  incident with the resident, my contractual obligation

23  had changed.  I was working under our security

24  management program.  This is not a full-time patrol

25  services, and I was on the property to pass out

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 103

1   notices."  Did I read that portion of the document

2   correctly?

3        A    Yes.

4        Q    And again, that's consistent with what you

5   testified a moment ago.  Right?

6        A    Yes.

7        Q    Okay.  What do you -- let me ask this.  So

8   before the burglary that gave rise to this litigation,

9   did you know who our clients were?  And so this would

10  be Senora Elsa Flores Diaz and Senor Edwin Caceres

11  Medrano.

12       A    I didn't know them personally.  I've seen

13  them on the property.

14       Q    Did you see them on the property to where

15  you knew who they were?

16       A    Yeah.  I knew who they were 'cause they got

17  kids that like to play, and they play out in the

18  streets and stuff.

19       Q    Yeah.  So what were your observations of the

20  family before the burglary?

21       A    He didn't have control of his kids.  I

22  wouldn't let my daughters hang out in the property.

23  They would riot.  They would be in areas where I

24  thought that young girls and boys shouldn't be at.

25            They rolled through the parking lot skating,

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 104

1    which was unsafe.  They -- in fact, I had to stop them

2    several times to stop pushing somebody because they so

3    low to the ground you couldn't see them.  You know, I

4    had a truck and I had Dodge Charger.

5              But they were always out.  They -- but I'm

6    old school.  My kids -- once the street lights come

7    on, you got to be in the house.  They were out a lot

8    late, and I just -- I didn't agree with that.

9         Q    Did you speak with anyone in the family

10   about any of this?

11        A    I spoke with him himself.

12        Q    Tell me what you remember about that

13   conversation.

14        A    He couldn't speak English well, so I had an

15   app on my phone that allows me to speak Spanish to

16   someone; and I told him that his kids need to be

17   inside and that they are in a cul-de-sac bringing too

18   much noise and they was by somebody else's building.

19   And we had a little brief conversation, and I used

20   this phone right here to translate.

21        Q    When did that conversation take place?

22        A    It was before the incident, so it was --

23   we've had -- I've had to tell kids -- and not just his

24   kids but other kids too.  They like to loiter, hang

25   out.  You know, most apartment policies, you got to be

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 105

1   in or either on your balcony or your patio and not

2   hanging out in the common area.  And of course you got

3   kids, they going to want to play and skate and do all

4   the other stuff; so that was one of the things that

5   they would do.

6          So we were very lenient on that.  management

7   didn't like it though; but, you know, I can't arrest

8   somebody for skating on, you know, on the thing.

9   That's -- that's some leasing agreement they have to

10  address.  But other than that, that was it.

11      Q    When you said management did not like it,

12  what specifically did management not like?

13      A    The kids hanging out loitering late at night

14  or that they were -- you know, you rent from your

15  balcony to your front door.  And so if they was on

16  they porch or balcony, we didn't care.

17          But when they left that area and they --

18  they would get on they bikes, the skates 'cause it has

19  a circle like a racetrack, how it -- how it circles.

20  So they would go around and around and stuff.  And

21  so -- and they hung out with other little kids out

22  there.  I mean, they did kid stuff.

23      Q    Yeah.  So which of the family's kids

24  specifically did you observe?

25      A    All of them.  All the kids that lived there.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 106

1    I didn't know their -- I didn't identify them by their

2    names.  I just knew if I saw them, what apartment they

3    went in.  Only a few I actually had to go speak to

4    their parents.

5              You know, you have some young boys over

6    there that was growing up and some of the young girls

7    that were growing up too; and it was, you know, they

8    had some inappropriate -- in my opinion, inappropriate

9    conversation.  There were times where the little boys

10   were flirting with the girls and the girls were

11   flirting with them and so, you know, they would just

12   get out of hand, started horseplaying as they say.

13        Q    So are you talking about the kids from more

14   than one family in your testimony just now?

15        A    That and also their -- if I'm -- if I'm --

16   if it's the same family that they live downstairs in

17   the bottom apartment, then it would be -- it would be

18   him, the clients, their kids too.  I saw them out,

19   hanging out too.

20        Q    How did management express to you that they

21   didn't like the kids out there?

22        A    I would -- I would let them know.  They told

23   me.  They were like, "One of our problems we going to

24   make sure it's safe with kids loitering, out playing

25   and doing stuff they not supposed to be doing.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 107

1    That's, you know, that's any apartment complex.  It's

2    not --

3         Q    Did you ever observe Ms. Wynn interacting

4    with the children?

5         A    Yes.  But her interactions were more like

6    the mother figure type, you know.  "Y'all don't be

7    doing this."  You know, "Don't play in this area.

8    Don't, you know, hang out."  It wasn't one where she

9    was, you know, being mean to them.

10        Q    You ever hear Ms. Wynn say that she'd call

11   immigration on them?

12        A    No.

13        Q    You ever hear her make any comments that you

14   would consider disrespectful?

15                    MR. MELCHER:  Objection.  Form.

16                    Go ahead.

17                    THE WITNESS:  She has her own way of

18   speaking, so I don't -- I mean, what might offend me

19   might not offend somebody else.  I don't -- I don't

20   know how to answer that one.  She -- she was -- can be

21   verbal.  She used profanity at times.  So, you know,

22   but that's not uncommon in my industry.

23   BY MR. MARKS:

24        Q    You ever hear her interact with Latinos in a

25   way that she didn't interact with non-Latinos?

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 108

1        A     No.  I wasn't -- I wasn't privy to that.

2    You know, I was there to come into the office.  If I

3    grab notices or I was on patrol, say, "Hey.  I'm

4    here."  I wasn't privy to sit in any meetings that she

5    had.

6        Q     You had mentioned that you spoke with our

7    client about the children.  Correct?

8        A     Yes.

9        Q     At least you think that you did.

10        A     Yes.

11        Q     Are you sure that it's our client or you

12    just think so?

13        A     Well, if it's the apartment when -- like I

14    said in my report where we had the incident, if that's

15    the same -- if he's the same individual, the husband,

16    the wife, and the kids, then that's them.  I mean, I'd

17    have to look at the leasing agreement or the location

18    of where they property at -- the apartment was located

19    at, which is by the leasing office.

20              It was downstairs.  There's only one at that

21    particular location.  I also have a diagram that I

22    created of the property and stuff.  So, I mean, if

23    that's him, yeah.

24        Q     So you recall having one conversation with

25    the father?

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 109

1              MR. MELCHER:  Objection.  Form.

2              Go ahead.

3    BY MR. MARKS:

4        Q    Right?

5        A    Yes.

6        Q    Do you recall any other conversations other

7    than the one you testified about a moment ago?

8        A    Yes.  There's been a few with the kids

9    playing in the street.  Remember I was telling you

10   about they were playing in the parking lot, running

11   around.  It was unsafe.  I just felt it was unsafe,

12   and I spoke to management about it.

13       Q    Okay.  What happened after you spoke with

14   management?

15       A    Normally they'll send a letter.  They would

16   send a letter to them or they will speak to them or

17   however to communicate.  But most of the time, if I --

18   if I spoke to her about somebody, the next day or

19   maybe a day or two later, I have a notice I have to

20   put on that apartment.  So I just assume that they

21   probably let them know, "Hey.  You need to take care

22   of this infraction."  Or "Please don't so this."

23       Q    Okay.  Any other interactions with the

24   family that you can recall?

25       A    There was an incident where the young lady

Kenneth H. Hickey , Sr.                     May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 110

1    was talking with some young boys; and the little boys,

2    I think, got a little out of hand.  They were, you

3    know, being kind of promiscuous towards the young

4    lady; and it was -- and I told them, you go that way,

5    you go that way and -- 'cause she was saying they were

6    bugging him.  That's what it was.

7              They were bugging her and they were

8    following her trying to talk to her.  And she was

9    like -- I think she had a little -- it was a little

10   young lady with her too 'cause they were on the

11   playground at first.

12             And, you know, and I think that's when

13   they -- I don't know if they closed it down or they

14   weren't supposed to be in there.  But it was a rope --

15   they done roping the playground off 'cause the

16   playground was roped off for quite a long time.  But

17   then they end up taking it -- letting them go back and

18   play in the area and sit.

19        Q    So you recall a time when you had an

20   interaction with the daughter involving some young men

21   who were bothering her?

22        A    Yes, yes.

23        Q    Do you recall around when that was?

24        A    It was during the daytime.  It was daylight

25   hours when I remember that it happened.  So.  But it

Kenneth H. Hickey , Sr.                     May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 111

1    was probably me coming on the property, picking up

2    some notices or something like that, and probably

3    going to come back the next -- later on that night and

4    stuff, pass them out or I probably pass them out

5    during that time 'cause if the weather was warm, I

6    would go ahead and do it right then and there.

7         Q    So would that be towards the end of your

8    time at Seven Courts?

9         A    No.  Towards -- that was probably around

10   about April.  The weather wasn't -- you know, it was

11   still cool.  It wasn't that, you know, hot.

12        Q    Okay.

13        A    So that's about when I remember that.

14        Q    Any other interactions that you can recall

15   now?  And you're aware that the family was the victim

16   of an armed robbery.  Right?

17                  MR. MELCHER:  Objection.  Form.

18                  THE WITNESS:  Yes.  I responded -- I

19   just happened to be coming on the property when the

20   police was there, and I went to find out.  So.

21   BY MR. MARKS:

22        Q    Tell me everything about that night from the

23   time you arrived on the property in as much detail as

24   you can recall.

25        A    When I came onto the property, I had to pass

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 112

1   out some notices.  So that's why I was on the property

2   that particular night.  And when I got there, I saw a

3   large number of police officers, City of Atlanta.

4            I parked my vehicle, went to speak to one

5   officer.  "Hey.  What's going on?"  Introduced myself.

6   They were not -- they were not -- they were being a

7   pain.  They were not cooperative whatsoever.  I just

8   wanted to know what was going on.

9            And then that's when I don't know who told

10  me that they had a -- somebody tried to break into

11  their house, kicked their door in or something like

12  that, tried to rob them.  And I was like -- I was

13  shocked for it to be that particular apartment because

14  they just have their little kids and stuff.

15           I don't -- you know, they had a little young

16  -- young boy, probably, like, a little teenager.  I'm

17  not sure.  He might have been 16 or 15 or 16.  But --

18  and then the young girl.  I think they have a little

19  -- it's two little kids too.  So.  But I was just

20  surprised that it was that -- that particular

21  apartment.

22       Q    Why were you surprised about that?

23       A    I mean, they weren't and -- I mean, they

24  weren't bad kids.  It wasn't like they were doing

25  anything that I would think that, you know, to bring

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 113

1   attention to themselves or -- like some of the other

2   apartments that -- people that she had gotten rid of

3   that kids were just, you know, out being mischief.

4   And so she would -- she would get rid of the people

5   that were causing problems.

6                  MR. MELCHER:  Who's "she"?

7                  THE WITNESS:  I'm sorry.  Ms. Wynn.

8                  MR. MELCHER:  Okay.  Thank you, sir.

9                  THE WITNESS:  Ms. Wynn would get rid of

10  people, evict them.  But like I say, because of the

11  moratorium that was going on with the eviction, that

12  was really hard to do.  And so it was just sending out

13  notices.  And that's what they did a lot of.  She kept

14  documentation of stuff or, I guess, she kept it.  But

15  I know I passed out some notices for her.

16  BY MR. MARKS:

17      Q    Why are you talking about eviction right

18  now?

19      A    Because that what was going -- that's what I

20  said.  They would normally evict people; but because

21  of the moratorium --

22      Q    Okay.  But who would they have normally

23  evicted?

24                  MR. MELCHER:  Let him finished the

25  first question if you don't mind.

Kenneth H. Hickey , Sr.                May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 114

1              THE WITNESS:  So the reason why I said

2    eviction because that was a way of getting rid of

3    people who were causing problems on the property.  So

4    because of the moratorium, we could not evict the

5    people.  We would send out notices.

6              So that's why I did probably a lot more

7    notices than I probably would have in any other cases

8    from time when I been doing this for quite some time.

9    So normally it wouldn't take that long to get somebody

10   who is a problem child out of the property.  I was

11   just referring to based upon the incidents that I was

12   talking about.

13             But we didn't have any issue with your

14   clients because, you know, I'd say, they weren't real

15   bad kids.  The other people that were, she would evict

16   them.  We couldn't do that because of moratorium.

17   That's why I was bringing up evictions.

18   BY MR. MARKS:

19      Q    Are you suggesting that someone who you

20   couldn't -- or that TPI couldn't have evicted because

21   of the moratorium may have robbed our clients?

22      A    No.  I did not say that at all.

23      Q    I'm just curious -- I'm wondering if you

24   were suggesting that maybe our client should have been

25   evicted or -- I'm not entirely following how eviction

Page 115

1   figured into it.

2        A    Counsel, I did not say that in any shape,

3   form, or fashion.

4        Q    Yeah, yeah.  I apologize.  I'm just trying

5   to understand how eviction fits in.

6        A    Well, you ask me.  I'll answer the question,

7   but don't -- don't try to lead me into saying

8   something I didn't say.  What I said was your client

9   -- I said they were not that bad.

10            I said other people who cause problems on

11  the property, we would evict them; but due to the

12  moratorium that we could not kick them out the

13  property or evict them; therefore we had to do other

14  things where she passed out notices, which I passed

15  out notice and we would contact them.  That's all I

16  said.  I never said nothing about your client in any

17  way, shape, form, or fashion on that level.

18       Q    How does the comments about evictions and

19  the moratorium connect to the robbery that took place?

20            MR. MELCHER:  Objection.  Form.

21            THE WITNESS:  It doesn't.  I was -- I

22  was answering a question that you asked me and

23  about -- you asked me about people who we have

24  problems with.  I said we have problems with people on

25  the property.  I said normally we could evict them;

Page 116

1    but because of the moratorium that they were not

2    allowing people to evict because of the COVID, we

3    could not do that so we passed out notices.

4    BY MR. MARKS:

5         Q    I think we may have gone down a trail here

6    that's not -- so you had commented that you were

7    surprised that our clients were people who had gotten

8    robbed, and I asked you why.

9         A    And I said because they -- I haven't had any

10   issues or problems with them.  They were not, you

11   know, known, you know, to have any problems.  So

12   that's why I said if we did have somebody that had

13   problems on there.  That's why I spoke about that.

14        So I didn't have any issue with your client.

15   The only thing I had about that the kids were allowed

16   to be out late at night, and I -- that just my

17   opinion.  While I observed that but a lot of time too

18   that they were hanging sometimes with the wrong

19   people.  And some of the people who we did have issue

20   with, they hung out with them.

21        Q    So would it be the case that you would more

22   expect someone that you had issues with to be the

23   victim of a robbery?

24        A    No.

25        Q    What about our clients not being involved in

Page 117

1    a lot of issues made it surprising that they were the

2    victim?

3         A    Because they -- they were not part of, that

4    I noticed, any kind of issues on the property that

5    would -- normally somebody in any apartment or

6    anything, if they were doing anything illegal, they

7    normally would be susceptible to that type of kicking

8    in doors and stuff like that.  So that's why it

9    surprised me.

10             Me doing this for so many years, I've had

11   apartments where I worked at that individuals selling

12   drugs out their house and out their apartment.  And

13   when the local drug dealers figured out who they were,

14   they would kick in they door and rob them.  So

15   that's - that's why I said I was surprised because I

16   didn't know they were doing anything.

17             I didn't suspect them of doing anything, but

18   I'm not with them 24/7.  I'm not on their property

19   24/7, so my observation was based upon they seemed to

20   be nice.  They always sat outside, sitting on their

21   porch doing whatever they were doing.  But I didn't

22   see them -- foresee them as a troubled, you know,

23   household in that sense that they were dealing drugs

24   or doing something majorly illegal.  So.

25        Q    It would have been less surprising to you if

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 118

1    someone who you knew was dealing drugs or something

2    would have their door kicked in?

3        A    Yeah.  Yes.  If they were dealing drugs and

4    somebody kicked in they door, I've -- I've had that

5    happened.

6        Q    And you'd be like, "Ah.  No surprise there."

7        A    I tell them -- I was like, you brought this

8    to you door.

9        Q    I'm with you Mr. Hickey, and I apologize for

10   our confusion there.  So I'm with you.  So on the

11   night of the burglary, did you talk to anyone in our

12   client's family?

13       A    No.

14       Q    Did you talk to them after the burglary?

15       A    Someone -- I don't know if it was a family

16   but someone who spoke English spoke to me, like, the

17   -- I think it was the next day or two days later about

18   what took place.  And I was like, "Okay."

19            Because -- and I think I also spoke with --

20   well, I know I did.  I spoke with Ms. Wynn and also

21   Maggie who work in the office.  All I can recall on

22   that conversation was, you know, I was shocked.

23            But I did say this, that the young lady that

24   was of age was hanging out with some of the

25   undesirables that we've had issues with.  And those

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 119

1    are some of the little -- the little rough boys that

2    was messing with them or trying to gain their

3    attention and talk to them on the thing.  And, you

4    know, they ended up going to the house; and they went

5    the other way.

6           That was my speculation at the time that

7    what took place because when I first got there, she --

8    the young lady, appearance was that of a child.  And

9    as we was there for a year, I noticed she was wearing

10   makeup and different stuff, and she was flirting with

11   the young boys and stuff.

12          So that was my speculation when I said,

13   "Well, was anything going on that one of them was

14   trying to" -- I thought it was just one of the little

15   boys was trying to, you know, be her boyfriend and she

16   probably said no and he chased her home and that's

17   what happened.  Then that's when they -- that's when I

18   found out from police.  I was like okay.  Well, this

19   is completely different then, you know?  It's not one

20   of those little situations.  So --

21          Q    When did you find that out?

22          A    The night -- I'm talking about when I saw

23   the police there and I was going over there.  And

24   that's when they told me the door -- I didn't -- I

25   didn't put everybody together because, you know, you

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 120

1    got -- you got other, you know, that property is

2    culturally diverse; so you got different people.  So I

3    wasn't really thinking about everything until we

4    started.

5            I got to the police.  I found out what was

6    going on.  Then I was trying to put people you know,

7    at apartments 'cause, like I said, I know of these --

8    of the individuals and stuff, where they live at.

9    Some of them I don't.  I just started investigating.

10   It's just part of what we do in CID.

11           What we do is we start -- I never look

12   exactly what it is.  I try to look at all the other

13   stuff that I've seen and put pieces together 'cause I

14   always tell people, if you look at specific something,

15   you're not going to do a good investigation.  You got

16   to look outside the box.  And so that's why I was

17   like, "Well, why would somebody kick in they door?"

18           When they said they kick in the door trying

19   to rob them, I was like, was it the little boy trying

20   to, you know -- maybe it was a misunderstanding or

21   something.  And that's when they -- when I spoke to

22   Ms. Wynn and Maggie about what was going on, I was

23   like, "Okay.  Well, then, you know, that's different."

24           Because I thought it might have been maybe

25   just a little boy 'cause, like I said, I didn't speak

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 121

1    to nobody.  The police wasn't cooperative with me.

