# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | | |
|---|---|---|
| ELSA FLORES DIAZ, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | 1:21-CV-03661-ELR |
| | * | |
| THE PARTNERSHIP, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

—————————

# O R D E R

—————————

There are several matters presently pending before the Court.  The Court sets forth its reasoning and conclusions below.

## I.    Background[1]

This case arises out of alleged discriminatory conduct and a July 2021 armed robbery that took place while Plaintiffs Elsa Flores Diaz, Edwin Medrano Caceres, and their minor children, E.M.F., V.M.F., B.M.F., and H.M.F. (the "Minor Plaintiffs"), were living at Seven Courts Apartments (the "Complex"), an apartment complex owned and operated by Defendant The Partnership, Inc. (or "TPI").  See Compl. [Doc. 1]; Defendant's "Concise Statement of Undisputed Material Facts" ("Def.'s SOMF") ¶ 16 [Doc. 50-2].

Following the murder of Plaintiff Diaz's sister in September 2012, Plaintiffs "fled threats of violence in" Honduras and immigrated to Mexico and then the United States in search of a safer home.  See Plaintiffs' "Statement of Additional Material Facts in Opposition to TPI's Motion for Summary Judgment" ("Pls.' SOMF") ¶ 2; Def.'s SOMF ¶ 6; Deposition of Elsa Flores Diaz ("Diaz Dep.") at 13:18–14:11. Their harrowing journey to America included "deaths, kidnappings[,] and uncharted

---

[1] The facts discussed herein are undisputed unless noted otherwise.  The Court excludes proposed facts that are immaterial, includes facts drawn from its own review of the record, and considers all proposed facts in light of the standard for summary judgment.  See LR 56.1(B)(2)(a)(2)(iii), NDGa.; see also FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); Tomasini v. Mt. Sinai Med. Ctr. of Fla., 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004) (explaining that a district court is not obligated to "scour the record" to determine whether triable issues exist).  Defendant objects to many of Plaintiffs' proposed additional material facts, including all of Plaintiffs' proposed additional facts Nos. 110–87.  See generally Defendant's "Reply to Plaintiffs' Statement of Additional Material Facts" [Doc. 73].  However, Defendant's objections are boilerplate based on purported immateriality or failure to comply with Local Rule 56.1(B)(1)'s requirements.  See generally id.  The Court's inclusion of a proposed fact or discussion of a document with no comment on an objection means that the objection has been considered and overruled.

levels of horror."[2]  See Def.'s SOMF ¶ 6.  In 2016, Plaintiffs were paroled into the United States to live as they continued with the asylum application process.  See Pls.' SOMF ¶ 5.  Upon entering the United States, Plaintiffs settled in Atlanta, Georgia, and lived in an apartment complex for three (3) years until their unit was "destroyed by a fire that started in a neighbor's unit in 2019."  See id. ¶ 6.  Subsequently, Plaintiffs moved to the Complex on October 1, 2019.  See Diaz Dep. at 31:17–20.

The Complex is located in a "high-crime neighborhood."  See Def.'s SOMF ¶ 17.  Both before Plaintiffs moved into their apartment in October 2019 and throughout their tenancy, violent crime and drug activity were common and persistent fixtures of life at the Complex.  See, e.g., Pls.' SOMF ¶¶ 100–01, 103–12, 117–22, 131, 134–36, 151–53, 179–84.  Defendant implemented various security measures to combat crime during Plaintiffs' tenancy, including engaging two (2) different security companies, owned by Mr. Horace Holt and Mr. Kenneth H. Hickey, respectively, that provided security guards to regularly patrol the Complex and report to the Complex's management.  See id. ¶¶ 108, 166, 177, 196.  However, the Complex is not gated, many lights and security cameras around the Complex

---

[2] Plaintiffs detail additional hardships of homelessness, hunger, and being kidnapped and separated by the Zeta cartel.  See Pls.' SOMF ¶¶ 2–3.

consistently malfunctioned, and crime continued to occur despite the presence of the security guards.  See, e.g., id. ¶¶ 71, 99, 110, 152, 156, 164, 166, 183, 188.

In May 2021, Defendant downgraded its security services to a more "budget-friendly," "limited" package that only included "safety checks three times a week" and did not include "any armed or unarmed security officer services."  See id. ¶¶ 197–99.  The random checks involved security officers "just driving through [the Complex] and coming out" and mostly entailed security officers passing out notices of overdue rent.  See id. ¶ 199.  Although Defendant planned to install a security camera system, those cameras were not fully operational until November 2021.  See id. ¶ 104.

During the time they lived at the Complex, Plaintiffs were allegedly the victims of three (3) home invasion attempts.[3]  See Def.'s SOMF ¶ 22–23; Pls.' SOMF ¶¶ 53–54, 56–58, 60.  The third of these occurred on July 21, 2021, shortly after Defendant reduced its security measures at the Complex.  See Pls.' SOMF ¶ 60.  On that date, Plaintiffs were the victims of an armed robbery at their apartment.  See id.  That evening, Plaintiffs left their apartment after dinner to check their mail.  See id. ¶ 61.  When Plaintiffs returned and began to re-enter the apartment, the outside of which was pitch-black due to lights that had been broken since June, "a man came

---

[3] The Parties dispute whether the second identified incident was a home invasion attempt or an errant soccer ball that went through Plaintiffs' apartment window.  See Pls. SOMF ¶¶ 56–58.

up behind them and put a gun to [Plaintiff Caceres'] head." See id. ¶¶ 62–64. The assailant demanded money and threatened Plaintiffs as he rifled through the cabinets and drawers in their apartment. See id. ¶ 65. After finding $3,000.00 cash in a drawer (which Plaintiffs had saved to make a payment to the Internal Revenue Service) and taking Plaintiffs Diaz and Caceres' wedding rings, the assailant fled. See id. ¶ 66; Diaz Dep. at 68:11–22, 121:17–23. The Minor Plaintiffs hid in their closets as the police were called. See Pls.' SOMF ¶ 68. Upon arrival, the police noted that there were no cameras that might have captured the incident, a fact the Complex's manager, Latoya Wynn confirmed the next day. See id. ¶¶ 69–71. Afterwards, Ms. Wynn told Plaintiffs that they should leave the Complex "quickly[] because you are going to get killed." See id. ¶ 73.

In addition to the security threats they experienced while living at the Complex, Plaintiffs also allegedly faced discrimination because of their Hispanic origin. See, e.g., Pls.' SOMF ¶¶ 22, 30. Specifically, Ms. Wynn excluded the Minor Plaintiffs from using the Complex's playground because it was "not for Latinos," but rather was "only for Americans." See Pls.' SOMF ¶ 30; see also id. ¶ 32. Plaintiffs also offer facts that suggest that they were overcharged rent and consistently harassed by Ms. Wynn for being "Hispanic" or "Latino." See id. ¶¶ 22, 26–34, 36–38, 49–51. Following the security threats and alleged discrimination, Plaintiffs moved out of the Complex before the end of their lease. See id. ¶ 82.

On September 2, 2021, Plaintiffs Diaz and Caceres filed the instant suit on behalf of themselves and the Minor Plaintiffs against Defendant, bringing three (3) Counts: (I) violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*; (II) premises liability; and (III) punitive damages. See Compl. Following the close of discovery, Plaintiffs filed a "Motion to Strike Defendant TPI's Untimely Expert Under Local Rule 26.2(C)" [Doc. 46], and Defendant filed a "Motion to Exclude Testimony of Plaintiffs' Proposed Expert, Anique Whitmore LPC." [Doc. 77]. Each side opposes the other's motion. [Docs. 54, 78]. Defendant also filed its "Motion for Summary Judgment." [Doc. 50]. Plaintiffs oppose Defendant's motion. [Docs. 65, 66]. On April 19, 2023, the Court held a hearing on the Parties' pending motions. [Docs. 84, 88]. Defendant subsequently filed a "Motion for Extension of Time for Defendant to Disclose Rebuttal Expert Witness, Dr. Julie Medlin." [Doc. 89]. Having been fully briefed, the Parties' motions are now ripe for the Court's review. The Court begins with Plaintiffs' motion to strike Defendant's expert as untimely. [Doc. 46].

## II. Plaintiffs' Motion to Strike Defendant's Expert [Doc. 46]

In their motion to strike Defendant's expert, Plaintiffs argue that Defendant's disclosure of its rebuttal expert over one month after the end of discovery was both untimely and unjustified pursuant to this district's Local Rules. [See generally id.] In defense of its untimely expert disclosure, Defendant contends (1) that the timing

of its disclosure was justified and (2) that its disclosure should be considered pursuant to the expert disclosure deadline set out in the Federal Rules of Civil Procedure.  [See Doc. 54 at 3–7].

The Federal Rules of Civil Procedure require a party to disclose the identity of any expert witnesses it may use at trial.  See FED. R. CIV. P. 26(a)(2)(A).  "A party must make these disclosures at the times and in the sequence that the court orders."  Id. 26(a)(2)(D).  Absent a court order and where the expert is "intended solely to contradict or rebut evidence" of the other party's expert, the expert must be disclosed "within 30 days after the other party's disclosure."  See id.  Pursuant to this district's Local Rules,

> [a]ny party who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert and, if desired, to name its own expert witness sufficiently in advance of the close of discovery so that a similar discovery deposition of the second expert might also be conducted prior to the close of discovery.
>
> Any party who does not comply with the provisions of the foregoing paragraph shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by Court order based upon a showing that the failure to comply was justified.

LR 26.2(C), NDGa.  Where a party fails to timely disclose an expert, prejudice is presumed, and exclusion of the expert is the proper remedy unless the delay was "justified."  See Harrell v. U.S. Fire Ins. Co., Civil Action No. 4:18-CV-00110-HLM, 2019 WL 3772644, at *2 (N.D. Ga. Feb. 28, 2019).

Here, the Court finds that (1) Defendant failed to timely disclose its rebuttal expert and (2) that failure was not justified.  By its original Scheduling Order, the Court directed the Parties to make their expert disclosures by April 11, 2022, and conclude expert discovery on May 11, 2022.  [See Doc. 13].  During discovery, the Parties moved to extend the expert disclosure deadline to July 11, 2022, and the end of expert discovery to August 11, 2022, which the Court granted in an Order dated February 23, 2022.  [See Docs. 18, 19].  Soon thereafter, the Parties requested that fact discovery end on August 11, 2022, the same day that expert discovery was set to end, while "leaving all other deadlines the same[.]"  [See Doc. 30].  The Court granted the Parties' motion in an Order dated July 7, 2022.  [See Doc. 34].  Therefore, pursuant to this Court's February 23, 2022 and July 7, 2022 Orders, the Parties deadline to make expert disclosures was July 11, 2022, and expert discovery ended on August 11, 2022.  [See id.].