2    They just said, you know, "Somebody kicked in they

3    door and tried to rob them."  I was like, "Why would

4    somebody do that?"  Because like you said, that wasn't

5    just -- I wouldn't picture them.

6              Now, if it was an apartment in A building,

7    maybe one of those ones that we have and they said

8    they kicked in their door, I'd be like, "Okay.  Well,

9    yeah."  You know, 'cause we've had issues out of, you

10   know, those particular areas until she evicted them.

11   And they were forced to move.  They were -- that one

12   on the left.  So that's why.  I just, I didn't know.

13   I was just trying to put things together, what it

14   could be, you know, investigating the whole situation.

15        Q    So as of that next day when you -- was it

16   the next day that you talked to Ms. Wynn?

17        A    It might have been a day or -- well, no.

18   yeah.  When I spoke to Ms. Wynn, it was the next day.

19        Q    So when you talked to Ms. Wynn, even at that

20   point you knew that the police had been on the

21   apartment complex the night before and the apartment

22   that it was about; but no one had given you any real

23   information about what had occurred?

24        A    Well, I actually -- I gave the actual -- the

25   wrong apartment.  I actually gave her -- I text her

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 122

1   the day that it happened, the night that I was there.

2   Once I found out, I let her know.  I actually gave her

3   the apartment upstairs, and it was actually the

4   apartment downstairs.  And so I got the numbers mixed

5   up.  I think I told her -- I think it was, like, 21

6   and it was 22 or something like -- it was 22 or 20 --

7   whatever the number was.  I made a mistake on that

8   one, and she had corrected me on the next day.  So I

9   said, "Okay.  Well, this is what -- what they told

10  me."  And then she started telling me more about what

11  took place.

12      Q    Okay.  I am handing you a document that has

13  been marked as Exhibit 17.  This is a compilation

14  exhibit of text messages produced from the custodial

15  files of Latoya Wynn.  And what we have done here is

16  we have tried to compile all of the text messages that

17  she produced that she exchanged with you and to put

18  them all chronologically and into one exhibit.  And so

19  that's what this is.

20                  (Exhibit 17 was marked for

21                  identification.)

22      A    Okay.

23      Q    I will represent to you that we've made our

24  best effort to include everything we've received from

25  Ms. Wynn.

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                                        Page 123

1        A     Okay.

2        Q     And I'll give you a moment to look through

3    this exhibit.

4        A     I'm good.

5        Q     Does this appear to you to be photographs of

6    text exchanges that you had with Ms. Wynn?

7        A     Yes.

8        Q     Now, I want to go to the second to last

9    page; and this is a page bearing the Bates number

10   TPI001174.  And it includes text messages from between

11   May 3rd --

12       A     You said 1174?

13       Q     1174.  Second to last page of the exhibit.

14   It has text messages ranging from May 3, 2021, to

15   August 9, 2021.  Do you have that page in front of

16   you?

17       A     Yes.

18       Q     I will represent to you that the robbery of

19   our clients took place, I believe it was, July 21,

20   2021.  My question is why are there not text messages

21   between you and Ms. Wynn on any day between July 13th

22   and August 9th?

23             MR. MELCHER:  Objection.  Form.

24             THE WITNESS:  I probably called her.

25   //

Page 124

1    BY MR. MARKS:

2        Q    I believe you testified a moment ago that

3    your main form of communication with her was by text

4    and that you had exchanged a lot of texts with her on

5    these days.

6        A    Yes.  But texting wasn't the only form.  I

7    would call her.  It depends on what I felt.  So

8    probably -- I probably called her.  If I didn't send a

9    text, then I probably called her.

10       Q    Do you still have text exchanges with

11   Ms. Wynn on your cellphone beside you?

12       A    No.  Not on this one.  I -- I updated.  So,

13   you know, when you switch out my phone.  So this is an

14   iPhone 12, and I got another iPhone.  But I can --

15       Q    Would you mind checking?

16       A    I sure can.

17       Q    Because to again be transparent, if it is

18   the case that Ms. Wynn has deleted some text messages,

19   I'm trying to figure that out.

20            MR. MELCHER:  Obviously objection to

21   form.

22            MR. MARKS:  Yeah.  It wasn't a

23   question.  But.

24            MR. MELCHER:  Yeah.

25            MR. MARKS:  Totally fair objection.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 125

1           THE WITNESS:  I do have some text

2    messages.

3    BY MR. MARKS:

4        Q    Have you texted with Ms. Wynn at more than

5    one number?

6        A    She does have -- she did have an additional

7    number.

8        Q    What number are you looking at right --

9        A    This is the only one I have.  I don't -- she

10   -- she switched out her phone and she text me and she

11   said, "This is my new number."  So the other number, I

12   just -- I swapped it out.

13       Q    Okay.  Does the chain you're looking at

14   right now include the text messages here in this

15   exhibit and then also additional ones?

16       A    It does have the -- it has -- so it has --

17   oh.  No, it doesn't.  It says July, August.  Okay.

18   Hold on a second.  Yeah.  So I have August of last

19   year, August 9th, July 13th, May the 9th, May the 3rd,

20   May the 3rd, April the 24th.

21       Q    So you -- you don't see any texts between

22   July 13th and August 9th?

23       A    July 13th?  I got July 13th said, "Hey.

24   Check on you and Maggie said you was in the hospital."

25   That's when I -- I end up going to the hospital and I

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 126

1    was admitted because I had a blood sugar of, like,

2    700.  So -- so I was in there for a little while.

3         Q    Okay.  So after July 13th, when was your

4    next text with her?

5         A    The August 9th, say, "Hello.  How you doing?

6    Can you advise on the June payment?" -- payment and

7    yes.

8         Q    Yeah.  So you don't see any text on the day

9    of the burglary with Ms. Wynn?

10        A    No.  And you said that happened on April

11   what?

12        Q    I believe it was July 21st.

13        A    No.  None whatsoever.

14        Q    Okay.  Now, can you go in this exhibit onto

15   the fourth page.  And this has a designation TPI001178

16   at the bottom.

17        A    Yeah.  I'm here.

18        Q    So you see that this text exchange ends with

19   a January 13, 2021, message at the bottom of the page.

20   Correct?

21        A    Yes.

22        Q    Now, if you look to the next page of the

23   exhibit, which is TPI001157, it does not include the

24   remainder of that message.  Right?

25        A    Yes.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 127

1      Q    It picks up on February 7, 2021.  Correct?

2      A    Yes.

3      Q    Now, look to the last page of this exhibit.

4   You had testified earlier, I believe, that Seven

5   Courts had fixed its problems regarding late payment?

6      A    Yes.

7      Q    If you see here, it looks like you're still

8   asking about payment as of at least September 7th.

9   Correct?

10     A    Yes.

11     Q    Now, if you look down below that, there's a

12  heading that says, "Monday, November 22nd 4:25 p.m."

13  Correct?

14     A    Yes.

15     Q    But there's no actual text below that.

16  Right?

17     A    No.

18     Q    Did you exchange a text message with

19  Ms. Wynn on November 22nd at 4:25 p.m.?

20     A    I probably did.  I can check my phone.

21     Q    Please do.

22     A    But the reason why the payments are

23  different now is because it's monthly.  It's no longer

24  the weekly how I set up, so that's why that was like

25  that.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 128

1        Q     We're looking for November 22, 2021.

2        A     So this stop at January the 2nd 2021.

3        Q     Oh.  So the other direction.  So November of

4    2021. So it would be --

5        A     I went the wrong way.  My fault.  November

6    22nd, "Please give me a call."

7        Q     Did she give you a call on November 22nd?

8        A     No.  She didn't.

9        Q     When was the last time you spoke with

10   Ms. Wynn?

11       A     The last time I spoke -- I don't think I

12   spoke with her.  I think I spoke with Maggie.  And

13   that was that I got you guys' deposition.  I was a --

14   or not the deposition but the subpoena.  I was a

15   little upset that no one called and let me know 'cause

16   I was like, you know, that would have been nice to

17   know that.  So that was the basis of that.

18       Q     So nobody called to let you know what?

19       A     That you guys had filed a suit.  That's all.

20       Q     What do you remember about that conversation

21   with Maggie?

22       A     "Hey.  I got this subpoena.  What's going

23   on?"  She said, "Oh, don't worry about it.  The

24   property -- the people at whatever apartment filed a

25   thing."  Said -- I said, "Okay."

Kenneth H. Hickey , Sr.                May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 129

1      Q     Have you spoken with anyone else at Seven

2   Courts since we filed the lawsuit?

3      A     No.

4      Q     So one conversation with Maggie.

5      A     Yes.

6      Q     have you spoken with any attorneys for TPI?

7      A     No.  I don't recall.  No, I don't.

8      Q     Have you had any contact with any attorneys

9   with TPI other than meeting Jeff?

10     A     No.

11               MR. MELCHER:  His first time meeting

12   me.

13   BY MR. MARKS:

14     Q     Have you spoken with anybody else about the

15   lawsuit or the underlying situation since it happened?

16     A     No.

17     Q     Did you ever discuss the security guard

18   Horace Holt with anyone at Seven Courts?

19     A     I don't know who Horace Holt is.

20     Q     So no?

21     A     No.

22     Q     Did you ever discuss the prior security

23   guard who was there before you started at Seven

24   Courts?

25     A     Yes.  I did talk to management.  I think it

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 130

1    was Maggie or somebody that was there because I always

2    asked the question, "What was -- how was the previous

3    security?"  Because we always want to, you know --

4    that's always part of any contract that I get.

5            I'll ask, "What did they do wrong?  What

6    that did you not like?  What can we do that's better

7    than, you know, our services?"  So I -- I would ask

8    that in just general conversation.

9        Q    What do you remember about that

10   conversation?

11       A    They -- they didn't give me a lot of

12   information.  They were kind of vague.  Because when I

13   think I did the crime stats and I got some

14   information, that's when I found out that the incident

15   with the security officer -- no.  Actually, that and

16   one of the residents told me about what happened with

17   the former security.  That's how I found out a lot

18   more.

19       Q    What did the resident tell you?

20       A    Something about they got shot or a shooting

21   happened or something of that nature and that they

22   were -- they were not as thorough as we were.  You

23   know, when I initially went out there, I went out

24   there in my police uniform.  So they saw me

25   differently.  So it wasn't -- you know, my initial

Page 131

1    process was, I work this as an off-duty job.  And so,

2    you know, that's one of the reasons why we didn't have

3    any problems.

4         Q    When you had armed security officers on the

5    property, did any burglaries take place while you were

6    there?

7         A    Not that I know of.  No.

8         Q    Had your company maintained the same armed

9    security hours that you had, you know, on your armed

10   security contract, how do you think that it would have

11   affected the security situation at the complex in

12   July?

13                  MR. MELCHER:  Objection.  Form and

14   speculation.

15                  THE WITNESS:  I can't speculate on

16   that, sir.  That's -- that's me -- I can't guess on

17   what -- what could have done.  They had hired me for

18   24 -- I can tell you if they hired me 24/7, they

19   wouldn't have had any problems because we would have

20   been there --

21   BY MR. MARKS:

22        Q    And you testified that in March or before

23   March, you had suggested increasing hours.  Correct?

24        A    Yes.

25                  MR. MELCHER:  Objection.  Form.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 132

1   BY MR. MARKS:

2       Q    Instead of increasing hours, they changed

3   your contract to fewer hours.  Correct?

4                MR. MELCHER:  Objection.  Form.

5                THE WITNESS:  No.

6   BY MR. MARKS:

7       Q    A different type of service.

8       A    No.  I -- I was getting ready to terminate

9   contract.  They wanted me to continue; and I said, "I

10  can provide you with this service."  They never -- we

11  probably could have been there until now.  So they

12  never said, "We want to get rid of service."  I never

13  said that.

14           I said that I was going to terminate service

15  because it wasn't feasible for me, the -- the

16  staffing, the issues on that level.  And then they

17  said, "We want to give us an upgrade with cameras and

18  stuff," and that we would wanted me to stay on a

19  little while longer.

20           And I said, "I'll give you this service

21  right here"; and they said, "Okay.  Good."  So that's

22  why I said this form or some form of security services

23  on my e-mail.

24      Q    So from May to the end of July 2021, are you

25  aware of any other security officer working on the

Page 133

1    property?

2        A    No.

3        Q    So the only contract for security services

4    that you're aware of during that time is your security

5    management services contract.  Right?

6        A    Yeah.  Until the, I guess -- what? -- the

7    May, June, July, whatever that -- that timeframe was.

8    Yeah.  That's it.  Now, I will say this that they did

9    call me to solicit for security services; but they

10   probably called the wrong person.  So.

11       Q    What do you mean?

12       A    They were probably trying to look for

13   additional security.  I don't know.  But they did call

14   me.  So if they were trying to get additional

15   security, they called the wrong person 'cause I'm

16   already was with them.

17       Q    So while you were still working there, they

18   called to ask about additional services?

19       A    Yeah.  They thought -- they probably thought

20   they were talking to a different company.  It was a

21   new person that was working there.  So.

22       Q    How did you end up stopping work altogether

23   at Seven Courts Apartments?

24       A    The contract was out.  She called and said,

25   "Do you want to terminate this?"  Said we going to be

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 134

1    doing, I guess, adding light or -- cameras but -- not

2    lights but cameras and stuff.  And she called and

3    said, "Hey.  We're going to terminate the service on

4    this day."  And I was like, "Fine.  That'll be --

5    that'll be fine with me."

6         Q    And was the last day the end of July?

7         A    I forgot the exact day.  Probably it was.

8         Q    I'll represent to you that your last invoice

9    was for the month of July.

10        A    Yeah.  So yes.  That would probably be it.

11   That's correct.

12        Q    I believe we already covered this, but let

13   me just double check.  So you testified that you had a

14   very brief conversation with the officers on the night

15   of the burglary.  Correct?

16        A    Yes.  They were not cooperative whatsoever.

17   City of Atlanta, they were -- and to be honest with

18   you, their -- one of their issues, you know, they just

19   -- they were -- they been working a lot.  The guys

20   were doing a lot and not just at that apartment but

21   just the whole city.  They were short-staffed.  So

22   they all were kind of short with people, you know.

23   Just an unfortunate time.

24        Q    And so the next day, you spoke with Ms. Wynn

25   and Ms. Fontaine both?

Kenneth H. Hickey , Sr.                      May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 135

1        A    Yes.  I think.  I know we spoke because

2    Ms. Wynn called me.  Was like I gave her the wrong

3    apartment number.  And I was like, my fault because I

4    got the numbers confused.  But I know it was apartment

5    that was downstairs, and so I had told her about that.

6        Q    And you learned more details about the

7    incident from them.  Correct?

8        A    Yes.

9        Q    After that conversation, you said that at

10    some point you spoke with Maggie about receiving the

11    subpoena.  Correct?

12        A    That was months later.

13        Q    Months later.

14        A    Yeah.

15        Q    So between those conversations, so the day

16    after the incident and months later about the

17    subpoena, did you have any other conversations about

18    the incident?

19        A    No.

20        Q    And it was your testimony that the only time

21    you spoke with anyone other than folks from our office

22    about this case was this one conversation with Maggie?

23        A    Yes.

24                MR. MARKS:  I think that's probably it.

25    If I could have, like, a couple of minutes to -- or

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 136

1    maybe Aaron could just write me a note.

2              MR. BLOCK:  Why don't we just talk for

3    a minute?  Let's step out.

4              MR. MARKS:  Okay, okay.

5              THE REPORTER:  Okay.  We are off the

6    record at 1:09 p.m.

7              (Off the record.)

8              THE REPORTER:  And we are back on the

9    record at 1:14 p.m.

10             MR. MARKS:  I have no further questions

11   for you, Mr. Hickey.  thank you very much for your

12   time and attention today.

13             THE WITNESS:  You're welcome.  Thank

14   you.

15                     EXAMINATION

16   BY MR. MELCHER:

17       Q    Mr. Hickey, Jeff Melcher.  We met this

18   morning and I appreciate as well you giving us your

19   time today.  I know your time is valuable, and we

20   appreciate you giving us some of that.

21             I just have a few questions.  I represent

22   the defendants.  For purposes of qualifying the jury,

23   do you have any relatives in the Atlantic area whose

24   last name is not Hickey?

25       A    Yes.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 137

1        Q      Okay.  Can you give us those last names, so
2   we can provide the court that?
3        A      That are relatives?
4        Q      Yeah.  That are relatives.  Like, if you
5   have a relative whose last name is Smith.
6        A      Bell.
7        Q      Okay.
8        A      Wade.  Way and Wade.  That's about it.
9        Q      Okay.  And, sir, in conversations I've had
10  with my client, they indicated that they thought one
11  of the reasons you left the complex was because of
12  lack of cooperation with the Atlanta Police
13  Department.  Is that accurate or inaccurate?
14       A      That could be true.  That could be true
15  also.
16       Q      Okay.  And if that was the case, what can
17  you tell us in that regard?
18       A      Well, I think the -- when I had the young
19  lady we 10-13 with the mental thing, that -- that was
20  one of the defining factors but the staffing too.  It
21  was like -- it's hard to staff, but APD wasn't
22  cooperative whatsoever on -- on anything.  It's -- but
23  they were short-staffed, and I think a lot of people
24  just use -- they use that and other stuff they can
25  excuse not to do their job.  So.  But that was -- that

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 138

1    did play a little part into it.

2        Q    Okay.  During your time doing security for

3    this apartment complex, Seven Courts, did you have

4    experience with people who were not residents coming

5    onto the property?

6        A    Yes.

7        Q    Okay.  And would those people come into the

8    property through, let's just say, measures that were

9    not valid, such as jumping a fence or something like

10   that?

11       A    Well, it's an open property.  They could

12   jump the fence, or they could walk through the front

13   gate.  It's not a gated community.

14       Q    Okay.  Did you have experience with parts of

15   the fence being damaged so that people could enter and

16   leave the property without being seen?

17       A    They do -- they did have a little area

18   towards one of the buildings that they bent the thing

19   a little bit.  They did have that.

20       Q    And who do you think "they" was?

21       A    Local prostitutes, drug users.

22       Q    Okay.  So even in the areas where there was

23   a fence, sometimes those fences would be compromised

24   by people coming on?

25       A    Yes.

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 139

1        Q     During your time at the property, did you

2    have any experience with residents keeping large sums

3    of cash in their apartments?

4        A     I wouldn't have known that.  No.  Not that I

5    know of.

6        Q     In your experience as a security officer,

7    would you think it's advisable or unadvisable for a

8    tenant to keep a large sum of cash in their apartment?

9        A     No.  I wouldn't -- I wouldn't advise that at

10    all.

11        Q     And why not?

12        A     Well, it's unsafe.  Plus, if someone find

13    out, then, you know.

14        Q     You could be targeted?

15        A     They could be.

16        Q     Okay.  All right.  Did you ever have any

17    personal knowledge of any prior break-ins attempted at

18    the Diaz-Caceres apartment?

19        A     No.

20        Q     So you weren't aware then of any incidents

21    prior to the one in question where they may have had

22    someone confront them or attempt to get in their

23    apartment or acquire any of their possessions?

24        A     No.

25        Q     Okay.  When you went to the apartment the

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

                                             Page 140

1    night in question, Mr. Hickey, did you observe any of

2    the Diaz-Caceres family?