Plaintiffs timely disclosed their proffered expert, Ms. Anique S. Whitmore, LPC, and provided her expert report to Defendant on July 11, 2022.  [See Doc. 35].  On September 16, 2022, more than two (2) months after Plaintiffs disclosed their expert and the expert disclosure deadline and more than one month after the close of expert discovery, Defendant made a supplemental filing by which it disclosed its intention to offer a rebuttal expert.  [See Doc. 44].  Therefore, Defendant's disclosure of its rebuttal expert was untimely pursuant to this district's Local Rules, and

Defendant may only use such testimony with the Court's authorization by demonstrating that its "failure to comply was justified." See LR 26.2(C), NDGa.

Defendant argues that its failure to timely disclose its rebuttal expert was justified (1) because Defendant's counsel was undergoing "personal and professional shifts" including switching law firms and a divorce and (2) because of the nature and timing of Plaintiffs' expert disclosure.[4] [See Docs. 54 at 5–6; 89 at 2]. The Court finds neither of Defendant's arguments convincing. First, Defendant defeats its own argument that its counsel's change of law firms and personal adjustments justify its untimely rebuttal expert disclosure. As Defendant remarks in its response brief, "[t]his upheaval and new transition to an entirely new firm located out of state contributed to the numerous consent motions filed with this Court for extensions on several matters." [Doc. 54 at 5]. The fact that Defendant requested and received numerous extensions of time to complete discovery and file motions cuts against a finding that Defendant's failure to timely disclose its expert is justified. Defendant knew how to ask the Court for extensions of various deadlines, and the Court demonstrated a willingness to extend deadlines when appropriate. [See, e.g., Docs. 18, 30, 42, 48]. Nonetheless, Defendant failed to seek a similar extension of

---

[4] Defendant separately argues that its untimely disclosure was harmless and that Plaintiffs were not prejudiced by it. [Doc. 54 at 7–8]. This argument is misplaced because "the standard for striking untimely expert testimony is not whether the opposing party is prejudiced, but whether the proffering party's failure to comply was justified." See Durkin v. Platz, 920 F. Supp. 2d 1316, 1328 (N.D. Ga. 2013).

the deadline to disclose its rebuttal expert and only supports its failure by contending that it believed the Parties had "agreed to informally adjust the expert discovery deadline."  [See Doc. 89 at 2].  However, "extensions of deadlines imposed by court orders and the Federal Rules of Civil Procedure can be granted only by the Court, and not by stipulation or agreement among the parties."  See Stone v. City of Mobile, No. 06-0441-WS-C, 2007 WL 505057, at *2 (S.D. Ala. Feb 13, 2007); see also FED. R. CIV. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").   Given these circumstances, the Court cannot find that Defendant's counsel's personal changes, transition to a new law firm, or purported informal agreement with Plaintiffs justify its untimely expert disclosure.

The nature and timing of Plaintiffs' expert disclosure likewise does nothing to justify Defendant's untimely expert disclosure.  Plaintiffs timely disclosed Ms. Whitmore and served her expert report on July 11, 2022.  [See Doc. 35].  Defendant had one month to evaluate Plaintiffs' proffered expert and consider the need for a rebuttal expert prior to the close of expert discovery.  Instead, Defendant waited more than two (2) months following Plaintiffs' expert disclosure and until well after the expert discovery deadline in this case had run to disclose a rebuttal expert.  [See Doc. 44].

Defendant further argues that its untimely disclosure was justified because Ms. Whitmore's deposition did not take place until August 24, 2022.  [See Docs. 38;

54 at 6]. Although the substance of Ms. Whitmore's deposition may have been necessary to *complete* Defendant's rebuttal expert's report, it was not necessary to timely consider if a rebuttal expert was needed and to identify that expert. Defendant received Ms. Whitmore's expert report and knew the purpose for which Plaintiffs proffered her expert testimony more than two (2) months before Defendant disclosed its rebuttal expert. [See Doc. 35]; see also Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC, Civil Action No. 1:15-CV-01422-AT, 2017 WL 1806384, at *3 (N.D. Ga. Feb. 1, 2017) ("A party's failure to comply with Local Rule 26.2(C)'s disclosure requirements is not justified when the party knew or should have known that an expert was necessary before the late stages of the discovery period."); Vision Airlines, Inc. v. SST Air, LLC, Civil Action No. 2:12-CV-00021-WCO, 2013 WL 6908935, at *3–4 (N.D. Ga. Feb. 27, 2013) (finding an untimely expert disclosure to be unjustified where the plaintiff "could plausibly foresee the need for expert testimony" before the end of the discovery period).

Additionally, Defendant's argument that the deadline set in the Federal Rules of Civil Procedure governs rebuttal expert disclosures in this case is simply wrong. Rule 26(a)(2)(D) explicitly recognizes that expert disclosures are to be made "at the times and in the sequence that the court orders," and that the deadlines in the Federal

Rules apply "[a]bsent a stipulation or court order[.]"[5]   See Fed. R. Civ. P. 26(a)(2)(D); see also Fox v. Gen. Motors LLC, Civil Action No. 1:17-CV-209-MHC, 2019 WL 3483171, at *13–14 (N.D. Ga. Feb. 4, 2019) (excluding untimely rebuttal expert pursuant to Local Rule 26.2(C)); Harrell, 2019 WL 3772644, at *2 (noting that the expert disclosure deadline in Federal Rule 26 does not apply and instead "[t]he stricter time-frame of Local Rule 26 . . . applies to all cases in this Court"); LR 26.2(C), NDGa. (a party must disclose its expert witness sufficiently early enough so that the opposing party may "name its own expert witness sufficiently *in advance of the close of discovery*") (emphasis added); [Docs. 18, 19, 30].

For the foregoing reasons, the Court finds Defendant's rebuttal expert disclosure was untimely pursuant to this Court's Orders and unjustified pursuant to

---

[5] Nevertheless, even if the Federal Rules' deadline for rebuttal expert disclosures did govern in this case, Defendant's disclosure would *still* be untimely by more than a month.  See Fed. R. Civ. P. 26(a)(2)(D)(ii) (requiring a party to disclose a rebuttal expert within thirty (30) days of the other party's disclosure); [Docs. 35 (Plaintiffs' disclosure of Ms. Whitmore on July 11, 2022); 44 (Defendant's disclosure of its rebuttal expert on September 16, 2022)].

this district's Local Rules.  Accordingly, the Court grants Plaintiffs' motion and

excludes Defendant's rebuttal expert.[6]

## III.   Defendant's Motion to Strike Plaintiffs' Expert [Doc. 77]

### A.   Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony

and provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence
> or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and
> methods; and
>
> (d)  the expert has reliably applied the principles and methods
> to the facts of the case.

---

[6] For similar reasons, the Court finds that Defendant has failed to show the excusable neglect necessary to extend its deadline to disclose its rebuttal expert witness.  See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 388–97 (1993) (explaining that "[u]nder [Federal Rule of Civil Procedure] 6(b), where the specified period for the performance of an act has elapsed, a district court may enlarge the period and permit the tardy act where the omission is the 'result of excusable neglect'" and describing the concept of "excusable neglect").  The Court therefore denies Defendant's "Motion for Extension of Time for Defendant to Disclose Rebuttal Expert Witness, Dr. Julie Medlin." [Doc. 89].  Although the time for Defendant to file its reply in support of that motion has not yet expired, the Court finds it appropriate to pronounce its ruling on that motion now.  See LR 7.1(C), NDGa.

FED. R. EVID. 702.  Although the face of Rule 702 provides the Court with only limited guidance as to when expert testimony is admissible, the Supreme Court's opinion in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), is instructive. As the Court observed in that opinion, "[u]nlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  Daubert, 509 U.S. at 592.  However, a jury may find it difficult to evaluate an expert's opinion.  See id.  Trial courts are therefore tasked with acting as "gatekeepers" to ensure that a proposed expert's testimony is not only relevant, but reliable.  Id.  To that end, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand."  Corwin v. Walt Disney Co., 475 F.3d 1239, 1250 (11th Cir. 2007).

In performing this gatekeeping function, a trial court must engage in a "rigorous three-part inquiry" to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).  Although the three (3) prongs of this analysis inevitably overlap, trial courts must be cautious

not to conflate them, and the proponent of expert testimony bears the burden to show that each requirement is met.  Id.; Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113–14 (11th Cir. 2005).

While many factors bear on the Court's inquiry, there is no definitive checklist.  See Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001); see also United States v. Scott, 403 F. App'x 392, 397 (11th Cir. 2010) (finding that Daubert provides only general guidelines and that the trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable" (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999))).  There are multiple ways, for instance, that an individual may be qualified to give expert testimony.  Indeed, the text of Rule 702 makes clear that expert status may be based on "knowledge, skill, experience, training, or education."  FED. R. EVID. 702 (emphasis added) advisory committee's notes to 2000 amendment ("Nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony.").

Likewise, Daubert sets forth a list of "general observations" regarding the reliability of a proposed expert's testimony.  Factors to be considered include: (1) whether the expert's theory can be and has been empirically tested; (2) whether the expert's theory has been subjected to peer review and publication; (3) the known or potential error rate of the expert's theory and whether that rate is acceptable; and

(4) whether the expert's theory is generally accepted in the scientific community. See Daubert, 509 U.S. at 593–94.  Importantly, not every factor "will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion."  Frazier, 387 F.3d at 1262; accord FED. R. EVID. 702 advisory committee's notes to 2000 amendment.  Thus, the trial court has considerable leeway to determine whether proffered expert testimony is reliable. Frazier, 387 F.3d at 1262.

Finally, the district court must assess whether the expert testimony will assist the trier of fact.  Put another way, the court must ask whether the expert testimony "concerns matters that are beyond the understanding of the average lay person."  Id. If the proffered expert testimony "offers nothing more than what lawyers for the parties can argue in closing arguments," it should not be admitted.  Id. at 1262–63.