3         A     No, I did not.

4         Q     Okay.  You had no contact with them,

5    visually or otherwise?

6         A     No.  I think everybody was in the -- the

7    apartment.

8         Q     All right.

9              MR. MELCHER:  That's all I have for

10   now, sir.  I appreciate it.

11             MR. MARKS:  Nothing further from me.

12             MR. MELCHER:  Thank you, sir.  I

13   appreciate you coming out.

14             THE WITNESS:  Okay.

15             THE REPORTER:  So this concludes the

16   testimony, and state rules provide that the witness

17   should be afforded the opportunity to review the

18   transcript.  If parties wish to waive the review,

19   please state so.

20             So that's for you, Mr. Hickey.  As we

21   discussed earlier, you have the right to review the

22   transcript before it's submitted to, like, an official

23   transcript.  You have a right to review it.

24             THE WITNESS:  Oh.  I can wait until

25   after.  Can I get a copy of it after?

Page 141

1           THE REPORTER:  Well, they're possibly
2    ordering; so I don't know how you get a copy.  Your
3    best way would be to read and sign it, unless they
4    have other suggestions.  But.
5           MR. MARKS:  Yeah.  So when you read and
6    sign, you have an opportunity to see if you think that
7    there might be a typographical error or something on
8    the transcript.  You can write it that, you know, this
9    line has an error and this is what it should be.  But
10   it's your right whether or not you want to have that
11   opportunity.
12          THE WITNESS:  Not for me.  I just want
13   it for training purpose.  That's all it was.  But
14   that's fine.  I don't have to have it.  That's fine.
15          MR. BLOCK:  Well, we are going to buy
16   copies and -- which is like several hundred dollars.
17   Would you say it's kind of in that?  Maybe a little
18   bit more, and that's part of how she earns her living.
19          THE WITNESS:  Oh, okay.
20          MR. BLOCK:  And so I think what she's
21   saying is the best way for you to get a copy for free
22   is if you choose to invoke your right to read and
23   sign.
24          THE WITNESS:  Okay.
25          THE REPORTER:  I mean, I don't know

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 142

1   that you get to keep that.  You would -- you sign it

2   --

3                    THE WITNESS:  It would --

4                    MR. BLOCK:  What about an E-tran?

5                    MR. MELCHER:  Is that -- yeah.  I

6   just --

7                    MR. MARKS:  We can't say that.

8                    MR. BLOCK:  Yeah.  I know I can't

9   but --

10                   THE WITNESS:  But that's fine.  I'll

11  just -- it was just for training purposes.  But that's

12  good.

13                   THE REPORTER:  So did you want to waive

14  then?

15                   THE WITNESS:  Yeah.  I'll waive.

16  That's fine.

17                   THE REPORTER:  And would counsel like

18  to order a copy of the transcript?

19                   MR. MARKS:  Yes.

20                   MR. MELCHER:  E-tran with exhibits,

21  please.

22                   THE REPORTER:  Absolutely.  So the time

23  is now 1:21 p.m., and we are off the record.

24                   (Signature waived.)

25  //

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 143

1                    (Whereupon, at 1:21 p.m., the

2                proceeding was concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenneth H. Hickey , Sr.                          May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 144

1            CERTIFICATE OF DEPOSITION OFFICER

2            I, ARIEL DALLAS, the officer before whom the

3    foregoing proceedings were taken, do hereby certify

4    that any witness(es) in the foregoing proceedings,

5    prior to testifying, were duly sworn; that the

6    proceedings were recorded by me and thereafter reduced

7    to typewriting by a qualified transcriptionist; that

8    said digital audio recording of said proceedings are a

9    true and accurate record to the best of my knowledge,

10   skills, and ability; that I am neither counsel for,

11   related to, nor employed by any of the parties to the

12   action in which this was taken; and, further, that I

13   am not a relative or employee of any counsel or

14   attorney employed by the parties hereto, nor

15   financially or otherwise interested in the outcome of

16   this action.

17                              ARIEL DALLAS

18                              Notary Public in and for the

19                              State of Georgia

20

21

22

23

24

25

Kenneth H. Hickey , Sr.                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

Page 145

1              CERTIFICATE OF TRANSCRIBER

2              I, KATIE SCOTT, do hereby certify that this

3      transcript was prepared from the digital audio

4      recording of the foregoing proceeding, that said

5      transcript is a true and accurate record of the

6      proceedings to the best of my knowledge, skills, and

7      ability; that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in

9      which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14

15                                    KATIE SCOTT

16

17

18

19

20

21

22

23

24

25

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

**[& - 590]**

Page 1

| & | | | |
|---|---|---|---|
| **&** 3:4 12:10 18:4,8 18:13 38:5 79:2 | **1263** 22:23 | **2020** 21:3 29:10 | **3/30/21** 4:18 |

**&**

**&** 3:4 12:10 18:4,8
18:13 38:5 79:2

**0**

**03661** 1:12
**04122021.pdf.**
83:24

**1**

**1** 4:8 15:9 21:3,7
30:6 45:24,25
47:19 49:3 51:8
51:13 52:9 73:17
**1/1/21-3/20/21**
4:15
**1/5/22** 4:24
**10** 4:17 73:13,14
**10-13** 80:14
137:19
**100** 4:24
**102** 5:4
**10:03** 1:18 6:5
**10:49** 44:15
**10:52** 44:18
**11** 4:18 79:1,4
89:1
**11/4/20** 4:10
**11/5/20** 4:11
**1174** 123:12,13
**11:02** 51:1
**11:09** 51:4
**11:55** 87:7
**12** 4:19 55:4,5
83:21 84:1 86:8
87:14 90:10
102:10 124:14
**12/13/21-12/20/21**
5:4
**122** 5:6
**1262** 22:22

**1263** 22:23
**12:05** 87:10
**13** 4:21 83:21
90:24 91:3 102:5
102:16 126:19
**136** 4:4
**13th** 102:12
123:21 125:19,22
125:23,23 126:3
**14** 4:22 99:11,15
**15** 4:23 100:9,13
100:20 112:17
**16** 5:3 13:11 102:3
102:3,7 112:17,17
**16-7-21** 38:25
**16th** 57:16
**17** 1:17 5:5 6:11
42:12 122:13,20
**18** 46:25
**19** 67:4
**1900** 61:17
**1915** 34:14
**1995** 16:6
**1:09** 136:6
**1:14** 136:9
**1:21** 1:12 142:23
143:1
**1st** 50:9 53:23 54:4
91:11 92:11,17

**2**

**2** 4:9 13:14,19,21
29:9,9,14,25 81:3
87:16
**20** 49:3 51:9 102:6
122:6
**2001** 12:20 15:8,11
**2005** 13:17,19
**2007** 15:9
**20080** 144:16
**2015** 13:11 17:19

**2020** 21:3 29:10
30:6,16 38:7
42:12 44:4 47:1
**2021** 4:13 44:6,23
49:3,3 51:8,9 52:9
55:4,5 60:2 62:13
73:17 78:19 79:3
81:3 83:21 89:2,4
91:1 99:12 101:9
102:5,6,9,10,16
123:14,15,20
126:19 127:1
128:1,2,4 132:24
**2022** 1:17 6:11
100:12 101:5,8
**20th** 100:15 102:9
102:17
**21** 4:8 100:16
122:5 123:19
**21st** 126:12
**22** 80:5 122:6,6
128:1
**22nd** 127:12,19
128:6,7
**23** 99:12
**24** 21:3 60:2 91:1
131:18
**24/7** 43:12 84:7
86:20 117:18,19
131:18
**24th** 125:20
**27249** 145:14
**2800** 3:5
**29** 4:9
**2nd** 51:19 61:12
61:15 81:6,8
128:2

**3**

**3** 4:10 30:14,18
42:20 123:14

**3/30/21** 4:18
**30** 4:10 12:6 33:16
79:3 89:2,4
**303** 3:5
**30305** 1:20 2:8,14
2:20 6:13
**30308** 3:7
**309** 1:19 2:7,13,19
6:11
**31** 78:18
**31st** 91:17
**35** 22:16 30:2
**357** 67:5
**36** 22:15 30:1
61:19
**38** 4:11
**3rd** 51:19 123:11
125:19,20

**4**

**4** 4:11 22:6 30:16
38:4,8 47:10
101:8
**4/13/21** 4:19
**400** 1:19 2:7,13,19
6:12
**42** 4:12
**44** 4:13
**47** 4:14
**49** 4:15
**4:25** 127:12,19
**4th** 31:25 51:20
91:11

**5**

**5** 4:12 22:21 38:7
42:10,15 100:12
101:5
**5/24/21** 4:21
**5203299** 1:22
**590** 86:10

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

**[5th - apartment]**

Page 2

| | | | |
|---|---|---|---|
| **5th** 51:20 53:24 | **a** | 121:24 127:15 | **agree** 6:18 71:2 |

**6**

**6** 4:13 22:21 29:10 44:6,7,21
**6th** 51:22 54:8

**7**

**7** 4:14 42:19 46:25 47:4 127:1
**700** 126:2
**71** 4:16
**73** 4:17
**79** 4:18
**7th** 56:6 127:8

**8**

**8** 4:3,15 48:25 49:7 51:7,14 61:11 81:2,8 93:17
**84** 4:20
**87** 11:11

**9**

**9** 4:16 45:24,25 71:7,16 123:15
**9/11** 12:21
**90** 11:11,11 12:16 12:16
**90s** 17:5
**91** 4:21 11:11
**911** 62:2 65:11 83:8,12
**93** 12:14,16
**95** 8:22 17:6,6
**96** 8:22 13:22 17:6
**97** 13:22
**99** 4:22 12:14
**9th** 123:22 125:19 125:19,22 126:5

**a.m.** 1:18 6:5 42:20 44:15,18 45:24,25 51:1,4
**aaron** 2:11,15 4:22 7:8 99:12 136:1
**abandoned** 31:6,7
**ability** 44:1 144:10 145:7
**able** 15:16 20:6 23:23 49:4 58:21 58:23 73:7 74:1 76:19
**absent** 6:16
**absolutely** 142:22
**abusive** 35:3,9 40:4
**access** 56:24 58:22 83:9
**accommodate** 74:1
**accumulation** 57:9
**accurate** 49:6 101:21 137:13 144:9 145:5
**accurately** 10:5
**acknowledgeme...** 6:15
**acquire** 139:23
**action** 144:12,16 145:8,12
**actions** 10:14
**active** 15:14 43:16 46:3
**activities** 76:10
**activity** 25:7 38:17 56:9 60:5 61:16 66:2 76:16 81:9
**actual** 25:17 47:17 59:24 62:15 64:4 64:13 66:23

**add** 34:4 74:19
**added** 30:12
**addendum** 91:24 91:25 92:5 93:7
**adding** 134:1
**additional** 33:21 125:6,15 133:13 133:14,18
**address** 38:21 43:10,11,17 47:2 54:19 94:22,23,24 94:25 95:15 96:21 96:22,25 97:4,12 97:15,16,18,25 98:4 105:10
**adjacent** 60:13
**adjust** 43:6 44:1
**administer** 6:15
**admitted** 126:1
**advisable** 139:7
**advise** 42:21 126:6 139:9
**advised** 47:8
**afford** 84:7,8
**affordable** 57:25 58:7
**afforded** 140:17
**age** 118:24
**agencies** 13:7 18:19
**agency** 13:5
**agent** 19:16
**aggravated** 72:24
**ago** 8:21 9:5 14:19 22:1 36:19 64:6 66:4 74:23 80:24 98:24 100:6 101:16,24 102:2 103:5 109:7 124:2

104:8
**agreement** 73:19 78:18 84:20 90:11 92:2,12 93:6 105:9 108:17
**ah** 118:6
**ahead** 28:11 107:16 109:2 111:6
**allison** 2:17 7:10
**allow** 24:17 75:3
**allowed** 71:24 116:15
**allowing** 116:2
**allows** 86:13 104:15
**altogether** 14:4 133:22
**amazon** 67:4
**amount** 36:9 73:24 75:20,21 85:24
**answer** 9:10,16 54:25 107:20 115:6
**answered** 69:2
**answering** 115:22
**answers** 9:9
**anybody** 37:17 89:7 98:2 129:14
**anyway** 37:19 74:20
**apartment** 10:21 16:4,6,9,14 18:9 18:25 19:4,25 20:2,4,9 21:5 25:3 25:3 26:2 27:8 29:22 33:11 36:20 38:22 39:3 41:20 44:23 45:11 49:11

Kenneth H. Hickey , Sr.
May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

[apartment - backseat]

Page 3

55:16 56:15 57:1
57:13 60:12,17
63:21 65:23 67:16
78:2 86:11,13
88:6 90:25 104:25
106:2,17 107:1
108:13,18 109:20
112:13,21 117:5
117:12 121:6,21
121:21,25 122:3,4
128:24 134:20
135:3,4 138:3
139:8,18,23,25
140:7
**apartment's** 46:6
60:6 83:24
**apartments** 17:2
19:22 31:6 45:1
48:22 55:17 56:2
65:5 97:7 113:2
117:11 120:7
133:23 139:3
**apd** 47:8,18 48:1,7
62:3,14 63:12
64:11 65:14 66:16
68:4,6,15,19 70:10
70:21 71:14 72:16
72:18 74:17 80:24
81:12 82:17 83:6
88:13 137:21
**apologize** 115:4
118:9
**app** 104:15
**appear** 49:6 123:5
**appearance** 119:8
**applicable** 6:22
**appreciate** 37:12
136:18,20 140:10
140:13
**approach** 40:17

**approached** 40:15
**approved** 43:24
**april** 83:21 91:10
91:11,20 92:5,9,21
93:3,15 94:14,18
95:11 97:2,11
101:18 111:10
125:20 126:10
**area** 26:9 27:11,12
31:6,12,14 33:2
34:17 40:8,9
52:18,22 53:8,10
53:21 63:6 87:3
105:2,17 107:7
110:18 136:23
138:17
**areas** 27:9 31:4,11
32:8,21 33:20
34:6 52:19 53:4
103:23 121:10
138:22
**arguing** 61:24
63:14 64:3
**argument** 61:23
63:7,9,19
**arguments** 63:20
**ariel** 1:21 6:3
144:2,17
**armed** 22:15
23:25 25:12 28:6
30:2 48:9,13
72:24 77:6,7
78:21 91:9,16,19
92:6,9,21 97:3
111:16 131:4,8,9
**army** 11:13,14
13:3
**arrest** 82:22 98:12
105:7
**arrested** 39:7

**arresting** 58:18
**arrests** 82:20
**arrival** 34:21
**arrived** 111:23
**asked** 15:23 21:17
43:6 69:2 71:13
74:11 88:16,20
91:21 115:22,23
116:8 130:2
**asking** 17:14 82:1
92:22 127:8
**assault** 72:24
**assaulting** 59:5
**assessment** 25:5
**assessments** 71:24
**assigned** 6:3
**assist** 19:14 79:24
88:10
**association** 20:2,9
**assume** 109:20
**atlanta** 1:3,20 2:8
2:14,20 3:7 6:12
11:6 20:2 25:21
25:23 26:4 39:4
47:14 48:4 58:10
58:16 60:8 63:10
79:13,22 83:8,12
112:3 134:17
137:12
**atlantic** 136:23
**attached** 5:7 45:2
71:12
**attaching** 29:11
**attachment** 29:20
71:10 73:20,22
83:23
**attacking** 32:18
**attain** 71:23
**attempt** 139:22
**attempted** 139:17

**attendance** 7:4
**attention** 48:11
113:1 119:3
136:12
**attorney** 144:14
145:10
**attorneys** 129:6,8
**audibly** 9:10
**audio** 144:8 145:3
**august** 21:3
123:15,22 125:17
125:18,19,22
126:5
**authorized** 6:14
39:2
**avoid** 9:19
**aware** 38:20 48:4
71:21 111:15
132:25 133:4
139:20

**b**

**b** 4:6 5:1 51:15,23
**b.f.m.** 6:10
**b.m.f.** 1:8 2:4
**back** 12:19,23
13:11,16,24,25
14:8,18 15:17,22
15:23 17:5,12,14
17:16,21 19:5,8
25:19 33:17 44:17
51:4 52:21 53:6,6
59:11 61:11,13,25
65:18 81:2 86:8
87:9 93:23 95:16
95:17 110:17
111:3 136:8
**background** 11:2
13:8 23:21 65:2
82:5 88:11
**backseat** 65:8

Kenneth H. Hickey , Sr.
May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

[backup - camera]
Page 4

**backup** 94:5
**bad** 16:19 33:15
　47:15 112:24
　114:15 115:9
**bailey** 2:17 7:10
　7:10
**balcony** 105:1,15
　105:16
**barely** 81:14
**based** 10:14 23:5,8
　23:11 24:11 45:16
　63:23 114:11
　117:19
**basically** 11:20
　14:13 24:11 31:3
　31:9 46:18 50:8
　51:19 73:9
**basis** 66:5 84:23
　128:17
**bates** 22:9 123:9
**bb** 67:2,5
**bearing** 123:9
**beast** 76:17
**bed** 41:17
**bedbugs** 41:18
**beef** 62:5 63:22
**befriend** 98:10
**beginning** 7:5
**begins** 39:11 102:5
**behalf** 1:7 2:2,3
　3:2 6:9 7:8,10,12
**believe** 21:4 38:2
　48:13 74:23 81:9
　101:17 123:19
　124:2 126:12
　127:4 134:12
**bell** 137:6
**belligerent** 82:6
**belong** 35:21
**bent** 138:18

**best** 50:11 55:25
　76:11 84:15 93:20
　122:24 141:3,21
　144:9 145:6
**better** 30:11 32:21
　34:7 75:22 78:8
　130:6
**biblical** 14:20
**big** 18:13 26:23
　81:3
**biggest** 19:2 89:12
**bikes** 105:18
**birth** 11:3
**bit** 9:15,20 11:1
　14:12 30:11 38:12
　91:23 99:19
　138:19 141:18
**black** 4:22 34:22
**blacked** 32:7
**blackout** 33:20,20
　34:5
**blackouts** 33:8
**block** 2:6,11,12,18
　7:7,8,8 99:12
　136:2 141:15,20
　142:4,8
**blockfirmllc.com**
　2:9,15
**blocks** 62:7
**blood** 126:1
**board** 13:4 15:10
**bold** 54:14
**born** 11:7
**boss** 98:17
**bothering** 110:21
**bottom** 22:7 57:19
　58:2 86:10 102:12
　106:17 126:16,19
**bought** 67:7
**box** 120:16

**boy** 112:16 120:19
　120:25
**boyfriend** 119:15
**boys** 103:24 106:5
　106:9 110:1,1
　119:1,11,15
**brazen** 28:3
**break** 16:11 27:8
　44:10 50:21 51:7
　87:4 112:10
　139:17
**bridge** 47:20
**brief** 25:7 39:25
　74:17 104:19
　134:14
**briefly** 9:1 12:16
　12:22 13:25 31:21
**bring** 14:17 17:7
　27:6 112:25
**bringing** 16:19
　104:17 114:17
**broke** 37:3 40:22
　61:23
**broken** 86:18
**brought** 10:19
　33:3 118:7
**brush** 68:13
**budget** 73:25 75:3
　77:17
**budget's** 76:24
**bugging** 110:6,7
**bugs** 41:17
**building** 32:14
　34:15 41:16 51:15
　51:23 52:16 58:8
　58:9,15 61:18,19
　63:6 79:18 81:13
　85:5,6 104:18
　121:6
**buildings** 34:17
　52:15 138:18