## B.    Discussion

Defendant moves to exclude Plaintiffs' proffered expert, Ms. Anique S. Whitmore, LPC.  [See Doc. 77].  Plaintiffs offer Ms. Whitmore's testimony regarding their "level of traumatic exposure as victims of discrimination and multiple home invasions at Seven Courts Apartments[.]"  [See Doc. 77-5 at 2]. Defendant argues that Ms. Whitmore should not be permitted to offer expert testimony because (1) she is not qualified to testify as to the effects of racial discrimination and (2) her proffered opinion is not the product of reliable principles

and methods. [See Doc. 77-1 at 11, 16]. Plaintiffs oppose Defendant's motion. [Doc. 78]. The Court addresses each of Defendant's arguments in turn.

### 1.    Ms. Whitmore's qualifications

In its motion to exclude Ms. Whitmore's expert testimony, Defendant contends that Ms. Whitmore is not qualified to offer an expert opinion on the effects of any alleged discrimination Plaintiffs experienced or to conclude that several of Plaintiffs likely suffer from Post-Traumatic Stress Disorder ("PTSD") due to their experiences at the Complex. [See Doc. 77-1 at 11–16]. Specifically, Defendant asserts that Ms. Whitmore only has experience as a child trauma counselor and "does not appear to have any experience treating, diagnosing[,] or testing victims of racial discrimination and does not appear to have any educational or scholarly experience studying or opining on the adverse psychological effects of [the] same." [See id. at 12–13]. The Court disagrees.

Upon review, the Court finds that Ms. Whitmore is qualified to offer expert opinion regarding Plaintiffs' alleged trauma as a result of their experiences at the Complex, including from instances of racial discrimination. Ms. Whitmore attended Northwestern University where she attained a bachelor's degree in education and social policy and a master's degree in counseling psychology. [See Doc. 81-9 at 3]. She has been a practicing therapist and licensed professional counselor for over two (2) decades, working in various public and private capacities related to trauma and

17

abuse. [See id. at 1–3]. She has spent over a decade instructing and training other practitioners and professionals regarding trauma. [See id. at 4]. Ms. Whitmore has owned her own private therapy practice for over a decade focusing on "anxiety, parenting, conflict resolution[,] and the broad spectrum of adolescent and adult trauma/conflict" and she conducts "mental health assessments for court resolution." [See id. at 1]. Throughout her career, Ms. Whitmore has also "counseled dozens of clients and consulted on even more cases that have experienced racial trauma[.]" See Declaration of Anique S. Whitmore, LPC ("Whitmore Decl.") ¶ 2 [Doc. 78-2]. Ms. Whitmore has decades of experience evaluating and diagnosing patients who present symptoms of "trauma with a multifactorial etiology, including racial discrimination alongside other stressors." [See Doc. 81-9]; Whitmore Decl. ¶ 2. The Court finds that all of the above sufficiently qualifies Ms. Whitmore to testify as an expert regarding Plaintiffs' purported trauma resulting from, among other things, alleged discriminatory acts by Defendant.

Contrary to Defendant's contention, Ms. Whitmore possesses experience diagnosing and evaluating patients who have experienced different types of trauma, including trauma as a result of racial discrimination. See Whitmore Decl. ¶¶ 2–3. And although Ms. Whitmore does not specialize in treating trauma stemming from racial discrimination, her practice need not be hyper-particularized to the specific

alleged traumas at issue in this case in order to qualify her as an expert.[7] <u>See</u> <u>Moore v. Intuitive Surgical, Inc.</u>, 995 F.3d 839, 854 (11th Cir. 2021) ("Our caselaw does not support a bright line rule that an expert witness is qualified to testify regarding the cause of an injury only if he personally has used the allegedly defective product."); <u>see also</u> <u>G v. Fay Sch., Inc.</u>, 282 F. Supp. 3d 381, 392 (D. Mass. 2017) (holding expert's qualifications and experience as a "pediatric neurologist and neuroscientist" were sufficient for her to evaluate the diagnosis of a child with electromagnetic hypersensitivity syndrome even though she was not specially qualified as a diagnostician in that area); <u>Wilson v. Flack</u>, No. 19-14294, 2022 WL 4477025, at *5 (11th Cir. Sept. 27, 2022) (upholding a district court's ruling that the proffered expert, a forensic pathologist specializing in cause of death, was not qualified to opine on treatment and survivability of sickle cell disease because he

---

[7] Defendant's reliance on <u>United States v. Ta</u> and similar out-of-circuit cases where the proffered experts' areas of expertise and knowledge were too far removed from the topic for which their testimony was offered is inapposite. [<u>See</u> Doc. 77-1 at 13–14] (citing to <u>Ta</u> and to cases involving a plastic surgeon who sought to testify about chemicals causing birth defects and an economic geologist who demonstrated that he lacked knowledge of a kaolin mineral deposit he was to testify about). In <u>Ta</u>, the court found that the proffered expert was not qualified to offer an opinion regarding how the defendant's intent to commit a crime may have been affected by his Vietnamese culture because the proffered expert's "education [was] entirely in American Literature," the expert had only taught English in Vietnamese schools, and primarily had "significant experience as a software developer." <u>See</u> Civil Action No. 1:05-CR-094-01-WSD, 2007 WL 2324616, at *3 (N.D. Ga. Aug. 9, 2007). The Court finds <u>Ta</u> and the other cases cited by Defendant unpersuasive because, unlike the proffered experts in those cases, Ms. Whitmore has spent more than two (2) decades studying and working in the field of "trauma with a multifactorial etiology, including racial discrimination alongside other stressors," and Plaintiffs offer her testimony related to the alleged trauma they experienced as a result of violence and discrimination during their tenancy at the Complex. <u>See</u> Whitmore Decl. ¶ 2; [Doc. 81-9].

had never treated a patient with sickle cell, had hardly any clinical experience, was not experienced in hematology, and had not studied sickle cell disease).

> 2.   Ms. Whitmore's principles and methods

Defendant next contends that Ms. Whitmore's expert testimony should be excluded because it is not the product of reliable principles and methods.  [See Doc. 77-1 at 16].  Specifically, Defendant argues that Ms. Whitmore's expert opinion is unreliable because (1) she failed to consider Plaintiffs' "numerous prior traumas . . . and how those traumas may have impacted or contributed to their present psychological conditions" and (2) her conclusions are "purely subjective and do not appear to follow any objective testing methods[.]"  [See id. at 18–24].  Plaintiffs assert that Ms. Whitmore's expert report and deposition squarely contradict Defendant's speculative arguments.  [See Doc. 78 at 13–20].  Upon review, the Court finds that Ms. Whitmore's expert opinion is admissible because her conclusions are the product of reliable principles and methods.   The Court addresses each of Defendant's arguments regarding the reliability of Ms. Whitmore's opinions in turn.

First, Defendant's contention that Ms. Whitmore neglected the significant prior traumas experienced by Plaintiffs—including rape, murder, homelessness, a fire destroying their possessions, hunger, poverty, and kidnapping—all of which could have contributed to their present PTSD, is simply incorrect.  [See Doc. 77-1 at 18–19].  In her deposition, Ms. Whitmore rejected the notion that Plaintiffs' PTSD

is solely the result of their experiences at the Complex.  See Deposition of Anique S. Whitmore ("Whitmore Dep.") at 94:9–14, 94:21–95:5, 115:2–12 [Doc. 51-5]. Instead, Ms. Whitmore testified that "multiple bits of trauma play a part in current trauma but to different degrees" and that "someone who has experienced trauma is more susceptible to secondary trauma, third degree trauma, and reoccurrence of trauma.  They receive it emotionally to more of an extreme because it triggers familiar feelings, and it elevates what they're feeling."  See id. at 97:12–23, 115:23–116:1; [see also Doc. 78 at 14] ("[T]rauma etiology is not an either-or proposition"). Ms. Whitmore concluded that Plaintiffs' experiences at the Complex are a cause (but not necessarily the exclusive cause) of their current PTSD after assessing how Plaintiffs presented in a clinical setting when describing those events and their subsequent psychological distress in contrast to their descriptions of and reactions to other traumatic events.[8]  See Whitmore Dep. at 66:14–20, 83:19–23, 88:19–90:17, 115:2–12, 116:4–19; [Doc. 77-5 at 5–11].  In sum, Ms. Whitmore appropriately considered alternative causes of Plaintiffs' trauma, provided detailed explanations

---

[8] Defendant relies on Cooper v. Marten Transport, Ltd. to support that an expert should be excluded where they fail to rule out alternative causes of harm.  See 539 F. App'x 963, 967 (11th Cir. 2013); [Doc. 77-1 at 20].  However, in that case, the Eleventh Circuit held that the district court did not abuse its discretion in excluding an expert who only relied on a "temporal relationship" between the incident and injury at issue rather than consider other potential causes of the injury.  See 539 F. App'x at 967.  However, that case does not require this Court to conduct any particular inquiry or analysis in evaluating an expert, and Defendant's argument ignores Ms. Whitmore's consideration of both events before and during Plaintiffs' tenancy at the Complex in evaluating their present trauma.

from her clinical observations as to why she believes Plaintiffs' experiences at the Complex contributed to their current trauma and resultant PTSD after taking into account Plaintiffs' past ordeals, and testified about how past traumas compound and interact with present ones. See Whitmore Dep. at 66:14–20, 83:18–24, 88:19–90:17, 115:2–116:19; [Doc. 77-5 at 5–10] (detailing the psychological distress of Plaintiffs and their children that arose following the robbery and discrimination at the Complex); see also Hendrix ex rel. G.P. v. Evenflo Co., Inc., 609 F.3d 1183, 1197 (11th Cir. 2010) (noting that an expert's testimony is sufficiently reliable when she "provide[s] reasons for rejecting alternative hypotheses . . . founded on more than subjective beliefs or unsupported speculation" and that a district court is justified in excluding an expert for her failure to address alternate causes of a condition only where the expert "utterly fail[s] . . . to offer an explanation for why the proffered alternative cause was ruled out" (quoting Clausen v. M/V New Carissa, 339 F.3d 1049, 1058 (9th Cir. 2003))).  The Court finds Ms. Whitmore's expert opinion sufficient in this regard.