**burglaries** 131:5
**burglary** 56:11,24
　69:15,16,18 103:8
　103:20 118:11,14
　126:9 134:15
**burn** 33:10 53:13
**business** 12:22
　17:15 76:3
**businesses** 40:10
**buy** 25:3 28:4 50:4
　50:11 93:20
　141:15
**buying** 98:15

**c**

**c** 2:1 3:1 6:1 61:1
　61:18 95:8
**caceres** 1:6 2:3 6:8
　103:10 139:18
　140:2
**call** 20:20 21:23
　48:15 50:17 63:23
　68:15 81:13,17,25
　82:2,10,13 83:10
　84:13,25 99:7,7
　107:10 124:7
　128:6,7 133:9,13
**called** 8:3 15:22
　20:8,9,17 22:8
　34:12,18 39:4
　47:16 62:2,4
　64:10,10 65:11
　68:15 72:17,20
　84:11 91:22
　123:24 124:8,9
　128:15,18 133:10
　133:15,18,24
　134:2 135:2
**calling** 44:10
　70:11
**camera** 59:4,7,7

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

**[cameras - communications]**

Page 5

cameras 57:25
58:7,21,24,24 59:1
59:9,13,16 74:19
74:20,21 132:17
134:1,2
candid 96:19
cap 63:1 66:5,22
67:1
captain 12:24
captioned 38:5
car 44:10
care 105:16
109:21
carl 60:5,24
carl's 60:22
carry 62:19 66:25
carver 12:9 14:19
14:20
cascade 14:21
case 1:11 10:9,11
53:17,20 66:15
116:21 124:18
135:22 137:16
cases 114:7
cash 139:3,8
caught 59:11,15
cause 27:23 43:15
46:2 62:20 63:10
85:17 88:12 93:7
95:15,20 96:22
103:16 105:18
110:5,10,15 111:5
115:10 120:7,13
120:25 121:9
128:15 133:15
causing 113:5
114:3
cellphone 124:11
center 8:19 12:3
12:15,20 13:25

ceo 15:19
certain 32:7 33:13
53:16
certificate 144:1
145:1
certified 6:18 15:8
15:9
certify 144:3
145:2
chain 99:11,25
101:4,8 102:4,11
102:16,19 125:13
chance 50:21
change 41:22
42:19 43:23 45:15
45:19 46:17,20
76:9,19 82:13
93:8
changed 4:12
16:10 23:3 30:10
42:13 73:4 80:6
81:17 82:10
102:23 132:2
changing 64:14
93:6 100:23
characterization
45:11
charge 77:9,9,9,10
charged 80:2,3
charger 104:4
charges 80:15
charging 77:8
chart 86:25
chased 119:16
check 31:3,7 78:4
78:9 84:10 86:23
89:15 90:4 100:2
125:24 127:20
134:13
checking 87:3
124:15

checks 78:11
84:17 87:21
chevy 61:24 65:6
65:18 68:25 69:25
child 114:10 119:8
children 1:8 2:4
6:10 107:4 108:7
choose 141:22
christmastime
43:22
chronologically
122:18
cid 24:14 120:10
circle 105:19
circles 105:19
circumstances
8:16
city 25:21 26:4
39:4 48:4 58:10
63:10 79:12,22
112:3 134:17,21
class 15:9
clean 9:9 40:7,10
clear 81:19 89:19
client 10:13,18
38:19 96:24 108:7
108:11 114:24
115:8,16 116:14
137:10
client's 10:4
118:12
clients 10:9 17:13
23:19 30:9 96:24
103:9 106:18
114:14,21 116:7
116:25 123:19
close 43:21 77:8
77:10
closed 31:17
110:13

closing 31:18,19
clothes 24:5 41:22
cloud 94:3
clubs 65:4
code 38:25
college 14:20,21
14:22
com 95:8
come 15:12,19,23
27:8,12,14,17,20
28:2,3 33:17
40:24 41:6 43:4
47:21 52:21 53:6
62:3,16 63:12
65:14 66:16 68:25
69:17 70:21 72:8
86:2 99:9 104:6
108:2 111:3 138:7
coming 46:8 57:13
58:12 60:15,16
69:24 70:7 73:6
89:16 111:1,19
138:4,24 140:13
comment 55:9
58:6
commented 116:6
comments 34:12
37:9,13 39:12
107:13 115:18
commit 59:14
commits 59:11
common 105:2
communicate 42:5
109:17
communicating
99:18
communication
50:18 124:3
communications
99:5

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

[communities - couple]

Page 6

communities
 86:13
community  71:9
 71:12 72:20
 138:13
companies  20:1,4
 20:5 23:20 33:9
 33:10
company  13:2,12
 13:14,19 15:6
 17:8,11,12 18:3,17
 22:24 23:12,13,14
 24:12,16 26:22
 32:10 89:1 95:23
 98:9 131:8 133:20
compilation  48:24
 51:8 122:13
compile  122:16
complain  40:23
complained  41:1
 41:13
complaining  40:20
complaint  39:15
 40:18 41:18 42:2
complaints  40:24
 41:10 42:1
complete  24:24
 81:18
completed  30:25
completely  14:2
 55:18 119:19
complex  16:4,9
 18:25 25:3,4
 36:20 46:6 60:12
 63:21 65:23 78:2
 107:1 121:21
 131:11 137:11
 138:3
complex's  60:17
complexes  18:9
 19:4,25 20:4,7

67:17
compromised
 138:23
computer  93:19
 93:21 94:5,12
 96:10
computers  50:4
 94:12
concentrate  18:24
concern  33:3
 43:17
concerning  81:19
 81:21
concluded  143:2
concludes  140:15
conditions  32:6,24
conducive  80:10
conducted  56:20
conflict  98:11
confront  139:22
confused  66:11
 70:19 135:4
confusion  118:10
congress  8:19 12:3
 12:15,20 13:25
connect  115:19
consider  82:4
 107:14
consistent  101:23
 103:4
constitute  7:1
consultant  13:3,18
 14:13 24:19 25:14
 74:16 101:11
consulting  13:20
 14:14 15:3,21
 25:16
cont'd  3:1 5:1
contact  20:3 23:8
 28:14,15 39:14,22
 48:4 79:14 89:7

115:15 129:8
 140:4
context  96:14
continue  22:2
 132:9
continued  92:3
continues  54:13
continuing  77:2
contract  4:9,17
 18:11 24:24 28:25
 29:11,12,21 30:5,8
 37:16,17 74:10,11
 74:16 75:18 77:3
 78:22,24 88:17,20
 90:11,16 92:22,23
 92:25 130:4
 131:10 132:3,9
 133:3,5,24
contracts  77:15,22
contractual  73:19
 78:18 102:22
control  18:19
 103:21
conversation  9:12
 9:15 28:21 39:25
 75:9,12 104:13,19
 104:21 106:9
 108:24 118:22
 128:20 129:4
 130:8,10 134:14
 135:9,22
conversations
 74:2 109:6 135:15
 135:17 137:9
cool  111:11
cooperation  81:21
 83:2 137:12
cooperative  82:7
 112:7 121:1
 134:16 137:22

copied  29:17
copies  141:16
copy  40:2 73:1
 140:25 141:2,21
 142:18
corner  60:6
corps  11:13,15
correct  21:12 22:4
 22:19 24:20 25:14
 30:3 32:21 33:22
 42:14 47:3 48:22
 50:1 51:9,16,24
 52:9,15 55:7
 56:11 64:8 65:12
 71:15 74:25 81:10
 87:14,22 88:17
 91:13,17 97:13
 99:22 100:3,6,21
 101:18,21 102:6
 102:17 108:7
 126:20 127:1,9,13
 131:23 132:3
 134:11,15 135:7
 135:11
corrected  122:8
correctly  35:10
 39:17 42:22 43:3
 47:11 58:4 60:9
 62:7 81:22 101:14
 103:2
cost  16:22 77:7
counsel  115:2
 142:17 144:10,13
 145:7,10
counselor  60:22
county  12:8,14
 17:2
couple  64:25
 69:12 78:11 82:16
 135:25

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc                                May 17, 2022

[course - deter]                                                              Page 7

course  16:21
  27:13,17 105:2
court  1:1 4:8 9:6,7
  9:21 20:8 47:17
  137:2
courts  4:14 10:20
  10:24 11:4 19:22
  20:13 21:5,11
  22:4,19 26:11
  28:14,16 29:21
  40:17 44:22 45:1
  45:6 47:1,8,25
  48:22 58:20 65:23
  74:5,5 83:23
  86:11 87:18 88:6
  90:25 97:7,12,18
  98:2,21 111:8
  127:5 129:2,18,24
  133:23 138:3
cover  23:10 47:2,7
  92:5,21
coverage  22:16
covered  74:16
  134:12
covering  97:11
covid  35:24 41:3
  47:15 72:1 73:5
  78:7 82:21,23
  116:2
create  36:18 49:16
  86:25
created  49:12
  108:22
crime  4:16 25:6,21
  25:23 26:2,9,10,15
  28:8 37:7 43:8,21
  59:10,11,12,14
  62:16,23 71:9,12
  71:23 73:10 76:20
  86:24,25,25
  130:13

crimes  26:1,18
  88:13
criminal  13:6
  23:17 24:14 36:2
  38:23 39:1,7,12
  88:11
criminals  46:8
  59:14
crisis  80:17
cul  104:17
culturally  120:2
curious  10:1
  114:23
current  17:8,10
currently  12:8,9
  47:23
cursing  40:3
custodial  122:14
customer  85:25
cut  33:14 52:17,18
  52:20 53:5,17
cv  1:12

**d**

d  4:1 6:1 34:17
  61:19,19
daily  4:10,15
  30:15,22 38:12,17
  49:10,16 51:8
  70:23 89:3 93:16
  94:18 95:12 97:4
  97:10 99:1
dallas  1:21 6:3
  144:2,17
damaged  138:15
date  1:17 30:6,16
  49:12 93:2 102:21
dated  38:6 42:12
  46:25 79:2 91:1
  99:11 100:11
  101:5,8

daughter  110:20
daughters  103:22
day  14:24 16:18
  37:2 41:8 49:19
  57:14 94:21
  109:18,19 118:17
  121:15,16,17,18
  122:1,8 123:21
  126:8 134:4,6,7,24
  135:15
daylight  110:24
days  45:15 51:12
  51:18 52:2,15,23
  54:4,15 118:17
  124:5
daytime  84:19
  110:24
de  104:17
deal  13:9 19:3,9
  19:16 40:21 70:3
  77:5
dealer  58:9,15
dealers  26:24 27:1
  117:13
dealing  19:18 41:3
  41:23 78:14 79:17
  87:2 93:25 117:23
  118:1,3
deals  38:20
decatur  16:5
december  42:12
  44:4 46:25 100:16
  102:5,6,9,10,12,16
  102:17
decide  77:1
decided  13:16
  14:4,11 15:17
  17:16 36:17 74:10
  92:17
decrease  76:2

defendant  1:13
defendants  3:2
  7:15 136:22
defense  82:20
defining  137:20
dekalb  12:7,12,14
  14:1 16:8 17:2
delay  26:6 47:10
  50:3
deleted  124:18
deliver  40:14
department  12:9
  12:13 60:9 86:24
  137:13
departments  13:7
depending  72:23
depends  38:23
  53:14 85:22 90:10
  124:7
deposition  1:15
  6:6,24 7:17 8:13
  8:17,19 9:4
  128:13,14 144:1
depth  80:21
describe  86:11
  87:17 102:20
described  100:25
describes  56:10
description  4:7
  5:2
designation
  126:15
detail  10:5 96:7
  100:6 111:23
details  22:12
  135:6
detective  56:23,23
detectives  13:5
deter  59:10,12,14
  59:16,17,20

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

**[determined - ellie]**

Page 8

**determined** 34:19
62:25
**deterrent** 28:7
**diagram** 108:21
**diaz** 1:5 2:2 6:7
103:10 139:18
140:2
**different** 13:12
17:15 18:19 19:4
19:14,25 20:5,7
22:23 23:2,4,9,13
25:8 26:1 27:9
30:12 38:12,15
44:21 50:4 55:18
72:22 74:13 98:13
100:18 119:10,19
120:2,23 127:23
132:7 133:20
**differently** 130:25
**digital** 144:8 145:3
**direct** 20:3 40:25
48:4 83:5
**direction** 128:3
**directly** 11:15
43:4 50:17 98:23
**discuss** 10:2 74:4
129:17,22
**discussed** 30:1
37:20 46:21 91:15
140:21
**discussing** 87:13
**discussion** 29:1
55:10 74:7,9
**dispute** 40:18
61:22 62:9
**disrespectful**
107:14
**distance** 35:6
**distinctive** 70:6
**district** 1:1,2

**disturbance** 81:18
82:14
**diverse** 120:2
**division** 1:3 23:3,5
23:7,15 24:1,3,4
24:13,15,19 25:10
25:14,18
**divisions** 22:23
23:1
**doctor** 19:12
**document** 21:10
22:7,10,22 24:1
30:15,21 38:5,11
42:11 79:1 81:4
90:21 100:18,24
102:2 103:1
122:12
**documentation**
39:5 92:14 113:14
**documents** 10:2
38:16 48:18 92:21
96:12,15
**dodge** 104:4
**dog** 98:20
**dogs** 61:20,21
**doing** 12:25 13:3
13:17,20 14:10
15:3,7,20 16:8
17:20,23 18:12
25:17 26:5 35:22
42:4,7 46:9 64:12
66:18 67:23 72:2
72:6 79:21 80:25
85:8,9 86:20
90:13 93:4,8
95:22 96:5,6
98:12,14 106:25
106:25 107:7
112:24 114:8
117:6,10,16,17,21
117:21,24 126:5

134:1,20 138:2
**dollars** 141:16
**domestic** 71:25
72:11 81:12,20
82:11
**door** 57:8,9,11
105:15 112:11
117:14 118:2,4,8
119:24 120:17,18
121:3,8
**doors** 31:3 58:1
117:8
**double** 134:13
**downstairs** 106:16
108:20 122:4
135:5
**drive** 86:23 90:3
**driving** 89:15
101:12
**drop** 99:9
**drove** 61:24 65:6
**drug** 26:23,24
27:1 58:9,15 66:1
79:16 117:13
138:21
**drugs** 28:4 79:19
98:14,15 117:12
117:23 118:1,3
**due** 35:6 42:20
115:11
**duly** 8:3 144:5
**duties** 41:7 101:11
**duty** 11:23 16:7,20
18:16,18 79:15
131:1

**e**

**e** 2:1,1 3:1,1 4:1,6
4:9,12,14,16,17,20
4:21,22 5:1 6:1,1
19:24 21:3 25:20
29:10,18 42:10,11

42:13,18 44:21,22
44:24,25 45:2,19
46:25 47:1,3,7
61:5,7 71:7,10
73:17,18,22 74:11
83:21 90:24 91:6
91:21 92:23 93:5
93:5 94:22,23,24
94:25 95:8,14,16
95:18 96:21,22,25
97:4,5,14,15,15,17
97:20,24 98:3,3
99:11,21,24 100:9
100:11 101:4,5,8
102:4,11,19
132:23 142:4,20
**e.m.f.** 1:8 2:4 6:10
**earlier** 21:24
52:17 53:10 54:17
66:1 86:17 91:16
127:4 140:21
**early** 45:12
**earns** 141:18
**easier** 9:21
**east** 1:19 2:7,13,19
6:12 16:10 17:1
**edwin** 1:5 2:2 6:8
103:10
**effect** 28:7
**effective** 59:7,13
59:17,19,22
**effort** 122:24
**eight** 16:20 37:3
84:8 90:9
**either** 24:5 25:12
47:19 77:18 105:1
**elaborate** 29:1
37:17
**elevator** 40:22
**ellie** 3:11 4:23 5:3
7:12 48:22 100:11

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc                                    May 17, 2022

101:4,9 102:20
**elr** 1:12
**elsa** 1:5 2:2 6:7
  103:10
**else's** 104:18
**email** 4:23 5:3
**employed** 144:11
  144:14 145:8,11
**employee** 144:13
  145:10
**ems** 80:16
**ended** 11:24 16:19
  16:19 26:12 50:10
  50:13 58:18 64:13
  65:1 80:13 93:5
  96:20 119:4
**ends** 86:9 102:5
  126:18
**enforcement** 12:7
  12:21 13:1,8,24
  14:18 19:11 76:18
  84:11
**engagement** 15:14
**english** 104:14
  118:16
**enter** 138:15
**entirely** 90:13
  114:25
**entrance** 34:17
  43:2
**entries** 51:12
**entry** 56:22 69:18
**epiphany** 14:5
**erase** 94:4
**error** 141:7,9
**es** 144:4
**especially** 40:5,7
  43:21 53:18 62:21
  71:22 72:1,9 73:5
  75:19 77:5

**esquire** 2:5,11,17
  3:3
**everybody** 20:15
  20:16 97:19,20
  119:25 140:6
**evict** 35:23 113:10
  113:20 114:4,15
  115:11,13,25
  116:2
**evicted** 113:23
  114:20,25 121:10
**eviction** 113:11,17
  114:2,25 115:5
**evictions** 114:17
  115:18
**evidentiary** 6:23
**exact** 32:14 75:6
  95:23 134:7
**exactly** 31:20
  69:14 83:11 92:14
  120:12
**examination** 4:2
  8:8 136:15
**examined** 8:5
**example** 54:21
  55:19
**excellent** 33:6,18
  34:8 75:21 76:12
**exchange** 4:16,22
  4:23 5:3 71:7
  126:18 127:18
**exchanged** 99:22
  122:17 124:4
**exchanges** 123:6
  124:10
**excuse** 52:7 72:10
  82:25 137:25
**exhibit** 4:8,9,10,11
  4:12,13,14,15,16
  4:17,18,19,21,22
  4:23 5:3,5 21:1,3

21:7 22:3 25:20
29:8,9,14 30:14,18
38:1,4,8,13 42:10
42:15 44:6,7,21
46:21,25 47:4
48:24,25 49:7
51:7,14 61:11
71:7,16 73:13,14
79:1,4 81:2,8
83:21 84:1 86:8,9
87:13 89:1 90:19
90:24 91:3 93:17
99:11,15 100:9,13
100:24 102:3,3,7
122:13,14,18,20
123:3,13 125:15
126:14,23 127:3
**exhibits** 5:7
  142:20
**exist** 95:12 96:18
**existing** 20:23
  77:2
**exists** 92:23
**exit** 58:2
**expect** 9:2,3 21:18
  116:22
**experience** 12:7
  17:13 56:22 68:11
  138:4,14 139:2,6
**explain** 23:1 25:21
**explained** 53:10
  55:23
**explaining** 39:5
**express** 106:20
**extend** 86:1
**extensive** 13:8
**extent** 97:10
**extremely** 81:14