Defendant argues that Ms. Whitmore's conclusions are unreliable unless she completely "rule[s] out other sources of Plaintiffs' emotional distress" so as to "prove that Seven Courts was the predominant cause of their harm[.]"  [See, e.g., Doc. 81 at 15–16].  However, Defendant's suggestion that this Court must require Ms. Whitmore to precisely parse out what specific incidents caused what percentage

of Plaintiffs' PTSD defies common sense, ignores the complex nature of trauma as detailed by Ms. Whitmore, and is unsupported by caselaw.  See Hendrix, 609 F.3d at 1197; see also AT Sys. Se., Inc. v. Carnes, 613 S.E.2d 150, 153 (Ga. Ct. App. 2005) ("It has long been the rule that a tortfeasor takes a plaintiff in whatever condition he finds him.  A negligent actor must bear the risk that his liability will be increased by reason of the actual physical condition of the other toward whom his act is negligent." (alterations accepted) (quoting Coleman v. Atlanta Obstetrics & Gynecology Grp., 390 S.E.2d 856, 858 (Ga. Ct. App. 1990))).  Though Defendant may disagree with Ms. Whitmore's conclusions regarding Plaintiffs' experiences at the Complex and their past traumatic experiences, that does not render her testimony scientifically unreliable or inadmissible.  See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341, 1345 (11th Cir. 2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence" and "[t]he identification of . . . flaws in generally reliable scientific evidence is precisely the role of cross examination" (collecting cases)).

Second, Defendant's argument that Ms. Whitmore failed to use objective and reliable standards in her evaluation of Plaintiffs is contradicted by Ms. Whitmore's expert report and deposition.  For example, Defendant claims that Ms. Whitmore failed to appropriately or sufficiently consult the Diagnostic and Statistical Manual of the American Psychiatric Association (the "DSM-5"), which is widely regarded

as an authoritative text in the field of psychology.  [See Docs. 77-1 at 8, 21, 24; 81 at 14].  However, Ms. Whitmore repeatedly references the DSM-5 when discussing how she concluded that Plaintiffs likely suffer from PTSD.  See, e.g., Whitmore Dep. at 25:4–9, 27:4–9, 62:24–63:4, 118:3–5; [Doc. 77-5 at 3] ("Some minorities who experience racial discrimination can develop racial trauma, a psychological form of trauma with symptoms comparable to [DSM-5] criteria for PTSD").  Further, Ms. Whitmore details the methods and techniques she uses to evaluate patients, informed by her more than two (2) decades of experience and her study of scholarly research. [See, e.g., Doc. 77-5 at 2–3, 11]; Whitmore Dep. at 35:8–15 (listing patient factors she considers in a clinical setting), 38:6–14 (listing scholarly sources concerning race discrimination she relied on), 43:7–24 (discussing the experience of racial discrimination and referencing scholarly sources in her expert report), 65:8–66:2 (discussing effects of past trauma), 68:13–19 (discussing efficacy of self-reporting), 86:4–88:17 (describing best practices, standardized measures, and psychological instruments), 91:15–94:1 (discussing how to avoid and detect confirmation bias, malingering, and exaggeration), 115:21–116:3 (discussing the effects of past trauma generally), 117:10–118:5 (discussing her use of and familiarity with the DSM-5).  Ms. Whitmore reliably applied these methods to this case.  See, e.g., Whitmore Dep. at 34:5–35:2 (discussing how she evaluated Plaintiffs and why she did not consider outside depositions), 45:1–14 (discussing how Plaintiffs' racial trauma and

discrimination may have manifested), 66:14–20 (discussing Plaintiffs' symptoms following the robbery which were unique from their symptoms following different past traumatic events), 72:12–17 (relevant factors to Plaintiffs' diagnosis), 83:19–23 (discussing how Plaintiff Caceras described the robbery compared to past traumas), 91:15–93:9 (claiming to have addressed issues of exaggeration, fainting, malingering, and secondary gain regarding Plaintiffs), 116:9–19 (discussing how she differentiated and assessed trauma both from Plaintiffs' past life events and experiences at the Complex), 117:10–118:5 (stating she consulted the DSM-5 in this case); [Doc. 77-5 at 3, 11] (citing the DSM-5 and other scholarly sources Ms. Whitmore relied upon in forming her opinions in this case).

Otherwise, Defendant identifies a litany of issues that purportedly make Ms. Whitmore's opinion unreliable, including that she "did not document the amount of time she spent interviewing each Plaintiff;" "did not keep any notes for her interview[] of [B.M.F.];" "does not even remember what order she interviewed Plaintiffs;" did not "conduct a forensic evaluation[,] . . . testing[,] . . . or diagnose any [Plaintiff] with anything"; and tainted Plaintiff Caceres' interview by permitting V.M.F. to translate, which supposedly resulted in Plaintiff Caceres not providing "reliable answers," V.M.F. not reliably translating, or V.M.F. repeating what Plaintiff Caceres said during her own interview.  [See Doc. 77-1 at 21–23]. However, Defendant fails to detail how Ms. Whitmore's examinations of Plaintiffs

failed to comport with professional norms or reliable principles and methods.[9] Instead, these arguments by Defendant concern the weight and credibility of Ms. Whitmore's testimony rather than its admissibility. See Quiet Tech. DC-8, Inc., 326 F.3d at 1341, 1345 (explaining that "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence" and that "[t]he identification of . . . flaws in generally reliable scientific evidence is precisely the role of cross examination" and collecting cases in support of these propositions); Tippens v. Celotex Corp., 805 F.2d 949, 954 (11th Cir. 1986) ("Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact.").

In sum, the Court finds Ms. Whitmore's expert opinions to be admissible because she is qualified as a trauma expert and her conclusions are the product of reliable principles and methods. Accordingly, the Court denies Defendant's motion to exclude Ms. Whitmore's testimony.

## IV. Defendant's Motion for Summary Judgment [Doc. 50]

### A. Legal Standard

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to

---

[9] Defendant attempts to support some of these assertions by citing to its own rebuttal expert's report. [See, e.g., Doc. 81 at 14]. However, as explained above, Defendant's disclosure of its rebuttal expert was untimely, and the Court accordingly does not consider that expert's report in its analysis herein. See supra, part II.

judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome pursuant to the governing law.  See id.

When ruling on a motion for summary judgment, the Court must view all evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party must show the lack of evidentiary support for the non-moving party's position.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

If the moving party meets this initial burden, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial in order to survive summary judgment.  See id. at 324–26.  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.  "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a

motion for summary judgment.  Id. at 252.  There must be evidence on which the jury could reasonably find for the non-moving party.  See id.

## B.    Discussion

In its instant motion, Defendant requests that this Court grant summary judgment in its favor on all of Plaintiffs' claims, including (I) FHA violations, (II) premises liability, and (III) punitive damages.  [See Doc. 50-1].  Plaintiffs oppose Defendant's motion.  [See Doc. 65].  The Court addresses Defendant's arguments as they pertain to each of Plaintiffs' three (3) Counts in turn.

### 1.    Count I: FHA violations

Plaintiffs assert that Defendant violated 42 U.S.C. § 3604(b) and § 3617 of the FHA.[10]  [See Doc. 65 at 21].  Defendant seeks summary judgment as to both alleged violations.  [See Docs. 50, 71].  The Court assesses the Parties' arguments pertaining to each statutory provision in turn.

#### a.    42 U.S.C. § 3604(b)

Defendant argues that it is entitled to summary judgment on Plaintiffs' 42 U.S.C. § 3604(b) claim because that claim only relies on  unsupported, "conclusory assertions" of racial discrimination—all of which have supposedly been disproven

---

[10] In its reply brief, Defendant also argues that Plaintiffs' claims fail pursuant to 42 U.S.C. § 3604(a).  [See Doc. 71 at 8].  However, as Defendant acknowledges, "Plaintiffs neither alleged nor advanced any evidence to establish a violation under Section 3604(a)[.]"  [See id.]  Because Plaintiff does not purport to advance a claim pursuant to Section 3604(a), the Court does not address Defendant's arguments regarding the same.

by Defendant's record evidence. [See Docs. 50-1 at 9; 71 at 9]. In response, Plaintiffs assert that the record evidence supports that Ms. Wynn excluded the Minor Plaintiffs from the Complex playground because they are Hispanic, thereby violating the FHA. [See Doc. 65 at 21–23].

The purpose of the FHA is "to provide, within constitutional limitations, for fair housing throughout the United States." See 42 U.S.C. § 3601. To that end, 42 U.S.C. § 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). "There is thus no question that a landlord may be liable under the FHA for intentionally discriminating against a tenant based on race." Francis v. Kings Park Manor, Inc., 992 F.3d 67, 71 (2d Cir. 2021). "[B]y its plain meaning, the FHA protects a tenant . . . from receiving differential or less favorable treatment in housing terms, conditions, or privileges if the but-for cause of that treatment is" the tenant's race. See Fox v. Gaines, 4 F.4th 1293, 1296 (11th Cir. 2021) (discussing the FHA as applied to sex discrimination claims). "The language of the FHA is broad and inclusive," "prohibits a wide range of conduct," has a "broad remedial purpose," and "is written in decidedly far-reaching terms." See Ga. State Conf. of the NAACP v. City of LaGrange, 940 F.3d 627, 631–32 (11th Cir. 2019) (quoting City of Mia. v. Wells Fargo & Co., 923 F.3d

12260, 1278 (11th Cir. 2019)).  As such, the statute encompasses conduct that occurs both before and after the sale or rental of a property.[11]  See id.

"A plaintiff can establish a violation under the FHA by proving (1) intentional discrimination, (2) discriminatory impact, or (3) a refusal to make a reasonable accommodation."  Bonasera v. City of Norcross, 342 F. App'x 581, 583 (11th Cir. 2009).  "To prove intentional discrimination, 'a plaintiff has the burden of showing that the defendant[] actually intended or w[as] improperly motivated in [its] decision to discriminate against persons protected by the FHA.'"  Id. (quoting Reese v. Mia.-Dade Cnty., 242 F. Supp. 2d 1292, 1301 (S.D. Fla. 2002)).  "[C]ourts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [race], to constitute direct evidence of discrimination."  Carter v. City of Mia., 870 F.2d 578, 582 (11th Cir. 1989); see also Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) ("One example of direct evidence [of discrimination] would be a management memorandum saying, 'Fire Earley—he is too old.'").

---

[11] The Parties do not dispute that the Complex playground is a "service or facility" in connection with Plaintiffs' apartment rental pursuant to Section 3604(b).  See Ga. State Conf. of the NAACP, 940 F.3d at 633 ("[T]he conduct at issue must relate to services provided in connection with the sale or rental of a dwelling"); [see also Doc. 50-1 at 6] (describing Defendant's control of access to the playground and establishing rules for the same); Gonzalez v. Diversified Real Prop. Mgmt. & Bus. Servs., Inc., No. SA CV 09-718 PA (RNBx), 2010 WL 10105755, at *3 (C.D. Cal. Jan. 4, 2010) (finding that apartment common areas are "facilities" pursuant to the FHA and Section 3604(b)).