**f**

**fact** 36:15 45:6
  49:10 80:19 94:17
  99:21 104:1
**factors** 137:20
**failed** 79:13,15
  81:18
**fair** 124:25
**falling** 87:25
**false** 56:17 69:20
  69:24
**familiar** 8:23 10:8
  80:16 83:13
**family** 83:12
  103:20 104:9
  106:14,16 109:24
  111:15 118:12,15
  140:2
**family's** 105:23
**far** 62:9 98:20
**fashion** 115:3,17
**fast** 48:7 61:25
  65:7
**faster** 48:14
**father** 108:25
**fault** 128:5 135:3
**fear** 59:15
**feasible** 132:15
**february** 44:5
  56:6 57:16 60:2
  62:10 93:17 127:1
**february's** 44:24
**federal** 81:19
**fee** 15:13
**feel** 19:5,7,14,15
  19:19 59:13 70:25
**felt** 42:6 109:11
  124:7
**fence** 51:15 138:9
  138:12,15,23

**fences** 138:23
**ferry** 1:19 2:7,13
  2:19 6:12
**fewer** 132:3
**field** 63:4
**fight** 72:11
**figure** 107:6
  124:19
**figured** 115:1
  117:13
**file** 39:15
**filed** 128:19,24
  129:2
**files** 122:15
**filing** 10:14
**fill** 30:23
**financially** 144:15
  145:11
**find** 9:23 10:3
  19:21 52:12 69:17
  94:2 95:18 111:20
  119:21 139:12
**fine** 50:22 134:4,5
  141:14,14 142:10
  142:16
**finish** 9:18
**finished** 113:24
**finishing** 85:4
**fire** 16:5 60:6
**firearm** 15:9
  66:24 67:6
**firearms** 69:4
**firecrackers** 67:22
**fired** 39:16 61:25
  62:10,15 65:7,17
**firm** 2:6,12,18 7:7
**first** 8:3 13:14
  16:3 19:21 20:17
  21:1 25:19 30:6
  31:13,22 44:22
  51:13 64:21 74:3

**fit** 15:4 59:1
**fits** 115:5
**five** 52:2,23
**fix** 50:12
**fixed** 52:2 93:21
  127:5
**flag** 48:10
**flash** 70:4
**flat** 44:11
**fledged** 90:7
**flickering** 53:1
**fliers** 19:24
**flirting** 106:10,11
  119:10
**floor** 58:2,4,4
**flores** 1:5 2:2 6:7
  103:10
**folks** 36:19 37:10
  58:12 96:15
  135:21
**follow** 39:17
**following** 110:8
  114:25
**follows** 8:5
**fontaine** 21:4 71:8
  134:25
**footage** 58:22
**football** 63:5
**forced** 56:21 69:18
  121:11
**foregoing** 144:3,4
  145:4
**foresee** 117:22
**forgot** 47:16 58:17
  134:7

**form** 28:10 30:8
  32:4 34:1 52:5
  53:25 54:10,24
  65:20 66:6 68:8
  69:1 70:2 77:25
  86:13,15,19 89:5
  107:15 109:1
  111:17 115:3,17
  115:20 123:23
  124:3,6,21 131:13
  131:25 132:4,22
  132:22
**formal** 88:25
**format** 9:2 38:12
**former** 12:7
  130:17
**forms** 89:6,6
**forward** 15:2
  28:22 54:13 99:4
**forwarding** 73:18
**forwards** 42:13
**found** 14:7 56:25
  119:18 120:5
  122:2 130:14,17
**four** 11:7,8,19,20
  14:19 16:17 37:1
  37:3 59:21 85:20
  89:9 91:10
**fourth** 126:15
**fraternize** 98:10
**free** 141:21
**frequenting** 58:11
**friday** 37:2
**friday's** 14:23
**fried** 50:7
**front** 9:6,6 21:6
  29:12 30:16 34:25
  38:7 45:3 61:17
  63:6 73:20 79:3
  83:24 90:21 91:2
  99:14 100:12

**g**

**g** 6:1 34:17 51:23
  60:23
**ga** 1:20 2:8,14,20
  3:7
**gain** 119:2
**gaining** 56:24
**gap** 94:19
**gate** 138:13
**gated** 138:13
**gathered** 61:17
**geek** 50:11 93:20
  94:4,15 96:9
**general** 21:18 26:9
  30:13 53:8 62:9
  75:12 130:8
**generally** 8:23
  46:17 49:5
**gentleman** 36:6
  56:25 79:17
**genuinely** 10:1
**georgia** 1:2 6:12
  6:15 8:18 11:9
  12:3,15,19 13:4,6
  13:25 32:9 33:12
  38:25 56:4 59:14
  144:19
**germany** 11:8,10
  11:21
**gesture** 39:16
**getting** 18:22
  49:24 74:19 77:23
  78:9 80:9 114:2

101:3 105:15
  123:15 138:12
**full** 8:11 86:18
  90:7 102:24
**further** 136:10
  140:11 144:12
  145:9
**fyi** 47:10

[getting - hickey]                                                          Page 11

132:8
**girl** 112:18
**girlfriend** 40:12
**girls** 103:24 106:6
  106:10,10
**give** 25:25 32:12
  45:17 50:6 62:4
  82:8 85:19 86:19
  123:2 128:6,7
  130:11 132:17,20
  137:1
**given** 121:22
**giving** 136:18,20
**glisson** 60:5
**glock** 67:4 80:5
**gmail.com** 97:25
**go** 9:1,4,19 13:16
  14:8 19:3 25:4,19
  26:8 28:11 37:24
  41:21 51:11 53:5
  58:2,3 72:19 73:1
  74:18 76:20 77:10
  79:24 84:10,12
  85:5,6 86:6 87:5
  88:2 93:23 95:16
  95:17 96:17,22
  97:9 99:8 102:21
  105:20 106:3
  107:16 109:2
  110:4,5,17 111:6
  123:8 126:14
**goal** 9:23 46:17
**goes** 98:21
**going** 9:16,24
  10:21 16:12 19:9
  21:1 25:3,8,17
  26:12 27:11 28:25
  33:19 34:12 35:25
  36:11 37:21 38:1
  39:21 41:21 43:18
  45:20 46:3,4 59:4

59:4 61:12 73:10
  74:20 76:1 84:12
  90:20 93:10
  100:19 102:1
  105:3 106:23
  111:3 112:5,8
  113:11,19 119:4
  119:13,23 120:6
  120:15,22 125:25
  128:22 132:14
  133:25 134:3
  141:15
**good** 6:2 8:10 14:7
  40:6 59:6 75:20
  76:3 85:25 120:15
  123:4 132:21
  142:12
**google** 60:19
**gotpi.org** 47:1
  97:12,15,22
**gotten** 30:11 113:2
  116:7
**grab** 108:3
**grady** 12:23 15:5
  15:18 16:1,2
  17:22 18:1,2,3,4
  65:3 80:15,16,19
**grassy** 63:6
**great** 33:1 50:18
  72:19
**green** 51:15 61:16
  64:10,10,20,22
  68:21 69:23 70:14
**grey** 61:24 65:6
**ground** 104:3
**group** 97:20
**groups** 63:24
**growing** 106:6,7
**guard** 28:7 30:2
  48:9,14 55:21
  129:17,23

**guess** 10:14 14:5
  70:24 74:7 78:8
  97:20 113:14
  131:16 133:6
  134:1
**gun** 60:5 62:15
  63:1 66:5,22
  67:23 70:4,6,9
**gunfire** 60:14 64:4
**guns** 67:1,1,2,5
**guy** 35:13
**guys** 50:6 128:13
  128:19 134:19

**h**

**h** 1:16 4:6 5:1 8:2
  95:1,8
**h.m.f.** 1:9 2:4 6:10
**half** 61:13
**hand** 7:22 106:12
  110:2
**handed** 21:2 78:25
  83:20 102:4
**handing** 38:4 42:9
  44:20 46:24 48:24
  71:6 73:12 99:10
  100:8 122:12
**handle** 82:22
  84:13
**hang** 103:22
  104:24 107:8
**hanging** 105:2,13
  106:19 116:18
  118:24
**happen** 75:4
**happened** 9:24
  16:12 50:16 64:5
  67:16 82:1 89:10
  94:8 95:13 96:3
  96:23 109:13
  110:25 111:19
  118:5 119:17

122:1 126:10
  129:15 130:16,21
**happy** 36:8,20,25
  37:5
**harbison** 3:4
**hard** 113:12
  137:21
**harris** 29:10 42:12
  73:18 98:6
**hazardous** 32:6
**heading** 24:19
  30:15 127:12
**health** 15:6 17:22
  65:4
**hear** 35:5 60:7
  107:10,13,24
**heard** 9:5 34:15
  60:6,15 68:24
  69:3 70:6
**hearing** 7:19
**heat** 53:4,11,16
**held** 94:21
**hello** 126:5
**help** 9:9 59:5
**helps** 9:17
**hereto** 144:14
  145:11
**hey** 14:5 17:14
  32:13 41:17 45:20
  59:8 72:10 77:16
  79:21 89:19 93:10
  99:8 108:3 109:21
  112:5 125:23
  128:22 134:3
**hickey** 1:16 5:6
  6:7 7:16,16,21 8:2
  8:10,12,14 11:5
  12:10 13:10,13
  14:25 15:4 16:4
  17:7,21 18:1,4,8
  18:13 38:5 44:20

48:17 59:21 64:22
70:25 71:6 78:25
79:1 87:12 88:24
90:23 95:17 118:9
136:11,17,24
140:1,20
**hickey.pdf.** 29:12
**hickeysi** 95:8
**hickeysi.com** 95:9
**hickeysi.com.** 95:1
**high** 11:3,15 45:10
**hired** 12:1 22:18
131:17,18
**history** 11:5
**hit** 34:23 63:16
79:9 80:4,10
**hold** 125:18
**holidays** 43:19
**holt** 51:6 129:18
129:19
**home** 41:21 49:22
119:16
**homeless** 58:11
**honest** 56:16 68:2
134:17
**honestly** 76:11
**horace** 8:12
129:18,19
**horseplaying**
106:12
**hospital** 125:24,25
**hot** 111:11
**hounded** 39:23
**hour** 22:16 30:2
33:16 37:4 79:14
79:24 86:22,22
**hours** 4:12 22:15
25:8 30:1 34:14
37:1,20 42:13,19
43:6,7,23 44:1
45:11,12,21,23

53:19 61:17 71:22
72:5 73:24,25
74:25 75:13,16,18
75:20,21,22 76:2,3
76:15,24 77:2,4
78:14 84:8 85:19
89:10 90:8 110:25
131:9,23 132:2,3
**house** 104:7
112:11 117:12
119:4
**household** 117:23
**hsi** 4:10,11,18 21:5
30:15
**huh** 9:11
**human** 59:24
**hundred** 141:16
**hung** 105:21
116:20
**husband** 108:15
**hydrogen** 53:15

**i**

**identification** 21:8
29:15 30:19 38:9
42:16 44:8 47:5
49:8 71:17 73:15
79:5 84:2 91:4
99:16 100:14
102:8 122:21
**identify** 7:4 46:10
106:1
**illegal** 117:6,24
**immediately** 17:20
52:8
**immigration**
107:11
**impala** 61:24 65:6
65:18 68:25 69:25
**important** 9:10
**improve** 34:4

**improving** 33:2
**inaccurate** 137:13
**inappropriate**
106:8,8
**incidence** 25:24
**incident** 4:11,18
26:2 34:16 35:12
38:6,11,20 39:8
42:20,24 43:9,12
43:13 62:10,13
64:7,16,17 66:8,12
66:13,19 67:12,14
68:1,3,4,13,19
69:11,11,12 70:10
70:15,20,22 72:9
72:10 79:2,7,12
81:16,24 82:12,18
89:2,4 102:22
104:22 108:14
109:25 130:14
135:7,16,18
**incidents** 43:14
61:20 63:18 71:20
71:25 72:3 74:17
114:11 139:20
**include** 47:3
122:24 125:14
126:23
**included** 45:12
**includes** 45:2
83:23 123:10
**including** 71:10
**income** 15:16
**increase** 75:13,15
76:2,15 77:18
**increased** 43:20
72:1
**increases** 76:16
**increasing** 131:23
132:2

**indicated** 137:10
**individual** 24:5
34:19,25 35:2,3,14
35:19 36:14 38:2
39:1 41:11 79:14
108:15
**individuals** 19:10
23:6 27:7 35:20
35:21,22 117:11
120:8
**industry** 107:22
**inform** 39:11
**information** 37:19
47:11 81:15 82:9
121:23 130:12,14
**informed** 35:1
36:11
**infraction** 109:22
**ing** 80:14
**initial** 29:22 56:19
71:10 78:3,10
130:25
**initially** 66:20
79:13 130:23
**initiate** 70:22
**injured** 63:16
**ins** 16:11 139:17
**inside** 55:15,16
104:17
**inspection** 31:1,10
55:6
**inspections** 25:2
**instance** 45:24
97:24
**instances** 41:12
**instructed** 39:25
**instructor** 13:4,6
15:10,11 67:8
**intended** 6:21
**interact** 98:8
107:24,25

**[interacting - know]**                                                 Page 13

**interacting** 107:3
**interaction** 98:19
  110:20
**interactions** 107:5
  109:23 111:14
**interest** 84:16
**interested** 58:16
  144:15 145:12
**internet** 26:7 73:8
**interruption** 16:25
  87:24
**introduce** 21:1
**introduced** 51:7
  112:5
**introductory**
  21:15
**investigating**
  120:9 121:14
**investigation**
  12:11 18:21,21
  23:10,12,14,15,16
  24:13,15,15 25:10
  38:6 56:19 79:2
  88:12 120:15
**investigations**
  18:5,8,13
**investment** 25:1,1
  25:2
**invoice** 91:7,12
  92:18 134:8
**invoices** 4:21 91:1
  91:7,9,9
**invoke** 141:22
**involved** 62:21
  116:25
**involving** 89:2
  110:20
**iphone** 124:14,14
**issue** 19:2 32:8,17
  33:3 36:2,18
  43:10,17 50:19

55:22 56:3 63:8
  63:14 77:5 78:6
  78:10 79:16,16
  114:13 116:14,19
**issued** 39:1,12
**issues** 17:15 26:23
  27:7 41:24 46:2
  48:5 60:14 78:15
  79:11 80:1 116:10
  116:22 117:1,4
  118:25 121:9
  132:16 134:18
**it'll** 25:25 59:5

**j**

**jail** 80:14 82:23
**jan** 4:13
**january** 44:5,23
  45:9 49:3 50:9
  51:8,19,19,20,20
  51:22 52:9 53:23
  53:23 54:4,8 55:4
  55:5 61:12,15
  62:13 93:17
  100:12 101:5,8
  126:19 128:2
**jeff** 7:14 129:9
  136:17
**jeffrey** 3:3
**jmelcher** 3:8
**job** 1:22 33:2,7,18
  34:8 39:16 42:4,7
  75:20,21,22 76:12
  76:12 79:13,15
  80:13,25 131:1
  137:25
**jobs** 15:24
**join** 12:1
**joined** 11:25
**july** 123:19,21
  125:17,19,22,23
  125:23 126:3,12

131:12 132:24
  133:7 134:6,9
**jump** 138:12
**jumping** 138:9
**june** 126:6 133:7
**jury** 9:6 136:22
**juveniles** 61:17,18
  61:23 62:1,6,6

**k**

**k** 13:14,19,21
  60:25 95:1,8
**katie** 145:2,15
**keep** 22:10 40:5
  73:9 139:8 142:1
**keeping** 139:2
**kenneth** 1:16 5:6
  6:6 7:16 8:2,12
**kept** 30:22 93:2
  113:13,14
**key** 27:18
**khickey** 95:17
**khickeysr** 95:1
**kick** 35:25 115:12
  117:14 120:17,18
**kicked** 35:20
  112:11 118:2,4
  121:2,8
**kicking** 117:7
**kid** 105:22
**kids** 31:13,25
  62:18,21 63:3,11
  63:14,15,16,19
  64:2 66:25 68:2
  68:25 103:17,21
  104:6,16,23,24,24
  105:3,13,21,23,25
  106:13,18,21,24
  108:16 109:8
  112:14,19,24
  113:3 114:15
  116:15

**killed** 26:21
**kind** 9:15,18 10:23
  11:2 14:7 26:4
  41:20 55:20 70:24
  70:25 93:16 110:3
  117:4 130:12
  134:22 141:17
**kinds** 26:18
**knew** 40:14 61:20
  79:18 103:15,16
  106:2 118:1
  121:20
**knit** 63:24
**know** 9:11,16 10:3
  10:4 11:3 14:7
  15:23 16:22,23
  18:16 19:5,11,16
  21:25 22:22 23:19
  24:12,14 27:20,22
  27:24,24,25 28:3,4
  28:21 29:2,2,3
  30:11 31:7,19
  33:7,11,12,15,16
  35:24 36:7 37:7
  37:21 40:1,4,5,6
  40:13 41:2,3,4,7
  41:17,21 43:10,13
  43:14 45:24,25
  46:2,5,22 49:4,12
  49:20,22,25 50:19
  53:11,22 54:3
  57:12 59:25 60:18
  63:15,22,25 64:2,2
  64:17 66:22 67:19
  67:20,22,23 68:2
  68:10,16 69:15,19
  69:20,21 70:23
  71:4,20,25 72:3,5
  72:13,14 73:1,25
  75:13,23 76:8,17
  76:18 77:6,16

78:7 80:10,20,22
82:4,5,8,11 83:4,8
84:12 85:18,23,25
88:9 89:17 90:9
92:24 93:6 94:4,9
96:3,23 97:1 98:6
98:14,17 103:9,12
104:3,25 105:7,8
105:14 106:1,5,7
106:11,22 107:1,6
107:7,8,9,20,21
108:2 109:21
110:3,12,13
111:10,11 112:8,9
112:15,25 113:3
113:15 114:14
116:11,11 117:16
117:22 118:15,20
118:22 119:4,15
119:19,25 120:1,6
120:7,20,23 121:2
121:9,10,12,14
122:2 124:13
128:15,16,17,18
129:19 130:3,7,23
130:25 131:2,7,9
133:13 134:18,22
135:1,4 136:19
139:5,13 141:2,8
141:25 142:8
**knowing** 79:22
**knowledge** 17:13
139:17 144:9
145:6
**known** 29:2 63:2
116:11 139:4
**knucklehead**
62:25

## l

**l** 60:23
**label** 22:8
**lack** 81:21 83:2
137:12
**lackadaisical** 26:5
**lady** 41:18 69:16
79:25 85:2 93:25
109:25 110:4,10
118:23 119:8
137:19
**laid** 15:20
**laptop** 49:19 50:4
50:7,11,12 94:1
96:10 102:21
**laptops** 50:4
**large** 72:4 85:23
112:3 139:2,8
**lasting** 48:1
**late** 77:23 95:10
100:3 104:8
105:13 116:16
127:5
**latinos** 107:24,25
**latoya** 5:5 122:15
**launch** 18:22
**laundry** 27:9 31:4
**law** 12:6,21,25
13:6,8,24 14:18
19:11 68:10 76:18
81:19 84:10
**laws** 6:23
**lawsuit** 10:14,19
129:2,15
**lazy** 82:15
**lead** 115:7
**leadership** 81:21
83:2,5
**leading** 74:3
**learn** 11:1