The Court finds that a reasonable jury could conclude that Defendant denied the Minor Plaintiffs access to the Complex playground because of their race in violation of 42 U.S.C. § 3604(b). Plaintiffs put forth direct evidence of racial discrimination in support of their claim. For example, V.M.F. testified that Ms. Wynn told the Minor Plaintiffs several times that they could not play on the Complex playground because it was "not for Latinos" but was instead "only for Americans." See Deposition of V.M.F. ("V.M.F. Dep.") at 31:12–15, 31:25–32:4, 33:20–23 [Doc. 66-6]. Defendant's former security guard, Horace Holt, similarly averred that he heard Ms. Wynn yell racially inflamed remarks at the Minor Plaintiffs while they were on the Complex playground. See Deposition of Horace Holt ("Holt Dep.") at 175:8–22 [Doc. 66-15]. Ms. Wynn's remarks directly invoke the Minor Plaintiffs' race as the reason she was excluding them from the Complex playground. See Carter, 870 F.2d at 582; see also V.M.F. Dep. at 34:10–12 (stating that the Minor Plaintiffs left the playground following their confrontation with Ms. Wynn). The Court finds this record evidence is sufficient to support a jury finding that Defendant—through Ms. Wynn—intentionally discriminated against the Minor Plaintiffs and subjected them to differential treatment in excluding them from the playground, a facility of the Complex, because of their race in violation of 42 U.S.C. § 3604(b). See Bonasera, 342 F. App'x at 583; Fox, 4 F.4th at 1296.

Defendant attempts to rebut this evidence by disputing the Minor Plaintiffs' testimony about Ms. Wynn's remarks and claiming that she instead told the Minor Plaintiffs to leave the Complex playground because she was enforcing Defendant's COVID-19 rules.  [See Docs. 50-1 at 9–10; 71 at 10]; Deposition of Latoya Wynn ("Wynn Dep.") at 112:3–8, 137:19–139:7 [Doc. 52-2].  However, even if Ms. Wynn was merely enforcing the COVID-19 rules and attempting to remove the Minor Plaintiffs from the closed playground, her explicit reference to their race and contention that the playground was "only for Americans" as the reason for their removal could lead a reasonable jury to conclude that they were singled out for differential treatment and denied the privilege of using the Complex playground because of their race.  See V.M.F. Dep. at 31:12–15, 32:12–33:23 (discussing Ms. Wynn's explicit reference to "Latinos" and "Hispanics" as those who could not play on the playground); Holt Dep. at 96:7–11, 98:4–99:12, 175:8–22 (detailing Ms. Wynn yelling at "Latino kids" such as Plaintiffs, "being racist toward them," calling them things other than their names such as "illegal immigra[nts]" and "you Mexicans," and threatening to "call Immigration" whereas he did not hear her make similar comments to "non-Latino people").  Ms. Wynn's denials of contradictory evidence are simply not an adequate basis for the Court to grant summary judgment in favor of Defendant because Plaintiffs' record evidence gives rise to a genuine issue of material fact.  It is not the Court's role to weigh the evidence or make

credibility determinations at this juncture.  See Patterson v. Ga. Pac., LLC, 38 F.4th 1336, 1350 (11th Cir. 2022) ("[W]hen determining whether there is a genuine issue of material fact that defeats summary judgment, we do not weigh conflicting evidence or make credibility determinations to resolve factual disputes."). Therefore, the Court denies Defendant summary judgment on Plaintiffs' Count I to the extent it is based on a violation of 42 U.S.C. § 3604(b).

> b.  *42 U.S.C. § 3617*

Next, Defendant argues that it is entitled to summary judgment on Plaintiffs' Count I to the extent that Count is premised on a violation of 42 U.S.C. § 3617.  [See Doc. 71 at 10].  That FHA provision makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" Sections 3603–3606 of the FHA.  See 42 U.S.C. § 3617.  A Section 3617 claim requires that a plaintiff demonstrate

> (1) a defendant coerced, intimidated, threatened or interfered; (2) with a (a) plaintiff's exercise of a right under Sections 3603–3606; (b) plaintiff's enjoyment of a housing right after exercise of that right; or (c) plaintiff's aid or encouragement to a protected person to exercise or enjoy a housing right; (3) because of discriminatory animus.

See Lawrence v. Courtyards at Deerwood Ass'n, Inc., 318 F. Supp. 2d  1133, 1143–44 (S.D. Fla. 2004) (quoting Gourlay v. Forest Lake Ests. Civic Ass'n, 276 F. Supp.

2d 1222, 1235 (M.D. Fla. 2003)); see also Baggett v. Baird, Civil Action No. 4:94-CV-00282-HLM, 1997 WL 151544, at *37 (N.D. Ga. Feb. 18, 1997).

"[T]he Eleventh Circuit has not prescribed the precise magnitude of conduct required by [Section] 3617[.]"  See Dulworth Family L.P. v. 400 LA Peninsula Condo. Ass'n, Inc., No. 2:11-CV-00584-UA-DNF, 2012 WL 11794802, at *3 (M.D. Fla. July 23, 2012); see also FSI Green Park S. Prop., LLC v. City of Pelham, No. 2:18-CV-1211-GMB, 2020 WL 4933664, at *13 (N.D. Ala. Aug. 24, 2020) ("[T]he Eleventh Circuit has not defined the precise contours of conduct violative of the FHA's interference provision").  However, several district courts in the Eleventh Circuit recognize a distinction between Section 3617 interference claims brought alone and those brought in conjunction with violations of Sections 3603–3606, requiring the former to demonstrate "severe or pervasive" conduct rather than merely interfering conduct.  See Gourlay, 276 F. Supp. 2d at 1235–36 (observing that the Eleventh Circuit permits Section 3617 claims to be brought alone, collecting cases supporting the proposition that Section 3617 claims unaccompanied by violations of Sections 3603–3606 require severe or pervasive conduct, and justifying such an approach so as to prevent the proliferation of FHA disputes untethered to underlying Section 3603–3606 discriminatory conduct); Lawrence, 318 F. Supp. 2d at 1145 ("[T]o constitute actionable interference [pursuant to Section 3617], *in the absence of a violation* of [S]ections 3603–3606, the discriminatory conduct must be

pervasive and severe enough to be considered as threatening or violent." (emphasis added)); Jackson v. Comberg, No. 8:05-CV-1713-T-24TMAP, 2007 WL 2774178, at *6 (M.D. Fla. Aug. 22, 2007) (recognizing the same distinction); see also Fair Hous. Ctr. of Greater Palm Beaches, Inc., v. Shutters Condo. Ass'n, Inc., No. 9:08-CV-81566-WPD, 2009 WL 10667030, at *4 (S.D. Fla. Sept. 11, 2009) (noting that violations of Section 3617 depend on the validity of claims pursuant to Section 3604).

Instead, the interference element of Section 3617 claims accompanied by those alleging violations of Sections 3603–3606 "should be broadly interpreted to reach all practices which have the effect of interfering with housing rights."  See Linkletter v. W. & S. Fin. Grp., Inc., 851 F.3d 632, 638 (6th Cir. 2017); Jackson, 2007 WL 2774178, at *6 (finding evidence of Section 3617 interference where the defendant refused to accept rent payments and made comments about the plaintiffs' interracial relationship); Walton v. Claybridge Homeowners Ass'n, Inc., No. 1:03-CV-69-LJM-WTL, 2004 WL 192106, at *6 (S.D. Ind. Jan. 22, 2004) ("[N]othing in the statute indicates that [Section] 3617 claims are limited to extraordinarily violent and discriminatory acts like cross-burning.  Rather, the plain language of [Section] 3617 and the purpose of the FHA evidence that the provision was intended to cover a broad range of discriminatory conduct associated with the exercise of housing rights." (collecting cases)); see also Ga. State Conf. of the NAACP, 940 F.3d at 631–

32 (describing the FHA's far-reaching terms, broad remedial purpose, and the wide range of conduct it prohibits); Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 (1972) ("The language of the [FHA] is broad and inclusive.").

Bearing in mind these guiding principles, the Court finds that there is a genuine dispute of material fact regarding whether Defendant violated Section 3617. First, the Court finds that Plaintiffs need not present any evidence of "severe or pervasive" conduct by Defendant to maintain their Section 3617 interference claim because Plaintiffs bring that claim alongside their surviving Section 3604(b) claim.[12] Compare Jackson, 2007 WL 2774178, at *4–6 (analyzing a Section 3617 interference claim without requiring severe or pervasive conduct after upholding part of the plaintiffs' Section 3604(b) claim), with Gourlay, 276 F. Supp. 2d at 1235 (analyzing a Section 3617 claim for severe or pervasive conduct after finding no Section 3604 violations), and Lawrence, 318 F. Supp. 2d at 1144–45 (same).

---

[12] Defendant cites to caselaw suggesting that Section 3617 "extends only to discriminatory conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her housing rights." [See Doc. 71 at 11] (quoting Noah v. Assor, 379 F. Supp. 3d 1284, 1289–90 (S.D. Fla. 2019)). However, the district court in Noah noted a distinction similar to the one the Court makes here between Section 3617 claims brought alone and those brought in conjunction with Sections 3603–3606 and cited to cases recognizing that same distinction. See Noah, 379 F. Supp. 3d at 1289, 1290 n.3 (citing Lawrence, 318 F. Supp. 2d at 1144 and Gourlay, 276 F. Supp. 2d at 1235) (noting that the heightened interference standard has only been required for a Section 3617 claim in the absence of accompanying violations of Sections 3603–3606); see also Joubert v. Hussain, No. CV 118-147, 2020 WL 12676384, at *7 (S.D. Ga. Sept. 8, 2020) (citing Noah, 379 F. Supp. 3d at 1289 and Lawrence, 318 F. Supp. 2d at 1144) (assessing the plaintiff's Section 3617 interference claim and requiring severe and pervasive conduct *after* dismissing the plaintiff's Section 3604 claim). Still, as detailed below, Plaintiffs present record evidence supporting that Defendant's discriminatory conduct was pervasive and resulted in the Minor Plaintiffs abandoning the Complex playground.