**learned** 135:6
**lease** 35:15 40:2,3
56:15 57:1 72:8,9
**leash** 61:21
**leasing** 19:15
35:15 84:20 105:9
108:17,19
**leave** 46:5 49:23
138:16
**left** 7:5 11:25 12:2
14:1 15:5,7 18:2,4
57:8 87:12 99:13
105:17 121:12
137:11
**legal** 40:1
**lenient** 105:6
**letter** 10:13 74:8
74:24 78:17 86:10
91:15 93:1 109:15
109:16
**letters** 40:13,14
**letting** 23:19 96:3
110:17
**level** 11:3 23:22
24:8 41:23 45:10
115:17 132:16
**lexisnexis** 72:20
**license** 18:3 23:18
**life** 11:3
**light** 31:12 32:12
32:14 33:5 134:1
**lighting** 32:21,23
33:15,21 34:7
54:18 55:14,24
**lights** 32:3,4,5,7
32:11,16,20 33:2
33:10,13,17 34:9
51:14,15,23 52:1
52:14,17,19,24
53:1,4,7,9,14,16
53:23 54:4,8,14

55:5,7 84:18 90:5
104:6 134:2
**limited** 89:23,25
90:16,17
**line** 47:18 71:8
141:9
**list** 22:23 23:13
**listed** 24:1 25:13
88:5
**listing** 25:25
**lit** 33:7,18,25
**litigation** 103:8
**little** 9:15,20 11:1
14:10 15:19 25:7
30:11 38:12 39:24
39:24,24 63:4,5,23
74:12 78:5 83:14
83:14 91:23 99:19
104:19 105:21
106:9 110:1,2,9,9
112:14,15,16,18
112:19 119:1,1,14
119:20 120:19,25
126:2 128:15
132:19 138:1,17
138:19 141:17
**live** 11:8 27:9
56:16 106:16
120:8
**lived** 10:20 26:24
57:3 105:25
**living** 27:1 31:8
35:14 56:14 57:1
57:4 62:6 141:18
**llc** 2:6,12,18
**local** 84:10 86:23
117:13 138:21
**located** 108:18
**location** 1:19
32:14 62:2,17
65:11 77:13

[location - marks]                                                          Page 15

108:17,21
**lock** 58:1
**log** 4:10 30:15,22
38:12,17 70:23
**logs** 51:8 97:4,11
99:2
**loiter** 104:24
**loitering** 46:9
105:13 106:24
**long** 6:8 8:21
21:23 22:1 47:24
64:21,24 110:16
114:9
**longer** 74:12 85:17
91:23 94:23
127:23 132:19
**look** 22:6,21 24:18
29:20,25 31:10
34:11 45:9 51:18
54:13 55:4,9
57:19,20 64:20,25
67:4 71:24 77:12
77:14,16 82:3
86:9 87:16 91:8
93:23 99:24 101:7
108:17 120:11,12
120:14,16 123:2
126:22 127:3,11
133:12
**looked** 52:8 67:1
**looking** 20:21
26:13 58:10 59:25
125:8,13 128:1
**looks** 127:7
**loose** 63:24
**lose** 95:25
**losing** 50:13
**lost** 50:5 93:21,25
94:7,14 95:20
**lot** 14:4 17:13
18:21,25 19:3,9,10

19:16,18 20:3
26:17 27:6,11
29:2 33:10,11
34:23 36:8 41:1,3
43:21 47:15 53:11
63:20 70:7 72:19
82:21 83:9,15
93:21 95:25
103:25 104:7
109:10 113:13
114:6 116:17
117:1 124:4
130:11,17 134:19
134:20 137:23
**loud** 34:16
**low** 104:3
**lump** 77:19
**lying** 68:21,23

**m**

**mad** 35:18
**maggie** 21:4,20,21
28:19 71:8 118:21
120:22 125:24
128:12,21 129:4
130:1 135:10,22
**magnum** 67:5
**mail** 4:9,12,14,16
4:17,20,21,22 21:3
25:20 29:10,18
42:10,11,13,18
44:22,24,25 45:20
46:25 47:1,3,7
71:7,10 73:17,18
73:22 74:11 78:4
83:21 90:24 91:6
91:21 92:23 93:5
93:5 94:22,23,24
94:25 95:14,16
96:21,22,25 97:4,5
97:14,15,15,17,20
98:3 99:11,24

100:9,11 101:4,5,8
102:4,11,19
132:23
**mailed** 19:24 78:4
97:24 98:3
**mails** 19:24 44:21
45:2 95:18 99:21
**main** 34:17 124:3
**maintain** 14:21
15:16
**maintained** 131:8
**maintaining** 77:13
**maintenance**
19:15 31:5 41:6
41:24 55:22 98:8
98:13
**major** 18:22 19:23
28:24 50:16 63:8
63:13 67:12 68:1
68:3,12 70:20
72:23 84:14 96:5
**majority** 46:5 50:2
**majorly** 117:24
**makeup** 119:10
**making** 46:4 49:25
82:22
**male** 34:15,22
**mall** 12:1
**man** 98:8
**management** 4:19
20:1,4 28:14
37:24 40:19 41:14
41:16 42:5 46:1,5
46:7,22 47:8
49:11,24 54:18
72:3 75:2 83:22
84:5 85:15 86:12
87:13,19 88:7,11
88:16 90:6 91:8
91:12 92:1,7,12
93:13 98:25 100:1

102:24 105:6,11
105:12 106:20
109:12,14 129:25
133:5
**manager** 10:15
21:22 28:20 29:5
34:18 40:5
**managers** 21:11
33:11 53:11 98:12
**mandates** 82:20
**manner** 6:24
**map** 4:16 71:9,12
**mar** 4:13
**march** 44:5 49:3
51:9 73:17 78:18
79:2 81:3,5,6,8
89:2,4 91:17
93:17 94:14 101:9
131:22,23
**march's** 44:25
**marked** 21:2,7
29:8,14 30:18
38:8 42:10,15
44:7,21 46:24
47:4 49:7 71:7,16
73:13,14 79:1,4
83:20 84:1 90:24
91:3 99:11,15
100:9,13 102:7
122:13,20
**market** 23:6
**marketing** 19:23
20:11
**marking** 30:14
**marks** 2:5 4:3 7:6
7:6 8:9 17:4 28:12
34:10 44:12,19
46:15 50:22 51:5
52:6 54:2,12 55:3
60:23 61:1,10
65:22 68:5,17

69:6 70:13 78:12
87:5,11 88:1,4
95:6 100:21,23
101:2 107:23
109:3 111:21
113:16 114:18
116:4 124:1,22,25
125:3 129:13
131:21 132:1,6
135:24 136:4,10
140:11 141:5
142:7,19
**marta** 12:17
**materials** 20:12
**matter** 6:7
**max** 2:5 7:6
**max.marks** 2:9
**mean** 18:14 19:8
27:15 28:2 34:6
40:21 48:6 63:10
75:20 76:3,11
77:9 80:14 86:15
105:22 107:9,18
108:16,22 112:23
112:23 133:11
141:25
**means** 6:25 59:17
59:20
**meant** 23:5 25:22
46:11
**measures** 86:14,15
138:8
**media** 66:17
**medication** 80:23
**medrano** 1:6 2:3
6:8 103:11
**meet** 21:19
**meeting** 21:11,14
21:16,24 77:17
129:9,11

**meetings** 108:4
**melcher** 3:3 4:4
7:14,14 28:10
34:1 44:9,13
46:10,13 50:20,23
52:5 53:25 54:10
54:24 55:2 65:20
66:6 68:8 69:1
70:2 77:25 100:19
100:22 107:15
109:1 111:17
113:6,8,24 115:20
123:23 124:20,24
129:11 131:13,25
132:4 136:16,17
140:9,12 142:5,20
**member** 20:2,6
77:13
**members** 83:12
**men** 110:20
**mental** 79:11,16
79:25 80:17
137:19
**mentioned** 80:24
88:15 108:6
**merely** 101:12
**merit** 70:10
**message** 99:6
126:19,24 127:18
**messages** 5:5
122:14,16 123:10
123:14,20 124:18
125:2,14
**messed** 41:20
**messing** 119:2
**met** 28:18,20 29:5
39:11 136:17
**microphone** 87:25
**middle** 61:22
**military** 11:13,15
11:25

**mind** 60:21 80:6
113:25 124:15
**minimum** 90:5
**minor** 1:7 2:4 6:9
41:2
**minute** 8:24 52:20
95:24 136:3
**minutes** 33:16
135:25
**mischief** 113:3
**missing** 49:5
**mistake** 122:7
**mistaken** 58:18
**misunderstanding**
120:20
**mixed** 122:4
**mmhmm** 9:11
61:14
**moment** 9:5 36:19
49:15 66:4 74:23
80:24 98:24 100:6
101:16,24 102:2
103:5 109:7 123:2
124:2
**monday** 37:2
100:15 102:9
127:12
**money** 75:17
77:21
**monitoring** 74:17
**month** 61:13 86:6
90:19 91:12,20
92:5,9 93:12,15
94:18 95:11 97:2
101:17 134:9
**monthly** 91:7
92:17 127:23
**months** 45:7
135:12,13,16
**moratorium** 35:25
113:11,21 114:4

114:16,21 115:12
115:19 116:1
**morning** 6:2 8:10
10:25 45:12
136:18
**mother** 107:6
**move** 28:22
121:11
**muzzle** 70:4

**n**

**n** 2:1 3:1 4:1 6:1
60:23 61:7
**name** 6:2 8:11
16:10 34:22,24
41:15 58:17 60:17
60:19,22 61:3
83:16,19 95:23
98:7 136:24 137:5
**names** 106:2 137:1
**narrative** 39:10
**nature** 68:13
76:17 82:2 130:21
**near** 61:18
**necessarily** 19:19
48:7
**need** 18:17 19:13
32:21 33:5 38:20
75:19,24 76:5
77:18 85:23 88:10
99:8 104:16
109:21
**needed** 23:6 89:23
90:1
**needs** 45:16,16
**negotiating** 84:7
**neither** 144:10
145:7
**network** 95:21
**never** 37:17,20
50:11,18 76:2
78:6 98:1,19,23

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc
May 17, 2022

115:16 120:11
132:10,12,12
**new**   15:19 48:3
94:25 125:11
133:21
**news**   66:17
**nice**   39:24 117:20
128:16
**night**   45:12 46:18
49:18 105:13
111:3,22 112:2
116:16 118:11
119:22 121:21
122:1 134:14
140:1
**nighttime**   53:19
84:18
**nine**   62:23
**nobody's**   73:10
**noise**   104:18
**non**   55:19 107:25
**nonpayment**   56:3
**nonresident**   34:21
35:13
**normal**   9:12 23:20
68:16,19
**normally**   46:9
49:18 50:4 56:16
62:20 66:13,17
70:17,19 84:25
85:5,10,14,17,19
94:3,6 109:15
113:20,22 114:9
115:25 117:5,7
**northeast**   3:5
**northern**   1:2
**northlake**   12:1
**notary**   1:21 6:14
144:18
**note**   57:21,24
136:1

**noted**   51:15 56:4
**notepad**   49:21
**notice**   34:3 35:17
35:23 109:19
115:15
**noticed**   117:4
119:9
**notices**   36:16 57:8
57:10 85:1,3,10,14
86:3,7 87:3 88:15
89:11,13 90:2,3
99:8 100:3 101:12
103:1 108:3 111:2
112:1 113:13,15
114:5,7 115:14
116:3
**notify**   44:2 88:13
**november**   29:9
30:6,16 31:25
38:6 44:4 99:12
100:15 127:12,19
128:1,3,5,7
**now's**   50:22
**number**   22:9
32:13 54:15 66:15
85:23 112:3 122:7
123:9 125:5,7,8,11
125:11 135:3
**numbers**   122:4
135:4
**nurse**   19:12

**o**

**o**   6:1 60:23 61:7
**oath**   9:5
**oaths**   6:15
**objection**   6:16
7:19 28:10 34:1
52:5 53:25 54:10
54:24 65:20 66:6
68:8 69:1 70:2
77:25 107:15

109:1 111:17
115:20 123:23
124:20,25 131:13
131:25 132:4
**obligation**   102:22
**obnoxious**   36:14
**observation**   27:21
117:19
**observations**   50:1
103:19
**observe**   26:15
105:24 107:3
140:1
**observed**   26:19
116:17
**obtain**   86:25
**obviously**   29:17
124:20
**occur**   71:21
**occurred**   69:17
121:23
**occurring**   54:22
**offend**   107:18,19
**offer**   21:17 23:14
23:20,20,23 24:11
24:16,25 29:3
88:9
**offered**   74:12
**offering**   23:4
**offers**   24:13
**offhand**   60:18
**office**   31:5,5 34:15
40:25 48:18 49:2
49:22 97:18 99:13
99:18,22 100:10
101:4 108:2,19
118:21 135:21
**officer**   12:4,8 16:7
16:13 18:18 22:16
23:25 24:7 26:21
47:9 51:14 53:3

56:22 60:5,15
62:3,5 64:10
65:14 67:18 68:10
70:11 81:13,17,25
82:5 83:17 91:10
91:17 112:5
130:15 132:25
139:6 144:1,2
**officers**   16:20
18:16 25:13 38:18
47:16 49:16 77:6
77:7 82:3 86:4
112:3 131:4
134:14
**official**   140:22
**oglesby**   3:11 4:23
5:3 7:12,12
100:11 101:4
102:5
**oh**   28:2 39:23
67:20 96:20
102:15 125:17
128:3,23 140:24
141:19
**okay**   9:12,21
10:18 13:23 14:17
17:9,20,23 18:6
22:2,11 28:22
31:1 42:21 44:14
48:17 49:24 50:23
50:25 55:2 57:16
73:9 78:25 83:20
92:20 94:11 97:8
97:14 98:2,19
99:9 100:8,22
101:3,7 102:1,19
103:7 109:13,23
111:12 113:8,22
118:18 119:18
120:23 121:8
122:9,12,22 123:1

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

**[okay - person]**

Page 18

125:13,17 126:3
126:14 128:25
132:21 136:4,4,5
137:1,7,9,16 138:2
138:7,14,22
139:16,25 140:4
140:14 141:19,24
**old** 93:5 94:23
96:25 102:20
104:6
**once** 8:20 14:6
15:17 18:2 33:6
33:13 43:8 46:4,7
49:21 52:20 53:4
53:11,16 71:23
72:7 78:7 92:8,17
104:6 122:2
**one's** 31:8
**ones** 31:7 121:7
125:15
**online** 26:8,13,14
67:3 72:19 73:3
**open** 31:21 82:8
138:11
**opened** 31:15,19
**operate** 77:20
**opinion** 27:3 32:23
33:4 34:6 70:5
80:25 106:8
116:17
**opportunity** 15:12
140:17 141:6,11
**order** 142:18
**ordered** 67:3
**ordering** 141:2
**organization**
10:16 11:18
**originally** 11:6
12:15 13:15 56:2
**outbreak** 47:15

**outcome** 144:15
145:12
**outdoor** 55:24
**outside** 55:17
117:20 120:16
**overall** 11:17
32:24
**overcoming** 19:17
**owner** 12:10 16:14
**owners** 41:16
53:12
**ownership** 37:25
39:14,22

**p**

**p** 2:1,1 3:1,1 6:1
61:7
**p.m.** 42:19 45:24
45:25 87:10
127:12,19 136:6,9
142:23 143:1
**paces** 1:19 2:7,13
2:19 6:12
**packages** 19:25
**page** 4:2,7 5:2
22:6,12,21 24:18
25:19 30:6 39:9
51:13,13 86:9
87:16,17 88:5
102:14,15 123:9,9
123:13,15 126:15
126:19,22 127:3
**pages** 22:22
**paid** 77:23 90:14
**pain** 112:7
**pandemic** 31:17
**panthersville** 17:2
**paralegal** 3:11
**pardon** 16:24
87:24
**parents** 106:4

**parked** 112:4
**parking** 34:23
103:25 109:10
**part** 24:9 25:18
32:4 34:12 68:21
76:17 80:13 82:4
84:16 117:3
120:10 130:4
138:1 141:18
**particular** 10:16
16:16 23:4,17
26:18 27:11 36:7
37:9 51:12 53:18
64:4 66:10 70:10
77:18 78:24 85:16
93:2 108:21 112:2
112:13,20 121:10
**parties** 6:17
140:18 144:11,14
145:8,11
**partnership** 1:12
3:2 6:11 10:19
20:12
**parts** 138:14
**pass** 85:1,10,14
86:3,6 89:11 90:2
90:3 102:25 111:4
111:4,25
**passed** 100:24
113:15 115:14,14
116:3
**passing** 29:9 85:3
87:2 88:15 89:13
90:23 100:3
101:12
**patio** 105:1
**patrol** 21:5 23:10
27:19 34:3 59:21
74:17 84:7,8,9
85:16 86:20,21
88:21 102:24

108:3
**patrolled** 16:21
**patrolling** 36:7
38:18
**patrols** 96:5
**pause** 9:19
**pay** 19:1
**payment** 29:25
92:16 126:6,6
127:5,8
**payments** 78:3,14
127:22
**peachtree** 3:5
**pellets** 67:21
**people** 10:15
15:13 18:18 19:13
27:21 29:2 32:8
37:13,22 40:18
41:3,4,8 43:18
46:2,8 57:12
59:25 67:7,22
69:20 73:6 76:19
83:15 97:19 98:13
113:2,4,10,20
114:3,5,15 115:10
115:23,24 116:2,7
116:19,19 120:2,6
120:14 128:24
134:22 137:23
138:4,7,15,24
**perfect** 7:18 88:2,3
**perform** 41:7
**period** 10:22 13:1
15:2 85:17
**periodically**
101:13
**permitted** 6:21
**person** 9:18 35:17
36:4 59:8 133:10
133:15,21

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

**personal** 33:4
41:23 97:25
139:17
**personality** 19:10
**personally** 103:12
**petty** 39:14,16,20
39:22
**peyton** 61:4,5
**phone** 62:4 70:12
72:17 104:15,20
124:13 125:10
127:20
**photographs**
123:5
**physical** 25:17
**picking** 111:1
**picks** 127:1
**picture** 121:5
**pieces** 120:13
**place** 16:19 31:11
34:12 37:18 45:6
57:5 58:11 61:4
74:22 86:14,16
104:21 115:19
118:18 119:7
122:11 123:19
131:5
**placed** 33:21
57:25
**plain** 24:5
**plaintiffs** 1:10 2:2
7:7,9,11,13
**play** 63:5,5 103:17
103:17 105:3
107:7 110:18
138:1
**playground** 31:11
31:12,14 110:11
110:15,16
**playing** 31:13,25
63:1 106:24 109:9