Second, the record evidence supports that Defendant interfered with the Minor Plaintiffs' right to access the Complex playground, a "service or facility" pursuant to 42 U.S.C. § 3604(b), in a brazen fashion when Ms. Wynn ordered them to leave for no other reason than their race. See V.M.F. Dep. at 31:12–15, 34:10–12 (stating that they left the playground following Ms. Wynn telling them that it was "not for Latinos" and was "only for Americans"); see also Jackson, 2007 WL 2774178, at *1, 6 (finding sufficient evidence of interference with a FHA right done with discriminatory animus to create a jury question where the defendant made comments about the plaintiffs' race and interracial marriage and refused to accept rent payments).   Record evidence supports that Ms. Wynn's direct discriminatory statements towards the Minor Plaintiffs were pervasive, flagrant, plainly reflect racial animus, and caused the Minor Plaintiffs to abandon the Complex playground. See, e.g., Holt Dep. at 96:7–11, 98:4–99:12, 175:8–22 (detailing Ms. Wynn yelling at "Latino kids" such as Plaintiffs, "being racist toward them," calling them things other than their names such as "illegal immigra[nts]" and "you Mexicans," and threatening to "call Immigration" whereas he did not hear her make similar comments to "non-Latino people"); V.M.F. Dep. at 24:22–25:5, 31:12–15, 33:23, 34:10–12; Diaz Dep. at 105:12–16 (describing Ms. Wynn yelling that she "d[idn't] want to see any Hispanic children playing outside").

Without citation to evidence or authority, Defendant argues that "[b]ecause of the health protocols of a global pandemic, the playground ceased to be a right or activity to which Plaintiffs . . . were entitled." [See Doc. 71 at 12]. However, the global pandemic did not eliminate the Minor Plaintiffs' right to use the playground facility pursuant to the FHA, but rather, potentially provides a non-discriminatory reason as to why Defendant might have lawfully restricted access to the playground for all tenants. Indeed, preventing access to an apartment complex facility solely because of the global pandemic would not be actionable pursuant to Section 3617, which requires evidence of *discriminatory* animus. See, e.g., Lawrence, 318 F. Supp. 2d at 1144. However, record evidence supports that Defendant removed Plaintiffs at least in part because of racial animus—not just the COVID-19 pandemic. See V.M.F. Dep. at 33:23; Wynn Dep. at 112:3–8; see also Deposition of E.M.F. ("E.M.F. Dep.") at 27:1–4 (claiming racist incidents involving Ms. Wynn occurred at the playground and elsewhere both before and after the COVID-19 pandemic started); Holt Dep. at 113:11–15 (claiming Ms. Wynn removed children from the playground before the COVID-19 pandemic). Therefore, Defendant fails to establish why it is entitled to summary judgment as a matter of law on Plaintiffs' 42 U.S.C. § 3617 claim. See Jackson, 2007 WL 2774178, at *6 (denying the defendant summary judgment on the plaintiff's Section 3617 claim because there

was evidence of discriminatory animus).  Accordingly, the Court denies Defendant's

motion for summary judgment as to Count I.

2.      Count II: Premises liability

Defendant next seeks summary judgment on Plaintiffs' Count II for premises

liability stemming from the armed robbery and home invasion that occurred on July

21, 2021.  [See Doc. 50].  Defendant argues that Plaintiffs' claim fails as a matter of

law because (1) Defendant did not owe Plaintiffs a duty because the crime at the

Complex was unforeseeable and Defendant did not have superior knowledge of it

and (2) Defendant did not breach any duty it owed to Plaintiffs because it took

reasonable and adequate measures to safeguard the premises.[13]  [See Doc. 55 at 10–

---

[13] In a "Notice of Filing of Supplemental Authority in Support of Defendant's Motion for Summary Judgment," Defendant identifies the recent Georgia Court of Appeals case Tara Bridge Apartments, LP v. Benson.  See 879 S.E.2d 531 (Ga. Ct. App. 2022); [Doc. 57].  In that case, a plaintiff brought a premises liability claim against her apartment complex for a robbery that supposedly occurred because the robber was able to climb through the plaintiff's malfunctioning apartment window.  See Benson, 879 S.E.2d at 535.  The Georgia Court of Appeals reversed the lower court's denial of defendant's motion for summary judgment in part because the plaintiff failed to establish that the defendant's conduct was the proximate cause of the robbery because she did not provide evidence to support that the robber entered her apartment through the window rather than the front door, that the window was broken and unable to properly lock, that she checked the window on the night of the incident, or that the front door was locked at the time of the robbery.  See id., 879 S.E.2d at 535.  Defendant does not explain in its notice or its reply brief in support of its motion for summary judgment citing Benson how it is applicable or relevant to the present case or the facts at hand.  [See Docs. 57; 71 at 12 (citing Benson only for the proposition that "[a] failure to establish causation precludes premises liability claims")].  For this reason and because causation is not the focus of Defendant's present motion for summary judgment, the Court declines to further discuss Benson.

15].  The Court addresses each of Defendant's arguments, along with Plaintiffs' responses thereto, in turn.[14]

### a.  *Defendant's duty*

Defendant argues that it did not owe Plaintiffs a duty because the July 2021 armed robbery in Plaintiffs' apartment was not foreseeable as a matter of law.  [See Doc. 50-1 at 11–13].  Specifically, Defendant contends that the fact that the Complex is in a "relatively high-crime part of Atlanta" and receives "dozens" of 911 calls every year is insufficient to establish foreseeability.  [See id. at 12–13].  Otherwise, Defendant claims to have had no knowledge of any "criminal activity or misconduct during Plaintiffs' rental period[.]"  [See id.]  Instead, Defendant places the onus on Plaintiffs, asserting that *Plaintiffs* had superior knowledge of the criminal activity but chose to stay at the Complex for its low rates.  [See id.]  In response, Plaintiffs argue that record evidence directly contradicts Defendant's claim that it had no knowledge of the crime at the Complex and that being located in a high-crime part of the city should not serve as a "get-out-of-protecting-tenants card."  [See Doc. 65 at 25–26].

---

[14] Georgia law applies to Plaintiffs' premises liability claim because Plaintiffs invoke the Court's supplemental jurisdiction over this claim, and Plaintiffs' injury allegedly occurred in Georgia.  See Benchmark Med. Holdings, Inc. v. Rehab Sols., LLC, 307 F. Supp. 2d 1249, 1258–59 (M.D. Ala. 2004) ("When a federal court decides a state law claim, whether acting pursuant to diversity or supplemental jurisdiction, it applies the choice-of-law rules of the jurisdiction in which its sits."); Mullins v. M.G.D. Graphics Sys. Grp., 867 F. Supp. 1578, 1580 (N.D. Ga. 1994) (explaining that "[u]nder Georgia's choice of law rules, the substantive law to be applied in a tort case is" that of the place "where the injury [took place]").

"With respect to premises liability cases, 'the general rule is that a landlord is not an insurer of his tenant's safety; however, landlords do have a duty to exercise ordinary care to prevent foreseeable third-party criminal attacks upon tenants.'" See Walker v. Aderhold Props., Inc., 694 S.E.2d 119, 121 (Ga. Ct. App. 2010) (quoting Brookview Holdings v. Suarez, 645 S.E.2d 559, 566 (Ga. Ct. App. 2007)); Martin v. Six Flags Over Ga. II, L.P., 801 S.E.2d 24, 30 (Ga. 2017) (observing that a landlord has a duty to protect invitees where "there is reason to anticipate some criminal conduct" but that a landlord does not have a duty to "guard against imagined dangers"). Prior criminal activity substantially similar to the crime in question "may give a landlord notice of possible future crimes against a person" and thus impose a duty on the landlord. See Walker, 694 S.E.2d at 121–22; FPI Atlanta, L.P. v. Seaton, 524 S.E.2d 524, 528 (Ga. Ct. App. 1999) ("The type of violent crimes must be such that a reasonable person should reasonably foresee the risk of crime occurring to the tenants in their apartments."). However, the reasonable foreseeability inquiry is not a "rigid" one, and "[a]ll that is required is that the prior incident be sufficient to attract the landlord's attention to the dangerous condition which resulted in the litigated incident." See Walker, 694 S.E.2d at 121–22. Testimony from employees working on the premises regarding its safety may also "create a question of fact as to whether [the] defendant knew or should have known about the unreasonable risk of criminal attack." See Piggly Wiggly S., Inc. v. Snowden, 464 S.E.2d 220, 223

(Ga. Ct. App. 1995).  "An establishment's location in a high crime area may also support the finding of a duty on the part of the landowner to guard against criminal attacks," as can "evidence that the landowner had knowledge of a volatile situation brewing on the premises[.]"  See Martin, 801 S.E.2d at 32.

However, even if foreseeable, the "key question . . . is the landowner's superior knowledge of the criminal activity."  See Bolton v. Golden Bus., Inc., 823 S.E.2d 371, 372 (Ga. Ct. App. 2019) (granting summary judgment in favor of the defendants on a premises liability claim where there was no evidence that the defendants "witnessed criminal activity or misconduct," "were informed of such conduct," received security requests, or knew about the volume or content of numerous police reports); see also Fair v. C V Underground, LLC, 798 S.E.2d 358, 362 (Ga. Ct. App. 2017).  In sum, in order to show that a landlord owed a legal duty of care, a plaintiff must demonstrate reasonable foreseeability by showing the occurrence of prior criminal acts substantially similar to the crime committed against the plaintiff and that the landowner had superior knowledge of that risk.  See Cleveland v. Team RTR2, LLC, 854 S.E.2d 756, 760 (Ga. Ct. App. 2021).

Here, the Court finds that a genuine dispute of material fact exists regarding whether the July 2021 armed robbery of Plaintiffs' apartment was reasonably foreseeable such that Defendant owed Plaintiffs a duty.  First, Defendant admits that "Seven Courts Apartments was located in a high-crime part of Atlanta[.]"  [See Doc.

50-1 at 13]; Martin, 801 S.E.2d at 32.  Second, a reasonable jury could find that

Defendant had superior knowledge of crimes occurring both before and during

Plaintiffs' tenancy that were substantially similar to the armed robbery of Plaintiffs'

apartment.  Record evidence from September 2018 to October 2019—including

Defendant's internal incident reports; police reports; and emails and reports about

the crimes from Mr. Holt, head of security at the Complex, to Ms. Wynn and Mr.