109:10
**plaza** 3:6
**please** 7:4,21 8:7
8:10 42:21 60:20
109:22 127:21
128:6 140:19
142:21
**plenty** 77:15
**pllc** 3:4
**plus** 37:19 43:17
58:18 96:9 139:12
**point** 19:3 35:10
99:4 121:20
135:10
**pole** 32:13,13
**police** 8:18 11:13
11:15 12:4,4,5,8,9
12:12,17 13:5
14:21 15:11 16:7
16:8,20 18:18
24:7 47:14 48:15
56:22 58:16 60:8
62:22 63:11 66:14
67:8,8,12,17 68:9
69:7 72:5 79:13
79:23 82:5 86:24
111:20 112:3
119:18,23 120:5
121:1,20 130:24
137:12
**policies** 104:25
**policing** 19:5,8
**policy** 98:15
**porch** 105:16
117:21
**portion** 39:10
74:16 103:1
**position** 34:14
**positioned** 47:18
**possessions** 139:23

**possibility** 74:4
**possible** 57:11
71:13,15
**possibly** 141:1
**postal** 78:8
**power** 32:10 33:12
55:11 56:2,4
**practice** 46:21
76:3
**prepared** 145:3
**presence** 28:7
**present** 3:10
**press** 80:15
**pretty** 15:24 26:7
40:6 49:25
**preventing** 42:6
**previous** 26:22
130:2
**primarily** 99:5
**prior** 21:12 38:13
46:21 74:7 129:22
139:17,21 144:5
**private** 13:4 23:12
23:16 24:8,14,15
**privy** 83:15 85:18
108:1,4
**proactive** 43:11
76:14,15
**probably** 20:15
35:13,16 42:2
53:7 63:7 66:17
67:13 69:4 75:10
75:11,13 76:6
86:5 93:9 94:9,21
95:13,15,19 96:1,2
109:21 111:1,2,4,9
112:16 114:6,7
119:16 123:24
124:8,8,9 127:20
132:11 133:10,12
133:19 134:7,10

135:24
**problem** 34:9
44:10 47:23,25
48:2 85:21 114:10
**problems** 16:15,22
17:16 19:10 26:23
26:25 54:18
106:23 113:5
114:3 115:10,24
115:24 116:10,11
116:13 127:5
131:3,19
**procedural** 6:22
**procedure** 68:16
68:19
**proceed** 10:7
**proceeded** 80:9
**proceeding** 6:4,20
143:2 145:4
**proceedings** 144:3
144:4,6,8 145:6
**process** 8:24 9:3,4
9:17 28:23,24
31:18 131:1
**produced** 6:19
122:14,17
**profanity** 35:4,5
107:21
**program** 86:13
102:24
**project** 45:18
**promiscuous**
110:3
**promoted** 12:5
**properly** 50:13
51:23 54:6,7,14
55:7 84:19
**properties** 32:9
40:9 84:6 90:9
**property** 10:15
16:14,21 24:25

[property - recognized]                                                      Page 20

25:1,1,25 26:3,8
26:16,24 27:1,8,13
27:16,20 30:23,24
31:1,10 33:7,18,21
33:24 34:18 35:15
35:20,21 36:2,9,10
36:21,22 37:1
38:19 39:6,14
40:4,6,7 41:15
43:1,4,5,9,15
45:16 46:1,3
47:21 48:9 53:12
55:6 56:16,20
57:2,4 58:12,21,25
59:2,25 60:7,16
61:4 66:2 71:21
72:4,7 74:18,21
76:10 77:18,19
84:6,10,21 86:3,21
87:1 88:21 89:8
89:23 90:1,4,8,10
100:2 101:13
102:25 103:13,14
103:22 108:18,22
111:1,19,23,25
112:1 114:3,10
115:11,13,25
117:4,18 120:1
128:24 131:5
133:1 138:5,8,11
138:16 139:1
**property's** 27:2
**proposal** 4:8,20
20:22 21:6,10
22:3,6 28:13,17,18
83:22 84:4 86:12
87:13,16,19 92:1
93:9
**proposed** 90:6
**proprietary** 37:19

**prosecute** 59:6
**prostitutes** 138:21
**prostitution** 27:11
**protective** 13:15
13:21
**provide** 22:13
24:6,24 46:6
49:11 132:10
137:2 140:16
**provided** 10:23
29:23 48:21 49:1
81:14 97:7
**provides** 38:17
**providing** 24:23
48:17 87:18 88:7
91:19 97:3 99:1
100:1
**psychiatrist** 19:13
**psychologist** 19:13
**public** 1:21 12:23
16:2 144:18
**pull** 25:6 26:8
72:14,20,25
**pulled** 72:22
**purpose** 43:8
141:13
**purposes** 136:22
142:11
**pursuant** 49:2
**pushing** 18:20
104:2
**put** 20:22 22:10
25:9 31:12 33:9
33:24 34:5,5 53:7
58:19 64:21 70:23
88:1 90:19,21
109:20 119:25
120:6,13 121:13
122:17
**putting** 14:15 15:1
57:7,10 100:25

## q

**qualified** 144:7
**qualifying** 136:22
**quality** 34:4
**question** 9:16
113:25 115:6,22
123:20 124:23
130:2 139:21
140:1
**questioned** 10:17
**questions** 9:8
51:12 136:10,21
**quick** 87:4
**quite** 21:20 60:18
83:9 92:13 93:7
96:7 110:16 114:8
**quote** 57:24 86:12

## r

**r** 2:1 3:1 6:1 95:4
**racetrack** 105:19
**railroad** 47:20
**raise** 7:21
**raised** 11:7
**random** 84:9,23
89:9,15
**randomly** 88:22
100:2
**ranging** 123:14
**rape** 72:13,24
**rapes** 16:17
**rate** 30:2 76:20
77:7,8,10
**reach** 20:7 33:13
**reaction** 70:24
**read** 10:13 34:12
35:9 39:17 42:22
47:11 58:4 60:9
62:7 81:22 100:3
101:13 103:1
141:3,5,22

**reading** 68:14
**reads** 57:24
**ready** 18:22 49:23
74:19 132:8
**real** 14:22 16:18
47:15,22 67:1
87:4 114:14
121:22
**really** 9:17 11:2
18:20 35:24,24
59:10 82:4 98:8
113:12 120:3
**reason** 15:7 37:20
58:13 69:23 95:19
114:1 127:22
**reasons** 80:23
131:2 137:11
**recall** 20:11 21:14
21:25 22:1 28:15
31:14 35:12 37:9
41:25 43:23 47:13
47:25 48:17 53:21
56:13 60:11 63:13
64:1,5,15 65:2
67:14,24 69:10,11
71:19 75:7 79:7
81:24 83:7,11,16
95:23 98:7 99:18
108:24 109:6,24
110:19,23 111:14
111:24 118:21
129:7
**receive** 26:10
**received** 36:16
48:19 88:25
122:24
**receiving** 40:13
99:19 135:10
**recognized** 61:19
80:20

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

[recollection - right]                                                Page 21

**recollection** 55:25
  57:21
**record** 6:4,5,16
  7:4 8:11 9:10
  34:13 44:15,16,18
  46:11 51:1,2,4
  65:1 82:8 87:5,6,8
  87:10 101:1 136:6
  136:7,9 142:23
  144:9 145:5
**recorded** 6:24
  144:6
**recording** 6:19
  144:8 145:4
**recoup** 94:10
**recover** 96:8
**reduced** 144:6
**reducing** 37:7
**refer** 21:11 31:25
**referenced** 38:3
**referred** 21:23
**referring** 29:6
  42:24 85:11
  114:11
**reflects** 30:5
**refresh** 57:21
**regard** 137:17
**regarding** 40:17
  127:5
**regular** 9:14 21:15
  84:23 85:16
**relate** 27:2
**related** 10:20
  29:22 41:25
  144:11 145:7
**relates** 10:4
**relationship** 79:19
**relative** 137:5
  144:13 145:10
**relatives** 136:23
  137:3,4

**relayed** 98:22
**relinquish** 73:7
**reluctant** 82:23
**rely** 48:7
**remainder** 126:24
**remember** 10:6
  20:20 28:21 31:20
  39:19 41:12,18
  43:2 53:9 62:12
  63:8,10,15 64:9,16
  64:18 66:8,9 75:6
  75:10 83:3,5,19
  92:14 93:19
  104:12 109:9
  110:25 111:13
  128:20 130:9
**renew** 72:8,8
**rent** 105:14
**rephrase** 28:15
**report** 4:11,18
  26:2 31:2,22
  32:11,20 34:11
  38:3,6,11,20,24
  39:3,9 41:11
  49:17 51:19 54:5
  54:7 55:4,5,14
  56:6,9,17 57:17,19
  60:2,4 61:12,15
  64:21 66:12,13
  68:1,4,4,20,22
  69:24 70:15,20,22
  72:9,10,25 73:1
  79:2 81:3,8,16,18
  82:12,15,18 88:25
  89:2,18 108:14
**reported** 1:21 52:1
  52:23 54:3,18
  55:13 69:7
**reporter** 6:2,3
  7:18 8:6 9:7,21
  16:24 44:14,17

50:25 51:3 60:21
  60:24 61:2,5,8
  87:6,9,24 88:2
  95:2,5 136:5,8
  140:15 141:1,25
  142:13,17,22
**reporting** 65:17
**reports** 4:14,15
  47:2,3 48:21 49:1
  49:10,25 50:5,8
  52:7,8 56:10
  69:20 81:16 89:4
  89:4 90:7 93:16
  94:7,13,18 95:12
  101:9,10,17
**repositioned** 62:1
  65:11
**represent** 29:21
  31:2 44:3 48:25
  88:24 122:23
  123:18 134:8
  136:21
**representative**
  23:8 39:2 84:15
**representing**
  92:20
**require** 82:14
**requirement**
  24:10
**requires** 68:10
**reserve** 14:20 16:5
**resident** 34:24
  35:7 36:2,17 40:1
  42:20 56:10 58:2
  102:22 130:19
**residents** 36:8
  40:16 48:6,10
  130:16 138:4
  139:2
**resolution** 59:6

**resolved** 71:4
**respond** 26:3
  37:22 47:21 60:9
  62:14,16,22 67:13
  67:19 72:5 84:11
  84:13
**responded** 66:14
  71:14 81:12,25
  111:18
**responding** 16:13
  35:6 63:10 70:11
**response** 26:5
  48:14,18 80:17
**responses** 47:10
**rest** 57:20
**restroom** 50:21
**retired** 12:21
**return** 26:5 72:18
**review** 88:11
  140:17,18,21,23
**ricky** 51:14 61:16
  64:10,20,22 68:21
  69:23
**rid** 113:2,4,9
  114:2 132:12
**right** 7:21 10:8,18
  20:18 21:2 22:7
  22:13,16 29:8
  30:14 38:3,13
  41:8 42:9 43:1,2
  44:13 45:9,21
  46:4,13,24 49:13
  50:23 51:3,6,20
  52:3,12,18,24
  53:21,22,24 54:9
  54:15,19 55:11
  57:22 63:4,6 65:8
  65:10,15,18 66:5
  67:10 68:7,20
  69:25 71:4 73:12
  76:4,4,23 77:24

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

[right - sent]

78:19 80:25 82:16
86:10 89:5,22
90:7,14,23 94:20
95:16 96:16 99:10
99:13 100:8
101:24 102:1
103:5 104:20
109:4 111:6,16
113:17 125:8,14
126:24 127:16
132:21 133:5
139:16 140:8,21
140:23 141:10,22
**riot** 103:23
**rise** 103:8
**road** 1:19 2:7,13
2:19 6:12 14:22
17:3
**rob** 112:12 117:14
120:19 121:3
**robbed** 42:21,25
59:8 114:21 116:8
**robberies** 16:11
16:18
**robbery** 72:24
84:14 111:16
115:19 116:23
123:18
**rodrick** 29:10
42:12 98:6
**rolled** 103:25
**room** 27:9 31:5
**rope** 110:14
**roped** 55:20
110:16
**roping** 110:15
**rough** 119:1
**roundabouts**
13:20
**route** 34:18

**routine** 21:15
**row** 52:2,23
**rule** 38:22
**rules** 6:23 9:1
140:16
**run** 49:2
**running** 12:22
79:10 109:10
**runs** 102:17

**s**

**s** 2:1 3:1 4:6 5:1
6:1 60:23,23 95:4
95:8
**sac** 104:17
**safe** 62:2 65:11
106:24
**safety** 12:24 15:14
25:2 27:2 32:8,17
34:4 37:8,20
86:14,15 87:21
**salary** 15:24
**sat** 117:20
**saturday** 42:19
**savvy** 94:12
**saw** 26:13 27:18
33:4 70:4,5 80:5,5
85:7 89:11 106:2
106:18 112:2
119:22 130:24
**saying** 28:22 53:8
68:11,18 70:9,19
86:12 110:5 115:7
141:21
**says** 31:1 32:3
51:22 72:10 81:12
100:15,16 102:9
125:17 127:12
**scary** 80:12
**scattered** 62:1
**scene** 62:3,16,23
65:14

**schedule** 44:4,23
44:24 45:1,2,5,10
45:13,18,22 46:16
46:20
**schedules** 4:13
44:5 45:14,15
**school** 11:15 104:6
**scott** 145:2,15
**screaming** 79:22
**search** 56:20,20
**seat** 62:1
**second** 9:19 39:9
44:24 47:8 123:8
123:13 125:18
**section** 29:25 31:2
31:11 55:6 81:9
**sector** 16:2
**secure** 31:4,8
**security** 4:8,9,19
10:23 12:1,7,10
13:2,2,3,3,5,10,12
13:13 14:14,25
15:4 16:4,6 17:7
17:21 18:1,4,8,13
19:11,19 20:21,24
21:5 22:15 23:10
23:12,20,25 24:1,3
24:4,12,12,19 25:2
25:4,13,13 26:21
27:19 28:6 29:11
29:11 31:3 32:6
38:5 41:25 42:2
55:20,21 59:2,21
64:23 65:4 71:24
74:15 76:18 79:2
81:22 82:3 83:22
84:5,17 85:15
86:12,14,15 87:13
87:19 88:7 91:8
91:10,12,17,19
92:1,6,7,11 93:13

97:3 98:25 100:1
102:23 129:17,22
130:3,15,17 131:4
131:9,10,11
132:22,25 133:3,4
133:9,13,15 138:2
139:6
**see** 23:25 25:7,12
32:8,18 36:8,20,25
37:5 38:19 47:7
60:7,8 61:3 71:15
81:16 84:19,21,21
86:24 89:16 91:24
97:19,21 103:14
104:3 117:22
125:21 126:8,18
127:7 141:6
**seen** 44:3 61:21
92:21 93:15
103:12 120:13
138:16
**seldom** 57:2
**selling** 98:14
117:11
**send** 21:10 32:11
35:23 94:20 97:6
109:15,16 114:5
124:8
**sending** 74:8
94:18 113:12
**senior** 8:12 16:13
95:2
**senor** 103:10
**senora** 103:10
**sense** 19:1 76:21
117:23
**sent** 19:23 20:11
20:13,15 22:4,9
28:16,18 35:16
74:11,24 91:21,23
91:25 92:4,16,18

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc                    May 17, 2022

**[sent - speculated]**                                                    Page 23

93:1,7,9,16 95:10
96:21,25 97:4,5,5
97:10
**sentence**  47:8
**september**  127:8
**sergeant**  8:18 12:4
12:5,9 56:23 82:6
**serious**  60:14
**seriously**  71:1
**serve**  11:10,12,14
**served**  11:7
**service**  13:15,21
21:17 22:12 23:7
23:13 24:14 29:3
34:3 59:22 73:23
74:13 78:8,24
84:5,8,9,16 85:25
86:18 92:1,3,8,15
93:10 132:7,10,12
132:14,20 134:3
**services**  10:23
23:5,9 24:6,24
29:22 30:1 46:7
74:4 78:22 87:18
88:7,8 90:6,17
91:8,10,17,20 92:6
92:9,12,22 93:13
97:3 99:1 100:1
102:25 130:7
132:22 133:3,5,9
133:18
**set**  45:23 58:1 62:6
88:22 127:24
**seven**  4:8,14 10:20
10:24 11:4 19:21
20:8,13 21:5,11
22:4,19 26:11
28:14,16 29:21
40:17 44:22 45:1
45:6 47:1,7,17,24
48:22 58:20 59:21

65:23 74:5,5
83:23 86:11 87:18
88:6 90:25 97:7
97:11,18 98:2,20
111:8 127:4 129:1
129:18,23 133:23
138:3
**severity**  26:1
**sexual**  79:19
**shape**  115:2,17
**she'd**  107:10
**shift**  37:4
**shocked**  112:13
118:22
**shoot**  63:11 80:8
**shooting**  15:15
62:13,21 64:13
130:20
**shootings**  65:24
**short**  12:17 31:13
36:9,21 44:9
47:14,22,25 50:21
134:21,22 137:23
**shortage**  47:9,22
**shot**  14:4,11 26:21
63:15 67:20,21
79:8 80:7,9
130:20
**shots**  61:25 62:10
65:7,17 68:25
69:8,24 70:25
**show**  44:5 67:7,8
**showed**  64:11
66:25 92:8
**shut**  53:12
**sic**  51:6
**side**  13:16 51:15
**sign**  56:21 141:3,6
141:23 142:1
**signature**  142:24
144:16 145:14

**similar**  24:7
**simplify**  25:11
**sir**  8:6 46:14 61:8
95:5 113:8 131:16
137:9 140:10,12
**sister**  83:8,14
**sit**  108:4 110:18
**site**  49:20
**sitting**  10:6,8
53:22 68:20 71:3
75:11 79:20 83:17
99:13 117:20
**situation**  10:4
39:24 55:10,20
56:10,13 59:2
60:11 62:24 72:12
75:25 80:12
102:20 121:14
129:15 131:11
**situations**  82:16
119:20
**six**  18:16
**skate**  105:3
**skates**  105:18
**skating**  103:25
105:8
**skills**  23:22 144:10
145:6
**sledgehammer**
79:9 80:2,3,4,10
89:3
**sleeping**  58:12
**slew**  15:15 16:11
**slide**  57:11
**small**  14:22 85:24
**smith**  137:5
**smoother**  9:4
**soccer**  63:5
**social**  19:12 63:24
**solicit**  40:10 133:9

**soliciting**  27:10
**solutions**  95:21
**somebody**  35:25
48:15 56:14,24
57:13 59:5 67:20
76:1,2 83:3,4,10
104:2,18 105:8
107:19 109:18
112:10 114:9
116:12 117:5
118:4 120:17
121:2,4 130:1
**soon**  49:25
**sorry**  6:8 15:5
46:12 54:25 79:23
113:7
**sound**  70:6
**southeast**  60:6,13
61:9 63:21
**southwest**  61:4
**spanish**  16:9,25
17:1 104:15
**speak**  82:9 104:9
104:14,15 106:3
109:16 112:4
120:25
**speaking**  15:13
34:24 49:5 81:13
81:20 83:4,5,7
107:18
**special**  57:21,24
**specific**  23:9 31:4
41:12 64:17 88:16
88:19 120:14
**specifically**  23:6
36:5 41:13 71:3
105:12,24
**speculate**  27:23
131:15
**speculated**  69:4

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

[speculating - suspicious]