Roderick Harris, Defendant's area manager—suggests that Defendant was aware of

the rampant violent crime occurring at the Complex.[15]  [See, e.g., Docs. 66-30

(internal incident report of a September 11, 2018 attempted break-in); 66-31

(internal incident report of an October 24, 2018 break-in and robbery); 66-33

(internal incident report of an April 6, 2019 "shootout" resulting in one death); 66-

34 (seventy-four (74) pages of police reports detailing crime at the complex in 2019);

66-59 (Mr. Holt bringing twelve (12) police reports of crime including robbery,

burglary, and damage to property to Mr. Harris and Ms. Wynn's attention); 66-60

---

[15] Record evidence also supports that Defendant knew of the extensive drug activity at the Complex during this time.  [See, e.g., Docs. 66-26 (May 1, 2019 letter to Defendant from the City of Atlanta regarding the known drug activity taking place on the premises and threatening to seize the property as a result); 66-43 (Mr. Holt's July 17 and 18, 2019 incident report describing an individual attempting to buy "weed and good powder" from a unit); 66-44 (Mr. Holt's July 20 and 21, 2019 reports detailing his interaction with Atlanta police regarding "heroin or cokcane [sic]" activity in a unit)]; see also Hood v. State, 811 S.E.2d 392, 396 (Ga. 2018) ("This [c]ourt and others have recognized that violence is inherent in the business of dealing drugs" (collecting cases supporting that violence is a foreseeable byproduct of drug dealing)); Martin, 801 S.E.2d at 32 (noting that a duty may be found where there is "evidence that the landowner had knowledge of a volatile situation brewing on the premises").  According to Mr. Holt, tenants and others were compensating Ms. Wynn so that she would stifle potential investigations into the known drug activity at the Complex.  See Holt Dep. at 51:7–54:5.

(Ms. Wynn emailing a summarized chart of those same police reports to Mr. Harris and other of Defendant's employees); 66-35 (internal incident report of an April 19, 2019 break-in and robbery describing Ms. Wynn surveying the damage); 66-40 (June 28, 2019 email to Ms. Wynn memorializing a call from a resident detailing three (3) break-ins in a two and a half (2.5)-week span).

These violent crimes—similar to the July 21, 2021 armed robbery of Plaintiffs at their apartment—continued after Plaintiffs moved into the Complex in October 2019.[16]  [See, e.g., Docs. 66-46 (December 28, 2019 email from Mr. Holt to Mr. Harris regarding drug activity and a "shooting" that occurred "[a]bout a week ago"); 66-49 (March 16, 2020 email from a tenant to Ms. Wynn regarding threats from a neighbor to shoot through her apartment); 66-53 (April 18, 2020 email from Mr. Harris to Mr. Holt saying he informed Ms. Wynn about fighting and potential prostitution on the premises); 66-41 (May 20, 2020 email from Mr. Holt to Mr. Harris regarding teenage prostitution, drugs, and shootings on the property "for the last month"); 66-56 (May 29, 2020 email from Mr. Holt to Mr. Harris about a shooting, shell casings on the premises, and a car being "shot up"); 66-65 (July 25, 2020 email from Mr. Holt to Mr. Harris detailing a shooting supposedly involving an assault rifle); 66-70 (August 3, 2020 email from Mr. Holt detailing incidents of

---

[16] Most security guard crime reporting stopped after March 30, 2021, because, as discussed below, Defendant cut security services to where guards were only at the Complex performing "driv[e] through[s]" and passing out late rent notices.  See Hickey Dep. at 89:3–20.

vandalizing, auto theft, and an attempted robbery); 66-75 (August 9, 2020 email from Mr. Holt to Mr. Harris regarding twelve (12) units that "are involved in illegal activities"); 66-81 (email from Mr. Holt to Defendant regarding an incident of domestic violence and suspiciously high visitor "traffic" near a particular unit); 66-82 (text from Mr. Holt to Mr. Harris describing a 1 a.m. police call regarding disturbances from Ms. Wynn's people); 66-84 (October 13, 2020 police report detailing a resident punching Ms. Wynn in the face in the leasing office); 66-86 (internal incident report detailing November 12, 2020 maintenance shop break-in); 66-88 (December 17, 2020 email from Mr. Hickey to Ms. Wynn referencing a robbery); 66-90 (January 2, 2021 text from Mr. Hickey to Ms. Wynn about a shooting and fighting on the premises and February 7, 2021 text regarding a burglary); 66-17 at 63 (February 24, 2021 report detailing gunfire); 66-94 (March 30, 2021 report detailing Mr. Hickey being attacked by a woman with a sledgehammer)].  Plaintiffs were even the victims of at least one other previous home invasion attempt while living at the Complex prior to the July 21, 2021 armed robbery.  See Pls.' SOMF ¶¶ 53–54, 56–58.  And both of Defendant's security personnel during Plaintiffs' tenancy averred that crime was a serious issue at the Complex.  See, e.g., Hickey Dep. at 26:15–17 (observing that the complex "had a lot" of crime); Holt Dep. at 144:23–145:1, 177:20–178:10, 220:2–4; [Doc. 66-82]; see also Snowden, 464 S.E.2d at 223.

Because the record evidence supports that Defendant had superior knowledge of the high risk of criminal activity similar to the July 2021 armed robbery of Plaintiffs at their apartment before that incident occurred, a genuine issue of material fact exists regarding the foreseeability of the armed robbery. Therefore, a reasonable jury could conclude that Defendant owed a duty of reasonable care to Plaintiffs.[17] See Seaton, 524 S.E.2d at 528 (finding a factual question of reasonable foreseeability given the "fifty-nine burglaries, five armed robberies, one robbery, one kidnapping, two murders" and other aggravated violent crimes at an apartment complex in the span of five (5) years preceding the violent crime against the plaintiffs underlying the suit); Walker, 694 S.E.2d at 122 ("The fact that [the defendant's] security personnel received reports that burglaries were taking place on the premises provides

---

[17] The Court is not persuaded by Defendant's arguments that it did not have superior knowledge of the crimes occurring at the Complex as a matter of law, that such crimes were not foreseeable because it "did not have a duty to investigate police files and 911 call logs[,]" and that Plaintiffs cannot overcome summary judgment because they only rely on "evidence of generalized crime" at the Complex. [See Docs. 50-1 at 12; 71 at 14]. The record evidence supports that Defendant had actual knowledge not only of the police reports detailing the violent crime occurring on a regular basis at the Complex but also that Defendant had actual knowledge of the crimes themselves, as evidenced by the internal incident reports, emails, and security reports detailed above. For these reasons, Defendant's reliance on the Georgia Court of Appeals' decisions in Pappas Restaurants, Inc. v. Welch and Bolton v. Golden Business, Inc. is inapposite. See Pappas Rests., Inc. v. Welch, 867 S.E.2d 155, 161 (Ga. Ct. App. 2021) (finding police reports of crime in the general area of a restaurant and the lack of both evidence regarding crime in the specific restaurant location and the defendant's knowledge of crimes other than break-ins occurring on its property insufficient to create a jury question on reasonable foreseeability of a shooting that occurred); Bolton, 823 S.E.2d at 372 (granting the defendant's motion for summary judgment on a premises liability claim where there was no evidence that the defendants "witnessed criminal activity or misconduct," "were informed of such conduct," received security requests, or knew about the volume or content of numerous police reports).

such reasonable grounds for the defendants to appreciate that another criminal attack would occur."); Lau's Corp., Inc. v. Haskins, 405 S.E.2d 474, 476–77 (Ga. 1991) (finding a triable issue regarding the defendant's duty where the defendant's manager knew that the business was in a high crime area and knew about "one previous purse snatching in his parking lot"), abrogated on other grounds by Robinson v. Kroger Co., 493 S.E.2d 403 (Ga. 1997); Woodall v. Rivermont Apartments Ltd. P'ship, 520 S.E.2d 741, 745 (Ga. Ct. App. 1999) ("[W]here a complex has experienced a large volume of crime over a period of time, the extent of such crime may indicate fundamental problems with security at the complex, thus making a risk of violent crime more foreseeable. This is particularly so if the complex is located in an area with a high occurrence of violent crimes."). Accordingly, the Court denies Defendant's motion for summary judgment on Plaintiff's Count II regarding if Defendant owed Plaintiffs a duty when the July 2021 armed robbery occurred.

### b.   *Defendant's breach of the duty of reasonable care*

Defendant next argues that even if it owed Plaintiffs a duty of care, it reasonably exercised that duty as a matter of law. [See Doc. 50-1 at 13]. Specifically, Defendant points to the fact that it installed systematic lighting throughout the Complex, "observed multiple daily police patrols," conducted routine lighting inspections and repairs, and "had [a] periodic security patrol[.]" [See id. at

14].  Defendant also relies on the testimony of its expert, Bruce Jacobs, who avers that it was reasonable for Defendant to cut back on armed security guards just before the July 2021 armed robbery at issue.  [See Docs. 50-1 at 13–14; 71 at 5]; Deposition of Bruce Jacobs ("Jacobs Dep.") at 154:8–156:3 [Doc. 66-29].   In response, Plaintiffs argue that a reasonable jury could conclude that Defendant breached its duty of care because it "cut armed security in favor of non-operational cameras" and failed to repair the "lighting in the very spot the [Plaintiffs] w[ere] attacked[.]"  [See Doc. 65 at 27].

"[I]f criminal acts of third parties are reasonably foreseeable, the owner or occupier is required to undertake definite precautions on behalf of its invitees." Martin, 801 S.E.2d at 32 (quoting Silva v. Spohn Health Sys. Corp., 951 S.W.2d 91, 94 (Tex. App. 1997)).  In this regard, the landowner's duty is to "exercise ordinary care in keeping the premises and approaches safe."  See O.C.G.A. § 51-3-1; see also Atl. C.L.R. Co. v. Godard, 86 S.E.2d 311, 315 (Ga. 1955); Lau's Corp., 405 S.E.2d at 476.  In the context of foreseeable criminal activity at an apartment complex, "the failure to provide a real 'security patrol' for [an] apartment complex and to have a fenced and gated access gives rise to a jury issue as to an entire want of care."  See Seaton, 524 S.E.2d at 530; see also Carlock v. Kmart Corp., 489 S.E.2d 99, 103 (Ga. Ct. App. 1997) (finding that the "intentional and complete absence of security measures" created a jury question regarding reasonableness in light of the

foreseeability of crime in the parking lot at night). "[I]n general, questions of reasonableness are for the jury." See Wilcox v. State, 713 S.E.2d 468, 471 (Ga. Ct. App. 2011).