Page 24

speculating 68:6
speculation 119:6
119:12 131:14
spell 60:21
spoke 21:16 34:21
36:13 57:7 66:11
80:20 83:1,3,10,11
98:23 104:11
108:6 109:12,13
109:18 116:13
118:16,16,19,20
120:21 121:18
128:9,11,12,12
134:24 135:1,10
135:21
spoken 129:1,6,14
squad 50:11 93:20
94:4,15 96:9
sr 1:16 8:2
staff 12:8 77:13
78:7 85:24 98:10
137:21
staffed 47:14
134:21 137:23
staffing 47:9,22,25
48:5 77:4,5 78:15
132:16 137:20
stairway 58:3
stairways 58:1
stairwell 58:13
start 9:16 10:25
11:4 13:10 17:10
28:23,25 30:6
46:8,8 76:10
92:17 93:10
120:11
started 13:11,12
13:17,19,21 14:25
15:6,7,18,20 16:8
17:12,21 18:4
31:14 78:9 79:21

92:12,19 106:12
120:4,9 122:10
129:23
starting 15:3
51:13 76:8,16
starts 43:21
102:16
state 8:11,18 11:9
23:11 24:11,17
81:19 83:13
140:16,19 144:19
stated 34:22,25
35:1,7 39:13,15
62:5 101:11
statement 10:15
62:4 101:20
states 1:1 11:13,14
stating 10:13
stationed 11:21
statistics 25:21
26:10
stats 25:6,23 26:8
43:8 71:23 72:14
72:20 86:24,25
130:13
stay 33:13 52:20
74:12 91:23
132:18
stayed 57:2
staying 35:17
40:12 57:5 90:8
stenographic 6:25
stent 12:17
step 136:3
stipulation 7:1
stites 3:4
stites.com 3:8
stone 45:15
stop 58:3 59:5
104:1,2 128:2

stopped 57:7,10
stopping 133:22
store 94:3
street 3:5 36:18
104:6 109:9
streets 103:18
stretch 14:11
stuff 15:13 16:11
17:16 18:16 19:3
19:9,18,24 23:17
25:8 26:13 29:1
30:12 36:16 40:13
41:1,2,8,24 43:11
43:19 46:9 50:13
53:19 56:21 57:10
63:1,2,14 65:5
67:23 72:18,19,21
73:3 74:18 75:14
82:22 83:9,15
84:20,21 87:3
89:14 93:21,25
94:10 95:18,25
96:21 103:18
105:4,20,22
106:25 108:22
111:4 112:14
113:14 117:8
119:10,11 120:8
120:13 132:18
134:2 137:24
subcontract 18:17
41:5
subject 29:11
39:13 44:23 71:8
73:19 90:25
submitted 140:22
subpoena 48:18
49:2 99:19 128:14
128:22 135:11,17
sugar 126:1

suggested 131:23
suggesting 114:19
114:24
suggestions 141:4
suit 128:19
suite 1:19 2:7,13
2:19 3:5 6:12
sum 139:8
sums 139:2
suntrust 3:6
supervisor 51:14
61:16 64:20,22
66:16,16 68:21
69:23 82:10
supervisors 98:13
supply 71:13
supposed 35:22
106:25 110:14
sure 21:21 31:4,8
44:2 46:4 62:14
63:17 83:9 84:18
90:4 92:13 93:7
94:21 96:7 106:24
108:11 112:17
124:16
surprise 118:6
surprised 68:14
112:20,22 116:7
117:9,15
surprising 117:1
117:25
surveillance 23:16
25:7
surviving 80:11
susceptible 117:7
suspect 39:12 60:7
117:17
suspects 60:8
suspicious 56:9
60:4 61:15 81:9

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

**[swapped - time]**                                                                  Page 25

| | | | |
|---|---|---|---|
| **swapped** 125:12 | **tell** 8:4 24:11 | 140:16 | 43:25 47:18 52:16 |
| **swear** 7:19 | 25:24 33:12 36:24 | **text** 5:5 45:20 | 52:18,21 53:15 |
| **switch** 95:14 | 37:22 39:21 40:24 | 50:17 89:8,19 | 54:21 55:15 56:18 |
| 100:17 124:13 | 41:19 47:7 60:19 | 99:5,7 121:25 | 58:8 59:3 63:24 |
| **switched** 50:3 | 62:12 74:2 76:1,2 | 122:14,16 123:6 | 64:3,13,13 66:8,18 |
| 95:20,24 96:20 | 85:23 96:6 104:12 | 123:10,14,20 | 66:23 67:11 68:20 |
| 98:25 125:10 | 104:23 111:22 | 124:3,9,10,18 | 68:23,24 69:3,21 |
| **sworn** 6:17 8:3 | 118:7 120:14 | 125:1,10,14 126:4 | 72:12 73:2 74:18 |
| 144:5 | 130:19 131:18 | 126:8,18 127:15 | 75:15,19,24 76:6,7 |
| **system** 15:6 17:22 | 137:17 | 127:18 | 76:12 82:9,17 |
| 26:7 65:4 94:3 | **telling** 36:11 109:9 | **texted** 125:4 | 83:3 85:1,3 89:18 |
| | 122:10 | **texting** 96:3 124:6 | 92:22 93:24 94:13 |
| **t** | **temperature** | **texts** 124:4 125:21 | 95:11,13 98:24 |
| | 33:14 53:16 | **thank** 7:18 8:6 | 108:9,12 110:2,9 |
| **t** 4:6 5:1 61:7 | **ten** 48:3 | 37:11 44:13 46:13 | 110:12 112:18,25 |
| **tag** 100:17 102:1 | **tenant** 139:8 | 50:23 60:24 61:2 | 116:5 118:17,19 |
| **tagged** 38:4 48:25 | **tentative** 45:14,22 | 61:8 95:5 113:8 | 122:5,5 128:11,12 |
| **take** 6:4,14 8:20 | **terminate** 74:10 | 136:11,13 140:12 | 129:25 130:13 |
| 44:9 50:10,21 | 77:3 92:25 93:1 | **thanks** 73:16 | 131:10 135:1,24 |
| 82:24 87:4 104:21 | 132:8,14 133:25 | 94:14 | 137:18,23 138:20 |
| 109:21 114:9 | 134:3 | **thing** 9:14 18:23 | 139:7 140:6 141:6 |
| 131:5 | **terminated** 65:1 | 18:23 19:23 27:19 | 141:20 |
| **taken** 6:7 8:13,17 | **terminating** 73:23 | 33:16 59:7 67:19 | **thinking** 63:18 |
| 71:1 144:3,12 | 74:4,9 78:18,21,23 | 67:20 85:16 88:16 | 70:16 120:3 |
| 145:9 | 91:16 | 89:10,12 105:8 | **third** 44:25 86:9 |
| **takes** 85:17 | **termination** 4:17 | 116:15 119:3 | **thorough** 96:7 |
| **talk** 9:15 37:24 | 73:19 74:3,8,24 | 128:25 137:19 | 130:22 |
| 70:14 72:16 75:2 | 78:13 91:15 | 138:18 | **thought** 56:3,17 |
| 75:5 90:22 110:8 | **terms** 54:4 | **things** 14:3 15:15 | 68:2 69:13,16 |
| 118:11,14 119:3 | **terrible** 16:18 | 24:17 31:9 38:19 | 94:5 103:24 |
| 129:25 136:2 | **territory** 16:13 | 40:21 46:4 66:24 | 119:14 120:24 |
| **talked** 121:16,19 | **testified** 8:5 54:17 | 67:6 70:7 72:22 | 133:19,19 137:10 |
| **talking** 9:18,20 | 66:1 98:24 100:5 | 73:7 76:13 82:13 | **thread** 100:10 |
| 63:3 75:11 79:17 | 101:16 103:5 | 84:24 88:19 92:18 | **three** 14:19 15:23 |
| 106:13 110:1 | 109:7 124:2 127:4 | 98:9 105:4 115:14 | 16:17 44:21 45:2 |
| 113:17 114:12 | 131:22 134:13 | 121:13 | 45:6 85:20 86:6 |
| 119:22 133:20 | **testifying** 144:5 | **think** 13:17 18:11 | 86:21 87:21 88:22 |
| **targeted** 139:14 | **testimony** 52:11 | 20:8,17 21:21,21 | **threw** 79:10 |
| **teach** 13:6 | 66:4 83:1 92:4 | 26:20 27:24 28:19 | **time** 1:18 7:3 |
| **team** 80:17 | 94:17 101:23 | 31:17,21 33:14 | 10:20,22 14:1 |
| **technology** 73:4 | 106:14 135:20 | 37:2 43:1,1,3,17 | 16:3,16,17,23 |
| **teenager** 112:16 | | | |

Kenneth H. Hickey , Sr.
May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

**[time - uniform]**
Page 26

17:24 18:11 19:1
20:10 21:22 23:4
26:5 28:19,19
30:10,24 31:17
32:24 33:24 34:25
36:1,7,9,21 39:13
41:5 43:18,18,20
43:20 47:15 48:14
48:21 50:2 53:18
59:3 61:13,21
64:4 66:10 69:5
72:8,18 73:23
74:11,19 75:6,9,10
77:19,24 78:9
82:6,21 85:3,8,17
89:13,24 90:1
93:22 94:8,19
96:2,4 100:10
101:10 102:24
109:17 110:16,19
111:5,8,23 114:8,8
116:17 119:6
128:9,11 129:11
133:4 134:23
135:20 136:12,19
136:19 138:2
139:1 142:22
**timeframe** 133:7
**timeframes** 31:13
**timeliness** 78:13
**timers** 33:9
**times** 28:1 86:2,6
86:21 87:21 88:22
89:19 98:11 104:2
106:9 107:21
**tire** 44:11
**titled** 21:5 42:13
47:2 79:1 83:22
**today** 9:23 10:6,22
83:17 136:12,19

**told** 26:20 33:6
35:7 36:4 37:15
52:17 80:21 93:19
93:24 101:8
104:16 106:22
110:4 112:9
119:24 122:5,9
130:16 135:5
**top** 42:11 98:20
99:25 100:11
101:5,7
**totally** 124:25
**tour** 11:23
**toya** 21:4 34:18
**toyawynn** 97:25
**toys** 62:19
**tpi** 22:9 96:15 98:3
114:20 129:6,9
**tpi000591** 87:17
**tpi001157** 126:23
**tpi001174** 123:10
**tpi001178** 126:15
**tpi001261** 22:8
**trace** 16:9,25 17:1
**track** 22:10 73:9
**tracks** 47:20
**traffic** 18:19 31:12
**trail** 116:5
**train** 15:13
**training** 13:18
14:13 15:8,21,21
23:22 67:6,8
141:13 142:11
**tran** 142:4,20
**transcriber** 145:1
**transcript** 6:19
140:18,22,23
141:8 142:18
145:3,5
**transcriptionist**
144:7

**translate** 104:20
**transparent**
124:17
**transpired** 50:16
**tremendously**
72:1
**trespass** 36:3 39:1
39:7,12
**trick** 9:25 90:20
**tried** 50:6 82:22
93:23 94:10
112:10,12 121:3
122:16
**trip** 9:25
**troubled** 117:22
**truck** 104:4
**true** 14:16 68:24
90:15 137:14,14
144:9 145:5
**truth** 8:4,4,5 9:24
**try** 9:17,24 27:8
27:12 43:9 57:11
71:23 79:9 85:25
90:20 94:9,10
96:12 98:10 115:7
120:12
**trying** 40:9 64:5
96:14,16 110:8
115:4 119:2,14,15
120:6,18,19
121:13 124:19
133:12,14
**tuesday** 1:17 6:11
**turn** 39:9 56:6
57:16 60:2 61:12
81:3,15
**turned** 64:18 66:9
66:19 67:14 69:9
69:12,13 72:13
**turning** 22:2 86:8

**twenty** 59:21
**two** 38:15 41:8
50:5 61:25 65:7
65:17 67:3 68:24
69:7,24 70:25
77:21 85:19 86:5
86:21 109:19
112:19 118:17
**type** 25:24 26:9
49:20,23 53:14
63:22 74:13 79:18
86:24 92:13 107:6
117:7 132:7
**types** 26:1 38:16
**typewriting** 144:7
**typical** 30:8
**typically** 45:12
**typographical**
141:7

**u**

**uh** 9:11
**unadvisable** 139:7
**unarmed** 25:13
**uncommon** 107:22
**uncooperative**
81:14
**underlying** 129:15
**understand** 6:18
62:10 90:13 96:11
96:16 115:5
**understanding**
10:11 46:16
**undesirables** 27:6
118:25
**unfortunate**
134:23
**unfortunately**
26:4 62:18 82:2
98:11
**uniform** 24:6
59:24 130:24

Veritext Legal Solutions

Kenneth H. Hickey , Sr.
Diaz, Elsa Flores v. The Partnership, Inc

May 17, 2022

[unit - worker]

Page 27

**unit**  14:20
**united**  1:1 11:13
  11:14
**units**  55:10
**unknown**  34:22,24
**unsafe**  104:1
  109:11,11 139:12
**update**  38:2
**updated**  124:12
**upgrade**  74:20
  132:17
**upper**  81:20 83:2
**upset**  35:8,18
  36:15 40:12,23
  128:15
**upstairs**  122:3
**use**  30:9 94:23
  95:21 137:24,24
**users**  138:21
**uses**  6:21
**utilize**  18:18

**v**

**v**  1:11
**v.m.f.**  1:8 2:4 6:10
**vague**  67:11
  130:12
**valid**  138:9
**valuable**  136:19
**vehicle**  70:7 112:4
**vehicles**  27:10
**verbal**  107:21
**verbally**  35:3,9
  40:4
**veritext**  6:4
**viability**  77:12
**victim**  111:15
  116:23 117:2
**view**  28:7 32:16
  59:1,9,16,19
**violate**  84:19

**violation**  35:16
  38:22,23 81:19
**violence**  15:14
  71:25 81:20 82:11
**violent**  88:13
**visibility**  27:18
  37:8
**visible**  27:19
**visually**  140:5
**voice**  34:15
**volume**  77:21
**vs**  6:10

**w**

**w**  3:3
**wade**  137:8,8
**wait**  9:18 140:24
**waited**  81:15
**waiting**  25:20,23
**waive**  140:18
  142:13,15
**waived**  142:24
**walk**  11:2 36:17
  84:21 138:12
**walked**  28:5 34:25
  41:19
**walking**  34:22
  46:3
**want**  10:2,5 14:6
  14:11 17:7 19:6
  28:22 36:15 41:8
  44:1 63:24 73:6
  105:3 123:8 130:3
  132:12,17 133:25
  141:10,12 142:13
**wanted**  17:12 42:3
  43:16 72:7,15
  73:25 74:24 75:17
  79:19 89:11 91:22
  112:8 132:9,18
**wanting**  78:14

**warm**  76:16 111:5
**warmer**  76:9
**warning**  36:3 39:2
  39:13
**warrants**  38:24
**waste**  59:3
**watch**  16:5
**way**  9:5 27:5 33:8
  42:6 48:10 56:24
  59:22 67:11 73:9
  93:11 107:17,25
  110:4,5 114:2
  115:17 119:5
  128:5 137:8 141:3
  141:21
**ways**  19:14
**we've**  18:20 43:25
  53:3 104:23
  118:25 121:9
  122:23,24
**wearing**  119:9
**weather**  76:8,9,15
  76:19 111:5,10
**website**  95:9,21
**wednesday**  21:12
**week**  16:17 86:2
  86:21 87:22 88:22
**weekend**  37:2
**weekends**  72:6
**weekly**  22:15 30:2
  71:14 72:7 91:9
  92:15 127:24
**weeks**  64:25 91:10
**welcome**  57:20
  136:13
**went**  12:19 13:24
  21:16 40:8 56:2
  93:19 95:21 106:3
  111:20 112:4
  119:4 128:5
  130:23,23 139:25

**whatsoever**  112:7
  126:13 134:16
  137:22
**wicked**  95:22
**wife**  108:16
**window**  56:21
**wise**  32:6
**wish**  37:15 140:18
**wished**  35:7 37:23
**witness**  6:17,18
  7:20 8:3 17:1 34:2
  46:12 54:1,11
  55:1 59:4 61:3,7,9
  65:21 66:7 68:9
  69:3 70:3 78:1
  95:4 107:17
  111:18 113:7,9
  114:1 115:21
  123:24 125:1
  131:15 132:5
  136:13 140:14,16
  140:24 141:12,19
  141:24 142:3,10
  142:15 144:4
**woman**  56:14 79:8
  89:3
**wondering**  114:23
**words**  57:6
**work**  10:16 12:12
  13:18 14:13 15:21
  18:9,17 24:5
  25:17 32:10 41:4
  41:6 65:3 80:19
  83:8,12,14 86:23
  90:14 118:21
  131:1 133:22
**worked**  12:15
  15:18 16:3 40:8
  67:17 117:11
**worker**  19:12

Kenneth H. Hickey , Sr.                                    May 17, 2022
Diaz, Elsa Flores v. The Partnership, Inc

[workforce - zoning]                                                    Page 28

**workforce** 12:23
13:16 15:18
**working** 12:18
14:23 16:12 32:25
40:17 45:20 47:24
51:23 52:20 53:18
54:6,7,9,14 55:7
58:20 64:22 83:13
84:18 101:11
102:23 132:25
133:17,21 134:19
**workplace** 15:14
**world** 8:19 12:3
12:15,19 13:25
**worry** 128:23
**worth** 77:14
**write** 32:20 38:24
49:21 70:15 78:17
89:3 91:6 136:1
141:8
**writes** 60:5
**written** 7:1 9:9
45:14 89:1 95:2
**wrong** 116:18
121:25 128:5
130:5 133:10,15
135:2
**wrote** 33:20 61:16
65:6,10 81:10
**www** 95:9
**wynn** 5:5 21:4
29:6,10 34:18,23
35:1,2,8,14 36:5
39:11,15 40:18
41:13 42:11,18
46:12 73:18 83:22
85:12,13 89:7
92:5 97:14 107:3
107:10 113:7,9
118:20 120:22
121:16,18,19

122:15,25 123:6
123:21 124:11,18
125:4 126:9
127:19 128:10
134:24 135:2
**wynn's** 98:17

**x**

**x** 4:1,6 5:1

**y**

**y** 61:7 95:8
**y'all** 37:14 107:6
**yards** 62:23
**yeah** 14:10,16,16
17:6,6 18:7 19:20
21:19 24:18 27:18
28:2 31:22,24
37:11,15 39:23
55:23 70:1 75:3
76:4,21 78:23
80:8,13,22 81:6
83:18 85:4,7 93:4
93:12 94:16 96:11
96:13,13 97:2,23
102:15 103:16,19
105:23 108:23
115:4,4 118:3
121:9,18 124:22
124:24 125:18
126:8,17 133:6,8
133:19 134:10
135:14 137:4
141:5 142:5,8,15
**year** 119:9 125:19
**years** 11:7,8,17,19
11:20 12:6 14:19
48:3 50:5 56:22
73:5 98:12 117:10
**yelling** 34:16,19
**young** 85:2 93:24
103:24 106:5,6

109:25 110:1,3,10
110:20 112:15,16
112:18 118:23
119:8,11 137:18
**youth** 63:3

**z**

**zone** 47:10,16,17
47:19,19
**zoning** 47:18
84:20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.