Upon review, the Court finds that there is a genuine dispute of material fact regarding whether Defendant breached its duty of reasonable care to Plaintiffs in light of the reasonable foreseeability of the violent crime they experienced on July 21, 2021. Record evidence shows that Mr. Holt suggested that Defendant increase security hours and officer presence to better correlate with when crime was occurring. [See, e.g., 66-58 (Mr. Holt suggesting security return to "7 days a week"); 66-59 (Mr. Holt's email to Ms. Wynn and Mr. Harris detailing the crime occurring "over night and early morning" when security was not working); 66-54 (Mr. Holt's email to Mr. Harris suggesting the complex "add at leas[t] 3 to 4 officer[s]")]. Mr. Hickey similarly averred that the situation at the Complex in 2021 "probably" necessitated increased security coverage and that a "proactive" approach was best as the summer months approached, since crime was expected to increase during those months. See Hickey Dep. at 75:15–76:20. However, Defendant consistently rejected the suggestion that it increase security at the Complex. [See, e.g., Docs. 66-41 (Mr. Holt noting to Mr. Harris that Ms. Wynn did "not want [him] on the property" before or after his required patrol times unlike when he first began working at the Complex); 66-72 (email from Mr. Harris to Mr. Holt saying that Ms. Wynn

told him not to allow security to work more than the approved hours following Mr. Holt's report of an armed robbery); 66-71 (Ms. Wynn rejecting Mr. Harris' idea that security surveil the back of a building because that is where "people [are] getting robbed and there are shootings")]; see also Hickey Dep. at 36:19–37:25 (noting that residents were happy during the "short time" his security patrols were on property and requested security officers stay longer and come more often, to which he responded that the residents should talk to management).  Mr. Hickey also informed Defendant of Atlanta Police Department "staffing shortages" which would result in "a delay on any responses" the Department might make to calls for help from the Complex.  [See Doc. 66-89].  And the company "Eye Q Monitoring" recommended that Defendant purchase thirty-two (32) security cameras, in part because of the multiple areas that were "vulnerable to intruder/vandalism."  [See Doc. 66-93]; [see also Doc. 66-17 at 56 (Mr. Hickey's February 16, 2021 daily report noting that "[t]here are affordable cameras that can be placed in the stairways.")].  Indeed, the Complex was easy to access because people "could jump the fence[] or they could walk through the front gate" because it is "not a gated community."  See Hickey Dep. at 138:11–13.

However, despite the persistent violent crime detailed at the Complex; its location in a high crime area; and the warnings of Mr. Holt, Mr. Hickey, and others regarding the need for increased security measures; in May 2021, just over two (2)

months before the armed robbery of Plaintiffs at their apartment, Defendant chose to drastically reduce security services at the Complex. See Hickey Dep. at 92:4–12. Defendant opted for Mr. Hickey's more "budget-friendly" security package called "Security Management Services." [See Doc. 66-95]; Hickey Dep. at 92:11–12. This security package did not include "full-time" coverage of the Complex, did not include any security guards (armed or unarmed), did not include reporting requirements, and did not require that the Complex be patrolled for any specific number of hours. See Hickey Dep. at 24:18–25:18, 89:5–90:12; [Doc. 66-95]. Instead, the package Defendant chose consisted primarily of random "safety checks three times a week" which, according to Mr. Hickey, mainly entailed him passing out late rent notices and driving in and out of the property. See Hickey Dep. at 89:5–24; [Doc. 66-95]. According to Mr. Hickey, this package is "the minimum" and is "very limited." See Hickey Dep. at 89:21–90:18.

The Court finds that a reasonably jury could conclude that Defendant's decision to drastically reduce the security presence at the Complex in May 2021 breached the duty of reasonable care Defendant owed to Plaintiffs. Georgia law recognizes that a "failure to provide a real 'security patrol'" or "active security measures to protect tenants" in the face of crime at an apartment complex creates a

jury question regarding reasonable care.[18]  See Seaton, 524 S.E.2d at 529–30; see also Carlock, 489 S.E.2d at 103 (finding that the "intentional and complete absence of security measures" created a jury question regarding reasonable care in light of the foreseeability of crime).  And although Defendant contracted to have security cameras installed at the Complex, those cameras were not fully operational until November 2021, six (6) months after Defendant reduced its security services and four (4) months after Plaintiffs were robbed at gunpoint.  See Deposition of Hugh Jacobs at 127:8–128:4 [Doc. 67-3].  Indeed, when asked what was done to compensate for this months-long gap in security measures, Ms. Wynn testified, "I don't recall."  Wynn Dep. at 119:11–14.

Accordingly, the Court denies Defendant's motion for summary judgment on Plaintiffs' Count II to the extent it asks the Court to conclude that Defendant exercised reasonable care as a matter of law.

### 3.    Count III: Punitive damages

Finally, in its motion for summary judgment, Defendant argues that Plaintiffs' request for punitive damages fails as a matter of law because "[t]here is no clear and

---

[18] Defendant relies almost exclusively on its expert's opinion to support that its security measures, including reducing security, were reasonable as a matter of law.  [See Doc. 50-1 at 13–15]. However, Defendant cites to no caselaw supporting summary judgment for a landlord in a premises liability claim merely because the landlord arranged for (minimum) "routine" patrols and purportedly conducted lighting inspections.  [See id.]  Instead, at most, this expert testimony gives rise to a jury question.  See Wilcox, 713 S.E.2d at 471; Diaz Dep. at 65:2–68:2 (describing how the light outside of Plaintiffs' apartment stopped working starting June 1, 2021, through the date of the armed robbery on July 21, 2021).

convincing evidence that Defendant showed willful misconduct, wantonness, or that . . . entire want of care which would raise the presumption of conscious indifference to consequences." [See Doc. 50-1 at 18].  Plaintiffs contend that Georgia law allows punitive damages in cases involving discriminatory statements or where landlords reduce security at an apartment complex that is known to be dangerous.  [See Doc. 65 at 31].

> Pursuant to Georgia law,
>
> Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

O.C.G.A. § 51-12-5.1(b).  In order to impose punitive damages, a litigant's actions must rise above "even gross negligence," see Coker v. Culter, 431 S.E.2d 443, 444 Ga. Ct. App. 1993), and involve conduct that "is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."  See Williams v. First Advantage LNS Screening Sols. Inc., 947 F.3d 735, 751 (11th Cir. 2020) (quoting State Farm Mutual Auto Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003)).  Courts have found both "blatant racial statements," see Tolliver v. Amici, 800 F.2d 149, 151 (7th Cir. 1986), and "the failure to provide a real 'security patrol' for" an apartment complex known to have crime issues "give rise to a jury issue as to an

entire want of care, which gives rise to a presumption of conscious indifference to the consequences for tenants." See Seaton, 524 S.E.2d at 530.

Upon review, the Court finds a genuine dispute of material fact exists regarding whether Plaintiffs are entitled to punitive damages. As discussed, Ms. Wynn made blatant racial remarks towards the Minor Plaintiffs in excluding them from the Complex playground and in other circumstances. See, e.g., V.M.F. Dep. at 31:12–15; Holt Dep. at 96:7–11, 98:4–99:12, 175:8–22. "These statements were by their very nature willfully made, and it is difficult to imagine that they could have been motivated by anything other than ill will or malice." See Tolliver, 800 F.2d at 151 (upholding the district court's imposition of punitive damages against a defendant who had made blatantly discriminatory racial remarks to the plaintiff); see also O'neal by Boyd v. Ala. Dep't of Pub. Health, 826 F. Supp. 1368, 1374 (M.D. Ala. 1993) (discussing punitive damages in the context of "cases in which the defendants treated the plaintiffs callously and were obviously motivated by prejudiced and ill-founded fears" (citing Tolliver, 800 F.2d at 151)). Additionally, the record evidence supports that Defendant drastically reduced security measures at the Complex in May 2021, just two (2) months before the armed robbery of Plaintiffs at their apartment, despite the dangerous location, the pervasive history of violent crime, and repeated warnings that more, not less, security was needed. See supra, part IV.B.2. A reasonable jury could interpret such actions to demonstrate

"conscious indifference to the consequences for tenants[.]"  See Seaton, 524 S.E.2d at 530 (upholding the trial court's denial of the defendant's motion for partial summary judgment as to punitive damages due to the defendant's failure to provide adequate security for an apartment complex known to have violent crime); Carlock, 489 S.E.2d at 103 (reversing the trial court's grant of summary judgment in favor of the defendant regarding punitive damages because a reasonable jury could find that the defendant eliminating security when crime was foreseeable showed "conscious indifference").

Although Defendant argues that it "had no indicia of a serious crime issue within" the Complex and that "Plaintiffs rely on soliloquys and exaggerations" to support their claims, the record evidence detailed throughout this order could lead a reasonable jury to conclude otherwise.[19]  [See Doc. 50-1 at 18, 19]; supra, part IV.B.2.  Therefore, the Court denies Defendant's motion for summary judgment regarding Plaintiffs' Count III.

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS** Plaintiffs' "Motion to Strike Defendant TPI's Untimely Expert Under Local Rule 26.2(C)" [Doc. 46],  **DENIES**

---

[19] Defendant continues to present arguments regarding the admissibility of Ms. Whitmore's testimony in its discussion of punitive damages, arguing that Plaintiffs "cannot prove any damages related to" their claims.  [See Doc. 50-1 at 15–17].  However, the Court denied Defendant's motion to strike Ms. Whitmore's expert testimony and finds Defendant's argument regarding punitive damages more appropriate for a jury's consideration.  See supra, part III.

Defendant's "Motion for Summary Judgment" [Doc. 50], **DENIES** Defendant's "Motion to Exclude Testimony of Plaintiffs' Proposed Expert, Anique Whitmore, LPC" [Doc. 77], and **DENIES** Defendant's "Motion for Extension of Time for Defendant to Disclose Rebuttal Expert Witness, Dr. Julie Medlin." [Doc. 89]. Finally, the Court **ORDERS** the Parties to, within thirty (30) days of this order, jointly file a proposed consolidated pretrial order. See LR 16.4(A), NDGa.

    **SO ORDERED**, this 26th day of April, 2023.


                                        Eleanor L. Ross
                                        United States District Judge
                                        Northern District of Georgia